**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOSEPH A. DAOU and KAREN M. DAOU,      :

                   Plaintiffs,      :      Case No. 1:20-cv-04438-DLC

                             :

       vs.      :

                             :

BLC BANK, S.A.L., CREDIT LIBANAIS,
S.A.L., AL-MAWARID BANK, S.A.L., and      :
BANQUE DU LIBAN,

                             :

               Defendants.      x

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR AN ORDER OF ATTACHMENT**

---

**MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500

*Attorneys for Plaintiffs*
*Joseph A. Daou and Karen M. Daou*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................... ii

PRELIMINARY STATEMENT.................................................................. 1

STATEMENT OF FACTS ......................................................................... 3

ARGUMENT ............................................................................................ 8

    I.     Plaintiffs are Entitled to an Attachment of the Banks' United States Assets............... 8

        A. Plaintiffs Have a Cause of Action ................................................ 9

        B. It is Probable Plaintiffs Will Succeed on the Merits ........................................ 9

            1.  Plaintiffs are entitled to their $18,676,844.00 USD, plus interest .......................... 9

            2.  The Banks are Subject to Personal Jurisdiction in New York ............................. 10

        C. Multiple Grounds for an Order of Attachment Exist under CPLR 6201 ................... 12

            1.  Defendants are nondomiciliaries and are not qualified to do business in New York ................................................................................ 12

            2.  The Banks Will Frustrate the Enforcement of a Judgment in Plaintiffs' Favor.... 17

        D. The Amount Demanded from Defendants Exceeds their Counterclaims .................. 18

    II.    The Banks Have Title to the Funds Held by the Correspondent Banks..................... 19

    III.   Plaintiffs Have a Probability of Success on their Civil Conspiracy Claim Such that the Attachment Should be Joint and Several ................................................. 21

    IV.   The Banks Already Misappropriated $18,676,884.00 from Plaintiffs and Therefore the Court Only Require a Nominal Undertaking of $500.00 ........................................... 22

    V.    The Court Should Authorize Plaintiffs to Conduct Expedited Discovery to Locate Additional United States Assets of the Banks for Attachment .................................. 23

CONCLUSION ......................................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Adler v. Solar Power, Inc.*,
   2019 WL 2210661 (S.D.N.Y. 2019) ............................................................... 13, 14, 22

*Arzu v. Arzu*,
   190 A.D.2d 87 (1st Dep't 1993) .................................................................................. 18

*Averbach v. Cairo Anman Bank*,
   2020 WL 486860 (S.D.N.Y. 2020) .............................................................................. 10

*Ayyash v. Bank Al-Madina*,
   233 F.R.D. 325 (S.D.N.Y. 2005) .................................................................... 13, 23, 24

*Banco Ambrosiano v. Artoc Bank & Trust*,
   62 N.Y.2d 65 (1984) ............................................................................................. 20, 21

*Bank Leami Trust Co. of N.Y. v. Istim, Inc.*,
   892 F. Supp. 478 (S.D.N.Y. 1995) ............................................................................. 18

*BSH Hausgerate, GMBH v. Kamhi*,
   282 F. Supp.3d 668 (S.D.N.Y. 2017) ........................................................ 8, 9, 13, 18

*Elton Leather Corp. v. First Gen. Resources Co.*,
   138 A.D.2d 132, 529 N.Y.S.2d 769 (1st Dep't 1988) ................................................ 16

*Etalon Imob S.R.L. v. Schoenbach*,
   2012 WL 4741595 (S.D.N.Y. Oct. 3, 2012) ............................................................... 14

*Fratelli Italiani, LLC v. Mironova*,
   2019 WL 3759160 (S.D.N.Y. April 11, 2019) ........................................................... 13

*Georgia-Pacific Corp. v. Multimark's Intern. Ltd.*,
   265 A.D.2d 109 (1st Dep't 2000) ............................................................................... 20

*Golden Horn Shipping Co. Ltd. v. Volans Shipping Co. Ltd.*,
   2014 WL 5778535 (S.D.N.Y. Nov. 6, 2014) ............................................................. 19

*Herzi v. Ateliers De La Haute-Garonne*,
   2015 WL 8479676 (S.D.N.Y. Oct. 13, 2015) ............................................................. 15

*Hotel 71 Mezz Lender LLC v. Falor*,
   14 N.Y.3d 303 (NY 2010) .......................................................................................... 15

*In re Amaranth Natural Gas Commodities Litigation*,
    711 F. Supp.2d 301 (S.D.N.Y. 2020) ..................................................................*passim*

*ITC Entert., Ltd. v. Nelson Film Partners*,
    714 F.2d 217 (2d Cir. 1983) ............................................................... 12, 15

*JP Morgan Chase Bank, N.A. v. Reijtenbagh*,
    615 F. Supp. 2d 278 (S.D.N.Y. 2009) ...................................................... 23

*Kashi v. Gratsos*,
    790 F.2d 1050 (2d Cir. 1986) ............................................................... 21

*Licci v. Lebanese Can. Bank, SAL*,
    20 N.Y.3d 327 (2012)......................................................................... 10, 11

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2013) ........................................................................... 11, 12

*Mischon De Reya New York LLP v. Grail Semiconductor, Inc.*,
    2011 WL 6957595 (S.D.N.Y. 2011) ........................................................ 15

*New York v. Mountain Tobacco Co.*,
    953 F. Supp. 2d 385 (E.D.N.Y. 2013)...................................................... 23

*Nike, Inc. v. Wu, et al.*,
    349 F. Supp. 3d 310 (S.D.N.Y. 2018) ..................................................... 12

*Notaro v. Koch*,
    95 F.R.D. 403 (S.D.N.Y. 1982)............................................................... 23

*Olshan Grundman Frome Rosenzweig & Wolosky LLP v. Jeglitza*,
    2000 WL 420557 (S.D.N.Y. 2000) ........................................................ 13, 18

*OSRecovery, Inc. v. One Groupe International*, Inc.,
    305 F. Supp.2d 340 (S.D.N.Y. 2004) ..................................................... 13, 22

*R.B. Development Co., Ltd. V. Tutis Capital LLC*,
    2018 WL 7076023 (S.D.N.Y. 2018) ....................................................... 21

*Reed Smith LLP v. Leed HR LLC*,
    156 A.D.3d 420 (1st Dep't 2017)........................................................... 12

*Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016)........................................................................... 10

*Samirah & Enung v. Sabhnani*,
    2010 WL 2629770 (E.D.N.Y. 2010) ....................................................... 14

*Societe Generale Alsacienne de Banque, Zurich v. Flemington Dev. Corp.*,
  118 A.D.2d 759 (2d Dep't 1986)................................................................................17

*Strike 3 Holdings, LLC v. Doe*,
  2020 WL 264584 (S.D.N.Y. Jan. 17, 2020) ...............................................................23

