UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSEPH A. DAOU and KAREN M. DAOU,

                                        Plaintiffs,

                -against-

BLC BANK, S.A.L.; CREDIT LIBANAIS, S.A.L.;
AL-MAWARID BANK, S.A.L.; and BANQUE
DU LIBAN,

                                        Defendants.

Case No. 1:20-cv-04438 (DLC)

---

## MEMORANDUM OF LAW OF AM BANK S.A.L. IN OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER OF ATTACHMENT

**SQUIRE PATTON BOGGS (US) LLP**
Gassan A. Baloul
Mitchell R. Berger
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

Joseph S. Alonzo
1211 Avenue of the Americas, 26th Floor
New York, New York 10036
Telephone: (212) 872-9800
Facsimile:  (212) 872-9815

*Counsel for Defendant AM Bank S.A.L.*

October 9, 2020

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF CONTENTS................................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................ 2

ARGUMENT ............................................................................................................................... 11

I.      LEGAL STANDARD....................................................................................................... 11

II.     PLAINTIFFS HAVE NOT SHOWN, AND COULD NOT SHOW, A
        LIKELIHOOD OF SUCCESS ON THE MERITS. ........................................................ 13

        A.      The Parties' Mandatory Forum Selection Clause Requires Dismissal of the
                Complaint Under the Doctrine of *Forum Non Conveniens.* ................................ 13

        B.      Plaintiffs Have Not Stated a *Prima Facie* Case for Either General or
                Specific Personal Jurisdiction Over AM Bank. .................................................... 14

        C.      Plaintiffs' Claims Fail to State a Cause of Action, and Thus are Not Likely
                to Succeed on the Merits........................................................................................ 18

                1.      Plaintiffs' Breach of Contract Claim is Unlikely to Succeed. ................. 18

                2.      Plaintiffs are Unlikely to Succeed on the Unjust Enrichment,
                        Conversion, or Promissory Estoppel Claims. ......................................... 19

                3.      Plaintiffs are Unlikely to Succeed on their Fraud or RICO Claims......... 19

                4.      Plaintiffs are Unlikely to Succeed on their Florida Law Claims. ............ 19

                5.      Plaintiffs are Unlikely to Succeed on their Conspiracy Claims.............. 20

III.    PLAINTIFFS HAVE NOT ESTABLISHED A NEED FOR ATTACHMENT. ............ 20

IV.     PLAINTIFFS ARE NOT ENTITLED TO JOINT AND SEVERAL
        ATTACHMENT. .............................................................................................................. 23

V.      A SIZEABLE UNDERTAKING WOULD BE REQUIRED TO COMPENSATE
        THE BANK FOR LOSSES ARISING FROM THE PROPOSED
        ATTACHMENT. .............................................................................................................. 24

CONCLUSION ........................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Atlantic Marine Constr. Co. v. U.S. Dist. Court*,
   571 U.S. 49 (2013)........................................................................................13, 14

*Bd. of Trustees v. BNY Mellon, N.A.*,
   No. 11-CV-6345, 2012 U.S. Dist. LEXIS 132724 (S.D.N.Y. Sept. 10, 2012).......................19

*Bollenbach v. Haynes*,
   No. 18-cv-997, 2018 U.S. Dist. LEXIS 239449 (S.D.N.Y. May 29, 2018) ............................21

*Buy This, Inc. v. MCI Worldcomm Commc'ns Inc.*,
   178 F. Supp. 2d 380 (S.D.N.Y. 2001).....................................................................12, 20

*Capital Ventures Int'l v. Rep. of Argentina*,
   443 F.3d 214 (2d Cir. 2006).................................................................................11, 12

*Cargill Fin. Servs. Int'l, Inc. v. Bank Fin. & Credit Ltd.*,
   70 A.D.3d 456 (N.Y. App. Div. 1st Dept. 2010) ..................................................................23

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)....................................................................................................15

*In re del Valle Ruiz*,
   939 F.3d 520 (2d Cir. 2019)........................................................................................16

*Druyan v. Jagger*,
   508 F. Supp. 2d 228 (S.D.N.Y. 2007)............................................................................19

*Elsevier, Inc. v. Grossman*,
   883 F. Supp. 2d 398 (S.D.N.Y. 2012)............................................................................21

*Flame, S.A. v. Primera Maritime (Hellas) Ltd.*,
   No. 09 CIV 8138, 2010 U.S. Dist. LEXIS 9830 (S.D.N.Y. Feb. 2, 2010) .............................12

*Fratelli Italiani, LLC v. Mironova*,
   No. 18 Civ. 7013, 2019 U.S. Dist. LEXIS 127796 (S.D.N.Y. Apr. 11, 2019).................11, 12

*Hau Yin To v. HSBC Holdings, PLC*,
   700 F. App'x 66 (2d Cir. 2017) ..........................................................................16, 17, 20

*Herzi v. Ateliers de la Haute-Garonne*,
   No. 15-cv-7702, 2015 U.S. Dist. LEXIS 165258 (S.D.N.Y. Oct. 13, 2015)....................20, 21

*Johnson v. UBS AG*,
    791 F. App'x 240 (2d Cir. 2019) ........................................................................15

*Licci v. Lebanese Canadian Bank SAL*,
    673 F.3d 50 (2d Cir. 2013)................................................................................17

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)..............................................................................16

*Martinez v. Bloomberg LP*,
    740 F.3d 211 (2d Cir. 2014)..............................................................................14

*McLarty Capital P'ship SBIC, L.P. v. Brazda*,
    18-cv-2599 (DLC), 2018 U.S. Dist. LEXIS 103615 (S.D.N.Y. June 20, 2018) ...............13, 14

*MyPart Software, Ltd. v Fluent Trade Tech. Ltd.*,
    No. 650316/2017, 2017 N.Y. Misc. LEXIS 4587 (N.Y. Sup. Ct., N.Y. County
    2017) ......................................................................................................25

*Nat'l Audubon Soc., Inc. v. Sonopia Corp.*,
    No. 09 Civ. 975, 2009 U.S. Dist. LEXIS 17094 (S.D.N.Y. Mar. 6, 2009) ...........................12

*Negrete v. Citibank, N.A.*,
    759 F. App'x 42 (2d Cir. 2019) .........................................................................19

*Shiu v. New Peking Taste Inc.*,
    No. 11-cv-1175, 2013 U.S. Dist. LEXIS 115671 (E.D.N.Y. Mar. 14, 2013) ............11, 12, 13

*Sigmoil Res., N.V. v. Pan Ocean Oil Corp.*,
    234 A.D.2d 103 (N.Y. App. Div. 1st Dept. 1996) ...................................................23

*Siverls-Dunham v. Lee*,
    No. 05 Civ. 7518, 2006 U.S. Dist. LEXIS 82927 (S.D.N.Y. Nov. 13, 2006) ........................17

*Skyline Steel, LLC v. PilePro, LLC*,
    No. 13-CV-8171, 2015 U.S. Dist. LEXIS 114038 (S.D.N.Y. Aug. 27, 2015)................12, 21

*Walden v. Fiore*,
    571 U.S. 277, 287 (2014)..................................................................................16

*Waldman v. PLO*,
    835 F.3d 317 (2d Cir. 2016)..........................................................................15, 16

*Wolff v. Rare Medium, Inc.*,
    210 F. Supp. 2d 490 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003)....................18

**Other Authorities**

CPLR § 301..........................................................................................................15

CPLR § 302..................................................................................................................15

CPLR § 6201................................................................................................................22

Fed. R. Civ. P. 9..........................................................................................................19

## PRELIMINARY STATEMENT

Plaintiffs' motion for attachment should be denied because Plaintiffs have not established, and could not establish, a probability of success on the merits of their claims against AM Bank, as required to obtain pre-judgment attachment.  AM Bank today moved to dismiss all of Plaintiffs' claims on multiple grounds, including that Plaintiffs agreed when they opened their accounts to litigate any dispute with AM Bank solely in the courts of Beirut.

