UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH A. DAOU and KAREN M. DAOU,

                Plaintiff,

v.

BLC BANK, S.A.L., CREDIT LIBANAIS,
S.A.L., AL-MAWARID BANK, S.A.L., and
BANQUE DU LIBAN,

                Defendants.

Case No. 1:20-cv-4438-DLC

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS BLC BANK, S.A.L., AND CREDIT LIBANAIS, S.A.L.'S
## MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Jeffrey D. Rotenberg
Caroline A. Fish
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Tel. 212.335.4500
Fax. 212.335.4501

*Attorneys for BLC Bank, S.A.L., and
Credit Libanais, S.A.L.*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ...................................................................................................................... 4

    A.    Parties.......................................................................................................................... 4

    B.    Plaintiffs' Lebanese Banking Relationships .............................................................. 4

STANDARD OF REVIEW ...................................................................................................... 8

ARGUMENT ........................................................................................................................... 8

I.      PLAINTIFFS' CLAIMS SHOULD BE DISMISSED ON PROCEDURAL GROUNDS ............. 8

    A.    The Banks Are Not Subject To Personal Jurisdiction................................................. 8

          1.    Plaintiffs Cannot Satisfy The Long-Arm Statute .................................... 9

          2.    Due Process Precludes The Exercise Of Jurisdiction Over The Banks ...................... 10

    B.    Lebanon Is The Proper Forum For This Dispute ....................................................... 13

          1.    BLC's Forum Selection Clause Supports Dismissal................................... 14

          2.    Other *Forum Non Conveniens* Factors Favor Dismissal............................ 14

II.     PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF........................................... 18

    A.    Plaintiffs Fail To Plead Governing Lebanese Law .................................................. 18

    B.    Plaintiffs Fail To State A Claim Under New York Law........................................... 19

          1.    Plaintiffs Fail To Plead Breach of The Lebanon Contracts ......................... 20

          2.    Plaintiffs Fail To State An Unjust Enrichment Claim .................................. 21

          3.    Plaintiffs Fail To State A Promissory Estoppel Claim................................. 22

          4.    Plaintiffs Fail To Plead Fraud ................................................................... 23

          5.    Plaintiffs Fail To State A Conversion Claim .............................................. 25

          6.    Plaintiffs Fail To Plead Civil Conspiracy .................................................. 27

          7.    Plaintiffs Fail To State Florida Statutory Claims........................................ 27

    C.    Plaintiffs' Racketeer Influenced and Corrupt Organizations Act Claims Fail........................... 28

          1.    Plaintiffs Lack RICO Standing ................................................................. 30

2.     Plaintiffs Fail To Plead A Violation of § 1962(c)........................................................32

    (a)     No Enterprise ...............................................................................................32

        i.     Plaintiffs Fail to Allege An Association-In-Fact ..............................32

        ii.     Plaintiffs Fail To Allege An Enterprise Separate and Distinct From Alleged Racketeering Activity ....................................................34

    (b)     No Conducting ..............................................................................................35

    (c)     No Pattern .....................................................................................................35

        i.     No Predicate Acts ..............................................................................36

        ii.     No Continuity .....................................................................................39

3.     Plaintiffs Fail To Plead A RICO Conspiracy Claim Under § 1962(d) .......................41

4.     Plaintiffs Fail To Overcome The Presumption Against Extraterritoriality .................41

CONCLUSION ..............................................................................................................................42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Adelphia Supply USA*,
    2017 WL 57802 (E.D.N.Y. Jan. 4, 2017) ................................................................. 34, 35

*ACR Sys., Inc. v. Woori Bank*,
    232 F. Supp. 3d 471 (S.D.N.Y. 2017) ....................................................................... 27

*Al Rushaid Parker Drilling Ltd. v. Byrne Modular Blds. L.L.C.*,
    180 A.D.3d 577 (1st Dep't 2020) .............................................................................. 18

*Alamir v. Callen*,
    750 F. Supp. 2d 465 (S.D.N.Y. 2010) ....................................................................... 17

*Amigo Foods Corp. v. Marine Midland Bank*,
    39 N.Y.2d 391 (1976) ................................................................................................ 9

*Anctil v. Ally Fin., Inc.*,
    998 F. Supp. 2d 127 (S.D.N.Y. 2014) ....................................................................... 33

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) .................................................................................................. 31

*Arndt v. Twenty-One Eighty-five, LLC*,
    448 F. Supp. 3d 1310 (S.D. Fla. 2020) ..................................................................... 28

*Asahi Metal Indus. Co. v. Super. Ct. Cal., Solano Cty.*,
    480 U.S. 102 (1987) .................................................................................................. 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................... 8, 25, 30

*Bangladesh Bank v. Rizal Com. Banking Corp.*,
    2020 WL 1322275 (S.D.N.Y. Mar. 20, 2020) ........................................................... 34

*Belfon v. Credit Check Total Consumerinfo.com, Inc.*,
    2018 WL 4778906 (E.D.N.Y. Oct. 1, 2018) .............................................................. 4

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................. 30

*Berry v. Deutsche Bank Trust Co. Americas*,
    2008 WL 4694968 (S.D.N.Y. Oct. 21, 2008) ........................................................... 35

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007) ............................................................................... 8, 11

*Bigsby v Barclays Capital Real Estate, Inc.*,
   170 F. Supp. 3d 568 (S.D.N.Y. 2016) ................................................................ 36

*Blitzer v. Potter*,
   2005 WL 1107064 (S.D.N.Y. May 6, 2005) ........................................................ 23

*Blockchain Luxembourg S.A. v. Paymium, SAS*,
   2019 WL 4199902 (S.D.N.Y. Aug. 7, 2019) .................................................... 8, 11

*Boritzer v. Calloway*,
   2013 WL 311013 (S.D.N.Y. Jan. 24, 2013) ........................................... 29, 39, 40

*Boyle v. United States*,
   556 U.S. 938 (2009) .............................................................................................. 33

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
   373 F.3d 296 (2d Cir. 2004) ................................................................................ 22

*Broder v. Cablevision Sys. Corp.*,
   418 F.3d 187 (2d Cir. 2005) .................................................................................. 4

*Brown v. Lockheed Martin Corp* .,
   814 F.3d 619 (2d Cir. 2016) .................................................................................. 9

*Cairo Amman Bank v. Bucheit*,
   1 Fed. App'x 98 (2d Cir. 2001) ........................................................................... 11

*Carling v. Peters*,
   96 N.Y.S.3d 33 (1st Dep't 2019) ........................................................................ 25

*Carlson v. Am. Int'l Grp.*,
   67 N.Y.S.3d 100 (2017) ....................................................................................... 27

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*,
   547 F.3d 115 (2d Cir. 2008) ................................................................................ 37

*Chem. Bank v. Ettinger*,
   602 N.Y.S.2d 332 (1st Dep't 1993) ..................................................................... 26

*Chloé v. Queen Bee of Beverly Hills*,
   LLC, 616 F.3d 158 (2d Cir. 2010) ......................................................................... 9

*Citadel Mgmt., Inc. v. Telesis Trust, Inc.*,
   123 F. Supp. 2d 133 (S.D.N.Y. 2000) ............................................................ 26, 27

*City of Almaty, Kazakhstan v. Ablyazov*,
   226 F. Supp. 3d 272 (S.D.N.Y. 2016) ................................................................. 42

*City of New York v. Chavez*,
   944 F. Supp. 2d 260 (S.D.N.Y. 2013) ................................................................. 33

*Cofacredits, S. A. v Windsor Plumbing Supply Co.*,
   187 F. 3d 229 (2d. Cir. 1999) ................................................................................ 40, 41

*Cooney v. Osgood Mach., Inc.*,
   81 N.Y.2d 66 (1993) ...................................................................................................... 19

*Corning Inc. v. Shin Etsu Quartz Prods. Co.*,
   2000 WL 1811067 (2d Cir. Dec. 11, 2000) ................................................................... 4

*Crawford v Franklin Credit Mgmt. Corp.*,
   758 F. 3d 473 (2d Cir. 2014) .............................................................................. 36, 40

*CUnet, LLC v. Quad Partners, LLC*,
   2017 WL 945937 (S.D.N.Y. Mar. 7, 2017) ................................................................ 22

*D. Penguin Bros., Ltd. v. City Nat'l Bank*,
   587 Fed. App'x 663 (2d Cir. 2014) ........................................................................... 34

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ........................................................................................................ 9

*DeFalco v. Bernas*,
   244 F.3d 286 (2d Cir. 2001) ............................................................................... 35, 41

*Doe v. Trump Corp.*,
   385 F. Supp. 3d 265 (S.D.N.Y. 2019) ....................................................................... 31

*Donenfeld v. Brilliant Techs. Corp.*,
   96 A.D.3d 616 (1st Dep't 2012) ................................................................................ 18

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014) ..................................................................................... 38

*Elsevier Inc. v. W.H.P.R., Inc.*,
   692 F. Supp. 2d 297 (S.D.N.Y. 2010) ................................................................. 33, 35

*Empire Merchs., LLC v. Reliable Churchill LLP*,
   902 F.3d 132 (2d Cir. 2018) ...................................................................................... 31

*Farahmand v. Dalhousie Univ.*,
   947 N.Y.S.2d 459 (1st Dep't 2012) ........................................................................... 18

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004) ............................................................................. *passim*

*In re Fosamax Prod. Liab. Litig.*,
   2009 WL 3398930 (S.D.N.Y. Oct. 21, 2009) ............................................................ 15

*In re: Gen. Motors LLC Ignition Switch Litig.*,
   2016 WL 3920353 (S.D.N.Y. July 15, 2016) ............................................................ 31

*Georgakis v. Excel Mar. Carriers Ltd.*,
    900 N.Y.S.2d 260 (1st Dep't 2010) .......................................................................... 10

*Gibbon v. Am. Univ. of Beirut*,
    1983 US Dist LEXIS 13401 (S.D.N.Y. Sept. 27, 1983) ...................................... 16

*Gilstrap v. Radianz Ltd.*,
    443 F. Supp. 2d 474 (S.D.N.Y. 2006) .................................................................. 15

*Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.*,
    2011 WL 4031203 (S.D.N.Y. Sept. 12, 2011) .................................................... 27

*Gross v. Waywell*,
    628 F. Supp. 2d 475 (S.D.N.Y. 2009) ............................................................ 30, 36

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*,
    2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016)........................................................ 33

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) ........................................................................... 9, 12

*Hau Yin To v. HSBC Holdings, PLC*,
    700 F. App'x 66 (2d Cir. 2017)................................................................................ 9

*Hemi Grp., LLC v. City of New York, N.Y.*,
    559 U.S. 1 (2010) ................................................................................................... 31

*Hyundai Merchant Marine Co., Ltd. v. Mitsubishi Heavy Indus., Ltd.*,
    2015 WL 7758876 (S.D.N.Y. Dec. 1, 2015) ........................................................ 17

*Ismail v Am. Univ. of Beirut*,
    246 F Supp 2d 330 (S.D.N.Y. 2003) .................................................................... 16

*Jazini v. Nissan Motor Co., Ltd.*,
    148 F.3d 181 (2d Cir. 1998) .................................................................................... 8

*Johnson v. UBS AG*,
    791 Fed. Appx. 240 (2d Cir. 2019) ...................................................................... 10

*Kante v. All Taxi*,
    958 N.Y.S.2d 61 (2d Dep't 2010) ........................................................................ 26

*Kashef v. BNP Paribas SA*,
    442 F. Supp. 3d 809 (S.D.N.Y. 2020) ............................................................ 10, 18

*Khalife v. Audi Saradar Private Bank SAL*,
    129 A.D.3d 46832 (1st Dep't 2015) .................................................................. 9, 10

*Matter of Kimball*,
    16 B.R. 201 (Bankr. M.D. Fla. 1981) .................................................................. 28

*Kimm v. Chang Hoon Lee & Champ, Inc.*,
    196 F. App'x 14 (2d Cir. 2006) ........................................................................... 30

*Komlossy v. Faruqi & Faruqi, LLP*,
    2017 WL 722033 (S.D.N.Y. Feb. 23, 2017) ........................................................ 23

*Kottler v. Deutsche Bank AG*,
    607 F. Supp. 2d 447 (S.D.N.Y. 2009) ................................................................. 34

*LaSala v. UBS AG*,
    510 F. Supp. 2d 213 (S.D.N.Y. 2007) ................................................................. 18

*LLM Bar Exam, LLC v. Barbri, Inc.*,
    271 F. Supp. 3d 547 (2017) ................................................................................. 33

*Lynn v. McCormick*,
    2017 WL 6507112 (S.D.N.Y. Dec. 18, 2017), *aff'd* 760 F. App'x 51 (2d Cir. 2019) ................. 34, 41

*Madness, L.P. v. DiTocco Konstruction, Inc.*,
    873 So.2d 427 (4th Dist. Fla. 2004) ............................................................. 28, 29

*Malvar Egerique v. Chowaiki*,
    2020 WL 1974228 (S.D.N.Y. Apr. 24, 2020) ..................................................... 30

