## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH A. DAOU and KAREN M. DAOU, | Civ. Action No. 1:20-cv-4438-DLC |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| vs. | |
| BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., AL-MAWARID BANK, S.A.L., and BANQUE DU LIBAN, | |
| Defendants. | |

### FIRST AMENDED COMPLAINT

Plaintiffs Joseph A. Daou and Karen M. Daou, by their undersigned counsel and for their complaint against Defendants, allege as follows:

### INTRODUCTION

1.      Plaintiffs Joseph A. Daou and Karen M. Daou are married United States citizens who deposited hard earned United States dollars ("USD") in three Lebanese banks, only to be preyed upon by the Ponzi scheme that is the Lebanese banking system.

2.      Defendant Banque Du Liban ("BDL") is the central bank of Lebanon and the architect of the Ponzi scheme.  In the 1990s, as Lebanon emerged from its devastating fifteen-year civil war, a dual currency system formed with the USD and Lebanese Lira (the "Lira") both being used widely.  The two currencies were not pegged, however, causing massive swings in the exchange rate and chaos in the Lebanese economy.

3.      In an attempt to solve the problem, the then and current BDL Governor, Riad Salameh, engineered the pegging of the exchange rate at 1507.51515 Lira to $1 USD.  To support

the artificial pegging of the exchange rate, BDL and the Lebanese government sought to encourage foreign currency investment, particularly USD, which ultimately became the dominant deposit currency in Lebanon.

4.      Lebanese banks lured investments of USD with high interest rates, strong correspondent banking relationships in New York, and sophisticated banking services.

5.      The shareholders and executives of the commercial banks, many of whom served in high levels of the government, portrayed the banking system as strong and flourishing, and they received rich distributions and salaries.

6.      In reality, the interest rates were unsustainable, and placed the commercial banks in jeopardy once new deposits ebbed and depositors sought to remove their USD from the commercial banks.

7.      BDL was also vulnerable as a result of the strain on the commercial banks which deposit USD with BDL to provide it with liquidity.

8.      By early 2015, Lebanese banks began recognizing depleting USD deposits, which strained the system as the banks' interest obligations increased.

9.      BDL and the commercial banks needed to adjust their business model, which would have revealed the false premise on which BDL engineered the banking system and the shareholders and executives of the commercial banks would have no longer been able to enrich themselves to same extent.

10.     Because BDL and the commercial banks were intent on keeping a curtain over the growing problem so they could continue to enrich themselves notwithstanding the unsustainability of their policies, they did not alter their business model.

11.     Instead, BDL and the commercial banks agreed that they would engage in an illegal scheme to cover up and delay the self-created and looming crisis, all so that they could cover up their failed policies and continue enriching themselves.

12.     BDL and the commercial banks, including the defendant-commercial banks, agreed they would offer even higher interests to lure new deposits and to induce depositors to retain their deposits in Lebanon, knowing the banks could never sustain the interest payments.  BDL and the commercial banks agreed they would project strength and health for the Lebanese banking system they knew was facing an imminent liquidity crisis.

13.     The conspirators agreed to specifically target people of Lebanese descent living abroad,  particularly United States citizens and residents.

14.     They agreed to use illegal means to carry out their conspiracy, including by making fraudulent misrepresentations and theft, all so the BDL executives and the shareholders and executives could further enrich themselves at the expense of their victims, which included depositors, borrowers and Lebanon.

15.     The commercial banks used the Lebanon Association of Banks to coordinate their scheme with each other and BDL and to communicate instructions for carrying out the scheme. The Association of Banks may have once been a legitimate organization of the chief executives of the commercial banks in Lebanon, but the commercial banks and BDL started to use it as an instrumentality of their unlawful scheme.

16.     In furtherance of their scheme, Lebanese banks began offering extremely high interest rates to attract USD depositors both within Lebanon and abroad to feed the failing system and further their scheme.  Upon inducing depositors to deposit their USD in Lebanon, depositors were then induced to convert the USD into Lebanese Lira, in return for which the depositors were promised even higher (and even more unsustainable) interest rates.

17.     As the Lebanese banks and BDL planned, and as the depositors would soon learn, the Lira was about to become highly devalued, and nearly worthless.

18.     Once the depositors converted their USD to Lira, they were left with no alternative other than a complete devaluation of the Lebanese Lira and to completely erase any of the remaining value held by these depositors.  While BDL advertises an "official" exchange rate of approximately 1,507 Lira to $1 USD, the true exchange rate has been fluctuating between 7,000 to 10,000 Lira to $1 USD.

19.     While Lebanon's commercial banks (and those benefiting from their association with, and employment by, these banks) were able to continue to hoard valuable USD, depositors who exchanged their USD into Lira were left with an almost worthless local Lebanese currency.

20.     When certain depositors, like Plaintiffs, refused to convert their USD to Lira, the Lebanese commercial banks and BDL conspired to issue worthless checks that could not be deposited anywhere outside of Lebanon, including in the United States.  The depositors' USD cannot be withdrawn or collected outside of Lebanon (nor can it be withdrawn or collected within Lebanon).

21.     The end result for victims of this enterprise is that, while BDL and Lebanon banks continue to hold USD in deposit within the Lebanese banking system, the victims have no way to access their hard-earned USD anywhere in the world.

22.     BDL and the commercial banks knew that the payment of the inflated interest rates was unsustainable, and when the flood of new USD deposits waned, the Lebanese banking system collapsed.

23.     The conspirators' scheme engineered the theft of tens of billions of dollars from over two and a half million people, including thousands of United States citizens and residents.

24.     When the Lebanese banks could not induce sufficient new deposits to pay their obligations, the banks hoarded the USD deposits of many of their depositors by lying to induce customers to retain their deposits.  Ultimately, the banks refused lawful withdrawal requests from their depositors.   At the same time, the Lebanese banks discriminatorily permitted politically connected depositors, bank executives, bank shareholders, and their relatives to offshore their USD, which of course only exacerbated the self-inflicted liquidity crisis.  The Ponzi scheme had collapsed, and BDL and the Lebanese banks resorted to outright theft of their depositors' USD.

25.     By mid-2019, the Lebanese banks were actively colluding with BDL and using the Association of Banks to institute unlawful, draconian, and discriminatory capital controls and restrictions on withdrawals of USD and transfers of USD outside Lebanon.

26.     Lebanon's banking crisis has driven the Lebanese banking system to place its own USD hoarding above the rule of law in flagrant violation of the rights of depositors and foreign investors like Plaintiffs.

27.     At the same time, Lebanese politicians, bank shareholders, executives, owners, and board members (many of whom are parliament members and former ministers of Lebanon's government), bank employees, and other influential people and companies were permitted by BDL and the Lebanese banks to safely offshore their USD.  This self-destructive corruption exacerbated the liquidity crisis in the Lebanese banking system, and is the subject of ongoing investigations and political unrest within Lebanon.

28.     Defendants BLC Bank S.A.L. ("BLC Bank"), Credit Libanais, S.A.L. ("CL Bank"), and AL-Mawarid Bank, S.A.L. ("AM Bank") are large commercial and retail banks in Lebanon which were among the chief perpetrators of the Ponzi scheme BDL designed.

29.     Starting with misconduct that began in 2016 and continues to this day, Defendants victimized Plaintiffs of more than $18,500,000.00 USD in principal and accrued interest from Plaintiffs' accounts in Lebanon, which caused Plaintiffs tens of millions of dollars in damages above and beyond the stolen deposits.  In addition, under both applicable state and federal law and as described below, Plaintiffs are entitled to treble damages, attorneys' fees and costs.

30.     BLC Bank, CL Bank, and AM Bank targeted and solicited Plaintiffs to make USD deposits.

31.     BLC Bank, CL Bank, and AM Bank promised Plaintiffs high interest rates on Plaintiffs' USD deposits to induce Plaintiffs to make the deposits, even though the banks knew their scheme was unsustainable.

32.     To amass USD deposits and to effectuate USD transactions, including for Plaintiffs, BLC Bank, CL Bank, and AM Bank all maintain correspondent bank accounts in New York at large United States banks.

33.     As Plaintiffs advised all three banks, Plaintiffs needed the ability to readily transfer their USD from Lebanon to their accounts in the United States so they could conduct business and execute on investments.  In 2019, Plaintiffs specifically advised all three banks that they needed to transfer their USD to satisfy Plaintiffs' funding obligations for three highly valuable real estate acquisitions in the United States.

34.     Therefore, Plaintiffs agreed with BLC Bank, CL Bank and AM Bank that Plaintiffs' accounts would have short-term maturity dates of one month, and the banks would pay Plaintiffs interest averaging approximately ten percent.  Such interest rates are enormous relative to the United States, but Lebanese banks, including BLC Bank, CL Bank, and AM Bank, were offering interest rates in the high teens to depositors willing to make longer-term deposits for several months or years.  However, because Plaintiffs needed ready access to their USD, Plaintiffs insisted on having short-term maturity dates of one month.

35.     BLC Bank, CL Bank and AM Bank all knew Plaintiffs intended to transfer their USD to the United States.

36.     However, unbeknownst to Plaintiffs, BDL, BLC Bank, CL Bank and AM Bank, among other Lebanese banks, had collusively agreed to violate the rights of USD depositors by preventing the depositors from withdrawing their USD or transferring their USD outside Lebanon.

37.     By the end of 2019, Plaintiffs had more than $18,000,000.00 USD on deposit across their bank accounts in Lebanon.

38.     When Plaintiffs delivered instructions to BLC Bank, CL Bank and AM Bank to initiate wire transfers of Plaintiffs' USD to Plaintiffs' accounts in the United States, the banks at first ostensibly agreed to make the transfers.

39.     BLC Bank, CL Bank and AM Bank then asked for additional time to execute the wire transfers, and they repeatedly assured Plaintiffs the wire transfers had been approved and would be forthcoming.

40.     BLC Bank, CL Bank and AM Bank's representations to Plaintiffs that Plaintiffs could transfer their USD outside Lebanon were knowingly false when made.  BLC Bank, CL Bank and AM Bank had no intention of permitting Plaintiffs to transfer their USD outside Lebanon. Rather, the banks were stalling while they unlawfully misappropriated Plaintiffs' USD.

41.     As the Lebanese banks had no grounds for refusing depositors' instructions to transfer USD outside Lebanon, BDL and the banks entered into a conspiracy in which they agreed to make fraudulent misrepresentations to Plaintiffs, issue worthless checks to Plaintiffs in the United States that Defendants had no intention of honoring, and, despite the fact that they were knowingly issuing worthless checks to Plaintiffs, reducing Plaintiffs' balances as if Plaintiffs had actually received their USD.  Like many perpetrators of a Ponzi scheme, Defendants' desperation to keep afloat drove them to blatantly unlawful activity against Plaintiffs.

42.     BLC Bank, CL Bank and AM Bank are all large creditors of BDL, having deposited billions of USD with BDL.  As part of BDL's repayment of its debts owed to BLC Bank, CL Bank and AM Bank, BDL allows the banks to issue cashier's checks drawn by BDL against BDL to satisfy obligations the banks owed to third parties.

43.     BLC Bank, CL Bank, and AM Bank all represented to Plaintiffs that they had the authority to issue checks drawn on BDL in order to provide Plaintiffs with their USD in the United States.  BLC Bank, CL Bank, and AM Bank all represented to Plaintiffs that the banks maintained USD on deposit with BDL to cover the amounts of checks drawn on BDL, and that BDL would

thus make good on checks signed and issued by the banks to depositors or other payees, like Plaintiffs.

44.     In furtherance of their conspiracy, BDL and the banks utilized their own debtor-creditor relationship to coerce Plaintiff to accept illusory checks BDL and the banks would never honor in lieu of the wire transfers Plaintiffs requested and to which Plaintiffs were entitled.

45.     Ultimately, after weeks and months of Plaintiffs repeatedly and desperately pleading for BLC Bank, CL Bank and AM Bank to follow Plaintiffs' binding instructions to execute wire transfers of Plaintiffs' USD on deposit in Lebanon to Plaintiffs' accounts in the United States, BLC Bank, CL Bank and AM Bank, in collusion with BDL, all tried to coercively persuade Plaintiffs to accept cashier's checks drawn on the Lebanese central bank in lieu of wire transfers, despite the banks' previous representations and assurances to Plaintiffs that Plaintiffs could freely transfer their USD to the United States.

46.     Wire transfers would take effect immediately and almost certainly be effective. Thus, Plaintiffs continued to insist on wire transfers.  For the same reason, BLC Bank, CL Bank and AM Bank steadfastly refused to follow Plaintiffs' instructions to execute the wire transfers. The banks had no intention of allowing Plaintiffs to have their USD.  Instead, BLC Bank, CL Bank and AM Bank continued to insist that Plaintiffs take paper checks for deposit in the United States that Defendants knew and intended BDL would refuse to honor in a process that would take weeks, instead of instantaneous wire transfers.

47.     Knowing that Plaintiffs were desperately trying to salvage their real estate investments in the United States, BLC Bank, CL Bank and AM Bank steadfastly refused Plaintiffs' repeated demands for wire transfers.

9

48.     Ultimately, Plaintiffs relented and agreed to accept checks drawn by and against BDL for deposit in the United States.  Defendants coerced Plaintiffs to accept the checks.  As a material inducement for Plaintiffs accepting checks, Defendants assured Plaintiff the checks were valid and could be deposited in the United States.

49.     BLC Bank and CL Bank issued checks to Joseph Daou while he was in Lebanon knowing Joseph Daou would ship them to the United States via DHL Courier for deposit in United States banks.  AM Bank issued a check to Plaintiffs' representative knowing Plaintiffs' representative would ship the check to the United States via DHL Courier for Plaintiffs to deposit in their United States bank account.

50.     However, in furtherance of their conspiracy, Defendants agreed and intended that BDL would refuse to honor the checks after Plaintiffs deposited them in a United States Bank.

51.     On numerous occasions, Defendants lied to Plaintiffs about their intentions, including in electronic written communications and telephonic communications, all in furtherance of their conspiracy to misappropriate Plaintiffs' USD.

52.     The checks Defendants issued to Plaintiffs for deposit in the United States were worthless and known to be worthless by Defendants at the time they were issued.  Nevertheless, upon issuance of the worthless checks, BLC Bank, CL Bank, and AM Bank fraudulently reduced Plaintiffs' account balances in Lebanon in the amount of the worthless checks.  AM Bank later credited Plaintiffs' account in the amount of the worthless check it issued, but the gesture is illusory because AM Bank will not allow Plaintiffs to have their USD.

53.     Defendants pervasively used the wires and mails to carry out their fraudulent scheme to steal from Plaintiffs who are United States citizens.

54.     Plaintiffs suffered substantial injury in the United States as a result of Defendants' unlawful activity and corrupt conspiracy, including the loss of Plaintiffs' USD on deposit with BLC Bank, CL Bank, and AM Bank, the loss of tens of millions of dollars in the United States from the real estate acquisitions Plaintiffs lost due to Defendants' unlawful conduct of which BLC Bank, CL Bank and AM Bank were made keenly aware, and reputational damage to Plaintiffs caused by Defendants passing Plaintiffs worthless checks for deposit in United States banks.

55.     Defendants' conspiracy was a commercial activity, comprised of BDL's purported repayment of debts it owed BLC Bank, CL Bank and AM Bank and the obligations those banks owed to Plaintiffs as their retail clients.  BDL knowingly drew bad checks as part of Defendants' conspiracy to defraud Plaintiffs.  BDL also authorized BLC Bank, CL Bank, and Am Bank to issue the worthless cashier's checks, despite intending not to honor the checks.  Thus, BDL has no entitlement to sovereign immunity in this action.

56.     Defendants are liable to Plaintiffs under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*., as a result of their commission of wire fraud and mail fraud to further their conspiracy to misappropriate Plaintiffs' USD and perpetuate their Ponzi scheme.

57.     Defendants are also liable to Plaintiffs under state law for knowingly and intentionally drawing and issuing worthless checks to Plaintiffs, all in furtherance of their conspiracy to defraud Plaintiffs, misappropriate Plaintiffs' USD, and perpetuate Defendants' Ponzi scheme.

58.     The fact that Lebanon's central bank would conspire with three of Lebanon's largest commercial banks to commit wire fraud and mail fraud in the United States in order to

defraud United States Citizens who deposited their hard earned USD in Lebanon in order for the Lebanese banking system to hoard USD, demonstrates not only the depth of the banking crisis in Lebanon, but the utter collapse of the rule of law in Lebanon.

59.     Therefore, Plaintiffs, as United States citizens suffering injury in the United States from unlawful conduct Defendants directed into the United States, come to this Court seeking compensation for their injuries caused by Defendants' flagrantly unlawful conduct, and exemplary damages to punish Defendants for their illicit conspiracy to misappropriate USD from Plaintiffs and other depositors.

60.     The total compensatory and exemplary damages Plaintiffs seek in this action exceed $150,000,000.00 USD.

## **PARTIES**

61.     Plaintiff Joseph Daou is a citizen of the United States and the State of Florida, where he is domiciled.  Joseph Daou resides at 200 Palm Island SW, Clearwater Beach, Florida 33767.

