# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSEPH A. DAOU and KAREN M. DAOU,

        Plaintiff,

v.

BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., AL-MAWARID BANK, S.A.L., and BANQUE DU LIBAN,

        Defendants.

Case No. 1:20-cv-4438

---

## DECLARATION OF ELIAS JOSEPH ABIMRAD, CREDIT LIBANAIS, S.A.L.

I, Elias Joseph ABIMRAD, hereby declare as follows:

1. I am the General Controller, Head of Group Internal Audit at Credit Libanais S.A.L. ("Credit Libanais" or the "Bank"). I submit this Declaration in opposition to the Plaintiffs' motion for an attachment and in support of the Bank's motion to dismiss in this action (the "New York Litigation").

2. I am a native Arabic speaker and fluent in English and, for the ease of the parties and the Court, have prepared this affirmation in English.

3. I make this declaration based on my personal knowledge, review of documents and discussions with others at the Bank.

**Overview of Credit Libanais S.A.L.**

4. Credit Libanais is one of Lebanon's leading banks. The Bank was established in Beirut, Lebanon in 1961 and is duly registered at the Central Bank of Lebanon (the "CBL") under No. 53, and at the Commercial Registrar of Beirut /Lebanon under No. 10742. Credit Libanais' head office is located at Corniche El Nahr, Adlieh Roundabout, Beirut, Lebanon.

5. Credit Libanais is among the ten (10) largest financial institutions in Lebanon, with 64 branches, and a market share, by total assets, of 5.07% of the Lebanese banking system (until July 2020). It has over 1,400 employees.

6. Credit Libanais is a traditional commercial and private bank and leverages on extensive branch network outreach. The Bank's principal activities include retail banking services (consumer lending, credit cards and lending to small businesses and sole proprietorships), corporate banking services (including various forms of credit facilities, loans and overdrafts to medium-size and large corporations), trade finance services (letters of credit and letters of guarantee), capital markets services and private banking services. The Bank also holds a dominant position in e-banking and e-commerce through several of its affiliates. The Bank also provides systems, logistics and marketing for ATM and POS networks and payment gateway solutions for e-banking and e-commerce. Credit Libanais is mainly regulated by the Central Bank of Lebanon and its supervisory commission, the Banking Control Commission.

7. Credit Libanais is not licensed to conduct business in New York or elsewhere in the United States). Credit Libanais does not operate in or solicit business from New York. Credit Libanais has no agencies, branches or representative offices in New York. There are no Credit Libanais employees or representatives in New York.

8. As is common among financial institutions, Credit Libanais maintains correspondent bank accounts at banks in countries around the world. Correspondent accounts enable banks to have access to foreign currencies and to facilitate transactions in these currencies for its customers. These accounts are not customer or transaction specific. Rather, a bank such as Credit Libanais will use its correspondent accounts for dollar transactions for all of its

customers as needed. These accounts are important because, regardless of the location of the sending and receiving parties, most international dollar-denominated interbank payments are cleared through banks located in the United States and, more specifically, in New York.

**Course of Relationship/Dealings**

9. On March 9, 2016, the Plaintiffs opened a joint resident account with the Bank's Jounieh branch and accordingly signed all related legal documents and an account opening agreement which stipulates under Article 1, section 11, Article 2, section 3, and Article 3, section 7 that accounts are subject to the provisions of the agreement and the Lebanese laws stipulated in the Code of Money and Credit, the Code of Obligations and Contracts, and the law governing the joint account dated December 19, 1961.

10. Mr. Daou showed up in-person at the physical branch of the Bank located in Jounieh – Mount Lebanon District- Lebanon to open the account, represented himself as a citizen of Lebanon presenting a Lebanese Identification document, and designated Lebanon as the place of residence for banking purposes. Per the Plaintiffs' account opening documents, the Plaintiffs are Lebanese nationals domiciled in Lebanon, identifying their residence address in Dekwaneh – Mar Roukoz – Cap sur Ville – Lebanon.

11. Based on forms executed by Mr. Daou, it appears he is a skilled professional investor engaged in several private financial institutions specialized in engineering and hedge funds services. My understanding is that Mr. Daou engaged with various banks in Lebanon over the years in order to negotiate and earn the highest interest rates paid by banks in Lebanon, as he was well aware of the circumstances and prevailing conditions in the country. From conversations between Mr. Daou and bank employees, it was apparent that Mr. Daou had

a strong understanding and working, up-to-date knowledge of the Lebanese economy and banking system.

12. Mr. Daou is an important Real-estate proprietary in Lebanon, since he owns no less than 23 plots of real estate in several districts across Lebanon, as shown in the records of the Real-estate Register and is deeply engaged in business there.

13. Plaintiffs made one deposit in April 2016 and one in February 2018, totaling $3.325M USD.  In August 2018, Plaintiffs withdrew $3,699,995M USD, nearly their entire balance.  In October 2018, Plaintiffs re-funded their account in the amount of $4,699,994M USD.

14. Throughout the course of the parties' relationship, Mr. Daou aggressively sought and negotiated the interest rates the Bank served on his joint account.  Mr. Daou even proposed in February 2019 to transfer an additional amount of USD 15 million in case the Bank was willing to pay more advantageous, higher interest rates, which the Bank declined.  On the 24th of September 2019, according to a WhatsApp conversation between the bank's regional manager and the personal assistant of Mr. Daou, the latter was willing to transfer 5-10 USD million if the bank served 11% or more as interest rate on the account.  The bank declined because of the rate demanded.

