

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH A. DAOU and KAREN M. DAOU,

Plaintiff,

v.

BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., AL-MAWARID BANK, S.A.L., and BANQUE DU LIBAN,

Defendants.

Case No. 1:20-cv-4438

**DECLARATION OF BASSAM FARID HASSAN, BLC BANK S.A.L**

I, Bassam Farid Hassan, hereby declare as follows:

1. I am the Chief Executive Officer at BLC Bank S.A.L. I submit this Declaration in opposition to the Plaintiffs' motion for an attachment and in support of BLC Bank's motion to dismiss in this action (the "New York Litigation").

2. I am a native Arabic speaker and fluent in English, and for ease of the parties and the Court have prepared this affirmation in English.

3. I make this declaration based on my personal knowledge, review of documents and discussions with others at BLC Bank.

**Overview of BLC BANK S.A.L**

4. Established in 1950, BLC Bank is the 13th largest financial institution in Lebanon, with 43 branches, and a market share, by total assets, of 2.25% of the Lebanese banking system. It has over 700 employees, with branches in Achrafieh, Adlieh, Aisha Bakkar, Aley, Antelias, Baabda, Batroun, Becharreh, Beit Chabab, Bickfaya, Bourj Hammoud, Chekka, Chiah,





Chtaura, Dekwaneh, Dora, Ferzoul, Furn El Chebbak, Ghobeiry, Hadath, Hamra, Hazmieh, Hermel, Jal El Dib , Jbeil , Jounieh, Kousba, Mar Elias, Mar Mikhael, Mazraa, Mazraat Yachouh, Nabatieh, New Jdeide, Saida, Sarafand, Sin El Fil, Tabaris, Tripoli Mina, Tripoli Tell, Tyr, Zahle, Zouk Mikhael and Zouk Mosbeh.

5. BLC Bank is a commercial bank that provides retail, private banking, investment banking, wealth management, and other services.

6. BLC Bank is regulated mainly by the Central Bank of Lebanon, the banking control commission, and the Special Investigation Committee.

7. The main shareholder of BLC Bank is Fransabank SAL that owns more than 80% of the share-capital of BLC Bank.

8. BLC Bank is not licensed to conduct business in New York (or elsewhere in the United States). BLC Bank does not operate in or solicit business from New York. BLC Bank has no agencies, branches or representative offices in New York. There are no BLC Bank employees or representatives in New York.

9. As is common among financial institutions, BLC Bank maintains correspondent bank accounts at banks in countries around the world, including in New York the United States. Correspondent accounts enable banks to have access to foreign currencies and to facilitate transactions in these currencies for its customers. These accounts are not customer or transaction specific. These accounts are important because regardless of the location of the sending and receiving parties, most international dollar-denominated interbank payments are cleared through banks located in the United States and more specifically, in New York.

**Course of Relationship/Dealings**

10. On 26 and then 27 April 2016, BLC Bank established new client relationships with Mr. Joseph Daou and Mrs. Karen Daou who, as part of the account opening formalities, completed and signed a number of documents.

11. The first documents signed by the Daous were the Know Your Customer Individual forms and the opening of account contract which included BLC Bank's standard terms and conditions applicable for various accounts and services offered by BLC Bank; the document is titled "*General Operating Conditions Governing BLC Bank SAL's Accounts, Products and Services*" (the "Opening of Account Agreement").

12. The Opening of Account Agreement included various terms and conditions. These include a provision under paragraph X Governing law – Jurisdiction, which state the following:

*"1. These General Conditions and the relationship between the Bank and the Client shall be governed by the laws of Lebanon.*

*2. The Beirut courts shall have exclusive jurisdiction to hear any dispute arising in connection with these General Conditions and/or relating to the relationship between the Bank and the Client. This exclusive jurisdiction is for the benefit of the Bank which shall be entitled to take action against the Client in any Lebanese or foreign court of its choice in order to defend its rights."*

13. The Opening of Account Agreement was duly signed by the Daous and representatives of BLC Bank, as per the formalities for opening accounts applied by BLC Bank.

14. When opening the account, BLC Bank assigned to Mr. Joseph Daou the relationship identification number RIM [redacted], and Mrs. Karen Daou the relationship identification number RIM [redacted].

15. The Daous indicated in their Know Your Customer Individual forms they are Lebanese nationals. They also indicated having a second nationality, being U.S. citizens, and provided copies of their U.S. passports, provided an address in Lebanon, and supplied the





Bank with an additional address in the U.S. Mrs. Daou also provided a copy of a Lebanese identification document.

