# Exhibit 5

# GENERAL OPERATING CONDITIONS GOVERNING BLC BANK S.A.L.'S ACCOUNTS, PRODUCTS AND SERVICES

The undersigned ..Karim....Daou........ hereby request(s) the opening in my / our name (s) the account(s) mentioned below:
..........................................................................

in accordance with the general terms and conditions applied by your Bank and which govern these accounts and services. I declare that I / we have reviewed and approved such general terms and conditions without reservation.
(Client RIM number ▮▮▮▮▮▮▮▮)

Hereinafter the « Account Holder » or the « Client »

## CHAPTER 01: BANK ACCOUNT OPENING PROCEDURE AND GENERAL OPERATING CONDITIONS

### I. Client's obligation to provide information

1. Subject to the Bank's approval, the Client may open one or more accounts with the Bank in either Lebanese pounds or foreign currency or with respect to precious metals or shares. Such accounts shall be governed by applicable Lebanese laws and regulations and these general terms and conditions. The Bank reserves the right to subdivide these accounts into sub-accounts, without prior notification of the Client.

2. Pursuant to the laws and regulations in force, and in particular the Law N°318 of 20 April 2001 and the circulars issued by the Banque du Liban relating to the fight against money laundering, article 160 of the Credit and Monetary Code and the Foreign Account Tax Compliance Act, known as FATCA, adopted by the United States Congress on March 18, 2010, the Client undertakes under his/her own responsibility to provide the Bank with all true information necessary to open a bank account, together with any other information deemed necessary or useful by the Bank throughout their relationship, including but not limited to information relating to the Client's identity, address, profession, business, financial position, the origin of the Client's banking transactions and the reasons and purpose thereof.

3. Similarly, the Bank is entitled to obtain all information it deems necessary in order to assess at any time the risks and uncertainties it could face with regard to the credits and other facilities it may grant to the Client. The Client is also obliged to provide to the Bank any information which may be necessary for a proper assessment of any risks and uncertainties which could have an adverse effect on the Client's personal position or his/her activities.

4. The Client represents and warrants, under his/her own responsibility, that all statements, information and documents provided or to be provided to the Bank are or shall be accurate and/or authentic. In the case of any inaccuracy or the falsification of a document, statement or information provided by the Client, all sums whatsoever advanced to the Client as a credit or facility shall be immediately repayable, notwithstanding any previously agreed term.

### II. Banking secrecy

1. The Bank is bound by banking secrecy in accordance with the conditions and restrictions provided for by the Law of 3 September 1956 relating to banking secrecy.

2. Moreover, the Client hereby expressly, unconditionally and irrevocably releases the Bank from its obligation to banking secrecy with regard to the following:

- The Client hereby empowers the Bank without liability to the latter to lift the banking secrecy relating to his/her credit and debit accounts with regard to the U.S. tax authorities with respect to all matters pertaining to the application of the Foreign Account Tax Compliance Act (FATCA).

- The Bank's obligation to banking secrecy shall not apply with regard to its correspondents, all member companies of its group, its existing and future subsidiaries and affiliates.

- In accordance with article 2 of the Law relating to banking secrecy, the Client hereby authorizes the Bank to request all information relating to funds and assets deposited with other banks and, more generally, regarding accounts opened with such banks. For this purpose, the Client releases these other banks, their directors and employees from their obligations with regard to banking secrecy.

- In accordance with article 4 of the Law relating to banking secrecy, the Client hereby expressly, unconditionally and irrevocably authorizes the Bank to carry out any seizure of funds and assets deposited with any other bank.

- The Bank shall not be bound by banking secrecy with regard to customary acts concerning a bank and its clients and/or which require the involvement of third parties, including but not limited to acts relating to the authentication and registration of guarantees and mortgages of whatever nature (including but not limited to sureties, first demand guarantees, pledges and liens) or any other instrument or contract involving notaries and any other relevant authorities, for the purpose of paying any applicable taxes and duties (including stamp duties) to the Finance Ministry or other relevant authority, or in order to secure a credit or advance from an insurance company, or in order to hire the services of a debt recovery company. In addition, the Client hereby expressly authorizes the Bank to disclose to third parties information relating to the Client which are necessary to complete transactions requested by the latter (including, without limitation, information to be given to other financial or banking institutions in order to complete a wire transfer, to collect trade bills, to issue, notify and/or confirm letters of credit and/or guarantees).

3. If the account is a joint or collective account, any and all Account Holders hereby unequivocally, expressly, unconditionally and irrevocably releases the Bank from its obligations with regard to banking secrecy for all of the matters listed above.

### III. Foreign currency accounts

1. Existing and future foreign currency accounts shall be subject to both Lebanese law and the law of the country of the currency in question. The Bank's liability shall not be involved in the event that the currency in question is not fully available or available only in part, or is no longer in uses, for whatever reason, and in particular as a result of any Lebanese or foreign law or regulation, a decision of the Lebanese administrative authorities or of any foreign authorities, or as a result of an act of State.

2. The Client hereby irrevocably and unconditionally grants at all times all powers to the Bank in order to a) convert all or part of the foreign currency credit balance of the Client's account into Lebanese pounds or another foreign currency, at the rate on the date of the transaction, in order to cover the debit of one or other of the Client's other accounts, and b) make the necessary transfers from accounts in credit to accounts in debit. An exchange commission shall be applied by the Bank, at the rate and under the conditions applied by the Bank.

### IV. Verification of signatures and multiple signatures

1. The Bank shall rely on the specimen signature given by the Account Holder for any transactions carried out by it, and it shall not be held liable in this respect either by the Account Holder or any third party in the case of its refusal to carry out a transaction if the signature does not comply with the above mentioned specimen. Similarly, the Bank shall not be liable in any manner whatsoever in the event of the falsification of the signature.

2. The Client may decide to use a specific signature, which differs from his/her usual signature, in order to authenticate instructions relating to the operating of any of his/her accounts. In this case, he/she shall provide a specimen of the said signature to the Bank, and the Bank shall be authorized to refuse to carry out any instruction given by the Client or any transaction concerning the account in question which does not show the specific signature adopted for this purpose. Moreover, the Client acknowledges that he/she is bound by any transaction involving the account in question using the said signature and further acknowledges his/her liability for any loss suffered by the Bank or any third party as a result of the use of the account.

### V. Collection services

1. Account deposits made by cheque, wire transfer, trade bills or any other payment instrument, are made under the sole responsibility of the Account Holder, and the Bank is under no obligation to ensure payment or to take any steps in this respect. In the exceptional event that any such deposits are made temporarily, the sum in question shall not be available to the Account Holder until it has been collected

by the Bank. The Bank reserves the right to reverse the entry, with no obligation to notify the Client in advance, in the case of the debtor's failure to pay the sum. Accordingly, the Bank shall be entitled to refuse any drawing on the Client's account if the sums concerned by the cheques, wire transfers, trade bills or any other payment instrument have not been collected and/or to reverse the entry of the amount of those which have been returned.

2. It is expressly agreed by the parties that the Bank shall be entitled, with no obligation to notify the Client, to reverse account entries made as a result of a material or legal error. Any entry made by the Bank shall be binding on the Account Holder once this entry has been made.

3. If the Client has used sums mistakenly credited to his/her account or if cheques, trade bills or negotiable instruments are returned for any reason whatsoever, it shall immediately repay the concerned amount to the Bank, plus interest, commission, costs and ancillary charges, at the rates and under the conditions applied by the Bank, under threat of court action and an order to pay damages. With regard to cheques, trade bills and negotiable instruments to be collected abroad, the Client acknowledges that foreign legislations allow banks to return such cheques, trade bills and negotiable instruments many years after their deposit for collection and to claim their value even after they have been paid. As a result, the Client irrevocably and unconditionally undertake to repay the Bank forthwith the value of said cheques, trade bills and negotiable instruments, plus interest, commission, costs and ancillary charges, at the rates and under the conditions applied by the Bank, irrespective of the time at which they are returned. In the event that the Client fails to pay any of the aforementioned amounts, the Bank shall be entitled to debit such amounts from any one of his/her accounts and/or from a debit account which shall be opened in his/her name without giving prior notice to the Client, and the Client hereby grants full powers to the Bank for such purpose.

4. The Client shall bear alone all the consequences of any difficulties, delays or errors relating to any collection, payment or transfer, and the Bank's liability shall not be involved in this respect.

5. Cheques and other trade bills or negotiable instruments deposited for collection shall be sent by post on behalf of the Client, at his/her risks and at his/her own expenses. The Client shall bear the risk of loss, theft, fire or other event, as well as risks arising as a result of an event of **force majeure**, third party default or his/her own default. It shall also bear the consequences of any delay in collection, or the time needed for collection, and any loss or costs incurred as a result of the latter. The Client shall pay any commission, costs and ancillary charges which may be due to the Bank or to its correspondents.

6. The Bank's shall not be held liable as a result of any delay in the presentation of cheques, trade bills or negotiable instruments deposited with it by the Account Holder for the purpose of collection. Similarly, the Bank shall have no obligation to make any act of protest or issue any formal notice relating to non-acceptance or non-payment, nor any responsibility with regard to any legal action taken for the purpose of collection. It is expressly agreed by the parties that any such measures shall be initiated by the Account Holder himself/herself.

## VI. Account keeping fees

1. The Bank is entitled to charge fees for account keeping, at the rates and under the conditions applied by it, and which the Bank is entitled to change at any time, in accordance with the provisions of section I(K) below, entitled « Tariffs ». The Bank has the right to debit these fees from any one of the accounts opened by the Client with it, with no obligation to notify the Client.

## VII. Bank statements

1. The Bank shall issue a bank statement for each of the Client's debit accounts at the end of each calendar month, and for each of the credit accounts at the end of June and December of each year. This statement, together with the balance shown, shall be deemed to have been irrevocably accepted by the Account Holder if no written notice of opposition has been sent to the Bank, by registered letter with acknowledgement of receipt, by the Account Holder within 15 (fifteen) days of the date of the said statement. If the Client does not collect the statement from the Bank within the above mentioned time limit, it shall be deemed to have received it and approved its content. On expiry of this time limit, the Account Holder's right to oppose the statement or to discuss its content shall lapse. The Bank however reserves the right to correct any errors or omissions at any time. It is expressly agreed by the parties that the Bank may, at any time and with no obligation to notify the Client, destroy statements made available to the Client if the latter has not collected them within the above-mentioned 15 (fifteen) day period.

2. Only the registers and account entries of the Bank have probative force and are enforceable against the parties.

## VIII. Probative force of the Bank's books, registers and entries

1. The Bank's books, registers and account entries are binding upon the parties and are enforceable against the Client. They shall have probative force with regard to the Account Holder, his/her successors and assigns and third parties. Moreover, and notwithstanding the **above**, it is expressly agreed that the reproduction of orders on microfilm or any other IT medium kept by the Bank shall constitute proof of transactions carried out by the Client and may be produced in the case of litigation.

2. The Client may transmit his/her orders and instructions by facsimile on the subscription number declared by the Client in the Know Your Customer form signed by him. Orders made in this way are binding on the Client, which acknowledges that it is aware of risks associated with this method, including the risk of fraud, falsification and/or the use of a false signature. The Client therefore releases the Bank from any liability connected with the execution of orders and instructions transmitted by facsimile, shall be liable for any losses or damages that could ensue from the execution of the above without holding the Bank liable for any reason whatsoever in this regard, and acknowledges that the Bank is entitled to refuse to execute an order or instruction which is not sufficiently clear, or which it deems doubtful, without any liability to the Bank as a result of such refusal.

3. In addition, in order to facilitate the Client's access to the various services offered by the Bank, the latter may allow the Client to transmit orders and instructions orally during telephone conversations. Any Client wishing to benefit from the telephone banking services shall be given a password and shall take all measures necessary to keep such password confidential. The Client shall be bound by any and all transactions resulting from an improper use of the password until the Bank has received written notice of such improper use. Orders and instructions transmitted by the Client during a telephone conversation may be recorded on magnetic tape under conditions which guarantee the reliability and integrity of any such recording. It is therefore expressly agreed by the parties that the recordings on magnetic tape are self-authenticating and provide sufficient proof of the genuine nature of orders and instructions transmitted by the Client. The Client hereby acknowledges the accuracy of all operations and entries effected on his/her accounts, and from then on, stands down to argue or make any objection in this respect.

4. The Client shall in any event be deemed to have irrevocably approved transactions executed pursuant to the said orders and instructions as shown on the bank statements, provided that the conditions set down in section 7 above under the title "Bank statements" are met. No claim made by the Client will therefore be admitted.

5. It is expressly agreed by the parties that the Bank may, if the Client transmits his/her instructions by telephone, facsimile or e-mail, decide whether or not to act on the said instructions, under the responsibility of the Client which shall bear all associated risks, including those risks which could arise in the event that the said instructions are shown to be a result of fraud or theft. If the Client's instructions are not sufficiently clear, the Bank shall have the right to refuse execution, without any liability to the Bank as a result of such refusal.

