# Exhibit 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH A. DAOU and KAREN M. DAOU,<br><br>Plaintiff,<br><br>v.<br><br>BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., AL-MAWARID BANK, S.A.L., and BANQUE DU LIBAN,<br><br>Defendants. | Case No. 1:20-cv-4438 |

**DECLARATION OF Professor Nasri Antoine DIAB**

I, Nasri Antoine DIAB, declare pursuant to 28 U.S.C. § 1746:

1. I am a lawyer, member of the Bar of Beirut (since 1984) and of the Bar of Paris (since 2009). I am Professor of Law (I held the chair of Civil Procedure at the Faculty of Law at Université Saint-Joseph in Beirut; and I gave PhD seminars in Arbitration at Université Paris V René-Descartes in my capacity as Visiting Professor). I authored a book on conflict of jurisdictions, two books of civil procedure, and one book of financial law (securitization), and I co-authored a book of private international law (the second volume on conflict of jurisdictions) as well as dozens of related academic articles (the entire list can be checked on the website mentioned in my professional biography attached as **Appendix A** to this Declaration), published in Lebanon, France and Belgium. I preside the Scientific Committee of the main Lebanese law review - the Beirut Bar Law Review "Al Adl" -, and I am member of various professional committees *inter alia* the Legal Commission of the Association of Banks in Lebanon, the

1

International Arbitration Committee of the ICC – Lebanon, and the Energy Institute - Institute of Petroleum (London). I hold a Ph.D. in Law from Université Panthéon-Assas Paris 2; a Master of Laws from Georgetown University; a Post-graduate degree (DEA) in Private Law and two "Licences", in Private Law and in Public Law from Saint-Joseph University.

Thus, I am well versed, both as a lawyer and an academic, in matters relating to banking and financial contracts, civil litigation and arbitration, and private international law. I am knowledgeable regarding the structure of the Lebanese courts and the availability of remedies arising out of civil obligations, in both contract and in tort. My professional biography outlining my academic and professional credentials is included as **Appendix A** to this Declaration.

2. I submit this declaration in support of BLC Bank S.A.L.'s (the "Bank") motion to dismiss plaintiffs Joseph and Karen Daou's (the "Plaintiffs") complaint (the "Complaint") and in opposition to the Plaintiffs' Motion to Attach (the "Motion").

3. I am a native Arabic and French speaker and fluent in English, and for ease of the parties and the Court, I prepared this declaration in English.

4. For the purpose of this Declaration, I have reviewed scanned photocopies of the following documents:

   a. A copy of the "General Operating Conditions" dated 26 April and 27 April 2016 duly executed by the Plaintiffs and the Bank (the "BLC Agreement").

   b. A copy of the check drawn by the Bank on its account with Central Bank of Lebanon - Banque du Liban (the "Central Bank") to the order of the Plaintiffs, dated 28 November 2019, for an amount of US$7,525,000 (the "Check").

   c. I have also reviewed the Complaint filed by the Plaintiffs in this lawsuit.

**A- Jurisdiction of the Lebanese Civil Courts**

5. There are multiple separate legal grounds for the jurisdiction of the Lebanese courts in this matter, which are all provided for in the Lebanese Code of Civil Procedure of 1983 as amended ("CCP"), being noted that Article 74 of the CCP provides that, in principle, the rules of internal (territorial) jurisdiction apply to determine the international jurisdiction of the Lebanese courts, without discrimination between Lebanese and foreigners :

i. The main ground for the jurisdiction of the Lebanese courts, which applies unless otherwise provided in the law (Article 97, para.1, of the CCP) and which is based on the fundamental "*Actor sequitur forum rei*" rule, is the domicile of the defendant (E. Tyan, *Précis de droit international privé,* Ed. Librairies Antoine, 1966, No.358 – in French language). In case the defendant is a legal entity, the ground is its registered office or the branch with which business was conducted (Article 101 of the CPC). The Bank's registered office is located in Beirut, Lebanon, and thus Lebanese courts have jurisdiction on this case.

