## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH A. DAOU and KAREN M. DAOU,<br><br>Plaintiffs,<br><br>vs.<br><br>BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., AL-MAWARID BANK, S.A.L., and BANQUE DU LIBAN,<br><br>Defendants. | Civ. Action No. 1:20-cv-4438 |

## DECLARATION OF FADI MOGHAIZEL

I, Fadi Moghaizel, declare pursuant to 28 U.S.C. § 1746:

1.      My name is Fadi Moghaizel. I am a Lebanese attorney, member of the Beirut Bar Association and senior partner of *Moghaizel Law Office*, a firm of 22 attorneys founded in 1953 and based in Beirut, Lebanon. My legal education covers a *License en droit* (law degree) from the Faculty of Law of Saint Joseph University, Beirut, in 1985, an LLM from the University of London in 1986, and a PhD from the University of London in 1991. I have been admitted to the

Beirut Bar and started practicing in 1985. I was also admitted to the Paris Bar in 1992[1]. Since 1985, my main areas of practice include litigation, arbitration, contract law, and banking law and finance. My experience includes representing local and foreign clients before Lebanese courts (civil and commercial chambers), whether as plaintiffs, defendants, or intervening third parties in more than one thousand five hundred lawsuits, with more than seven hundred lawsuits in the area of banking and finance law. My litigation experience covers all stages of litigation, and covers claims on the merits, attachments, injunctions, appeals to the Courts of Appeal and Cassation Court, as well as enforcement of deeds and judgments. I am in a position to say that I have acted before all types and degrees of Lebanese courts. I have also been advising clients for more than thirty years in relation to issues of Lebanese contract law, banking law, including structuring, securing and enforcing the settlement of banking facilities of all types, breach of contract, and validity of contracts. I have acted as counsel and arbitrator in institutional (ICSID, ICC, and several Arab arbitration centres) and *ad hoc* arbitration proceedings. I have also acted as an expert witness before foreign courts, including the High Court of Justice in London and courts in the United States of America, as well as before arbitral tribunals. My clients comprise individuals, legal entities, governmental entities and foreign governments. I am fluent in Arabic (bilingual proficiency), French (bilingual proficiency), and English (full professional proficiency).

---

[1] In 1994, I requested my omission from the Paris Bar for fiscal considerations linked to my French non-resident tax status.

2.      I submit this declaration (the 'Declaration') in support of the *Banque du Liban*'s ('BDL')

motion to dismiss plaintiffs' (the 'Plaintiffs') First Amended Complaint (the 'Complaint').

3.      The specific matters that I will address in this Declaration are the following:

A.  Background on the Lebanese legal system, and the current state of its functioning.

B.  Background on the laws establishing BDL and its authority over monetary policy
    and bank supervision in Lebanon.

C.  General availability of claims for (i) civil conspiracy, (ii) unjust enrichment, (iii)
    conversion, (iv) promissory estoppel, (v) fraud, and (vi) issuance of dishonored
    checks under Lebanese law.

D.  Whether the Complaint's allegations concerning BDL, if assumed to be true,
    would be sufficient to establish BDL's liability to the Plaintiffs under any
    Lebanese counterparts to the claims asserted against BDL in the Complaint.

4.      For the purpose of this Declaration, I have relied upon copies of the following documents:

      A.  The Complaint filed by the Plaintiffs; and

      B.  The following checks (the 'Checks'):

         - Check no. 115982/F drawn by *BLC Bank SAL* on BDL on November 28, 2019 in an amount of US $ 7,525,000, marked 'Redacted';

         - Check no. 036018/F drawn by *Crédit Libanais* SAL on BDL on November 21, 2019 in an amount of US $ 5,300,000, marked 'Redacted';

         - Check no. 036022/F drawn by *BLC Bank SAL* on BDL on December 2, 2019 in an amount of US $ 40,180, marked 'Redacted'; and

         - Check no. 443219/F drawn by *Al-Mawarid Bank SAL* on BDL on March 3, 2020 in an amount of US $ 5,811,500, marked 'Redacted'.

**A.**      **Background of the Lebanese Legal System, and the Current State of its Functioning**

5.      The Lebanese legal system follows the pattern of civil law legal systems. The Lebanese legal system is based on the predominance of codified bodies of laws, which comprise the Lebanese Constitution (1926), laws enacted by Parliament, governmental decrees, ministerial decisions, and orders and decisions issued by regulatory authorities.

6.      The Preamble of the Lebanese Constitution provides that '*Lebanon is also a founding and active member of the United Nations Organization and abides by its covenants and by the Universal Declaration of Human Rights. The State shall embody these principles in all fields and areas without exception*'.[2]

7.      Article 7 of the Lebanese Constitution states that '*All Lebanese shall be equal before the law. They shall equally enjoy civil and political rights and shall be bound equally by public obligations and duties without any distinction*'.[3]

8.      Article 20 of the Constitution adds: '*Judicial power shall be exercised by courts of various degrees and jurisdictions. It shall function within the limits of an order established by the law and offering accordingly the necessary guarantees to judges and litigants. The law shall determine the conditions and limits of judicial guarantees. Judges shall be independent in the exercise of their tasks*'.[4]

9.      Article 7, paragraph 3 of the Lebanese Code of Civil Procedure[5] underlines that each person or corporate body, whether Lebanese or foreign, is entitled to file claims and defenses before Lebanese courts.