*Taman v. Fransabank SAL*,
  677 F.Supp.2d 720 (S.D.N.Y. 2010) ..........................................................................12

*Toisa Ltd. v. PT Transamudra Usaha Sejahtera*,
  2013 WL 12125701 (S.D.N.Y. Sept 9, 2013) ............................................................19

**Statutes**

18 U.S.C. § 1961 ....................................................................................................................1

Florida Statutes § 68.065.........................................................................................................1

Florida Statutes § 673.4121.....................................................................................................9

**Rules**

CPLR 302 ......................................................................................................................10, 11

CPLR 6201 ..................................................................................................................*passim*

CPLR 6212 ...............................................................................................................8, 9, 22

CPLR 7502 ......................................................................................................................15

FRCP 64 ......................................................................................................................1, 8

Plaintiffs Joseph A. Daou and Karen M. Daou (together, "Plaintiffs") respectfully submit this memorandum of law in support of their motion: (1) pursuant to Article 62 of New York's Civil Practice Law and Rules ("CPLR") and Rule 64 of the Federal Rules of Civil Procedure (the "Rules") for an order of attachment against Defendants BLC Bank S.A.L. ("BLC Bank"), Credit Libanais, S.A.L. ("CL Bank"), and AL-Mawarid Bank, S.A.L. ("AM Bank" and together with BLC Bank and CL Bank, the "Banks"); and (2) pursuant to Rule 26(d) authorizing Plaintiffs to take expedited discovery regarding the Banks' United States assets.

## PRELIMINARY STATEMENT

In this action Plaintiffs are prosecuting twelve causes of action to recover vast damages caused by the Commercial Banks and Banque Du Liban's ("BDL", and together with the Banks, "Defendants") conspiracy to steal $18,676,844.00, plus interest, from Plaintiffs who deposited their hard-earned United States Dollars ("USD") in the Banks.  In 2019, Defendants colluded with other Lebanese banks by refusing to transfer USD outside of Lebanon, except for the politically connected, bank executives, and their relatives.  When pressed by Plaintiffs for their USD, the Banks issued Plaintiffs worthless checks drawn against BDL, which the Banks knew Plaintiffs would deposit in the United States.  As Defendants planned, BDL dishonored the checks when the United States banks where Plaintiffs deposited the checks attempted collection.  Defendants' scheme caused Plaintiffs massive damages, and has exposed Defendants to massive liability, including under Florida's worthless check statute, Florida Statutes § 68.065, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.

The current motion, however, raises a much narrower issue.  Plaintiffs seek an attachment of the Banks' United States assets in the amount of $18,676,844.00 USD, plus interest, which is

the amount Plaintiffs had on deposit with the Banks.  There can be no genuine debate that this money is immediately due to Plaintiffs.

Plaintiffs' money is at grave risk because the Lebanese banks in general, and Defendants in particular, have operated a Ponzi scheme by promising depositors like Plaintiffs outsized interest to lure USD deposits in Lebanon.  Moreover, Defendants have colluded with the rest of the Lebanese banking system to block any USD from leaving Lebanon, except of course for the politically connected and friends and family of the banks who were permitted to offshore their USD to safety.  If a depositor wins a claim against the banks in Lebanon, he or she gets a check from BDL that BDL will not honor unless it is simply moved from one underwater Lebanese bank to another.  That of course is no relief at all to a United States citizen whose USD have been misappropriated by Lebanese banks.

The fact that Lebanon's central bank would conspire with three of Lebanon's largest commercial banks to commit wire fraud and mail fraud in the United States in order to defraud United States Citizens who deposited their hard earned USD in Lebanon in order for the Lebanese banking system to hoard USD, demonstrates not only the depth of the banking crisis in Lebanon, but the utter collapse of the rule of law in Lebanon.  Thus, Plaintiffs require an attachment of the Banks' assets in the United States, including USD held by the Banks at their correspondent banks.

Plaintiffs readily satisfy the requirements for an attachment under New York law. Plaintiffs have a probability of success on their claims to recover their $18,676,844.00, plus interest.  The Banks are nondomiciliaries of New York, and are not registered to conduct business in New York.  Moreover, there is a genuine threat that when Plaintiffs obtain a judgment they will be unable to collect from the Banks unless they can execute against the Banks' United States assets. Thus, for the reasons set forth below, Plaintiffs meet the requirements for an attachment under

Article 62 of the CPLR, and the Court should grant Plaintiffs a prejudgment attachment against the Banks' assets located within the United States.

## STATEMENT OF FACTS

Plaintiffs are married United States citizens who deposited their USD in three Lebanese banks, only to be preyed upon by the Ponzi scheme that is the Lebanese banking system.  *See* Declaration of Joseph A. Daou, dated July 30, 2020 ("Daou Declr."), ¶¶ 4, 9-12; *see also* Ex. 7 to Declaration of Christopher J. Major, dated July 30, 2020 ("Major Declr.").

BDL is the central bank of Lebanon and the architect of the Ponzi scheme.  Ex. 3 to Major Declr., at p. 2.  In the 1990s, as Lebanon emerged from its devastating fifteen-year civil war, a dual currency system formed with the USD and Lebanese Lira (the "Lira") both being used widely. *Id*., at p. 3.  The two currencies were not pegged, however, causing massive swings in the exchange rate and chaos in the Lebanese economy.  *Id*.  In an attempt to solve the problem, the then and current BDL Governor, Riad Salameh, engineered the pegging of the exchange rate at 1507.51515 Lira to $1 USD.  *Id*.  To support the artificial pegging of the exchange rate, BDL and the Lebanese government sought to encourage foreign currency investment, particularly USD, which ultimately became the dominant deposit currency in Lebanon.  *Id*.

Lebanese banks lured USD deposits by fraudulently representing to depositors that they would earn exceedingly high interest rates while still having ready access to their USD.  *Id*.   The Lebanese banks did so despite knowing the interest rates they represented they would pay depositors were unsustainable, and would require the banks to continue to induce new depositors to keep the scheme propped up.  *Id*. at pp. 3-4.

By 2016, Lebanese banks began recognizing depleting USD deposits, which strained the Ponzi scheme as the banks' interest obligations increased.  *Id*. at p. 3.  Thus, Lebanese banks began

offering even higher interest rates to attract USD depositors both within Lebanon and abroad to feed the failing scheme. *Id*. at pp. 3-4. The payment of inflated interest rates was unsustainable, and when the flood of new USD deposits waned, the Lebanese banking system collapsed. *Id*.