Moreover, Plaintiffs have not established, and could not establish, a need for the "drastic action" of pre-judgment attachment, because their funds remain in their account at AM Bank and are available to Plaintiffs to the fullest extent provided in the account agreements Plaintiffs signed. What Plaintiffs actually seek is an order making their funds available to them **in the United States**, but that is not a proper purpose of a pre-judgment attachment and that is not something to which Plaintiffs are entitled under the terms of their account agreements with AM Bank.

In the midst of an unprecedented financial and banking crisis in Lebanon, and after learning that they could not obtain wire transfers into the U.S. of their funds at two other Lebanese banks due to crisis-limits on U.S. dollar transactions, Plaintiffs in December 2019 moved certain funds to new accounts at AM Bank.  When viewed in the context of Plaintiffs' antecedent relationships with two other Lebanese banks, Plaintiffs' move to AM Bank appears to have been a first step in a plan to get their funds out of Lebanon.  But as Plaintiffs surely anticipated, AM Bank advised Plaintiffs that their new accounts would be subject to the same limits they encountered at their predecessor banks, by which they could transact in U.S. dollars within Lebanon, but could not transfer U.S. dollars outside Lebanon.

The false premise of Plaintiffs' attachment motion is that they were shocked to learn that they would face at AM Bank the same restrictions that they already had encountered at two other Lebanese banks—restrictions that had been in place for all Lebanese banks well before Plaintiffs

ever did business with AM Bank.  The Court should not indulge Plaintiffs' effort to game both the Lebanese banking system and the rules for pre-judgment attachment.

Even more implausibly, Plaintiffs seek to attach from AM Bank an amount ($18 million) that is more than triple what they deposited with AM Bank.  But Plaintiffs are not entitled to "joint and several" attachment, because they do not plausibly show that AM Bank acted in concert with the other Lebanese banks holding their funds, and do not even identify a conspiracy claim as one of the causes of action supporting their attachment motion.

## STATEMENT OF FACTS

Plaintiffs are U.S. citizens and residents of Florida.  Complaint (Dkt. #1) ("Compl.") ¶¶ 44-45.  Since 2016, long before opening accounts at AM Bank, Plaintiffs maintained U.S. dollar-denominated accounts at two other Lebanese banks, Defendants BLC Bank ("BLC") and Credit Libanais ("CL").  *See id.*, ¶¶ 44-45, 94, 98, 190, 194; Declaration of Joseph A. Daou (Dkt. #27) ("Daou Decl."), ¶ 5.  AM Bank "is a Lebanese bank with its headquarters located in the Yared Building, 6th Floor, Abdel Aziz Street, Hamra, 1103-2110, Beirut, Lebanon.  AM Bank is a Lebanese joint stock company, and a citizen of Lebanon.  AM Bank is listed at No. 101 on Banque Du Liban's list of Lebanese banks."  Compl. ¶ 48.  AM Bank S.A.L. was established in Lebanon in 1980, and was formerly known as Al-Mawarid Bank.  Declaration of Youssef Hanna El Khoury (Dkt. # 41-2) ("El Khoury Decl.") ¶ 5.  As a Lebanese commercial bank headquartered in Beirut, AM Bank is regulated by the BDL, the central bank and regulatory authority for all banks in Lebanon.  *Id.* ¶ 7.

Lebanon, and particularly the Lebanese banking industry, is in the midst of an unprecedented economic and fiscal crisis.  *Id.* ¶ 8.  In the summer and fall of 2019, the black-market exchange rate between the Lebanese pound and the U.S. dollar began to diverge from the official, pegged exchange rate, leading to devaluation of the Lebanese pound and shortages of

dollars.  *Id.*   The crisis has led to, among other things, widespread social unrest, including nationwide protests beginning in October 2019 and the resignation of Prime Minister Saad Hariri. *Id.* ¶ 9.  The crisis has also resulted in violent attacks on banks and bank employees and nationwide closures of banks for multiple weeks in October and November 2019.  *Id.*

In response to the crisis, in November 2019, the Governor of the BDL, Mr. Riad Salameh, made a television appearance in which he announced certain restrictions on dollar-denominated banking transactions.  In particular, Mr. Salameh announced that the BDL had informed Lebanese banks that they could borrow U.S. dollars from the BDL to meet their cash-flow needs, but that those dollars may not be transferred outside Lebanon.  *Id.* ¶ 10.

Also in November 2019, the Association of Banks in Lebanon (the "ABL") held a general assembly and agreed to certain "general temporary directives" to address the crisis "in consultation with Banque du Liban."  *Id.* ¶ 11.  The ABL issued a press release on November 17, 2019, announcing the measures which its members, including AM Bank and other Lebanese commercial banks, had agreed upon.  *Id.*  Among the temporary measures to which the ABL and its member banks agreed, "in consultation with Banque du Liban," were that "Overseas transfers"—meaning transfers of U.S. dollars outside of Lebanon—would be "only made to cover urgent expenses," and that cash withdrawals from U.S. dollar-denominated current accounts would be restricted.  *Id.* ¶ 12.  On the other hand, there were "[n]o restrictions on checks, transfers and the use of credit cards in Lebanon," and clients with dollar-denominated current accounts "can withdraw, without ceilings, the needed amounts from these accounts using checks" within Lebanon.  *Id.*

In other words, to address the unprecedented challenges facing the country and the banking industry caused by the financial crisis, the Lebanese banking community, in coordination with the BDL, determined in November 2019 to impose strict limitations on transfers of U.S. dollars outside

of Lebanon and cash withdrawals of U.S. dollars from Lebanese bank accounts. *Id.* ¶ 13. However, customers remained free to transfer dollars within Lebanon through the use of checks, credit cards, or transfers between accounts at Lebanese banks. *Id.*

As alleged in the Complaint, Plaintiffs were very much aware of the crisis as it unfolded. As early as February 6, 2019, Joseph Daou asked a CL employee about "rumors … that depositors of Lebanese banks were having difficulty withdrawing USD cash". Compl. ¶ 212. In April 2019, Daou discussed with CL employees the potential lowering of depositors' interest rates, including Plaintiffs', based on instructions from "BDL and the Lebanese Association of Banks". *Id.* ¶¶ 214-16. On October 29, 2019, a BLC employee told Daou that "the Lebanese banks, including BLC Bank, were closed" due to the crisis. *Id.* ¶ 124. And on November 11, 2019, Plaintiffs allege, "Joseph Daou learned the news of a nationwide strike by bank tellers who were refusing to work without better security given the civil unrest in Lebanon as the banking crisis was deepening." *Id.* ¶ 244.