*Mandarin Trading Ltd. v. Wildenstein*,
    16 N.Y.3d 173 (2011).......................................................................................... 25

*Marin v. AI Holdings (USA) Corp.*,
    35 Misc. 3d 1227(A) (Sup. Ct., N.Y. Cty. 2012) ............................................... 25

*Martinez v. Bloomberg LP*,
    740 F.3d 211 (2d Cir. 2014) ............................................................................... 14

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*,
    23 N.Y.3d 129 (N.Y. 2014) ................................................................................ 18

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014) ................................................................................. 8

*McBrearty v. Vanguard Grp, Inc.*,
    2009 WL 875220 (S.D.N.Y. Apr. 2, 2009) ........................................................ 32

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) ............................................................................... 30

*McPhee v. General Elec. Int'l, Inc.*,
    736 F. Supp. 2d 676 (S.D.N.Y. 2010) ..................................................... 18, 19, 25

*MG W. 100 LLC v. St. Michael's Protestant Episcopal Church*,
    8 N.Y.S.3d 299 (1st Dep't 2015)......................................................................... 22

*Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*,
    311 F.3d 488 (2d Cir. 2002) ............................................................... 16

*Negrete v. Citibank, N.A.*,
    759 Fed. App'x 42 (2d Cir. 2019) ...................................................... 20

*In re Nine West Holdings, Inc.*,
    614 B.R. 175 (Bankr. S.D.N.Y. 2020) ............................................... 16

*O'Leary v. S & A Elec. Contracting Corp.*,
    53 N.Y.S.3d 617 (1st Dep't 2017) ...................................................... 19

*Petroleos Mexicanos v. SK Eng'g & Constr. Co.*,
    572 F. App'x 60 (2d Cir. 2014) .......................................................... 42

*Picard v. Kohn*,
    907 F. Supp. 2d 392 (S.D.N.Y. 2012) ............................................... 30

*Prod. Res. Grp. v. Martin Prof'l*,
    907 F. Supp. 2d 401 (S.D.N.Y. 2012) ............................................... 14

*Quenoy v. Am. Univ. of Beirut*,
    2019 WL 4735371 (S.D.N.Y. Sept. 27, 2019) ................................... 14

*Quenoy v. Am. Univ. of Beirut*,
    2020 WL 5868290 (2d Cir. Oct. 2, 2020) .................................... 14, 16

*Radian Int'l, LLC v. Alpina Ins.*,
    2005 WL 1656884 (N.D. Cal. July 14, 2005) ................................... 14

*Reich v. Lopez*,
    858 F. 3d 55 (2d Cir. 2017) ........................................................ 36, 40

*Ridenhour v. Bryant*,
    2020 WL 1503626 (S.D.N.Y. Mar. 29, 2020) ................................... 23

*RJR Nabisco, Inc. v. European Cmty.*,
    764 F.3d 129 (2d Cir. 2014) .............................................................. 41

*RJR Nabisco, Inc. v. European Cmty.*,
    136 S. Ct. 2090 (2016) ....................................................................... 42

*Rosenson v. Mordowitz*,
    2012 WL 3631308 (S.D.N.Y. Aug. 23, 2012) ............................. 29, 38

*Rosner v. Bank of China*,
    528 F. Supp. 2d 419 (S.D.N.Y. 2007) ............................................... 36

*In re Salomon Analyst AT&T Litig.*,
    350 F. Supp. 2d 455 (S.D.N.Y. 2004) ............................................... 38

*Seaweed, Inc. v. DMA Prod. & Design & Markeg. LLC*,
219 F. Supp. 2d 551 (S.D.N.Y. 2002) ................................................................................ 4

*Sedima S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985) ......................................................................................................... 29

*Segal v. Bitar*,
2012 WL 273609 (S.D.N.Y. Jan. 30, 2012) ..................................................................... 32

*Shron v. LendingClub Corp.*,
2020 WL 3960249 (S.D.N.Y. July 13, 2020) ................................................................... 19

*Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*,
17 F. Supp. 3d 207 (E.D.N.Y. 2014) ................................................................................ 41

*Spinelli v. Nat'l Football League*,
96 F. Supp. 3d 81 (S.D.N.Y. 2015) .................................................................................. 20

*Spool v. World Child Int'l Adoption Agency*,
520 F.3d 178 (2d Cir. 2008) ...................................................................................... 37, 41

*SPV Osus Ltd. V. UBS AG*,
882 F.3d 333 (2d Cir. 2018) ........................................................................................ 9, 12

*SPV Osus Ltd. v. UniCredit Bank Austria*,
2019 WL 1438163 (S.D.N.Y. Mar. 30, 2019) .................................................................. 12

*Tevdorachvili v. Chase Manhattan Bank*,
103 F. Supp. 2d 632 (E.D.N.Y. 2000) .............................................................................. 26

*U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*,
303 F. Supp. 2d 432 (S.D.N.Y. 2004) .............................................................................. 35

*U.S. v. Binday*,
804 F.3d 558 (2d Cir. 2015) ............................................................................................ 37

*U.S. v. Halloran*,
821 F.3d 321 (2d Cir. 2016) ............................................................................................ 37

*U.S. v. Males*,
459 F.3d 154 (2d Cir. 2006) ...................................................................................... 37, 38

*In re Veon Ltd. Secs. Litig.*,
2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) .................................................................. 11

*Villoldo v. BNP Paribas S.A.*,
648 F. App'x 53 (2d Cir. 2016) ........................................................................................ 30

*Walden v. Fiore*,
571 U.S. 277 (2014) ......................................................................................................... 12

*Weiss v. La Suisse*,
   154 F. Supp. 2d 734 (S.D.N.Y. 2001) ......................................................................... 19

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
   127 F. Supp. 3d 156 (S.D.N.Y. 2015) .......................................................................... 4

*Williams v. Affinion Grp., LLC*,
   889 F.3d 116 (2d Cir. 2018) ....................................................................................... 37

*Woori Bank v. RBS Secs., Inc.*,
   910 F. Supp. 2d 697 (S.D.N.Y. 2012) .................................................................... 23, 24

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
   530 F. Supp. 2d 486 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).................. 30

*Yanchukov v. Finskiy*,
   2017 WL 3491965 (S.D.N.Y. Aug. 14, 2017)............................................................... 42

**Statutes**

Fla. Stat. § 68.065 ............................................................................................................ 28

Fla. Stat. § 167.105 .......................................................................................................... 28

Fla. Stat. § 673.4121 ........................................................................................................ 28

N.Y. C.P.L.R. § 302(a)(1)............................................................................................. 9, 10

18 U.S.C. § 1962.......................................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 4(k)(1)(A) .................................................................................................. 9

Fed. R. Civ. P. 9(b) .................................................................................................. 8, 25, 37

Fed. R. Civ. P. 12(b)(2).................................................................................................. 1, 8

Fed. R. Civ. P. 12(b)(6).................................................................................................. 1, 8

Defendants BLC Bank, S.A.L. ("BLC") and Credit Libanais, S.A.L. ("CL," together the "Banks"), by and through their undersigned attorneys, respectfully submit this memorandum of law in support of their Motion to Dismiss ("Motion") Joseph and Karen Daou's ("Plaintiffs") Complaint pursuant to Federal Rules of Civil Procedure ("FRCP") Rules 12(b)(2) and 12(b)(6).

## PRELIMINARY STATEMENT

This lawsuit does not belong in this Court.  It is a foreign dispute involving bank accounts opened by Lebanese citizens with Lebanese commercial banks in Lebanon with contracts expressly governed by Lebanese law.  It purports to implicate a foreign sovereign governmental entity in an unlawful conspiracy involving Lebanese commercial bank defendants.  Plaintiffs' claims arise from Lebanon's financial crisis, Defendants' actions in Lebanon during that crisis, and the legality of those actions under Lebanese law.

Plaintiffs have no alleged connection to New York. They are married dual Lebanese-U.S. citizens with a residence and substantial holdings and business in Lebanon.  The defendants are three Lebanese commercial banks (the movants BLC and CL along with Al-Mawarid Bank, S.A.L. ("AM Bank")), and Banque du Liban, Lebanon's Central Bank ("Central Bank," together with the Banks and AM Bank, "Defendants").  BLC and CL do not have offices, operations, employees, or representatives in New York (or elsewhere in the United States).

There is no reason for this lawsuit to have been filed, let alone for it to be litigated, here in the Southern District of New York.  It should be dismissed with prejudice.

Plaintiffs engaged, negotiated with, and deposited money with the Banks in Lebanon to obtain interest rates unavailable elsewhere.  Mr. Daou initiated the opening of Plaintiffs' accounts with the Banks in-person in Lebanon in 2016.  He gave the Banks his home address in Lebanon when opening these accounts and often visited the Banks in Lebanon.  Plaintiffs agreed that

Lebanese law would govern their relationships with the Banks.  They agreed to litigate in Lebanon.  Yet, Plaintiffs are here, instead of in Lebanon, to transform contractual claims, involving approximately $18 million in bank deposits, into super-claims for $150 million.  Plaintiffs try, but fail, to get there via exaggerated compensatory damages demands for spurious common law torts, compounded by treble damages under statutes that offer them no right to relief.

Unsurprisingly, given Plaintiffs' blatant forum shopping, multiple procedural grounds for dismissal exist.  First, the Court lacks personal jurisdiction over BLC and CL.  Plaintiffs premise personal jurisdiction entirely on the Banks' correspondent accounts.  But Plaintiffs cannot satisfy New York's long-arm statute.  The Complaint fails to demonstrate the required substantial nexus between Plaintiffs' claims and the Banks' routine correspondent banking activity—the same routine activity engaged in by all banks that transact business in dollars—to support this Court's exercise of jurisdiction over the Banks.  Nor would the exercise of personal jurisdiction over the Banks on the facts of this dispute comport with due process, as it must.

Second, this is the wrong forum.  Plaintiffs' agreements with BLC and with AM Bank contain mandatory forum selection clauses requiring that their claims be litigated in Lebanon.  On top of these mandatory clauses, the *forum non conveniens* factors overwhelmingly support dismissal of this action in favor of Lebanon.  The parties, including the Central Bank, are Lebanese, Lebanese law applies, Lebanon's national interests are implicated, the dispute arose in Lebanon, Lebanon's judiciary is more than able to adjudicate the dispute, and that forum is most convenient.  In contrast, New York has no interest in this dispute and is not convenient for any party.

Plaintiffs also fail to state a claim against the Banks as a matter of law.  First, Plaintiffs fail to plead governing Lebanese law.  Plaintiffs' rights vis-à-vis the Banks begin and end with banking contracts governed by Lebanese law.  The Complaint does not explain how the Banks breached

their agreements or any obligations running from the Banks to Plaintiffs under Lebanese law.

Second, even if New York law applied (which it does not), Plaintiffs fail to satisfy their pleading burden across the board under New York law.  Plaintiffs fail to allege breach of contract and cannot avoid their contracts by invoking equitable quasi-contract doctrines.  Their unjust enrichment and promissory estoppel claims are unavailable given that the parties' relationship is governed by a contract.  Plaintiffs also fail to plead adequately the elements of these claims.

Nor do any of the alleged facts in the Complaint transform Plaintiffs' contract claims to ones sounding in tort.  As to fraud, Plaintiffs fall well short of alleging actionable false and misleading statements, wrongful intent, reliance on these statements, and resulting damages. Plaintiffs allege nothing from which to plausibly infer fraudulent conduct by the Banks.  Plaintiffs similarly do not plead the elements of conversion.  In the absence of an underlying tort, the civil conspiracy claim fails (and would fail anyway because Plaintiffs fail to allege a wrongful agreement among the defendants).

Third, Plaintiffs' Florida statutory claims are inapplicable by the parties' agreements. Separately, Plaintiffs do not explain why these statutes apply to checks tendered and accepted in Lebanon and governed by Lebanese law.  Both claims also fail because the allegations do not support the Banks' liability thereunder.

Finally, Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") Act claims are the type of statutory abuse which courts regularly admonish against.  Plaintiffs lack standing and satisfy none of the many elements for section 1962(c) liability.  The RICO conspiracy claim falls with the primary claim.

For these reasons and others below, the Complaint should be dismissed with prejudice. [1]

---

[1] The Banks incorporate the arguments contained in AM Bank's Memoranda of Law in Opposition to Plaintiffs' Motion for Attachment (ECF No. 42) and in Support of its Motion to Dismiss (ECF No. 41-1), as applicable.

## BACKGROUND

### A.      Parties

Plaintiffs **Joseph Daou** and **Karen Daou** are married Lebanese citizens with a residence in Lebanon. Ex. 1, ¶ 10; Ex. 2, ¶ 15.[2]  Mr. Daou is an established real estate proprietor in Lebanon with over 23 properties in the country and a "skilled professional investor," who is "engaged in several private financial institutions specialized in engineering & hedge funds services" in Lebanon.  Ex. 1, ¶¶ 11–12.  Defendants **BLC Bank, S.A.L.**, and **Credit Libanais, S.A.L.**, are Lebanese commercial banks.  Ex. 1, ¶ 6; Ex. 2, ¶ 5.  Plaintiffs do not allege that the Banks have any connection to New York outside the maintenance of correspondent accounts.