62.     Plaintiff Karen Daou is a citizen of the United States and the State of Florida, where she is domiciled.  Karen Daou resides at 200 Palm Island SW, Clearwater Beach, Florida 33767. Joseph Daou and Karen Daou have been married for twenty-seven years.

63.     Defendant BLC Bank is a Lebanese bank with its headquarters located in the BLC Bank Building, Adlieh Square, 2064-5809, Beirut, Lebanon.  BLC Bank is a Lebanese joint stock company, and a citizen of Lebanon.  BLC Bank is listed at No. 11 on Banque Du Liban's list of Lebanese banks.

64.     Defendant CL Bank is a Lebanese bank with its headquarters located in the Credit Libanais Tower, Corniche El Nahr, 1100-2811, Beirut, Lebanon.  CL Bank is a Lebanese joint stock company, and a citizen of Lebanon.  CL Bank is listed at No. 53 on Banque Du Liban's list of Lebanese banks.

65.     Defendant AM Bank is a Lebanese bank with its headquarters located in the Yared Building, 6th Floor, Abdel Aziz Street, Hamra, 1103-2110, Beirut, Lebanon.  AM Bank is a Lebanese joint stock company, and a citizen of Lebanon.  AM Bank is listed at No. 101 on Banque Du Liban's list of Lebanese banks.

66.     Defendant BDL is the central bank of Lebanon.  BDL is a legal public entity established by the Lebanese Code of Money and Credit promulgated on August 1, 1963 by Decree No. 13513.  BDL's operations as the central bank of Lebanon commenced April 1, 1964.  BDL is headquartered at Masraf Lubnan Street, 1100-5544, Beirut, Lebanon.  BDL is a citizen of Lebanon.

## JURISDICTION AND VENUE

67.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert causes of action pursuant to 18 U.S.C. § 1962, such that this action arises under the laws of the United States.

68.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a), because the action is against BDL, BDL is a foreign state within the meaning of 28 U.S.C. § 1603(a) and (b), and BDL is not entitled to sovereign immunity in this action, including pursuant to 28 U.S.C. § 1605(a).

69.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental subject matter jurisdiction over all other claims not arising under the laws of the United States.

70.     The Court would separately also have subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), because Plaintiffs are citizens of the State of Florida and Defendants are citizens of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

71.     The Court has personal jurisdiction over Defendants pursuant to New York CPLR § 301 and the United States Constitution, because Defendants regularly and systematically conduct business in New York and avail themselves of New York.

72.     The Court has personal jurisdiction over Defendants pursuant to New York CPLR § 302(a)(1) and the United States Constitution, because the causes of action set forth herein arise from Defendants' transaction of business in New York.

73.     This Court has personal jurisdiction over BDL pursuant to 28 U.S.C. § 1330(b), because Plaintiffs will serve BDL pursuant to 28 U.S.C. § 1608.

74.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to the claims herein occurred in this District. In the alternative, venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(3), because Defendants are subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND FOR ALL CAUSES OF ACTION

### Plaintiffs Establish Banking Relationships in Lebanon

75.     Plaintiffs are entrepreneurs engaged in a variety of businesses and investments.

76.     For example, Joseph Daou is the owner of Development & Option Unlimited, Company ("DAOUCO").

77.     DAOUCO owns and operates real estate projects around the United States.

78.     In addition, Plaintiffs are the owners of SAVIS, Inc. ("SAVIS"), which operates in the pharmaceutical and biomedical engineering space and provides services to clients including, Amgen, Gilead, Genentech, Medtronic, and other major pharmaceutical companies.

79.     Specifically, SAVIS provides business services such as operations support, human resources, accounting, legal, and information technology support to pharmaceutical companies.

80.     Beginning in 2016, certain banks in Lebanon began soliciting Plaintiffs through Joseph Daou to provide Plaintiffs with banking services.

81.     The Lebanese banks were actively targeting successful business people like Joseph Daou who are of Lebanese descent.

82.     The Lebanese banks sought to convince investors like Plaintiffs to deposit money USD in Lebanese banks by promising high interest rates and representing to Plaintiffs that their USD would be safe including by providing inflated financial performance about the banks and assuring depositors that they could readily withdraw or transfer their USD outside Lebanon.

83.     The Lebanese banks, including BLC Bank, CL Bank, and AM Bank, were anxiously pursuing USD deposits because investment in Lebanon was waning and the banks were under pressure to meet previous obligations to pay interest and an overall strain on their USD deposits.

84.     The Lebanon banking system was appealing to international investors like Plaintiffs because of the higher interest rates the Lebanese banks offered to their depositors.

85.     In particular, the Lebanese banks incentivized the deposit of USD by offering interest rates that exceeded the interest rates offered in other large banking markets.

86.     However, as Plaintiffs repeatedly advised the banks, liquidity was critical for Plaintiffs, as they would need to withdraw the USD they were depositing in Lebanon for deployment in their ongoing investment projects outside Lebanon on relatively short notice, including real estate in the United States and other opportunities.

87.     Therefore, Plaintiffs insisted on opening short-term maturity bank accounts in Lebanon, which permitted depositors to withdraw their money regularly as needed by instructing the Lebanese bank to transfer their USD, including outside Lebanon.

**Plaintiffs' Deposits with BLC Bank**

88.     BLC Bank is one of the leading private commercial banks in Lebanon.  BLC Bank was established in Lebanon in 1950.  In August 2007, Fransabank Group, the fourth largest banking institution in Lebanon, acquired 97.52% of the capital of BLC Bank.

89.     BLC Bank offers a broad range of retail banking services, including commercial, corporate, investment, private and correspondent banking.

90.     BLC Bank ranks in the top ten of the roughly fifty-five banks that currently operate in Lebanon in terms of total assets.

91.     BLC Bank maintains correspondent bank accounts in New York at JPMorgan Chase Bank, NA, The Bank of New York Mellon, and Standard Chartered Bank.   BLC Bank utilized these correspondent banks throughout its relationship with Plaintiffs, including to accept Plaintiffs' USD deposits.

16

92.     By 2016, Lebanese banks, including BLC Bank, were experiencing and witnessing pressure on their USD deposits.  The high interest rates the banks had offered for years to induce deposits were catching up with the Lebanese banking system.

93.     BLC Bank knew that the interest rates it was offering were unsustainable and placing its depositors' rights and property at risk as the problem worsened.

94.     The burgeoning problem fueled BLC Bank's need for USD, so, true to the nature of a Ponzi scheme, the Lebanese banks including BLC Bank sought new victims to lure in order to create income for the scheme.

95.     Plaintiffs were new victims targeted by BLC Bank.

96.     Through Branch Manager Jean Claude Zakhia, BLC Bank solicited and pursued Joseph Daou as a client because BLC Bank wanted Joseph Daou to deposit USD in Lebanon.

97.     At the time, Zakhia was a personal friend of Joseph Daou.

98.     In 2016, when Lebanese banks started precipitously inflating interest rates to attract USD, Zakhia reached out to Joseph Daou on a personal note soliciting him to deposit USD with BLC Bank.

99.     BLC Branch staff explained to Joseph Daou that in order for him to open an account with BLC, Plaintiffs must comply with the Foreign Account Tax Compliance Act ("FATCA") and complete and sign W9 forms and FATCA forms.  Joseph Daou informed the staff that he of course would report his funds as they are already reported in the United States and would be reported on the yearly Report of Foreign Bank and Financial Accounts ("FBAR") Plaintiffs would file.

100.    Joseph Daou advised Zakhia that Plaintiffs would only be interested in depositing their USD in short-term, monthly maturity accounts so that Plaintiffs' USD would be readily available anytime they needed their USD.

101.    To induce Plaintiffs to open accounts and deposit USD, BLC Bank offered Plaintiffs high interest rates.

102.    In addition, to induce Plaintiffs to open accounts and deposit USD, BLC Bank offered Plaintiffs short-term maturity periods of one-month.

103.    In addition, to induce Plaintiffs to open accounts and deposit USD, BLC Bank represented to Plaintiffs that there were no restrictions on Plaintiffs withdrawing their USD and accrued interest from the BLC Bank accounts or transferring their USD outside Lebanon.

104.    BLC Bank through Zakhia offered Plaintiffs interest rates in excess of fifteen percent if Plaintiffs would agree to longer-term deposits.  However, Plaintiffs refused.  Plaintiffs insisted that they be able to withdraw or transfer their USD outside Lebanon freely.  Therefore, Plaintiffs agreed to an interest rate of nine and one-half percent with deposits that matured monthly, meaning Plaintiffs could withdraw or transfer their USD each month.

105.    While these interest rates are enormous relative to the United States, they were prevalent in Lebanon at the time.

106.    Zakhia made these representations on behalf of BLC Bank.

107.    At the time Zakhia made these representations, BLC Bank knew that there was a substantial likelihood the representations were false because BLC Bank knew the strain on its USD deposits.

108. BLC Bank further represented to Plaintiffs that it had many clients who were United States citizens residing in the United States and that BLC Bank regularly engaged in banking relations with individuals residing in the United States.

109. BLC Bank's representations that it would pay Plaintiffs substantial interest while still permitting Plaintiffs to readily withdraw or transfer their USD outside Lebanon were false. BLC Bank knew that due to the shortage of USD in the Lebanese banking system there was a substantial likelihood that Plaintiffs' rights to the large interest payments and transferability of their USD would be impaired.

110. Based on these assertions, Plaintiffs agreed to open accounts at BLC Bank.

111. On April 26, 2016, and while physically present at BLC Bank's Byblos Branch, Joseph Daou opened a joint USD account for Plaintiffs.

112. BLC Bank sent the account opening documents by mail to Karen Daou in the United States, where Karen Daou was physically present.

113. The account opening documents, which included, among other documents, FATCA, W9 forms, and know your customer ("KYC") forms, identified Plaintiffs as United States citizens residing in Florida.

114. Thereafter, BLC Bank delivered Plaintiffs' account statements to Plaintiffs in the United States via email. The account statements BLC Bank sent to Plaintiffs listed Plaintiffs' Florida address. Thus, BLC Bank knew its misconduct against Plaintiffs was directed into the United States and Florida.

115.    On April 27, 2016, Plaintiffs transferred $2,500,000.00 USD from their account at Fifth Third Bank, N.A. in the United States to BLC Bank in Lebanon.

116.    BLC Bank utilized its correspondent bank account in New York to accept the April 27, 2016 wire transfer deposit of $2,500,000.00 USD.

117.    On June 9, 2016, Plaintiffs directed the transfer of $1,900,000.00 from SAVIS' bank account with BMO Harris Bank, N.A. to Plaintiffs' account at BLC Bank in Lebanon.

118.    BLC Bank utilized its correspondent bank account in New York to accept the June 9, 2016 wire transfer deposit of $1,900,000.00 USD.

119.    On November 21, 2016, Plaintiffs directed the transfer of $2,000,000.00 from SAVIS' bank account with BMO Harris Bank, N.A. to Plaintiffs' account at BLC Bank in Lebanon.

120.    BLC Bank utilized its correspondent bank account in New York to accept the November 21, 2016 wire transfer deposit of $2,000,000.00 USD.

121.    On February 21, 2017, Plaintiffs transferred $2,045,000.00 from Plaintiffs' account with BMO Harris Bank, N.A. to Plaintiffs' account at BLC Bank in Lebanon.

122.    BLC Bank utilized its correspondent bank account in New York to accept the February 21, 2017 wire transfer deposit of $2,045,000.00 USD.

123.    Each of the aforementioned transfers by Plaintiffs from the United States were solicited by BLC Bank in furtherance of the scheme to induce deposits through the false representations of high interest rates and ready transferability of the depositors' USD.

124.    The banking relationship between Plaintiffs and BLC Bank was primarily conducted through phone calls, text messages, and emails between BLC Bank in Lebanon and Plaintiffs in the United States.

125.    By September 2019, Plaintiffs were successful in securing multiple real estate investment opportunities for their affiliated entities.   Specifically, the transactions were acquisitions of multi-family properties in South Florida, Virginia Beach, Virginia, Austin, Texas, and Houston, Texas.

126.    The acquisitions required Plaintiffs to fund a deposit and related costs.

127.    As Plaintiffs had planned, and as they previously advised BLC Bank, Plaintiffs attempted to use their USD on deposit in Lebanon, including with BLC Bank, for their funding obligations for the multi-family property investments.

128.    On September 20, 2019, Joseph Daou contacted Zakhia, BLC Bank Branch Manager in Byblos, Lebanon, to instruct BLC Bank to execute a wire transfer, on September 28, 2019, of Plaintiffs' USD on deposit with BLC Bank to Plaintiffs' account with Huntington National Bank in the United States.

129.    Joseph Daou provided BLC Bank with the wire transfer information for Plaintiffs' Huntington National Bank account in the United States.

130.    BLC Bank did not respond.

131.    On September 23, 2019, Joseph Daou contacted Zakhia again to check on the status of the wire and to request a current statement of Plaintiffs' accounts.

132.    On September 24, 2019, Zakhia responded with Plaintiffs' account statements, and represented to Joseph Daou that BLC Bank would execute the wire transfer as planned on September 28th, 2019.

133.    This representation was false and known to be false at the time Zakhia made the representation.  The banking crisis in Lebanon had already become acute, and BLC Bank was unlawfully hoarding USD.  Also, Plaintiffs were not among the politically elite who BLC Bank and other Lebanese banks preferred and did allow to withdraw USD.

134.    Zakhia requested that Plaintiffs retain $1,500,000.00 USD on deposit with BLC Bank and withdraw the balance.

135.    Joseph Daou responded that although he would consider returning funds after Plaintiffs complete their real estate acquisition, Plaintiffs needed the funds for their real estate transaction.

136.    As it surreptitiously planned along with the other banks, BLC Bank refused to follow Plaintiffs' instruction and did not execute the wire transfer on September 28, 2020.

137.    On September 30, 2019, Zakhia falsely represented via wire transmission to Joseph Daou in the United States that BLC Bank would wire transfer the funds to Plaintiffs' account on October 28th, 2019, the next recurring monthly maturity date for Plaintiffs' accounts with BLC Bank.

138.    On October 21, 2019, while in South Florida Joseph Daou shared via WhatsApp pictures and video of the multi-family properties Plaintiffs secured for acquisition with Zakhia, BLC Bank's Branch Manager.  In response, via a WhatsApp text message Zakhia congratulated

Joseph Daou and assured Joseph Daou that BLC Bank was prepared to execute the wire transfer on October 28, 2019.

139.    On October 28, 2019, Joseph Daou requested an update from BLC Bank on the wire transfer, because it was not executed as promised.

140.    On October 29, 2019, Joseph Daou made another request regarding the status of the wire transfer that BLC Bank assured Plaintiffs it would execute on October 28, 2019 but had not.

141.    On October 29, 2019, Zakhia sent Joseph Daou a message via WhatsApp explaining that the Lebanese banks, including BLC Bank, were closed, but Zakhia nevertheless assured Plaintiffs that as soon as the banks reopened BLC Bank would execute the wire transfer.

142.    In response, on October 29, 2019 Joseph Daou reiterated that Plaintiffs were instructing BLC Bank to execute the wire transfer and expressed his concern that BLC Bank was dodging the issue and refusing to follow his instructions.

143.    On November 4, 2019, Joseph Daou notified Zakhia that he was in Lebanon and would appear personally in the branch to inquire about the long-overdue wire transfer.

144.    The next day, on November 5, 2019, Joseph Daou appeared at the BLC Branch in Byblos, Lebanon.   Joseph Daou and Zakhia consolidated Plaintiffs' two separate USD BLC Accounts into one account.

145.    During the meeting, Joseph Daou asked Zakhia if BLC Bank was in an insolvency proceeding or if any capital controls had been implemented by the Lebanese government.   Zakhia stated that there were no capital controls in place and no insolvency proceeding.

146.    Zakhia fraudulently concealed from Joseph Daou that BLC Bank was surreptitiously and collusively blocking USD withdrawals by the non-politically elite.

147.    On November 7, 2019, BLC Bank finally revealed through Zakhia that it was unlawfully refusing to follow Plaintiffs' instruction to execute the long-overdue wire transfer of Plaintiffs' USD to the United States.  Zakhia stated that BLC Bank's refusal to execute the wire transfer at the direction of BLC Bank's Board.

148.    As an alternative to the wire transfer, Zakhia offered to provide Plaintiffs with a cashier's check that would be valid for deposit in the United States.

149.    Plaintiffs rejected this proposal.  BLC Bank was obligated to follow Plaintiffs' instructions and execute the wire transfer for Plaintiffs.

150.    Plaintiffs should not be forced to accept a cashier's check that could take weeks to clear even if BLC Bank was not issuing worthless checks, which, as Plaintiffs would later learn, it was.

151.    Unable to obtain the long-overdue wire transfer of Plaintiffs' USD, and receiving no reliable information from the Branch Manager – Zakhia, on November 7, 2019, Joseph Daou wrote to Samir Khoury, BLC Bank's Deputy Head of Retail Banking, demanding a wire transfer of the full balance of Plaintiffs' USD in their BLC Bank account, including interest.  In addition, just as with his correspondence with Zakhia, Joseph Daou specifically advised Khoury that the wire transfer was necessary for Plaintiffs to fund real estate investments in the United States.