15. Noting that while Mr. Daou appears to claim he was wrongfully lured and deceived as to making deposits with Lebanon, his conduct throughout the relationship with the Bank indicates he considered this as an attractive investment opportunity irrespective of any risks associated with his joint deposits.  He regularly threatened to leave the Bank if he was not offered better interest rates.  He also appears to have set banks against one another so as to secure the highest interest rates served in the market.  Mr. and Mrs. Daou, through their large extended family in Lebanon, their business holdings, their residence in Lebanon, and

their frequent visits to the country, were well aware of the status of the Lebanese economic conditions and they were attracted to the anticipated returns on their deposits.

16. In late October/November 2019, during the well-publicized period of severe unrest and bank closures, the Plaintiffs requested the execution of an international transfer from their local [Lebanese] resident joint account to the United States of America, which constitute a "Service" neither included nor stipulated in the Terms and Conditions of the account Opening Agreement signed by the Plaintiffs. Consequently and pursuant to the provisions of the Lebanese laws governing the account opening agreement, the Bank did not execute the international transfer requested.

17. Upon the Bank's refusal to execute said transfer, the Plaintiffs decided to liquidate their Joint account's balance and consequently requested the issuance of banker checks drawn on the Central Bank of Lebanon after notifying the Branch Manager by WhatsApp message that they obtained the confirmation from their bank in the United States of America that banker checks could be legally deposited and collected in the United States of America.

18. Accordingly, on November 21, 2019, the Bank's Jounieh Branch Manager delivered to Mr. Joseph Daou, who presented himself in person to the Branch, a bankers check no. 036018/F duly drawn on the Central Bank of Lebanon and payable in Beirut for the amount of $5,300,000 (five million, three hundred thousand U.S. Dollars). Several days later on December 2, 2019, Mr. Joseph Daou received by hand from Jounieh Branch and upon his request, a second bankers check no. 036022/F drawn on the Central Bank of Lebanon and payable in Beirut for the amount of $ 40,180 (forty thousand, one hundred-eighty U.S. Dollars). At the time of issuing these two bankers checks, the Bank ensured that sufficient

provisions continued to be available in its account with the Central Bank of Lebanon to enable the proper settlement of these two checks.

19. On or about December 3, 2019, Mr. Daou presented himself in person to Credit Libanais Jounieh branch accompanied with his relative who was co-holder of a joint account opened with the same branch. Mr. Daou requested from the Branch Manager a banker check in his name from the account of his relative for an amount of US$5,735,930.00. His request was not satisfied by the Branch Manager due to lack of proper documentation requested from the Anti-Money Laundering Department of Credit Libanais. Instead, a banker check no. 036023/F drawn on BDL in the amount of $5,735,930.00 was provided on Dec. 3, 2019 by CL made payable to the joint account co-holder (who is the relative of Mr. Daou and who also benefits from a general proxy on the Plaintiff's joint accounts). Our understanding is that this check was endorsed on the same day by the beneficiary and deposited in Mr. Daou's account with the defendant Al-Mawarid Bank, S.A.L.

20. On January 31, 2020, over two months from the date of receipt of the two bankers checks, Mr. Joseph Daou, represented by his Lebanese legal counsel in Lebanon, returned to the Bank's Jounieh Branch, the 2 original bankers checks through a notice served by a Lebanese Notary public located in Jdeidet El-Matn (Mount Lebanon District) claiming that both checks were not valid to be deposited and collected in the United States of America and checks were returned because they could not be processed by the U.S. bank (without any mention of the Central Bank of Lebanon not being able to process said checks) and consequently Mr. Daou requested the cancellation of said checks and the re-recording of their value in his joint account and the execution of an international transfer to an account that the Plaintiffs specified at the United States of America.

21. Upon notification, the Lebanese legal counsel of the Bank immediately returned the originals of the two bankers checks to the Lebanese legal counsel of Mr. Joseph Daou in Lebanon through a notice served by a Lebanese Notary public located in Beirut in which the legal counsel of the Bank rejected Mr. Daou's unfounded accusations and claims and confirmed that, based on the legal practice and the actual jurisprudence of the Lebanese Courts, the Bank by the two bankers checks drawn on the Central Bank of Lebanon had duly honored all its contractual and legal obligations in respect to the Plaintiffs' Deposit Account and is consequently discharged from any liability in this respect and also confirmed that both bankers checks could be deposited by the Plaintiffs in any bank operating in Lebanon.  The Bank's legal counsel also explained in detail why the Bank's conduct was entirely appropriate and consistent with the parties' agreements and Lebanese law.

22. On June 23, 2020, in response to a letter received from the Plaintiffs' representative, Mr. Yasser Abdullah, dated May 29, 2020, to tender payment in cash of the full amount of the payment instruments, the Bank , through its Lebanese legal counsel, reiterated to the Plaintiffs' legal counsel in Beirut, that the Bank had fulfilled its contractual obligations of returning the Plaintiffs' deposit and that the two bankers checks drawn on the CBL by the Bank upon the request of the Plaintiffs are good for collection at any time and their provision is fully available at the CBL.  The Bank's legal counsel also explained that the Plaintiffs' request for payment of the two checks in cash contradicts the applicable rules and regulations in Lebanon governing the basis of acceptance and return of deposits and breaches all rules and regulations pertaining to fighting money-laundering activities.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

October 7, 2020

_____
Elias Joseph ABIMRAD