16. Mr. Daou also executed an "Instruction Letter" for carrying out "all instructions issued to [BLC Bank] via my [Mr. Daou's] electronic mail" address. In signing the letter, Mr. Daou expressly agreed that for all client requests sent electronically from his email, "I already exempt you irrevocably and definitely from any liability in the case you fail or delay to carry out [all] instructions for any reason … I am aware that you are freely entitled without the need of any justification and without incurring any liability upon you to this effect, to reject the instructions that you may receive via email."

17. The Daous opened two joint accounts "and/or" at BLC Bank.

18. The first joint account was opened upon the establishment of the relationship. It was a joint "and/or" time deposit account with Mr. Joseph Daou being primary holder.

    a. The Daous funded the account as follow (dates are all in dd/mm/yyyy format):

        - 27/4/2016 cash deposit $70,000.00
        - 3/5/2016 collected check for $74,700.00
        - 10/6/2016 inward remittance $1,899,980.00 from Savis cie
        - 23/11/2016 inward remittance $2,000,000.00 from Savis cie
        - 22/2/2017 inward remittance $2,044,965.00 from Mr. Joseph Daou
        - 21/6/2017 cash deposit for $45,000.00
        - 29/5/2019 2 cash deposits for $40,000.00 each
        - 8/11/2019 cash deposit for $432,221.00





b. The maximum balance reached (including the related credit interests) since account opening $7,530,627.57 on 27/11/2019;

c. The account was closed on 19/06/2020.

19. The second joint account was opened on 21 January 2019. It was a joint "and/or" current account with Mr. Joseph Daou being primary holder.

a. The maximum balance on this account reached $389,933.74 on 21/11/2019;

b. The account was funded by interest from the first joint "and/or" time deposit account; and

c. The account was closed on 26/11/2019

20. Throughout this relationship, Mr. Joseph Daou was keen to generate the maximum possible interest income on his deposit with BLC Bank and actively pursued obtaining higher interests:

21. Upon the establishment of the relationship, interest of 1.75% per annum was offered to the Daous on their time deposit of 1 month. Over the years that followed the Daous' rates became higher and higher. For example, on 21 November 2017, Mr. Daou requested to renew the account for 1 month at rate of 6.75% monthly (this was an increase on the account from previous rate of 5.3% monthly). BLC Bank approved a rate of 6-6.25% monthly for 1 month. Mr. Daou was insistent on receiving 6.75% monthly and claimed this was a rate he was receiving at other banks. BLC Bank ultimately approved a rate of 6.5% monthly for 1 month.

22. In 2019, it seems that Mr. Joseph Daou was shopping around Lebanese banks to obtain the highest interest rate on his deposit.





On 10 January 2019, the Daous had a balance of $6,550,492.85 and Mr. Joseph Daou requested to renew the time deposit account for 1 month at a rate of 9.5% going up from 8.5%. BLC Bank initially only approved to increase the interest rate to 8.75%. After going back and forth with the client, who was insisting, BLC Bank finally approved a rate of 9.3% per annum for 1 month.

On 27 May 2019 the Daous had a balance of $6,556,808 and Mr. Joseph Daou requested to renew the account for 1 month at a rate of 10.25% going up from 9.3%:

a. The relationship officer at the branch was notified by the management of BLC Bank that the requested rate is out of market rates and to negotiate downwards the rate with the client.
b. Mr. Joseph Daou advised the relationship officer at his branch that he was getting that rate at Bank Audi and Credit Libanais and was insisting on that rate
c. The management of BLC Bank advised relationship officer at the branch to maintain the same rate of 9.30%
d. Client refused to renew the deposit at the same rate and negotiated an interest rate at 9.75%
e. The account was finally renewed with a rate of 9.4% after client approval.

On 11 September 2019 the Daous had a balance of $6,595,808 and Mr. Joseph Daou requested to renew the account for 1 month at a rate of 10.75% going up from 9.4%:





a. The relationship officer at the branch was notified again by the management of BLC Bank that the requested rate is too high and the best that BLC Bank can offer is to increase the rate to 9.5% for 1 month

b. Mr. Joseph Daou was insistent on getting 10.75% monthly as offered to him by other banks and gave BLC Bank an ultimatum, either the interest rate is increased or he would transfer the funds back to the US.

c. BLC Bank's last proposal was to offer a rate of 10 to 10.15% on the deposit, provided that the deposit is blocked for 4 months instead of 1 month.

d. After going back and forth with the client and in light of his insistence, BLC Bank agreed to offer and interest rate of 10.75% on the deposit that was blocked for 4 months. Mr. Daou agreed to block his term deposit for four months, into January 2020, on such conditions.