6. The Client undertakes to use the telephone banking services within the legal limitations applied to traditional banking services. It may not oppose the payment of any cheque by using the telephone banking services. In addition, secret accounts and numbered accounts fall outside the scope of the services provided by the Bank.

7. The joint account holders are entitled to benefit from the telephone banking services if all joint account holders have so approved and signed on the subscription form relating thereto. In such case, the joint account holders are given one password only.

8. The Client releases Bank from any liability in respect of the banking secrecy in the event that any third party has reviewed his accounts or acquired any information through the telephone banking service without any direct intervention of the Bank. The telephone banking service is automatically suspended upon the Bank being notified of the passing away of the Client.

## IX. Account unity and merger

1. The Client acknowledges that the division into various accounts is purely for practical reasons. Accordingly, the Client expressly grants the Bank the discretionary right to consider at any time, with no obligation to notify the Client, that all transactions on the Client's accounts and/or sub-accounts, whether credit or debit entries, in Lebanese pounds or foreign currency, constitute indivisible entries for one and the same current account, which shall have one and the same balance. If there are one or more foreign currency accounts, the balance shall be calculated after the book conversion of the currencies into the currency of one or other of the Client's accounts, which shall be determined at the discretion of the Bank, at the rate in force on the day of calculation of the said balance.

2. The Bank may therefore, on its own initiative and at any time, with no obligation to notify the Client, merge and unify the balances of the various existing or future accounts of whatever nature opened in the name of the Client (including but not limited to sight deposit accounts, term deposit accounts and numbered accounts), regardless of the type or currency, whether such balances are in credit or debit.

3. It is expressly agreed by the parties that any merger or unification of the Client's various accounts and/or sub-accounts decided by the Bank shall have no impact on the autonomous functioning of the said accounts and sub-accounts. Accordingly, but without limitation, the various accounts and/or sub-accounts may operate as credit or debit accounts and bear interest at variable and differentiated rates. Similarly, the Bank shall be entitled to carry out transfers from account to account, pursuant to the powers or authorizations given to it by the Client either through these General Conditions or separately.

## X. Set off

1. Without prejudice to the Bank's right to merge and unify the Client's various accounts and/or sub-accounts, the Bank may at any time, with no obligation to notify the Client, set off the balances of the Client's various accounts opened with its branches (including but not limited to sight deposit accounts, term deposit accounts and numbered accounts). For this purpose, the Client hereby irrevocably and unconditionally grants all powers to the Bank to conduct any such set off by means which it deems appropriate, including by transfer from account to account. It is expressly agreed for this purpose that any term given for any one of the Client's accounts shall not limit the Bank's capacity to transfer funds from one term account to another, in particular to cover an overdraft.
2. If the Client has opened a savings account with the Bank, the Client undertakes to provide his/her savings book to the Bank forthwith and at the latter's first demand, for the purpose of proceeding with the set off referred to in these General Conditions.
3. For accounts in foreign currencies, the Client hereby expressly authorizes the Bank to carry out at all times any exchange transaction which may be necessary for the purpose of the set off, at the exchange rate in force at the date of the transaction.

## XI. Tariffs

1. Unless otherwise specifically agreed by the Bank and the Client, interest rates, fees, commission and other charges applied by the Bank for its clients' banking transactions shall be those applied by the Bank at the date of the transaction and the same shall be recorded in [the Client's account] after deducting the amount of any taxes, duties or expenses.
2. The Bank reserves the right to change its tariffs at any time for sight accounts and at maturity for term accounts, whatever the nature or currency of such accounts and without being required to give notice to the Client.
3. The Client shall have 15 (fifteen) days from the date of introduction of any new tariff conditions to inform the Bank, by registered letter with acknowledgement of receipt, if he/she wishes to close the account. If the Client does not request such closure within this time period, he/she shall be deemed to have accepted the new tariff conditions. If the Client has several accounts, he/she shall clearly identify those which he/she intends to close.
4. The Client may obtain information directly from the Bank concerning fees, commission and other charges which may apply.

## XII. Modification of the general conditions

1. The Bank reserves the right to change its services and to modify these General Conditions at any time, with the aim of improving the quality of services offered and completing the range of services. Any modification will take the form of an amendment of the General Conditions, which shall be notified to the Client. The Client shall have fifteen (15) days as from the date of introduction of the new General Conditions to inform the Bank, by registered letter with acknowledgement of receipt, if he/she wishes to close his/her account. If the Client does not request such closure within this time period, he/she shall be deemed to have given unreserved approval of the new conditions, releasing the Bank from any liability for any reason whatsoever in this respect. If the Client has several accounts, he/she shall clearly identify those which he/she intends to close.

## XIII. Application of payments made by the Client

1. All payments made by the Client pursuant to his/her obligations to the Bank shall be applied in the following order and manner:
a) firstly, for the payment of commission, charges and expenses to be paid by the Client for any reason whatsoever,
b) secondly, for the payment of interest due but not yet paid which is owed by the Client for any reason whatsoever,
c) thirdly, for the payment of the principal due but not yet paid which is owed by the Client for any reason whatsoever.

## XIV. Closure of the account

1. Subject to special terms and conditions relating to the operating of certain accounts, each party may terminate this agreement, by sending to the other party written notice and after 15 days of being notified or rejecting this notification by this party or default of notification for whatsoever reason, and thus, without need to justify the termination decision and without need to institute any judicial or extra judicial procedure, and thus close the account.

2. If the Client has several accounts with the Bank, the Client's termination letter shall clearly identify the account or accounts which he/she intends to close.
3. Notwithstanding any contrary provision, the Bank has the right to close the account without notice in the case of default on the part of the Client and/or the latter's failure to comply with any one of his/her contractual obligations (including but not limited to a failure to pay sums owed by the Client to the Bank, or any inaccuracy in the information provided to the Bank by the Client, including in relation to the application of the provisions of the United States Foreign Account Tax Compliance Act (known as FATCA).
4. After the closure of his/her account, the Client shall attend the Bank in order to collect any credit balance, it being understood that the withdrawal of the credit balance shall only take place once the Client has satisfied all of its obligations to the Bank.
5. It is expressly agreed by the parties that the closed credit account, closed for whatever reason, shall not bear interest but shall, after closure, be debited by any fees and/or commission and/or other ancillary charges for the benefit of the Bank, at the rates and under the conditions applied by the Bank. The Bank may withdraw these sums directly from the closed account and/or from any other account remaining open in the name of the Client.
6. If after closure it is seen that the account has a debit balance in favor of the Bank, this debit balance shall continue to bear debit interest, interest for late payment, penalties and commissions at the rates and tariffs then applied by the Bank.

## CHAPTER 02: SPECIAL OPERATING CONDITIONS APPLICABLE TO CERTAIN ACCOUNTS

### I. Special conditions relating to sight deposit accounts

1. The Account Holder has access to sums deposited in sight deposit accounts by way of deposits or withdrawals made directly at the Bank's counters (including « ATM » machines) or by way of any payment instrument made available to the Client by the Bank, and in particular wire transfer, payment cards and/or cheques.
2. With regard to any deposit or withdrawal, the account shall be operated under the signature of the Account Holder, as authorized by the Bank.
3. The Bank may at its discretion issue or refuse to issue a cheque book and/or payment card to the Account Holder, with no need to justify its decision.
4. The Bank shall issue a cheque book to the Account Holder on the basis of the form it has prepared. It may therefore refuse any payment by way of a cheque which does not comply with this form or a form it has not authorized in advance.
5. The Account Holder undertakes to take care of the cheque books and cheques provided to him/her. He/she shall bear full liability for his/her use whether by himself/herself or by his/her legal representative. Similarly, he/she shall bear full liability for the fraudulent use of the cheque books or cheques contained therein, including as a result of loss, theft or forgery, and the Bank shall be held harmless in this respect. The Account Holder shall inform the Bank in writing forthwith of the occurrence of any of the above mentioned events. The Bank may, but is not obliged to, block a sum equivalent to that of the cheque whose payment has been opposed by the Account Holder. This sum shall be blocked for a period to be decided by the Bank, or until the end of the period for presentation, or until the Account Holder notifies the Bank of the withdrawal of the opposition, or the handing down of an enforceable court decision bringing the dispute to an end.
6. The Bank has the right to honor cheques drawn on it by the Account Holder, even after expiry of the legal period allowed for presentation.
7. The Account Holder can only draw cheques in the currency in which the account is opened. He/she shall not draw a cheque when there are no or insufficient funds, nor withdraw a provision or part of a provision for a cheque after the cheque has been drawn, or oppose or prohibit payment in cases other than those listed in article 428 of the Commercial Code, under threat of legal proceedings pursuant to article 666 of the Lebanese Criminal Code. In the case of payment opposition, the Bank reserves the right to take any steps it deems appropriate, including the blocking of a provision until the Account Holder notifies the Bank of the withdrawal of the opposition, or the handing down of an enforceable court decision bringing the dispute to an end.
8. The Client states that he/she is aware of decision n° 6060 of the *Banque du Liban* of 25 November 1995 relating to the organization of the centralized service for defaulting clients and therefore irrevocably releases the Bank and its employees from banking secrecy in order to allow them to take any necessary steps for the enforcement of the provisions of the above mentioned decision, together with any amendments thereto, in particular in the event that the Account Holder

or his/her legal representative draws a cheque on one of the accounts opened with the Bank and where it becomes clear, on presentation of the cheque for payment, that there are insufficient funds to pay the amount in full.

9. The Account Holder undertakes to return cheque books and/or payment cards provided to him/her by the Bank immediately on closure of the account. If he/she fails to do so, he/she shall continue to be liable in the event of loss, theft or fraudulent use.

10. It is expressly agreed by the parties that any overdraft which may be exceptionally authorized by the Bank on the Client's deposit account is by nature temporary. The Account Holder shall cover the overdraft immediately. The Bank shall be entitled to apply interest, commission, fees and ancillary charges at the rates and under the conditions applied by the Bank to this overdraft, either before or after the closure of the account. Similarly, the Account Holder authorizes the Bank to make withdrawals from this account, once the credit balance has been restored, for set off against amounts which the Client owes to the Bank, and/or from any other account opened in the Account Holder's name with the Bank.

11. The special conditions relating to savings accounts apply to sight deposit accounts when the latter are opened with a savings book.

## II. Special conditions relating to savings accounts

1. The Bank may, at the request of a natural person or a not-for-profit association, issue a savings book to the Account Holder, which shall bear a personal number which may not be assigned, endorsed or transferred in any other manner.

2. Deposits and withdrawals may only be made on presentation of the savings book. All transactions on the account must be recorded in the savings book and in the Bank's registers.

3. The savings book shall indicate the date and the amount of each deposit and withdrawal, and each transaction shall bear the Bank's stamp. No change or correction made to amounts recorded in the savings book shall be taken into account if they do not bear the Bank's stamp. The Bank is thus released from the obligation to issue a statement.

4. The Account Holder may make withdrawals in person or name a representative to make deposits in and withdrawals from the account. The issuing of a savings book to the representative shall take place under the Account Holder's responsibility. The Bank does not recognize any beneficiary other than the holder of the savings book and the savings book is not transferable by assignment or endorsement.

5. No withdrawals may be made from the savings account through the use of cheques, wire transfers or payment cards.

6. The Account Holder shall solely bear the consequences arising as a result of the loss, destruction, theft or fraudulent use of the savings book, regardless of the identity of the perpetrator. In this case, the Account Holder shall inform the Bank in writing forthwith, either by registered letter with acknowledgement of receipt, or by hand-delivered letter against acknowledgement of receipt. The Bank shall not have any direct or indirect liability in this respect.

7. In the case of the destruction, loss or theft of the savings book, the Bank may issue a new savings book to the Account Holder, in exchange for the payment of compensation under the conditions set down by the Bank. The Account Holder shall thus sign a statement relating to the destruction, loss or theft which shall discharge the Bank in full, and in which it shall undertake to return the lost or stolen savings book if it is found. The Bank shall only issue the new savings book on expiry of a period of one week following the date of the above mentioned statement. The original savings book shall be cancelled and shall have no legal effects. The account balance at the date of issue of the new savings book, as shown by the Bank's registers, shall be recorded in this new savings book.

8. In the event of an error in recording the balance in the savings book, or a difference between the sums recorded in the savings book and those recorded in the Bank's registers, the latter shall prevail and only these records shall be taken into account. The Account Holder undertakes to allow the Bank to correct records in the savings book so that they comply with those of the Bank, which may request the Account Holder to sign the corrected copy of the savings book and, thus, approve the balance as shown and its conformity with the Bank's registers.

9. The Account Holder hereby irrevocably authorizes the Bank to record all fees and commission owed to the Bank relating to the said account in the savings book.