ii. The BLC Agreement was entered into in Lebanon and at least one of its main obligations (in fact all of them) was to be performed in Lebanon. Each one of these two grounds, taken separately, constitutes a sufficient ground for the jurisdiction of the Lebanese courts (Article 78, para.1, of the CCP).

iii. The dispute relates to assets located in Lebanon (funds credited to bank accounts located in Lebanon) (Article 78, para.1, of the CCP);

iv. The alleged tortuous acts have occurred in Lebanon (article 102 of the CCP);

v. In their agreement, the parties have expressly designated Lebanese courts as having "*exclusive jurisdiction to hear any dispute arising in connection with these*

*General Conditions and/or relating to the relationship between the Bank and the Client*" (Chapter 04, Section X, Clause 1 of the BLC Agreement). This clause alone gives jurisdiction to the Lebanese courts, and it should be noted that (a) this jurisdiction is said by the parties to be "exclusive" i.e. that no other jurisdiction or forum are acceptable to them, (b) the wording of this clause seems to encompass the contractual as well as the tortuous aspects (since it differentiates between the contract itself and the parties' relationship which means the extra-contractual relation they might have), and (iii) the Lebanese courts will give full effect to this choice of jurisdiction especially that, but this not a prerequisite, there are, as detailed above, several other grounds for their jurisdiction.

6. There is no correlation between the jurisdiction of the Lebanese courts over a lawsuit and the law that they will apply thereto (S. Mansour, *Handbook of Private International Law,* Dar al Ouloum al Arabia, 1993, page 69, No.42 – in Arabic language). The law that they will apply is determined by the Lebanese conflict of laws rules, which might well designate a foreign law, e.g. Articles 142 and 369 of the CCP, which respectively relate to the legal rules to be applied by the courts and the burden of proof of the foreign law, expressly provide for such a possibility.

7. Despite the absence of correlation that I mentioned above, Lebanese courts are the most appropriate courts to interpret and apply Lebanese law, especially when the claim implicates the operation of the Lebanese financial system in light of the current acute economic and financial crisis. This crisis has generated novel questions of law that Lebanese courts are the best and most appropriate forum to consider and rule upon, taking into consideration their

implication on the overall economic situation. As we shall see below, Lebanese law applies to this case.

**B- Governing Law**

8. As is the case in French law (Y. Loussouarn, P. Bourel, P. de Vareilles-Sommières, *Droit international privé,* Dalloz, 2013, No.560 – in French language) which is the principal source of inspiration to Lebanese law (statutes and case law), the Lebanese conflict of laws rules differentiate between the form of the contract and its substance:

i. Based on the "*Locus regit actum*" rule, the form is governed by the law of the country where the contract was entered into (P. Gannagé, "Droit international privé", *Juris-Classeur – Droit Comparé – Liban*, Fascicule 60, 1994, No.50 – in French language). In this case, the BLC Agreement was executed in Lebanon, and thus Lebanese law governs its form.

ii. As for the substance, and based on the "autonomy of the will of the parties" rule which applies in Lebanon (E. Tyan, *op.cit.*, No.229), the Lebanese courts give full effect to the clause in which the parties expressly designate the governing law, especially if, but this is not at all a condition (E. Tyan, *op.cit.*, No.231; P. Gannagé, *op.cit.*, No.55), the center of gravity of the contract concurs with such express designation. This is the case for the BLC Agreement : it was signed in Lebanon, with a Lebanese bank having its registered office in Lebanon and conducting its business in Lebanon; the majority of the services contained there in are to be rendered in Lebanon; several specific Lebanese statutes are expressly mentioned therein, e.g. the banking secrecy law of 1956 (Chapter 01, Section II, Clause 1 of the BLC Agreement), the joint account law of 1961 (Chapter 02, Section VI), the intellectual property protection law of 1999 (Chapter 02, Section XIV, final para.

not numbered, page 17), as well as the Code of Obligations and Contracts (e.g. Chapter 04, Section I, Clause 1) and the Code of Civil Procedure (Chapter 04, Section IX, Clause 1). The vast majority of attachments points, which are used by the Lebanese conflict of laws rules to determine the governing law (A. Ghossoub, *Lessons of Private International Law,* Al Mouassasa al Jamiya lil Dirassat wal Nachr wal Tawzi, 2008, pages 348 *et seq.* – in Arabic language), link the BLC Agreement and the parties' relationship to Lebanon.