---

[2] Exhibit no. 1. This Declaration includes the original Arabic and French texts of Lebanese constitutional and statutory provisions, along with either my own translation or the English translations of *the Bureau of Lebanese and Arab Documentation - Argus of Lebanese Documents*. In some instances, I have revised these publicly available translations for the sake of clarity, and hereby certify the accuracy of the translations that I have prepared or revised and that appear in the text of this Declaration and the Exhibits.
[3] Exhibit no. 1.
[4] Exhibit no. 1.
[5] Exhibit no. 2.

10.     Lebanese courts have one of the oldest and richest legal traditions in the Middle East, that started in the late 1870s under the Ottoman Rule, and developed greatly under the French mandate from 1920 to 1943. Lebanese courts continued to be very productive since then, with the exception of forced intermittent interruptions during the Lebanese civil war, from 1975 to 1990. Lebanese courts have again been very active following the end of the Lebanese civil war in 1990, and continued deciding cases in all areas of the law, including banking and financial law, benefitting also from the massive legislative and regulatory work that has been undertaken by Parliament since 1992. New laws and regulations were enacted in almost every area of activity, in order to modernize Lebanese legislation which evolution was halted due to the civil war. The financial sector was one of the fields where legislative and regulatory activity has been intense over the last twenty-five years.

11.     The civil unrest and financial crisis that broke out in Lebanon in fall 2019 did not materially disrupt the work of Lebanese courts. The courts continued their activity in a quasi-normal fashion. As of March 2020, the Covid-19 crisis caused a certain degree of disruption depending on the evolution of the pandemic, especially in the Lebanese areas that were particularly affected. The Ministry of Justice and the High Council of Magistrates have managed to organize the work of Lebanese courts in a reasonably efficient manner, taking into consideration the difficult working conditions caused by the pandemic. Such measures enabled litigants to file lawsuits and pleadings, and courts have used and continue to use their best efforts to continue handling the cases submitted to them in an efficient manner.

12.     On May 8, 2020 and August 19, 2020, laws were enacted to suspend statutory and contractual deadlines until December 31, 2020. The purpose of such laws is to prevent, *inter alia*, the lapsing of claims by time limitation, and to grant litigants the opportunity to organize their claims and defenses taking into consideration the difficulties that they might face due to the ongoing pandemic and other unforeseen and overwhelming events.

13.     After the outbreak of civil unrest in the fall of 2019, and the financial crisis that followed, a significant number of Lebanese and foreign bank depositors who faced difficulties in transferring funds out of Lebanon filed lawsuits against Lebanese banks before Lebanese courts in Beirut and several other Lebanese regions. Such lawsuits are diligently and timely being addressed by Lebanese courts who often take a highly protective stance in favor of depositors.

14.     Lebanese courts are divided in three main branches: (i) courts that rule on civil, commercial and criminal matters, and that are altogether designated as civil courts; (ii) courts that decide on disputes between governmental authorities, on one side, and individuals and private corporate bodies and organizations, on the other side, and that are designated as administrative courts, and (iii) courts that address family law matters, and for some religious communities, inheritance and personal capacity matters, designated as religious communities' courts.

15.     As a civil law jurisdiction, court decisions in Lebanon do not have the same value conferred upon precedents in common law countries. However, court decisions in Lebanon do constitute an undeniable authority. In the presence of well-established rulings laid down by the courts, judges often follow such rulings. Clearly, all court decisions are not equal in value: the higher the court, the higher the authority; and therefore, decisions rendered by Courts of Appeal have more authority than the decisions of lower courts, and decisions of the highest civil court, the Cassation Court, have more authority than decisions of the Courts of Appeal and lower courts. Within the Cassation Court, the importance of decisions depends on several factors, including:

- The formation that rendered the decision: the Cassation Court is divided into several sections and chambers, but in the most important matters, the judges form a General Assembly (*Assemblée plénière*). The decisions of this Assembly supersede all others in their value as a source of law[6].

- The nature of the decision: more importance is attributed to a decision that annuls the judgment of an inferior court (cassation), as well as to decisions called *Arrêts de principe* (decisions of principle), which rule on questions of law beyond the limits of the dispute concerned.

---

[6] This is the case despite the continuing principle that the doctrine of precedents does not apply in the Lebanese legal system.

- The date of the decision: between two decisions of the same court, the most recent has more authority, and thus, is a stronger reflection of the likely rulings in future judgments.

16.    Customs are a subsidiary source of law, and doctrine constitutes an authority taken into consideration by the courts.

17.    The French legal system is influential in Lebanon, since a majority of Lebanon's laws are inspired by French legislation, often dating back to the early twentieth century, and sometimes later.

18.    Lebanese courts, when they refer to French court decisions and doctrine, aim to benefit from the wealth of such sources, in particular in cases where French and Lebanese rules and principles are similar or comparable, and when no Lebanese authorities are available.

B.    **Background on the laws establishing BDL and its authority over monetary policy and bank supervision in Lebanon**

19.    BDL was established by Decree-Law no. 13513 of August 1st, 1963 enacting the Lebanese Code of Money and Credit (the 'CMC'). BDL has a dual status: It acts as (i) a financial authority and regulator, and (ii) operates too as a bank for designated entities and parties. Article

15 of the CMC specifies that BDL's capital is entirely owned by the State[7]. Law no. 1/84 of June 13, 1984, states in its Article 40 that '*Notwithstanding all other provisions, the Central Bank and those working at the Central Bank are subject only to the special legal and regulatory provisions governing its business*'.[8]

20.     Article 13 of the CMC provides that BDL is a public law body and enjoys financial independence. BDL has the exclusive right to issue the Lebanese currency[9]. In the context of its relationships with third parties, BDL is deemed as a merchant (business person), and it performs its activities and organizes its accounts in accordance with the commercial and banking rules and customs[10].