When the Lebanese banks could not induce sufficient new deposits to pay their obligations, the banks hoarded the USD deposits of many of their depositors by lying to induce customers to retain their deposits. *Id*. at p. 4. Ultimately, the banks refused lawful withdrawal requests from their depositors. *Id*. At the same time, the Lebanese banks discriminatorily permitted politically connected depositors, bank executives, bank shareholders, and their relatives to offshore their USD, which of course only exacerbated the self-inflicted liquidity crisis. Exs. 10 and 11 to Major Declr. This self-destructive corruption exacerbated the liquidity crisis in the Lebanese banking system, and is the subject of ongoing investigations and political unrest within Lebanon. *Id.*

Lebanon's banking crisis has driven the Lebanese banking system to place its own USD hoarding above the rule of law. The Ponzi scheme collapsed, and BDL and the Lebanese banks resorted to outright theft of their depositors' USD. Exs. 8, 12, 20 to Major Declr. No capital controls have been instituted by the Lebanese government. Yet, by mid-2019, the Lebanese banks were actively colluding with BDL to institute unlawful and discriminatory restrictions on withdrawals of USD and transfers of USD outside Lebanon. Exs. 5, 8, 19 to Major Declr.

The Banks are large commercial and retail banks in Lebanon which were among the chief perpetrators of the Ponzi scheme BDL designed. The Banks targeted and solicited Plaintiffs to make USD deposits. Daou Declr., ¶¶ 13-14, 66-68, 137-140. The Banks promised Plaintiffs high interest rates to induce Plaintiffs to make the deposits. *Id*., ¶¶ 15, 68, 91, 140.

As Plaintiffs advised all the Banks, Plaintiffs needed the ability to readily transfer their USD from Lebanon to their accounts in the United States so they could conduct business and

execute on investments.  Daou Declr., ¶¶ 17-19, 69-72, 140-142.  In 2019, Plaintiffs specifically advised the banks that they needed to transfer their USD to satisfy Plaintiffs' funding obligations for three highly valuable real estate acquisitions in the United States.  *Id*., ¶¶ 46, 96, 102, 146.  Therefore, Plaintiffs agreed with the Banks that Plaintiffs' accounts would have short-term maturity dates of one month, and the banks would pay Plaintiffs interest averaging approximately ten percent.  *Id*., ¶¶ 91, 139-140.  Such interest rates are enormous relative to the United States, but Lebanese banks, including BLC Bank, CL Bank, and AM Bank, were offering interest rates in the high teens to depositors willing to make longer-term deposits for several months or years.  *Id*., ¶¶ 69, 88.  However, because Plaintiffs required ready access to their USD, Plaintiffs insisted on having short-term maturity dates of one month.  *Id*., ¶ 69.

By the end of 2019, Plaintiffs had more than $18,500,000.00 USD on deposit across their bank accounts in Lebanon.  Daou Declr., ¶ 4.  To amass USD deposits and to effectuate USD transactions, including for Plaintiffs, BLC Bank, CL Bank, and AM Bank all maintain correspondent bank accounts in New York at large United States banks.  *Id*., ¶¶ 21, 75, 144; Exs. 25-27 to Major Declr.

When Plaintiffs delivered instructions to the Banks to initiate wire transfers of Plaintiffs' USD to Plaintiffs' accounts in the United States, the banks at first ostensibly agreed to make the transfers.  Daou Declr., ¶¶ 35, 39-40, 95, 147.  The Banks stalled, while repeatedly assured Plaintiffs the wire transfers had been approved and would be forthcoming.  *Id*., ¶¶ 38-39, 42, 100, 104, 110, 147, 152.  However, the Banks all refused to execute wire transfers in accordance with Plaintiffs' lawful and binding instructions.  *Id*., ¶¶ 44, 48-49, 96, 110-111, 160, 163.

The Banks of course had no grounds for refusing Plaintiffs' instructions to transfer USD outside Lebanon.  However, like many perpetrators of a Ponzi scheme, Defendants' desperation

to keep afloat drove them to blatantly unlawful activity against Plaintiffs.  The Banks are all large creditors of BDL, having deposited billions of USD with BDL.  *See* Ex. 3 to Major Declr., at p. 4.  As part of BDL's repayment of its debts owed to BLC Bank, CL Bank and AM Bank, BDL allows the banks to issue cashier's checks drawn by BDL against BDL to satisfy obligations the banks owed to third parties.  *See* Daou Declr., ¶ 56 and Ex. 5 thereto.

The Banks all represented to Plaintiffs that they had the authority to issue checks drawn on BDL in order to return Plaintiffs' USD in the United States.  Daou Declr., ¶¶ 56-57, 117-120, 165, 171.  To induce Plaintiffs to accept the checks, the Banks assured Plaintiff the checks were valid and could be deposited in the United States.  *Id*., ¶¶ 55, 57, 115, 117-118, 169, 171.

Ultimately, after weeks and months of Plaintiffs repeatedly and desperately pleading for the Banks to follow Plaintiffs' binding instructions to execute wire transfers of Plaintiffs' USD on deposit in Lebanon to Plaintiffs' accounts in the United States, Plaintiffs relented and agreed under duress to accept checks drawn by and against BDL for deposit in the United States.  Daou Declr., ¶¶ 54-55, 117-118, 169-171.  BLC Bank and CL Bank issued checks to Joseph Daou while he was in Lebanon knowing Joseph Daou would ship them to the United States via DHL Courier for deposit in United States banks.  *Id*., ¶¶ 56-57, 119.  CL Bank issued a second check and AM Bank issued a check to Plaintiffs' representative knowing Plaintiffs' representative would ship the check to the United States via DHL Courier for Plaintiffs to deposit in their United States bank account.  *Id*., ¶¶ 129, 171.  The checks the Banks issued to Plaintiffs for deposit in the United States collectively totaled $18,676,844.00 USD.  *Id*., ¶¶ 56 118, 129, 171 and Exs. 5, 14, 17, 21 thereto.

The checks were worthless.  When Plaintiffs deposited the checks in the United States as the Banks represented Plaintiffs could and knew Plaintiffs would, the United States banks attempted collection but BDL refused to honor the checks.  Daou Declr., ¶¶ 58-60, 122-124, 130-

133 172-173 and Exs. 7, 14, 15, 17, 21 thereto.  The United States banks reported back to Plaintiffs that BDL refused to honor them because they can only be presented at a local bank in Lebanon. *Id.*, ¶¶ 59, 124 and Exs. 6, 14 thereto.  Nevertheless, upon issuance of the worthless checks, the Banks fraudulently reduced Plaintiffs' account balances in Lebanon in the amount of the worthless checks.  *Id.*, ¶¶  65, 134, 173, and Exs. 9, 18 thereto.  AM Bank later credited Plaintiffs' account in the amount of the worthless check it issued, *id.*, ¶ 173, but the gesture is illusory because AM Bank will not allow Plaintiffs to have their USD.