In particular, the Complaint acknowledges that Plaintiffs were aware in the fall of 2019 that Lebanese banks had imposed restrictions on outward transfers of U.S. dollars out of Lebanon. In October 2019, Daou asked a CL employee whether "the rumors of wire transfers outside of Lebanon being prohibited were true," *id.* ¶ 225. Then, on November 7, 2019, Daou and a CL employee "discussed the informal constraints on cash withdrawals being reported in the press," and the employee "conceded to Joseph Daou that CL Bank was indeed restraining cash withdrawals." *Id.* ¶ 241. On November 7 and November 8, a BLC employee told Daou that BLC was refusing to execute a wire transfer of Plaintiffs' dollars to the United States "at the direction of BLC Bank's Board." *Id.* ¶¶ 130, 137. On November 8, Plaintiffs allege, a BLC employee advised Daou that the restriction on transfers of dollars outside Lebanon "was being carried out through an informal agreement among the banks." *Id.* ¶ 141.

For months in the fall of 2019, as the crisis continued, Plaintiffs allegedly instructed BLC and CL to provide Plaintiffs with their dollars by sending wire transfers to the United States, and the banks declined to execute those transfers.  *See generally id.* ¶¶ 111-157, 226-260.

Before December 2019, Plaintiffs were not customers of AM Bank and had no relationship with AM Bank.  *See* Compl. ¶¶ 288-290 ("Plaintiffs had not previously done business with AM Bank" prior to December 2019).  Yet, as Plaintiffs allege, they were well aware of the ongoing Lebanese financial crisis and that the crisis had led Lebanese banks, by "informal agreement," to place restrictions on dollar-denominated transfers out of Lebanon—and Plaintiffs themselves had unsuccessfully sought to transfer their funds on deposit with BLC and CL to the United States.

In December 2019, while Joseph Daou was in Lebanon, he reached out to Youssef El Khoury, AM Bank's Vice President for International Business Development, who Mr. Daou knew through a mutual friend, to discuss opening an account at AM Bank.  El Khoury Decl. ¶ 14.  On December 3, 2019, Joseph Daou appeared in person at AM Bank's branch in Jounieh, Lebanon. *Id.* ¶ 15.  While at the Jounieh branch, Mr. Daou opened an AM Bank account.  *Id.*  Per Mr. Daou's request, the account was a joint account in the names of Joseph Daou and Stephan Hanna Gerges (the "Daou-Gerges Account").  *Id.*  Mr. Daou also opened a second account, a joint account in the names of Joseph Daou and Karen Daou (the "Daou Plaintiffs' Account").  *Id.* ¶ 16.

<u>Before</u> opening the Daou-Gerges Account or the Daou Plaintiffs' Account, Mr. Daou was advised by Mr. El Khoury that there were restrictions on dollar-denominated transfers outside Lebanon, and that it was not possible to obtain such transfers.  *Id.* ¶ 17.

Consistent with AM Bank's policies and procedures, Mr. Daou provided certain information to AM Bank in connection with opening the Daou-Gerges Account.  *Id.* ¶ 18.  This information included copies of identification documents for both Mr. Daou and Mr. Gerges, who

Mr. Daou advised was his brother-in-law.  *Id.*  The identification presented for Mr. Gerges was a Lebanese passport.  *Id.*  The identification presented for Mr. Daou was a U.S. passport, which indicated, among other things, that Mr. Daou's place of birth was Lebanon.  *Id.*

AM Bank's policies and procedures provide that upon opening a new account, customers must be provided with, and agree to, a General Agreement between the customer and AM Bank. *Id.* ¶ 19.  Consistent with AM Bank policy, while Joseph Daou was physically present at AM Bank's Jounieh branch on December 3, 2019 to open the Daou-Gerges Account and the Daou Plaintiffs' Account, he was provided with and signed a General Agreement for each account.  *Id.* Karen Daou also signed the General Agreement related to the Daou Plaintiffs' Account.  *Id.*

The General Agreements each contain a mandatory, exclusive forum selection clause. Specifically, Article 68 of the General Agreements applicable to both the Daou-Gerges Account and the Daou Plaintiffs' Account provides in part that "Beirut courts alone have jurisdiction to consider all cases or disputes raised by" the customer (here, Plaintiffs or Mr. Gerges) against the Bank.  El Khoury Decl. ¶ 20.

In addition, the General Agreements make clear that the Bank is not obligated to perform any transaction requested by the customer—here, the Plaintiffs or Mr. Gerges—except at its own discretion:

- The introductory provisions (or "recitals") to the General Agreements provide that the customer "realizes that its mere signing of [the General Agreement] does not entitle [the customer] to the right of benefiting from the services or facilities that the 'Bank' provides, but rather [the General Agreement] governs the relation that might form between [the customer] and the 'Bank' in case the latter approves any written or verbal request from the [customer]".  El Khoury Decl. ¶ 21.

- The recitals further provide that "the 'Bank's' approval of any request from the [customer] . . . must be issued by those with authority thereof at the 'Bank,'" and that the Bank's approval of a customer's request "may include, when necessary, special additional conditions that the 'Bank' may deem to make its obligation

6

contingent upon their occurrence, and which the 'Bank' may modify later in order to accept the continuation of its obligation thereto."  *Id.* ¶ 22.

- Article 1 of the General Agreements provides in part that "all . . . the transactions that the 'Bank' agrees to conduct for the benefit of the [customer] . . . are subject to (a) any policies or directives currently implemented or will be implemented in the future at the 'Bank,' (b) any governmental laws or regulations, whether applicable currently or in the future, especially Lebanese laws and regulations, and (c) the terms and conditions of this agreement."  *Id.* ¶ 23.

- Article 4/2 of the General Agreements provides that when the customer "uses the services of the 'Bank,' which has a discretionary right to accept performing the service, [the customer] has thus accepted—through his mere use of those services—the 'Bank's' terms and conditions that are related to them, no matter what those conditions and services are, even if those conditions are not mentioned in this contract."  *Id.* ¶ 24.

The General Agreements also include a limitation of liability provision with respect to any transactions requested by the customer via e-mail, the internet, mobile banking, text messages, or any mobile phone application.  *Id.* ¶ 25.  Article 56/15 of the General Agreements provides that:

> "the following conditions apply when the [customer] uses e-mail and/or the internet web and/or e-banking and/or mobile banking and/or electronic texts (SMS) and/or any mobile phone application as a mean to inquire and/or to conduct any transaction on his accounts at the 'Bank,' including banking cards and/or to receive notifications, statements and SWIFTs regarding his accounts at it: . . . the 'Bank' will not bear the responsibility for any damage, direct or indirect, that the [customer] might endure . . . as a result of the 'Bank's' refusal to execute the requested transfer for any reason according to its absolute discretion."

*Id.*

Plaintiffs also signed Mobile Banking agreements relating to both the Daou-Gerges Account and the Plaintiffs' Account.  *Id.* ¶ 26.  Those agreements each state that they govern "all of the instructions and/or orders that we give and notify you from our e-mail address and/or via internet and/or through E-Banking and/or through Mobile Banking services, which may include any banking transaction of any type and any nature whatsoever, including but not limited to: transfer orders, forex operations of any type and in any currency whatsoever, withdrawals, opening of account suffixes of whatever kind, etc."  *Id.* ¶ 27.  The Mobile Banking agreements also provide that "We" (the

customer; in this case the Plaintiffs and Mr. Gerges) "confirm that you [the Bank] may refuse the instructions and orders received through the aforementioned means, at your sole discretion, since under no circumstances shall these instructions and orders be deemed binding upon you." *Id.* ¶ 28.