### B.      Plaintiffs' Lebanese Banking Relationships

Mr. Daou opened an account with CL on March 9, 2016, in person in Lebanon.  Compl. ECF No. 1, ¶ 190 (hereinafter "Compl.").  He opened an account with BLC on April 26, 2016, in person in Lebanon.  *Id.* ¶ 94.  In account opening documents, Plaintiffs listed a home address in Lebanon.  Ex. 1, ¶ 10; Ex. 2, ¶ 15.  Plaintiffs' agreements with the Banks stipulate that Lebanese law governs.  *See* Ex. 3, art. 1 § 11, art. 2 § 3, art. 3 § 7; Exs. 4–5, ch. 4, § X, ¶ 1.  The BLC agreement contains a mandatory Lebanon forum selection clause.  Exs. 4–5, ch. 4, § X, ¶ 2.

Mr. Daou regularly discussed investment opportunities with Lebanese banks and undertook to play banks off one another to secure higher rates.  *See, e.g.*, Compl. ¶¶ 204–5, 207,

---

[2] Exhibits cited "Ex." are attached to the Declaration of Jeffrey D. Rotenberg, dated October 9, 2020. Courts need not accept as true allegations that are contradicted by documents.  When a "complaint relies on the terms of [an] agreement," courts "may look to the agreement itself."  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005).  Courts may consider official government documents, publicly available documents, and published websites. *See, e.g.*, *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166–67 (S.D.N.Y. 2015); *Belfon v. Credit Check Total Consumerinfo.com, Inc.*, 2018 WL 4778906, at *3 (E.D.N.Y. Oct. 1, 2018).  Courts can also consider materials beyond the pleadings to resolve jurisdictional questions.  *Seaweed, Inc. v. DMA Prod. & Design & Markeg. LLC*, 219 F. Supp. 2d 551, 554 (S.D.N.Y. 2002) (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 364 (2d Cir. 1986)).  Evidentiary material may be presented by affidavit or otherwise.  *See Corning Inc. v. Shin Etsu Quartz Prods. Co.*, 2000 WL 1811067, at *2 (2d Cir. Dec. 11, 2000).

209, 215.  His practice was to aggressively negotiate rate increases while threatening to withdraw his funds.  *See id.*; Ex. 1, ¶ 14; Ex. 2, ¶ 21–22.  For example, in September 2019, Mr. Daou pushed for the highest interest rate yet with BLC, which BLC agreed to in exchange for blocking the account for four months, until January 2020.  Ex. 2, ¶ 22.  Mr. Daou continued to approach the Banks and others for opportunities into at least December 2019.  *See* Compl., ¶ 295.

i.    <u>Transactions</u>

Plaintiffs allege four wire transactions with CL.  They made deposits in April 2016 and February 2018, totaling $3.325M USD.  *Id.* ¶¶ 194, 196.  In August 2018, Plaintiffs withdrew $3,699,995 USD.  *Id.* ¶ 198.  In October 2018, Plaintiffs re-funded their account in the amount of $4,699,994 USD.  *Id.* ¶ 200.

Plaintiffs allege four wire transactions with BLC.  They wired $1.9M in June 2016, $2M in November 2016, and $2.045M in February 2017.  *Id.* ¶¶ 100, 102, 104.  BLC has no evidence of the alleged April 2016 wire transfer of $2.5M.  *See id.* ¶ 98; Ex. 2, ¶ 18.  The Complaint omits all of Plaintiffs' cash deposits and withdrawals, including on April 27 and May 3, 2016, June 21, 2017, and May 29 and November 8, 2019.  Ex. 2, ¶ 18.

ii.    <u>Lebanon's Financial and Banking Crisis</u>

Plaintiffs' claims hardly arise in a vacuum.  In October 2019, Lebanese government action to address economic issues triggered widespread protests.  Ex. 6.  These protests resulted in the Prime Minister's resignation.  Ex. 7.  Concerns heightened when a new government was not readily convened.  *Id.*; Ex. 8.  In response to this political uncertainty and mounting nationwide economic pressure and liquidity concerns, Lebanon's financial institutions took emergency measures, which included temporary bank closures on October 17.  Ex. 9.  When the banks re-opened two weeks later, November 1, they did so with well-publicized limitations on withdrawals.  *Id.*  Banks closed again one week later "because of a strike by staff who complained of intimidation from clients

5

demanding their cash." Ex. 10. When banks re-opened again on November 19, they announced further limitations including caps on U.S. dollar (and other currency) transfers from Lebanon. *Id.*; Ex. 11. In the months that followed, as reflected in press coverage, public statements, and financial analyses, Lebanon's banks engaged with the Central Bank and other governmental bodies in Lebanon and abroad, to respond to the crisis. *See, e.g.*, Ex. 12. These efforts are continuing.[3]

### iii.   Plaintiffs Demand International Transfers

Amidst this crisis and with the banks closed, on or around October 28, 2019, Mr. Daou requested the execution of an international transfer by CL. Compl. ¶ 226. At about the same time, Mr. Daou also demanded that BLC transfer his account funds to the U.S. although he had no right to do so. *Id.* ¶ 124; *see* Ex. 2, ¶ 22. For one thing, international transfers are a discretionary service. Ex. 15, ¶ 16; Ex. 16, ¶ 14. They are not guaranteed by the Banks' account opening agreements with Plaintiffs. Ex. 1, ¶ 16; Ex. 2, ¶ 27; Ex. 15, ¶ 17; Ex. 16, ¶ 15; *see* Exs. 3–5. Lebanese banks are not obligated by statute, decree, or decision to effect such transfers. Ex. 15, ¶ 15; Ex. 16, ¶ 14. Mr. Daou repeated his request for a transfer with BLC between November 5 and 7, 2019. Compl. ¶¶ 127, 134. He likewise renewed his request for a transfer with CL on November 15, 2019. *Id.* ¶ 252. In accordance with their respective agreements and consistent with Lebanese law, CL and BLC declined Plaintiffs' request. *Id.* ¶¶ 130, 143, 252.

Plaintiffs decided instead to liquidate their accounts with each bank and accept banker's checks for their balances. *Id.* ¶¶ 157, 262. Banker's checks are recognized under Lebanese law as a valid payment method in Lebanon and a legal means for the Banks to fully satisfy account

---

[3] On April 30, the Cabinet released a final economic rescue plan after months of discussions between the government, its financial advisors, IMF and other constituencies. Ex. 13. This plan is still being negotiated. Among the priorities IMF recently identified are "temporary safeguards to avoid continued capital outflows that would further undermine the financial system while reforms are taking hold. This includes adopting legislation to formalize capital controls in the banking system and eliminate the current multiple exchange rate system to help protect Lebanon's international reserves while reducing rent-seeking and corruption." Ex. 14.

payments to accountholders.  Ex. 15, ¶ 20; Ex.16, ¶ 20.  On November 21, 2019, CL Bank delivered to Mr. Daou, in Lebanon, a banker's check duly drawn on the Central Bank for $5.3M USD and, on December 2, a second banker's check drawn on the Central Bank for $40,180 USD.  Compl. ¶¶ 262, 275.  On November 27, 2019, BLC tendered to Mr. Daou in person in Lebanon a banker's check duly drawn on the Central Bank for $7.525M USD.  *Id.* ¶ 157.  On their face, the checks specify that they are for deposit only in Beirut.  *See* ECF Nos. 27-5, 27-15, 27-16 ("Payable à Beirut").  Each of these checks was and remains payable by the Central Bank.  Ex. 1, ¶ 18; Ex. 16, ¶ 21.  Plaintiffs have admitted each check is available for payment in Lebanon.  *See* ECF Nos. 27-6, 27-14 ("Checks must be presented at local bank in Lebanon").[4]  By Plaintiffs' acceptance of these checks, the Banks satisfied their obligations to Plaintiffs.  Ex. 15, ¶ 23; Ex. 16, ¶ 22.

On or around January 31, 2020, Plaintiffs demanded the cancellation of the checks and that the Banks make wire transfers to the U.S.  Ex. 1, ¶ 20; Ex. 2, ¶ 32; *see* ECF Nos. 27-8, 27-19.  Plaintiffs also purported to return the checks to both BLC and CL on the ground that the checks had not cleared in the U.S.  *Id.*  Each Bank explained that a wire transfer was not available, and the tender and acceptance of the checks drawn on the Central Bank satisfied their contractual and legal obligations to Plaintiffs.  Ex. 1, ¶ 21; Ex. 2, ¶ 33.  Plaintiffs ignored Defendants' explanations.  On May 29, Plaintiffs demanded that BLC make cash payments of $7.525M plus fees.  Ex. 2, ¶ 35.  At or around the same date, Plaintiffs made a similar demand on CL for payment "in cash" of $5.565M plus service charges.  Ex. 1, ¶ 22.  Plaintiffs sued one week later.

---

[4] Plaintiffs know the checks are available for deposit in Lebanon.  On December 3, 2019, Mr. Daou deposited a Central Bank-drawn banker's check (withdrawn from CL), at AM Bank to fund his newly opened account there in the amount of $5,735,930.00 USD.  *See* Ex. 1, ¶ 2; AM Br., ECF No. 41-1, at 5 (citing El Khoury Decl. ¶ 29).

## STANDARD OF REVIEW

"[T]o survive a motion to dismiss for lack of personal jurisdiction" under Rule 12(b)(2), the "plaintiff must make a prima facie showing that jurisdiction exists." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quotation omitted). That showing must be made with well-pleaded facts, rather than "conclusory non-fact-specific jurisdictional allegations" or "legal conclusion[s] couched as . . . factual allegation[s]." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185–86 (2d Cir. 1998). Courts should not "draw argumentative inferences in the plaintiff's favor" when determining whether this burden has been met. *Blockchain Luxembourg S.A. v. Paymium, SAS*, 2019 WL 4199902, at *4 (S.D.N.Y. Aug. 7, 2019) (quoting *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994)).

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court may consider only well-pled factual allegations. *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014). It must ignore "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by merely conclusory statements." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiffs' pleading burden is heightened for their claims sounding in fraud. *See* Fed. R. Civ. P. 9(b).

## ARGUMENT

## I.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED ON PROCEDURAL GROUNDS

### A.   The Banks Are Not Subject To Personal Jurisdiction

Plaintiffs fail to make a prima facie showing of personal jurisdiction over the Banks. New York's long-arm statute and principles of due process govern this Court's jurisdiction. *See Best Van Lines*, 490 F.3d at 244; *Chloé v. Queen Bee of Beverly Hills*, LLC, 616 F.3d 158, 163–64 (2d

Cir. 2010); Fed. R. Civ. P. 4(k)(1)(A).  Both must be satisfied, yet Plaintiffs satisfy neither.

     1.     <u>Plaintiffs Cannot Satisfy The Long-Arm Statute</u>

Plaintiffs premise long-arm jurisdiction solely on the Banks' correspondent accounts in New York.  Compl. ¶¶ 15, 54, 55.  Foreign banks routinely maintain correspondent accounts to enable the electronic transfer of U.S. dollars, including, as here, from accounts outside New York to accounts outside New York, as part of their foreign banking business.  Ex. 1, ¶ 8; Ex. 2, ¶ 9.  Plaintiffs contend that the maintenance and use of these correspondent accounts is sufficient to establish personal jurisdiction in this case.  Compl. ¶¶ 15, 54, 55.  Plaintiffs are wrong.  *See, e.g.*, *Amigo Foods Corp. v. Marine Midland Bank*, 39 N.Y.2d 391, 396 (1976) ("standing by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction"), *aff'd*, 46 N.Y.2d 855 (1979).

To establish specific personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1),[5] "the defendant must have transacted business within the state and the claim asserted must arise from that business activity." *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 67 (2d Cir. 2017).  What Plaintiffs must show—but cannot—is the requisite nexus between any New York transactions and its claims against the Banks.  For example in *Khalife v. Audi Saradar Private Bank SAL*, the court dismissed claims against a foreign bank for lack of personal jurisdiction where there was "no articulable nexus or substantial relationship between the securities transactions executed through [the] bank's omnibus trading account with a U.S. bank account and the freezing of plaintiffs' bank accounts in

---

[5] The Banks are not subject to general jurisdiction because any contacts are not "so continuous and systematic as to render [them] essentially at home in" New York.  *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (internal alterations and quotation omitted); *see SPV Osus Ltd. V. UBS AG*, 882 F.3d 333, 343–44 (2d Cir. 2018) ("aside from the truly exceptional case, a corporation is at home and subject to general jurisdiction only in its place of incorporation or principal place of business"); *Brown v. Lockheed Martin Corp* ., 814 F.3d 619, 629 (2d Cir. 2016) (same); *Gucci Am., Inc. v. Weixing Li* , 768 F.3d 122, 135 (2d Cir. 2014) (holding that exercise of general jurisdiction over Bank of China improper as bank "incorporated and headquartered elsewhere" and conducted only a small portion of its business in New York).