152.    As of November 8, 2019, Plaintiffs had $7,469,166.41 USD on deposit with BLC Bank.

153.    That same day, Joseph Daou again instructed Zakhia to execute the wire transfer to Plaintiffs' bank account in the United States.

154.    Zakhia notified Joseph Daou that BLC Bank would not execute the wire transfer, and further advised that the only method of withdrawal available to Plaintiff was a cashier's check.

155.    Khoury represented to Plaintiffs that the proposed cashier's check was valid and could be deposited in the United States where the funds on deposit at BLC Bank originated.

156.    Joseph Daou asked Khoury if the bank was in an insolvency proceeding or any capital controls had been imposed by the Lebanese government.

157.    In response, Khoury confirmed that BLC Bank was not subject to any insolvency proceeding.  In addition, Khoury confirmed that the Lebanese government had not imposed capital controls on the Lebanese banks.

158.    Instead, Khoury finally conceded that the Lebanese banks' and BDL's conspiracy to hoard USD in Lebanon through the selective refusal to permit some depositors from transferring their USD outside Lebanon was being carried out through an informal agreement among the banks.

159.    Joseph Daou advised Khoury that BLC's refusal to follow Plaintiffs' instructions regarding Plaintiffs' USD was unlawful, and Joseph Daou again demanded a wire transfer.

160.    Khoury again refused Plaintiffs' instruction.  Instead, he repeated that Plaintiffs' only option for withdrawing their USD was to accept a cashier's check drawn on BDL.  Khoury again represented that the cashier's check BLC would issue would be negotiable in the United States.

161.    Plaintiffs declined to accept a cashier's check and still insisted on a wire transfer.

162.    On November 13, 2019, Plaintiffs again advised BLC Bank that Plaintiffs would suffer substantial damages beyond the loss of their USD if BLC Bank continued to unlawfully misappropriate Plaintiffs' USD and refuse to follow their instructions.

163.    Specifically, on November 13, 2019, Plaintiffs' counsel in the United States sent a demand letter to Nadim Kassar, Chairman of the Board and General Manager of BLC Bank, instructing BLC Bank to execute a wire transfer from Plaintiffs' BLC Bank account to Plaintiffs' account at Huntington National Bank in the United States in the amount of $7,500,000.00 USD on November 28, 2019, the next recurring monthly maturity date for Plaintiffs' BLC Bank account.

164.    In his November 13, 2019 correspondence, Plaintiffs' counsel stated to BLC Bank that Plaintiffs and their related entities are imminently closing on the acquisition of a multi-family property in South Florida and require the $7,500,000.00 from Plaintiffs' BLC Bank account no later than December 2, 2019 for Plaintiffs' to meet their funding obligation for the real estate acquisition.  Plaintiffs' counsel further advised BLC Bank that its failure to wire Plaintiffs' their USD would result in damages of $28,000,000.00 USD above the loss of their USD and interest.

165.    Plaintiffs' counsel in the United States also sent a copy of the demand letter to Bassam Hassan, Chief Executive Officer of BLC Bank.

166.    The letter was delivered via the United States Postal Service Express to both Kassar and Hassan at BLC Bank's headquarters in Adlieh Square, Beirut, Lebanon.

167.    BLC Bank ignored the letter from Plaintiffs' counsel, and, between November 13, 2019 and November 23, 2019, BLC Bank continued to refuse Plaintiffs' instruction to execute the wire transfer.  Instead, BLC Bank continued to pressure Plaintiffs to accept a cashier's check instead, and represented to Joseph Daou that the cashier's check BLC Bank was pressuring

Plaintiffs to accept would be drawn against BDL, would be valid, and could be deposited in the United States.

168.     On November 24, 2019, BLC Bank showed Joseph Daou an exemplar of a cashier's check with BDL as both the drawee and drawer of the check.

169.     On November 24, 2019, BLC Bank, through Khoury, represented to Plaintiffs that the check was valid, and that there were sufficient funds for the check to clear, and that the check would be negotiable in the United States.

170.     BLC Bank specifically assured Plaintiffs that the check could be deposited in the United States.

171.     BLC Bank's unlawful misappropriation of Plaintiffs' USD was causing Plaintiffs severe prejudice and duress.  Plaintiffs needed their USD to meet their funding obligations for pending real estate acquisitions.  BLC Bank's callous disregard for Plaintiffs' rights made Plaintiffs desperate for access to their own USD.

172.     Reluctantly, and in reliance on both BLC Bank's representations and assurances and on the fact that the check was drawn by and against the BDL, which is the central bank of Lebanon, Plaintiffs agreed to accept the cashier's check.

173.     On November 24, 2019, Plaintiffs wrote to BLC Bank confirming that they were only accepting the check based on BLC Bank's ongoing refusal to execute a wire transfer and BLC Bank's repeated assurances that the check drawn against BDL could be deposited by Plaintiffs in the United States.

174.    On November 28, 2019, BLC Bank issued the check to Plaintiffs in the amount of $7,525,000.00 USD, which was drawn by BDL against BDL.  The check was signed by Zakhia and another representative of BLC Bank.  Plaintiffs were the payees.

175.    Zakhia explained to Joseph Daou that BLC Bank and Zakhia were authorized by BDL to issue the checks.

176.    BLC Bank again represented to Joseph Daou that the check was valid and could be deposited in the United States.

177.    Joseph Daou specifically notified BLC Bank that he would send the check home via DHL Courier to deposit in the United States.

178.    The copy of the check and the receipt stated in handwriting "valid for deposit in USA" and BLC Bank's Branch Manager, Zakhia, initialed it.

179.    At the time BLC Bank issued the check, BLC Bank knew Plaintiffs would send the check to the United States via DHL Courier for deposit in the United States.

180.    At the time BLC Bank issued the check, BDL and BLC Bank knew the check could not be validly deposited in the United States because BDL would dishonor the check when the United States bank attempted collection on the check.

181.    Defendants' refusal to execute wire transfers for Plaintiffs was motivated by and part of Defendants' fraudulent USD hoarding and misappropriation conspiracy.

182.    Plaintiffs deposited the check in the United States.  Specifically, Plaintiffs deposited the $7,525,000.00 USD check in Huntington National Bank.

183.    On December 5, 2019, Huntington National Bank advised Plaintiffs that the check had been dishonored.  Huntington National Bank stated that the reason for rejection was: "We are returning the attached check which was presented to us for collection.  The check is being returned unpaid for reason of LEBANON IS NOT ACCEPTING CHECKS FOR COLLECTIONS. CHECKS MUST BE PRESENTED AT LOCAL BANK IN LEBANON."

184.    BDL made these wire communications to financial institutions in the United States to execute Defendants' fraudulent scheme by dishonoring the check.

185.    On December 30, 2019, Plaintiffs deposited the $7,525,000.00 USD check at the Bank of America in Florida.

186.    On January 7, 2020, Bank of America returned the $7,525,000.00 USD check to Plaintiffs.  Bank of America wrote: "We're unable to process your collection item for the following reason:  The financial institution that the check is drawn on no longer supports presentments for payment."

187.    Thus, BDL once again used wire communications to execute Defendants' fraudulent scheme by dishonoring the check.

188.    Notably, Bank of America also wrote: "If you have concerns about the check being returned, you may contact the maker of the check and request an alternate payment method, such as a cashier's check or money order; or a wire or ACH funds transfer."  Of course, that is exactly what Plaintiffs had attempted, but which Defendants steadfastly refused.

189.    The statements made by BDL to the United States financial institutions were made by wire and were known to the BDL to be false when made.

190.     Plaintiffs attempted to contact BDL to discuss BDL's misconduct and attempt to mitigate their damages, but BDL refused to communicate with Plaintiffs.

191.     For their part, BDL and BLC Bank purposefully and knowingly passed worthless checks to United States citizens in the United States in furtherance of their conspiracy to defraud depositors like Plaintiffs and misappropriate their USD.

192.     After the check was dishonored, Plaintiffs' Lebanese counsel issued a demand letter to BLC Bank to execute a wire transfer of Plaintiffs' USD to Plaintiffs' United States bank account.

193.     On January 31, 2020, Joseph Daou sent an email to Khoury and Zakhia demanding execution of the wire transfer to Plaintiffs' Huntington Bank account, because the worthless check was dishonored as Defendants intended.  Joseph Daou also requested that BLC Bank credit his BLC Bank account in the amount of the worthless check.

194.     BLC Bank refused to transfer Plaintiffs' dollars, and spitefully reduced Plaintiffs' account at BLC Bank in the amount of the worthless check BLC Bank issued.  BLC Bank brazenly misappropriated Plaintiffs' USD.

195.     Plaintiffs were therefore left with bad checks and a nominal balance in their BLC Bank account.  Despite having $7,525,000.00 USD on deposit with BLC Bank and never receiving anything but a worthless check, as of April 8, 2020 Plaintiffs' BLC Bank account balance showed as $27.08.

**Plaintiffs' Deposits with CL Bank**

196.     CL Bank holds itself out as a global provider of banking products and services channeled through an extensive network of seventy-one branches.  CL Bank was established in

July 1961.  CL Bank's ownership is split between CIH Bahrain International Holding S.A.L. controlling 35.06% of the share capital and EFG Hermes CL Holding S.A.L. with an 8.81% stake. The remaining 56.13% is owned by over 1,000 individual shareholders, including investment companies, individuals, executives and employees of CL Bank, each with less than five percent, such as Joseph Torbey, Chief Executive Officer and Chairman of CL Bank.

197.    For USD transactions, CL Bank maintains correspondent bank accounts in New York with Citibank, N.A., JPMorgan Chase Bank, N.A., Standard Chartered Bank, and the Bank of New York Mellon.  CL Bank utilized these correspondent banks in New York to transact with Plaintiffs, including to accept deposits of Plaintiffs' USD at issue in this action.

198.    By 2016, Lebanese banks, including CL Bank, were experiencing and witnessing pressure on their USD deposits.  The high interest rates the banks had offered for years to induce deposits and the worsening Lebanese economy were catching up with the Lebanese banking system.

199.    CL Bank knew that the interest rates it was offering were unsustainable and placing its depositors' rights and property at risk and the problem worsened.

200.    The burgeoning problem fueled CL Bank's need for cash, so, true to the nature of a Ponzi scheme, the Lebanese banks, including CL Bank, sought new victims to lure in order to create income for the scheme.

201.    Plaintiffs were new victims targeted and solicited by CL Bank.

202.    Plaintiffs were introduced to CL Bank through Nadim Issa, Regional Manager of the Jbeil and North branches.  Issa pursued Joseph Daou as a client to solicit him to deposit USD in Lebanon.

203.    In March 2016, Issa visited Joseph Daou in Kaslik, Lebanon to introduce CL Bank's Jounieh branch staff, including Michel Ghalieh, Jounieh Branch Manager, who would be assisting Plaintiffs with their day-to-day banking services.

204.    Issa offered Plaintiffs even higher interest rates if they would agree to longer-term maturity deposits.  Plaintiffs steadfastly refused, and reiterated they needed ready access to their USD and would only deposit their USD if CL Bank could assure Plaintiffs of at most one-month reoccurring maturity dates.

205.    CL Bank, through Issa, represented to Joseph Daou that Plaintiffs could readily withdraw or transfer their USD outside Lebanon.

206.    Plaintiffs relied on these repeated representations and were induced to enter into a banking relationship with CL Bank and were induced to deposit their USD with CL Bank.

207.    On March 9, 2016 and while physically present in Lebanon, Joseph Daou opened a joint bank account with his wife, Karen Daou at CL Bank, Jounieh Branch.  Issa and Ghalieh were both present at the time Joseph Daou opened the account.

208.    As Karen Daou was present in the United States at the time of the account opening, CL Bank sent Karen Daou the account opening documents in Florida via mail.

209.    CL Bank knew, including based on account opening documents such as FATCA disclosures, W9 forms and KYC forms, that Plaintiffs were Florida citizens residing in Florida, and CL Bank knew it was directing wire communications and mail communications into the United States.

210.    The banking relations between Plaintiffs and CL Bank since 2016 were conducted mostly through WhatsApp voice messages and WhatsApp text messages between Plaintiffs in the United States and CL Bank representatives in Lebanon.  CL Bank even delivered Plaintiffs their account statements in the United States via WhatsApp text messages.

211.    On April 07, 2016, Plaintiffs deposited $2,500,000.00 USD in their CL Bank account by initiating a wire transfer from Joseph and Karen Daou's account at Fifth Third Bank in the United States to Plaintiffs' account with CL Bank in Lebanon.

212.    CL Bank utilized its correspondent bank in New York to accept the transfer of Plaintiffs' $2,500,000.00 USD deposit on April 07, 2016.

213.    On February 05, 2018, Plaintiffs deposited $825,000.00 USD in their CL Bank account by transferring $825,000.00 USD from Joseph and Karen Daou's account at BMO Harris Bank in the United States to Plaintiffs account with CL in Lebanon

214.    CL Bank utilized its correspondent bank in New York to accept the transfer of Plaintiffs' $825,000.00 USD deposit on February 5, 2018.

215.    On August 20, 2018, and subsequent to Plaintiffs' request via phone for a wire transfer, CL Bank initiated a wire transfer of $3,699,995.00 USD to Plaintiffs' account at BMO Harris Bank in the United States.

216.    CL Bank used its correspondent bank in New York to effectuate the August 20, 2018 transfer to Plaintiffs in the United States.

217.    On October 22, 2018, Plaintiffs deposited $4,699,994.00 USD in their CL Bank account by transferring $4,699,994.00 USD from Joseph Daou's account at Huntington National Bank in the United States to Plaintiffs account with CL Bank in Lebanon.

218.    CL Bank used its correspondent bank account in New York to accept Plaintiffs' $4,699,994.00 USD transfer on October 22, 2018.

219.    Throughout the discussions between Joseph Daou and Issa, Joseph Daou made clear to Issa and Issa understood that Plaintiffs required ready transferability of their USD outside Lebanon.

220.    On behalf of CL Bank, Issa repeatedly represented to Joseph Daou, over the telephone and written electronic communications to Joseph Daou including while Joseph Daou was physically present in the United States, that Plaintiffs' deposits would earn substantial interest rates in USD and that Plaintiffs could promptly withdraw or transfer their USD outside Lebanon.

221.    On January 12, 2019, Joseph Daou sent Issa a text message to inquire about the situation in Lebanon, and asked why he was receiving higher interest rates at other banks relative to CL Bank.

222.    On January 14, 2019, Joseph Daou then showed Issa a forwarded text message showing that he was getting 9.75% net interest from another Lebanese bank.

223.    On January 14, 2019, Issa replied that CL Bank does not offer interest rates equal to what Plaintiffs were receiving at other Lebanese banks.  Issa further explained that some banks needed the USD cash because they "mismatched" their investment.  Specifically, Issa asserted that other banks were paying high interest rates to borrow money to pay their debts, and thus were willing to pay high interest rates to depositors to gain USD deposits.  Issa maintained that only

34

Lebanese banks that needed USD cash were giving customers that high of an interest rate, and represented that CL Bank was not in such a compromised financial condition.

224.    On January 16, 2019, Joseph Daou sent a message to Issa advising that he had been trying to call him with no success.  Joseph Daou stated to Issa that Plaintiffs' next monthly account maturity date was approaching and that Plaintiffs wanted to know if CL Bank would match the 9.75% interest rate Plaintiffs were receiving at other Lebanese banks.  Joseph Daou advised Issa that if CL Bank would not match the interest rate, Plaintiffs would withdraw their USD from CL Bank.

225.    Issa responded in a WhatsApp text message to Joseph Daou advising that Issa was unable to discuss any interest rates with CL Bank's General Manager and that he will be doing that the next day.  On January 17, 2019, Issa asked for additional time because the General Manager wanted to talk to Torbey before they could give him a final answer on the interest.

226.    On January 21, 2019, Issa left Joseph Daou a voicemail in the United States advising Joseph Daou that the Chairman of CL Bank approved the 9.75% interest rate for Plaintiffs' USD.  Issa stated that CL Bank did not want to lose Plaintiffs as clients, and therefore the Chairman approved the request even though it was purportedly the first request of this kind. Issa also asked Daou to deposit more USD with CL Bank.

227.    On February 5, 2019, Daou requested a financial statement from CL Bank so that Plaintiffs could see how the bank performed in general in 2018 to make sure they were dealing with a solid bank.

228.    On February 6, 2019, Issa used the wires to send Plaintiffs in the United States approximate confidential numbers showing good performance and claiming the official statements were not finalized yet.

229.    In response, Daou asked Issa if the rumors were true that depositors of Lebanese banks were having difficulty withdrawing USD cash from their USD accounts in Lebanon.

230.    On February 7, 2019, Issa responded that it was not true of CL Bank, but might be true for other banks if they had liquidity difficulties.