**Impact of Lebanon Financial Crisis**

23. The financial crisis in Lebanon started after the uprising of the 17 October 2019 when banks closed their doors during the first weeks of the uprising as commuting within the country was extremely difficult.

24. Banks reopened on the 1 November 2019 and they were faced with a "bank run" from depositors who wanted either to withdraw all their money in banknotes or to transfer them outside the country. Banks in Lebanon were requested and advised, in order to address the shortage of US Dollars, to take measures applicable across the board to all customers in order to treat them fairly with respect to their access to US Dollars or other foreign currency accounts and minimize prejudice among them. These efforts were made necessary, in part, by the lack of government action.





25. The failure of the government to make the necessary reforms mandated by the IMF and the international community in order to compile a rescue package for Lebanon made the reserves of commercial banks in foreign correspondent dry out with very little left to face some international obligations (acceptances, and software license agreements) and some urgent humanitarian needs of some clients, such as, children's education and medical care.

**Discussion of check issuing process**

26. On 7 November 2019, after the start of the uprising in Lebanon and implementation of restrictive measures, Mr. Joseph Daou sent an email requesting a wire transfer of the full amount of each of his accounts on their maturity to his account in the USA.

27. On 13 November 2019, BLC Bank received a request from Mr. Yas Manaseer, CFO and attorney of Mr. Joseph Daou, asking BLC Bank to make a wire transfer for the amount of 7,469,073.41. BLC Bank responded that a wire transfer was not available. BLC Bank had no obligation to make such a transfer under the account agreements and Lebanese law.

28. On 27 November 2019, Mr. Joseph Daou verbally requested over the phone from at BLC Bank to issue a banker's check in the amount of $7,525,000 (i.e. approximately all the balance standing to the credit of the Daous account).

29. On 28 November 2019, Mr. Joseph Daou stopped by the branch and collected the bankers' check number /11582/ for the amount of $7,525,000, as a result of which he withdrew almost all the funds he held in the account at BLC Bank. The remaining balance of the account being US$5,622.57 at the time.

30. A few days thereafter, on 2 December 2019, Mr. Daou returned to Jbeil branch again requesting to deposit US$5,500,000. BLC Bank rejected this request.





31. On 5 December 2019, BLC Bank received from Mr. Yas Manaseer, CFO and attorney of Mr. Joseph Daou a letter through the United States Post Services requesting to transfer funds from the Daous accounts to the USA. At such time Mr. Joseph Daou had already been paid said amount by virtue of the bankers' check delivered to him personally and accepted by him as payment.

32. On 31 January 2020, Mr. Joseph Daou, through his legal counsel Me. Roy Abou Chedid, sent a notice to BLC Bank through the Notary Public, Randa Abboud-Jdeideh, including the original bankers' check number /11582/ in the amount of $7,525,000 requesting that such bankers' check be cancelled and its value credited to the account of the Daous and others to have the funds transferred to the US.

33. BLC Bank declined the request through the notary public Mr. Joseph Abdallah and a formal reply together with the original check were sent to Mr. Joseph Daou's lawyer Me. Roy Abou Chedid.

34. On 12 February 2020, per BLC Bank's rights under the Agreement, the legal department at BLC Bank sent through secure mail two legal notifications to Mr. Joseph Daou and Mrs. Karen Daou informing them that BLC Bank decided to terminate the relation with them and close all their accounts.

35. On 29 May 2020 a letter was received by the bank through certified mail from Yasser Abdullah, Esq. notifying BLC Bank that the Daous were not able to deposit in their US bank account the bankers' check number /11582/ issued on the 28 November 2019 for the amount of $7,525,000.00

36. On 16 June 2020 BLC Bank made a Real Offer and Tender for Payment through the notary public Mr. Nagib Joseph Abdallah to the Daous and a banker's check no. /155506/ dated





16/06/2020 amounting to $23.08 representing the full balance of the Daou's account was deposited with the notary public.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

October 8, 2020

Bassam F. Hassan
Chief Executive Officer

Bassam Farid Hassan