10. The Bank may at any time refuse, either in whole or in part, to deposit any sum in the savings account; similarly the Bank may record such sums in any other account opened in the name of the Account Holder, or open an account in the latter's name under conditions which it deems appropriate, it being understood that the Account Holder has no right to oppose any of the above mentioned measures.

11. The opening of an account is subject to a minimum balance, which shall be fixed at the discretion of the Bank and which may be changed at any time, with no obligation to notify the Client. If the balance falls below the minimum threshold, the account shall cease to bear creditor interest for the benefit of the Account Holder, and the Bank shall be entitled to collect commission at the rate then applied by the Bank which it may debit directly from the account, with no obligation to notify the Account Holder.

12. If the account is a sight account, it shall bear creditor interest at the rate fixed by the Bank which shall be added to the account balance. However, if the account is closed before the interest period, for any reason whatsoever, the Bank shall not be liable for the payment of this interest for the period concerned.

13. If the account is blocked for a given period, creditor interest shall be added to the account balance at the end of the period. If the account is closed before the end of this period, the Bank shall not be liable for the payment of this interest for the period concerned. It is expressly agreed by the parties that the blocking of this account shall be automatically renewed for a similar period, and the Bank shall have the right to change the interest rate in order to apply that in force at the time of the renewal, unless the Account Holder decides otherwise by notifying the Bank by registered letter with acknowledgement of receipt, at least two business days before the end of the period.

14. In the event that the Account Holder passes away, the heirs shall not have the right to dispose of the balance of the deceased until they have provided evidence of their capacity in the manner required by law. The agreed interest rate shall continue to apply on the time deposit account even after the passing away of the depositor and until maturity of the term.

15. The Client undertakes to return the savings book to the Bank on closure of the account, for whatever reason.

## III. Conditions relating to term deposit accounts

1. The Bank may, at the request of the Client, open one or more term deposit accounts in Lebanese pounds or foreign currency.

2. Sums deposited in this account shall be automatically blocked, as from the date of opening, for a period requested on opening the account. The Client cannot either withdraw or transfer any sums deposited in this account before this date.

3. If the Bank exceptionally authorizes a withdrawal before the term, it is for the Bank to set down the conditions.

4. At the end of the term, the account shall be blocked for a similar term under the same conditions, subject to the Bank's right to change the interest rate in order to apply that in force at the date of the renewal, unless the Account Holder decides otherwise by notifying the Bank by registered letter with acknowledgement of receipt, at least two business days before the end of the period.

In the case of renewal, the creditor interest shall be added to the account balance at the end of the period.

If there is no renewal, the account shall be converted into a sight deposit account which shall be automatically subject to the special conditions applicable to sight deposit accounts, as set forth herein.

If the account is closed before the end of the period, the Bank shall not be liable for the payment of this interest for the period concerned.

5. The special conditions applicable to savings accounts shall apply to deposit accounts, when the latter are opened with a savings book.

## IV. Special conditions relating to numbered accounts

1. At the request of the Client, the Bank may, at its discretion, agree to open a numbered cash or shares deposit account governed by the Law of 3 September 1956 relating to banking secrecy and by these General Conditions. Safe boxes may also be hired under a number.

2. This account shall be identified exclusively by a number allotted by the Bank.

3. Any notices and correspondence sent by the Bank to the Client concerning the numbered account shall refer only to the account number. Similarly any instructions given and all transactions carried out by the Client relating to the account shall refer only to the account number.

4. Numbered accounts are operated exclusively as deposit accounts. No credit granted by the Bank to the Client shall be recorded in a numbered account. Withdrawals made by the Client shall not under any circumstances exceed the amount of the account balance.

5. The numbered accounts are funded exclusively by deposits in cash, cheques or by wire transfers from another bank for credit to the account, which shall be referred to only by its number. Withdrawals from these accounts shall be made in cash, by cheques or by wire transfer, referring only to the account number. No payment instruments (cheques, payment cards or other) shall be made available to the Client for the purpose of operating the numbered account.

6. The numbered account shall bear interest under the same conditions as those applicable to the other accounts, as set forth herein.

7. The Bank shall protect the identity of the Account Holder in accordance with the conditions set down by the Law of 3 September 1956 relating to banking secrecy. The Account Holder's identity may only be disclosed with his/her written consent, or that of his/her heirs or legatees, in the event that the Account Holder is declared bankrupt or in the case of a dispute between the Bank and the Client arising in connection with their relationship.

## V. Special conditions relating to collective accounts

1. All signatories to the request to open this account are treated as collective account holders. They can only use and operate the account collectively. In the case of the death of one of the holders, the other collective account holders can only use and operate the account collectively with the successors of the deceased joint holder.
2. However, the collective account holders hereby authorize the Bank to credit the collective account pursuant to the instructions of one of them, without need to give advance notice to the other collective holders.
3. It is expressly agreed by the parties that the collective account holders shall be jointly and severally liable with each other toward the Bank for the proper performance of any obligation arising from the collective account. Accordingly, the collective account holders shall be jointly and severally liable for the payment to the Bank of any debit balance of the collective account, and/or any related interest, commission, fees and ancillary charges which may be due.
4. Similarly, obligations arising in connection with the operating of the account and/or relating to the account shall be treated as indivisible obligations for which each of the collective account holders and their heirs and successors shall be liable.
5. In the case of a dispute between one of the heirs or legatees and the other collective account holders, the Bank may block the account until the dispute has been definitively settled, either amicably or by the courts.
6. The collective account holders may grant powers of attorney to each other or to a third party to operate the collective account. In order to be valid, such power of attorney must be signed by all collective account holders of the account.

## VI. Conditions relating to joint accounts (and/or)

1. The joint account is governed by the provisions of the Law of 19 December 1961 authorizing the opening of a joint account.
2. It is expressly agreed that the joint account holders shall be jointly and severally liable with each other toward the Bank for the proper performance of any obligation arising from. Similarly, obligations arising in connection with the operating of the account and/or relating to the account shall be treated as indivisible obligations for which each of the joint holders and their heirs and successors shall be liable.
3. Each joint account holder shall, as joint and several creditor, be entitled to give instructions and operate the account with his/her own signature, with neither limitation nor reservation, and without having to notify the other joint holders or obtain their consent. Accordingly, each joint account holder may make withdrawals, collect all sums, give instructions to the Bank and generally dispose of the full account balance, regardless of the amount. It is expressly agreed that the joint account holders, which are signatories hereto, hereby authorize the Bank with regard to any transaction carried out by the Bank to act in accordance with instructions given by one of them, and the Bank shall be held harmless in this respect.
4. Each joint account holder shall be entitled to enter alone into any services agreement relating to the to the joint account and to request alone the Bank to issue any means or instrument of payment relating to such account (including, without limitation, checks, debit and/or credit cards), without having to obtain the other joint account holders' prior approval.
5. It is expressly agreed that the Bank shall not accept any defense or opposition on the part of any of the joint account holders relating to the operating or use of the account on the part of another joint account holder. Any such notice sent to the Bank shall be automatically rejected and treated as null and void.
6. In the case of a dispute between the joint account holders relating to the said account, the Bank shall block the balance until it has been notified of a request to unblock the account signed by all joint account holders, or of an enforceable court decision settling the dispute.
7. The joint account holders shall not give power of attorney to any third party to operate the account, without first obtaining the express and written consent of the other joint account holders.
8. In the case of the death of one of the joint account holders, the other joint holder or holders, excluding the heirs of the deceased joint holder, shall have the unrestricted right to use and dispose of the account.
9. Pursuant to article 6 of the Law of 19 December 1961, it is expressly agreed that all account holders and each joint account holder hereby authorize the Bank to carry out any set off between the balance of the joint account and the personal account or accounts of such joint account holder opened with the Bank.
10. The joint account holders, when requesting the opening of the joint account, shall stipulate whether the Bank is authorized to provide information concerning the joint account to the heirs of the deceased joint account holder, pursuant to article 3 of the Law of 19 December 1961 relating to joint accounts, which provides as follows:
« *In the case of the death of one of the joint account holders, the other joint account holder or holders shall have full access to the account, which they shall be free to operate. In this case, the bank is not obliged to provide any information to the heirs of the deceased joint account holder, unless otherwise expressly provided for in the joint account contract.*»
«*This article shall be repeated in full in the contract*».
The joint account holders hereby declare that they agree / do not agree to disclose information on the joint account to the heirs of the deceased joint account holder.
11. Given the joint and several liability of the joint account holders, each one of the joint account holders shall be jointly liable for the payment to the Bank of any debit balance of the joint account, and/or any related interest, commission, fees and ancillary charges which may be due.
12. Pursuant to article 2 of the Law relating to banking secrecy, and article 7 of the Law of 19 December 1961, each of the joint account holders hereby authorizes the Bank to request information relating to the funds and aasets deposited in other banks and, more generally, regarding the personal or joint accounts of each joint account holder with such other banks. For this purpose, each joint holder hereby releases these other banks, their managers and employees of their obligations with regard to banking secrecy.
13. In accordance with article 4 of the Law relating to banking secrecy, the Client hereby expressly, unconditionally and irrevocably authorizes the Bank to carry out any seizure of funds and assets deposited in a personal or joint account with any other bank.

## VII. Special conditions relating to payment cards

1. The Bank may, at its entire discretion, agree to provide a payment card to the Client (hereafter the « card ») thus allowing the Account Holder (hereafter the « card holder »), in exchange for payment of the applicable commission:
- To make cash withdrawals from ATM machines in Lebanon and abroad
- To obtain a statement from these machines concerning the balance of his/her accounts with the bank
- To pay for purchases of goods and services at any establishment in Lebanon and abroad
- To make account to account transfers between his/her accounts with the Bank.
2. The card is issued at the request of the Account Holder or its representative. The card holder may, under his/her own responsibility, request additional cards for third parties, after having given the number of his/her personal account on which the card or additional cards are to be used.
3. The card remains the property of the Bank, which has the right to withdraw or prevent its use at any time, without having to justify its decision. The card holder shall therefore return the card to the Bank at the latter's first request.
4. The card shall have an expiry date marked on the card itself. It shall be renewed at such date, unless the Bank or the card holder decides not to renew it. The closure of the account to which the card is attached, for whatever reason, shall lead automatically to the cancellation of the card and, thus, the obligation to return any additional card used for this account.
5. The cap on the amount which may be used each day with the card shall be that agreed by the Bank and the card holder or, if applicable, the limit authorized by the Bank for this type of card.
6. The Bank shall withdraw from the account operated with the card a sum (in US dollars or Lebanese pounds at the exchange rate applicable at that date) to cover account management fees, which shall also include the costs of insurance against loss, theft or the fraudulent use of the card.
7. The card holder is responsible for all withdrawals, costs and charges arising in connection with the use of the card. The card holder shall, under his/her responsibility and before carrying out a transaction, ensure that there are sufficient funds available, and shall maintain such funds until the corresponding amount has been debited. The card holder authorizes the Bank to debit the amount from the account operated with the card.
8. If the card holder has made several withdrawals and purchases in Lebanese pounds and/or foreign currency, the Bank is authorized, without notice and in accordance with the exchange rate as at that date, to convert the amount of the said withdrawals and purchases into US dollars if the account operated with the card operates in Lebanese pounds, or vice versa.
9. The card holder states that he/she is perfectly aware of the risks connected with any transaction carried out with the card, in particular

those arising in connection with the machines used and which could lead to inaccurate information. The card holder states that he/she shall bear such risks and shall hold the Bank harmless in this respect.

10. The Bank may, at its entire discretion and without prior notice, convert any amount in the account operated with the card into the currency of withdrawals and/or purchases and/or account management fees and/or any other transaction, at the exchange rate as at that date, it being understood that the card holder waives his/her right to oppose the determination of the exchange rate and/or the date on which the exchange transaction is carried out.

11. The card is strictly personal. The card holder may not transfer, lend or dispose of the card. The card holder shall sign the card immediately on receipt. A personal and secret code shall be provided to the card holder by the Bank, such that no transaction may be carried out without using this secret code, under threat of confiscation or invalidation of the card after three unsuccessful attempts to use it.

12. The card holder shall do the necessary to ensure the safety of the card and the secret code, in particular by not writing the code on the card or any other document attached to it. The card holder is responsible for any use of the card, all withdrawals and connected costs, and shall thus bear all consequences arising as a result of his/her failure to protect the confidentiality of the code.

13. In the case of the loss or theft of the card, the card holder shall inform the Bank by telephone, at the number provided to him/her by the Bank, and shall confirm his/her opposition in writing, by registered letter with acknowledgement of receipt, or by e-mail, facsimile or through the Bank's web site, under threat of bearing all fees, costs and charges connected with the use of the card. The card holder shall have no further liability for fees, costs and charges relating to the card as from the date of the Bank's receipt of the letter, sent by registered letter with acknowledgement of receipt, confirming the opposition, except in the case of negligence on the part of the card holder. The insurance shall come into effect on the date on which the Bank is notified of the loss, theft or fraudulent use of the card.