9. The parties clearly and expressly chose Lebanese law to govern the BLC Agreement and their relationship. Chapter 04, Section X, Clause 1, of the BLC Agreement states that "*the relationship between the Bank and the Client shall be governed by the laws of Lebanon*".

10. Thus, Lebanese law will apply to the BLC Agreement and to this case based on the governing law clause of Chapter 04, Section X, Clause 1, of the BLC Agreement.

11. If the case at hand is to be considered tortuous (Lebanese courts would still have jurisdiction, as mentioned above), which is not the case since what the Plaintiffs blame the Bank for arises directly from the BLC Agreement (and its alleged breach), then Lebanese law would also apply. The "*Lex loci delicti*" rule, which is applied by the Lebanese courts in the scope of the conflict of laws (E. Tyan, *op.cit.*, No.273; P. Gannagé, *op.cit.*, No.47), designates the law of the country where the tort has been committed as the applicable law.  The purported tortuous acts as alleged by the Plaintiffs took place in Lebanon : refusal to transfer funds; remittance of the Check; etc.

## C- Lebanese Forum

12. Based on the above, this dispute should be litigated before the Lebanese courts (which have been expressly given "exclusive" jurisdiction by the parties) and under Lebanese law (which is the governing law expressly chosen by the parties). In filing the Complaint outside

6

Lebanon and by trying to have a law other than the Lebanese law apply to the case, the Plaintiffs are in breach the provisions of the BLC Agreement (Chapter 04, Section X, Clauses 1 and 2).

13. Furthermore, and since it purports to challenge the operation of the Central Bank, a governmental entity, and three commercial banks (including the Bank), the Complaint seeks to effect action that would directly impact and further disrupt the Lebanese banking and financial system. The Bank acted in line with the whole Lebanese banking sector, in the limits of its financial means. Lebanon is in the midst of an unfolding and unprecedented financial and economic crisis, and the actions taken by the Bank can only be analyzed in the scope of this crisis. It is my opinion that it would be proper for this matter to be addressed by Lebanese courts which are aware of every aspect of the situation.

**D-  Lebanese law relating to international transfers**

14. The international transfer of funds by Lebanese banks is a service which is discretionary. It is not required by any statute in force in Lebanon. The Lebanese banks are not obligated by any statute or decree decision to effect such transfers. A client's request or instruction to transfer funds internationally is subject to the consent and agreement of the bank. As stated by a Lebanese author (F. Nammour, *Droit bancaire,* Beirut, 2nd Edition, 2012, No.666 – in French language), there is no such right as the "right to the transfer" (*droit au virement*), and the transfer instruction is a mandate given by the client to its bank to debit an amount from the client's account and credit it to another bank account; this author concluded that, as for all mandates, the bank's consent is required. Some judicial decisions confirm this position and consider that the transfer requires the consent of the bank that receives the transfer instructions from its client (Tribunal of First Instance of Beirut, Judgment No.22 dated 11 January 1996, *Law Review of the Bar of Beirut "Al Adl"*, 1996, p.45, especially p.46 – in Arabic language) as well

7

as the consent of the bank where the funds are to be transferred, which means that this "*operation is consensual*" (i.e. it requires the consent of all three parties) (Special Banking Court, 2nd Chamber, Decision No.247/77 dated 18 October 1994, published in *Sader – Between Statutes and Case Law – The Banks,* 2011, p.561, No.69 - in Arabic language), and hence the client cannot force the bank to execute such a transfer.