21.     The monetary and financial regulatory role of BDL is described in more detail in Article 70 of the CMC[11]. It consists of safeguarding the currency to ensure the basis of a permanent economic and social growth, and covers in particular the following: (i) safeguarding the Lebanese currency, (ii) safeguarding economic stability, (iii) safeguarding the soundness of the Lebanese banking system, and (iv) developing the monetary and financial markets.

---

[7] Exhibit no. 3.
[8] Exhibit no. 4.
[9] Article 47 of the CMC (Exhibit no. 3).
[10] Article 13 of the CMC (Exhibit no 3).
[11] Exhibit no. 3.

22.     When performing its role under Article 70 above, BDL uses its prerogatives in its capacity as a regulatory authority in charge of enforcing financial, economic, and monetary policies and measures.

23.     BDL performs its regulatory functions independent of the Lebanese government.  That being said, BDL does consult with and work closely with the government: (i) BDL advises the government on economic, financial, and monetary policies, (ii) proposes to the government measures which it deems likely to improve the balance of payments, the movement of prices, public finances and, economic development, (iii) draws the government's attention to facts that may adversely affect the national economy and currency, and (iv) handles the government's relations with international finance institutions.[12] BDL also acts as banker for the public sector, that includes the State, municipalities, and other governmental entities[13]. BDL does not have legal authority to maintain accounts for any other persons or entities.

24.     The role of BDL in relation to monetary policy aims at protecting the national currency. BDL controls the overall currency supply in the various economic sectors, and uses several means to manage the monetary policy.

---

[12] Articles 71 and 72 of the CMC (Exhibit no. 3).
[13] Articles 84 and 85 of the CMC (Exhibit no. 3).

25.     To regulate banking liquidity and the volume of credit, BDL is authorized to take all measures it deems appropriate, including (but not limited to): (i) defining discount and credit rates granted to banks and financial institutions, (ii) taking steps aiming at ensuring exchange stability by operating on the open market either as buyer or seller of bullion or of foreign exchange in agreement with the Minister of Finance, (iii) buying and selling securities on the open market, (iv) ordering banks to deposit with BDL assets amounting to a specific ratio of their liabilities arising from deposits and loans granted to them, (iv) requiring banks to invest in Lebanese Treasury Bills up to a specific ratio of their reserves, (v) enforcing ratios on the different categories of banks' liabilities, and (vi) accepting, in the light of the general monetary situation, interest bearing deposits[14].

26.     BDL may also regulate the general credit situation by limiting the volume of lending in specific categories, or granted for specific purposes, or to specific sectors, and lay down conditions governing such lending.[15]

27.     BDL is authorized to (i) buy and sell, import and export gold and other precious metals and transact all other operations on such commodities, (ii) take deposits of coined gold and gold ingots, (iii) discount, rediscount, buy and sell trade bills and instruments of payment and assets at call drawn up in foreign currencies, (iii) buy and sell bonds issued or guaranteed by foreign governments or international institutions, (iv) open accounts with central banks or with

---

[14] Articles 75 and 76 of the CMC (Exhibit no. 3).
[15] Article 79 of the CMC (Exhibit no. 3).

correspondents abroad, (v) open accounts to central banks, foreign banks and international institutions and act as correspondent to such banks and institutions; and (vi) lend to, and borrow from, central banks, foreign financial institutions and banks, and international finance institutions, within specific conditions[16]. In addition, BDL operates a US dollar clearing and compensation system among banks operating in Lebanon, with settlement of checks issued by financial institutions against deposits with BDL occurring exclusively in Lebanon by credit to other financial institutions maintaining accounts with BDL.

28.      Transactional operations mentioned above are carried out by BDL for the account of the government and other public sector entities, banks and financial institutions domiciled in Lebanon, central banks, banks and financial institutions located abroad, and international finance institutions.[17] BDL is not authorized to enter into such transactions with individuals.

29.      The role of BDL with regard to overseeing the banking sector involves regulatory powers, monitoring powers, and disciplinary powers. With respect to the monitoring or control power, law no. 28/67 of May 9, 1967, that amended the CMC, established the Banking Control Commission of Lebanon ('BCCL') as a special administrative organ that has an independent status, within BDL. The BCCL is generally tasked with controlling the banks' compliance with the various laws and regulations that are applicable to the banking sector. For such purpose, it

---

[16] Article 81 of the CMC (Exhibit no. 3).
[17] Articles 82 and 84 of the CMC (Exhibit no. 3).

---

enjoys the same extensive supervisory powers than BDL under the CMC[18], and works in close coordination with the Governor of BDL. It should be underlined that regulatory and disciplinary authority is not vested with the BCCL, and remains with BDL.

30.      The BCCL performs its duties mainly through periodic audits of banks[19]. Without having access to clients information[20], it analyses the banks' financial statements, requests documents and data, interviews banks' staff and managers, and oversees the proper implementation by the banks of applicable laws and regulations, including the provisions of the CMC, Basel committee requirements, BDL's regulations, International Accounting Standards, and corporate governance requirements.