Defendants pervasively used the wires and mails to carry out their fraudulent scheme to steal from Plaintiffs who are United States citizens.  *See* Daou Declr., ¶¶ 21, 23, 25, 27, 29, 39-40, 42, 57, 76, 78-79, 82, 84, 91-95, 119, 144, 150, 156, 160.  Plaintiffs suffered substantial injury in the United States as a result of Defendants' unlawful activity and corrupt conspiracy, including the loss of Plaintiffs' USD on deposit with the Banks, the loss of tens of millions of dollars in the United States from the real estate acquisitions Plaintiffs lost due to Defendants' unlawful conduct of which the Banks were keenly aware, and reputational damage to Plaintiffs caused by Defendants passing Plaintiffs worthless checks for deposit in United States banks.  *See* ECF 1, at p. 37.

Defendants are liable to Plaintiffs under the RICO statute due to their commission of wire fraud and mail fraud to further their conspiracy to misappropriate Plaintiffs' USD and perpetuate their Ponzi scheme.  *See* ECF 1, at pp. 70-73.   Defendants are also liable to Plaintiffs under state law for knowingly and intentionally drawing and issuing worthless checks to Plaintiffs, all in furtherance of their conspiracy to defraud Plaintiffs, misappropriate Plaintiffs' USD, and perpetuate Defendants' Ponzi scheme.  *Id.*, at p. 64-65.  Therefore, Plaintiffs, as United States citizens suffering injury in the United States from unlawful conduct Defendants directed into the United States, come to this Court seeking compensation for their injuries caused by Defendants'

flagrantly unlawful conduct, and exemplary damages to punish Defendants for their illicit conspiracy to misappropriate USD from Plaintiffs. *See* ECF 1, pp. 51-75. While the total compensatory and exemplary damages Plaintiffs seek in this action exceed $150,000,000.00 USD, *id*., at p. 75, Plaintiffs seek an attachment equal to just the total amount of the worthless checks, $18,676,844.00 USD, plus interest. Daou Declr., ¶ 185.

## ARGUMENT

Plaintiffs readily satisfy the requirements for a prejudgment attachment of the Banks' assets to eventually satisfy a portion of Plaintiffs' damages in this action.

## I.    <u>Plaintiffs are Entitled to an Attachment of the Banks' United States Assets</u>

Rule 64 authorizes a federal court to attach "property to secure satisfaction of the potential judgment" in accordance with "the of the state where the court is located." Fed. R. Civ. P. 64. Under New York law, "[a]n order of attachment may be granted in any action, except a matrimonial action, where the plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more defendants …" CPLR 6201.

Pursuant to CPLR 6212, on a motion for an attachment, the plaintiff must show: "(1) that there is a cause of action; (2) that it is probable that the plaintiff will succeed on the merits; (3) that one or more grounds for attachment provided in Section 6201 exist; and (4) that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." CPLR 6212. In deciding a motion for an attachment, "a district court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the facts pleaded." *BSH Hausgerate, GMBH v. Kamhi*, 282 F. Supp.3d 668, 672 (S.D.N.Y. 2017).

The issuance of an attachment rests in the discretion of the trial court. *In re Amaranth Natural Gas Commodities Litigation*, 711 F. Supp.2d 301, 305. (S.D.N.Y. 2020). "However,

where a statutory ground for attachment exists and both need and likelihood of success are established, a district court's discretion does not permit denial of the remedy for some other reason, at least absent extraordinary circumstances and perhaps not even then. *Id*. (where defendant-investment fund maintained it ceased making distributions a year earlier and contended that the freezing of $75 million would harm innocent investors, the court held that "[t]hese circumstances are not so extraordinary that they justify exercising discretion to deny plaintiffs' motion where plaintiffs have shown that they are statutorily entitled to an attachment and there is a demonstrated need for it"). As set forth below, Plaintiffs satisfy each element for an attachment.

### A.      Plaintiffs Have a Cause of Action

The existence of a claim for relief satisfies CPLR 6212(1). *See BSH Hausgerate*, 282 F. Supp.3d at 672. As the motion only seeks an attachment equal to the USD Plaintiffs had on deposit, the relevant causes of action are: Plaintiff's third cause action for collection on payment instruments (i.e., the worthless checks) under Florida Statutes § 673.4121; the fifth, sixth, and seventh causes of action alleging breach of contract against BLC Bank, CL Bank, and AM Bank, respectively; the eight cause of action alleging conversion; and the ninth cause of action for unjust enrichment. *See* ECF 1, at pp. 63-69. Thus, Plaintiffs satisfy CPLR 6212(1).

### B.      It is Probable Plaintiffs Will Succeed on the Merits

The Banks have no defense to Plaintiffs' claims seeking return of their $18,676,844.00.

### 1.      Plaintiffs are entitled to their $18,676,844.00 USD, plus interest

"Probability of success on the merits for purposes of an order of attachment requires that the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that required to make a prima facie case." *In re Amaranth Natural*

*Gas Commodities Litigation*, 711 F. Supp.2d at 306.  "However, all legitimate inferences should be drawn in favor of the party seeking attachment."  *Id.*

It is more likely than not that Plaintiffs will prevail on their claims to the extent of the $18,676,844.00 USD, plus interest.  That is the amount Plaintiffs undeniably had on deposit with the Banks, and the amount of worthless checks that the Banks issued to Plaintiffs.  There is no legal basis for the Banks to misappropriate Plaintiffs' USD or restrict where Plaintiffs can transfer their USD.  Leaving aside, for now, Plaintiffs' claims for statutory damages, other compensatory damages, and attorneys' fees, there is no defense at all to Plaintiffs' claim for return of their USD. Accordingly, Plaintiffs' easily establish probability of success on their claims to the extent of $18,676,844.00 USD, plus interest.

### 2.    The Banks are Subject to Personal Jurisdiction in New York

"[A] court may exercise personal jurisdiction over any non-domiciliary …, who in person or through an agent: Transacts any business within the state …."  CPLR 302(a)(1). Under New York law, "a foreign bank's repeated use of a correspondent account in New York on behalf of a client – in effect a 'course of dealing' – show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 339 (2012); *see also Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 327 (2016) (the "[r]epeated, deliberate use" of New York based correspondent banks "by [a] foreign bank on behalf and for the benefit of a customer … demonstrates volitional activity constituting transaction of business" in New York); *Averbach v. Cairo Anman Bank*, 2020 WL 486860, *6 (S.D.N.Y. 2020) (the "crediting funds in a correspondent account is volitional use of the account, and repeated crediting of funds is a course of conduct sufficient to demonstrate purposeful use").

10

The "arise from" prong does not require proof of causation between a defendant's New York activities and a plaintiff's harm. *Licci*, 20 N.Y.3d at 340. It merely requires a showing of an "articulable nexus" or a "substantial relationship between the business transaction and the claim asserted." *Id*. In *Licci*, the Court of Appeals determined that the allegations that "LCB engaged in terrorist financing by using its correspondent account in New York to move the necessary dollars," which funds were then used to engage in terrorist activities that resulted in harm to the plaintiffs was sufficient to find the necessary "substantial relationship" for purposes of personal jurisdiction. *Id*. Indeed, the "repeated use of the correspondent account shows not only transaction of business, but [also] an articulable nexus or substantial relationship between the transaction" and a plaintiff's causes of actions, including for breach of duties owed to a plaintiff. *Id*.