On December 3, 2019, the same day that Daou opened the Daou-Gerges Account, Daou deposited $5,735,928.67 into the account.  Compl. ¶ 296.  This deposit was made by check, which was delivered in person by Joseph Daou to AM Bank's Jounieh branch.  El Khoury Decl. ¶ 29.  The check was payable to "Stephan Hanna Gerges" and was drawn on CL's account at the BDL.  *Id.*

In addition to formulating and implementing monetary and banking policies in Lebanon, the BDL operates a payment system that performs U.S. Dollar clearing functions for transfers between Lebanese banks, including check clearing, inter-bank transfers, and personal money transfers.  *Id.* ¶ 30.  All banks operating in Lebanon, including BLC, CL, and AM Bank, are required to participate in the BDL's payment system.  *Id.*

AM Bank processes dollar-denominated transactions for its customers in different ways based on the nature of the transaction—none of which, with respect to the Plaintiffs' accounts, involved AM Bank transferring or clearing dollars through the United States.  *Id.* ¶ 31.  Dollar-denominated transfers from one AM Bank account-holder to another are cleared and settled on AM Bank's own books.  *Id.* ¶ 32.  Dollar-denominated transfers between an account-holder at AM Bank and an account-holder at another Lebanese bank, such as a check drawn on another Lebanese bank for payment into an AM Bank account-holder's account, are settled through the BDL's payment system.  *Id.* ¶ 33.  Given that AM Bank, CL, and the BDL are all participants in the BDL's payment system, the check that Joseph Daou used to fund the Daou-Gerges Account on December 3, 2019 was cleared through the BDL's payment system, and was <u>not</u> processed through AM Bank's U.S. correspondent bank, Bank of New York Mellon.  *Id.* ¶ 34.

On December 10, 2019, Joseph Daou sent a message to Youssef El Khoury via the mobile messaging application WhatsApp, stating, "I have two questions to ask. 1. What is the story of interest that I m hearing about. 2. If i get a check from your bank to be deposited in USA, what is the process?" *Id.* ¶ 38.  Mr. El Khoury responded by calling Joseph Daou and telling him that, for that month, interest on the Daou-Gerges Account would be paid at a rate of 11 percent per year, paid half in U.S. dollars and half in Lebanese currency, and that thereafter the interest rate would drop to 5 percent annually, as determined by the BDL.  *Id.* ¶ 39.  Further, Mr. El Khoury stated that the Bank may not be able to issue Mr. Daou a check payable in the U.S.  *Id.*  Following the phone call, Mr. Daou sent Mr. El Khoury a WhatsApp message confirming what Mr. El Khoury had said on the phone: "Thanks for calling me and responding to the above message explaining the monthly payment . The interest of this months based on 11 percent yearly paid in half Lebanese and half USD.  After which it will drop to 5 percent yearly according to BDL as you said. Second part of my question you said it may not be available.  As you are Aware I told you I will be buying real estates and requid a minimum of 3.7 mil by next month."  *Id.* ¶ 40.

Between January 3, 2020, and January 13, 2020, Mr. Daou sent Mr. El Khoury emails and WhatsApp messages inquiring about the possibility of receiving a wire transfer of some of the funds deposited in the Daou-Gerges Account, as well as the change to the interest rate to 5 percent pursuant to the BDL's directive.  *Id.* ¶ 41.  On January 15, 2020, Mr. El Khoury responded by email to Mr. Daou.  *Id.* ¶ 42.  Mr. El Khoury stated that "[d]ue to the situation in lebanon , all the external transfers are restricted for the time being" and that "[a]s for the interest rates , these instructions came from the central bank as mandatory actions."  *Id.*  Mr. El Khoury continued, "NB: Just for the record we discussed all these issues before opening the account at AMbank and

i made it very clear that i ll wire your money to any place you want the minute these restrictions are gone and the same applies on the decrease of the interest rates." *Id.*

On February 25, 2020, Mr. Daou requested a transfer of the funds from the Daou-Gerges Account to the Daou Plaintiffs' Account. *Id.* ¶ 43.  That same day, per Mr. Daou's request, AM Bank transferred $5,811,718.08 from the Daou-Gerges Account to the Plaintiffs' Account. *Id.*  This transfer, between two accounts held at AM Bank, was settled on the books of AM Bank, and was not processed through AM Bank's correspondent account at Bank of New York Mellon. *Id.* ¶ 44.

On March 4, 2020, Joseph Daou sent Mr. El Khoury a WhatsApp message requesting a wire transfer from the Plaintiffs' Account to their bank account in the United States. *Id.* ¶ 45.  Mr. El Khoury responded by email the same day and stated that "international outward transfers are still banned so i am sorry again for not being able to transfer your money from your account mentioned above.  We as bank are still committed with you that [we] will transfer this money as soon as the banning are gone.  Please be aware that we are ready to issue a banker s chq (drawn on BDL) for the full amount upon your request". *Id.*  The same day, March 4, 2020, Mr. Daou agreed to Mr. El Khoury's proposal to issue the Plaintiffs a check drawn on BDL, stating via WhatsApp message, "My wife and I thank you and AM bank." *Id.* ¶ 46.  Also the same day, Mr. Daou sent Mr. El Khoury another WhatsApp message confirming that the check would be drawn on BDL. *Id.*  Mr. Daou requested that the check be made payable to "Joseph or Karen Daou," in the amount of $5,811,500.00, with the remainder of the account balance to be kept in Plaintiffs' Account "to ensure" that the account "would stay active," per Mr. Daou's WhatsApp message. *Id.*

Mr. El Khoury responded to Mr. Daou via WhatsApp the same day, March 4, 2020, specifically notifying Mr. Daou that "the stamp (paid in lebanon)" would appear on the banker's check, "due to BDL instructions." *Id.* ¶ 47.

On March 7, 2020, per Joseph Daou's instructions, AM Bank issued a check drawn on BDL, payable to Joseph or Karen Daou, in the amount of $5,811,500. *Id.* ¶ 48. The check clearly stated on its face that it was drawn on the BDL, that it was payable in "BEIRUT," and that it was "To be cleared in Lebanon." *Id.* ¶ 49. Plaintiffs allege that they then attempted to deposit the check with a bank in the United States, and that it was returned and not paid. Compl. ¶¶ 323-24.

The Daou-Gerges Account and the Plaintiffs' Account were opened, and remain open, on the books of AM Bank in Lebanon. El Khoury Decl. ¶ 50. The only deposits or withdrawals that have taken place on the Daou-Gerges Account from its opening to today are the initial deposit of the check on December 3, 2019, and the transfer from the Daou-Gerges Account to Plaintiffs' Account on February 25, 2020, as requested by Mr. Daou. *Id.* ¶ 51. The only deposit that has taken place on the Daou Plaintiffs' Account from its opening to today is the initial transfer of $5,811,718.08 from the Daou-Gerges Account on February 25, 2020. *Id.* ¶ 52. There have been no withdrawals from the account. *Id.* The balance in the Daou-Gerges Account is currently $0.00, and the balance in the Daou Plaintiffs' Account is $5,811,656. *Id.* ¶ 53.

## ARGUMENT

## I.   LEGAL STANDARD

To obtain a prejudgment order of attachment, Plaintiffs must establish, by affidavit or other documentary evidence, "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in Section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." *Capital Ventures Int'l v. Rep. of Argentina*, 443 F.3d 214, 219 (2d Cir. 2006) (quoting N.Y. CPLR § 6212(a)); *see, e.g., Fratelli Italiani, LLC v. Mironova,* No. 18 Civ. 7013, 2019 U.S. Dist. LEXIS 127796, *20 (S.D.N.Y. Apr. 11, 2019); *Shiu v. New Peking Taste Inc.*, No. 11-cv-1175, 2013 U.S.