Lebanon by [the] bank and the Lebanese authorities."  129 A.D.3d 468, 468 (1st Dep't 2015).  The

court highlighted that "none of the four causes of action . . . contain any element relying upon the

[defendant's] U.S. securities transactions."  *Id.*

The Complaint's claims are all premised on (1) the Banks' maintenance of Plaintiffs' funds

in Lebanon, (2) the Banks' refusal to permit wire transfer withdrawals from those accounts in

Lebanon on terms dictated by Plaintiffs, and/or (3) the banker's checks drawn in Lebanon on the

Central Bank that state the checks are for deposit in Lebanon.  *See, e.g.,* Compl. ¶¶ 380–81, 407–

10, 462.  No element of these claims is tethered to the correspondent accounts.  The Complaint

references deposits involving the Banks' correspondent accounts between 2016 and 2018.  Those

transactions all *predate* the core facts and events giving rise to the causes of action asserted here.

Even Plaintiffs' unduly broad damages theories, such as those concerning anticipated real estate

investments of unknowable value (Compl. ¶ 108), have no connection to New York.  Removing

the correspondent accounts from the equation simply has no impact on Plaintiffs' claims.

Accordingly, there is no "substantial nexus," and the Banks are not subject to personal jurisdiction

under New York's long-arm statute.  *See Georgakis v. Excel Mar. Carriers Ltd.*, 900 N.Y.S.2d

260, 261 (1st Dep't 2010) (finding that "[e]ven assuming . . . defendant transacted business in New

York, CPLR 302(a)(1) does not authorize the courts to exercise jurisdiction . . . because there is

no relationship between defendant's transaction of business and plaintiff's claims"); *see also*

*Johnson v. UBS AG*, 791 Fed. Appx. 240, 242–43 (2d Cir. 2019); *Kashef v. BNP Paribas SA*, 442

F. Supp. 3d 809, 820–21 (S.D.N.Y. 2020) ("[E]very major fraud case in the world in which dollars

are involved [does not] belong[] in the New York courts") (quoting *Mashreqbank PSC v. Ahmed*

*Hamad Al Gosaibi & Bros. Co.*, 23 N.Y.3d 129, 137 (N.Y. 2014)).

2.      Due Process Precludes The Exercise Of Jurisdiction Over The Banks

Because "[t]he reach of New York's long-arm statute . . . does not coincide with the limits

of the Due Process Clause," courts may decline to exercise jurisdiction on due process grounds even where the long-arm statute is satisfied. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007). Constitutional due process requires that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Cairo Amman Bank v. Bucheit*, 1 Fed. App'x 98, 99 (2d Cir. 2001) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Only when a defendant has certain "minimum contacts" with the forum (*id.*) and the exercise of jurisdiction is "reasonable under the particular circumstances of the case" will jurisdiction comport with fair play and substantial justice. *Blockchain*, 2019 WL 4199902, at *4 (internal citations omitted).

Even if the Court were to conclude—which it should not—that the long-arm statute confers personal jurisdiction over the Banks, the Court should still dismiss this action on due process grounds. First, as discussed above, there were no New York correspondent bank transfers giving rise to the causes of action or Plaintiffs' alleged injuries. *See supra*, Section I(A)(1). Second, the Banks could not have reasonably "forsee[n] being haled into court" in New York. *In re Veon Ltd. Secs. Litig.,* 2018 WL 4168958, at *5 (S.D.N.Y. Aug. 30, 2018) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d. Cir. 2002)). This un-foreseeability flows naturally from the fact that Banks do not conduct business in New York, the accounts in question were opened in Lebanon by a Lebanese national using his Lebanon home address to be governed by Lebanese law (with a Lebanon forum clause as to BLC), and there is no allegation that Plaintiffs have any connection to New York. *See* Ex. 1, ¶¶ 7, 10; Ex. 2, ¶¶ 8, 15; Ex. 15, ¶¶ 6–9; Ex. 16, ¶¶ 8–11. For these reasons, the exercise of jurisdiction would not be consistent with due process.

In addition, "[c]ourts require . . . causation depending on the extent of a defendant's contacts with the forum." *SPV Osus Ltd. v. UniCredit Bank Austria*, 2019 WL 1438163, at *6

(S.D.N.Y. Mar. 30, 2019) (not just degree of contacts but whether a sufficient causal relationship exists between the contacts and the suit-related conduct).  As the Supreme Court has explained, "[t]he inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation."  *Walden v. Fiore*, 571 U.S. 277, 283–284 (2014) ("defendant's suit-related conduct must create a substantial connection with the forum").  And, as the Second Circuit recently held, "[w]here the defendant has had only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts."  *SPV Osus Ltd.*, 882 F.3d at 344 (internal citations omitted); *see Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 141 (2d Cir. 2014) (scope of specific jurisdiction is limited to claims that "arise[] out of or relate[] to the [entity's] contacts with the forum").  Fatally, the Complaint does not allege how any of the alleged correspondent account activity proximately caused Plaintiffs' alleged injury.  This is another reason why due process would not be satisfied.

As to the reasonableness factors, first, New York has no discernible interest in this dispute. This dispute centers around Lebanese banks, Lebanese citizens (with no New York ties), deposits in Lebanon, Lebanese law, and Lebanon's financial and banking crisis.  Second, New York is not uniquely able to afford relief to Plaintiffs, whereas similar disputes are already being litigated and adjudicated by Lebanese courts.  *See* Ex. 15, ¶ 33; Ex. 16, ¶ 31.  Third, it undermines the administration of justice and interests of international comity to permit Plaintiffs to pursue these claims in New York, which has nothing to do with any of the parties or the claims, while ignoring Lebanon, where the parties agreed to litigate, whose law applies, and where the relevant conduct took place.  Fourth, Lebanon is the only "state" with a substantive interest implicated here.  This interest is pronounced, given the crisis in Lebanon from which this lawsuit arises, the involvement

of Lebanese banks, and of Lebanon's Central Bank, and the key questions of Lebanese law.  These factors favor dismissal on due process grounds.

Finally, this litigation will pose a significant burden on the Banks which do not have offices, operations, or employees in New York.  The Supreme Court has admonished that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."  *Asahi Metal Indus. Co. v. Super. Ct. Cal., Solano Cty.*, 480 U.S. 102, 114 (1987).  There are numerous hardships to litigating here, some of which are already manifesting.[6]  In addition to the fact that all of the relevant witnesses, documents, and experts are located in Lebanon and that Lebanese law governs this dispute, the forum selection clauses in the agreements of at least two of the three commercial bank defendants require that Plaintiffs' claims be adjudicated there (as set forth further below, *see* Exs. 4–5, ch. 4, § X, ¶ 2); thus, rather than having some or all of these claims against some or all of these defendants tried in two separate courts in two different jurisdictions, the only reasonable conclusion is that this controversy should be adjudicated in Lebanon.

Accordingly, this Court should conclude that due process precludes the exercise of personal jurisdiction over the Banks and dismiss the Plaintiffs' Complaint in its entirety.

## B.      Lebanon Is The Proper Forum For This Dispute

The doctrine of *forum non conveniens* provide an alternative ground for dismissal.  This action belongs in Lebanon, not here.

---

[6] For example, the Banks have been required to retain New York counsel and incur costs in order to defend against the Complaint and attachment motion in a court where this dispute does not belong.  If the case goes to discovery, these litigation costs will only increase.  The Banks' employees may have to travel to the U.S. for depositions and court proceedings (which would require visas and lengthy flights), assuming such would be possible given Covid-19. The Banks would be forced to incur translation costs for numerous documents.  Experts will be required on Lebanon's banking and legal system and other Lebanon-related issues.

1.     BLC's Forum Selection Clause Supports Dismissal

The forum selection clause agreed to by Plaintiffs with BLC supports dismissal on *forum non conveniens* grounds.  *See Quenoy v. Am. Univ. of Beirut*, 2020 WL 5868290, at \*1 (2d Cir. Oct. 2, 2020) ("appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*") (internal citations omitted).  A forum selection clause is presumptively enforceable where the clause is reasonably communicated to the party, is mandatory, and governs "the claims and parties involved in the suit."  *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (quotations omitted).  Here, Plaintiffs' agreement with BLC states as follows: "The Beirut courts shall have exclusive jurisdiction to hear any dispute arising in connection with these General Conditions and/or relating to the relationship between the Bank and the Client."  Ex. 4–5, ch. 4, § X, ¶ 2.  This clause was reasonably communicated to Plaintiffs, is mandatory ("shall"), and governs each of the claims ("any dispute") asserted against BLC.  *Id.*; Ex. 16, ¶ 12; *see Quenoy v. Am. Univ. of Beirut*, 2019 WL 4735371, at \*6 (S.D.N.Y. Sept. 27, 2019) ("New York has a strong public policy of enforcing forum selection clauses so that parties are able to rely on the terms of the contracts they make"; dismissing in favor of agreed-upon Lebanon forum); *Iskandar v. Am. Univ. of Beirut*, 2019 WL 4735371, at \*\*2–4 (S.D.N.Y. Aug. 9, 1999) (dismissing in favor of Lebanon forum selection clause); *Radian Int'l, LLC v. Alpina Ins.*, 2005 WL 1656884, at \*3 (N.D. Cal. July 14, 2005) (same).

This clause is therefore presumptively enforceable.  Nothing in the Complaint rebuts this presumption.  *See Prod. Res. Grp. v. Martin Prof'l*, 907 F. Supp. 2d 401, 408 (S.D.N.Y. 2012) (citing *S.K.I. Beer Corp. v. Baltika Brewery*, 612 F.3d 705, 708, 711 (2d Cir. 2010)).

2.     Other *Forum Non Conveniens* Factors Favor Dismissal

*Forum non conveniens* supports dismissal even without the forum selection clause.  Generally, the court's forum *non conveniens* assessment  includes (1) "the degree of deference that

is properly afforded the [Plaintiffs'] choice of forum" (2) "whether the 'alternative forum proposed by [Defendants] constitutes an adequate forum for the resolution of the [Plaintiffs'] claims" and (3) "the relevant private and public interest factors" implicated in the choice of forum. *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 477 (S.D.N.Y. 2006) (citing *Norex Petro. Ltd. V. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005)).   Consideration of these factors confirms the appropriateness of dismissal in favor of Lebanon.

First, Plaintiffs' choice of this forum is not entitled to meaningful deference.  Questions of "degree of deference" are determined on a "sliding scale."  *Id.*  This scale is calibrated by "'the lawsuit's bona fide connection to the United States and to the forum of choice,'" and how "'considerations of convenience favor the conduct of the lawsuit'" in the plaintiffs' designated forum.  *Id.* at 478 (quoting *Iragorri v. United Techs.*, 274 F.3d 65, 71–72 (2d Cir. 2001)).  "[A] plaintiff's choice of forum should be afforded less deference the more it appears as though the choice [of forum] was motivated by forum-shopping."  *Id.*  Where "the litigation itself . . . is devoid of any significant connection to New York," such that it would be fair to assume that "the New York forum was selected for tactical purposes," courts will give only minimal deference to plaintiffs.  *In re Fosamax Prod. Liab. Litig.,* 2009 WL 3398930, at *3 (S.D.N.Y. Oct. 21, 2009).

This action has no "bona fide" connection and is certainly devoid of any "significant connection to New York,"  The relevant events occurred in Lebanon, the claims arose in Lebanon, the accounts at issue are located in Lebanon, the customer agreements are between Lebanese citizens and Lebanese banks, Lebanese law governs these agreements and disputes arising out of those agreements, Plaintiffs are not residents of New York, and the Banks have no offices or employees here.  *See* Ex. 1, ¶¶ 7, 10; Ex. 2, ¶¶ 8, 15; Ex. 15, ¶¶ 6–9; Ex. 16, ¶¶ 8–11.  Plaintiffs choice of forum appears to be classic forum shopping in order to obtain what it surmises to be a

higher likelihood of success and a greater damages awards from a U.S. court.

Second, Lebanon is an adequate alternative forum. Adequacy is assessed first and foremost by whether "defendants are amenable to service of process there and the forum permits litigation of the subject matter of the dispute." *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002). The Banks are subject to jurisdiction in Lebanon and could be sued by Plaintiffs there. Ex. 15, ¶¶ 10–14; Ex. 16, ¶¶ 5–7. Lebanon is an adequate forum for Plaintiffs' claims, as Courts within this district and elsewhere have consistently recognized. Just last week, the Second Circuit affirmed a district court decision upholding a Lebanon forum clause while rejecting arguments based on inconvenience, corruption, and political instability in Lebanon. *See Quenoy*, 2020 WL 5868290, at *2; *see also Ismail v Am. Univ. of Beirut*, 246 F Supp 2d 330, 333 (S.D.N.Y. 2003) (rejecting conclusory claims about inadequacy of Lebanon's judiciary); *Gibbon v. Am. Univ. of Beirut*, 1983 US Dist LEXIS 13401, at *13 (S.D.N.Y. Sept. 27, 1983) ("[T]he tragedy the state of Lebanon has suffered and continues to suffer . . . hardly provides sufficient grounds for the Court to find that the fabric of Lebanese society in Beirut has disintegrated or has even become so impaired as to make a fair adjudication of a common civil matter improbable."). Bank customers are litigating similar claims in Lebanon right now. *See* Ex. 15, ¶ 33; Ex. 16, ¶ 31.