231.    On April 14, 2019, Michel Ghalieh stated to Joseph Daou that BDL and the Lebanese Association of Banks were instructing banks including CL Bank to unilaterally lower depositors' interest rates.

232.    On April 14, 2019, Joseph Daou and Issa spoke via WhatsApp voice messaging while Joseph Daou was in the United States.  Joseph Daou reiterated what Ghalieh told him. Ghalieh explained that CL Bank may have to reduce his bank accounts interests and that he wanted to make sure Joseph Daou was aware because he knew Joseph Daou is a United States citizen and would potentially need to change his tax planning in the United States.  Issa agreed to look into the matter.  In addition, Issa volunteered to Joseph Daou that the previous month, CL Bank's General Manager requested Issa to reduce Plaintiffs' interest rate by one quarter of one percent, but Issa refused to do it.  Joseph Daou thanked Issa, and asked Issa to advise him if the interest rate would be reduced because, if so, Plaintiffs would withdraw their USD.

233.    On April 18, 2019, Issa responded via WhatsApp to Joseph Daou in the United States, confirming that CL Bank would not reduce any interest rates on Plaintiffs' USD.

234.     Neither Issa nor anyone else on behalf of CL Bank informed Plaintiffs of interest rate changes prospectively, even though CL Bank knew it would never actually pay the interest that was accruing at the rate promised to Plaintiffs.

235.     On September 4, 2019, Joseph Daou inquired of Issa via WhatsApp about the risk of Plaintiffs keeping their USD in Lebanon, and asked Issa about the best time for Plaintiffs to withdraw their USD.

236.     On September 5, 2019, Issa responded to Joseph Daou in the United States via WhatsApp.  Issa thanked Joseph Daou for his trust.  Issa represented to Joseph Daou that the Lebanese banking system was still very solid and there were no risks for Plaintiffs' USD.  Issa stated that he wished Plaintiffs would not withdraw their USD from CL Bank, while assuring Joseph Daou there was no risk.

237.     On September 23, 3019, Issa offered further assurance to Plaintiffs, representing to Vanessa Mikhael, Plaintiffs' international business agent, via wire transmission to the United States that Joseph Daou's money was safe in Lebanon and he should not have any concerns about the same.   To support his representation, Issa asserted that CL Bank recently received $100,000,000.00 USD from a European Bank which, according to Issa, was a sign of safety and security.

238.     These representations were false and known to be false when made by Issa on behalf of CL Bank to induce Plaintiffs to retain their USD in Lebanon and CL Bank in particular.

239.     By late September 2019, Plaintiffs were successful in securing multiple real estate investment opportunities for their affiliated entities.   Specifically, the transactions were

acquisitions of multi-family properties in South Florida, Virginia Beach, Virginia, Austin, Texas, and Houston, Texas.

240.    The acquisitions required Plaintiffs to fund a deposit and related costs.

241.    As they had planned, Plaintiffs attempted to use the funds on deposit in Lebanon, including with CL Bank, for their funding obligations for the multi-family property investments.

242.    On October 21, 2019, Joseph Daou asked Issa whether the rumors of wire transfers outside of Lebanon being prohibited were true.  Via WhatsApp Issa represented to Joseph Daou while Joseph Daou was in the United States that there was nothing even close to such a prohibition, because banks cannot stop people from withdrawing their funds. Joseph Daou then asked Issa if there were any capital controls.  On October 22, 2019, Issa represented via WhatsApp to Joseph Daou that there were no capital controls whatsoever and the rumors were not true.

243.    On October 28, 2019, Joseph Daou contacted Issa, and instructed that CL Bank wire transfer the balance of $7,000,000.00 USD.

244.    In response, on October 28, 2019, Issa confirmed to Joseph Daou while he was in the United States using WhatsApp that he could arrange to send the wire to the United States in the amount of $7,000,000.00 USD, and further represented to Joseph Daou that the wire transfer had already been approved by CL Bank's Board.

245.    These representations were false and known to be false when made by Issa.

246.    Issa subsequently reneged in part and contracted Joseph Daou to request that the wire transfer be delayed until November 14, 2019.

247.    Joseph Daou responded by explaining that the wire transfer was required promptly so Plaintiffs could use it to satisfy Plaintiffs' funding obligations for their acquisition of multi-family real estate projects in Virginia Beach and South Florida.

248.    On October 29, 2019, Plaintiffs, through Mikhael, delivered formal instructions for the requested wire transfer to Issa.

249.    After receiving the instruction, Issa phoned Mikhael requesting that the wire transfer be delayed until November 14, 2019.

250.    In response, Mikhael inquired about the reason for the delay.

251.    Issa over wires into the United States confirmed to Mikhael that there were no restrictions whatsoever, but the delay would let Issa close the month with higher USD in the accounts originated by him, and that his request is purely personal.

252.    Issa fraudulently concealed from Mikhael the facts that Defendants had already collusively enacted informal capital controls by only allowing politically connected depositors to transfer their USD outside Lebanon for safekeeping while agreeing to prohibit withdrawals and transfers outside Lebanon by depositors without political connections.

253.    In reality, Issa was acting in furtherance of Defendants' extensive conspiracy to hoard the USD in Lebanon by misappropriating USD from their depositors.

254.    On October 29, 2019, Joseph Daou sent Issa via WhatsApp a lengthy explanation of the United States real estate investments Plaintiffs secured in Virginia Beach and South Florida and that the contract was signed.  Joseph Daou explained to Issa that this had been discussed a few

months prior and CL Bank was aware of that through a regional manager who confirmed to Joseph Daou that Plaintiffs could transfer the USD out of Lebanon.

255.    On November 5, 2019, Joseph Daou and Issa discussed the pending wire transfer again.  Joseph Daou explained that the latest the wire could be executed was November 14, 2019, but that Plaintiffs preferred that it be executed by November 13, 2019.

256.    Issa confirmed to Joseph Daou that CL Bank would execute the requested wire transfer on November 14, 2019.  Issa's representation was knowingly false when he made it to Joseph Daou.  Issa knew CL Bank had already agreed not to permit withdrawals or transfers outside Lebanon by depositors like Plaintiffs who were not among the political elite.

257.    Furthermore, Issa gratuitously and falsely represented to Mikhael that he notified the CL Bank Board of Directors of his resignation should the wire transfer not get executed to Plaintiffs on the promised date, November 14, 2019.  Issa was clearly trying to increase Plaintiffs' confidence that the wire would be made, and to cement his personal relationship with Joseph Daou. CL Bank never executed the wire transfer, but Issa remains employed by CL Bank to this day as one of five of its Regional Managers.

258.    On November 7, 2019, Joseph Daou and Issa discussed the informal constraints on cash withdrawals being reported in the press.  Issa conceded to Joseph Daou that CL Bank was indeed restraining cash withdrawals, but reassured Joseph Daou that the pending wire transfer was not impacted and would be "no problem."

259.    On November 8, 2019, Issa again reassured Joseph Daou that the wire transfer would proceed as planned on November 14, 2019, regardless of whether the bank was closed

because, according to Issa, CL Bank's back office which would execute the wire transfer was still functioning.

260.    Issa additionally assured Plaintiffs' representative, Mikhael, during a telephone conversation, that even if CL Bank could not initiate the wire transfer from Lebanon, CL Bank has the full capability of initiating the wire transfer of $7,000,000.00 USD from CL Bank's correspondent bank in New York to Plaintiffs' United States bank account and assured Mikhael CL Bank would do so if necessary.

261.    On November 11, 2019, when Joseph Daou learned the news of a nationwide strike by bank tellers who were refusing to work without better security given the civil unrest in Lebanon as the banking crisis was deepening, he contacted Issa to determine whether the bank strike could impact the wire.  Issa once again assured Joseph Daou via wire communication that CL Bank's back office remained open and therefore the strike would not impact the wire transfer.  Issa further confirmed to Joseph Daou that CL Bank was not the subject of an insolvency proceeding and that the Lebanese government had not imposed any capital controls on CL Bank or the other Lebanese banks.

262.    On November 12, 2019, Joseph Daou sent a written communication to Issa requesting confirmation that the wire transfer would be performed as requested.  Issa reassured Joseph Daou via wire communication that the transfer would be completed as requested.

263.    On November 13, 2019, Issa confirmed to Joseph Daou that the wire transfer was approved by Torbey.  Issa assured Daou that the $7,000,000.00 USD would be in his account the following morning of November 14, 2019 when Joseph Daou's team woke up in the United States.

264.    All of these representations were knowingly false when made by Issa.

265.    CL Bank never executed the wire transfer, despite its repeated assurances that it would.

266.    On November 14, 2019, Joseph Daou and Mikhael attempted to contact Issa numerous times but Issa never responded.   Mikhael also texted Issa, reminding Issa of the monetary and reputational damages CL Bank is causing by not executing the wire transfer to Plaintiffs' bank accounts in the United States.

267.    Eventually, on November 14, 2020, Issa shut off his phone to avoid Plaintiffs' repeated phone calls

268.    On November 15, 2019, Plaintiffs, through Mikhael, wrote to Torbey demanding a status update on the overdue wire transfer and advised Torbey that CL Bank's unlawful conduct was about to cost Plaintiffs substantial damages from losing the Virginia Beach multifamily property acquisition.   The same day Joseph Daou also wrote to Torbey explaining the harm CL Bank's unlawful conduct was causing.   Torbey did not respond to either communication from Plaintiffs.

269.    With Issa and Torbey ignoring Plaintiffs, on November 15, 2019 Joseph Daou also sent a separate communication to both Michel Ghalieh and Torbey to request a wire transfer in the amount of $5,300,000.00 USD.  Ghalieh responded, and advised Joseph Daou that CL Bank cannot make the wire transfer as Issa and CL Bank previously assured Plaintiffs.  Torbey persisted in his failure to respond.

270.    Joseph Daou wrote to Ghalieh on November 15, 2019 specifically advising Ghalieh that CL Bank's failure and refusal to execute the wire transfer as instructed by Plaintiffs was causing Plaintiffs substantial damages from the delay in closing on the acquisition of the Virginia

Beach multi-family property and potential loss of the acquisition which would cause millions of dollars in losses.

271.     Plaintiffs spent the next several days attempting to persuade CL Bank to execute the wire transfer to no avail.  Specifically, Plaintiffs' counsel wrote to Torbey instructing CL Bank to execute a wire transfer from Plaintiffs' CL Bank account to Plaintiffs' bank account in the United States. This correspondence was delivered to Torbey via USPS Express at CL Bank headquarters in Adlieh Roundabout, Beirut, Lebanon.

272.     On November 19, 2019, Joseph Daou appeared in CL Bank's offices in Lebanon to meet with Ghalieh.  Ghalieh again advised Joseph Daou that CL Bank would not make a wire transfer of Plaintiffs' USD to Plaintiffs' account in the United States.  Instead, Ghalieh proposed CL Bank issuing Plaintiffs a cashier's check that Plaintiffs could deposit in the United States. Joseph Daou continued to insist upon receiving a wire transfer, and implored Ghalieh to explain the reason CL Bank was refusing to follow Plaintiffs' instruction to execute the delinquent wire transfer.

273.     Regarding CL Bank's proposal that Plaintiffs accept a cashier's check drawn on BDL in lieu of a wire transfer, Joseph Daou responded on November 19, 2019 by asking Ghalieh of CL Bank to reconsider executing the wire transfer per Plaintiffs' instruction to avoid the substantial economic damages CL Bank's unlawful activities were causing to Plaintiffs.  Plaintiffs further reiterated to CL Bank that Plaintiffs' entity had committed to fund $8,000,000.00 USD for their investment in the Virginia Beach multi-family project and advised CL Bank that its continued misappropriation of Plaintiffs' USD was impeding the consummation of the acquisition and exposing Plaintiffs to substantial potential liability.

274.     As of November 20, 2019, Plaintiffs had on deposit with CL Bank $5,298,845.03 USD in one account and $413,027.25 USD in another CL Bank account.

275.     On November 20, 2019 Joseph Daou again appeared in the Jounieh branch of CL Bank and met with Ghalieh.  Joseph Daou demanded a wire transfer to Plaintiffs' United States account, but again Ghalieh refused citing his superiors' instructions.

276.     Ghalieh again suggested a cashier's check, and represented to Joseph Daou that the check could be deposited in the United States.  Ghalieh also advised Joseph Daou that CL Bank was not subject to any insolvency proceeding, and represented to Joseph Daou that Ghalieh confirmed with CL Bank's headquarters, specifically Michel Khadige, Executive Board Member and Deputy General Manager of Corporate Banking and Financial Institutions at CL Bank, that Plaintiffs could deposit the cashier's check in the United States.

277.     On November 21, 2019, Joseph Daou once again appeared in the Jounieh branch of CL Bank to demand that CL Bank follow Plaintiffs' instructions and execute the wire transfer Plaintiffs first requested in September 2019.  Joseph Daou also wrote to Ghalieh that day demanding the wire transfer of the balance in Plaintiffs' accounts.

278.     On November 21, 2019, Ghalieh, CL Bank branch manager, again proposed that CL Bank would deliver a cashier's check drawn against BDL and represented to Joseph Daou that Plaintiffs could deposit the check in the United States.

279.     On November 21, 2019, CL Bank presented Joseph Daou with a cashier's check drawn by BDL against BDL in the amount of $5,300,000.00 USD.  The check was signed by Ghalieh and another representative of CL Bank.  The account transfer debit advice states "Deposit in USA."  The copy of the check stated "Original Received.  To be deposited and authorized in the

44

USA.  Declined to make a wire transfer."  The copy of this statement was signed and stamped by Ghalieh.

280.    At the time CL Bank issued the check, CL Bank knew Plaintiffs would send the check to the United States via DHL Courier for deposit in the United States.

281.    On behalf of CL Bank, Ghalieh assured Joseph Daou that the cashier's check could be deposited by Plaintiffs in the United States, and that there were sufficient funds on deposit with BDL for the check to clear.

282.    CL Bank's representations that the check was valid and could be deposited in the United States were knowingly false when made.  CL Bank had already agreed with BDL and the other banks to not permit USD withdrawals or transfers outside Lebanon for non-politically connected depositors, including Plaintiffs.

283.    CL Bank knew that Plaintiffs would be depositing the check in the United States for immediate deployment for Plaintiffs' real estate investments.

284.    Despite knowing that BDL and CL Bank issued Plaintiffs a bad check that would never be honored, CL Bank deducted the amount of the worthless check from Plaintiffs' CL Bank account.

285.    Plaintiffs deposited the $5,300,000.00 USD check drawn by BDL against BDL at Huntington National Bank.

286.    Huntington National Bank acknowledged on December 4, 2019 that it was attempting to clear the check, but BDL refused to honor the check, just as BDL and CL Bank always intended.

287.    On December 23, 2019, Huntington National Bank wrote to Plaintiffs and advised Plaintiffs that the reason for rejection was: "The check is being returned unpaid for reason of LEBANON IS NOT ACCEPTING CHECKS FOR COLLECTIONS.  CHECKS MUST BE PRESENTED AT LOCAL BANK IN LEBANON."

288.    Plaintiffs subsequently attempted to deposit the $5,300,000.00 USD check with Bank of America on December 30, 2019.

289.    However, on January 7, 2020, Bank of America returned the $5,300,000.00 USD check.  Bank of America wrote: "We're unable to process your collection item for the following reason:  The financial institution that the check is drawn on no longer supports presentments for payment."

290.    BDL used wire communications to the United States banks to fraudulently dishonor the check issued to Plaintiffs.

291.    Notably, Bank of America also wrote to Plaintiffs: "If you have concerns about the check being returned, you may contact the maker of the check and request an alternate payment method, such as a cashier's check or money order; or a wire or ACH funds transfer."  Of course, that is exactly what Plaintiffs had attempted, but which Defendants steadfastly refused.

292.    On December 2, 2019, CL Bank issued a further check to Plaintiffs in the amount of $40,180.00 USD.  CL Bank handed the check to Plaintiffs' agent in Lebanon knowing Plaintiffs' agent would use the mails to deliver the check to the United States for deposit by Plaintiffs in the United States.  The drawer of the check was BDL, and BDL was the drawee.

293.    On December 11, 2019, Plaintiffs attempted to deposit the $40,180.00 USD check in BMO Harris Bank N.A.

294.     BDL refused to honor the $40,180.00 USD check.

295.     BMO Harris Bank N.A. rejected the $40,180.00 USD check, stating that the check could not be negotiated outside Lebanon.

296.     On December 30, 2019, Plaintiffs attempted to deposit the $40,180.00 USD check in Bank of America.

297.     On January 7, 2020, Bank of America returned the $40,180.00 USD check to Plaintiffs.  Bank of America wrote: "We're unable to process your collection item for the following reason:  The financial institution that the check is drawn on no longer supports presentments for payment."

298.     Despite the fact that CL Bank knew the two checks drawn against BDL were worthless, CL Bank deducted the amounts of the check from Plaintiffs' CL Bank accounts.

299.     BDL and CL Bank purposefully and knowingly passed bad checks to United States citizens for deposit in the United States in furtherance of their conspiracy to defraud Plaintiffs and misappropriate their USD.