14. The Bank shall be held harmless with regard to any dispute which may arise between the card holder and establishments affiliated to the card issuer as a result of any refusal of the card, for whatever reason.

15. The Bank reserves the right to change the conditions for use of the card at any time. These changes shall be notified to the card holder, who shall have 15 (fifteen) days as from the date of the said changes to inform the Bank, by registered letter with acknowledgement of receipt, that he/she does not wish to use the card under the new conditions. The Client's failure to reply within this time limit, or the fact that he/she continues to use the card after this time limit, shall be deemed acceptance of the said changes without any reservation.

16. For transfers between accounts of the cardholder, the latter shall be responsible for specifying the concerned accounts, which accounts shall be of the same currency.

17. The Bank shall not be liable for any loss directly or indirectly incurred by the cardholder as a result of the non-availability, for any reason whatsoever, of the ATM or sales point services.

18. The entries of the ATM and sales points shall be deemed to be conclusive and definitive evidence of the transactions performed by the cardholder.

19. This agreement shall automatically terminate upon the passing away of the cardholder. The value of all costs and amounts due by the Account Holder shall be recorded.

## VIII. Deposit of shares, financial instruments and other securities

1. The Client may, subject to the Bank's acceptance, deposit shares, financial instruments, securities, documents, goods and other valuable objects with the Bank. The Bank undertakes to ensure their safeguard.

2. The Bank reserves the right to refuse the deposit of all or some of the goods and objects, without need to justify its decision.

3. The Bank shall collect fees for this service on the basis of the tariffs and conditions applied by it. The Client hereby expressly authorizes the Bank to debit commission, fees and charges owed by him/her from any of the accounts he/she holds with the Bank. It is expressly agreed by the parties that the return of the objects deposited is subject to the payment of all sums due to the Bank with regard to such deposited objects.

4. In the case of the deposit of financial instruments and securities, their owner hereby expressly agrees that they may be returned with different numbers, unless otherwise agreed in writing between the Bank and the owner at the time of deposit.

5. The Bank undertakes to keep the goods and objects entrusted to it in its safe and to act with all due diligence. The Bank shall not however have any liability with regard to their lack of availability, decrease in value, loss in whole or in part or theft in the case of an event of force majeure, fortuitous event, natural phenomena (for example floods, earthquakes, tidal wave), acts of war, acts of State (for example decisions of public authorities, the government or courts), or any other circumstance beyond the control of the Bank.

6. The Bank may deposit, in its name but on behalf of the Client and at his/her risk, securities located in another country with a correspondent, which shall be responsible for their safeguard and administration under the conditions set down by the laws and regulations of this other country.

7. The deposit is made for an indefinite period and the depositor may request their return at any time during Bank opening hours, in exchange for payment of all sums owed to the Bank with regard to the deposited objects. Similarly, the Bank may request the Client to withdraw the deposited objects at any time.

8. The financial instruments and securities account shall be operated in the same way as the other accounts and a nominative certificate shall be issued for each deposit which shall not be either negotiable or assignable.

9. In the case of the partial or full withdrawal of the deposited objects, the depositor shall sign a discharge for the benefit of the Bank. In the case of the sale of the securities, the Bank is discharged by the recording of the net sale income to the credit of the Client's account.

10. The Bank shall make a statement available to the Client, which the Client shall check and which shall be governed by the above provisions of the section I entitled « Bank statements ».

11. With regard to transactions concerning financial instruments, the Client shall pass his/her orders to the Bank under his/her own responsibility. The order may be made in writing or by telephone, in which case it shall be confirmed in writing. The Bank is entitled to refuse to execute an order which is not sufficiently clear. In any event, the Bank is under no obligation to monitor or to inform the Client of transactions which may concern the securities or financial instruments, more particularly with regard to the collection of dividends, coupons, interest, amounts relating to share capital amortization, operations on capital (for example capital increases or decreases, the grouping or division of shares or securities, exchanges or conversions of securities) or, more generally, the exercise of any right or privilege relating to securities or financial instruments. If the Bank is involved in any of the above-mentioned transactions on behalf of the Client, with the aim of protecting the latter's interest, it shall not under any circumstances bear any liability with regard to its choices and decisions.

## IX. Rental of safe boxes

1. The Bank may offer to rent safe boxes to the Client, located in the Bank's strong room.

2. If there are several renters, they shall have joint and severally liability with regard to their obligations to the Bank. These obligations are indivisible.

3. The Bank shall charge a rental fee for the entire rental period, at the rate applied by it, in exchange for making a safe box available. This rent shall be paid in advance, at frequencies to be determined by the Bank. If there are several renters, they shall be jointly and severally liable for the payment of the rent. The renter(s) shall remain liable for the rent until the keys are returned to the Bank.

4. It is expressly agreed by the parties that the Bank may terminate this rental at any time and at its discretion, without bearing any liability by notice of 15 (fifteen) calendar days sent to the Client by registered letter with acknowledgement of receipt, or by hand delivery against acknowledgement of receipt. In this case, the Bank shall return that part of the rent for the remainder of the rental period in progress to the Client, less any fees and charges which may be owed.

5. In the event that the safe box needs to be opened by force, for any reason whatsoever, any costs shall be borne by the Client, in particular those incurred for the repair of the safe box and/or the making of a new key or the installation of a new lock, and the Bank reserves the right to ask for help from anyone to carry out any such works.

6. The Client undertakes, under his/her own responsibility, to use the safe box as intended, and not to cause any loss to the Bank or to any third party. he/she undertakes not to place dangerous objects, explosive or inflammable products or products forbidden by the law and regulations in the safe box.

7. The Client shall take possession of the safe box and the keys in a good state of repair and operating condition. He/she undertakes not to make duplicates of the keys for any reason whatever and to return the keys at the end of the rental period. He/she shall also return the safe box to the Bank in a good state of repair and emptied of its content.

8. The Client may only have access to the strong room during opening working hours and after completing a form providing proof of this access. The Bank reserves the right to close the strong room at any time, in order to prevent risks and for reasons of security.

9. The Client acknowledges that the Bank is not aware of the content of the safe box and bears no liability in the event of the non-availability, disappearance or deterioration of its content caused by an event of force majeure, fortuitous events or any other event beyond the control of the Bank, or for any event for which there is no proof that it was caused by a wrongful misconduct on the part of the Bank or of its employees, for example the natural deterioration of the content, a natural disaster, floods or earthquakes, work stoppages, strikes, civil commotions, acts of war, riots, theft, fire, rebellion, political decisions, administrative, court or military decisions.

10. Similarly, if the Bank is prohibited from opening the safe box by a court order or other legal decision, it may keep the safe box closed

for the period of such prohibition, without prejudice to its rights arising under these General Conditions, in particular with regard to the collection of rent.

11. The Bank may however, as a precautionary measure and at any time it deems appropriate, examine the content of the safe box in the presence of the Client or his/her representative, before placing the content in the safe box, and may refuse to allow dangerous, harmful or illegal objects to be placed in the safe box.

12. Similarly, the Client releases the Bank from any liability in the event that he/she is unable to access its strong room for one of the above mentioned reasons, or as a result of a strike by its employees.

13. In the case of the loss or theft of the key, the renter shall notify the Bank immediately and in writing. If the Client subsequently recovers the key, he/she shall immediately inform the Bank in the same manner.

14. At the end of the rental period, or in the case of its early termination for any reason including but not limited to a failure to pay the rent or the abusive use of the safe box, the Bank shall have the right, fifteen days after sending a formal warning to the Client by registered letter, to request from the judge in chambers the appointment of an expert to open the safe box, at the expense of the Client, in order to carry out an inventory of its contents, to provide the safe box to the Bank and only return it to the renter after payment of all rental amounts and costs due.

15. In order to guarantee the performance of its obligations arising in connection with the rental, the Client shall pay a sum as a guarantee deposit, to be fixed by the Bank, which shall not bear interest and which shall be repaid to the client at the end of the rental period. It is however expressly agreed by the parties that the Bank shall be entitled to set off the amount of the guarantee deposit against any other amount owed by the Client to the Bank for any reason whatsoever.

16. The safe box may not under any circumstances be sub-let to a third party.

17. If there are several renters, they shall have joint liability with regard to the Bank for the payment of rent and fees, and the Bank shall be entitled to debit all sums owed to it from any one of their accounts or from a debit account opened at this time.

18. In the case of joint or collective rental, the terms and conditions of these General Conditions relating to the operating of joint or collective accounts shall apply *mutatis mutandis* to the relationship between the renters, on the one hand, and, between the renters and the Bank, on the other hand.

## X. Current account overdraft

The Bank may, at its entire discretion, agree to allow an overdraft to the Client on its current account in Lebanese pounds and/or foreign currency, for the purpose of its business. The operating of the account and the conditions governing facilities granted to the Client are governed by the terms and conditions set down in this section.

1. It is expressly agreed that the overdraft granted to the Client shall be used exclusively for its business, and the Client expressly undertakes to use such sums exclusively for its business. Notwithstanding any contrary provision, the Client acknowledges that the current account overdraft does not benefit from any specific term, and that therefore the Bank may withdraw this facility at any time. The Client shall therefore immediately repay all amounts due in principal, interest, commission, fees and ancillary charges to the Bank.

2. The Bank shall fix the maximum amount (limit) of the overdraft at its entire discretion. The Bank has the right to change this amount at any time. The Client shall immediately pay any amount in excess of the new authorized overdraft limit. Failing this, the Bank shall have the right to close the current account.

3. Any temporary exceeding of the overdraft level shall not under any circumstances be treated by the Client as a change in the authorized overdraft, and the Client undertakes to pay any amount in excess of this authorized level at the first request of the Bank. Failing this, the Bank shall have the right to close the current account.

4. The Bank shall apply interest and commissions, at the rates and tariffs and under the conditions applied by it, to deposits it makes in the current account. Interest and commission shall be determined and paid at the end of each calendar month, and capitalized in accordance with terms and conditions agreed by the Bank and the Client. On the other hand, unless otherwise agreed by the parties, deposits in the current account made by the Client shall not bear interest.

5. It is expressly agreed by the parties that the Bank may, at its entire discretion, oppose the entry of a receivable in the current account. Moreover, notwithstanding the provisions of article 303 of the Commercial Code, personal and/or real guarantees attached to receivables shall subsist and produce their full effect for the benefit of the Bank.

6. It is expressly agreed by the parties that receivables shall only be entered in the current account subject to their payment by the debtor. Accordingly, the Bank reserves the right to reverse the entry in the case of non-payment of the receivable by the debtor.

7. Apart from the Bank's right to close the account as set forth herein, each party reserves the right to close the account subject to at least 15 (fifteen) calendar days notice as from the date given to the other party,

or immediately in the case of the death of the Client or if the latter no longer has legal capacity. A final account balance shall be determined on the day of closure. Without prejudice to any remedy available to the Bank to recover its claim, this balance shall, as from the date of closure of the account, bear interest until full and final payment of all sums owed to the Bank.

8. When a deposit is comprised of trade bills, the deposit is deemed made subject to collection. If the trade bill is not paid on its maturity date, the Bank has the right, whilst retaining such bill as guarantee and exercising at its discretion associated rights, to reverse the entry and debit the Client's accounts.

9. The Client's account deposits must be recorded in writing.

10. The Client irrevocably undertakes to issue forthwith for the benefit of the Bank, at the latter's first request, promissory notes representing the amount of its overdraft. They shall be immediately available and may be discounted by the Bank at its discretion. The form, references and payment dates for these promissory notes shall be determined by the Bank. The non-payment of one or other of them on the maturity date shall automatically result in all promissory notes and receivables underlying such promissory notes becoming immediately due and payable.

11. The Bank reserves the right, with no notice to the Client, to convert at any time the sum owed by the Client further to the use of the overdraft into Lebanese pounds or into the overdraft currency, at the exchange rate at the date of the exchange transaction. The Client may not attribute any liability to the Bank as a result of this transaction.

## XI. Current account credit backed by trade bills

1. The Bank may at its discretion agree to grant the Client a current account credit secured by trade bills. These trade bills shall be either be endorsed in blank or endorsed for the benefit of the Bank, or pledged for the benefit of the latter by way of a pledge endorsement. The form, references and payment dates for these trade bills shall be determined by the Bank. It is further specified, as need be, that the terms and provisions of these General Conditions which apply to trade bills shall also apply to trade bills provided to the Bank as collateral for a credit.

2. The Bank shall determine the amount of the current account credit to be granted to the Client, on the basis of the trade bills provided to it by the Client as collateral.

3. It is expressly agreed by the parties that the Bank shall also have the right to apply these trade bills for the repayment of any other sum owed by the Client for any reason whatsoever to a branch of the Bank, in particular as a result of the non-payment of trade bills bearing its signature which are in the possession of the Bank.