15. As shown above, the Plaintiffs have no statutory right to international transfers abroad from their account with the Bank. In addition, they do not have a contractual right to that effect : BLC Agreement comprises numerous provisions covering various types of services to be rendered by the Bank to its clients (collection; savings, deposits, joint accounts; payments cards; deposit of securities; overdraft; trade bills; documentary credits; guarantees; electronic services; etc.) and detailed in 14 two-column pages, but it does not contain any provision relating to international transfers. Thus, the Bank is not bound in any way to carry out international transfers on Plaintiffs' behalf. As matter of contract and Lebanese law, the Bank can, at its discretion, refuse the Plaintiffs' instructions to transfer funds abroad from his account.

16. Furthermore, Article 302, para.1 and para.2, of the Lebanese Code of Obligations and Contracts provide that "(1) *The debt should be paid at the place determined in the contract.* (2) *Absent an express or implicit determination to that effect, the payment is to be collected at the debtor's domicile.*" Since the Bank is debtor of the amount of the Plaintiffs' deposit, and since the BLC Agreement does not determine a place where this debt should be paid by the Bank to the Plaintiffs, then the provisions of Article 302, para.2, apply and the Plaintiffs' deposit should be collected by the latter at the Bank's offices

17. It is important to note that even if the Bank wanted to carry out the Plaintiffs' requests of international transfer, although it is in no way obligated to, as shown above, it might

8

well find it impossible to do so, for reasons well known and highly publicized across the world. On 17 October 2019, all banks in Lebanon, including the Bank, closed their doors and stopped their activities due to mass protests. When they reopened for business in early November 2019, they were effectively forced to drastically reduce their international transfers, along with other capital control restrictions, without any formal regulation being enacted to that effect by any public authority. The Lebanese government and Central Bank continue to work to address the ramifications of the financial crisis.

18. Banks that did make international transfers despite these *de facto* restrictions have been considered by some public and judicial authorities in Lebanon as making illegal transfers, and several inquiries have opened into the question, which means that any bank which effected international transfers might have been investigated. For instance, the Special Investigation Commission (Fighting Money Laundering & Terrorism Financing) requested, in January / February 2020, all banks to give the details of all the international transfers that they have made from 17 October to 31 December 2019.

19. The above matters made it practically impossible for the Bank to effect international transfers, and such impossibility would extinguish any contractual obligation that the Bank would have had to the Plaintiffs to make such a transfer (although it does not have such an obligation, as explained above). Article 341 of the Code of Obligations and Contracts provides that the obligation is extinguished when it becomes impossible for the debtor, either naturally or legally, to perform it. Article 341 relates to force majeure, which is defined as being an event external to the parties, unpredictable and insurmountable (G. Sioufi, *General Theory of Obligations and Contracts,* 2nd volume, Beirut, 1994, No.497 *et seq.* – in Arabic language). It is my opinion that the acute and unprecedented economic and financial crisis affecting Lebanon in

general and the banking sector in particular, and which made The Republic of Lebanon default on its Eurobonds on 7 March 2020, for the very first time in its history, and brought the international banking and financial activities to an almost complete stop, might be deemed by the Lebanese courts to constitute a case of force majeure with regard any contractual obligation that the Bank would have had to the Plaintiffs to make an international transfer (although it does not have such an obligation).