31.      The BCCL enjoys other specific prerogatives such as preapproving bad debts reserves, assessing the need for a bank to reinstate its capital in the event of losses, and authorizing banks to acquire real estate on a temporary basis in settlement of outstanding debts[21]. The BCCL enjoys too a consultative authority concerning the banks' investments. Additionally, the BCCL may lay down and recommend plans for designated banks to improve their status and control their

---

[18] Article 9 of Law no. 28/67 (Exhibit no. 5).
[19] Article 9 of Law no. 28/67 (Exhibit no. 5).
[20] Article 150 of the CMC forbids BDL auditors (this includes BCCL auditors) from asking the banks to disclose the names of their clients, except for holders of debtor accounts (Exhibit no. 3). The Lebanese Banking Secrecy Law of September 3, 1956 imposes on banks and financial institutions an absolute secrecy duty with respect to clients' personal and account-related information. Managers and staff of banks and financial institutions, and all persons who, by virtue of their position or capacity have access to privileged information, may not disclose any such information to any individual, or any governmental, military or judicial authority, except in very limited circumstances, including in the context of anti-money laundering measures (Exhibit no. 6).
[21] Article 154 of the CMC (Exhibit no. 3).

expenses[22]. More generally, the BCCL has the authority to issue directives and recommendations to banks and impose corrective and remedial measures[23].

32.     Law no. 28/67 has established, within BDL, the Higher Banking Commission[24] that is chaired by the Governor of BDL. The Commission has, *inter alia*, the authority to impose sanctions on banks in the event they violate legislative and regulatory prescriptions, including the provisions of the CMC and BDL's decisions. Decisions of the Higher Banking Commission are final and not subject to appeal[25].

33.     BDL's regulatory role with respect to the banking sector materializes through BDL's decisions, circulars, directives, and formal and/or informal communications addressed to the banks to ensure a safe banking activity, organize their relationships with their customers, and set the applicable solvency and liquidity requirements. BDL can set ceilings to interest rates offered by banks to their clients.[26]

34.     Under Article 13 of the CMC, Beirut courts have exclusive jurisdiction to settle disputes between BDL and third parties. When BDL acts in the context of its public authority under Article 70 of the CMC, it is not subject to the jurisdiction of Beirut courts, but to that of administrative courts[27].  This is because decisions taken by BDL in the context of its regulatory

---

[22] Article 9 of Law no. 28/67 (Exhibit no. 5).
[23] Article 9 of Law no. 28/67 (Exhibit no. 5).
[24] Article 10 of Law no. 28/67 (Exhibit no. 5).
[25] Article 209 of the CMC (Exhibit no. 3).
[26] Article 19 of Law no. 28/67 (Exhibit no. 5).
[27] Fady Nammour, *Droit Bancaire*, 2012, p. 57, paragraph 137.

authority are deemed as administrative decisions that fall outside the scope of ordinary law and cannot be referred to civil courts (as well as commercial and criminal courts).

**C.    General availability of claims for (i) civil conspiracy, (ii) unjust enrichment, (iii) conversion, (iv) promissory estoppel, (v) fraud, and (vi) issuance of dishonored checks under Lebanese law**

**Civil Conspiracy**

35.    I understand that, under New York law, '*to properly plead a claim of civil conspiracy, 'the plaintiff must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement.' alola v. Int'l Bus. Machines Corp., No. 19 CV 9900 (VB), 2019 WL 6879307, at \*4 (S.D.N.Y. Dec. 16, 2019) (citing McSpedon v. Levine, 158 A.D.3d 618, 621, 72 N.Y.S.3d 97, 101 (N.Y. App. Div. 2018)) (emphasis in original).*' Under Florida law, '*a claim for civil conspiracy requires: '(1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy.' Philip Morris USA, Inc. v. Russo, 175 So. 3d 681, 686 (Fla. 2015) (citations and quotations omitted). 'The gist of a civil action for conspiracy is not the conspiracy itself but the civil wrong which is alleged to have been done pursuant to the conspiracy.' Id.*'

36.     Lebanese law does not acknowledge civil conspiracy claims.


**Unjust enrichment**


37.     I understand that the elements of unjust enrichment claims under New York law are *'(1) the other party was enriched, (2) at the other party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.'  Cohen v. BMW Investments L.P., 144 F. Supp. 3d 492, 495, 501 (S.D.N.Y. 2015) (citing Georgia Malone & Co. v. Rieder, 19 N.Y.3d 511, 516 (N.Y. 2012))'.* Under Florida law, '*The elements of an unjust enrichment claim are: 'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.'  Fla. Power Corp. v. City of Winter Park, 887 So. 2d 1237, 1242 (Fla. 2004).*'


38.     Lebanese law does recognize unjust enrichment under the terms of 'enrichment without cause' (in French: '*enrichissement sans cause*')[28]. Article 140 of the COC states that '*Anyone who, without a legitimate cause, has enriched himself at the expense of others, is liable to restitution*'.[29]

---

[28] The COC was drafted in French in 1932 at the time when Lebanon was administered by France pursuant to the League of Nations mandate.
[29] Exhibit no. 7.

39.     Article 141 of the COC explains further the following:


'*The obligation of the enriched person towards the enricher arises, in this form and by*

*virtue of this source, only if the following conditions are met:*

*1- An enrichment, direct or indirect, pecuniary or moral, must have been carried out by*

*the alleged enriched;*

*2- A correlative impoverishment must have been suffered by the enricher, due to the*

*transfer of an asset or value made by him or a service rendered by him;*

*3- The enrichment that was realized and the corresponding impoverishment must be*

*devoid of a legal cause that would justify them; and*

*4- The enricher must not have at his disposal, to obtain satisfaction, any action other*

*than the action based on enrichment and which has, compared to all other legal grounds,*

*a subsidiary character.*'[30]


40.     On the basis of the above statutory provisions, I am of the opinion that enrichment

without cause under Lebanese law is comparable to unjust enrichment under New York and

Florida law, save that enrichment without cause under Lebanese law can be relied upon to claim

restitution only when no other legal grounds are available to obtain such restitution[31].