The Banks all utilized correspondent bank accounts in New York to accept the USD they misappropriated from Plaintiffs. *See* Daou Declr., ¶¶ 21, 23, 25, 27, 29, 75, 78, 80, 82, 84, 144, 145. Moreover, the Banks represented that their correspondent bank accounts in New York would facilitate their ability to comply with Plaintiffs' requirement that Plaintiffs be able to readily transfer their USD outside Lebanon and to the United States. *Id*., ¶¶ 16, 71.

As the court in *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2013) found, "[i]t would be unusual, indeed, if a defendant transacted business in New York and the claim asserted arose from that business activity within the meaning of section 302(a)(1), and yet, in connection with the same transaction of business, the defendant cannot be found to have 'purposefully availed itself of the privilege of doing business in the forum and [to have been able to] foresee being haled into court there." *Id.*, at 170.

The Banks could have set up correspondent banking relationships with any of the myriad of other countries around the world that maintain U.S. Dollar correspondent relationships, such as

the United Kingdom, Egypt, France, Jordan or the Philippines. *Taman v. Fransabank SAL*, 677 F.Supp.2d 720, 729 (S.D.N.Y. 2010).  Yet, the Banks deliberately chose to set up its accounts with the New York correspondent banks, represented it would use them to perform for Plaintiffs, and thus purposefully availed itself of the benefits of New York.  The Bank's use of the correspondent banks to transact with Plaintiffs amply supports the constitutional exercise of personal jurisdiction over the Banks particularly where, as here, the Banks specifically used their New York correspondent banks to establish credibility with Plaintiffs and to induce Plaintiffs' deposits.  *See Licci*, 732 F.3d at 171; *see also Nike, Inc. v. Wu, et al.* 349 F. Supp. 3d 310, 329 (S.D.N.Y. 2018) (Chinese banks purposefully availed themselves of privileges and benefits of New York by using correspondent accounts to facilitate transactions consistent with due process").

### C.    Multiple Grounds for an Order of Attachment Exist under CPLR 6201

Plaintiffs satisfy two independent grounds for an attachment under CPLR 6201, and the Court should grant the attachment to secure Plaintiffs' probable judgment.

### 1.    Defendants are nondomiciliaries and are not qualified to do business in New York

CPLR § 6201(1) authorizes an attachment when "the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state." CPLR § 6201(1)); *see also Reed Smith LLP v. Leed HR LLC*, 156 A.D.3d 420, 421 (1st Dep't 2017) ("Two grounds under CPLR 6201 are met here.  First, LEED is a Kentucky limited liability company not qualified to do business in New York").  The statute is "designed to serve two independent purposes:  obtaining jurisdiction over and securing judgments against nondomiciliaries residing without the state." *ITC Entert., Ltd. v. Nelson Film Partners*, 714 F.2d 217, 220 (2d Cir. 1983).

Here, the Banks are all domiciled in Lebanon.  *See* Daou Declr., ¶ 5.  Moreover, none of Defendants are domiciled in New York.  *See* ECF 1, at p. 10.  Therefore, Plaintiffs are entitled to an attachment under CPLR § 6201(1).  *See Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (In a RICO action against Lebanese banks, the court granted an attachment in the amount of $1 billion because the banks were "all non-New York domiciliaries resident abroad" and the claim had merit notwithstanding the court's reservation about the difficulty in prevailing on RICO claims generally); *see also BSH Hausgerate, GMBH*, 282 F. Supp.3d at 675 (holding that movant established entitled under N.Y. CPLR § 6201(1) by demonstrating respondent was a Turkish national domiciled outside New York); *Olshan Grundman Frome Rosenzweig & Wolosky LLP v. Jeglitza*, 00-cv-1140, 2000 WL 420557, *3 (S.D.N.Y. 2000) ("this requirement [under N.Y. CPLR § 6201] is plainly met because the respondents, who reside in Germany, are non-domiciliaries residing outside New York").

Where, as here, the statutory requirements are met, some courts have held that before granting the attachment, as a matter of discretion, the court should examine whether "the order of attachment is needed to provide security or jurisdiction.[1]  *See Adler v. Solar Power, Inc*., No. 16-cv-1635, 2019 WL 2210661, *3 (S.D.N.Y. 2019).

---

[1] Plaintiffs maintain that the proper construction of CPLR 6201(1) requires only a showing that the defendant is not located in New York.  *See OSRecovery, Inc. v. One Groupe International*, Inc., 305 F. Supp.2d 340, 348 (S.D.N.Y. 2004) (granting $250 million attachment because "[t]he record before the Court establishes that all of the corporate One Group Defendants are foreign corporations not qualified to do business in New York, that Reed and Johnson are non-domiciliaries, and that plaintiffs are likely to prevail against them").  That is all the plain language of the statute requires.  Moreover, as courts have recognized, their discretion should not be used to deny a motion for attachment where the statutory requirements are met.  *In re Amaranth Natural Gas Commodities Litigation*, 711 F. Supp.2d at 305.  Rather, the court's discretion is implicated in the "weighing of evidence and also in balancing competing considerations."  *Fratelli Italiani, LLC v. Mironova*, 2019 WL 3759160 at *7 (S.D.N.Y. April 11, 2019).

Courts have found attachments necessary to provide security in a variety of circumstances. In *Adler*, the defendant was domiciled in China, and its only United States assets were solar projects in Hawaii. *Adler*, 2019 WL 2210661, *1. The court found that the defendant regularly transferred proceeds from United States sales to China, and there was no evidence the defendant was developing new assets in the United States. *Id.*, *4. The court therefore concluded "that it is necessary to attach SPI's direct and indirect membership and other ownership interests in the Hawaii Assets to ensure that judgment can be satisfied." *Id.*

The court in *In re Amaranth*, 711 F. Supp.2d at 312, held that the nondomiciliary defendant's depleted financial condition and proposed distribution posed a significant risk that plaintiffs would be unable to enforce a future judgment such that an attachment under CPLR 6201(1) was appropriate. *Id.*

In *Samirah & Enung v. Sabhnani*, No 08-cv-2970, 2010 WL 2629770 (E.D.N.Y. 2010), the court found an attachment necessary for security because "the Defendants maintain strong family and business ties overseas" such that "the Defendants have both the incentive and the opportunity to remove assets from this state in order to frustrate a judgment." *Id.*, *3.