Dist. LEXIS 115671, at *33-*34 (E.D.N.Y. Mar. 14, 2013); *Flame, S.A. v. Primera Maritime (Hellas) Ltd.*, No. 09 CIV 8138, 2010 U.S. Dist. LEXIS 9830, at *9 (S.D.N.Y. Feb. 2, 2010).

"The burden of proof in a motion for attachment is on the moving party.  It is a high burden.  Specifically, a party seeking an order of attachment must show a probability of success akin to that required to obtain injunctive relief.  When evaluating a motion for attachment, 'statutory factors are strictly construed in favor of those against whom attachment is sought, and attachment may be denied even where all four prerequisites have been met.'"  *Fratelli Italiani*, 2019 U.S. Dist. LEXIS 127796, at *20 (citations omitted); *see Skyline Steel, LLC v. PilePro, LLC*, No. 13-CV-8171, 2015 U.S. Dist. LEXIS 114038, at *5 (S.D.N.Y. Aug. 27, 2015) (plaintiff "bears a heavy burden in attempting to establish its right to an attachment, because New York attachment statutes are construed strictly against those who seek to invoke the remedy.") (citation omitted); *Nat'l Audubon Soc., Inc. v. Sonopia Corp.*, No. 09 Civ. 975, 2009 U.S. Dist. LEXIS 17094, at *5 (S.D.N.Y. Mar. 6, 2009) (quoting *Buy This, Inc. v. MCI Worldcomm Commc'ns Inc.*, 178 F. Supp. 2d 380, 383 (S.D.N.Y. 2001) (same)).

"Attachment is an extraordinary remedy.  Unsurprisingly, courts are leery of granting such harsh relief.  When, as here, attachment is being used as a means of security rather than to obtain *quasi in rem* jurisdiction, courts should issue [the attachment] only upon a showing that *drastic action* is required for security purposes."  *Fratelli Italiani*, 2019 U.S. Dist. LEXIS 127796, at *21 (internal quotations and citations omitted, emphasis in original).  "[E]ven where the statutory requirements for attachment are met, a court may nevertheless deny a writ of attachment where the movant has not established a need for the writ."  *Skyline Steel*, 2015 U.S. Dist. LEXIS 114038, at *6; *see Buy This*, 178 F. Supp. 2d at 383 ("attachment should [be] issue[d] only upon a showing that *drastic action* is required for security purposes.") (emphasis in original).

12

## II.     PLAINTIFFS HAVE NOT SHOWN, AND COULD NOT SHOW, A LIKELIHOOD OF SUCCESS ON THE MERITS.

To establish a probability of success" as required on a motion for pre-judgment attachment, "the moving party must show that it is more likely than not that it will succeed on its claims." *Shiu*, 2013 U.S. Dist. LEXIS 115671, at *35 (citing *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 319 (E.D.N.Y. 2009)).

The Bank hereby incorporates by reference herein the Memorandum of Law in Support of AM Bank's motion to dismiss the Complaint, filed today in this action (the "MOL").  The strength of AM Bank's motion, as well as the facts set forth in the El Khoury Decl. and the documents attached thereto, make clear that Plaintiffs' claims must be dismissed.  Accordingly, Plaintiffs have not established, and could not establish, a probability of success on their claims against AM Bank, requiring denial of Plaintiffs' attachment motion.

### A.     The Parties' Mandatory Forum Selection Clause Requires Dismissal of the Complaint Under the Doctrine of *Forum Non Conveniens.*

The General Agreements that govern the relationship between the parties contain a mandatory forum selection clause that requires the Plaintiffs to bring any claims against the Bank exclusively in the courts of Beirut, Lebanon.  El Khoury Decl. ¶ 20.  Article 68 of the General Agreements provides that "Beirut courts alone have jurisdiction to consider all cases or disputes raised by" the customer (here, Plaintiffs) against the Bank.  *Id.*  As discussed more fully in the MOL, this requires dismissal of all of Plaintiffs' claims against the Bank pursuant to the doctrine of *forum non conveniens*.  *See Atlantic Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49, 60 (2013) (holding that "the appropriate way to enforce a forum-selection clause pointing to a … foreign forum is through the doctrine of *forum non conveniens*"); *McLarty Capital P'ship SBIC, L.P. v. Brazda*, 18-cv-2599 (DLC), 2018 U.S. Dist. LEXIS 103615, at *5 (S.D.N.Y. June 20, 2018) (Cote, J.) ("'When the parties have agreed to a valid forum-selection clause, a district court should

ordinarily transfer the case to the forum specified in that clause' unless 'extraordinary circumstances unrelated to the convenience of the parties' exist.") (quoting *Atlantic Marine*, 571 U.S. at 62 (2013)); *Martinez v. Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014).

The forum selection clause in the General Agreements is both mandatory and exclusive; it provides that "Beirut courts <u>alone</u> have jurisdiction" to litigate Plaintiffs' claims.  El Khoury Decl. ¶ 20 (emphasis added).  It was reasonably communicated to the Plaintiffs because it was plainly stated in the General Agreements.  The forum selection clause encompasses all of the Plaintiffs' claims against the Bank, including tort claims.  And Plaintiffs cannot show that enforcement of the forum selection clause would be unreasonable or unjust, or that the clause is otherwise invalid.

Where, as here, the parties have a valid forum selection clause, the Court's *forum non conveniens* analysis changes, because the court "must deem the private-interest factors to weigh entirely in favor of the preselected forum," and thus the Court "may consider arguments about public-interest factors only."  *Atlantic Marine*, 571 U.S. at 64.  The public interest factors relevant to the *forum non conveniens* analysis favor enforcement of the parties' forum selection clause. Accordingly, and as discussed more fully in the MOL, the forum selection clause in the parties' General Agreements should be enforced, and Plaintiffs' Complaint as against AM Bank should be dismissed in its entirety pursuant to the doctrine of *forum non conveniens*.  On this basis alone, Plaintiffs cannot show likelihood of success of any of their claims against AM Bank, requiring denial of the attachment motion.

### B.    Plaintiffs Have Not Stated a *Prima Facie* Case for Either General or Specific Personal Jurisdiction Over AM Bank.

Separate from the forum selection clause, Plaintiffs cannot show likelihood of success of any of their claims because Plaintiffs' Complaint is subject to dismissal because, as discussed more fully in the MOL, Plaintiffs have not stated a *prima facie* case for personal jurisdiction over the Bank.

14

Plaintiffs allege that Defendants are subject to personal jurisdiction pursuant to CPLR § 301, on the grounds that "Defendants regularly and systematically conduct business in New York and avail themselves of New York," and under CPLR § 302(a)(1), on the grounds that "the causes of action set forth herein arise from Defendants' transaction of business in New York." Compl. ¶¶ 54-55. However, the Court may only exercise jurisdiction over the Bank consistent with due process and "'traditional notions of fair play and substantial justice' under the circumstances of the particular case." *Waldman v. PLO*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014)); *Johnson v. UBS AG*, 791 F. App'x 240 (2d Cir. 2019) (summary order); *see Daimler*, 571 U.S. at 126-27. Under these standards, the Complaint fails to make a *prima facie* case for either general or specific personal jurisdiction over AM Bank, requiring its dismissal.