Third, Plaintiffs' commitment to litigate against CL and AM Bank in Lebanon ends the private factor analysis. *In re Nine West Holdings, Inc.*, 614 B.R. 175, 182 (Bankr. S.D.N.Y. 2020) ("Where, as here, a valid forum selection clause exists, courts do not consider private interest factors"). Even so, private interest factors courts consider favor dismissal. These include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses . . . and all other practical problems that

make trial of a case easy, expeditious and inexpensive." *Alamir v. Callen*, 750 F. Supp. 2d 465, 469 (S.D.N.Y. 2010) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  Lebanon is the most practical location for litigating this dispute in terms of all procedural and logistical matters.  All Defendants are in Lebanon, Defendants' dealings with Plaintiffs were in Lebanon, the witnesses and proof are in Lebanon, and the accounts at issue were opened and maintained in Lebanon.  Even Plaintiffs have a residence in Lebanon, and Mr. Daou has extensive business contacts and regularly travels to Lebanon, making litigation of the dispute in Lebanon convenient for all parties.  There is no burden or inconvenience in litigating this entire lawsuit there against all Defendants.  In contrast, there is nothing in the Complaint that suggests any witness or document is located in, or anywhere near, New York.

Public factors also favor dismissal.  These include the competing forums' interest in the dispute and the application of foreign law.  *See Hyundai Merchant Marine Co., Ltd. v. Mitsubishi Heavy Indus., Ltd.*, 2015 WL 7758876, at **5–6 (S.D.N.Y. Dec. 1, 2015).  This matter will be litigated under Lebanese law by the parties' agreements.  Ex. 15, ¶¶ 6–9; Ex. 16, ¶¶ 8–11.  Lebanese law calls for the litigation of this type of dispute (concerning a Lebanese bank account opened by a Lebanese citizen in Lebanon) in Lebanon.  Ex. 15, ¶¶ 13–14; Ex. 16, ¶ 5.  Lebanon also has a clear overriding public policy interest in hearing this dispute, given the role of Lebanon's current financial and banking situation in this dispute.  Ex. 15, ¶ 14; Ex. 16, ¶¶ 7, 13.  It is imperative that matters relating to the conduct and operations of the country's major banks and its Central Bank be handled by the Lebanese courts in a uniform manner.  *See id.*  The alternative could result in courts in different countries and jurisdictions around the world making potentially conflicting decisions that could have an irreversible, deleterious impact on the Banks' customers, the Lebanese banking system, and the country's wider economy.  *See id.*

17

At the same time, the burden on New York courts in adjudicating Plaintiffs' claims should also favor dismissal for Lebanon.  If every foreign bank customer whose transactions pass through New York correspondent accounts of foreign banks was to litigate in New York, New York courts would be swamped with litigation truly having nothing to do with New York.  *Kashef*, 442 F. Supp. 3d at 820–21  ("[E]very major fraud case in the world in which dollars are involved [does not] belong[] in the New York courts") (quoting *Mashreqbank*, 23 N.Y.3d at 137).[7]  Whatever interest New York conceivably has in this private commercial dispute "pales in comparison with that of [Lebanon]" which "possesses a strong interest in regulating the conduct of banks within its borders." *LaSala v. UBS AG*, 510 F. Supp. 2d 213, 229 (S.D.N.Y. 2007).  Plaintiffs' claims should be dismissed on grounds of *forum non conveniens*.

## II.     PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF

### A.     Plaintiffs Fail To Plead Governing Lebanese Law

By the parties' agreements, Lebanese law governs all aspects of their banking relationship and this dispute.  Ex. 15, ¶¶ 6–9; Ex. 16, ¶¶ 8–11; *see* Exs. 3–5.  New York law is clear that "'[a]s a general matter, the parties' manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored.'" *Donenfeld v. Brilliant Techs. Corp.*, 96 A.D.3d 616, 616 (1st Dep't 2012) (quoting *Freedman v. Chem. Const. Corp.*, 43 N.Y.2d 260, 265 (1977)); *McPhee v. General Elec. Int'l, Inc.*, 736 F. Supp. 2d 676, 680 (S.D.N.Y. 2010) ("'[I]t is clear that in cases involving a contract with an express choice of law provision . . . a court is to apply the law selected

---

[7] In *Mashreqbank*, the parties were not New York residents, there were no key New York witnesses or documents, New York law did not apply, the property at issue was outside New York, and other forums were available.  *Id.* at 138–39.  The Court of Appeals emphasized that the "use of New York banks to facilitate dollar transfers" at the heart of the case was insufficient grounds for continuing the litigation in New York, as "no other circumstance support[ed] an argument that New York is an appropriate forum." *Id.*  Other courts have ruled similarly.  *See Al Rushaid Parker Drilling Ltd. v. Byrne Modular Blds. L.L.C.*, 180 A.D.3d 577 (1st Dep't 2020) (dismissing where "the sole New York connection [is] the fleeting presence of . . . bribery funds at a nonparty New York correspondent bank" and all relevant factors favored foreign forum); *Farahmand v. Dalhousie Univ.*, 947 N.Y.S.2d 459, 461 (1st Dep't 2012) ("incidents . . . occurred in Nova Scotia . . . Nova Scotia law governs . . . [and the] evidence and witnesses are . . . in Nova Scotia").

in the contract as long as the state selected has sufficient contacts with the transaction.'") (quoting *Aramarine Brokerage, Inc. v. OneBeacon Ins. Co.*, 307 Fed. App'x 562, 564 (2d Cir. 2009)).  The parties' choice of Lebanese law is also "'presumptively valid'" because "'the underlying transaction is fundamentally international in character.'"  *McPhee*, 736 F. Supp. 2d at 680–681 (quoting *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1362 (2d Cir.1993) (citing *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 15 (1972)); *see Weiss v. La Suisse*, 154 F. Supp. 2d 734, 736 (S.D.N.Y. 2001) ("The burden of demonstrating that Swiss law does not govern rests with plaintiffs . . . and it is a heavy burden.").[8]  Plaintiffs offer no reason why the parties' choice of law should not be enforced.

In addition, the Complaint's allegations, which near entirely revolve around Lebanon, demonstrate that Lebanese law should apply.  *See Shron v. LendingClub Corp.*, 2020 WL 3960249, at *2 (S.D.N.Y. July 13, 2020) (evaluating "'the center of gravity' or 'grouping of contacts,' with the purpose of establishing which state has 'the most significant relationship to the transaction and the parties").  Yet, the Complaint does not plead Lebanese law.  It follows that Plaintiffs have not plead any cause of action against or entitlement to relief from the Banks under the laws of Lebanon. The Complaint should be dismissed on this ground.

### B.    Plaintiffs Fail To State A Claim Under New York Law

Plaintiffs argue that New York law governs the relationship between Lebanese banks and Lebanese citizens with no connection to New York.  *Id.* ¶ 40 ("[Banks] are . . . liable to Plaintiffs under state law").  Not so.  In any event, Plaintiffs fail to state any New York common law claim.

---

[8] New York's choice-of-law principles also call for the application of the law of Lebanon as the jurisdiction where all relevant conduct occurred and which has "the greatest interest in regulating behavior within its borders."  *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993); *O'Leary v. S & A Elec. Contracting Corp.*, 53 N.Y.S.3d 617, 620 (1st Dep't 2017).

1.    Plaintiffs Fail To Plead Breach of The Lebanon Contracts

Plaintiffs fail to plead any breach of contract.  "'Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages.'"  *Negrete v. Citibank, N.A.*, 759 Fed. App'x 42, 46 (2d Cir. 2019) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)).  Plaintiffs do not set forth any facts evincing the Banks' breach of their agreements.  *See* Compl. ¶¶ 427–443. Their only allegation is that BLC and CL "failed and refused to comply with Plaintiffs' instructions" "to transfer Plaintiffs USD and accrued interest to Plaintiffs' account in the United States."  *Id.* ¶¶ 431–32; 440–41.  That general statement does not amount to a breach of contract. Plaintiffs cite no contractual language or provision that this alleged failure and refusal violates, as they must.  *See Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 131 (S.D.N.Y. 2015) ("New York law and the *Twombly–Iqbal* standards of federal pleading require a complaint to identify, in non-conclusory fashion, the specific terms of the contract that a defendant has breached. Otherwise, the complaint must be dismissed") (quoting *Tonking v. Port Auth. Of N.Y. & N.J.*, 3 N.Y.3d 486, 490 (2004)).

The relevant agreements governing the parties' banking relationship are the account opening agreements executed by the Plaintiffs in 2016.  *See* Exs. 3–5.  In none of the agreements between the Banks and the Plaintiffs is there any commitment by the Banks to execute international transfers on behalf of the Plaintiffs.  *See id.*  In fact, international transfers are a discretionary service. Ex. 15, ¶ 16; Ex. 16, ¶ 14.  The Banks never guaranteed such transfers under any provision, and thus had no obligation to make them. Ex. 1, ¶ 16; Ex. 2, ¶ 27; Ex. 15, ¶ 17; Ex. 16, ¶¶ 15–16.

Moreover, the agreements granted the Banks the express right to refuse requests demanding that funds be transferred or returned to Plaintiffs in the mode or manner requested by Plaintiffs. Plaintiffs' agreements with CL state in the relevant part that "[t]he Bank reserves the right to accept

or refuse any or all [accountholder] requests," such as a request for an international transfer.  Ex. 3, art. 6 § 12.  Similarly, Plaintiffs' agreements with BLC impose limitations on the amount and manner of withdrawals and grant BLC discretion in that regard, including that BLC could refuse all demands made by email.  *See* Ex. 17.  Plaintiffs allege they largely communicated with BLC by email and do not allege any requests by other means.  *See* Compl. ¶ 107 "(The banking relationship between Plaintiffs and BLC Bank was primarily conducted through . . . emails"); ¶ 176 ("Joseph Daou sent an email . . . demanding execution of the wire transfer"); Ex. 2, ¶ 26 (requesting wire transfer via email on November 7, 2019).

Not only were the Banks within their right to refuse to transfer under the parties' agreements, their refusal was the proper course given banking restrictions in effect in Lebanon. *See* Ex. 16, ¶ 17.  Some Banks that did make international transfers are now being investigated in Lebanon by a Special Investigation Commission and judicial authorities have pronounced that such transfers were and are illegal.  *See id.* ¶ 18.  Thus, the Banks acted not only in accordance with their agreements but in full accord with Lebanese law.

Finally, the Banks fully satisfied their obligations by issuing Plaintiffs' banker's checks drawn on the Central Bank and payable in Beirut in the full amount requested.  *See* Ex. 15, ¶ 23; Ex. 16, ¶ 22.  Plaintiffs were given and accepted checks in the full amounts demanded, and these remain payable.  Thus, Plaintiffs cannot allege they have suffered any contract damages.

Accordingly, Plaintiffs fail to state a claim for breach of contract.

2.    <u>Plaintiffs Fail To State An Unjust Enrichment Claim</u>

Plaintiffs have no claim for unjust enrichment under New York law law.[9]  "[A] valid and enforceable written agreement governing the parties' dispute, precludes recovery in quasi contract

---

[9] Plaintiffs do not allege that claims for unjust enrichment, promissory estoppel, or conversion are available under Lebanese law.

for events arising out of the same subject matter." *MG W. 100 LLC v. St. Michael's Protestant Episcopal Church*, 8 N.Y.S.3d 299, 301 (1st Dep't 2015). Thus, the existence of agreements between Plaintiffs and the Banks setting forth the terms of the deposits and their relationship precludes this claim. That aside, the Complaint does not explain how the Banks have been "enriched" to Plaintiffs' detriment. *See Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). To the contrary, Plaintiffs admit that the Banks have nothing on balance in the closed accounts. *See* Compl. ¶ 24.

### 3. Plaintiffs Fail To State A Promissory Estoppel Claim

Given the binding agreements governing the parties' relationship, the promissory estoppel claim should be dismissed. *See CUnet, LLC v. Quad Partners, LLC*, 2017 WL 945937, at *6 (S.D.N.Y. Mar. 7, 2017) ("claims of promissory estoppel . . . precluded whenever a valid and enforceable contract governs the same subject matter of the claims"). Plaintiffs cannot assert promissory estoppel based on a party's promises to perform under a contract or the alleged failure to make funds available in the manner Plaintiffs claim to be entitled to by contract. *See CUnet,* , 2017 WL 945937, at *8 (finding that alleged "'separate and independent assurances' and 'promises' does not remove" promissory estoppel "claim[] from the subject matter addressed in the formal contract when the plaintiff simply "seeks compensation for the precise services covered by the [contract]"). In addition, as discussed in Section II(b)(2), there are no actionable allegations of how any "reliance" on the transfers or checks discussed in October or November 2019 caused them an injury, as required. *See Komlossy v. Faruqi & Faruqi, LLP*, 2017 WL 722033, at *8 (S.D.N.Y. Feb. 23, 2017); *Ridenhour v. Bryant*, 2020 WL 1503626, at *7 (S.D.N.Y. Mar. 29, 2020). Plaintiffs also fail to allege any resulting injustice, particularly in the face of the banking crisis in Lebanon. *See Blitzer v. Potter,* 2005 WL 1107064, at *17 (S.D.N.Y. May 6, 2005) (promissory estoppel requires allegation of "an injustice if the promise is not enforced").