300.     BDL made false statements to the United States banks via wire communications claiming that the checks could not be deposited in the United States, despite the fact that CL Bank represented to Plaintiff that they could and despite the fact that BDL was under no legal obligation to dishonor the checks.

301.      After the checks were dishonored, Plaintiffs' Lebanese counsel issued a demand letter to CL Bank to execute a wire transfer of Plaintiffs' USD to Plaintiffs' United States bank account.

302.   CL Bank refused, and spitefully will not even allow Plaintiffs to access their account at CL Bank.

**Plaintiffs' Deposits with AM Bank**

303.   AM Bank was established in 1980 and is today one of the largest commercial banks in Lebanon.

304.   For USD transactions, AM Bank uses its correspondent bank account at Bank of New York Mellon, N.A. in New York.

305.   As of December 2, 2019, Joseph Daou had a preexisting friendship through a mutual friend with AM Bank's Vice President of International Business Development, Youssef Hanna El-Khoury.

306.   Plaintiffs had not previously done business with AM Bank because El-Khoury and AM Bank had not previously offered Plaintiffs interest rates equal to what was offered by BLC Bank and CL Bank (i.e., approximately ten percent) for short-term maturity accounts.

307.   On December 2, 2019, El-Khoury solicited Joseph Daou to deposit USD with AM Bank.  This time, El-Khoury offered AM Bank to pay interest of eleven percent on Plaintiffs' deposit, and represented to Joseph Daou that Plaintiffs could withdraw or transfer their USD outside Lebanon in early January.  Specifically, El-Khoury represented to Joseph Daou that it would be beneficial for him and AM Bank to have Plaintiffs' USD on deposit through the end of the 2019 but that Plaintiffs could withdraw or transfer their USD outside Lebanon in early January so Plaintiffs could deploy their USD for their funding obligations for the real estate transactions they were closing.

308.     Joseph Daou clearly informed El-Khoury that he was only interested in a short-term deposit so that he could wire transfer the money to the United States to satisfy a real estate investment funding obligation due in January 2020.

309.     El-Khoury assured Joseph Daou that AM Bank will initiate the requested wire transfer after New Year's Day in 2020.

310.     El-Khoury, on behalf of AM Bank, represented to Joseph Daou that he would earn a high rate of interest on his short-term deposit and that Joseph Daou could then withdraw the money in early January 2020.

311.     El-Khoury, on behalf of AM Bank, represented to Joseph Daou that AM Bank was in sound financial condition and even showed Joseph Daou purported financial statements of AM Bank to assure him of the bank's soundness.

312.     On December 3, 2019, in reliance on AM Bank's representations, Joseph Daou, while physically present in Lebanon, opened a bank account at AM Bank through its branch in Jounieh.  AM Bank's Jounieh Branch Manager, under the supervision of El-Khoury, opened the account on AM Bank's behalf.

313.     On December 3, 2019, upon opening the account, Joseph Daou deposited $5,735,928.67 USD into his account.

314.     On December 13, 2019, upon Joseph Daou's return to the United States and during his tour of the secured properties in Texas, Joseph Daou communicated with El-Khoury and sent him the information related to the investment in the multi-family properties in Austin, Texas and Houston, Texas that Plaintiffs had secured. Joseph Daou explained to El-Koury that Plaintiffs required transfer of their USD on deposit with AM Bank to the United States so that Plaintiffs

could meet their funding obligations for this upcoming closing on a real estate transaction in the United States, as previously discussed at the time of the opening of the account.

315.     El-Khoury again assured Joseph Daou that AM Bank will initiate the requested wire after New Year's Day 2020.

316.     In December 2019, Joseph Daou, while in the United States, sought to open a joint account for Plaintiffs at AM Bank.

317.     Under the supervision of El-Khoury, Chirine Aoun, AM Bank's Jounieh Branch Manager, opened the joint bank account for Plaintiffs and delivered the opening documents to Plaintiffs' residence in Clearwater Beach, Florida via DHL Courier. Documents included but were not limited to KYC documents and FATCA compliance forms identifying Plaintiffs as United States citizens and residents.

318.     From this point forward, all communications to Plaintiffs by AM Bank were wire communications directed into the United States, including the false representations by El-Khoury of AM Bank described below.

319.     On January 3, 2020, Joseph Daou emailed El-Khoury instructing AM Bank to initiate the wire transfer to the United States of Plaintiffs' USD.

320.     El-Khoury responded to Joseph Daou that El-Khoury had to wait for AM Bank Chief Executive Officer, Marwan Kheireddine, to return from a trip on January 7 or 8, 2020 so Kheireddine could approve the wire transfer.

321.     On January 11, 2020, AM Bank advised Plaintiffs through El-Khoury that, at the direction of BDL, AM Bank was unilaterally and unlawfully lowering Plaintiffs' interest rate to

five percent. AM bank also informed Joseph Daou that the interest payment of the five percent would be made partially in Lebanese Lira and not completely in USD.

322.    On January 12, 2020, Joseph Daou emailed El-Khoury again to follow up on his wire transfer instruction after learning that AM Bank Chief Executive Officer, Kheireddine, had appeared on Lebanese national television acknowledging that the wire restrictions in Lebanon were unlawful and fraudulent.

323.    Joseph Daou inquired about AM Bank unilaterally and unlawfully lowering the interest rate and informed El-Khoury that Plaintiffs were demanding an immediate wire transfer of the full amount deposited at AM Bank to Plaintiffs' bank account in the United States.  Joseph Daou also specifically objected to the interest payments being made in Lebanese Lira because Plaintiffs funds on deposit were in USD.

324.    On January 15, 2020, El-Khoury responded via email to Joseph Daou in the United States stating that due to the external wire transfers restrictions in Lebanon, AM Bank refuses to initiate any wire transfers of the Plaintiffs USD. El-Khoury also stated that the decision to unilaterally and unlawfully lower the interest rate was made by BDL.

325.    Joseph Daou again explained to El-Koury that Plaintiffs required transfer of their USD on deposit with AM Bank to the United States so that Plaintiffs could meet their funding obligations for an upcoming closing on a real estate transaction in the United States.

326.    El-Koury via email to Joseph Daou in the Unites States responded that he would need to inquire of his superiors about whether he could follow Plaintiffs' instruction and execute the wire transfer of Plaintiffs' USD to the United States.  El-Koury stated that he would have an answer for Plaintiffs within one week.

327.    However, El-Khoury did not respond within one week.  Therefore, between January 9 and 15, 2020, Joseph Daou repeatedly followed up with El-Koury imploring him to respond about the interest issue and wire transfer instruction.

328.    On January 15, 2020, El-Khoury responded via email that AM Bank would not execute the wire instruction because "all the external transfers are restricted for the time being," and claimed that AM Bank was unilaterally reducing Plaintiffs' interest rate at the direction of BDL.

329.    On January 17, 2020, while Joseph Daou was in Florida, El-Khoury and Joseph Daou had a telephone conversation while Joseph Daou was in the United States during which El-Khoury falsely represented to Joseph Daou that AM Bank would execute the wire transfer.

330.    On January 23, 2020, Joseph Daou wrote to El Khoury once again requesting the wire transfer so that Plaintiffs would have their USD available for Plaintiffs' funding obligations for their real estate transaction which was due to close in February 2020.  Thus, Joseph Daou instructed AM Bank to execute a wire transfer in the amount of $5,735,930.00, plus all accrued interest on February 3, 2020 to Plaintiffs' account at Huntington National Bank in the United States.

331.    AM Bank refused to comply with Plaintiffs' instruction, and continued misappropriating Plaintiffs' USD.

332.    From February 22, 2020 to February 29, 2020, Joseph Daou continued to demand that AM Bank comply with Plaintiffs' instruction and execute a wire transfer of Plaintiffs' USD to Plaintiffs' account in the United States.  Joseph Daou also continued to provide AM Bank with

notice of the fact that AM Bank's ongoing unlawful misappropriation of Plaintiffs' USD was jeopardizing Plaintiffs' pending real estate transaction in the United States.

333.    AM Bank still refused to comply with Plaintiffs' instruction and execute a wire transfer of Plaintiffs' USD to Plaintiffs' account in the United States.  Instead, in furtherance of Defendants' conspiracy, AM Bank suggested that Plaintiffs instead accept a cashier's check drawn by BDL against BDL which could be deposited by Plaintiffs in the United States.

334.    On February 25, 2020, Karen Daou requested via E-mail to El-Khoury that Plaintiffs' funds be transferred from Joseph Daou's savings account to Plaintiffs' current joint account.  AM Bank complied with this instruction.  AM Bank delivered the internal transfer authorization form to Plaintiffs in the United States via DHL.

335.    By March 4, 2020, AM Bank's continuous unlawful refusal to execute the wire transfer had coerced Plaintiffs into accepting a cashier's check which AM Bank assured Plaintiffs could be deposited in the United States.  While Plaintiffs were of course by now skeptical given that BDL, BLC Bank, and CL Bank had already defrauded Plaintiffs with bad BDL checks, they had no choice but to try.  AM Bank was misappropriating Plaintiffs' USD and unequivocally stated repeatedly for two months that it would not execute a wire transfer.

336.    AM Bank represented to Plaintiffs that Plaintiffs could deposit the check in the United States.

337.    In reliance on AM Bank's representations, on March 4, 2020 Joseph Daou wrote to El-Koury as follows: "per our phone conversation since your bank declined to make a wire transfer to the USA, I would have to accept a bank check drawn on Bank Du Liban (BDL).  The check will be valid to deposit in USA."

338.     On March 7, 2020, AM Bank issued a cashier's check payable to Plaintiffs in the amount of $5,811,500.00 USD.  BDL was the drawer and drawee of the $5,811,500.00 USD check. The check was signed by El-Khoury and Aoun of AM Bank. The check was delivered to Plaintiffs' representative in Lebanon who informed AM Bank that he would deliver the check to Plaintiffs in the United States via DHL Courier. The copy of the check stated "Accepted check since declined to wire transfer. Valid to deposit in the USA." The copy of this statement was stamped with a bank stamp by Aoun.

339.     At the time AM Bank and BDL issued the $5,811,500.00 USD check to Plaintiffs, AM Bank and BDL knew and intended that BDL would dishonor the $5,811,500.00 USD check when Plaintiffs tried to deposit it in the United States.

340.     On March 10, 2020, Plaintiffs attempted to deposit the $5,811,500.00 USD check with Fifth Third Bank in the United States.

341.     On April 15, 2020, Fifth Third Bank returned the $5,811,500.00 USD check to Plaintiffs advising Plaintiffs that the "Reason for return:  Unable to clear – Refer to Maker."

342.     After the check was dishonored, Plaintiffs' Lebanese counsel issued a demand letter to AM Bank to execute a wire transfer of Plaintiffs' USD to Plaintiffs' United States bank account.

343.     However, Am Bank unlawfully refused Plaintiffs' demand.

## FIRST CAUSE OF ACTION

### (Civil Conspiracy against All Defendants)

344.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 343 above as if fully set forth and realleged herein.

345.     From 2016 until 2019, Plaintiffs deposited USD in three Lebanese banks, namely BLC Bank, CL Bank, and AM Bank.

346.     By the end of 2019, Plaintiffs had more than $18,000,000.00 USD on deposit in Lebanon at BLC Bank, CL Bank, and AM Bank.

347.     In September 2019, Plaintiffs needed to withdraw the USD they had on deposit in Lebanon to fund real estate investments opportunities they identified in the United States, including three separate multi-family property investments in Florida, Virginia and Texas.

348.     When Plaintiffs attempted to transfer their USD from their bank accounts in Lebanon to the United States, however, they were confronted by the conspiracy within the Lebanese banking system to hoard USD by intentionally misleading their depositors and misappropriating their depositors' USD.

349.     Unbeknownst to Plaintiffs, Defendants had agreed to unlawfully refuse to allow Plaintiffs and certain other USD depositors to transfer their USD outside Lebanon and to instead misappropriate Plaintiffs' USD for their own use to the exclusion of Plaintiffs.

350.     Defendants had also agreed to make fraudulent misrepresentations to Plaintiffs to carry out their scheme of hoarding USD in Lebanon and misappropriating Plaintiffs' USD on deposit with BLC Bank, CL Bank, and AM Bank to do so.

351.     Defendants used wire communications, including emails, telephone calls, and text messages, to make fraudulent misrepresentations to Plaintiffs and United States financial institutions while Defendants misappropriated Plaintiffs' USD in Lebanon.

352.    Defendants agreed to pass bad checks to Plaintiffs in the United States in violation of United States law in order to carry out their scheme of misappropriating Plaintiffs' USD.

353.    Defendants agreed to use the mail (specifically, DHL Courier) to deliver fraudulent account documents to Plaintiffs in the United States in violation of United States law in order to carry out their scheme of misappropriating Plaintiffs' USD.

354.    Plaintiffs specifically advised the BLC Bank, CL Bank, and AM Bank that they needed to transfer their USD to the United States to fund the real estate investment opportunities they had secured.

355.    Plaintiffs instructed BLC Bank, CL Bank, and AM Bank to transfer their USD on deposit in Lebanon to their accounts in the United States.  The banks were obligated to comply with Plaintiffs' lawful instructions.

356.    Nevertheless, BLC Bank, CL Bank, and AM Bank unlawfully refused to execute Plaintiffs' wire transfer instructions.

357.    Then, Defendants further defrauded Plaintiffs by knowingly issuing Plaintiffs bad checks in the United States which were drawn on BDL.

358.    Plaintiffs were reluctant to accept checks from BLC Bank, CL Bank, and AM Bank, and repeatedly insisted that the banks execute wire transfers of Plaintiffs USD to accounts in the United States.

359.    BLC Bank, CL Bank, and AM Bank falsely represented to Plaintiffs that they were unable to execute wire transfers, when in fact Lebanese banks including BLC Bank, CL Bank, and

AM Bank were regularly transferring USD outside of Lebanon, including for influential Lebanese politicians, banks executives and shareholders, and other well-connected depositors.

360.    Contrary to their false representations, BLC Bank, CL Bank, and AM Bank were not subject to any genuine capital controls or any purported legal prohibition against following the instructions of depositors like Plaintiffs to transfer the depositors' USD outside Lebanon. Regardless, capital controls, even if enacted in Lebanon, would not absolve Defendants of their liability in this action.

361.    BLC Bank, CL Bank, and AM Bank's representations that they could not follow Plaintiffs' lawful instructions and execute transfers of Plaintiffs' USD outside of Lebanon were false and known to be false when made by BLC Bank, CL Bank, and AM Bank.

362.    The Lebanese commercial banks, including BLC Bank, CL Bank, and AM Bank, as well as BDL agreed to defraud USD depositors by having the commercial banks refuse to make USD wire transfers outside Lebanon, but instead issue checks drawn on BDL.

363.    The Lebanese commercial banks, including BLC Bank, CL Bank, and AM Bank, are large creditors of BDL, having deposited billions of USD with the BDL.

364.    BLC Bank, CL Bank, AM Bank, and BDL conspired to have BDL draw checks for Plaintiffs as payees, issue the checks to Plaintiffs in the United States, and then refuse to honor the checks after Plaintiffs deposited the checks with their United States banks despite Defendants' contrary representations to Plaintiffs.

365.    BLC Bank, CL Bank, and AM Bank represented to Plaintiffs that the banks maintained USD on deposit with BDL to cover the amounts of checks drawn on BDL, and that

BDL would thus make good on the checks signed by BLC Bank, CL Bank, and AM Bank and issued to Plaintiffs.

366.    After repeated refusals by BLC Bank, CL Bank, and AM Bank to follow Plaintiffs' instructions and execute wire transfers of Plaintiffs' USD to Plaintiffs' bank accounts in the United States, BLC Bank, CL Bank, and AM Bank pressured Plaintiffs to instead accept cashier's checks drawn on BDL.

367.    Plaintiffs specifically and repeatedly advised BLC Bank, CL Bank, and AM Bank that they needed to deposit their USD in the United States for imminent real estate investment opportunities that they would lose if they could not immediately withdraw their USD on deposit in Lebanon and deposit and deploy the USD in the United States.

368.     BLC Bank, CL Bank, and AM Bank knew that Plaintiffs needed their USD to be transferred from Lebanon to the United States in order to perform their funding obligations for the valuable real estate investment opportunities they had secured.

369.    BLC Bank, CL Bank, and AM Bank fraudulently represented to Plaintiffs that Plaintiffs could deposit the cashier's checks drawn on BDL in the United States.

370.    The representations by BLC Bank, CL Bank, and AM Bank that Plaintiffs could deposit the cashier checks drawn on BDL in the United States were false and known to be false when made by BLC Bank, CL Bank, and AM Bank.

371.    The goal of Defendants' conspiracy was fraudulently inducing USD deposits and later misappropriating certain depositors' USD so they could hoard USD in Lebanon, while allowing influential depositors to transfer their USD outside Lebanon to safer markets as the Lebanese banking crisis took hold in 2019 and continued in 2020.

372.     Defendants agreed and intended to further defraud Plaintiffs, by issuing checks drawn on BDL that BDL would refuse to honor when they were deposited outside Lebanon.