4. The Client expressly undertakes to pay to the Bank forthwith the amount of any trade bill unpaid on the maturity date, with no requirement for the Bank to make any protest or to seek judicial or extrajudicial remedies whatsoever against the other signatories of the trade bills. The Bank's waiver of protest and/or other remedies constitutes an option which it reserves the right to use at its discretion.

5. If one or other of the signatories of the trade bill is declared bankrupt or suspends his/her payments, or if for any reason the Bank deems that one of the signatories of the trade bill provided by the Client as collateral has insufficient solvency, then the Client shall, at the Bank's first request, pay the amount or replace the trade bills by other trade bills which have been approved by the Bank. Should the Client fail to honor this obligation, the Bank shall have the right to request that the Client repays forthwith all amounts due under the credit granted to it; this amount shall be immediately payable and the Client may not invoke any additional payment period.

6. The Client authorizes the Bank to discount the trade bills, which he/she has endorsed for the benefit of the Bank or in blank, at any time, and to credit the net income to his/her current account. More generally, the Client acknowledges the Bank's right to cash all the trade bills provided to it as collateral, and/or irrevocably authorizes the Bank to complete the blank endorsements in the manner it deems the most appropriate in order to protect its rights.

7. The current account credit granted pursuant to these conditions is subject to the other terms and conditions hereof applicable to current account overdrafts.

## XII. Trade bills

The terms and conditions set forth below apply to trade bills of all types (including but not limited to bills of exchange, promissory notes and other instruments which may be transferred by endorsement).

### A. General provisions

1. The trade bills provided by the Client to the Bank made out to the Bank's order and/or endorsed for any reason whatsoever (including, without limitation, for purposes of collection, discount or guarantee), shall be approved by the Bank which may, at its discretion, decide whether to accept or refuse the trade bills presented to it.

2. The deposit of any trade bill shall be recorded in a bordereau signed by the Client and shall be subject to these terms and conditions, even if no express reference is made hereto.

3. The Client undertakes to provide the Bank with trade bills which are free of any defect or irregularity, and guarantees the authenticity of all signatures and the lawfulness of the endorsements shown thereon. The Client shall in addition deal under its own responsibility with the consequences of any default or irregularity concerning the said trade bills or any dispute or claim made by any party whatsoever concerning them, even after their payment. Similarly, the Client irrevocably undertakes to compensate the Bank for any resulting harm or loss suffered by it.

4. The trade bills provided by the Client to the Bank shall bear tax stamps for the amount of the applicable stamp duties. Failing this, the Client hereby grants all powers to the Bank to pay all stamp duties which should have been paid, without however the Bank being obliged to make this payment. In any event, the Client shall bear all taxes, duties and/or penalties due on the trade bills provided to the Bank regardless of the amount, such that he/she hereby authorizes the Bank to debit the said amounts from any of the accounts opened in his/her name with the Bank.

5. The Client expressly undertakes to pay forthwith to the Bank the amount of any trade bills provided to it and remaining unpaid on the maturity date, with no requirement for the Bank to make any protest or seek any remedies whatsoever against the other signatories of the trade bills. The Client also hereby authorizes the Bank to debit the said amount from any of the accounts opened in his/her name with the Bank. However, the Bank's waiver of protest and/or other remedies constitutes an option which it reserves the right to use at its discretion.

6. The Client's failure to pay or late payment of the amount of any trade bill provided to the Bank, for whatever reason (including, without limitation, for the purpose of collection, discount or guarantee), and bearing his/her signature automatically shall result in all other trade bills and the receivables underlying, such trade bills becoming immediately due and payable, without need for prior formal notice or any formality or any judicial or extrajudicial proceedings. Interest, commission and other costs shall be due and shall accrue automatically from the date of default until the date of full and final payment of all amounts due to the Bank. They shall be calculated at the rates and tariffs and under the conditions applied by the Bank and/or those agreed by the parties. The amounts due shall be debited from any of the accounts opened in the name of the Client with the Bank.

### B. Bank remuneration

1. In consideration for the transactions relating to trade bills (including, without limitation, transactions for the purpose of collection, discount or guarantee), the Bank shall collect interest and/or commission and/or fees at the rate and tariffs and under the conditions applied by the Bank and/or those agreed by the parties. The amounts due shall be debited from any of the accounts opened in the name of the Client with the Bank, without prejudice to the latter's right to require from the client their payment.

### C. Special provisions relating to trade bills deposited for collection

1. The Bank acts as representative for the collection of the trade bills provided to it by the Client for the purpose of cashing them. It is expressly agreed that the Bank can send the trade bills to its branches and correspondents located in Lebanon and abroad for the purpose of cashing them. They will be sent, without insurance, by messenger, post or by any other means on behalf of the Client, at the latter's risk and expense.

2. The Bank reserves the right to accept payment for the trade bills by all means (including but not limited to cash, cheque, wire transfer or account entry). The Bank's liability shall not be involved in this regard.

3. The Bank reserves the right to reverse the entry and debit from the Client's account the amount of any trade bill presented for collection, where the amount has been credited to the Client's account but the trade bills has been returned unpaid for any reason whatsoever.

### D. Special provisions relating to trade bills provided as collateral

1. Trade bills in Lebanese pounds or foreign currency (whether simple or documentary) guarantee the payment of any sum which the Client could owe to the Bank or one of its branches for any reason whatsoever and, more generally, to guarantee the proper performance of the Client's obligations to the Bank and its branches, whether or not due.

2. It is therefore expressly agreed by the parties that the net income from the payment of a trade bill shall be used to pay any sum in principal, interest, commission, fees and ancillary charges owed by the Client to the Bank, without prejudice to the rights and remedies available to the Bank against the Client.

3. If the trade bill is drawn in a currency other than that in which the Client's commitment is drawn, the Bank shall have the right to convert the amount into the currency in question, without notifying the Client, at the rate in force at the date of the exchange transaction, whatever the rate.

4. The Client expressly undertakes to pay the Bank forthwith the amount of any trade bill remaining unpaid on the maturity date, without need for the Bank to make any protest or to seek judicial or extrajudicial remedies whatsoever against the other signatories of the trade bill. The Bank's waiver of protest and/or other remedies constitutes an option which it reserves the right to use at its discretion. Moreover, notwithstanding the above, the Client acknowledges that the Bank is entitled to keep the trade bill in order to exercise all rights attached thereto against each of the signatories, until its amount has been repaid in full.

5. The trade bills provided to the Bank as collateral shall have no impact on the real or personal guarantee provided by the Client to the Bank. Similarly, other real or personal guarantees provided in the future by the Client to the Bank shall have no impact on the pledge resulting from the trade bills provided as collateral.

### E. Special provisions relating to documentary trade bills

1. If the trade bill is accompanied by a bill of lading and/or other documents, neither the Bank nor its correspondents shall bear any liability with regard to the legality, adequacy, accuracy or authenticity of the documents, nor with regard to the description, quantity, weight, quality, condition, packaging or value of the goods represented by these documents, all of the latter being the exclusive responsibility of the Client which shall also be responsible for the loading of the goods and their transport, arrival at their destination, unloading, storage and delivery to the addressees, and the taking out of any necessary insurance for the relevant period. Provisions applicable to goods and documents in the framework of documentary credits made available by the Bank shall be applicable mutatis mutandis to documentary trade bills.

2. The documents shall be delivered to the drawee against payment in full of the sight documentary trade bill or against full acceptance thereof if it has a maturity date. Unless otherwise instructed, the drawee shall await the arrival of the goods to take delivery of the documents and pay or accept the associated trade bill.

### F. General waiver with regard to making protest – Waiver of the presentation time limits

1. It is expressly agreed by the parties that the Client shall release the Bank from the need to make protest in the case of a refusal to accept or to pay, for any reason whatsoever, any one of the trade bills endorsed by the Client for the benefit of the Bank (including, without limitation, for the purpose of collection, discount or guarantee) and bearing the Client's signature in any capacity whatsoever (drawer, drawee, endorser, guarantor), the Client remaining in any event jointly and severally liable for its obligations under the trade bill with the other co-debtors. Similarly the Client expressly releases the Bank from the need to present the trade bill endorsed for its benefit for acceptance and/or payment within the time limits provided for in the law.

2. The Bank has in any event the right to claim payment from the Client, without the latter having the right to oppose such payment or prevent its enforcement by the courts or the Execution Bureau. The Client shall not ask the Bank to take any action against a third party and shall not take any action personally against any such third party until full payment of the trade bill in principal, interest, fees and ancillary charges.

3. It is also agreed that the Client shall in any event and under all circumstances remain jointly and severally and indivisibly liable for the payment of trade bills bearing his/her signature and endorsed for the benefit of the Bank, regardless of the situation of the other signatories of the trade bills, and regardless of whether formalities relating to the protest have been made and whether or not they have been completed against the Client or against the other co-debtors.

4. Similarly, the Client shall remain responsible for the debt and its repayment in full in principal, interest, commission, fees and ancillary charges.

### XIII. Opening of documentary credits

The Bank may, at the Client's request and at the Bank's discretion, agree to provide a documentary credit governed by these General Conditions and the special conditions relating to each documentary credit:

1. The Bank reserves the right to accept or refuse any request for documentary credit, without either having to justify its decision or inform the Client in writing.

2. Unless otherwise agreed, documentary, credits shall be governed by the current Uniform Customs and Practice for Documentary Credits issued by the International Chamber of Commerce, together with the successive amendments thereto. In any event, the Bank's does not assume any liability of any nature whatsoever as a result of special measures to be taken, or the commercial and banking practices in force in the various foreign countries concerned by the documentary credit.

3. Unless otherwise agreed, documentary credits are irrevocable. The Client shall state, for each transaction, whether the Bank shall need to request its correspondent to confirm the availability of the documentary credit to the beneficiary.

4. The period of validity of each documentary credit shall be set down in the request for such documentary credit. The end of validity

of the documentary credit shall, unless otherwise provided, be the last date fixed for negotiation of the documents by the beneficiary with the correspondent, even if the documents bear a date falling within the payment period.

5. The Bank and/or its correspondents shall bear no liability whatsoever regarding the form, adequacy, validity, authenticity or legal scope of any document whatsoever or any of the general or special conditions or reservations, whether handwritten or printed, included therein or added thereto. Similarly, they shall bear no liability whatsoever concerning the description, quantity, weight, quality, condition, packaging, delivery or the value of the goods represented by the documents, or with regard to the terms and conditions or the good faith or actions of the dispatcher, transporter or insurers of the goods or of any other third party, or regarding the latter's capacity to meet their obligations. More generally, all of the above shall be the Client's exclusive responsibility.

6. The Bank and/or its correspondents shall not under any circumstances be held liable for the loss or destruction or the falsification of any correspondence whatsoever exchanged with regard to the documentary credit (including but not limited to letters, telegrams, telexes, facsimiles or by Swift) or any delay, default or negligence in their dispatch. Similarly, they shall have no liability for any mistaken interpretation or translation error, or for any instructions which may be given by the transporters or insurers. Any correspondence shall be sent at the expense and risk of the Client.

7. Unless otherwise provided, bills of lading shall be drawn or endorsed for the benefit of the Bank. The Client shall, under his/her exclusive responsibility and at his/her expense, insure the goods concerned by the documentary credit(s) against all risks (including but not limited to customs risks) and shall name the Bank as the beneficiary of the insurance policy. The terms and conditions of the insurance policy shall be approved by the Bank and the Client undertakes to make any change to the policy which may be requested by the Bank, and to provide the policy to the Bank immediately on signature. The insurance policy shall also be drafted such that the Bank may, in the event of a claim, collect the indemnity to be paid by the insurer(s) directly and easily. The Client further undertakes to pay insurance premiums at the due date. Failing this, the Bank shall have the right but not the obligation to pay the said premiums in the stead of the Client and to debit their amount from any of the Client's accounts opened with the Bank or its branches.

8. In the case of a accident of any nature whatsoever, any indemnity collected by the Bank from the insurer(s) may be used to repay the credit granted by the Bank to the Client, without prejudice to the Bank's right to claim for the repayment of the credit in full. More particularly, the Client may not invoke an action in progress or about to be initiated against his/her insurer(s) in order to refuse or delay the repayment of his/her credit.

9. The Client shall, under his/her own responsibility and at his/her expense, bear the costs of any action which may be taken against his/her insurers, without any such action interfering in any manner whatsoever with the satisfaction of his/her obligations to the Bank. The Bank is not under any circumstances obliged to take any measures, make any claims or take any action whatsoever against the insurers and its liability shall not be involved if no such measure, claim or action is taken. Such measures, claims or actions shall remain the exclusive prerogative of the Client, without prejudice to the right, but not the obligation, of the Bank to take action with or against the insurers. Accordingly, the Bank may request the Client to repay the credit in full and to pay the interest, commission, fees and ancillary charges which he/she owes to the Bank, it being for the Client to take the necessary measures and action against the insurers in order to recover the insurance indemnities due to him/her.