**E- Lebanese law relating to checks**

20. Since, as explained above, the Bank has no statutory or contractual obligation to the Plaintiffs to carry out international transfers, the Bank may decline to transfer the funds and, instead, propose to satisfy its restitution obligations to the Plaintiffs in another manner. This could include transferring the Plaintiffs' deposit to another bank located in Lebanon or remitting to Plaintiffs a check drawn on Central Bank (which can only be credited to a Lebanese bank account). Nothing in Article 307 of the Lebanese Code of Commerce, which, by reference made by Article 123 of the Lebanese Code of Money and Credit, governs bank deposits, obligates the banks to restitute funds to their clients in any specific manner or agree to any specific request. Authors (F. Nammour, *Droit bancaire,* Beirut, 1st Edition, 2003, No.1144) and some courts (Court of Appeals of Beirut, Decision dated 6 March 6 1986, *Law Review of the Bar of Beirut "Al Adl"*, 1988, page169, especially p.171 – in Arabic language) admit that the restitution of bank deposit to the client can be effected by way of transfer (in this case, to another bank located in Lebanon), or in cash, or by check: these three means of payment are considered to be equivalent

21. By way of analogy, I can refer to the special mechanism of debt reimbursement by way of offer and deposit made by the debtor to the creditor through a Notary Public, pursuant to

Articles 822 *et seq.* of the CCP. This Article mentions an "amount of money" which is due by the debtor to the creditor, and the Supreme Judicial Court (Cour de cassation) ruled that a check the provision of which is earmarked by the bank (which excludes any risk of non-payment of the check) could substitute to cash (Supreme Judicial Court - Cour de Cassation, Decision No.57 dated 8 April 1969, *Baz Collection*, 1969, p.274 – in Arabic language); this is the case of the Check, which was drawn by the Bank on the Central Bank to the order of the Plaintiffs, which provision was earmarked to the Plaintiffs, and which could have been deposited by the latter with any Lebanese bank.

22. Under Lebanese law, upon the Plaintiffs' acceptance of the Check drawn on the Central Bank, it is my opinion that the Bank's obligation to the Plaintiffs to restitute the bank deposit made by the latter with the Bank is fulfilled (for the amount set forth in the Check). At that point, the Bank has no further obligation toward the Plaintiffs.

**F- The Lebanese Courts are Subject to the Rule of Law and Operational**

23. I have reviewed the portions of the Complaint concerning the "utter collapse" of the rule of law in Lebanon. In my opinion, the Plaintiffs' claims in this respect are not correct. To put this issue in context, it may be helpful if I provide some background on the Lebanese legal system.

24. Lebanon has a civil law system, with a codified Constitution (adopted in 1926 and amended several times), formal statutes and codes enacted by the Parliament, decrees enacted by the Government and ministers, and various directives and decisions issued by other public authorities (such as the Central Bank).

25. The judicial system is divided into two main branches: the Administrative courts and the Judicial courts (the latter include *inter alia* civil, commercial and criminal courts). Similar to

the U.S. federal system, the Judicial courts' branch is a three-tiered system, divided into three degrees or levels: First Degree Tribunals (either a Sole Judge or a three-judge Chamber); Courts of Appeals (second degree); and the "Cour de Cassation" which is the Supreme Judicial Court (it acts also as a third degree).

26. The tribunals and courts cannot render decisions in contradiction with a clear statutory text. In the absence of such a text, they can rely on judicial precedents and, in commercial matters, on customs and sectoral practices (Articles 3 and 4 of the Lebanese Code of Commerce). Judicial precedents can be relied on, and constitute case law ("jurisprudence", in the meaning attributed thereto in Lebanese and French laws), if they result from several identical decisions rendered in similar cases by the Supreme Judicial Court (Cour de Cassation).

27. Similar to the United States, Lebanon has adopted the separation of powers principle between the executive, legislative, and judiciary powers. This principle is enshrined in the Preamble of Lebanon's Constitution (para. e), and the independence of the judicial power is consecrated in article 20 of the Constitution as well as in article 1 of the CCP which provides that the "*The judiciary is a power independent from the other powers in the investigation and resolution of lawsuits, and such independence cannot be restricted by any limit which is not provided for in the Constitution.*"

28. Lebanon places emphasis on the principle of non-discrimination and litigants' equality under the law. Same as Article 74 of the CCP (that I mentioned above) which expressly provides for non-discrimination between Lebanese and foreign litigants, Article 7, para. 3, of the CCP provides for the equality of all litigants, "*Lebanese or foreigners*", without any discrimination based on nationality, whether they are claimants or defendants.