---

[30] Exhibit no. 7.
[31] That is why, under Lebanese law, enrichment without cause is said to be a claim having a subsidiary character. See Khalil Joreige, *The General Theory of Obligations*, 4th edition by Ramzi Joreige, 1998, vol. 1, p. 525.

**Conversion**

41.     I understand that, under New York law, '*the two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights*'  Pappas v. Tzolis, 20 N.Y.3d 228, 234, 982 N.E.2d 576, 580 (N.Y. 2012); see also Nasso v. Bio Reference Labs., Inc., 892 F. Supp. 2d 439, 454 (E.D.N.Y. 2012) (citing  Independence Discount Corp. v. Bressner, 365 N.Y.S.2d 44, 46 (N.Y. App. Div. 1975)) ('*To establish a cause of action in conversion under New York law, a plaintiff must show 'legal ownership or an immediate superior right of possession to a specific identifiable thing' and 'that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights)'.* Under Florida law, '*the elements of conversion are '(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein.'  Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co., 125 F. Supp. 2d 1093, 1099–100 (S.D. Fla. 2000) (citing Warshall v. Price, 629 So.2d 903, 904 (Fla. Dist. Ct. App. 1993)).*'

42.     The conversion tort is not known under Lebanese law.

**Promissory estoppel**

43.     I understand that, under New York law, '*to establish promissory estoppel, a party must prove a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained in reliance on that promise.*'  *CP Found. of Nassau, Inc. v. Meyers*, No. 17CV1866JMAAYS, 2019 WL 1384083, at *4 (E.D.N.Y. Mar. 27, 2019) (citing *Weaver v. Town of N. Castle*, 60 N.Y.S.3d 236, 240 (N.Y. App. Div. 2017)).  The '*existence of valid and enforceable written contracts precludes recovery under the cause of action sounding in promissory estoppel....*'  *Tobin v. The Rector*, No. 17 CIV. 2622 (LGS), 2017 WL 5466705, at *3 (S.D.N.Y. Nov. 14, 2017) (citing *Grossman v. New York Life Ins. Co.*, 935 N.Y.S.2d 643, 645 (N.Y. App. Div. 2011)).'  Under Florida law, '*the basic elements of promissory estoppel are: '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.*'  *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924 (Fla. 1989).'

44.     The concept of promissory estoppel is not found in Lebanese law.

**Fraud**

45.     I understand that, under New York law, '*the required elements of a common-law fraud claim are 'a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury.' Ambac Assurance Corp. v. Countrywide Home Loans, Inc., 106 N.E.3d 1176, 1182 (N.Y. 2018) (citation omitted).*' Under Florida law, '*fraudulent misrepresentation elements are: '(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation.'  Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010).*'

46.     Lebanese law does provide for a civil tort or fraud (designated by the French legal term '*dol*') in the context of misrepresentations made by one party to incite the other party to enter into a contract. Misrepresentation is one of the elements that vitiates consent to contracts (vices of consent).

47.     Misrepresentation is not defined by statute. It is defined by Lebanese courts and doctrine as a defect that vitiates consent at the time when a contract is made. It consists of manoeuvres by one of the parties to the contract, aiming at misleading the other party in respect of a determining

element of the contract, so that, as a result of being misled, such other party enters into such contract. To be actionable, misrepresentation must have been the factor that induced the misled party to enter into the contract. In other words, the victim of the misrepresentation would not have entered into the contract had he/she known the true situation.

48.     Lebanese law addresses fraud or misrepresentation in Articles 208 and 209 of the COC. Article 208 of the COC states: '*Fraud is never exclusive of consent; it vitiates it and entails the nullity of the contract when it has been decisive and has decided the victim to contract.(…)*'.[32]

49.     Article 209 adds: '*Decisive fraud entails the nullity of the contract to the extent that it has been committed by one of the parties to the detriment of the other ; however, fraud by a third party is also decisive if the party who benefitted from it was aware of it when the contract was made, otherwise, it only entitles the victim to claim damages against the author.*'[33]

50.     The Lebanese Cassation Court held in 1992 that misrepresentation implies that '*a party to the contract uses lies, disinformation, and fraud to hide the truth in order to have the other contracting party commit to the subject-matter of the contract or to one of its provisions as a result of the error created in his mind by misrepresentation and without which he would not have made such commitment.*'[34]

---

[32] Exhibit no. 7.
[33] Exhibit no. 7.
[34] Cassation Court, Decision no. 11 of 19 March 1992, *Al Adl* 1993, p. 64.

51.     More recently, in a 2011 decision, the Cassation Court defined misrepresentation as '*a behavior by one of the two contracting parties or by a third party that qualifies as a trick, or a lie, or a confusion, that created an error in the mind of the other contracting party that led him to enter into the contract, and who would not have entered into the contract had such error not occurred.*'[35]

52.     In light of the above developments, I can say that Lebanese law recognizes a civil tort of fraud that is comparable to the New York and Florida law of fraud, with the distinction that the Lebanese tort of civil fraud applies only in relation to the inducement to enter into contracts.

**Issuance of dishonored checks**

53.     I understand that, under New York law, the statutory basis for dishonored check claims is N.Y. U.C.C. Law § 3-413 (McKinney), which states '*(1) The maker or acceptor engages that he will pay the instrument according to its tenor at the time of his engagement or as completed pursuant to Section 3-115 on incomplete instruments. (2) The drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder or to any indorser who takes it up. The drawer may disclaim this liability by drawing without recourse. (3) By making, drawing or accepting the party admits as against all subsequent parties including the drawee the existence of the payee and his then capacity to indorse.*'

---

[35] Decision no. 72 of 12 October 2011, *Sader on Cassation*, *Civil Decisions*, 2011, p. 425.