In *Etalon Imob S.R.L. v. Schoenbach*, No. 12-cv-6868, 2012 WL 4741595 (S.D.N.Y. Oct. 3, 2012), the plaintiffs advanced hundreds of thousands of dollars into an escrow account as part of a commercial real estate financing transaction. The plaintiffs never received any financing from the nondomiciliary defendants and, after defendants failed to return the funds, plaintiffs sought an order of attachment. *Id.* at *2. Based upon those facts, as well as the defendants' failure "to provide any explanation as to why … the escrow account no longer contains the funds transferred by Plaintiffs," the Court was "satisfied that Defendants' conduct regarding these funds demonstrates

a significant risk as to the enforceability of a future judgment" and concluded that an attachment under CPLR § 6201(1) was justified.

The court in *Mischon De Reya New York LLP v. Grail Semiconductor, Inc.*, 2011 WL 6957595 (S.D.N.Y. 2011), applied the same principle and held that a patent "physically located in California" was subject to attachment under CPLR 7502 (aid of arbitration). *Mischon* involved a legal fee dispute between *Mischon* and its former client, the defendant. *Mischon* commenced AAA arbitration proceedings and filed an application for attachment in aid of an arbitration, specifically seeking to attach a patent, which was the subject of the parties underlying representation relationship. The court concluded that "like in *Hotel 71*, the 'defendant[] … voluntarily submitted to the personal jurisdiction of the court …with a clause promising to 'submit[] to the jurisdiction of any federal or state court in New York City ….Therefore, the Court may properly order the attachment of the property of the defendant,' even if the situs of the property is outside New York." *Mischon*, 2011 WL 6957595 at *6 (citing *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303 (NY 2010)).

Numerous other courts have ordered attachments against a non-domiciliary to mitigate against collection risk under CPLR § 6201(1). *See ITC Entert.*, 714 F.2d at 219 (defendants were not domiciled in New York, lacked sufficient assets to satisfy a $2.7 million judgment, its general partner was "soon" to receive "highly liquid assets" that might be invested in a manner making judgment enforcement "difficult," and general partner had conducted business in "a less than exemplary manner"); *see also Herzi v. Ateliers De La Haute-Garonne*, No. 15-cv-7702, 2015 WL 8479676, at * 3 (S.D.N.Y. Oct. 13, 2015) (awarding attachment based on evidence "suggest[ing] that defendant "may attempt to transfer overseas or otherwise conceal what assets it has in New York" and the fact that defendant was foreign company "without any apparent business operations

15

in New York"); *Elton Leather Corp. v. First Gen. Resources Co.*, 138 A.D.2d 132, 529 N.Y.S.2d 769 (1st Dep't 1988) (defendant received goods for which it did not pay and proof showed defendant was in "financial trouble"); *Gem Holdco, LLC v Changing World Tech., L.P.*, No. 650841/2013, at *3 (Sup. Ct., N.Y. Co. Mar. 18, 2015) (valid concern that nondomiciliaries and foreign corporations would not be able to satisfy judgment where they lacked liquidity and any right to retain the funds at issue).

Here, the Banks' flagrant misconduct and increasing and very real financial instability justifies Plaintiffs' fear that a potential judgment will not be satisfied.  The Banks repeatedly ignored Plaintiffs' instructions for the transfer of Plaintiffs' own USD.  This fact alone justifies the attachment, because it shows the Banks do not respect Plaintiffs' property rights or the law.

Moreover, the Banks are among the perpetrators of a decades old Ponzi scheme afflicting Lebanon and the foreign depositors who placed their trust in its banking system.  As it has been aptly described by a commentator:

> Since the end of its civil war in 1990, Lebanon has relied on banking, tourism, and real estate to attract foreign currency to the country, mostly in US dollars. For decades, those dollars have been recycled by Lebanon's financial architects—the state, local commercial banks and Lebanon's central bank, the Banque du Liban (BDL)—to create a regulated Ponzi scheme, which has benefited the banking sector and left the Lebanese people to foot the bill. Like any Ponzi scheme, Lebanon's financial hustle relied on regular injections of US dollars to create a veneer of financial stability. This veneer masked a decrepit and untenable financial system designed to defend an outdated currency peg and increase banking sector profits. That is until now.

Ex. 3 to Major Declr., at p. 3.  Commercial banks in Lebanon offered high interest rates for depositors, and trumpeted their ready access to stable USD to lure foreign deposits.  That is exactly how the Banks persuaded Plaintiffs to deposit their USD.  The Banks used their New York correspondent banks to carry out the scheme against Plaintiffs by accepting the deposits of

Plaintiffs' USD through the Banks' New York correspondent bank accounts and represented they would transfer Plaintiffs' USD out of Lebanon through Defendants' New York correspondent bank accounts at Plaintiffs' direction.

Political turmoil in Lebanon is scaring depositors away, causing the banking segment to suffer increasing liquidity issues and impose limits on withdrawals. *See*, *e.g.*, Exs. 5, 7, 19 to Major Declr. The global credit rating agencies have steeply downgraded Lebanon from distress to junk, citing diminishing liquidity and an increasing reliance on unusual measures to attract and maintain currency. Ex. 9 to Major Declr.

Now that the inevitable liquidity crisis caused by their Ponzi scheme is strangling their operations, Lebanese banks, including the Banks, made an unlawful pact to prohibit their depositors from withdrawing or transferring USD. Furthermore, the Banks' brazenness demonstrates that the Banks are unconcerned about enforcement in Lebanon. The fact that the Lebanese banks like the Banks are willing to so flagrantly abuse their clients and violate the law confirms that an unsecured judgment against the Banks would be illusory. Thus, the Banks' United States assets, and in particular its New York correspondent bank accounts, are critical assets to be preserved for later execution.

### 2. The Banks Will Frustrate the Enforcement of a Judgment in Plaintiffs' Favor

Alternatively, to obtain an attachment under CPLR § 6201(3), the plaintiff must show: "(1) that the defendant has, or is about to conceal his or her property in one of the enumerated ways, and (2) that defendant has acted or will act with the intent to defraud his or her creditors or to frustrate the enforcement of a judgment for the plaintiff." *Societe Generale Alsacienne de Banque, Zurich v. Flemington Dev. Corp.*, 118 A.D.2d 759, 772 (2d Dep't 1986).

As New York courts recognize, "it is not always practicable to establish by proof the existence of fraudulent intent on the part of the debtor even when it really exists.  Direct proof of the fact can rarely be obtained, and when it is established it must ordinarily be inferred from circumstances." *Arzu v. Arzu*, 190 A.D.2d 87, 92 (1st Dep't 1993) (internal quotation omitted). The transfer or disappearance of an abnormal amount of property is sufficient to demonstrate the intent to defraud or frustrate a judgment.  *Bank Leami Trust Co. of N.Y. v. Istim, Inc.,* 892 F. Supp. 478, 482 (S.D.N.Y. 1995).