As Plaintiffs concede, AM Bank is "a Lebanese bank with its headquarters located in … Beirut, Lebanon" and is "a citizen of Lebanon." Compl. ¶ 48. As a commercial bank headquartered in Beirut, Lebanon, AM Bank is regulated by the BDL, the regulator for all banks in Lebanon. El Khoury Decl. ¶ 7. The Bank is not incorporated, licensed, registered as a foreign corporation, or otherwise authorized to conduct business anywhere in the United States. *Id.* ¶ 55. It does not have a branch, office, subsidiary, agency, or other regular place of business anywhere in the United States. *Id.* ¶ 56. It does not own, lease, or occupy any real property in the United States. *Id.* ¶ 57. It has no employees, directors, or officers in the United States. *Id.* ¶ 58.

As Plaintiffs appear to acknowledge, this Court does not have general jurisdiction over AM Bank. General jurisdiction is limited to circumstances where a defendant's contacts with the forum are so "constant and pervasive" that it is "essentially at home in the forum State." *Daimler*, 571 U.S. at 122; *Waldman*, 835 F.3d at 331. AM Bank is a Lebanese bank headquartered in Beirut. It

is not "essentially at home" in New York (or elsewhere in the United States).  It does not maintain a branch, office, subsidiary, or agency in the United States; has no physical presence in the United States; is not registered or licensed to conduct business in the United States; and has no employees or directors in the United States.  Accordingly, the Bank is not "present" in the United States for "all purposes" and is not subject to general personal jurisdiction.  *Waldman*, 835 F.3d at 332-33.

Nor is there any plausible basis for specific jurisdiction over AM Bank in this action.  When determining whether specific jurisdiction exists over a defendant consistent with constitutional due process, courts consider "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 287 (2014) (citations omitted); *In re del Valle Ruiz*, 939 F.3d 520, 530 (2d Cir. 2019) (same) (quoting *SPV Osus*, 882 F.3d at 344).  The Second Circuit has confirmed that to establish specific jurisdiction, a plaintiff must plausibly allege facts showing that "the defendants' <u>suit-related conduct</u> . . . creates a substantial connection with the forum State," *Waldman*, 835 F.3d at 335 (emphasis added); *see, e.g., Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 67 (2d Cir. 2017) ("To establish jurisdiction under § 302(a)(1), the defendant must have transacted business within the state and the claim asserted must arise from that business activity.") (citation omitted).  When the defendant is a bank, and jurisdiction is predicated on alleged financial transfers through the United States, a plaintiff must show not only the defendant's "selection and repeated use of New York's banking system" during the relevant period, but also that the defendant made financial transfers through U.S. banks that served "as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress."  *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013).

The *Licci* test does not allow for specific jurisdiction over AM Bank because AM Bank did not make <u>any</u> use of the New York (or other U.S.) banking system related to the Plaintiffs'

16

accounts.  Plaintiffs allege that the Bank maintains a correspondent account at Bank of New York Mellon in New York.  Compl. ¶ 287.  However, "'mere maintenance' of a correspondent bank account in New York does not suffice to establish personal jurisdiction there."  *Licci v. Lebanese Canadian Bank SAL*, 673 F.3d 50, 65 (2d Cir. 2013); *see id.* at 65 n.13 (collecting cases); *Hau Yin To*, 700 F. App'x at 67 (holding that "the mere maintenance of correspondent bank accounts at an affiliate bank in New York" does not give rise to personal jurisdiction) (citation omitted).  Plaintiffs do not and could not plausibly allege that AM Bank processed any transactions through the United States related to the Plaintiffs' accounts—and the El Khoury Declaration confirms that it did not. Specifically, the only deposits or withdrawals on Plaintiffs' AM Bank accounts at any time are Plaintiffs' initial deposit of the check into the Daou-Gerges Account on December 3, 2019, and the transfer from the Daou-Gerges Account to the Daou Plaintiffs' Account on February 25, 2020. El Khoury Decl. ¶¶ 37, 51-52.  The check was cleared in Lebanon through the BDL's payment system, and the transfer between Plaintiffs' two AM Bank accounts was settled on AM Bank's own books. *Id.* ¶¶ 29, 33-35, 43-44.  Accordingly, neither transaction was processed through AM Bank's New York correspondent bank. *Id.* ¶¶ 34, 44, 54.

Plaintiffs also allege that "[o]n December 2, 2019, El-Khoury solicited Joseph Daou to deposit USD with AM Bank."  Compl. ¶ 290.  This is insufficient to create jurisdiction over the Bank.  There is no allegation that Joseph Daou was in the United States when this "solicitation" took place.  Moreover, "mere solicitation of business within the state does not constitute the transaction of business within the state absent some other New York-directed activities."  *Siverls-Dunham v. Lee*, No. 05 Civ. 7518, 2006 U.S. Dist. LEXIS 82927 (S.D.N.Y. Nov. 13, 2006) (citations omitted).

In sum, and as discussed more fully in the MOL, Plaintiffs have not plausibly alleged either general or specific personal jurisdiction over AM Bank here, requiring dismissal of the Complaint as against the Bank.  Accordingly, Plaintiffs cannot show likelihood of success of their claims.

      **C.**      **Plaintiffs' Claims Fail to State a Cause of Action, and Thus are Not Likely to Succeed on the Merits.**

      1.      <u>Plaintiffs' Breach of Contract Claim is Unlikely to Succeed.</u>

As discussed in the MOL, Plaintiffs' claims are legally insufficient to establish a claim, and therefore Plaintiffs cannot demonstrate that they are likely to succeed on any of their claims.

Plaintiffs are unlikely to succeed on their breach of contract claim because the Plaintiffs do not plausibly allege a breach of any provision of their contracts with the Bank.  First, the Complaint does not identify any contracts between the Plaintiffs and the Bank, let alone the specific provisions of any contract that AM Bank is alleged to have breached.  *See Wolff v. Rare Medium, Inc.,* 210 F. Supp. 2d 490, 494-95 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003) (to assert a breach of contract claim, "a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue.") (citation omitted).

Second, the plain language of the General Agreements and the Mobile Banking agreement between Plaintiffs and the Bank makes clear that the Bank is not obligated to perform any transaction requested by the Plaintiffs, such as a transfer of Plaintiffs' funds to the United States.  *See* El Khoury Decl. ¶¶ 21-28.  Rather, under Lebanese law, where a customer deposits funds with a bank, the bank's only obligation is to return the value of the deposit in one or more payments, in the place where the initial agreement between the bank and the customer was executed—here, Lebanon.  *See* the Declaration of Malek Arslan (Dkt. 41-9) ¶¶ 15-17 (citing Article 307 of the Lebanese Code of Commerce and Article 764 of the Lebanese Code of Obligations and Contracts).  Finally, the General Agreements bind Plaintiffs to comply with "policies or directives" of the Bank, or "conditions"

18

established by the Bank, which here include the restrictions on U.S. dollar transfers outside Lebanon that were in place when Plaintiffs opened their AM Bank accounts.  *See* El Khoury Decl. ¶¶ 22-23.

       2.     <u>Plaintiffs are Unlikely to Succeed on the Unjust Enrichment, Conversion, or Promissory Estoppel Claims.</u>

Plaintiffs are unlikely to succeed on the merits of their unjust enrichment, conversion, and promissory estoppel claims.  First, Plaintiffs have not plausibly alleged that these causes of action exist under Lebanese law.  *See* Arslan Decl. ¶¶ 20-22.  Second, these claims would also fail under New York law because Plaintiffs' only alleged injury arises out of the purported breach of the contracts between the parties.  "[A] valid and enforceable contract precludes recovery in quasi-contract for all matters covered by the contract."  *Bd. of Trustees v. BNY Mellon, N.A.*, No. 11-CV-6345, 2012 U.S. Dist. LEXIS 132724, at *17 (S.D.N.Y. Sept. 10, 2012) (citation omitted).