Plaintiffs' claim for promissory estoppel fails.

### 4. Plaintiffs Fail To Plead Fraud

Plaintiffs fare no better in seeking to conjure fraud from a contract dispute.  Plaintiffs' fraud claim is based on the Banks' (1) alleged fraudulent inducement of Plaintiffs to open accounts and deposit funds in 2016 and (2) statements made to Mr. Daou between October and November 2019 concerning wire transfers and the Central Bank-drawn banker's checks.  *See* Compl. ¶¶ 380–83, 390, 395.  The alleged harm resulting from the fraud is Plaintiffs' inability to access their deposits at the time and place they demanded.  Because this fraud claim is merely a restatement of Plaintiffs' contract claim—it is based on the same facts and seeks the same relief—this fraud claims fails.

Plaintiffs' allegations are otherwise insufficient as a matter of law.  To state a New York fraud claim, Plaintiffs must allege: "'(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff.'"  *Woori Bank v. RBS Secs., Inc.*, 910 F. Supp. 2d 697, 700–701 (S.D.N.Y. 2012) (quoting *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006)).  Among other things, "[t]he plaintiff must . . . explain why the statements (or omissions) are fraudulent.'"  *Id.* at 702 (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 187 (2d Cir. 2004)).  "The Complaint must . . . state with particularity the circumstances of the fraud . . . and contain[] sufficient facts . . . to state claims for relief for common-law fraud that are facially plausible."  *Id.*

As to the first theory of fraud, nothing in the Complaint suggests that the Banks made any material misrepresentations or failed to disclose any material information in connection with the opening and funding of Plaintiffs' accounts.  The only alleged misrepresentation as to BLC is that BLC "offered Plaintiffs high interest rates" and "short term maturity periods of one-month" as well as the possibility of "withdrawing their USD and accrued interest from the BLC Bank

accounts." Compl. ¶¶ 84–86.  Similarly, the only alleged misrepresentation as to CL is that Plaintiffs could "withdraw or transfer their USD." *Id.* ¶ 188.

None of these are plausibly material misrepresentations.  Plaintiffs maintained their accounts with the Banks, without issue, while making deposits and withdrawals from both BLC and CL between 2016 and the onset of the Lebanese political and financial crisis in and around October 2019.  *See id.* ¶¶ 98, 102, 194, 196.  Into the crisis, Plaintiffs even continued to negotiate with the Banks to extract higher and higher interest rates and approached the Banks and AM Bank about depositing additional funds.  *See, e.g.*, *id.* ¶¶ 204–5, 207, 209, 215.  That Plaintiffs withdrew funds, including millions of dollars by wire during their banking relationship, confirms the implausibility of Plaintiffs' contention.  That in late 2019, during the crisis, the Banks were unable to, or declined to, transfer funds to the U.S. does not mean representations about their ability and willingness to do so were knowingly false when made *years* earlier.  The Complaint certainly does not plead facts sufficient to support any plausible inference that the Banks made these allegedly false statements to trick or deceive Plaintiffs into making deposits with them.

Plaintiffs' second theory based on events following the onset of the financial crisis is also flawed.  *Id.* ¶¶ 390, 395.  What the Complaint shows is the Banks' good-faith efforts to give Plaintiffs access to their funds consistent with Lebanese law and contractual obligations, during a national political and economic crisis.  *See, e.g.*, *id.* ¶¶ 157, 262, 275.  Whether the Banks complied with their obligations at this turbulent time is a question of Lebanese banking and contract law that should be addressed by the Lebanese courts, if anyone.  *See supra*, Sections I, II(A); Ex. 15, ¶ 14; Ex. 16, ¶¶ 7, 13; *see McPhee*, 736 F. Supp. 2d at 681–82 (parties' choice of law governs extra-contractual tort claims) (citing *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)).

Furthermore, the Complaint contains only non-actionable conclusory allegations that

certain statements were knowingly false when made, or that they were made to deceive Plaintiffs. It is not enough to say the Banks were wrong, or too ambitious, or aspirational in statements they made to Plaintiffs.  *See Iqbal*, 556 U.S. at 678; Fed. R. Civ. P. 9(b).  The law is clear that "alleged misrepresentations amount[ing] to no more than" what are "ultimately unfulfilled promises" are "not actionable as fraud."  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179 (2011) (citing *Jacobs v. Lewis*, 261 A.D.2d 127, 127–28 (1st Dep't1999)); *Marin v. AI Holdings (USA) Corp.*, 35 Misc. 3d 1227(A), at *9 (Sup. Ct., N.Y. Cty. 2012) ("allegations concern[ing] numerous alleged unfulfilled promises about performance and otherwise . . . do not support a misrepresentation claim").  The situation in Lebanon indisputably deteriorated, with multiple rounds of bank closures and heightening liquidity constraints and restrictions in October and November.  That the Banks did not make the demanded wire transfers (which the Banks had discretion to refuse under their contracts with Plaintiffs) does not equal fraud.  The allegations that the Central Bank requires that banker's checks drawn on the Central Bank be payable only in Beirut (as they say on their face) does not state a claim that BLC and CL defrauded Plaintiffs.

Plaintiffs also cannot allege reasonable reliance or recoverable damages.  First, the failure to allege damages distinct from those arising under their contracts independently defeats the fraud claim.  *See Carling v. Peters*, 96 N.Y.S.3d 33, 35 (1st Dep't 2019) (fraud requires damages "that would not be recoverable in a contract action.").  Second, Plaintiffs do not articulate what they did based on the Banks' alleged knowingly false statements about wire transfers or banker's checks, or that such reliance resulted in actual harm.

Plaintiffs fail to plead fraud, and the claim must be dismissed.

     5.    <u>Plaintiffs Fail To State A Conversion Claim</u>

Plaintiffs' conversion claim is just a restated contract claim based on the Banks' allegedly not releasing amounts owed under contracts governed by Lebanese law.  Such a claim is not viable

as conversion but rather lies in breach of contract.  *See Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 643 (E.D.N.Y. 2000) ("relationship between a bank and a depositor is the strictly contractual one of debtor and creditor"; dismissing conversion claim) (citing cases).  What Plaintiffs want by the conversion claim—as made explicit in the Complaint—is money that they deposited with a bank, back from that bank, *i.e.* payment of a debt.  But non-payment of a debt is not conversion.  *See id.*; *Kante v. All Taxi*, 958 N.Y.S.2d 61 (2d Dep't 2010) (withholding money pursuant to a contractual relationship constitutes breach of contract, not conversion).

In addition, Plaintiffs fail to plead the elements of conversion.  The funds deposited with the Banks are not "specific and identifiable" things subject to conversion.  *See Chem. Bank v. Ettinger*, 602 N.Y.S.2d 332, 336 (1st Dep't 1993) ("[F]unds deposited in a bank account are not sufficiently specific and identifiable, in relation to the bank's other funds, to support a claim for conversion against the bank").  Plaintiffs have not alleged the Banks' wrongful deprivation of "ownership, possession or control" over the funds.  *Citadel Mgmt., Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 147 (S.D.N.Y. 2000).  The Banks no longer have control over these funds.  And, the funds are available to Plaintiffs in Lebanon.  Separately, with their deposit at the Banks, Plaintiffs no longer owned, possessed or control the funds such that they can allege wrongful deprivation.  *Id.* ("a depositor loses (and the bank gains) title to money deposited in a general account at the moment those funds are deposited").  Finally, whether anything CL or BLC has done is "unauthorized" or "infringes" on any rights of Plaintiffs (which is not alleged) is governed by the parties' agreements and Lebanese law.  Questions about what those agreements mean must be analyzed and answered by applying Lebanese law—something Plaintiffs do not attempt to do. Plaintiffs' claim for conversion should be dismissed.

6.     <u>Plaintiffs Fail To Plead Civil Conspiracy</u>

New York law does not recognize the independent tort of civil conspiracy. *Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.*, 2011 WL 4031203, at *3 (S.D.N.Y. Sept. 12, 2011) (citing *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 237 (2d Cir.2006). Plaintiffs must allege an underlying tort and then "connect the actions of separate defendants" to that tort. *ACR Sys., Inc. v. Woori Bank*, 232 F. Supp. 3d 471, 478–79 (S.D.N.Y. 2017). Plaintiffs' conspiracy claim should be dismissed because both tort claims—for fraud and conversion—fail as a matter of law. *Carlson v. Am. Int'l Grp.*, 67 N.Y.S.3d 100, 114 (2017) (dismissing conspiracy claim, in part, because "New York does not recognize a freestanding claim for conspiracy" and the plaintiff failed to state a claim for fraud). There are also no factual allegations of an unlawful agreement to engage in tortious conduct, let alone actual tortious conduct by the Banks, in furtherance of any such agreement, or any resulting harm.

7.     <u>Plaintiffs Fail To State Florida Statutory Claims</u>

Plaintiffs' two Florida statutory claims should be dismissed for multiple reasons. First, the parties' choice-of-law provisions renders these provisions inapplicable. *See* Ex. 3, art. 1 § 11, art. 2 § 3, art. 3 § 7; Exs. 4–5, ch. 4, § X, ¶ 1. For one, "[s]ection 671.105(1), Florida Statutes, 'expressly anticipates that parties may enter into choice-of-law provisions: When a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties.'" *Arndt v. Twenty-One Eighty-five, LLC*, 448 F. Supp. 3d 1310, 1315 (S.D. Fla. 2020) (quoting Fla. Stat. § 671.105(1)).[10] The transactions certainly bear a "reasonable relation" to Lebanon, and the parties selected Lebanese law to "govern their rights and duties." *Id.* Plaintiffs

---

[10] Count 3 is based on Florida's UCC's choice of law provision. *See* Fla. Stat. § 167.105.

also fail to allege the extraterritorial application of these statutes to financial instruments issued, delivered and accepted in Lebanon.  There is no reason why the banker's checks should be subject to Florida law.

Second, Plaintiffs fail to state a claim under either section of Florida Statutes § 673.4121 (Count 3) or § 68.065 (Count 4).  These are bad check statutes, and there are no allegations of any bad checks.  Plaintiffs were provided valid checks, available for deposit in Lebanon.  Specifically, as to Count 3, the relevant portion of the statute relates to the issuance of a "cashier's check."  Fla. Stat. § 673.4121.  "[A] cashier's check . . . represents payment when delivered." *Matter of Kimball*, 16 B.R. 201, 203 (Bankr. M.D. Fla. 1981).  Thus, no liability can lie where the Banks delivered the banker's checks to the Plaintiffs.  In so doing, the Banks fulfilled their payment obligations.  *Id.*  Plaintiffs' allegation that "Defendants have failed and refused to pay Plaintiffs the amounts due and owing" (Compl. ¶ 413) is at odds with the facts and the law.

As to Court 4, a claim under this section is available only as against a "maker or drawer [that] stops payment on the instrument with intent to defraud."  Fla. Stat. § 68.065 (3)(a).  As an initial matter, neither of the Banks is alleged to have stopped payment on any of the checks.  And pleading "intent to defraud" under the statute requires specifically pleading fraud as to the maker or drawer.  *See Madness, L.P. v. DiTocco Konstruction, Inc.*, 873 So.2d 427, 429 (4th Dist. Fla. 2004).  Plaintiffs entirely fail to plead fraud by the Banks.  *See supra*, Section II(b)(2).  Plaintiffs have not alleged any theory that would render the Banks liable.  *See id.*

Accordingly, both claims under Florida law should be dismissed.

## C.     Plaintiffs' Racketeer Influenced and Corrupt Organizations Act Claims Fail

Plaintiffs get nowhere repackaging their Lebanese law contract claims as a multi-party racketeering scheme.  Plaintiffs' RICO claim is premised on the Defendants engaging in a fraudulent scheme in Lebanon to deprive Plaintiffs of their money.  As demonstrated above, there

is simply no fraud alleged in the Complaint.  Accordingly, the RICO claim falls flat.