373.     With their USD at risk in Lebanon, and with the urgent need for their USD in the United States for the real estate investments they secured in the United States, Plaintiffs engaged in discussions with BLC Bank, CL Bank, and AM Bank about accepting their USD in the form of checks.

374.     Plaintiffs insisted that the checks be negotiable in the United States.

375.     BLC Bank, CL Bank, and AM Bank specifically represented to Plaintiffs that the checks drawn on BDL would be negotiable in the United States.

376.     These representations were false and known to be false by Defendants.

377.     In reliance on BLC Bank, CL Bank, and AM Bank's false representations, Plaintiffs agreed to accept checks.

378.     Defendants knew the checks they were issuing to Plaintiffs would be presented by Plaintiffs in the United States.

379.     Defendants knew that their banking relationships in the United States, and in particular with correspondent banks in New York, would be utilized to effectuate the negotiation of the checks issued to Plaintiffs for deposit in the United States.

380.     When BLC Bank, CL Bank, and AM Bank issued the worthless checks to Plaintiffs, they deducted the money from Plaintiffs' accounts as if the checks were valid.

381.     As Defendants intended, when Plaintiffs presented the checks for deposit in the United States, BDL refused to honor the checks and Plaintiffs received none of their USD.

382.    Plaintiffs therefore were unable to deploy their USD for the real estate investment opportunities they had secured in Florida, Virginia, and Texas.

383.    As a direct and proximate result of Defendants' unlawful activity, Plaintiffs lost the valuable real estate investment opportunities.

384.    After their attempts to deposit the checks in the United States, Plaintiffs through counsel demanded that BLC Bank, CL Bank, and AM Bank deliver their USD to the United States.

385.    However, BLC Bank, CL Bank, and AM Bank have refused to honor Plaintiffs' lawful instructions.

386.    Defendants conspired to fraudulently and unlawfully misappropriate Plaintiffs' USD and detain Plaintiffs' USD in Lebanon by issuing BDL checks that could not be deposited anywhere but in Lebanon, which is enduring a massive, self-inflicted banking crisis where Plaintiffs' USD remain in peril.

387.    Defendants' conspiracy to misappropriate Plaintiffs' USD and issue bad checks to Plaintiffs in the United States was a pervasive scheme that has caused and continues to cause Plaintiffs vast damages.

388.    Defendants' conspiracy is ongoing, and is practiced against Plaintiffs and other similarly situated depositors.

389.    Defendants agreed to form a conspiracy pursuant to which they would fraudulently misappropriate Plaintiffs' USD for their own use to Plaintiffs' exclusion through their repeated fraudulent misrepresentations, fraudulent concealment, wire fraud, mail fraud, and knowingly passing bad checks.  Defendants continue to

390.     BDL agreed to participate in the conspiracy as a commercial actor, including in the context of its role as a debtor of BLC Bank, CL Bank, and AM Bank and in participating in the commercial relationship between Plaintiffs and those banks.  In addition, BDL has publicly stated that the funds of depositors of Lebanese banks were safe and that Lebanon had not instituted any capital controls such that BDL cannot possibly claim it was carrying out monetary policy when it drew the bad checks to Plaintiffs for the purpose of Defendants' misappropriating Plaintiffs' USD. Thus, BDL cannot avoid the consequences of its agreement to and participation in the conspiracy under the Foreign Sovereign Immunity Act, 28 U.S.C. § 1602, *et seq*.

391.     The pattern of unlawful activity in which Defendants engaged is strikingly demonstrated through Defendants' consistent and coordinated execution of their fraud across their respective financial institutions.

392.     Together, Defendants have stolen from Plaintiffs more than $18.5 million USD in principal and accrued interest Plaintiffs had on deposit with BLC Bank, CL Bank, and AM Bank, and interest continues to accrue.

393.     In addition, Defendants' conspiracy has caused Plaintiffs substantial damages to their business due to Defendants' conspiracy to fraudulently misappropriate Plaintiffs' USD which the conspirators knew was to be imminently invested by Plaintiffs in highly valuable real estate investments Plaintiffs had secured but lost because of Defendants' theft.

394.     To carry out their brazen conspiracy, Defendants all directed their unlawful activity into the United States, injuring United States citizens, and violating the United States wire fraud and mail fraud statutes as well as state laws against knowingly passing bad checks in the United States.

395.     As a result of their conspiracy, Defendants are jointly and severally liable for the damages suffered by Plaintiffs and the causes of action asserted by Plaintiff in this action to recover their damages.

## SECOND CAUSE OF ACTION

### (Fraud against All Defendants)

396.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 395 above as if fully repeated and set forth herein.

397.     Plaintiffs are banking clients of BLC Bank, CL Bank, and AM Bank.

398.     BLC Bank, CL Bank, and AM Bank fraudulently induced Plaintiffs to become clients and deposit their USD with the banks, using the false representations of high interest rates that were not paid (only accrued "on paper") and ready access to their USD through transfers outside Lebanon.

399.     At all times, Defendants represented to Plaintiffs that their deposits were safe and could be freely withdrawn or transferred so that Plaintiffs could satisfy their funding obligations for their business activities.

400.     The Lebanese banking system was stressed as depositors sought to withdraw USD and transfer USD out of Lebanon for fear of a run on the banks.

401.     BLC Bank, CL Bank, and AM Bank fraudulently induced Plaintiffs to deposit their USD in Lebanon by falsely representing to Plaintiffs that they would pay high interest rates and Plaintiffs could readily withdraw or transfer their USD outside Lebanon.

402.    By the end of 2019, Plaintiffs had more than $18,000,000.00 USD on deposit with BLC Bank, CL Bank, and AM Bank.

403.    Plaintiffs needed to transfer their USD from Lebanon to the United States in order to meet their funding obligations for three valuable multi-family real estate investments they secured in Florida, Virginia, and Texas.

404.    Plaintiffs expressly and repeatedly advised BLC Bank, CL Bank, and AM Bank that Plaintiffs needed to transfer their USD from Lebanon to the United States in order to meet their funding obligations for three valuable multi-family real estate investments they secured in Florida, Virginia and Texas.

405.    In the weeks and months that followed Plaintiffs' requests to transfer their USD from Lebanon to the United States, the Lebanese banking crisis was reaching a tipping point. Defendants and other Lebanese banks responded by permitting connected politicians, bank shareholders and executives and other influential depositors to transfer their USD out of Lebanon while blocking most depositors through a variety of fraudulent and flagrantly unlawful measures.

406.    Unbeknownst to Plaintiffs, Defendants were part of a conspiracy to hoard USD to prevent depositors like Plaintiffs from withdrawing USD or transferring USD outside Lebanon.

407.    Plaintiff delivered instructions to BLC Bank, CL Bank, and AM Bank to execute wire transfers of Plaintiffs' USD to Plaintiffs' accounts in the United States.

408.    BLC Bank, CL Bank, and AM Bank all repeatedly represented to Plaintiffs that they had sufficient funds to and would execute the wire transfers as instructed by Plaintiffs.

409.   These repeated representations by BLC Bank, CL Bank, and AM Bank were false and known to be false by BLC Bank, CL Bank, and AM Bank when made.

410.   Plaintiffs relied on these representations to continue expending resources on the real estate acquisitions they secured in the United States, as Plaintiffs concurrently advised BLC Bank, CL Bank, and AM Bank.

411.   After misleading Plaintiffs for months with affirmative misrepresentations about their ability and intentions to follow the lawful instructions from Plaintiffs in order to buy time and attempt to gain leverage over Plaintiffs, BLC Bank, CL Bank, and AM Bank finally revealed to Plaintiffs they would not be executing the wire transfers.

412.   However, BLC Bank, CL Bank, and AM Bank's representations to Plaintiffs that they could not execute the wire transfers were false.  Nothing prohibited BLC Bank, CL Bank, and AM Bank from honoring Plaintiffs' lawful instructions and executing the long overdue wire transfers, except Defendants' conspiracy to hoard Plaintiffs' USD at Plaintiffs' expense.

413.   Defendants' fraud continued when BLC Bank, CL Bank, and AM Bank repeatedly and falsely represented to Plaintiffs that BLC Bank, CL Bank, and AM Bank could issue Plaintiffs cashier's checks drawn by and against BDL that Plaintiffs could deposit in the United States.  This was presented to Plaintiffs by BLC Bank, CL Bank, and AM Bank as the only way Plaintiffs could obtain their USD for use in the United States.

414.   When BLC Bank, CL Bank, and AM Bank represented to Plaintiffs that Plaintiffs could deposit BDL's cashier's checks in the United States, Defendants knew BLC Bank, CL Bank, and AM Bank's representations were false because Defendants knew and intended that BDL would dishonor the checks when Plaintiffs attempted to deposit them in the United States.

415.    In reliance on BLC Bank, CL Bank, and AM Bank's false representations, Plaintiffs agreed to receive cashier's checks drawn on BDL.

416.    Upon issuing the checks, which Defendants all knew were worthless and not negotiable in the United States, BLC Bank, CL Bank, and AM Bank reduced Plaintiffs' balances by the amount of the worthless checks and misappropriated the USD in Plaintiffs' accounts.

417.    BDL knowingly and intentionally drew bad checks to Plaintiffs in the United States for deposit in the United States knowing it would dishonor the checks when Plaintiffs attempted to negotiate the checks in the United States.

418.    When Plaintiffs deposited the checks in the United States, BDL refused to honor the checks as Defendants planned.

419.    Defendants' lengthy and ongoing fraud against Plaintiffs caused Plaintiffs to lose the lucrative real estate acquisitions they had secured in the United States.

420.    Defendants' fraud has also caused Plaintiffs substantial damages from expenses Plaintiffs' incurred in furtherance of the real estate acquisitions Defendants' fraud caused Plaintiffs to lose.

421.    Defendants' fraud has also deprived Plaintiffs of the USD they deposited with BLC Bank, CL Bank, and AM Bank, plus interest.

422.    As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial but presently believed to be well in excess of $60,000,000.00.

**THIRD CAUSE OF ACTION**

**(Issuance of Dishonored Check against BLC Bank and BDL)**

423.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 422 above as if fully repeated and set forth herein.

424.    Separate and independent of the obligations BLC Bank owed to Plaintiffs as customers of BLC Bank, BLC Bank and BDL are liable to Plaintiffs for the checks at issue.

425.    In 2016, Plaintiffs opened an account with BLC Bank and made several transfers of USD into their BLC Bank account.

426.    Beginning in or about September 2019, Plaintiffs sought to withdraw their USD on deposit in Lebanon, including from BLC Bank, in order to use the USD for Plaintiffs' funding obligations for certain multi-family property investments in the United States.

427.    Plaintiffs initially requested that their funds with BLC Bank be transferred to them by wire transfer.  But BLC Bank failed and refused to follow Plaintiffs' instructions.  Instead, BLC Bank knowingly and falsely represented to Plaintiffs that issuance of a check was the only way for Plaintiffs to collect their funds, in USD, in the United States.

428.    BLC Bank represented that checks drawn by and against BDL could be deposited in the United States, and that funds could be withdrawn and collected in the United States.

429.    In light of BLC Bank's unlawful failure to comply with Plaintiffs' payment instructions, and its fraudulent representations that a transfer to Plaintiffs could only be made by check, Plaintiffs agreed to accept a transfer by check.  Plaintiffs made it clear that they were only accepting a check based on BLC Bank's ongoing refusal to execute a wire transfer and BLC Bank's

repeated assurances that the check drawn against BDL could be deposited by Plaintiffs in the United States.

430.    On November 28, 2019, BLC Bank issued a check to Plaintiffs in the amount of $7,525,000.00 USD, which was drawn by BDL against BDL (the "BLC Check").  The BLC Check was signed by Jean Clause Zakhia (BLC Bank's Branch Manager), and another representative of BLC Bank.

431.    The BLC Check was payable to the order of Plaintiffs as payees.

432.    The BLC Check contained an unconditional promise or order to pay a sum certain — *i.e.*, $7,525,000.00 USD — in money upon presentation of the BLC Check to a banking institution.  The BLC Check contained no other promise, order, obligation, or limitation on BLC Bank or BDL's authority to issue the BLC Check.

433.    The BLC Check was payable in full, on demand, upon presentation to a bank in the United States.

434.    Although issued in Lebanon, BLC Bank and BDL knew that Plaintiffs intended to deposit the BLC Check in the United States, with the expectation that the funds would be collected in the United States.  In fact, BLC Bank and BDL knew that the only reason Plaintiffs agreed to accept the BLC Check was on the condition that it could be deposited in the United States.

435.    BLC Bank's upper management affirmatively, but fraudulently, represented to Plaintiffs that their USD could be transferred out of Lebanon.  Among other representatives, Samir Khoury, the Director of all of BLC Bank's branches, specifically advised Plaintiffs that the BLC Check could be deposited in the United States and that Plaintiffs' USD could be collected in the United States.

67

436.    BLC Bank and BDL issued the BLC Check knowing full well that the check would be deposited in the United States but that the check would not be honored by BDL.  Nevertheless, at no time did either BLC Bank or BDL disclaim liability for the BLC Check or advise Plaintiffs that the check could not be deposited in the United States.  Nor did BLC Bank and BDL advise Plaintiffs that their funds could not be collected in the United States.

437.    The BLC Check was sent and delivered to Joseph Daou via DHL Courier in the United States.

438.    Plaintiffs presented the BLC Check for payment by depositing it in the United States.  Specifically, Plaintiffs deposited the BLC Check in Huntington National Bank.  However, Huntington National Bank advised Plaintiffs that the check had been dishonored.

439.    Plaintiffs then deposited the BLC Check at the Bank of America in Florida.  However, on January 7, 2020, Bank of America returned the BLC Check to Plaintiffs and advised Plaintiffs that the check had been dishonored.

440.    Plaintiffs have repeatedly and unsuccessfully demanded that BLC Bank and BDL honor the BLC Check and make the payment owed to Plaintiffs thereunder.  However, BLC Bank and BDL have failed and refused to honor their obligations under the BLC Check.

441.    The BLC Check constitutes a separate and independent valid and binding agreement between BLC Bank, BDL, and Plaintiffs for payment of the amount specified in the BLC Check.

442.    BLC Bank and BDL are jointly and severally liable to pay the amounts due and owing under the BLC Check, in an amount to be determined at trial but presently believed to be well in excess of $7,525,000.00.

## FOURTH CAUSE OF ACTION

### (Issuance of Dishonored Check against CL Bank and BDL)

443.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 442 above as if fully repeated and set forth herein.

444.    Separate and independent of the obligations CL Bank owed to Plaintiffs as customers of CL Bank, CL Bank and BDL are liable to Plaintiffs for the checks at issue.

445.    In 2016, Plaintiffs opened an account with CL Bank and made several transfers of USD into their CL Bank account.

446.    Beginning in or about September 2019, Plaintiffs sought to withdraw their USD on deposit in Lebanon, including from CL Bank, in order to use the USD for Plaintiffs' funding obligations for certain multi-family property investments in the United States.

447.    Plaintiffs initially requested that their funds with CL Bank be transferred to them by wire transfer.  But CL Bank failed and refused to follow Plaintiffs' instructions.  Instead, CL Bank knowingly and falsely represented to Plaintiffs that issuance of a check was the only way for Plaintiffs to collect their funds, in USD, in the United States.

448.    CL Bank represented that checks drawn by and against BDL could be deposited in the United States, and that funds could be withdrawn and collected in the United States.

449.    In light of CL Bank's unlawful failure to comply with Plaintiffs' payment instructions, and its fraudulent representations that a transfer to Plaintiffs could only be made by check, Plaintiffs agreed to accept a transfer by check.  Plaintiffs made it clear that they were only accepting a check based on CL Bank's ongoing refusal to execute a wire transfer and CL Bank's

repeated assurances that the check drawn against BDL could be deposited by Plaintiffs in the United States.

450.    On November 21, 2019, CL Bank presented Joseph Daou with a check in the amount of $5,300,000.00 USD, which was drawn by BDL against BDL (the "First CL Check"). The First CL Check was signed by Michel Ghalieh (the Jounieh Branch Manager) and another representative of BLC Bank.

451.    On December 2, 2019, CL Bank issued a second check to Plaintiffs in the amount of $40,180.00 USD (the "Second CL Check" and, together with the First CL Check, the "CL Checks").  The Second CL Check was drawn by BDL against BDL.  The Second CL Check was signed by Ghalieh and another representative of BLC Bank.

452.    The CL Checks were payable to the order of Plaintiffs as payees.

453.    The CL Checks contained an unconditional promise or order to pay a sum certain — *i.e.*, $5,300,000.00 USD in the First CL Check, and $40,180 USD in the Second CL Check — in money upon presentation of the CL Checks to a banking institution.  The CL Checks contained no other promise, order, obligation, or limitation on CL Bank or BDL's authority to issue the CL Checks.

454.    The CL Checks were payable in full, on demand, upon presentation to a bank in the United States.

455.    Although issued in Lebanon, CL Bank and BDL knew that Plaintiffs intended to deposit the CL Checks in the United States, with the expectation that the funds would be collected in the United States.  In fact, CL Bank and BDL knew that the only reason Plaintiffs agreed to accept the CL Checks was on the condition that they could be deposited in the United States.