10. The Bank may at its discretion and at the Client's expense, take any necessary measures and/or make any payment it deems necessary in order to protect the goods and ensure their arrival at their destination in good condition, it is being understood that the Bank shall bear no liability in the event that it does not carry out any of the above mentioned actions.

11. The Client undertakes to repay to the Bank, at the latter's first request, all the costs he/she has incurred. Similarly, the Bank has the right to debit the amount of any such costs from any one of the Client's accounts.

12. The Client hereby unconditionally and irrevocably grants all powers to the Bank in order to buy and/or sell and/or convert, in the Client's name and at any time, in one or more installments, foreign currency at the rate in force at the date of the transaction, whatever such rate and without need to inform the Client in advance, in order to repay the documentary credits drawn in a currency other than that of the credits granted by the Bank to the Client.

13. Unless otherwise provided, at the time of granting the credit, the Client undertakes to deposit a sufficient sum as provision with the Bank to guarantee the performance, in whole or in part, of its obligations to the Bank, it being understood that this provision shall not bear interest for the benefit of the Client and may be drawn in Lebanese pounds or in foreign currency as decided by the Bank. The Bank shall fix the amount of this deposit which it may, at its discretion, use to repay any amount in principal, interest, commission, fees and ancillary charges which may be due by the Client pursuant to the documentary credit or to exchange transactions made in connection with the documentary credit.

14. If the amount of this provision is less than the sum due to the Bank in principal, interest, commission, fees and ancillary charges, the Bank shall be entitled to debit the difference from any of the Client's accounts with the Bank, and/or a debit account which shall be opened in his/her name, without need to inform the Client in advance. This difference shall bear interest at the rate applied by the Bank. This interest shall be capitalized in accordance with the conditions applied by the Bank. Similarly, the Client undertakes, at any time, to provide to the Bank, at the latter's first request, a sufficient deposit, whose amount shall be determined by the Bank, in order to cover his/her commitments to the Bank relating to the documentary credit, including but not limited to in the case that the Bank had agreed to grant a documentary credit without first requesting the constitution of a provision.

15. The amount of each credit shall be paid to the beneficiary against provision to the Bank or its correspondent of the documents listed in the credit request.

16. If the value of the goods falls below the amount of the credit and/or the amount of the trade issued but not yet due, the Client undertakes to pay to the Bank, at the latter's request and as security, a sum at least equal to this decrease in value.

### XIV. Issuance of personal guarantees

The following conditions shall automatically apply to all personal guarantees (first demand guarantee or simple or joint and several sureties) issued by the Bank at the request of the Client for the benefit of any natural person or legal entity, whether public or private.

#### A. General provisions

1. The Bank is free to accept or refuse to issue the guarantees requested by the Client, without having to give reasons for any refusal. The Bank enjoys discretionary power in this respect.

2. The Bank may at any time and if required by the circumstances, ask the Client to pay the full amount of the guarantee as a provision. In this case, the Client undertakes to pay the said amount forthwith to the Bank. The Client hereby grants all powers to the Bank to debit the amount of the provisions from any of his/her accounts with the Bank. The provision shall be blocked by the Bank and may not be reclaimed or used by the Client until the latter has discharged his/her commitments to the Bank with regard to the guarantee and/or until the guarantee has lapsed.

3. Notwithstanding the above, the Client hereby grants all powers to the Bank to dispose of the above mentioned provision in order to discharge himself/herself from his/her commitments to the beneficiary of the guarantee.

4. The Client undertakes to repay the Bank forthwith, on the latter's first request, any sum due under the guarantee, including but not limited to any sum in principal, interest, fees and ancillary charges and/or damages paid under the guarantee. The Client hereby irrevocably and unconditionally grants the Bank the right to debit, without prior notice, all sums that the Bank is called on to pay pursuant to the guarantee from any one of his/her accounts and/or from a debit account which shall be opened in his/her name.

5. The Client also hereby irrevocably and unconditionally authorizes the Bank to convert any sum due under the guarantee into the guarantee currency, such sum to be debited from any one of the Client's creditor accounts with the Bank.

#### B. Financial conditions

1. The Client shall pay stamp duties and all other taxes and duties due under the guarantee. In exchange for issuing the guarantee, the Client shall pay commission to the Bank, payable in advance in accordance with the tariffs and conditions applied by the Bank or at a rate jointly agreed by the parties. This commission shall apply until the guarantee lapses. The amount, together with any sum in principal, interest, commission, fees and ancillary charges owed by the Client pursuant to the guarantee may be debited by the Bank, without prior notice, from any one of the accounts opened in the Client's name with the Bank and/or from a debit account to be opened in the Client's name.

#### C. Special provisions relating to first demand guarantees

1. If a first demand guarantee is provided or if the wording of the guarantee letter provides that the Bank shall pay the amount on the due date or issue a new guarantee letter under the same conditions as the previous guarantee, the Bank shall perform its obligations (including the payment of the guarantee) at the request of the beneficiary, without having to give prior notice to the Client, and without the latter having the right to oppose this or raise a defense on the basis of its relationship with his/her creditor.

#### D. Special provisions relating to simple and joint sureties

1. The Client acknowledges that the Bank is a third party to the Client's relationship with the beneficiary of the surety or with any third party and that therefore the Client irrevocably undertakes not to oppose, in any manner or for any reason whatsoever, the Bank's execution of the surety (including on the grounds that the Bank may have invoked the benefit of discussion or division, that the debt or obligation no longer exists or is invalid).

2. Moreover, the Bank shall not be bound to inform the Client before the payment of the amounts claimed by the beneficiary of the surety,

and the Client hereby irrevocably and unconditionally waives the right to invoke the loss of the guarantor's recourse referred to in Article 1086 of the Code of Obligations and Contracts.

## XV.  Internet, Mobile Phone and ATM Services

1. The Bank offers its clients the possibility to subscribe to its Internet, Mobile Phone and ATM Services and undertakes to use its best efforts to ensure that its Internet Service operates under optimal conditions, to ensure the execution of the orders received and the confidentiality of information provided.

### A.  Definitions

- **Bank:** means BLC Bank S.A.L. wherever it is used.
- **Services:** means the services allowing the carrying out of financial and banking transactions through electronic means.
- **Financial and banking transactions performed through electronic means**: wherever it is used in the current terms and conditions, means all the financial and banking services, information and transactions available through the internet, mobile phone, ATMs or through any electronic or digital means that BLC Bank S.A.L. makes available to his clients 24 hours a day every day.
- **Subscriber:** means, wherever it is used, the Bank's client who has applied with the Bank for the subscription to the services allowing the carrying out of financial and banking transactions through electronic means and/or any person who has used any of the services offered by BLC Bank S.A.L. through any electronic means.
- The **key** comprises the username and password, in addition to either the PIN or Token which is used depending on the type of service requested.
- **Token:** is a means used by the Bank for specific type of transactions carried out by legal entities and/or individuals through the internet in order to guarantee the highest degree of protection. It consists of a wireless device directly connected with the subscriber's key number and on which appears a ONE TIME PASSWORD (OTP) for each access by the latter of his/her accounts through the internet. The subscriber must enter the OTP in addition to his username and password. This is an additional verification that the transactions which are requested to be performed and the execution of which requires the entering of the OTP appearing on the Token are made by such subscriber, as well as additional protection against piracy acts.
- **MPIN:** is an identification number which has to be entered when accessing some services requested to be executed through the mobile phone, such as wire transfers and change of personal information .... in the BLC MB service. The PIN number must also be entered for each transaction whose value exceeds the ceiling amount determined by the Bank for the payment service through mobile phone BLC MB.
- **Lock pattern:** is a specific pattern to connect points appearing on the screen, determined by the user. The user will be later requested to draw such pattern when accessing the payment service through mobile phone.
- *Interruption caused by the updating of the information necessary for the proper operating of the service or required for the purpose of maintaining the IT system.*

### B.  Internet Services

This service allows the Client to either make a subscription for the sole purpose of checking his accounts activity and/or for the purpose of:
- obtaining the accounts balance, transferring funds from or to any account and checking his accounts and issuing recurrent payment orders in relation to any account;
- transferring funds from any of his accounts to another person's account opened with the Bank or with another financial institution, or to another of his accounts opened with another financial institution, provided that the aggregate daily transfers amount shall not exceed the daily services ceiling or its equivalent amount as determined by the Bank if the transfer was made in a foreign currency.
- transferring salaries from the clients' accounts to their employees' accounts opened with the Bank;
- purchasing or selling foreign currencies, provided that the purpose of purchasing the currency is to transfer it between the Client's accounts. If the order to purchase or sell a foreign currency is for a value which exceeds the daily service ceiling amount, any exchange rate shall be deemed to be given as an indication only. The exchange rate prevailing on the date and at the time of execution of such transaction by the Bank shall be retained.

### C.  Mobile Phone-Based Services BLC MB

This service is downloaded on the mobile phone and comprises two pages. The first page is an unsecured page which any person is permitted to access, not only a client of the Bank. It contains information and announcements relating to the Bank, its branches and the services that it offers.... The second page is a secured page specific to the Bank's clients which enables them to, inter alia, execute transfers between their personal accounts or to third parties which are or are not clients of the Bank and other transactions.

### D.  Mobile Phone-Based Payment Service "HEY BLC"

This service is downloaded on the mobile phone as prescribed by the Bank. The Client will designate the lock pattern (a PIN number required to access the mobile phone-based payment service "BLC HEY") in order to access and use HEY services. These services enable Bank customers to make payments to others and pay their bills to third parties, whether or not they are Bank customers, using their mobile phones and from a current credit account, opened electronically and specifically for this service with a ceiling set by the Bank. The following terms and criteria on using these services shall apply:
- A specific limit or ceiling, determined by the Bank, on the amounts and a maximum number of transactions that may be done.
- A specific ceiling amount determined by the Client for all transactions, provided that it does not exceed the ceiling established by the Bank.
- A specific ceiling amount determined by the Bank for each transaction. The Client must enter his/her PIN number for each transaction whose value exceeds this amount.
- A specific ceiling amount determined by the Client each transaction, provided that it does not exceed the ceiling amount set by the Bank. The Client must enter his PIN number for each transaction whose value exceeds this amount.

- Using this mobile phone service requires the Client to identify himself in accordance with the identification methods adopted by the Bank and which consist of entering the required key for each service. The key is highly confidential and may only be used through the internet, phone or any other electronic devices in an encrypted form. In addition, the password is delivered in a sealed form to the Client, ensuring that none other than the Client will receive it, unseal it and see it. Overall, the Client shall be responsible for the protection and use of his key, and must take all appropriate measures to ensure its security and to not disclose it, given that each transaction the Client executes requires that he enters his key, which is considered akin to his signature, and as such, a confirmation of the validity of this transaction and an attestation that it was executed by him personally. The Client may not object to the execution of said transaction for any reason.
- As a consequence, the Client acknowledges the validity of the transactions and entries recorded on his accounts, and waives any dispute or objection in this regard. The Client may not claim any damages for any losses incurred.
- The Bank may later, as part of maintaining the highest level of security, and if the Bank believes it is necessary depending on the type of transaction involved, require the Client to change the password periodically. To this end, a message from the Bank will appear on the Client's computer screen or mobile phone. The Bank shall not, in any case, be held liable for losses that may ensue from the misuse of these devices (computer or mobile phone).
- The Bank has full authority to discontinue this service immediately without notifying the Client once a dispute between the latter and the Bank arises, and the Client may not claim any damages as a result of this immediate termination.

### E.  ATM Services

These include two types of services:
- First type: This service allows Clients to deposit cash and checks using an envelope provided by the Bank, describing the terms and conditions of the transaction. The card holding Client must fill out and sign the form in order to finalize the transaction. Envelopes deposited before 1:00 p.m. will be processed on the same day, while envelopes deposited after 1:00 p.m. will be processed the next business day. After the deposit transaction is complete, the Client receives a receipt that contains the number of the deposited envelope.
- Second type: This service allows customers to directly deposit checks and bills in US dollars and/or Lebanese pounds and/or euros but no coins are allowed. These are counted by the ATM and converted into the currency of the account, to which the deposit is made, after the exchange rate is displayed to the Client on the screen. Afterward, the ATM produces a detailed statement of the transaction to the Client. The maximum amount of the deposit transaction, regardless of its type, and whether it is made automatically or through the branch, must not exceed ten thousand US dollars per day.
- The Bank reserves the right to add, cancel, or suspend any type of services provided. Furthermore, the Bank shall have full discretion to amend and upgrade the programs to ensure their consistency with the required standards, or to add new programs, services, or protection systems.
- When depositing cash via an ATM, the cardholder will be responsible for placing the money inside the designated envelope, sealing it tightly, and inserting it in the opening designated to receive deposits. Moreover, the cardholder must ensure that the deposit information that appears on the ATM screen indicates that the amount inside the envelope is the same amount inserted into the ATM. The Client must also ensure that the account in which the amount is deposited is the correct account.
- When depositing checks, the cardholder will be responsible for endorsing them correctly to the order of the Bank, recording under his signature the account number where the checks are to be deposited,

placing the checks inside the designated envelope, tightly sealing the envelope, and inserting it into the opening designated for this type of transaction. The amounts of checks deposited in the cardholder's account are recorded after they have been actually collected and under the cardholder's responsibility.