29. Lebanon is, since 1972, party to the U.N. International Covenant on Civil and Political Rights, of 1966. Article 14 of the Covenant states that *"All persons shall be equal before the courts and tribunals"* and are protected by due process. Article 2, para.2, of the CCP considers that international treaties (including the Covenant) prevail over Lebanese internal statutes, and the Lebanese Constitutional Council has given a constitutional value to the Covenant and other U.N. treaties (Constitutional Council, Decision No.24 dated 10 May 2001, *Official Gazette,* No.24 of 2001, page 1794, especially page 1797 – in Arabic language).

30. In my professional experience of commercial and banking lawsuits, the Lebanese judiciary rules based on the merits of each case. The judiciary is governed and guided by the comprehensive CCP, which is modeled on the French system (especially the French New Code of Civil Procedure, of 1975). In evaluating claims and rendering decisions, the judiciary follows the applicable codes and statutes, such as the Code of Obligations and Contracts, which is also modeled on French law and was enacted in 1932 under French Mandate, in French language. French law still exerts a large influence on Lebanese legislators, judges and legal authors. Lebanese courts often make direct reference to French statutes, precedents and legal books and articles. In a decision of 1988, the Lebanese Supreme Judicial Court (Cour de Cassation) mentioned that the Court of Appeals "*took inspiration from contemporary legislations which emanates, with Lebanese law, from same intellectual sources and legal principles, one of which being the French legislation*" (Supreme Judicial Court - Cour de Cassation, Decision No.4 dated 23 February 1988, *Baz Collection*, 1988, page 237, especially pages 224 & 225 – in Arabic language).

31. The Plaintiffs are not without access to recourse in Lebanon. To the contrary, there have been several cases filed in Lebanese courts in recent months involving disputes between

13

banks and their clients. Several decisions, mainly rendered by fast-track Judges of Urgent Matters (Juges des Référés), who rule on prima facie basis and not on the merits (Articles 579 *et seq.* of the CCP), are the subject of appeals, which are still pending.

32. The courts in Lebanon have remained operational throughout the current economic and financial crisis, except for limited closures due to mass protests and to the COVID-19 pandemic. In spite of a slowdown due to these closures, cases are being filed, litigated and decided, involving disputes relating to the financial crisis and the banking activities.

### G- Requested Relief is Available in Lebanon Under Lebanese Law

33. Under Lebanese law, the Plaintiffs are free to assert any claims against the Bank for damages arising from the conduct alleged in the Complaint. Claims based on breach of contract and torts, including for fraud or wrongful domination of property or others, are available *inter alia* under the Code of Obligations and Contracts, the Penal Code, and other specific statutes.

34. A Lebanese court could award a judgment against the Bank, and then an order enforcing that judgment. If claims against the Bank are found to be meritorious in Lebanon, the Bank would face liability and judgments in the Lebanese courts. A court decision can be enforced against the Bank as soon as this decision meets the conditions of enforcement, i.e. in principle, when no ordinary recourse can be filed against it (Article 553, para. 2, and Article 564 of the CCP).

## Conclusion

**Based on the above, I am of the opinion that:**

a) The Lebanese courts have jurisdiction over any claims related to the Bank and the Plaintiffs, whether in contract or tort.

b) Lebanese law governs such claims.

c) The Bank has no obligation to effect international transfers of funds, and it may have been impossible for the Bank to do so had it wanted to.

d) The Bank acted consistent with Lebanese law in issuing and delivering the Check (drawn on Central Bank of Lebanon) to the Plaintiffs, and it fulfilled its obligations towards them by doing so, since the Check is a valid instrument and constitutes proper tender under Lebanese law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Prof. Nasri Antoine DIAB**
Beirut (Lebanon), 9 October 2020.      signature :   *N. DIAB*