54.     Under Lebanese law, issuing a check that is not covered by sufficient funds is a criminal offence punishable by imprisonment and fines. Article 666 of the Lebanese Criminal Code reads as follows: '- *Whoever draws a check without a prior provision available for payment or without sufficient provision; - Whoever withdraws all or part of the funds after drawing the check, - Whoever orders the drawee not to pay in circumstances other than those provided for under Article 428 of the Code of Commerce, shall be punished by imprisonment of three months to three years, and a fine from one to four million Lebanese pounds, and shall be sentenced to pay the amount of the check, with damages, if the case so requires. In case of a repeated offence, in addition to the penalties for repeated offences, the provisions of Articles 66 and 68 shall also apply. The waiver of personal rights in the aforementioned offences leads to the lapsing of public action. The characterization of infamous offence used in other laws in effect does not apply to such offences, and whoever is sentenced by one of such offences shall not be subject to any of the consequences described in such laws that apply to those sentenced for an infamous offence.*'[36]

55.     Article 667 of the same code adds that '*Whoever knowingly takes a check that is not covered by sufficient fund shall be punished by the penalties for complicity in the aforementioned offence. Such penalties shall be doubled if the bearer of the check obtained it in order to cover a usurious loan even if he was not an accomplice. Except for the case of obtaining a check to cover a usurious loan, waiver of personal rights leads to the lapsing of the public action*'.

---

[36] Exhibit no. 8.

56.     Notwithstanding the fact that issuing a dishonoured check is a criminal offence under Lebanese law, the holder of such check can choose not to pursue the criminal law route, and file a civil lawsuit to claim the amount of the check from the issuer.

**D.      Whether the Complaint's allegations concerning BDL, if assumed to be true, would be sufficient to establish BDL's liability to the Plaintiffs under Lebanese law.**

57.     To assess whether the Complaint's allegations, assuming they are true, engage BDL's liability under Lebanese law, I will start by describing briefly the legal regime applicable to checks under Lebanese law, and then outline the role of BDL in relation to the Checks drawn by each of *BLC Bank SAL*[37]*, Credit Libanais SAL*[38], and *Al-Mawarid Bank SAL*[39] (altogether the 'Banks').

**Checks in Lebanese Law**

58.     The definition of check under Lebanese law is the same definition found in French law. The check is defined as '*an instrument drawn by a drawer on a bank or similar establishment to obtain payment in favor of the bearer, of an amount of money that is available in his favor*'[40]. A check can also be described as a written order addressed by a drawer or issuer to a drawee,

---

[37] Check number 115982/F in the amount of USD 7,525,000.00.
[38] Check number 036018/F in the amount of USD 5,300,000.00, and check number 036022/F in the amount of USD 40,180.00.
[39] Check number 443219/F in the amount of USD 5,811,500.00.
[40] Fady Nammour, *op. cit.*, p. 57, paragraph 171.

generally a bank with which the drawer has funds, requesting the drawee to pay on presentment a specific amount of money to a person named on the check, the beneficiary, or to the bearer of the check.[41] If the drawer and the drawee are the same person, generally a bank, the check is designated in some jurisdictions as a cashier's check or banker's check.

59.     Under Article 409 of the Lebanese Code of Commerce[42], the check must comprise the following items:

- The word 'check' must be stated in the language used to write the check.

- An unrestricted and unconditional mandate to pay a specified amount.

- The name of the party who has the duty to pay, *i.e.* the drawee.

- The place where payment must be made.

- The date when the check was made.

- The place where the check was made.

- The signature of the issuer of the check, *i.e.* the drawer.

60.     Article 410 of the Lebanese Code of Commerce[43] explains further that the document that does not contain all the items listed in Article 409 above is not considered as a check, subject to the following:

- Absent a specific indication, the place mentioned next to the drawee's name would be considered as the place of payment.

---

[41] Fady Nammour, *Instruments de paiement et de crédit*, 2008, pp. 3-4.
[42] Exhibit no. 9.
[43] Exhibit no. 9.

- If several places are mentioned next to the drawee's name, the check would be payable at the place that is mentioned first.

- If no such information is set out, the check must be payable at the drawee's principal place of business.

- When the place of issuance of the check is not indicated, the check is considered issued at the place mentioned next to the drawer's name.

61.     Article 411 of the Code of Commerce adds: '*The cheque may only be drawn on a banker who holds, at the time when the check is made, funds that are at the drawer's disposal in accordance with an express or implied agreement under which the drawer may dispose of such funds by issuing checks*.'[44]

62.     Under Lebanese law, the place of payment is thus mandatory information that must be mentioned in the check. The place of payment is important because (i) it informs the check's beneficiary or bearer of the place where the check must be presented, (ii) it is taken into consideration to identify the court having jurisdiction in case of a dispute related to the check, (iii) it allows the designation of the applicable law when the check is negotiated in different countries, and (iv) it is taken into account to determine the currency of payment in the event that there is uncertainty in that regard.[45]

---

[44] Exhibit no. 9.
[45] Sader, *The Check, Legislation and Court Decisions*, p. 42.

63.     We read on the four Checks that they are '*Payable à/At Beirut*', which means that they are all payable by the drawee, BDL, in Beirut, and thus must all be presented for collection in Beirut.

64.     The check that was issued by *Al-Mawarid Bank* in an amount of USD 5,811,500, bears the additional statement '*to be cleared in Lebanon*'. Whether such statement is contained in the Checks or not, their place of payment remains Beirut, where they should be presented for payment and cleared, unless the drawee agrees otherwise. The fact that one of the Checks comprises an additional statement aimed at confirming the place of clearing has no bearing on that fact. The simple indication of the place of payment as Beirut suffices for such purpose because any check presented for collection to a local bank must be cleared through BDL's clearing system.