The Banks have an established practice of blocking the transfer of USD outside Lebanon by refusing any wire transfer requests, except between Lebanese banks, and refusing to honor any checks that depositors attempt to negotiate outside Lebanon.  Thus, Plaintiffs cannot execute on a judgement in Lebanon.  And even if they could, Plaintiffs would be unable to transfer the proceeds outside Lebanon.  These circumstances make it impossible for United States citizens and residents like Plaintiffs to vindicate their property rights.  Plaintiffs' only genuine recourse is to execute on the judgment against defendants in the United States.  To preserve the efficacy of Plaintiffs' execution in the United States, an attachment is necessary to provide security.  The Banks simply do not care about the rule of law or their clients' rights.  Only an attachment of assets in the United States will preserve Plaintiffs' ability to collect.  Therefore, an attachment under CPLR § 6201(3) is warranted.

### D.   The Amount Demanded from Defendants Exceeds their Counterclaims

CPLR § 6201(4) is satisfied if the plaintiff states he is unaware of any counterclaims and the defendant fails to submit evidence of counterclaims.  *See BSH Hausgerate*, 282 F. Supp.3d at 676.  Defendants have no counterclaims against Plaintiffs, *see* Daou Declr., ¶ 181, and therefore CPLR § 6201(4) is satisfied.  *See Olshan*, 2000 WL 420557, \*4.

**II.**   **The Banks Have Title to the Funds Held by the Correspondent Banks**

The Banks all use correspondent bank accounts in New York to transact USD.  *See* Daou Declr., ¶¶ 21, 75, 144.  These accounts are subject to attachment.

It is well-established that "under New York law, 'the funds held in' [a foreign bank's] correspondent account … including the funds that have been attached," belong solely to the foreign bank.  *See Toisa Ltd. v. PT Transamudra Usaha Sejahtera*, 2013 WL 12125701 *14 (S.D.N.Y. Sept 9, 2013) (JMF).  The funds held in the Banks' accounts with the correspondent banks are the Banks' property and are subject to attachment under New York law.  *Golden Horn Shipping Co. Ltd. v. Volans Shipping Co. Ltd.*, 2014 WL 5778535 *4 (S.D.N.Y. Nov. 6, 2014) (JPO) (granting motion to attach $3.9 million held in the defendant's correspondent bank account).   It is irrelevant that the purpose of the funds in the Banks' accounts with the correspondent banks  may have been to transact business on behalf of the Banks' customers.  *Id*.  ("That the money [in the correspondent bank account] is there for the *purpose* of facilitating transactions on behalf of [the foreign bank's] customers in the United Stated does not mean that the money *belongs* to those customers.") (emphasis in original).

In *Golden Horn Shipping*, the plaintiff contracted with the defendant Norvik, a Latvian bank with no operations in the United States, to charter a fish shipping vessel.  *See Golden Horn Shipping*, 2014 WL 5778535 *1.  Norvik failed to deliver the vessel and the plaintiff brought suit in New York for breach of contract and attached $3.9 million from Norvik's correspondent account held at Deutsche Bank's New York branch.  Norvik moved to vacate the attachment order asserting that the funds held with Deutsche Bank did not belong to Norvik, but rather, that the funds belonged to Norvik's customers.  *Id*. at *3.   The court rejected this argument and held that

regardless of the purpose of the funds, *i.e.* to facilitate Norvik's customer's transactions, while the funds remained sitting in its account, the funds belonged to Norvik. *Id.*at *4.

Moreover, New York courts regularly permit the attachment of bank accounts of foreign entities held in New York banking institutions, particularly where, as here, the Banks deliberately identified the New York based correspondent banks to conduct its business with Plaintiffs. *See Georgia-Pacific Corp. v. Multimark's Intern. Ltd.*, 265 A.D.2d 109 (1st Dep't 2000). In *Georgia-Pacific*, the plaintiff brought suit against a foreign entity based in the British Virgin Islands, as well as its alter ego entity, for breach of contract. In connection with this suit, the plaintiff obtained an *ex parte* order of attachment against both defendants' New York based accounts. The Appellate Division, First Department affirmed the lower court's attachment order and held that the defendants' "deliberate use of a New York bank to conduct almost all of its business demonstrates an intent to take advantage of the benefits and protections of New York," subjected the defendants to personal jurisdiction in New York, and its accounts subject to an *ex parte* attachment order. *Id.* at 112.

Here, the Court may issue an attachment order against funds held in the Banks' accounts with the correspondent banks for the additional reason that it has *quasi in rem* jurisdiction over these funds. *Banco Ambrosiano v. Artoc Bank & Trust*, 62 N.Y.2d 65, 72-73 (1984) (Bahamian bank's use of correspondent bank accounts held at New York banking institutions sufficient to subject the New York accounts to *quasi in rem* jurisdiction in New York). In *Banco Ambrosiano*, the plaintiff, an Italian banking corporation brought suit against the defendant, a Bahamian banking institution, for breach of contract. In connection with the suit, the plaintiff was granted an *ex parte* attachment of $8 million, representing the defendant's account with its New York correspondent bank. *Id.* at 68. Affirming the attachment and the court's jurisdiction over the defendant's account

held at its New York correspondent bank, the Court of Appeals held that the key factor was the "relationship between the cause of action and the property, the activities to be performed in New York under the parties' agreement, and [the defendant's] other ties with New York [that] … combine to render the exercise of quasi-in-rem jurisdiction appropriate in this case." *Banco Ambrosiano*, 62 N.Y.2d at 73.  Moreover, the principals of "due process are not offended by requiring [the defendant] to defend … in New York, as it has maintained a significant connection with the State and undertaken purposeful activity here." *Id*.

Plaintiffs' causes of actions are directly related to the Banks' use of their accounts held at the New York correspondent banks, and jurisdiction is proper for the additional reason that the Banks are subject to *quasi in rem* jurisdiction in New York.

### III.   Plaintiffs Have a Probability of Success on their Civil Conspiracy Claim Such that the Attachment Should be Joint and Several

The First Cause of Action in the Complaint alleges a civil conspiracy among Defendants, including the Banks. *See* ECF 1, at pp. 51-59.  A successful conspiracy claim renders the conspirators jointly and severally liable for the independent torts committed in furtherance of the conspiracy. *See Kashi v. Gratsos,* 790 F.2d 1050, 1054 (2d Cir. 1986) ("Proof of a civil conspiracy under New York law connects a defendant with the transaction and charges him with the acts and declarations of his co-conspirators, and exposes that defendant to joint and several liability for the victim's losses").

To state a claim for civil conspiracy under New York law, a plaintiff, in addition to alleging an underlying tort, must plead facts sufficient to support an inference of the following elements: "(1) an agreement between two or more parties; (2) an overt act; (3) intentional participation in the furtherance of a plan or purpose; and (4) resulting damage." *R.B. Development Co., Ltd. V. Tutis Capital LLC*, 2018 WL 7076023, *10 (S.D.N.Y. 2018).