       3.     <u>Plaintiffs are Unlikely to Succeed on their Fraud or RICO Claims.</u>

As addressed more fully in the MOL, Plaintiffs' fraud claim, and their RICO claim (to the extent it is predicated on alleged fraudulent acts), are subject to dismissal and are thus unlikely to succeed.  Plaintiffs' fraud claim is based on the same alleged facts as the breach of contract claim, requiring dismissal.  *See Druyan v. Jagger*, 508 F. Supp. 2d 228, 239 (S.D.N.Y. 2007).  Additionally, Plaintiffs have not alleged any purportedly fraudulent statements by AM Bank with the "particularity" required under Fed. R. Civ. P. 9(b).  *See Negrete v. Citibank, N.A.*, 759 F. App'x 42, 47 (2d Cir. 2019).  Moreover, Plaintiffs have not plausibly alleged causation or injury, particularly because, as discussed above, Plaintiffs were well aware of the Lebanese financial crisis and the resulting restrictions on wire transfers before they ever opened their accounts at the Bank.

       4.     <u>Plaintiffs are Unlikely to Succeed on their Florida Law Claims.</u>

Plaintiffs' third and fourth causes of action essentially allege that Defendants issued the Plaintiffs bad checks.  These claims are unlikely to succeed as against AM Bank because Plaintiffs'

own allegations confirm that the Bank issued a check "that could not be deposited anywhere but in Lebanon." Compl. ¶ 368.  Moreover, the check itself confirms that it was payable in "BEIRUT," and that it was "[t]o be cleared in Lebanon."  El Khoury Decl. ¶ 49.  Plaintiffs are unlikely to succeed on these claims because they have not plausibly alleged that the Bank issued Plaintiffs a "bad check" intended to be deposited in Florida, rather than a <u>valid</u> check to be deposited in Lebanon.  Nor have Plaintiffs plausibly alleged that Florida law applies to a check issued in Lebanon by a Lebanese bank, drawn on the BDL, and payable only in Lebanon.

5.     <u>Plaintiffs are Unlikely to Succeed on their Conspiracy Claims.</u>

Plaintiffs cannot show likelihood of success of their civil conspiracy or RICO conspiracy causes of action because Plaintiffs have not plausibly alleged that AM Bank agreed with anyone to commit a wrongful act.  As noted above, the Bank is not required, either by Lebanese law or by Plaintiffs' contracts with the Bank, to accede to Plaintiffs' requests for transfers of dollars outside of Lebanon.  To the extent Plaintiffs allege facts related to an alleged "conspiracy" with the required specificity, those allegations suggest that Plaintiffs were "confronted by the conspiracy within the Lebanese banking system" in <u>September 2019</u>, Compl. ¶¶ 330-31.  But Plaintiffs did not even open their accounts with AM Bank until <u>December</u> 2019.  *Id.* ¶ 295.

## III.    PLAINTIFFS HAVE NOT ESTABLISHED A NEED FOR ATTACHMENT.

Aside from Plaintiffs' dispositive problem that they cannot demonstrate a likelihood of success on their claims, they have not demonstrated a need for the drastic remedy of attachment. "[W]here, as here, an order of attachment is sought pursuant to § 6201(1), the plaintiff must show that the attachment is needed for jurisdictional or security purposes."  *Herzi v. Ateliers de la Haute-Garonne*, No. 15-cv-7702, 2015 U.S. Dist. LEXIS 165258, at *2 (S.D.N.Y. Oct. 13, 2015); *see Buy This*, 178 F. Supp. 2d at 383 ("attachment should [be] issue[d] only upon a showing that *drastic action* is required for security purposes.") (emphasis in original).

20

Even where a plaintiff has "clearly established" for purposes of attachment that they have a cause of action, that it is probable that the plaintiff will succeed on the merits, and that the amount demanded exceeds all known counterclaims—which Plaintiffs have not done and cannot do here—the plaintiff still must demonstrate "that attachment is necessary for security purposes—that is, whether 'there exists a real threat to [Plaintiff's] ability to enforce a judgment against [D]efendant …, so as to justify the drastic remedy of pre-judgment attachment." *Herzi*, 2015 U.S. Dist. LEXIS 165258, at *5-6 (alterations in original, citation and quotation omitted); *Skyline Steel,* 2015 U.S. Dist. LEXIS 114038, at *6 ("[E]ven where the statutory requirements for attachment are met, a court may nevertheless deny a writ of attachment where the movant has not established a need for the writ.); *Elsevier, Inc. v. Grossman*, 883 F. Supp. 2d 398, 399 (S.D.N.Y. 2012) ("A court may exercise its discretion not to issue an attachment if it concludes that an attachment is not necessary 'to … provide security for potential judgments'" (citation omitted)).  "In sum, while attachment may be convenient in eventually enforcing a potential judgment, '[t]here must be more than a showing that the attachment would, in essence, be 'helpful.'"  *Bollenbach v. Haynes*, No. 18-cv-997, 2018 U.S. Dist. LEXIS 239449, at *6 (S.D.N.Y. May 29, 2018) (quoting *VisionChina Media Inc. v. S'holder Representative Servs., LLC*, 109 A.D.3d 49, 61 (N.Y. App. Div. 1st Dept. 2013)).

Here, Plaintiffs have not shown, and could not show, that they have a need for the drastic remedy of pre-judgment attachment.  As Plaintiffs acknowledge, their funds remain in their account at AM Bank.  *See* Daou Decl. ¶ 173 (admitting that "AM Bank [has] credited" Plaintiffs' funds to their account).  The balance in the Daou Plaintiffs' Account at AM Bank is currently $5,811,656.  El Khoury Decl. ¶ 53.  This exceeds the value of the $5,735,930 check that Plaintiffs initially deposited with the Bank in December 2019, *see id.* ¶ 29.  Further, the Bank has demonstrated its willingness to return Plaintiffs' funds in the same way AM Bank received them,

and through other means that accord with the governing account agreements.  On February 25, 2020, at Plaintiffs' request, the Bank transferred the balance of funds in the Daou-Gerges Account to the Daou Plaintiffs' Account.  *Id.* ¶ 43.  And on March 7, 2020, the Bank issued a check payable to Joseph or Karen Daou, in the amount of $5,811,500, payable in Beirut.  *Id.* ¶¶ 48-49.  The check clearly stated on its face that it was drawn on the BDL, that it was payable in "BEIRUT," and that it was "To be cleared in Lebanon."  *Id.* ¶ 49 and Exhibit 6 thereto.  The Bank explicitly notified Joseph Daou that "the stamp (paid in lebanon)" would appear on the check "due to BDL instructions."  *Id.* ¶ 47.  Plaintiffs' account agreements with AM Bank require no more than this.[1]

Plaintiffs claim that they require attachment due to the Bank's "issuance of worthless bank checks in Lebanese pounds that cannot be negotiated outside Lebanon and their seizure of millions of dollars from American depositors."  Daou Decl. ¶ 178.  First, as Plaintiffs admit, and at Plaintiffs' request, on March 7, 2020, AM Bank provided Plaintiffs with a check drawn on the BDL denominated in dollars, not Lebanese pounds.  Daou Decl. ¶ 171; El Khoury Decl. ¶¶ 48-49.  Second, the only funds that Plaintiffs have ever deposited with AM Bank were in the form of a bank check drawn on the BDL and payable only in Lebanon.  El Khoury Decl. ¶ 29.  That is the only source of the funds now in the Daou Plaintiffs' Account at AM Bank.  Under Lebanese law, the Bank is required to return Plaintiffs' funds only in Lebanon, not in the United States.  Arslan Decl. ¶¶ 15-17.