Plaintiffs' RICO claim is what courts, in this district and elsewhere, have long bemoaned as undue efforts to expand the statutory limits of civil RICO liability in pursuit of treble damages and attorneys' fees.  *See, e.g., Rosenson v. Mordowitz,* 2012 WL 3631308, at *4 (S.D.N.Y. Aug. 23, 2012) (collecting cases); *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 500 (1985) (civil RICO "evolving into something quite different from the original conception of its enactors").  In light of "all too frequent[]" attempts by plaintiffs "to mold their claims to the RICO form even though their injuries do not fall within those intended to be addressed by the Act . . . courts have an obligation to scrutinize civil RICO claims early in the litigation" and dismiss those wanting.  *Rosenson,* 2012 WL 3631308, at **4–5.  This gatekeeping function is serviced by RICO's strict pleading standard and the attendant burdens Plaintiffs face in adequately alleging each of RICO's many elements.  *See Boritzer v. Calloway*, 2013 WL 311013, at *4–5 (S.D.N.Y. Jan. 24, 2013) (recognizing that RICO "pleading standard . . . mandates an acknowledgment of the dangers posed by that legislation's manipulation, on the part of those who would exploit its aim").

To state a claim under Section 1962(c), Plaintiffs must allege a violation of "the substantive RICO statute" and injury to "business or property 'by reason of a violation' of the RICO statute." *Malvar Egerique v. Chowaiki*, 2020 WL 1974228, at *7 (S.D.N.Y. Apr. 24, 2020) (quoting *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)).  Under the "plausibility" standard of *Iqbal* and *Twombly*, Plaintiffs' Complaint, that just recites the RICO elements and merely attaches "labels and conclusions" to its factual allegations, fails to plead a RICO claim.  *See Twombly*, 550 U.S. at 545; *Gross v. Waywell*, 628 F. Supp. 2d 475, 479, 484 (S.D.N.Y. 2009); *Picard v. Kohn*, 907 F. Supp. 2d 392, 400 (S.D.N.Y. 2012) ("'formulaic recitation[s] of the elements of a cause of action' are not sufficient") (quoting *Twombly*, 550 U.S. at 555).  Plaintiffs' RICO claims should

29

be dismissed.

1. <u>Plaintiffs Lack RICO Standing</u>

To establish their RICO claim, Plaintiffs must demonstrate standing, *i.e.* show an injury to business or property caused by the RICO violation. Plaintiffs do not do so.

First, RICO compensates only for injuries resulting in "concrete financial loss." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008); *Villoldo v. BNP Paribas S.A.*, 648 F. App'x 53, 55 (2d Cir. 2016). "Expectation interests" and generally "loss of value" or "benefit of the bargain" damages do not qualify. *McLaughlin*, 522 F.3d at 227–229 (rejecting injury claim based on "loss of value model"). So, too, losses that are speculative or unprovable are not cognizable. *See World Wrestling Entm't, Inc. v. Jakks Pac., Inc.,* 530 F. Supp. 2d 486, 520–21 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009). Plaintiffs have not lost any property— they hold checks that they may deposit in Beirut. Plaintiffs' primary alleged "harm"—their inability to transfer funds to the U.S.—is not a "concrete financial loss." It is the very type of alleged qualitative, non-quantifiable injury courts eschew under RICO. Certainly, harm resulting from alleged real estate opportunities lost is "too speculative to constitute an injury to business property" under RICO. *Kimm v. Chang Hoon Lee & Champ, Inc.*, 196 F. App'x 14, 16 (2d Cir. 2006) (risk of future loss business commissions too speculative); *see In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353 (S.D.N.Y. July 15, 2016) (speculative, expectation-based, benefit-of-the-bargain damages to incompatible with RICO) (collecting cases). The failure to plead RICO injury is fatal.

Second, standing for RICO claims requires that the RICO offense was the 'proximate cause' of the plaintiff's injuries." *Hemi Grp., LLC v. City of New York, N.Y.,* 559 U.S. 1 (2010). This requires allegations of "a causal connection between the substantive RICO violation and the

plaintiff's injury that is not 'too remote, purely contingent, or indirect.'" *Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 275 (S.D.N.Y. 2019); *see Empire Merchs., LLC v. Reliable Churchill LLP,* 902 F.3d 132, 142 (2d Cir. 2018).  The Complaint must show how the alleged violations led directly to plaintiff's injury.  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).  Allegations that "but for the defendant's wrongful acts, the plaintiffs would not have entered into the transaction that resulted in their losses" are insufficient.  *Doe*, 385 F. Supp. 3d at 275 (citing *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999)).  "[E]ven at the pleading stage, civil RICO's direct relation requirement is rigorous and requires dismissal where substantial intervening factors attenuate the causal connection between the defendant's conduct and the plaintiff's injury." *Id.* at 276–277.

Assuming some form of actual damages, the reasons detailed above as to why Plaintiffs cannot show reliance and resulting harm from the alleged false statements about wire transfers and banker's checks apply here.  *See supra*, Section II(B)(4).  In the context of RICO's heightened causation standard, certainly, those acts are not adequately alleged to have caused the requisite injurious impact to Plaintiffs' business and property.  *See id.*  Plaintiffs also cannot rely on alleged predicate acts in connection with their making deposits with the Banks.  That type of "but for" argument does not work under RICO.  Plaintiffs cannot show how those alleged acts directly caused any harm, as opposed to being remote, contingent, or indirect factors in any injury.

Plaintiffs' pleading also suffers from its failure to address intervening factors that contributed to their alleged harm.  Plaintiffs ignore the Lebanese banking crisis and other domestic unrest in Lebanon at the crux of the parties' disputes and any purported harm to Plaintiff, which is fatal to their pleading.  *See Segal v. Bitar*, 2012 WL 273609, at *12 (S.D.N.Y. Jan. 30, 2012) (customers who lost access to deposited funds did not adequately plead loss causation because

government seizure of defendants' assets precluded "sufficiently direct causal link between the racketeering offenses and Plaintiffs' injuries"); *McBrearty v. Vanguard Grp, Inc.*, 2009 WL 875220, at *3 (S.D.N.Y. Apr. 2, 2009) (no loss causation where "shareholders were injured not by the ownership of or investment in the illegal gambling operations, but by the reaction of the stock price to the publicity following the government's investigation of those operations").

### 2.    Plaintiffs Fail To Plead A Violation of § 1962(c)

Under Section 1962(c), Plaintiffs must allege: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of racketeering activity (5) participates in the management or operations (6) of an "enterprise" (7) the activities of which affect interstate or foreign commerce. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173–182 (2d Cir. 2004). Plaintiffs fail to satisfy virtually all these elements. The RICO claim should be dismissed for this additional reason.

### (a)    No Enterprise

#### i.    Plaintiffs Fail to Allege An Association-In-Fact

Plaintiffs fail to plead the existence of an "enterprise" with conclusory allegations that the "commercial and retail Lebanese banks and the Central Bank" constitute an "association-in-fact." *See* Compl. ¶ 474. An association-in-fact enterprise is "'a group of persons associated together for a common purpose of engaging in a course of conduct'" *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). It must "have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* The alleged "common purpose" must be "to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Capital*, 385 F.3d at 174. Plaintiffs must allege that the defendants were "'dependent' on one another" and worked together in a "symbiotic" relationship

to achieve their shared fraudulent objective.  *City of New York v. Chavez*, 944 F. Supp. 2d 260, 275 (S.D.N.Y. 2013) (citations omitted); *Anctil v. Ally Fin., Inc.*, 998 F. Supp. 2d 127, 141–42 (S.D.N.Y. 2014), *aff'd in part, rev'd in part on other grounds sub nom. Babb v. Capitalsource, Inc.*, 588 Fed. App'x 66 (2d Cir. 2015) (dismissing RICO claims where no allegations of "coordinated activity to jointly achieve a common fraudulent purpose"); *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010) ("there has to be something that ties together the various defendants . . . into a single entity that was formed for the purpose of working together"). "[C]oterminous, independent parallel conduct" does not establish an enterprise.  *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, 2016 WL 6110565, at \*\*7–8 (S.D.N.Y. Aug. 4, 2016) (dismissing RICO claim).  Courts assess the "hierarchy, organization, and activities" of the alleged enterprise to determine whether "its members functioned as a unit."  *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 586 (2017).

Plaintiffs' enterprise allegations do not meet this standard.  The Complaint simply alleges the entire "Lebanese banking system" is an "enterprise" but is devoid of allegations of hierarchy, organization, and coordination.  *See* Compl. ¶ 474.  It offers no "plausible basis" for inferring the Banks "acted on behalf of the enterprise as opposed to on behalf of themselves in their individual capacities to advance their individual self-interests."  *D. Penguin Bros., Ltd. v. City Nat'l Bank*, 587 Fed. App'x 663, 668 (2d Cir. 2014) (denying RICO where complaints "create no plausible inference that [defendants acted] . . . for any shared purpose").  Plaintiffs do not explain how the Defendants organized or worked together towards any illicit goals.  *See Abbott Labs. v. Adelphia Supply USA*, 2017 WL 57802, at \*4 (E.D.N.Y. Jan. 4, 2017) ("[W]ithout factual allegations that [entities] cooperated to form a continuing unit working toward a common purpose, their mere independent, uncoordinated participation in this market does not create a RICO enterprise.").

To the contrary, what the Complaint reveals is that the Banks competed for customers and offered different rates and terms, in a way typical of all banks in all markets. *See, e.g.*, Compl. ¶ 204. Plaintiffs even pulled funds from one bank and deposited them with another and regularly played the banks off one another. *See* Ex. 1, ¶ 14; Ex. 2, ¶ 21–22. As the Complaint demonstrates, each Banks' purpose was to attract clients for itself. But independent, parallel conduct for individualized business purposes is the opposite of what is needed to plead an enterprise.

                ii.       Plaintiffs Fail To Allege An Enterprise Separate and Distinct From Alleged Racketeering Activity

"Critically, 'a requirement in this Circuit' is that the enterprise engages in a 'course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves.'" *Bangladesh Bank v. Rizal Com. Banking Corp.*, 2020 WL 1322275, (S.D.N.Y. Mar. 20, 2020); *Lynn v. McCormick*, 2017 WL 6507112, at *5–6 (S.D.N.Y. Dec. 18, 2017), *aff'd* 760 F. App'x 51 (2d Cir. 2019). Without this structural requirement, "any two thieves in cahoots would constitute an association-in-fact." *Bangladesh Bank,* 2020 WL 1322275, at *8.

*Kottler v. Deutsche Bank AG* is instructive. 607 F. Supp. 2d 447 (S.D.N.Y. 2009). There, the plaintiffs asserted RICO claims in connection with the development, marketing, and sale of fraudulent tax shelters by defendants and their co-conspirators. *Id.* at 458–59. The court found that because the defendants and co-conspirators came together strictly "for the purpose of creating these allegedly fraudulent tax shelters," they "did not exist as an association in fact separate and apart from the alleged RICO activity." *Id.* "The enterprise and the pattern [we]re one and the same." *Id.* The court dismissed the RICO claim. *Id.*

Similarly, here, the alleged enterprise and pattern are one in the same. Plaintiffs allege that the Defendants came together as an association-in-fact to fraudulently attract US dollars and prohibit withdrawals of USD. Compl. ¶ 475. The only alleged acts are the same: fraudulent

inducement and prohibiting withdrawals. *See id.* ¶ 482. Thus, the Complaint fails to allege how

the Banks existed as an association-in-fact separate and apart from the alleged RICO activity.

### (b)     No Conducting

Plaintiffs must allege that each RICO defendant participated "in the operation or

management of the enterprise." *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) (citing *Reves*

*v. Ernst & Young*, 507 U.S. 170, 185 (1993); *First Capital*, 385 F.3d at 176 (each RICO "defendant

must have had 'some part in directing [the enterprise's] affairs'") (quoting *Reves*, 507 U.S. at 179).

This means each Bank must have exercised "some degree of control over the enterprise. *Elsevier*

*Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307–08 (S.D.N.Y. 2010). Doing things "helpful to"

or "that ultimately benefit the enterprise" is insufficient. *U.S. Fire Ins. Co. v. United Limousine*

*Serv., Inc.*, 303 F. Supp. 2d 432, 451–52 (S.D.N.Y. 2004) (citations omitted).

The allegations against the Banks—that they engaged in "arm's length commercial

transaction[s]" for their own commercial interests—do not satisfy the "conduct" test. *See Berry v.*

*Deutsche Bank Trust Co. Americas*, 2008 WL 4694968, at *6 (S.D.N.Y. Oct. 21, 2008), *aff'd*, 378

Fed. App'x. 110 (2d Cir. 2010); *Abbott Labs.,* 2017 WL 57802, at *7 (plaintiffs failed to allege

facts "suggest[ing] that that relationship was other than an arm's-length business relationship").

That attracting and retaining customers may have benefitted the "Lebanese banking system" does

not mean that doing so constitutes the "operation and management" of an alleged industry-wide

RICO enterprise. Each Banks' attraction and retention of customers also does not show "control"

over anything beyond their own businesses. Plaintiffs fail to plead this element.

### (c)     No Pattern

RICO Section 1962(a) requires Plaintiffs to demonstrate that each Defendant engaged in a

"pattern of racketeering activity" by committing two or more predicate criminal acts. *Rosner v.*

*Bank of China*, 528 F. Supp. 2d 419, 429 (S.D.N.Y. 2007). For racketeering activity to constitute

a pattern, it must "amount to or pose a threat of continuing criminal activity." *Gross,* 628 F. Supp.