456.    CL Bank's upper management affirmatively, but fraudulently, represented to Plaintiffs that their USD could be transferred out of Lebanon.  Among other representatives, Michel Khadige, a member of CL Bank's Board of Directors, specifically advised Plaintiffs that the CL Checks could be deposited in the United States and that Plaintiffs' USD could be collected in the United States.

457.    CL Bank and BDL issued the CL Checks knowing full well that the checks would be deposited in the United States but that the checks would not be honored by BDL.  Nevertheless, at no time did either CL Bank or BDL disclaim liability for the CL Checks or advise Plaintiffs that the check could not be deposited in the United States.  Nor did CL Bank and BDL advise Plaintiffs that their funds could not be collected in the United States.

458.    The CL Checks were sent and delivered to Joseph Daou via DHL Courier in the United States.

459.    Plaintiffs presented each of the CL Checks for payment by depositing them in the United States.  Specifically, Plaintiffs deposited the First CL Check in Huntington National Bank, and subsequently in Bank of America.  However, Huntington National Bank and Bank of America advised Plaintiffs that the First CL Check had been dishonored.

460.    Plaintiffs deposited the Second CL Check in BMO Harris Bank N.A. and subsequently in Bank of America.  However, BMO Harris Bank and Bank of America advised Plaintiffs that the Second CL Checks had been dishonored.

461.    Plaintiffs have repeatedly and unsuccessfully demanded that CL Bank and BDL honor the CL Checks and make the payment owed to Plaintiffs thereunder.  However, CL Bank and BDL have failed and refused to honor their obligations under the CL Checks.

462.    Each of the CL Checks constitutes a separate and independent valid and binding agreement between CL Bank, BDL, and Plaintiffs for payment of the amounts specified in the CL Checks.

463.    CL Bank and BDL are jointly and severally liable to pay the amounts due and owing under the CL Checks, in an amount to be determined at trial but presently believed to be well in excess of $5,340,180.00.

**FIFTH CAUSE OF ACTION**

**(Issuance of Dishonored Check against AM Bank and BDL)**

464.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 463 above as if fully repeated and set forth herein.

465.    Separate and independent of the obligations AM Bank owed to Plaintiffs as customers of AM Bank, AM Bank and BDL are liable to Plaintiffs for the checks at issue.

466.    On or about December 3, 2019, Plaintiffs opened an account with AM Bank and made a transfer of USD into their AM Bank account.

467.    Beginning in or about December 13, 2019, Plaintiffs sought to withdraw their USD on deposit in Lebanon, including from AM Bank, in order to use the USD for Plaintiffs' funding obligations for certain multi-family property investments in the United States.

468.    Plaintiffs initially requested that their funds with AM Bank be transferred to them by wire transfer.  But AM Bank failed and refused to follow Plaintiffs' instructions.  Instead, AM Bank knowingly and falsely represented to Plaintiffs that issuance of a check was the only way for Plaintiffs to collect their funds, in USD, in the United States.

469.    AM Bank represented that checks drawn by and against BDL could be deposited in the United States, and that funds could be withdrawn and collected in the United States.

470.    In light of AM Bank's unlawful failure to comply with Plaintiffs' payment instructions, and its fraudulent representations that a transfer to Plaintiffs could only be made by check, Plaintiffs agreed to accept a transfer by check.  Plaintiffs made it clear that they were only accepting a check based on AM Bank's ongoing refusal to execute a wire transfer and AM Bank's repeated assurances that the check drawn against BDL could be deposited by Plaintiffs in the United States.

471.    On March 7, 2020, AM Bank issued a check to Plaintiffs in the amount of $5,811,500.00 USD, which was drawn by BDL against BDL (the "AM Check").  The AM Check was signed by Youssef Hanna El-Khoury (AM Bank's Vice President of International Business Development) and Chirine Aoun (AM Bank's Jounieh Bank Manager).

472.    The AM Check was payable to the order of Plaintiffs as payees.

473.    The AM Check contained an unconditional promise or order to pay a sum certain — *i.e.*, $5,811,500.00 USD — in money upon presentation of the AM Check to a banking institution.  The AM Check contained no other promise, order, obligation, or limitation on BLC Bank or BDL's authority to issue the AM Check.

474.    The AM Check was payable in full, on demand, upon presentation to a bank in the United States.

475.    Although issued in Lebanon, AM Bank and BDL knew that Plaintiffs intended to deposit the AM Check in the United States, with the expectation that the funds would be collected

in the United States.  In fact, AM Bank and BDL knew that the only reason Plaintiffs agreed to accept the AM Check was on the condition that it could be deposited in the United States.

476.    AM Bank's upper management affirmatively, but fraudulently, represented to Plaintiffs that their USD could be transferred out of Lebanon.  Among other representatives, Marwan Kheireddine, AM Bank's CEO, specifically provided the instructions to issue Plaintiffs the AM Check to be deposited and collected in the United States.

477.    AM Bank and BDL issued the AM Check knowing full well that the check would be deposited in the United States but that the check would not be honored by BDL.  Nevertheless, at no time did either AM Bank or BDL disclaim liability for the AM Check or advise Plaintiffs that the check could not be deposited in the United States.  Nor did AM Bank and BDL advise Plaintiffs that their funds could not be collected in the United States.

478.    The AM Check was delivered to Plaintiffs' representative in Lebanon who informed AM Bank that he would deliver the check to Plaintiffs in the United States via DHL Courier.

479.    Plaintiffs presented the AM Check for payment by depositing it in the United States.  Specifically, Plaintiffs deposited the AM Check in Fifth Third Bank.  However, Fifth Third Bank advised Plaintiffs that the check had been dishonored.

480.    Plaintiffs have repeatedly and unsuccessfully demanded that AM Bank and BDL honor the AM Check and make the payment owed to Plaintiffs thereunder.  However, AM Bank and BDL have failed and refused to honor their obligations under the AM Check.

481.    The AM Check constitutes a separate and independent valid and binding agreement between AM Bank, BDL, and Plaintiffs for payment of the amount specified in the AM Check.

482.     AM Bank and BDL are jointly and severally liable to pay the amounts due and owing under the AM Check, in an amount to be determined at trial but presently believed to be well in excess of $5,811,500.00.

## SIXTH CAUSE OF ACTION

**(Collection on Payment Instruments against All Defendants, Florida Statutes § 68.065)**

483.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 482 above as if fully repeated and set forth herein.

484.     Defendants' conspired to issue $18,676,680.00 in worthless checks to Plaintiffs in Florida.

485.     On November 21, 2019, CL Bank issued to Plaintiffs check number 036018/F in the amount of $5,300,000.00 USD.  BDL was the drawer and drawee.

486.     On November 28, 2019, BLC Bank issued to Plaintiffs check number 115982/F in the amount of $7,525,000.00 USD.  BDL was the drawer and drawee.

487.     On December 2, 2019, CL Bank issued to Plaintiffs check number 036022/F in the amount of $40,180.00 USD.  BDL was the drawer and drawee.

488.     On March 7, 2020, Am Bank issued to Plaintiffs check number 443219/F in the amount of $5,811,500.00.

489.     Each of the checks constitute payment instruments within the meaning of Florida Statutes § 68.065.

490.     BDL stopped payment on the checks with the intent to defraud Plaintiffs.

491.     Despite due demand, Defendants have failed and refused to pay Plaintiffs the amounts due and owing.

492.     Plaintiffs are entitled to recover from Defendants the amounts due and owing.

493.     In addition, pursuant to Florida Statutes § 68.065(3) Plaintiffs are entitled to recover from Defendants triple the amount due and owing, plus attorneys' fees and costs in an amount to be determined at trial but presently believed to be well in excess of $80,000,000.00.

## SEVENTH CAUSE OF ACTION

### (Breach of Contract against BLC Bank)

494.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 493 above as if fully repeated and set forth herein.

495.     Plaintiffs and BLC Bank entered into an agreement pursuant to which Plaintiffs agreed to deposit USD with BLC Bank.

496.     BLC Bank agreed to pay Plaintiffs interest on their deposited USD.

497.     In addition, BLC Bank agreed that Plaintiffs could withdraw or transfer their USD (including accrued interest) from their account by providing instructions to BLC Bank.

498.     Plaintiffs complied with their obligations under the agreement.

499.     Plaintiffs repeatedly issued instructions to BLC Bank to transfer Plaintiffs USD and accrued interest to Plaintiffs' account in the United States.

500.     In breach of the parties' agreement, BLC Bank failed and refused to comply with Plaintiffs' instructions.

501.    In fact, BLC Bank has in bad faith misappropriated all of Plaintiffs' USD and accrued interest.

502.    As a result of BLC Bank's breach, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial but presently believed to be well in excess of $50,000,000.00.

## EIGHTH CAUSE OF ACTION

### (Breach of Contract against CL Bank)

503.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 502 above as if fully repeated and set forth herein.

504.    Plaintiffs and CL Bank entered into an agreement pursuant to which Plaintiffs agreed to deposit USD with CL Bank.

505.    CL Bank agreed to pay Plaintiffs interest on their deposited USD.

506.    In addition, CL Bank agreed that Plaintiffs could withdraw or transfer their USD (including accrued interest) from their account by providing instructions to CL Bank.

507.    Plaintiffs complied with their obligations under the agreement.

508.    Plaintiffs repeatedly issued instructions to CL Bank to transfer Plaintiffs USD and accrued interest to Plaintiffs' account in the United States.

509.    In breach of the parties' agreement, CL Bank failed and refused to comply with Plaintiffs' instructions.

510.    In fact, CL Bank has in bad faith misappropriated all of Plaintiffs' USD and accrued interest.

511.    As a result of CL Bank's breach, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial but presently believed to be well in excess of $50,000,000.00.

## NINTH CAUSE OF ACTION

### (Breach of Contract against AM Bank)

512.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 511 above as if fully repeated and set forth herein.

513.    Plaintiffs and AM Bank entered into an agreement pursuant to which Plaintiffs agreed to deposit USD with AM Bank.

514.    AM Bank agreed to pay Plaintiffs interest on their deposited USD.

515.    In addition, AM Bank agreed that Plaintiffs could withdraw or transfer their USD (including accrued interest) from their account by providing instructions to AM Bank.

516.    Plaintiffs complied with their obligations under the agreement.

517.    Plaintiffs repeatedly issued instructions to AM Bank to transfer Plaintiffs USD and accrued interest to Plaintiffs' account in the United States.

518.    In breach of the parties' agreement, AM Bank failed and refused to comply with Plaintiffs' instructions.

519.    In fact, AM Bank has in bad faith misappropriated all of Plaintiffs' USD and accrued interest.

520.    As a result of AM Bank's breach, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial but presently believed to be well in excess of $50,000,000.00.

## TENTH CAUSE OF ACTION

### (Conversion against All Defendants)

521.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 520 above as if fully repeated and set forth herein.

522.    Plaintiffs had on deposit specific, identifiable sums of money.

523.    Plaintiffs' deposits were fraudulently induced by Defendants BLC Bank, CL Bank, and AM Bank.

524.    Defendants issued worthless checks to Plaintiffs and misappropriated Plaintiffs' USD on deposit for their own use and to the exclusion of Plaintiffs.

525.    Plaintiffs had the right to possess and use their identifiable USD

526.    Defendants intended to deprive Plaintiffs of their identifiable USD.

527.    Defendants deprived Plaintiffs of their rights to use and possess their identifiable USD.

528.    As a direct and proximate result of Defendants' conversion of Plaintiffs' personal property, Plaintiffs have been damaged in an amount to be determined at trial but presently believed to be well in excess of $50,000,000.00.

## ELEVENTH CAUSE OF ACTION

### (In the alternative, Unjust Enrichment against All Defendants)

529.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 528 above as if fully repeated and set forth herein.

530.     Defendants have been unjustly enriched by their misappropriation of Plaintiffs' USD, plus interest.

531.     Defendants have been unjustly enriched by their misappropriation of Plaintiffs' USD, plus interest, at Plaintiffs' expense.

532.     It would be against equity and good conscience to permit Defendants to retain what they have misappropriated from Plaintiffs.

533.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have been damaged in an amount to be determined at trial but presently believed to be well in excess of $20,000,000.00.

## TWELFTH CAUSE OF ACTION

### (In the alternative, Promissory Estoppel against All Defendants)

534.      Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 533 above as if fully repeated and set forth herein.

535.     Defendants represented to Plaintiffs that Plaintiffs could freely withdraw their USD from their accounts or transfer their USD from their accounts to bank accounts outside Lebanon.

536.     Defendants' issued checks to Plaintiffs representing that the checks were valid and could be deposited in the United States.

537.   Plaintiffs reasonably relied upon Defendants' representations.

538.   Plaintiffs proceeded with their real estate investments, forming new banking relationships, and other commercial activity, in detrimental reliance upon Defendants' representations.

539.   Defendants refused to honor their representations to Plaintiffs, and Defendants never allowed Plaintiffs to access their USD on deposit in Lebanon.

540.   In detrimental reliance on Defendants' misconduct, Plaintiffs have been damaged in an amount to be determined at trial but presently believed to be well in excess of $50,000,000.00.

## THIRTEENTH CAUSE OF ACTION

### (Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) against All Defendants)

541.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 540 above as if fully repeated and set forth herein.

542.   Defendants are part of an ongoing enterprise formed within the Lebanese banking system, which is comprised of commercial and retail Lebanese banks and BDL as the central bank.

543.   By early 2015, Lebanese banks began recognizing depleting USD deposits, which strained the system as the banks' interest obligations increased.

544.   BDL and the commercial banks needed to adjust their business model, which would have revealed the false premise on which the BDL engineered the banking system and the shareholders and executives of the commercial banks would have no longer been able to enrich themselves to same extent.

545.     Because BDL and the commercial banks were intent on keeping a curtain over the growing problem so they could continue to enrich themselves notwithstanding the unsustainability of their policies, they did not alter their business model.

546.     Instead, BDL and the commercial agreed that they would engage in an illegal scheme to cover up and delay the self-created and looming crisis, all so that they could cover up their failed policies and continue enriching themselves.

547.     BDL and the commercial banks, including the defendant-commercial banks, agreed they would offer even higher interests to lure new deposits and to induce depositors to retain their deposits in Lebanon, knowing the banks could never sustain the interest payments.  BDL and the commercial banks agreed they would project strength and health for the Lebanese banking system they knew was facing an imminent liquidity crisis.

548.     The conspirators agreed to specifically target people of Lebanese descent living abroad,  particularly United States citizens and residents.

549.     They agreed to use illegal means to carry out their conspiracy, including by making fraudulent misrepresentations and theft, all so the BDL executives and the shareholders and executives could further enrich themselves at the expense of their victims, which included depositors, borrowers and Lebanon.

550.     The commercial banks used the Association of Banks to coordinate their scheme with each other and BDL and to communicate instructions for carrying out the scheme.  The Association of Banks may have once been a legitimate organization of the chief executives of the commercial banks in Lebanon, but the commercial banks and BDL started to use it as an instrumentality of their unlawful scheme.

551.     In furtherance of their scheme, Lebanese banks began offering extremely high interest rates to attract USD depositors both within Lebanon and abroad to feed the failing system and further their scheme.  As BDL and the commercial banks knew, the payment of the inflated interest rates was unsustainable, and when the flood of new USD deposits waned, the Lebanese banking system collapsed.

552.     The conspirators' scheme engineered the theft of tens of billions of dollars from over two and a half million people, including thousands of United States citizens and residents.

553.     The enterprise had and continues to have as its purpose, fraudulently retaining existing depositors and fraudulently inducing new depositors to make foreign currency deposits in Lebanon through, among other incentives, unsustainably-high interest rates, and retaining those foreign currency deposits.  Existing and new deposits of USD currency were obtained in order to propagate the Ponzi scheme perpetuated by Lebanon's banks and to delay the inevitable consequence of the enterprise's financial engineering.  BDL and Lebanon's commercial banks systematically worked together to restrict and prohibit withdrawals of USD from Lebanese banks and restrict and prohibit USD transfers outside Lebanon.

554.     Upon inducing depositors to deposit their USD in Lebanon, it was a further goal of the enterprise to induce depositors to convert the USD into Lebanese Lira, in return for which the depositors were promised even higher (and even more unsustainable) interest rates.  Once the depositors converted their USD to Lira, it was time for the participants of the enterprise and the engineers of the ongoing Ponzi scheme in the Lebanese banking system to bail themselves out. They were left with no alternative other than a complete devaluation of the Lebanese Lira and to completely erase any of the remaining value held by these depositors.

555.     This is what we are witnessing now in the Lebanese financial crisis, as the "official" exchange rate is advertised by BDL to be approximately 1,507 Lira to $1 USD, whereas in reality, the actual exchange rate is fluctuating between 7,000 to 10,000 Lira to $1 USD.

556.     Thus, while Lebanon's commercial banks (and those benefiting from their association with, and employment by, these banks) were able to continue to hoard valuable USD, depositors who exchanged their USD into Lira were left with an almost worthless local Lebanese currency.