### F. General Terms
**Proof of transactions**

1. It is expressly agreed that the reproduction of orders on media held by the Bank shall be binding on the parties and shall constitute proof of transactions carried out by the Client. These media may take any form (paper, computer files or other).
2. These media shall be kept for a period of one month as from the date of execution of the transactions. After this date, the Client shall be deemed to have approved, and acknowledged the validity of, the transactions and any claim will be inadmissible.
3. Claims must be made within the above mentioned time period, by registered letter with acknowledgement of receipt, sent to the branch which holds the account.

**Opposition**

1. The Bank shall provide through any permitted means a username and a password to the Client, to allow the latter to carry out his/her transactions through the Internet. In case of the loss or theft of the username or the password, the Client shall inform the Bank forthwith, by registered letter with acknowledgement of receipt, or by telephone or facsimile in the event that he benefits from the two aforementioned services, and shall confirm his/her opposition by hand-delivered letter or by registered letter with acknowledgement of receipt sent to his/her branch. Access to the service shall be blocked immediately on the Bank's receipt of the information. The service shall become available again, with a new username or password, once the Account Holder has sent written instructions to the Bank. The Bank shall have no liability with regard to the loss or theft of the username or the password, nor for the Client's wrongful use of his/her user name or password.
2. The date of receipt of the opposition letter shall be binding on the parties.

**Conditions for the use of all services:**

1. The key determines the identity of the Client and the identity of the persons delegated by the Client when accessing the services. The key is regarded as the Client's legally binding signature vis-à-vis the Bank. Using the key indicates the Client's final and irrevocable approval that the Bank, without further action, shall execute the requested transaction.
2. The Client may, at his own discretion, only change the password at any time without consulting with the Bank, or upon the request of the latter.
3. Entering wrong key several consecutive times will deny the Client access to services.
4. Should the password be exposed, stolen, pirated, or forgotten and/or should the Client be denied access to the services as a result of entering the wrong key several consecutive times, the Client must immediately notify the Bank in writing, either by fax, e-mail (provided that the e-mail message is sent from the Client's e-mail address disclosed to the Bank), or via registered mail with acknowledgment of receipt, in order for the Client to be issued a new identification key in accordance with Bank procedures. The Client shall remain solely liable for all transactions executed before the Bank receives the notification of the abovementioned events, and the Bank shall not incur any liability or responsibility as a result, or be demanded to pay damages for any reason whatsoever.
5. The Client shall be liable for money lost due to unauthorized transactions executed in his account, should the loss take place before notifying the Bank in writing that the Client's key has been misused, lost or become known to others.
6. The Client shall be responsible for operating and maintaining his equipment, and shall undertake to pay subscription, communication, and operating costs as well as the charges owed to the Bank in return for these services, should the latter request these.
7. In any event, the Bank shall not be liable for any errors or malfunctions that affect the Client's equipment, or any virus or problem that may occur as result of the Client's use of the service. Likewise, the Bank shall not be liable for the loss or theft of the Client's phone or laptop, or for the Client's failure to comply with the guidelines given to him in writing or electronically displayed upon accessing or using the services.

**Protection of the Key**

- The Client shall undertake, under his full responsibility, to not disclose his key to others, and shall be deemed liable for all transactions executed with the use of this key by others, especially that the Bank is bound to execute transactions requested properly with the approved key without incurring any liability. The Client must maintain the confidentiality of his key and take the measures to prevent its unauthorized use. Therefore, the Client must not tell, disclose to, or otherwise share his key with others (including family members and friends). Furthermore, the Client must not leave behind any document that could enable others to identify the key. The Client must not choose a password that represents his birthdate or any part of his name that is easy to identify.
- When joining any of the services, and in order to activate the service, the Bank will provide the Client, depending on the service requested, with either an activation code for the mobile phone, sent to the Client's e-mail address linked with the online services to which the Client is subscribed, upon requesting the service, or otherwise the Bank will provide the Client with a password in a sealed envelope for available online services. The Client must change this password when accessing the service for the first time, whenever needed, and/or when the Client is electronically requested by the Bank to change it for security reasons.
- The Bank will not, in any case or under any circumstance, ask the Client to disclose the password. Likewise, the Client must not disclose the password, even if he receives a message from the Bank (which could be an act of piracy) requesting to know the password.

**Legal Entity**

If the Client is a legal entity, the Client must notify the Bank in writing of the following:
- Name(s) of authorized signatories who may access and use the services pursuant to the required terms and conditions.
- Any changes to the names of authorized signatories.
- The signature of legal entity's authorized signatories on applicable terms and conditions shall indicate their confirmation that they have reviewed and accepted the same. Moreover, the person signing these terms and conditions shall be the person authorized by the legal entity, absent any documents or instructions to the contrary, to receive the key, access, and carry out banking transactions on accounts belonging to the legal entity. The Bank shall not be liable if the authorized representatives continue to use the services and carry out transactions after losing their powers if the Bank is not notified in writing of these changes. All transactions of any kind performed on the legal entity's accounts until the date the Bank is notified shall be valid and effective, and the Bank shall be exempt from any liability in this regard.
- The Bank shall deliver to the legal entity, through its representative authorized signatory, one key dubbed "the main key" (consisting of a username, a password, and a Token). The main key is the only means the legal entity is able to generate a new key(s) from the main key, also consisting of username, password, and token, in order to assign to secondary users. Furthermore, the legal entity will be able to set a ceiling for the transactions that may be carried out through these keys, whereby the secondary users can access the legal entity's accounts and perform the transactions designated to them by the main key holder. The legal entity shall bear full responsibility for these activities and the Bank shall not be involved in these or with the secondary persons, their identities, keys, or designated ceiling of the transactions they may perform. All such matters shall be confined to the legal entity, and under its full responsibility, on condition that the secondary key holder personally visits the Bank in order to receive his token.
- In this regard, the Bank confirms that it does not execute any transaction initiated by secondary key holders unless their access has been electronically approved using the key token that belongs to the main legal entity, as the Bank does not recognize the secondary persons' tokens and keys, but rather executes the transaction because the main legal entity's key is used in the requested transaction through the secondary person. The use of the main legal entity's key proves that the transaction is initiated pursuant to an authorization from the legal entity, represented by its authorized signatories, to the secondary person under the legal entity's responsibility.
- The legal entity may not hold the Bank accountable for the wrong entry, piracy, or disclosure of password, or similar actions done by the legal entity's authorized representative, in regard to the requested transactions, and shall acknowledge in advance that the execution of such transactions is valid.

**Legal Entities/Authorized Third Person**

The Client of the Bank that is a legal entity may authorize a third person (primary users) to act on its behalf in initiating and executing electronic transactions by means of a written authorization signed by the principal Client (authorizer) and approved by the Bank. This authorization empowers the authorized third person to generate a key (consisting of a username, a password, and a token) that enables him to:

- Generate and activate principal Client key(s) derived from the authorized person's key, so that transactions of all kinds must pass through the principal Client's key generated by the authorized person, and must be approved by the principal Client;
- Access the accounts of the legal entity and execute transactions using the available services;

The proper use of the key by the authorized third person is akin to the principal Client's agreement to access and review his accounts as well as use all available services. The principal Client shall remain the only person authorized to cancel and terminate the authorized third person's access to the Client's accounts as part of the service

provided to him in this regard. The Client shall remain liable for all the transactions performed by the authorized person. The Client is deemed to have reviewed, through the authorized person, the content of these terms and conditions, and to have complied with them.

- The legal entity may not hold the Bank accountable for the wrong entry, piracy, or disclosure of password, or similar actions done by the legal entity's authorized representative in regard to the requested transactions, and shall acknowledge in advance that the execution of such transactions is valid.

### Time for Using the Services

The Client may use the services around the clock and at any venue. The Client agrees that routine maintenance, system overload, and circumstances beyond the Bank's control entail that it is impossible to make the aforementioned services always available during or outside the Bank's business hours, given the nature of the internet, the Bank's website may not be sometimes accessible for technical or operational reasons. Hence, the Bank shall not be liable for any losses or for failure to receive transactions due to poor and/or lack of connection and access to the services.

### Constraints on the Use of Services and on Certain Transactions

The Client shall acknowledge and agree not to hold the Bank liable for the outcome of Bank decisions that the Bank has the discretionary power to make, including the following:

1. The Bank may refuse to execute transactions requested by the Client if the transaction does not comply with applicable terms and conditions, other agreements that the Client signed in with the Bank separately, and with the requirements of public policy, the provisions of the Central Bank of Lebanon as well as applicable international and domestic laws.

2. The Bank, pursuant to current terms and conditions, may prevent the Client from accessing any services at any time without citing the reasons and without a prior notice, and the Bank shall not be liable for any losses or damages that could ensue from the execution of the above.

3. The Bank, at its sole discretion, may set a ceiling for amounts in certain requested transactions, and shall not be bound to provide justifications in this regard.

### Notifications and Correspondence

- The Bank, without any obligation in this respect, may send messages by e-mail, to phone through the Short Message Service (SMS), via fax, or in writing, in order to notify the Client of all the financial and banking transactions that the Client has performed on his accounts through electronic means, and the Client shall inform the Bank of any objection in writing and within five days from the date of sending the communications, otherwise the transaction shall be considered valid.
- The content of correspondence provided through electronic means, may include:
  • Any amendments, changes, or additions that apply to the current terms and conditions.
  • The transactions carried out by the Client through financial and banking transactions performed through electronic means.
  • Any advice, notifications, periodical, or basic information related to the electronic services.
  • Any correspondence pertaining to Client service.
  • Any other correspondence related to services, accounts, or marketing products and services.
- The Bank shall not be liable for any delays in the delivery of electronic correspondence to the Client should such delay result from factors beyond the Bank's control. Furthermore, the Bank shall not be liable for inaccurate or incomplete message content and for any delay, error, misunderstanding, malfunction, or failure in sending messages should such events ensue from the use of communication devices or malfunction thereof.
- All correspondence sent by the Bank, through any means, to the electronic or physical address provided by the Client shall be considered duly notified by the Client from the time it is sent, even if the Client does not receive it for any reason.

### Determining Liability

- Despite using the most effective protection tools, in addition to the special care taken in carrying out transactions, the Bank cannot ensure the complete protection of information transferred electronically in financial and banking transactions, given the nature of the internet, and shall take due diligence with respect to all aspects of sending and receiving information. Therefore, the Bank shall not bear any responsibility with respect to the transfer of information although it ensures its protection in its systems and upon receipt.
- The Bank shall not be deemed liable when the reasons for not fulfilling its obligations are attributed to factors beyond its control, or to the lack and/or quality of communication networks. Further, the Bank shall not be deemed liable for the outage of services for contingent reasons, natural disasters, or force majeure, and in particular those that result from power or phone communication outages, poor communication networks, or the Client's own equipment and devices (specifically the computer, software, modem, mobile phones, etc.) which enable him to access the service.
- The Bank shall not be held responsible in the event of piracy, if the computer is infected by a virus, or for any action that is beyond its control.
- The Bank shall not be responsible for errors, delays, and other matters beyond its control that may occur during the execution of the Client's instructions through the use of electronic financial and banking services, and if service is disrupted for any reason.

### Customer's Rights and Obligations

The Client shall release the Bank, definitely and irrevocably, from the banking secrecy obligation toward the companies the Bank contracts with or may contract in relation to the current terms and conditions, including those through which e-mails, of all types, are transferred, and those that transfer information in order to implement activities pertaining to financial and banking transactions performed through electronic means, and towards natural and legal persons that operate or may operate the services. Therefore, the Client shall acknowledge that the Bank is entitled to provide the abovementioned persons with any verbal or written information or any documents, of whatever nature, pertaining to the Client's transactions conducted online or on a mobile phone, when the Bank is requested to do so pursuant to the law and regulations governing the relevant banking transaction, or when the Bank is ordered to do so by the authorities in Lebanon and abroad, or for any transaction or action the Bank takes in order to ensure its rights under these terms and conditions.

### Framework of Electronic Financial and Banking Services and Transactions

1. The Client shall acknowledge that he is aware that any information pertaining to his accounts or banking transactions he performs through any of the services may not be executed and processed immediately if these transactions require verification by the Bank. The Client shall further agree that the information provided through electronic financial and banking services and transactions must not be considered at any time as definitive with regard to his account balance or the status of his transactions, and the Client may not hold the Bank accountable on that basis. Hence, the Bank does not guarantee the timely accuracy of account or transaction information which the Bank receives through electronic financial and banking transactions.