**BDL's Role in relation to the Checks**

65.     Throughout the Complaint, the Plaintiffs (i) indicate that the Checks were drawn by BDL on BDL[46], (ii) say that the Checks were passed by the Banks and BDL[47], (iii) describe the

---

[46] For instance, paragraph 42 of the Complaint: '*As part of BDL's repayment of its debts owed to BLC Bank, CL Bank and AM Bank, BDL allows the banks to <u>issue cashier's checks drawn by BDL against BDL</u> to satisfy obligations the banks owed to third parties*', paragraph 55: '<u>BDL knowingly drew bad checks</u> as part of Defendants' conspiracy to defraud Plaintiffs*', paragraph 292: '*The drawer of the check was BDL, and BDL was the drawee.*', and paragraph 338: '<u>BDL was the drawer and drawee</u> of the $5,811,500.00 USD check*' (emphasis added).
[47] See for instance paragraph 191 of the Complaint: '*For their part, <u>BDL and BLC Bank purposefully and knowingly passed worthless checks</u>…*', and paragraph 299: '<u>BDL and CL Bank purposefully and knowingly passed bad checks</u>…*' (emphasis added).

Checks as 'cashier's checks'[48], and (iv) make a distinction between the issuer and drawer of the Checks by saying that the issuers of the Checks are the Banks, and the drawer and drawee is BDL.[49].

66.     It is important to underline that, contrary to the above statements, the Checks were neither drawn nor passed or issued by BDL. They were all drawn, issued, and passed by the Banks. The drawers and issuer were the Banks, and BDL was simply the drawee. Furthermore, the Checks are not cashiers' checks, since they are not drawn by the Banks on themselves, but on another bank, BDL.

67.     The role of BDL with respect to the Checks being exclusively that of a drawee, its obligation was limited to paying the Checks, provided that the accounts on which such Checks were drawn had sufficient funds for settlement and the Checks were presented in Beirut, consistent with their terms.

**BDL's Liability to the Plaintiffs**

68.     BDL is not the drawer of the checks and the Complaint does not allege any facts suggesting that it was involved, nor concerned by the discussions, representations, statements, and events that took place between the Banks and the Plaintiffs leading up to the issuance and

---

[48] See footnote 46 above.
[49] For instance, paragraph 42 of the Complaint states: '*As part of BDL's repayment of its debts owed to BLC Bank, CL Bank and AM Bank, BDL allows the banks to* <u>*issue cashier's checks drawn by BDL against BDL*</u> *to satisfy obligations the banks owed to third parties*' (emphasis added).

remittance of the Checks to the Plaintiffs. In its role of a drawee, BDL's role arises only upon Plaintiffs' deposit of the Checks for payment. The Banks did not need BDL's authorization or approval to issue the Checks.

69.     That is why, all the Plaintiffs' suggestions that (i) BDL conspired with the Banks to issue bad checks[50], (ii) knowingly and intentionally drew bad checks[51], (iii) authorized the Banks to issue the Checks[52], and (iv) forced the Plaintiffs to accept the Checks[53], are not consistent with Lebanese law or practice[54].

---

[50] Paragraph 41 of the Complaint: '*As the Lebanese banks had no grounds for refusing depositors' instructions to transfer USD outside Lebanon, BDL and the banks entered into a conspiracy in which they agreed to make fraudulent misrepresentations to Plaintiffs, issue worthless checks to Plaintiffs in the United States that Defendants had no intention of honoring, and, despite the fact that they were knowingly issuing worthless checks to Plaintiffs, reducing Plaintiffs' balances as if Plaintiffs had actually received their USD.*' Paragraph 55 of the Complaint: '*BDL knowingly drew bad checks as part of Defendants' conspiracy to defraud Plaintiffs.*' Paragraph 364 of the Complaint: '*BLC Bank, CL Bank, AM Bank, and BDL conspired to have BDL draw checks for Plaintiffs as payees, issue the checks to Plaintiffs in the United States, and then refuse to honor the checks after Plaintiffs deposited the checks with their United States banks despite Defendants' contrary representations to Plaintiffs.*' (emphasis added).

[51] Paragraph 417 of the Complaint: '*BDL knowingly and intentionally drew bad checks to Plaintiffs in the United States for deposit in the United States knowing it would dishonor the checks when Plaintiffs attempted to negotiate the checks in the United States.*'

[52] Paragraph 42 of the Complaint quoted in footnote 46 above, and paragraph 55 of the Complaint: '*BDL also authorized BLC Bank, CL Bank, and AM Bank to issue the worthless cashier's checks*'.

[53] Paragraph 44 of the Complaint: '*In furtherance of their conspiracy, BDL and the banks utilized their own debtor-creditor relationship to coerce Plaintiff to accept illusory checks BDL and the banks would never honor in lieu of the wire transfers Plaintiffs requested and to which Plaintiffs were entitled.*' (emphasis added).

[54] See also paragraph 390 of the Complaint: '*BDL agreed to participate in the conspiracy as a commercial actor, including in the context of its role as a debtor of BLC Bank, CL Bank, and AM Bank and in participating in the commercial relationship between Plaintiffs and those banks. In addition, BDL has publicly stated that the funds of depositors of Lebanese banks were safe and that Lebanon had not instituted any capital controls such that BDL cannot possibly claim it was carrying out monetary policy when it drew the bad checks to Plaintiffs for the purpose of Defendants' misappropriating Plaintiffs' USD.*' (emphasis added).