Unbeknownst to Plaintiffs, Defendants agreed to and did unlawfully refuse to allow Plaintiffs and certain other USD depositors to transfer their USD outside Lebanon and to instead misappropriate Plaintiffs' USD for their own use to the exclusion of Plaintiffs.  Defendants also agreed to and did make fraudulent misrepresentations to Plaintiffs to carry out their scheme of hoarding USD in Lebanon and misappropriating Plaintiffs' USD on deposit with the Banks to do so.  Defendants agreed to and did pass bad checks to Plaintiffs in the United States in violation of United States law in order to carry out their scheme of misappropriating Plaintiffs' USD.  All of Defendants' misconduct was intentional.  As a result of Defendants' conspiracy, Plaintiffs have suffered substantial damages, including, without limitation, the loss of their $18,676,844.00 USD.

Having chosen to participate in a civil conspiracy, Defendants and, for purposes of this motion, the Banks are jointly and severally liable to Plaintiffs, and the attachment requested by Plaintiffs should also be joint and several against the Banks.

## IV.   The Banks Already Misappropriated $18,676,884.00 from Plaintiffs and Therefore the Court Only Require a Nominal Undertaking of $500.00

"Section 6212(b) of the CPLR requires on a motion for an order of attachment for the plaintiff to post an undertaking of no less than $500 to provide surety for any damages suffered by virtue of the attachment." *In re Amaranth*, 711 F. Supp. 2d at 313.  In *In re Amaranth*, the defendant requested a bond of $3,600,000.00.  Instead, the court imposed "an undertaking of $250,000.00-or approximately 0.35 percent of the attachment." *Id* (fixing undertaking at $250,000 to obtain attachment order of $72,400,000).  In *Adler*, the court imposed an undertaking of $1,000.00, where the motion for attachment was not *ex parte* and defendant's liability had been determined.  *Adler*, 2019 WL 2210661, *4; *see also OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 305 F. Supp. 2d 340, 348 (S.D.N.Y. 2004) (fixing undertaking at $100,000 for attachment of $250,000,000 of assets).

Here, no further undertaking should be imposed on Plaintiffs for the attachment they seek. The Banks already misappropriated $18,676,884.00 plus interest from Plaintiffs.   Already holding$18,676,884.00 plus interest of Plaintiffs' USD, the Banks are well insulated against the nonexistent harm the Banks would suffer from the attachment Plaintiffs request.   Therefore, no further undertaking should be required beyond the $500 statutory amount.

**V.   The Court Should Authorize Plaintiffs to Conduct Expedited Discovery to Locate Additional United States Assets of the Banks for Attachment**

"When considering whether to grant a motion for expedited discovery prior to a Rule 26(f) conference, courts apply a 'flexible standard of reasonableness and good cause.'"   *Strike 3 Holdings, LLC v. Doe*, No. 19-cv-11466 (AJN), 2020 WL 264584, at *2 (S.D.N.Y. Jan. 17, 2020) (quoting *Ayyash*, 233 F.R.D. at 327.[2]

Here, good cause exists for expedited asset discovery.   Defendants misappropriated Plaintiffs' $18,676,844.00 and have repeatedly, deliberately, and unlawfully blocked Plaintiffs' attempts to recoup their USD.   Expedited asset discovery is particularly appropriate to aid Plaintiffs in ensuring that Defendants will not similarly evade the attachment of Defendants' assets in the United States.   *See JP Morgan Chase Bank, N.A. v. Reijtenbagh*, 615 F. Supp. 2d 278, 282-83 (S.D.N.Y. 2009) (where plaintiff established that "the remedy of attachment is needed to secure

---

[2]  Some courts in this Circuit have used the four-factor test set forth in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982) to determine whether to grant expedited discovery.  The *Notaro* test, which arises especially in the context of motions for injunctive relief, focuses to a significant extent on whether the party seeking expedited discovery will suffer irreparable (that, non-monetary) harm. Here, however, the ultimate relief sought by Plaintiffs is compensatory (not equitable) in nature, and Plaintiffs are not seeking injunctive relief.  Moreover, in applying the test of reasonableness and good faith for expedited discovery, several courts have outright rejected the *Notaro* test.  *See, e.g.*, *New York v. Mountain Tobacco Co.*, 953 F. Supp. 2d 385, 392 (E.D.N.Y. 2013) ("[T]he Court agrees with those District courts within this Circuit which have rejected the *Notaro* test on the basis 'that employing a preliminary-injunction type analysis to determine entitlement to expedited discovery makes little sense, especially when applied to a request to expedite discovery in order to prepare for a preliminary injunction hearing.'") (quoting *Ayyash*, 233 F.R.D. at 326-27).

payment of a potential judgment" based on defendants' failure to make full payment on a promissory note, plaintiff was permitted to take expedited discovery to "determine the location" of collateral to satisfy the potential judgment); *Ayyash*, 233 F.R.D. at 326-27 (where plaintiff made "strong evidentiary showing of the substantiality of his claims" against Lebanese banks as part of "complex scheme involving wire fraud, money laundering, forgery, and embezzlement," plaintiff was granted an attachment as well as leave to take expedited discovery on, among other things, any assets defendants may have had in New York banks).  Plaintiffs' request for expedited asset discovery is entirely reasonable.  The discovery is limited to Defendants' assets in the United States, and should be easy for the Banks to respond.  *See* Exs. 29-31 to Major Declr.

Therefore, the Court should permit Plaintiffs to conduct limited, expedited discovery so that Plaintiffs can discovery all of the Banks' United States assets so that Plaintiffs are more likely to attach assets in the amount of $18,676,884.00, plus interest.

## <u>CONCLUSION</u>

The Court should issue an order permitting Plaintiffs to attach $18,676,884.00 plus interest of the Banks' real property and personal property in the United States, jointly and severally. Plaintiffs satisfy the statutory requirements under New York law, and Defendants' unlawful conduct demonstrates the need and justification for the remedy of attachment.

The Court should also permit Plaintiffs to take expedited asset discovery to discover the Banks' assets located in the United States.

Finally, the Court should only impose an undertaking of $500.00, because Plaintiffs already have the amount of the requested attachment – $18,676,884.00 – on deposit with the Banks such that the Banks already have control over Plaintiffs' assets against which they could recover if the attachment turns out to have been improperly granted and damaging to the Banks.

Dated: July 30, 2020

**MEISTER SEELIG & FEIN LLP**

By:    /s/ Christopher J. Major
       Christopher J. Major
       Eva Sullivan
       Leah Henry
       125 Park Avenue, 7th Floor
       New York, NY 10017
       (212) 655-3500

*Attorneys for Plaintiffs*
*Joseph A. Daou and Karen M. Daou*