Plaintiffs argue that they "cannot execute on a judgement in Lebanon. And even if they could, Plaintiffs would be unable to transfer the proceeds outside Lebanon. These circumstances make it impossible for United States citizens and residents like Plaintiffs to vindicate their property

---

[1]  For these same reasons, Plaintiffs have not shown, and could not show, that AM Bank "with intent to defraud [its] creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts," as required under CPLR § 6201(3).  AM Bank has not assigned, disposed of, encumbered, secreted, or removed Plaintiffs' funds, which Plaintiffs admit remain in their AM Bank account.  Daou Decl. ¶ 173.

rights."  (Mem. of Law in Support of Plfs.' Mot. for Attachment ("Plfs.' Mot."), Dkt. #25, at 18.)

But judgment enforcement is beside the point when AM Bank has offered to return Plaintiffs'

funds to them in Lebanon in the same way that AM Bank received them.  Specifically, Plaintiffs

funded their account using a check drawn on a Lebanese bank's account at the BDL and payable

in Lebanon.  AM Bank has been and remains willing to return Plaintiffs' funds by the very same

mechanism.  Plaintiffs cannot now complain that AM Bank's provision of their funds by check

drawn on its account at the BDL and payable in Lebanon does not represent a "vindicat[ion] [of]

their property rights," when that is the only way Plaintiffs ever deposited funds with the Bank.

New York courts have recognized that, "[i]f New York permits correspondent bank

accounts to be regularly subject to attachment . . . the entire system of correspondent banking, in

which New York banks play an important role, will be disrupted." *Sigmoil Res., N.V. v. Pan Ocean*

*Oil Corp.*, 234 A.D.2d 103, 104 (N.Y. App. Div. 1st Dept. 1996) (quotation and citation omitted).

Here, Plaintiffs seek to restrain, and thus essentially preclude AM Bank's use of, the Bank's only

correspondent bank account in the United States—even though, as shown *supra* and in the MOL

and accompanying declarations, no transactions related to the Plaintiffs' accounts or Plaintiffs'

funds were processed through that account.  "Even if plaintiff established a statutory basis for

attachment of" a correspondent bank account—as Plaintiffs have sought, but failed, to do here—

this Court may use its discretion to deny attachment of the account, "given the nature of

correspondent banking and its importance in international transactions." *Cargill Fin. Servs. Int'l,*

*Inc. v. Bank Fin. & Credit Ltd.*, 70 A.D.3d 456, 456 (N.Y. App. Div. 1st Dept. 2010).  Under these

circumstances, the Court should deny attachment.

## IV.    PLAINTIFFS ARE NOT ENTITLED TO JOINT AND SEVERAL ATTACHMENT.

Astonishingly, Plaintiffs propose to attach from AM Bank an amount ($18 million) that is

more than triple what they deposited with AM Bank, on an implausible theory that AM Bank is

jointly liable to return funds Plaintiffs deposited at two other Lebanese banks.  (Plfs.' Mot. at 24).

But Plaintiffs are not entitled to attachment on a joint and several basis.  Plaintiffs themselves

identify which of the causes of action in their Complaint they are pressing on this motion:  "As the

motion only seeks an attachment equal to the USD Plaintiffs had on deposit, the relevant causes

of action are: Plaintiffs' third cause [of] action for collection on payment instruments (i.e., the

worthless checks) under Florida Statutes § 673.4121; the fifth, sixth, and seventh causes of action

alleging breach of contract . . . the eight[h] cause of action alleging conversion; and the ninth cause

of action for unjust enrichment."  (Plfs.' Mot. at 9).  Those claims do not include the conspiracy

or RICO claims alleged in the Complaint.  Plaintiffs are not entitled to joint and several liability

on their contract or quasi-contract claims or under the Florida bad-check statutes.  Moreover, for

the reasons set forth above and in the MOL, Plaintiffs cannot demonstrate likelihood of success on

their conspiracy or RICO claims in any event.  Accordingly, Plaintiffs are not entitled to

attachment against AM Bank in an amount consistent with joint and several liability.

## V. A SIZEABLE UNDERTAKING WOULD BE REQUIRED TO COMPENSATE THE BANK FOR LOSSES ARISING FROM THE PROPOSED ATTACHMENT.

For the reasons set forth above, Plaintiffs have not shown, and could not show, that they

are entitled to an attachment of AM Bank's assets in any amount, and this motion should be

dismissed.  Further, Plaintiffs propose attachment of a total of $18,676,884 plus interest as against

each Defendant bank, including the funds in AM Bank's New York correspondent account.  This

is more than three times the amount Plaintiffs have deposited with AM Bank and to which they

would be entitled to recover even if they succeeded on their contract claim against the Bank.

Attachment of AM Bank's correspondent account could have devastating effects on the Bank's

business, as it would essentially cut the Bank off from its only U.S. correspondent bank.

Plaintiffs argue that their undertaking should be limited to the statutory minimum, $500, because "[t]he Banks already misappropriated $18,676,884.00 plus interest from Plaintiffs."  But this prejudges the case.  And for the reasons set forth above, Plaintiffs have not plausibly alleged any such misappropriation and are unlikely to succeed on their claims.

For the reasons set forth above and in the MOL, no attachment of AM Bank's funds is necessary or appropriate.  However, should the Court grant such an attachment, Plaintiffs should be required to post an undertaking in the amount that is "rationally related to the potential damages in the event the attachment is found to have been unwarranted" and that is "sufficient to pay defendant(s) damages, including attorney's fees, in the event that plaintiff was found not entitled to an attachment."  *MyPart Software, Ltd. v Fluent Trade Tech. Ltd.*, No. 650316/2017, 2017 N.Y. Misc. LEXIS 4587, at *5 (N.Y. Sup. Ct., N.Y. County 2017) (citations omitted).  "Commentaries and court procedures suggest that an undertaking on an attachment should generally be set in the amount of five to ten percent of the amount restrained."  *Id.* (citing Courthouse Procedures, Procedure III [Ex Parte Applications][C]; 4A West's McKinney's Forms Civil Practice Law and Rules § 11:6 [d].)).  Accordingly, if this Court were to grant the attachment motion (which it should not), Plaintiffs should be required to post an undertaking of at least $1.8 million for each Defendant.  Indeed, under the unique circumstances presented here, it would be appropriate for the Court to require Plaintiffs to post an undertaking equal to the full amount they are seeking to attach.

## **CONCLUSION**

Plaintiffs' motion should be denied in its entirety as against AM Bank.[2]

---

[2]  Because, for the reasons discussed *supra*, Plaintiffs' motion for attachment should be denied as to AM Bank, Plaintiffs' request for expedited discovery in aid of attachment should be denied as moot.

Dated: October 9, 2020

Respectfully submitted,

**SQUIRE PATTON BOGGS (US) LLP**

/s/ *Gassan A. Baloul*

Gassan A. Baloul
gassan.baloul@squirepb.com
Mitchell R. Berger
mitchell.berger@squirepb.com
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

Joseph S. Alonzo
joseph.alonzo@squirepb.com
1211 Avenue of the Americas, 26th Floor
New York, New York 10036
Telephone: (212) 872-9800
Facsimile:  (212) 872-9815

*Counsel for Defendant AM Bank S.A.L.*