2d at 485.  Continuity can be closed-ended—a series of related predicate acts over a substantial

period of time—or open-ended—a pattern posing a threat of continuing criminal conduct beyond

the period of the predicate acts.  *See Reich v. Lopez*, 858 F. 3d 55, 60 (2d Cir. 2017) ("Predicate

crimes must be related both to each other (termed 'horizontal relatedness') and to the enterprise as

a whole ('vertical relatedness')").  Plaintiffs appear to attempt to plead that Defendants engaged

in both open and closed-ended patterns of racketeering activity but have shown neither.

### i.   No Predicate Acts

Plaintiffs purport to allege mail fraud and wire fraud as predicate acts but fail.  They cannot

overcome the "particular[] scrutin[y]" imposed on the use of mail and wire fraud as predicate acts

"because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that,

upon closer scrutiny, do not support it."'  *Crawford v Franklin Credit Mgmt. Corp.,* 758 F. 3d 473,

489 (2d Cir. 2014) (quoting  *Efron v Embassy Suites (Puerto Rico), Inc.*, 223 F. 3d 12, 20 (1st Cir,

2000)); *see Bigsby v Barclays Capital Real Estate, Inc.,* 170 F. Supp. 3d 568, 575–76 (S.D.N.Y.

2016) ("mail and wire fraud merit particular scrutiny . . . lest the courts allow the RICO statute 'to

federalize garden-variety . . . common law claims") (internal citations and quotations omitted).

The elements of mail and wire fraud, which must be plead with particularity under Rule

9(b), are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use

of the mails or wires to further the scheme." *U.S. v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015).  A

"scheme to defraud" is "a plan to deprive a person of something of value by trick, deceit, chicane

or overreaching." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124–25 (2d Cir. 2018); *see Spool*

*v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008).  There must be "proof of

a material misrepresentation," and Plaintiffs must plead with particularity "the specific statements

that are false or fraudulent, identify the speaker, state when and where the statements were made,

and explain why the statements were fraudulent." *Williams*, 889 F.3d at 124–125 (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (citing *Neder v. U.S.*, 527 U.S. 1, 25, (1999).  Plaintiffs must also allege the perpetrators' specific intent to defraud.  *U.S. v. Halloran*, 821 F.3d 321, 330 & n.2 (2d Cir. 2016) (citation omitted).  Plaintiffs must not only show that the Banks made the alleged false statements knowing they were false, but they did so with the intent and purpose of deceiving Plaintiffs to induce reliance in order to wrongfully deprive them of their property interests.  *See U.S. v. Males*, 459 F.3d 154, 158 (2d Cir. 2006) (defendants' scheme must have been "intended to deprive another of property rights").

Only certain statements can give rise to mail or wire fraud.  As discussed previously, unfulfilled promises are not actionable misrepresentations and are not indicative of intent to deceive.  Where a defendant makes an assurance that turns wrong, it is not actionable as fraud unless the defendant does so "knowing full well that its assurance was false."  *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 134–35 (2d Cir. 2008) (internal citations and quotation marks omitted).  The fact that one's opinion or an assurance is proven "unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held" does not render it fraudulent.  *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 465–66 (S.D.N.Y. 2004) (internal citations and quotation marks omitted).

Where, as here, the alleged fraud involves ordinary business operations, courts require the highest "level of factual specificity" when it comes to pleading intent to defraud.  That is because "[w]hen companies engage in . . . transactions that are facially legitimate . . . and otherwise act as routine participants in . . . commerce, a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme."  *Eclectic*

*Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997–998 (9th Cir. 2014); *see Rosenson v. Mordowitz*, No. 11 Civ. 6145, 2012 WL 3631308, at \*4 n.3 (S.D.N.Y. Aug. 23, 2012) (scrutiny heightened when "use of mail or wires to communicate is not in and of itself illegal").

The Complaint simply summarizes allegedly wrongful acts (*see* Compl. ¶ 483) and recites the statutory elements of mail and wire fraud. *Id.* ¶ 482.  But Plaintiffs do not connect the dots— they fail to explain how their allegations satisfy each element of these Federal statutes.  This is insufficient.  First, as described above, Plaintiffs fall short of the pleading standard for fraud.  *See supra*, Section II(B)(4).  Second, the "scheme" allegations are missing.  There are no facts approaching the level of specificity required to support a strong inference of specific intent to defraud Plaintiffs—that is acting with and for the specific purpose of tricking Plaintiffs to wrongfully deprive them of their money.  *See Males*, 459 F.3d 154, 158.  Any inference of specific intent is negated by Plaintiffs' withdrawal and transfer of funds over the course of the parties' relationship, and the Banks' offering and providing Plaintiffs, during the financial crisis, alternative means of accessing their money consistent with their agreements and Lebanese law. *See, e.g.*, Compl. ¶¶ 124, 130–31.  It is further negated when one considers the intervening political and economic situation in Lebanon.  *See* Exs. 6–8.

*Boritzer v. Calloway* reinforces the heavy burden on plaintiffs' seeking to allege schemes to defraud, particularly in the context of contractual agreements.  It demonstrates how far short Plaintiffs have fallen.  2013 WL 311013, at \*1.  There, the plaintiff alleged that the

> Defendants 'operated as part of a long term association for a criminal purpose with the practice of defrauding investors by making false representations that Defendants would open certain restaurants that Defendants never intended to open, or that Defendants intended only to open for a short period to obtain investors funds and then close down immediately, with the sole intent of defrauding the investors out of their invested monies.

*Id.*  The plaintiffs highlighted that "their monies were never repaid" and five other [of defendants']

. . . restaurant ventures failed under suspicious circumstances." *Id.* The court found that despite these allegations the plaintiff did not meet the requisite level of "specificity regarding the circumstances of an alleged fraud." It determined that "[a]t bottom, Plaintiffs' assertions of a scheme to defraud are rooted in speculation about the circumstances of their lost investment and Defendants' unpaid debt, rather than allegations sounding in a particularized narrative of wrongdoing." *Id.* The theory of the defendants' intent to defraud was "not clearly plausible, and indeed, flirt[ed] with the speculative" such that it was "insufficient as a matter of law." *Id. Boritzer*'s rejected allegations confirm that Plaintiffs' less than plausible, speculation-driven theory here does not meet their pleading burden on any scheme to defraud.

Third, Plaintiffs cannot plead reliance and harm resulting from the alleged mail and wire fraud amidst the Lebanon banking crisis. Plaintiffs' deposits were in the Lebanese banking system by 2018 at the latest, so it cannot be said that any reliance on false statements about wire transfer availability or the banker's checks in late 2019 caused actual harm. *See* Compl. ¶¶ 104, 200.

In sum, the Complaint fails to plead the requisite predicate acts of mail and wire fraud.

### ii.     No Continuity

The absence of predicate acts mandates dismissal of the RICO claim. Even assuming Plaintiffs had alleged predicate acts, they fail to plead a pattern in the form of either open-ended or closed-ended continuity, as required.

Open-ended continuity requires a showing "that there [is] a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *First Capital*, 385 F.3d at 168, 180 (quotation omitted). There must be past criminal conduct *coupled with* a threat of future criminal conduct. In this case, "the nature of the predicate acts themselves" do not at all imply "a threat of continued criminal activity." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487-488 (2d Cir. 2014) (quoting *Cofacredits, S. A. v Windsor Plumbing Supply Co.*, 187

F. 3d 229, 242 (2d. Cir. 1999) ("must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed").  The alleged "Ponzi scheme" is "inherently terminable," and, as described by Plaintiffs, it has terminated.  *See Cofacredit, S.A.*, 187 F.3d at 244.  Insinuations otherwise are not only speculative, but illogical and contradicted by the reams of articles attached to Plaintiffs' attachment motion.  *See* ECF Nos. 25–27.  Plaintiffs themselves are not at risk of being victimized by further alleged predicate acts of racketeering. Accordingly, Plaintiffs have failed to plead open-ended continuity.  *See, e.g.*, *Boritzer*, 2013 WL 311013, at *12 (no open-ended continuity where "no specific indication that Defendants have continued to obtain funds from Plaintiffs or any other[s]" in alleged scam).

Plaintiffs fare no better with closed-ended continuity.  This species of continuity requires a series of related predicate acts extending over a "substantial period of time," which the Second Circuit has construed to mean a period of "at least two years."  *Reich*, 858 F.3d at 60 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242 (1989)).  "The duration of a pattern of racketeering activity is measured by the RICO predicate acts the defendants commit."  *DeFalco*, 244 F.3d at 321.  Other actions—even those that might have served the ends of the alleged conspiracy—"are not included."  *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 226 (E.D.N.Y. 2014); *see  Spool*, 520 F.3d at 184 ("relevant period . . . is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place.").  Even then, "the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern."  *First Capital*, 385 F.3d at 181; *see DeFalco*, 244 F.3d at 321.

Plaintiffs cannot meet the two-year requirement.  As discussed, the Complaint hardly attempts to plead predicate acts prior to late 2019 and the allegations are lacking in the specificity

required to plead mail and wire fraud.  *See, e.g.*, Compl. ¶¶ 94–105, 193–201.  What is left are the (deficient) mail and wire fraud allegations during the Lebanon financial crisis.  *See id.* ¶¶ 116, 141.  These alone are insufficient, temporally, to establish closed-ended continuity.

### 3.  Plaintiffs Fail To Plead A RICO Conspiracy Claim Under § 1962(d)

The RICO conspiracy claim fails for at least two reasons.  First, the failure to state an underlying RICO claim precludes the conspiracy claim.  *See First Capital*, 385 F.3d at 182.  Second, Plaintiffs fail to plead facts demonstrating that the Defendants "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise."  *Cofacrèdit*, 187 F.3d at 244; *see McCormick*, 760 F. App'x at 54.  The Complaint does not support an inference that Defendants entered into an agreement to further the objectives of a criminal enterprise.

### 4.  Plaintiffs Fail To Overcome The Presumption Against Extraterritoriality

To overcome RICO's presumption against extraterritoriality, Plaintiffs must show (1) that the substantive predicates acts underlying the RICO claim are "either domestic or permissibly extraterritorial" *and* (2) that there is a "domestic injury to business or property."  *City of Almaty, Kazakhstan v. Ablyazov*, 226 F. Supp. 3d 272, 281 (S.D.N.Y. 2016).  Plaintiffs show neither.

First, the mail and wire fraud statutes Plaintiffs rely on do not apply extraterritorially.  So Plaintiffs are required to show domestic conduct sufficient to trigger these statutes.  *See RJR Nabisco, Inc. v. European Cmty.*, 764 F.3d 129, 140–41 (2d Cir. 2014), *rev'd on other grounds*, 136 S. Ct. 2090 (2016).  Yet, their focus is entirely on goings-on in Lebanon.  *See, e.g.*, Compl. ¶¶ 2–14.  Their allegations are insufficient to "support a claim of domestic application" of the mail and wire fraud statutes and, in turn, RICO.  *See Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014).

Second, the RICO statute "'does not allow recovery for foreign injuries."  *City of Almaty*,

226 F. Supp. 3d at 279 (quoting *RJR Nabisco, Inc.*, 136 S. Ct. at 2111).  Here, the only alleged

injury is in Lebanon—that is Plaintiffs' alleged inability to withdraw funds from Lebanon that they

deposited with Lebanese banks.  *See Yanchukov v. Finskiy*, 2017 WL 3491965, at *6 (S.D.N.Y.

Aug. 14, 2017) (no "domestic injury due to . . . 'losses suffered . . . in the United States, including

the funds processed through United States banks, the loss of domestic business and the inability to

access American markets" where plaintiffs' loss was "suffered" abroad).  For these independent

reasons, Plaintiffs' RICO claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the Banks' respectfully request that the Court grant this Motion

to Dismiss with prejudice.

DATED:  New York, New York          Respectfully submitted,
                October 9, 2020

                                          **DLA PIPER LLP (US)**

                                          By: */s/ Jeffrey D. Rotenberg*
                                               Jeffrey D. Rotenberg
                                               Caroline A. Fish
                                               1251 Avenue of Americas
                                               New York, NY  10020-1104
                                               Tel.:  212.335.4500
                                               Fax.:  212.335.4501
                                               Jeffrey.Rotenberg@us.dlapiper.com
                                               Caroline.Fish@us.dlapiper.com

                                               *Attorneys for Defendants BLC*
                                               *Bank, S.A.L., and Credit Libanais,*
                                               *S.A.L.*

42

## **CERTIFICATE OF SERVICE**

I hereby certify that I am one of the attorneys for the defendant in this action and that on

October 9, 2020, I caused a copy of the foregoing to be filed with the Court's ECF system, which

will cause notice of its filing to be served electronically upon all counsel who have appeared in

this action.


/s/ *Jeffrey D. Rotenberg*
Jeffrey D. Rotenberg