557.     Nonetheless, victims of this enterprise that are still holding USD in deposit within the Lebanese banking system have no way to access their money without first converting to Lebanese Lira at highly discounted rates.  Depositors have been left at the mercy of an enterprise that has deprived the innocent depositors of their hard-earned savings, with no alternatives for the depositors to access their money.

558.     Plaintiffs chose to keep their deposits in USD and earn far less interest even when they were offered lucrative interest rates by the Defendants to convert their USD to Lira.

559.     Since the participants of the enterprise could not devalue the USD that the Plaintiffs held, the participants took an alternative approach of issuing fraudulent worthless checks to the Plaintiffs.

560.     In the period before the full picture of the Ponzi scheme run by Lebanon's banks began to emerge, the banks made generous distributions to their shareholders.  The banks actively sought to hide and delay the imminent banking crisis in Lebanon for as long as possible so they could continue to enrich themselves.

561.    Lebanon's commercial banks, including Defendants, accomplished the purpose of the enterprise by targeting, among others, U.S. citizens of Lebanese descent (such as Plaintiffs) to make foreign currency deposits and then persuading the depositors not to withdraw their money from Lebanon.

562.    Defendants made false statements about the interest that depositors could expect to earn from their deposits, as Defendants knew full well that the depositors were highly unlikely to recover the interest that would be earned on the deposits.  Defendants also made false representations about the safety of the deposits and the transferability of USD outside of Lebanon. Defendants made these misrepresentations in order to induce new deposits and to retain existing deposits of USD.

563.    Lebanon's commercial banks, including BLC Bank, CL Bank, and AM Bank, benefited from the enterprise by prolonging their appearance as healthy financial institutions so that the shareholders and executives of the banks could continue reaping high but unwarranted compensation and distributions.

564.    BDL benefited from the enterprise by shielding the Ponzi scheme it had fostered from public view and attempting to delay the imminent collapse of the Lebanese banking system.

565.    While Lebanon's commercial banks, including BLC Bank, CL Bank, and AM Bank, promised unsustainably high interest rates to existing and new depositors, the banks purchased bonds from BDL, and in return for these investments, BDL promised to pay the commercial banks interest rates that were even higher than those that the commercial promised to pay depositors like Plaintiffs.

566.    A debtor/creditor relationship existed between the commercial banks who deposited money with, and purchased bonds from, BDL.  The commercial banks that have deposits with BDL were aware of the imminent banking crisis in Lebanon.

567.    BDL offered bonds to the Lebanese commercial banks because BDL had insufficient liquidity to meet its financial obligations.  As a result, BDL needed the commercial banks to step in and provide the necessary liquidity (which the banks obtained from the depositors like Plaintiffs).  By receiving high interest rates from BDL (rates that were even higher than those the banks offered their depositors), BDL and the banks create the false appearance that the commercial banks were profiting from their investment with BDL.

568.    In reality, Lebanon's commercial banks were insolvent.

569.    BDL and the Lebanese commercial banks, including BLC Bank, CL Bank, and AM Bank, formed a relationship to defraud existing and new depositors, like Plaintiffs.  Their scheme was temporarily effective in luring and retaining tens of billions of deposits from unwitting depositors, thousands of which are residents and/or citizens of the United States, like Plaintiffs.

570.    The commercial banks, including BLC Bank, CL Bank, and AM Bank, are members of the Association of Banks in Lebanon (the "Association of Banks").  The Association of Banks consists of a group of commercial banks, which are represented in the group by the banks' respective business leaders.  The Association of Banks helped facilitate the scheme against foreign depositors, including Plaintiffs.  While the Association of Banks may have had a legitimate purpose at the time of its inception, it ultimately became a mere vehicle for communicating instructions and coordinating plans for continuing Defendants' racketeering activities.

571.     The enterprise effectively transformed the Lebanese banking system into a Ponzi scheme.  Like the Madoff scandal of 2008, it took a crisis—*i.e.*, the ongoing financial crisis in Lebanon's banking sector—to bring the full scope and intent of Defendants' scheme to light.

572.     At least as early as 2014, the heads of Lebanon's commercial banks, including those at BLC Bank, CL Bank, and AM Bank, as well as BDL were aware of the problems, and likely eventual collapse, caused by Ponzi scheme they were perpetrating.  BDL and the commercial banks, including BLC Bank, CL Bank, and AM Bank, formed their RICO enterprise  in or about early 2015 to hide the Ponzi scheme by delaying the collapse so that the BDL officials and commercial bank shareholders and executives could continue to enrich themselves.

573.     Defendants have participated in the operation and management of the enterprise, including by designing, directing, and executing transactions and strategies in furtherance of the purpose of the enterprise.

574.     The enterprise affects interstate commerce and foreign commerce.

575.     Defendants formed vehicles for the commission of multiple predicate acts of mail and wire fraud.  The conduct of Defendants' enterprise is ongoing in nature, over an extended and ongoing period of time.

576.     Defendants conducted and participated in the enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c). Defendants have violated and continue to violate 18 U.S.C. § 1962(c) by being associated with the enterprise, which affects interstate and foreign commerce, and participating, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity.

577.     Each of BLC Bank, CL Bank, and AM Bank have committed wire fraud and mail fraud to further their scheme to misappropriate depositors' (including Plaintiffs') USD and perpetuate their Ponzi scheme.

578.     An essential part of Defendants' scheme was to retain existing deposits and procure new depositors to maintain a flow of foreign currency, especially USD, into Lebanon.  Jean Claude Zakhia (BLC Bank's Branch Manager) reached out to Joseph Daou as early as 2016 to solicit him to deposit USD with BLC Bank.  In follow up communications between Joseph Daou, Zakhia and other bank staff, BLC Bank falsely represented that Plaintiffs would earn substantial interest from their deposits while they would still be permitted to readily withdraw or transfer their USD outside of Lebanon.

579.     Nadim Issa (Regional Manager at CL Bank) reached out to Joseph Daou as early as March 2016, when Issa and Daou held in-person meeting during which Issa pursued Joseph Daou as a client to solicit him to deposit USD in Lebanon.  In follow up communications, Issa falsely represented that Plaintiffs would earn substantial interest from their deposits, as well as that they could readily withdraw or transfer their USD outside of Lebanon.

580.     Like BLC Bank and CL Bank, AM Bank was soliciting foreign investors as early as 2016 to deposit foreign currency in Lebanon based on promises of high interest rates and ability to withdraw or transfer currency outside of Lebanon.  On December 2, 2019, Youssef Hanna El-Khoury (AM Bank's Vice President of International Business Development) solicited Joseph Daou to deposit USD with AM Bank, and promised to pay interest of eleven percent (11%) on Plaintiffs' deposits.  In follow up communications, El-Khoury falsely represented that that Plaintiffs could withdraw or transfer their USD outside of Lebanon.

581.    In addition to soliciting Plaintiffs to deposit USD in Lebanon, each of BLC Bank, CL Bank, and AM Bank repeatedly attempted to induce Plaintiffs into converting their deposited USD into Lira.  That way, while Defendants would be able to have Plaintiffs' USD, Plaintiffs would be left with weak and unstable Lira, which Defendants knew to be almost entirely worthless. Plaintiffs, however, refused the banks' overtures to convert Plaintiffs' USD into Lira.

582.    Given BLC Bank, CL Bank, and AM Bank's promises of transferability of Plaintiffs' deposits outside of Lebanon, each of the banks effectively represented to Plaintiffs that the banks maintained international correspondent banking relationships, including in the United States, that would enable BLC Bank, CL Bank, and AM Bank to transfer money outside of Lebanon for withdrawal and collection in the United States.

583.    BLC Bank, CL Bank, and AM Bank were legally bound by their repeated promises and guarantees to Plaintiffs that Plaintiffs' deposits could be transferred out of Lebanon and collected in the United States.

584.    As part and parcel of their unlawful enterprise, Defendants all used the same pattern of fraudulent and intentionally misleading representations.  Defendants repeatedly assured Plaintiffs that the banks were in good financial condition, and that there would be no barriers to transferring Plaintiffs' deposits by wire transfer to the United States.  Defendants, however, had no intention of honoring Plaintiffs' wire transfer requests and allowing Plaintiffs' to withdraw their USD outside of Lebanon.

585.    When Plaintiffs' refused to "go away" and continued to insist on withdrawing their deposits in the U.S., Defendants issued worthless checks that they knew would be delivered to, and deposited in, the U.S. and that these checks would not be honored by BDL.

586.    Given that BLC Bank, CL Bank, and AM Bank were authorized to issue checks drawn by BDL and drawn against BDL, the scheme was perpetrated in coordination among all of the Defendants, including BDL.

587.    When Plaintiffs complained about the worthless checks, Defendants provided the deceitful excuse that the banks allegedly "satisfied" their obligations upon issuing the worthless checks.  BLC Bank and CL Bank deducted the check amounts from Plaintiffs' accounts, even though Plaintiffs could not collect their funds in the United States.  AM Bank likewise deducted the check amount from Plaintiffs' account, but when Plaintiffs returned the check because it had been dishonored, AM Bank readjusted Plaintiffs' account balance to include the check amount. AM Bank then disingenuously claimed that Plaintiffs' USD was still "available" in Lebanon because the USD could be moved to a different Lebanese bank.  This claim, however, contradicted AM Bank's prior representations that Plaintiffs' deposits could be withdrawn outside of Lebanon.

588.    In short, the coordination of unlawful activities by Defendants left Plaintiffs without any viable remedy.  Plaintiffs could not withdraw their USD outside of Lebanon.  Their only potential "option" was to transfer their funds to another Lebanese bank that was part of the scheme, and which—like BLC Bank, CL Bank, and AM Bank—would not permit Plaintiffs to withdraw their USD outside of Lebanon.  Defendants' reduced Plaintiffs' deposits of USD into meaningless numbers on the computer screens of Lebanese banks, with no ability by Plaintiffs to actually collect USD either in the U.S. or in Lebanon, which was the basis of Plaintiff making the deposits in the first place.

589.    Moreover, to the extent depositors were convinced to convert their deposited USD into Lira, it was the aim of the enterprise to leave such depositors with nothing more than a nearly worthless local currency, while participants of the enterprise kept the USD for their own use.

590.    The multiple acts of mail and wire fraud in violation of 18 U.S.C. §.1341 that were in furtherance of Defendant's fraudulent schemes include:

a.  Using the United States mail, courier services and/or email and/or telephone to fraudulently induce Plaintiffs into depositing USD into Defendants' banks;

b.  Using the United States mail, courier services and/or email and/or telephone to send Plaintiffs false and misleading statements that the more than $18,500,000.00 USD would be accessible to Plaintiffs for use in future business transactions;

c.  Using the United States mail, courier services and/or email and/or telephone to make false assurances to Plaintiff that the banks would execute the wire transfers as requested;

d.  Using the United States mail, courier services, and/or email and/or telephone to make false and misleading statements to Plaintiffs that the bad checks would be honored at a bank in the United States;

e.  Using the United States mail, courier services and/or email and/or telephone to purposefully and knowingly pass bad checks to Plaintiffs, United States citizens, in furtherance of their conspiracy to defraud Plaintiffs in furtherance of their fraudulent scheme;

f.  Using the United States mail, courier services and/or email and/or telephone to make false and misleading communications to Plaintiff to accept illusory checks knowing that the same would never be honored in the U.S., in an effort to insulate Defendants from the consequences of fraud;

g.   Using the United States mail, courier services and/or email and/or telephone to make false and misleading communications intended to conceal, cover up and perpetuate Defendants continuous racketeering activity;

h.   Using the United States mail, courier services and/or email and/or telephone to mail back bad checks to the U.S. banks (at which Plaintiffs attempted to deposit the bad checks) after BDL refused to honor the bad checks when presented for payment in Lebanon; and

i.   Using the United States mail, courier services and/or email and/or telephone to fraud in furtherance of their conspiracy to defraud Plaintiffs and misappropriate more than $18,500,000.00 in principle and accrued interest from Plaintiffs' accounts.

591.   Defendants violated the federal wire fraud statute, 18 U.S.C. § 1343, because Defendants entered into a scheme to defraud Plaintiffs; all of Defendants actively participated in the scheme to defraud Plaintiffs; all of Defendants had the specific intent to defraud Plaintiffs; and Defendants have used and continue to use wires and mails in interstate and foreign commerce in furtherance of their scheme to defraud Plaintiffs.

592.   Defendants violated the federal mail fraud statute, 18 U.S.C. § 1341, because Defendants entered into a scheme to defraud Plaintiffs; all of Defendants actively participated in the scheme to defraud Plaintiffs; all of Defendants had the specific intent to defraud Plaintiffs; and Defendants have used and continue to use the mails in interstate and foreign commerce in furtherance of their scheme to defraud Plaintiffs.

593.    Defendants' scheme to defraud depositors, including Plaintiffs and other United States citizens, including without limitation by passing bad checks through the mails and making intentionally false statements over the wires is ongoing and pervasive.

594.    Given the purpose of the enterprise, and the worsening situation of the banking crisis in Lebanon, continual racketeering activity directed at United States victims is inevitable.

595.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are persons injured in their business and property by reason of Defendants' RICO violations under 18 U.S.C. § 1962 as alleged herein.

596.    To date, Plaintiffs' deposits are still trapped in Lebanon, with no viable options for withdrawing Plaintiffs' USD outside of Lebanon.  Plaintiffs' have been, and continue to be, harmed as a result of Defendants' deliberate failure and refusal to return Plaintiffs' USD.

597.    The enterprise's scheme continues to this day.  Lebanon's commercial banks now acknowledge that USD previously deposited into Lebanon cannot be withdrawn outside of Lebanon, which is precisely what Defendants have claimed about Plaintiffs' USD deposits. Nevertheless, Lebanon's commercial banks, including Defendants, continue to solicit depositors to make fresh deposits of "new dollars" into Lebanon under the pretense that these "new dollars," unlike prior deposits of USD (like Plaintiffs'), can be transferred freely in and out of Lebanon. The banks' claims concerning the transferability of "new dollars" is false.

598.    Incredibly, despite the financial crisis roiling Lebanon's banking sector and society at large, many of the major figures and leaders of Lebanon's banking system have not resigned or admitted fault, nor have they acknowledged the existence of the unseemly and illegal practices that have been carried out to perpetuate the fraud committed against Plaintiffs and many other depositors.  The utter lack of acknowledgment and culpability suggests that the leaders of

Lebanon's banking system, of which Defendants are a part, are aware of the scope and nature of the enterprise's illegal activities, but that Lebanon's banks, including Defendants, continue to maintain the enterprise out of self-interest and a desire for self-enrichment.

599.     Plaintiffs are United States citizens and Defendants' unlawful activity injured Plaintiffs in the United States.

600.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to triple damages, reasonable attorneys' fees, and costs.

601.     As a result of Defendants' violations of 18 U.S.C. § 1962, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial, but trebled presently believed to be in excess of $150,000,000.00.

## FOURTEENTH CAUSE OF ACTION

### (Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) against All Defendants)

602.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 601 above as if fully repeated and set forth herein.

603.     Defendants have violated and continue to violate 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

604.     Defendants intended, and acted in coordination, to solicit foreign currency deposits into Lebanon with the goal of unlawfully keeping the deposits for Defendants' own use, and to leave depositors, including Plaintiffs, without any remedy to recover the foreign currency deposits.

605.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are persons injured in their business and property by reason of Defendants' RICO violations under 18 U.S.C. § 1962 as alleged herein.

606.    Plaintiffs are United States Citizens and Defendants unlawful activity injured Plaintiffs in the United States.

607.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to triple damages, reasonable attorneys' fees, and costs.

608.    As a result of Defendants' violations of 18 U.S.C. § 1962, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial, but trebled presently believed to be in excess of $150,000,000.00.

## JURY DEMAND

**PLAINTIFFS DEMAND A TRIAL BY JURY FOR ALL ISSUES SO TRIABLE**

[Conclusion on following page]

## **CONCLUSION**

**WHEREFORE**, Plaintiffs pray for judgment in favor of Plaintiffs and against

Defendants, jointly and severally, as follows:

A.      Compensatory damages;

B.      Prejudgment and post-judgment interest;

C.      Exemplary Damages, including triple damages pursuant to Plaintiffs' statutory causes of action, in an amount to be determined at trial;

D.      Total damages in an amount to be determined at trial but presently believed to be well in excess of $150,000,000.00.

E.      Attorneys' fees and costs;

F.      Such other and further relief as the Court deems just and appropriate.

Dated: New York, New York
October 30, 2020

**MEISTER SEELIG & FEIN LLP**

By: /s/  Christopher J. Major
        Christopher J. Major
        Eva M. Sullivan
        Leah Henry
        Amit Shertzer
125 Park Avenue, 7th Floor
New York, New York 10017
Tel: (212) 655-3500
E-mail:  cjm@msf-law.com
E-mail:  es@msf-law.com
E-mail:  lah@msf-law.com
E-mail:  as@msf-law.com

*Attorneys for Plaintiffs*