2. Electronic banking transactions cannot be executed unless their amount is consistent with the ceiling established by the Bank, and the available balance covers the transaction.

3. The execution of banking transactions (transfer, objection, etc.) shall be carried out on the same day if they are performed and validated within a business day and during the Bank's business hours. If the transaction is performed outside of the business hours or on a holiday, it will be executed on the next business day.

4. Transactions that require foreign currency conversion shall be executed in accordance with the prevailing exchange rates at the time of execution.

5. The Client may cancel the transaction as long as it has not been executed, by calling the Bank to cancel the transaction if the Client has subscribed to this service.

6. The exchange and interest rates shown through the electronic financial and banking transactions are for information only, and may be changed without any advance notification by the Bank.

7. No banking transaction or transfer from the Client's personal account to another account held at the Bank may be executed until the prior written approval of the accountholder benefiting from this transfer or said banking transaction has been obtain.

### Customer Service Fees, Commissions, and Expenses Payable to the Bank

In return for any services made available online for the use of the Client, the Bank shall receive a fee in accordance with prevailing fees throughout the course of the Client's subscription to the said service. The Client shall be notified of any amendment that applies to him or to the calculation of the commissions. The notification shall take place using all means, particularly a letter sent to the Client at least fifteen days before the said amendment comes into effect. Should the Client disapprove this change, the Bank may then request that the Client unsubscribes to the online service.

It is explicitly agreed that the Bank shall apply the fees, commissions, and charges it usually applies to all banking and financial transactions, including those carried out electronically. To this end, the Client authorizes the Bank from then on, definitely and irrevocably, to collect from his accounts at the Bank, and without notice to the Client, the amount of fees and commissions payable to the Bank under the current terms and conditions or in return for the transactions he carries out electronically.

**Duration and Termination of the Current Terms and Conditions**

Subscription to the electronic financial and banking services and transactions pursuant to the current terms and conditions shall be for an indefinite period, and shall take effect starting on the date of signing the current terms and conditions contract. The Client and the Bank, each separately, may terminate the current terms and conditions at any time. The termination shall be deemed in effect for the Bank from the date the Bank sends a written letter to the Client at his residence notifying him of its wish to discontinue his subscription to the service, and for the Client from the time he visits the Bank and signs a written notice stating his wish to unsubscribe to the electronic service. The termination of the subscription, regardless of its reason, shall not entail any compensation.

It is also explicitly agreed that the electronic service shall automatically stop from the moment the Client's accounts at the Bank are closed, without the need for any notice or notification whatsoever, and the Client may not, in any way, hold the Bank accountable for this measure. All transactions that are requested but not yet executed during the day on which the subscription to the electronic financial and banking transactions is terminated by the Client shall be automatically cancelled. The electronic financial and banking transactions shall automatically be suspended once the Bank is notified of the Client's passing away.

The Bank may terminate the subscription without carrying out any measure or notification if the Client commits material error or violations or has abused the service.

**Amendment of the Terms and Conditions Pertaining to Electronic Services**

- Considering the potential technological developments and improvements that could apply to the quality and efficiency of services, the Bank shall reserve the right to make upgrades and changes in the services made available through electronic financial and banking transactions, and to introduce the amendments the Bank deems fit to the current terms and conditions.
- The Client shall be informed by e-mail, through special text messages, or through any other means of notification about the amendments to the current terms and conditions, and shall be immediately invited to review such amendments at least 15 days prior to the date on which these amendments will enter into force.
- The Client may terminate the current terms and conditions should he not approve the current amendments. No compensation shall ensue from said termination. Should the Client not object in writing to the amendments, or continue to use the service after the lapse of the period specified above, the Client shall be deemed in agreement with the said amendments.

**Contractual Documents and Applicable Law**

The current terms and conditions as well as their possible amendments, pursuant to later supplements that the Bank hereby reserves the right to introduce at any time, shall form an integral part of all contracts, records, and documents signed and to be signed by the Client for all that is not inconsistent with their content, and the use of any service after the date on which the amendment becomes effective shall be deemed akin to the Client's unreserved approval of that amendment. The electronic financial and banking services and transactions subject of the current terms and conditions shall be governed inter alia by the provisions of Law No. 75/1999 on the Protection of Intellectual Property. This protection shall include, in particular, all information available on the Bank's website, including logo, design, fonts, and pictures protected by copyrights, trademarks, certification rights, and any other right recognized by Lebanese statutes. These may not be transferred or copied for commercial or noncommercial purposes, whether fully or partially.

## CHAPTER 03: COMPLIANCE WITH THE U.S. FOREIGN ACCOUNT TAX COMPLIANCE ACT (FATCA)

**Addendum to the General Conditions**

In view of the recent enactment by the United States of America of the Foreign Account Tax Compliance Act (known as FATCA), Foreign Financial Institutions and insurance companies outside the United States commit to comply with the said law and to report to the U.S. tax authorities creditor accounts opened with them under the names of any of the following persons:

- U.S. citizens or those naturalized later on
- Green Card holders or those who became Green cardholders later on
- Permanent U.S. residents or those who have resided in the U.S. for at least six months during the three-year period preceding the date of the disclosure to the Bank
- Companies registered in the United States
- Companies registered outside the United States and in which any of the abovementioned persons owns 10% or more of the capital in his own name or in the name of his ascendants, descendants, brothers, or sisters, whether directly or indirectly.

This shall apply whether the account is opened in the name of any of the persons mentioned above or whether such person is the holder of the economic rights relating to an account opened in the name of a person who does not hold the U.S. citizenship or is not subject to taxes in the Unites States of America.

Since BLC Bank S.A.L. is bound by the provisions of said Act, every customer, whether natural or legal person, must authorize the Bank to disclose to the competent U.S. authorities all accounts, whether regular or numbered, that belong to him and that are opened in his name, whether jointly with another person or severally.

Accordingly, every customer who has an account with the Bank or who wishes to open an account or deal with the Bank must complete and sign the KYC (Know Your Customer) Form used by the Bank or any other form requested, give any clarification or information necessary in order to apply such legislation, as well as periodically update the information on the these forms or every time a change occurs, whether the customer is a natural or legal person, U.S. citizen or otherwise.

The Client's signing of the Bank's general terms and conditions is akin to his compliance with the provisions of the said Act and with any subsequent amendments thereto, and to his irrevocable release of the Bank of any banking secrecy obligation with regard to the U.S. authorities concerned, in particular the IRS (Internal Revenue Service) with regard to which the Bank has an obligation to disclose any account held directly or indirectly by any clients mentioned above, and authorizing the Bank to carry out the required transactions without consulting him and releasing the Bank from any liability in this respect. Should the Client refrain from or refuse to comply with the aforementioned or provide inaccurate information, the Bank shall be compelled, in order to avoid being subjected to any measures taken by the IRS in accordance with the provisions of the aforesaid Act, to refuse opening an account for the Client or dealing with him, and to immediately and definitely close his account under his own responsibility, while holding the Client liable for any damages that the Bank incurs or may incur. In this case, the Client may not hold the Bank accountable in that regard, for any reason and in any way.

## CHAPTER 04: FINAL PROVISIONS

### I. Assignment of receivables

1. The Bank has the right to assign all or part of its receivables over the Client, together with associated guarantees, to any third party, in accordance with articles 280 et seq of the Code of Obligations and Contracts. The Client hereby authorizes the Bank to lift the banking secrecy in respect of all of his/her accounts with regard to the assignee

2. The Client shall not assign any of his/her rights arising in connection with his/her relationship with the Bank without the latter's prior approval.

### II. Acceleration

1. The Bank may at its direction, pursuant to simple notice sent to the Client and without need to initiate any legal proceedings, demand the immediate payment of any amount due by the Client to the Bank, in the case of the occurrence of any of the following events:
- the Client's failure to pay any amount owed to the Bank on the due date,
- the Client's failure to perform any of its commitments to the Bank, in whole or in part, if the Client does not remedy such failure within a period of 15 (fifteen) days from the date of the Bank's formal notice requesting the Client to remedy such failure,
- if any one of the personal or real guarantees granted to the Bank to secure the Client's obligations is or becomes null and void for any reason whatsoever, or in the case of a reduction in the value of any one of the personal or real guarantees granted to the Bank to secure the Client's obligations,
- in the case of bankruptcy or cessation of payment of the Client and/or any of its guarantors, or in the case of the appointment of an ad hoc or temporary administrator to manage the business of the Client and/or any of its guarantors,
- if the Client defaults on any one of the loans he/she has taken out with other banks, entities or institutions.

### III. Credit-insurance

1. In return for the facilities, loans or borrowings he benefited or will benefit from, the Client hereby authorizes the Bank to take out a credit-insurance policy, at the Client's expense, with an insurance company of its choice, and to debit the amount of the insurance premium, commissions and other costs from any of the Client's accounts with the Bank without the Client being entitled to oppose or make reservations in this regard.

## IV. Taxes, duties and other costs – the Bank's right to institute proceedings

1. The Client hereby grants the Bank unconditional and irrevocable powers to pay, in his/her name and on his/her behalf, all stamp duties and taxes of any nature whatsoever which are due or may be due, and/or to carry out, at his/her expense, any expertise and/or be assisted, at his/her expense, by any lawyers, and/or initiate, at his/her expense, any legal or other action (including against the Client's guarantors and co-debtors) which may be either necessary or appropriate, in relation to any agreements between the Bank and the Client, and, more generally, with regard to the relationship between the Bank and the Client. Amounts thus paid by the Bank for the performance of these agreements or in relation to such relationship, may be debited from any of the Client's accounts with the Bank without the Client being entitled to oppose or make reservations in this regard.

## V. Appointment of representatives

1. Notwithstanding the special provisions relating to the operating of certain accounts, the Client may authorize one or more persons to manage his/her accounts with the Bank, subject to having obtained any authorization which may be required. The form and the provisions of the power of attorney shall be approved by the Bank. The power of attorney shall remain in force until the Bank has been informed of its termination, by registered letter with acknowledgement of receipt. Such termination shall in any event take place in accordance with applicable laws and regulations

## VI. Accounts in the name of persons lacking capacity

1. Only the legal guardians of minors or of incapacitated persons have the right to open accounts in the name of the latter, in compliance with applicable legal provisions.
2. Accounts opened in the name of a minor or an incapacitated person can only be operated through the signature of the legal guardian(s), in compliance with applicable legal provisions.
3. The legal guardians of minors or of incapacitated persons undertake to provide to the Bank all documents proving their status and their right to represent the latter, including, without limitation, with respect to instruments relating to the operating of their accounts or their relationship with the Bank.

## VII. Special agreements between the Bank and the Client

1. The relationship between the Bank and the Client are governed by these General Conditions, subject to any special agreements which may otherwise be entered into between them. If any such special agreements exist, these General Conditions shall supplement them and shall apply to all matters not provided for in the said special agreements. In the case of a conflict between the terms and conditions of these General Conditions and those of any special agreements, the latter shall prevail.

## VIII. Address for service and notices

1. The Client's address and elected domicile shall be the address set forth below. The Client undertakes to inform the Bank of any change of address and/or elected domicile by registered letter. Failing this, only the address set forth below shall be deemed valid, and any notice or other written document sent to this address shall produce its effects, and the Client undertakes not to raise any exception of non-competence on the basis of a residency located elsewhere.

Client's Address: bldg 100 / Florida Palm Island Street SW clearwater bra

2. For the purpose of any notice, formality or measure, sent through the intermediary of any person whatsoever for the purpose of the performance hereof, in particular through official institutions or the notary, the Account Holder hereby lifts the banking secrecy with regard to the Bank and authorizes the latter to take any steps and send any letters, notices or summonses, and to carry out any formalities it deems to be either necessary and/or appropriate.

## IX. Enforcement of the Client's obligations

1. It is expressly agreed by the parties that these General Conditions, together with the Bank's statements and registers, shall be sufficient to prove the existence of a receivable, and may be enforced directly by the Execution Bureau pursuant to articles 847 et seq of the Code of Civil Procedure.

## X. Governing law - Jurisdiction

1. These General Conditions and the relationship between the Bank and the Client shall be governed by the laws of Lebanon.
2. The Beirut courts shall have exclusive jurisdiction to hear any dispute arising in connection with these General Conditions and/or relating to the relationship between the Bank and the Client. This exclusive jurisdiction is for the benefit of the Bank which shall be entitled to take action against the Client in any Lebanese or foreign court of its choice in order to defend its rights.

---

In case of discrepancy between the Arabic and English versions the Arabic version shall prevail.

Executed in Beirut
The day of .......... 27 - 04 - 2016 ..........

**The Client**
Read & Approved
Karen Dadu

**The Bank**
BLC Bank s.a.l.
Jbeil Branch

27-04-2016