70.     Turning to the payment of the Checks, which is the only part involving BDL in its capacity as drawee, BDL's obligation under Lebanese law is to pay the Checks to their rightful holder, provided there are sufficient funds in the accounts of the Banks with BDL and they are presented for payment consistent with their terms.

71.     Each of the four Checks indicates expressly that BDL's payment obligation is to be performed in Beirut. Even if no place of payment had been indicated in the Checks, they would still be payable in Beirut under Article 410 of the Code of Commerce that prescribes that, when the place of payment is not stated in the check, it is payable at the drawee's principal place of business. The Checks are therefore payable in all instances in Beirut.

72.     Under Lebanese law, BDL would validly discharge its payment obligation under the Checks by paying such Checks in the Plaintiffs' accounts in Lebanon, and BDL had no obligation to pay the Checks into the Plaintiffs' bank accounts abroad. There is no statute or regulation under Lebanese law that imposes a duty on BDL to pay the funds into an offshore account. That is why, any statements or communications made by BDL to financial institutions in the US, informing them that the Checks should be presented for payment and cleared through a clearing system in Lebanon, via a local bank, would be valid under Lebanese law, and would under no circumstances be either fraudulent or false.

73.     Moreover, as under the CMC BDL cannot deal with individuals, the Checks must necessarily be deposited with a bank in Lebanon having an account with BDL.

74.     Furthermore, BDL did not dishonor the Checks, it simply required that, in accordance with Lebanese law and the Checks' stated place of payment, the Checks be exclusively cleared and settled in Lebanon.

75.     That is why, the Plaintiffs' allegations that (i) BDL made false statements to financial institutions in the United States[55], (iii) '*stopped payment on the checks with the intent to defraud Plaintiffs*'[56], and (iii) fraudulently dishonored the Checks[57], would be dismissed under Lebanese law.

76.     I would finally like to address the issue whether the Plaintiffs would have a claim against BDL under the causes of action described in the preceding section and that are available in Lebanese law, *i.e.* civil fraud, unjust enrichment, and issuance of dishonored checks.

77.     In relation to fraud, as BDL did not engage into any statements, action or omission to induce the Plaintiffs to enter into a contract with any of the Banks, the Plaintiffs would not have a claim for fraud against BDL under Lebanese law.

---

[55] Paragraphs 184, 187, and 290 of the Complaint: '*BDL made these wire communications to financial institutions in the United States to execute Defendants' fraudulent scheme by dishonoring the check.*'. Paragraph 189 of the Complaint: '*The statements made by BDL to the United States financial institutions were made by wire and were known to the BDL to be false when made.*' Paragraph 300 of the Complaint: '*BDL made false statements to the United States banks via wire communications claiming that the checks could not be deposited in the United States, despite the fact that CL Bank represented to Plaintiff that they could and despite the fact that BDL was under no legal obligation to dishonor the checks.*' (emphasis added).
[56] Paragraph 490 of the Complaint.
[57] Paragraphs 184, 187, and 290 of the Complaint.

---

78.     Turning to unjust enrichment, non-payment of the Checks abroad, and even non-payment of the Checks at all, would not lead to any enrichment of BDL since BDL has no title to the funds, whether they are paid or not. The funds held by BDL in the Banks' accounts are the property of the Banks, not the property of either BDL or the Banks' customers.

79.     Finally, with respect to the offence of issuing dishonored checks that sanctions the drawer and, in certain circumstances, the beneficiary, the Checks not having been issued by BDL or to the order of BDL, such offence would not be applicable as far as BDL is concerned.

## CONCLUSION REACHED

80.     BDL has no liability to the Plaintiffs under Lebanese law, save for paying the Checks in an account in Lebanon, assuming that the accounts on which the Checks were drawn had sufficient funds at the time when the Checks were to be cleared for payment.

## FINAL CONSIDERATIONS

81.     The opinions expressed in this Declaration are limited to matters of the laws of Lebanon. I express no opinion with respect to the laws of any other jurisdiction, and it is assumed that no law of any other jurisdiction affects the conclusions in this Declaration.

34

82.     This Declaration is given in light of the laws of Lebanon presently in force, as implemented by Lebanese courts. The opinions in this Declaration may vary if these laws were to be amended, repealed or annulled, or differently applied by Lebanese courts.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 1st, 2020, in Beirut, Lebanon.

FADI MOGHAIZEL

# DECLARATION OF FADI MOGHAIZEL
December 1st, 2020

| LIST OF EXHIBITS | |
| --- | --- |
| Exhibit no. 1 | Preamble (paragraph b) and Articles 7 and 20 of the Lebanese Constitution. |
| Exhibit no. 2 | Article 7 of the Lebanese Code of Civil Procedure. |
| Exhibit no. 3 | Articles 13, 15, 47, 70, 71, 72, 75, 76, 79, 81, 82, 84, 85, 150, 154, and 209 of the Lebanese Code of Money and Credit. |
| Exhibit no. 4 | Article 40 of Law no. 1/84 of June 13, 1984. |
| Exhibit no. 5 | Articles 9, 10, 19 of Law no. 28/67 of May 9, 1967. |
| Exhibit no. 6 | Article 2 of the Lebanese Banking Secrecy Law of September 3, 1956. |
| Exhibit no. 7 | Articles 140, 141, 168, 208, and 209 of the Lebanese Code of Obligations and Contracts. |
| Exhibit no. 8 | Articles 666 and 667 of the Lebanese Criminal Code. |
| Exhibit no. 9 | Articles 409, 410, and 411 of the Lebanese Code of Commerce. |

12903.1