## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOSEPH A. DAOU and KAREN M. DAOU, | : | |
| Plaintiffs, | : | Case No. 1:20-cv-04438-DLC |
| | : | |
| vs. | : | **DECLARATION OF** |
| | : | **JOSEPH A. DAOU** |
| BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., | : | |
| AL-MAWARID BANK, S.A.L., and BANQUE DU | : | |
| LIBAN, | : | |
| | : | |
| Defendants. | x | |

JOSEPH A. DAOU, under the penalties of perjury, pursuant to 28 U.S. Code § 1746 declares:

1.      I am one of the Plaintiffs in the above-captioned action, and I have personal knowledge of the facts and circumstances giving rise to this action.

2.      I respectfully submit this declaration, together with the annexed exhibits: (a) in opposition to Defendants' respective motions to dismiss the First Amended Complaint (ECF 57, 59, and 62); and (b) in support of Plaintiffs' forthcoming renewed motion for an attachment.

3.      The facts stated below are true to the best of my knowledge and are based on my personal knowledge and my review of the records except where stated upon information and belief, in which case I believe the facts to be true.

4.      My wife, Karen Daou, and I are the Plaintiffs in this lawsuit.  We have been married for 28 years. We are United States citizens who had more than $18,500,000.00 (United States Dollars) ("USD") on deposit in Lebanon as of the end of 2019.  Defendants have conspired to steal our USD, thereby causing us tremendous hardship and damages for which we seek compensation through our First Amended Complaint in this lawsuit.

5.      Defendants BLC Bank S.A.L. ("BLC Bank"), Credit Libanais, S.A.L. ("CL Bank"), and AL-Mawarid Bank, S.A.L. ("AM Bank") (collectively referred to as the "Banks,")

are retail and commercial banks in Lebanon.  My wife and I have banked with BLC Bank since 2016, CL Bank since 2016, and AM Bank since 2019.

6.      Defendant Banque Du Liban ("BDL") is the central bank of Lebanon.  In late 2019 and early 2020, Defendants misappropriated our USD by refusing to transfer our USD on deposit with the Banks outside Lebanon as was our right.  Instead, the Banks issued us worthless checks drawn by and against BDL which BDL then refused to honor when we deposited them in the United States and the United States banks attempted collection from BDL.

7.      The Banks have blatantly refused to transfer our USD outside Lebanon, citing the banking liquidity crisis in Lebanon as their justification for unlawfully misappropriating more than $18,676,884.10 in principle and accrued interest from our accounts.

8.      The Banks repeatedly refer to me as a Lebanese citizen in their motion papers.  I am a Lebanese citizen because I was born in Lebanon.  Neither I nor any members of my family carry a Lebanese passport. My wife, Karen, is a U.S. citizen, as she and her parents were born in the United States. She has Lebanese citizenship through our marriage.  As the Banks know, I am a United States citizen.  I travelled to Lebanon, just like to any other country, using my United States passport.  I identified myself to the Banks as a United States citizen.  When opening accounts, I executed documents in compliance with the Foreign Account Tax Compliance Act of 2010 ("FATCA"), so that our USD on deposit in Lebanon would be declared to the United States Government.  FATCA requires foreign financial institutions to report, directly to the Internal Revenue Service, information about financial accounts held overseas by United States taxpayers.[1] My address on file with the Banks is our Florida residence.  In addition, the Banks routinely corresponded with me while I was physically present in the United States, and I regularly discussed

---

[1] https://www.irs.gov/businesses/corporations/summary-of-fatca-reporting-for-us-taxpayers.

with all the bankers with whom I communicated that my wife Karen and I are both United States citizens.

**The Lebanese Banking System**

9.      Defendants are all part of a government regulated Ponzi scheme also known as the Lebanese banking system.  BDL conspired with the Lebanese banks, including, but not limited to, the Banks, to defraud United States citizens, such as myself and my wife Karen, who deposited their hard-earned USD in Lebanon.

10.      The Banks solicited our deposit through false promises that our accounts would accrue interest at rates that were much larger than the interest rates available in the United States, while maintaining the ability to transfer USD from our Lebanese bank accounts to our United States bank accounts as needed.

11.      The Banks then used the Lebanese banking crisis they helped create to steal our USD.  The Banks have refused to provide my wife and I with any genuine explanation for their seizure, except to cite the Lebanese banking crisis.  The Banks then issued us worthless checks drawn on BDL that BDL refused to honor after we deposited them in the United States.  The specific facts relating to each of the Banks are set forth below.

**BLC Bank**

12.      My wife Karen and I were targeted and lured by BLC Bank into depositing USD into the Lebanese banking system.

13.      BLC Bank's Jbeil Branch Manager, Jean Claude Zakhia ("Zakhia"), is a personal friend of mine.

14.      In 2016, BLC Bank began inflating interest rates. During this time, Zakhia contacted me on a personal note seeking to solicit USD.  Zakhia asked if I was interested in

depositing USD at BLC Bank.  Zakhia advised that in return for my USD deposit, BLC bank would pay high interest rates on our USD deposit.

15.     During our initial conversations, BLC Bank represented that it maintained correspondent banking relationships with the largest U.S. banks and that BLC Bank could therefore quickly and reliably effectuate large transactions in U.S. Dollars on our behalf as it has done for many of its other United States customers.

16.     I advised BLC Bank that I would only be interested in depositing USD in a short term, monthly maturity account to ensure that I would have readily available access to USD as needed. I further explained that, as business owners, it was essential that Karen and I have ready access to our USD to be able to engage in future business ventures and fulfil financial obligations.

17.     Zakhia agreed to these terms and provided assurances that we would be able to transfer funds from our BLC Bank account to our bank accounts in the United States at any time without any issues.

18.     Relying on Zakhia's assurances and believing them to be true, we agreed to open an account with BLC Bank.  Zakhia and other members of the Jbeil Branch repeatedly told me that the account would be opened for me as a U.S. citizen and, accordingly, I would be required under FATCA to report information to the United States government and subject to United States tax obligations.  I informed them that I understood such and wanted the account to be opened for me as a U.S. citizen.

19.     On April 26, 2016, and while physically present at BLC Bank's Byblos Branch, Lebanon, I opened a joint USD account on behalf of Karen and myself. BLC Bank mailed the account opening documents to our residence in Florida so Karen could sign the documents.

20.     The account opening documents included, among other things, a FATCA provision which my wife and I signed as required of United States citizens. On the account opening documents, I repeatedly listed my Florida residence as the address to receive notices pertaining to the account.  A true and correct copy of the BLC Bank opening account documents is attached as **Exhibit 1.**

21.     BLC Bank maintains correspondent bank accounts in New York at JPMorgan Chase Bank, NA, The Bank of New York Mellon, and Standard Chartered Bank.  BLC Bank utilized these correspondent banks throughout its relationship with Karen and me, including to accept our USD deposits.

22.     On June 9, 2016, I directed the transfer of $1,900,000.00 from the account of SAVIS, Inc. ("SAVIS") at BMO Harris Bank, N.A. to our account at BLC Bank in Lebanon. Karen and I are the sole shareholders of SAVIS.  Attached hereto as **Exhibit 2** is a true and correct copy of the wire transfer, with the account numbers redacted.

23.     BLC Bank utilized its correspondent bank account in New York to accept the June 9, 2016 wire transfer deposit of $1,900,000.00 USD.

24.     On November 21, 2016, I directed the transfer of $2,000,000.00 from SAVIS' bank account with BMO Harris Bank, N.A. to our account at BLC Bank in Lebanon.  Attached hereto as **Exhibit 3** is a true and correct copy of the wire transfer.

25.     BLC Bank utilized its correspondent bank account in New York to accept the November 21, 2016 wire transfer deposit of $2,000,000.00 USD.

26.     On February 21, 2017, I transferred $2,045,000.00 from Karen and my account with BMO Harris Bank, N.A. to our account at BLC Bank in Lebanon.  Attached hereto as **Exhibit 4** is a true and correct copy of the wire transfer.

27.     BLC Bank utilized its correspondent bank account in New York to accept the February 21, 2017 wire transfer deposit of $2,045,000.00 USD.

28.     BLC Bank solicited the above-mentioned transfers from Karen and I in furtherance of their scheme to induce our deposits through the false promise of high interest rates and ready transferability of our USD. We would have not transferred the $5,945,000.00 USD to our account at BLC Bank if we knew that we would be prevented from transferring USD to our bank accounts in the United States as needed.

29.     By September 2019, Karen and I were successful in securing multiple real estate investment opportunities for our affiliated entities.  The transactions were acquisitions of multi-family properties in South Florida, Virginia Beach, Virginia, Austin and Houston, Texas.  The acquisitions required that Karen and I fund a deposit and related costs. Accordingly, Karen and I attempted to use our USD that was on deposit in BLC bank to fulfil our funding obligations for the multi-family property investments.

30.     On September 20, 2019, I contacted Zakhia and requested that BLC Bank execute a wire transfer on September 28, 2019 of Karen and my USD on deposit with BLC Bank to our account with Huntington National Bank in the United States.  I previously provided BLC Bank with the wire transfer information for our Huntington National Bank account in the United States.

31.     BLC Bank failed to respond to my request.

32.     On September 23, 2019, I contacted Zakhia again to check on the status of the wire and to request a current statement of our accounts.

33.     On September 24, 2019, Zakhia responded with our account statements. Zakhia assured me BLC Bank would execute the wire transfer as planned on September 28, 2019.

34.     Zakhia requested that Karen and I retain $1,500,000.00 USD on deposit with BLC Bank and withdraw the balance.

35.     In response to Zakhia's request, I advised that although Karen and I would consider returning funds after we completed our real estate acquisition, we needed all the funds for our real estate transaction.

36.     BLC Bank refused to follow my instruction and did not execute the wire transfer on September 28, 2020.

37.     On September 30, 2019, Zakhia falsely represented that BLC Bank would wire the funds to our account in the United States on October 28, 2019, the next recurring monthly maturity date for our accounts with BLC Bank.

38.     On October 21, 2019, Zakhia assured me that BLC Bank would execute the wire transfer on October 28, 2019.

39.     On October 28, 2019, I requested an update from BLC Bank on the wire transfer as BLC Bank had failed to execute it as promised. On October 29, 2019, I made another inquiry regarding the status of the wire transfer.

40.     On October 29, 2019, Zakhia contacted me via WhatsApp advising that the Lebanese banks, including BLC Bank, were closed. At that time, Zakhia assured me that as soon as the banks reopened BLC Bank would execute the wire transfer. I reiterated to Zakhia that we were instructing BLC Bank to execute the wire transfer and expressed my concern that BLC Bank was dodging the issue and refusing to follow my instructions.

41.     On November 5, 2019, I appeared at the BLC Bank Branch in Byblos, Lebanon and met with Zakhia.  I used my United States passport to travel to Lebanon for this meeting. Whenever I travelled to Lebanon for business or for other visits, I always used my United States

passport.  During the meeting, I asked Zakhia if BLC Bank was in an insolvency proceeding or if any capital controls had been implemented by the Lebanese government.  Zakhia advised that there were no capital controls in place and no insolvency proceeding.

42.     On November 7, 2019, Zakhia advised, on behalf of BLC Bank, that it was refusing to follow my instruction to execute the long-overdue wire transfer of Karen and my USD to the United States.  Zakhia stated that BLC Bank was refusing to execute the wire transfer at the direction of BLC Bank's Board.

43.     Zakhia then offered to provide a cashier's check that would be valid for deposit in the United States.  I rejected this proposal because BLC Bank was obligated to follow my instructions and execute the wire transfer on my behalf.

44.     Unable to obtain the long-overdue wire transfer and receiving no reliable information from Zakhia, on November 7, 2019, I wrote to Samir Khoury ("Khoury"), BLC Bank's Deputy Head of Retail Banking, demanding a wire transfer of the full balance of our USD on deposit with BLC Bank.  I specifically advised Khoury that the wire transfer was necessary for Karen and me to fulfil our real estate funding obligations in the United States.

45.     As of November 8, 2019, Karen and I had $7,469,166.41 USD on deposit with BLC Bank.

46.     That same day, I again instructed Zakhia to execute the wire transfer to our bank account in the United States.  Zakhia advised that BLC Bank would not execute the wire transfer, and further advised that the only method of withdrawal available was a cashier's check. Khoury then advised that the proposed cashier's check was valid and could be deposited in the United States where the funds on deposit at BLC Bank originated. When I inquired whether BLC Bank was in an insolvency proceeding or any capital controls had been imposed by the Lebanese

government, Khoury confirmed that BLC Bank was not subject to any insolvency proceeding.  In addition, Khoury confirmed that the Lebanese government had not imposed capital controls on the Lebanese banks.  Rather, Khoury advised that the Lebanese banks were refusing transfer instructions outside Lebanon pursuant to an informal agreement among the banks.

47.     I told Khoury that BLC Bank's refusal to follow my instructions regarding the transfer of Karen and my USD was unlawful. Again, I demanded a wire transfer. Once more, Khoury refused to follow my instructions, instead, he repeated that our only option for withdrawing their USD was to accept a cashier's check drawn on BDL.  Khoury again represented that the cashier's check they would issue would be negotiable in the United States.

48.     I declined to accept a cashier's check and still insisted on a wire transfer.

49.     On November 13, 2019, I notified BLC Bank that Karen and I would suffer substantial damages beyond the loss of our USD and interest if BLC Bank continued to unlawfully misappropriate our USD and refuse to follow my instructions.

50.     BLC Bank continued to refuse my instruction to execute the wire transfer.  BLC Bank also continued to pressure me to accept a cashier's check instead and provided further assurances that the cashier's check BLC Bank was pressuring me to accept would be drawn against BDL, would be valid, and could be deposited in the United States.

51.     On November 24, 2019, BLC Bank showed me an exemplar of a cashier's check with BDL as both the drawee and drawer of the check. Khoury represented that the check was valid, and that there were sufficient funds for the check to clear, and it could be negotiated in the United States.

52.     Desperate to meet our funding obligations in the United States, in reliance on both BLC Bank's representations and assurances and on the fact that the check was drawn by and

against the BDL, which is the central bank of Lebanon, I reluctantly agreed to accept the cashier's check.

53.     BLC Bank requested that I speak with a representative from my United     States bank to confirm whether it would accept the cashier's check issued by BLC Bank.  Accordingly, I had my representative contact Huntington National Bank and show the Huntington National Bank representative a picture of the check.  The Huntington National Bank representative confirmed that the foreign cashier's check was a normal foreign check which would be accepted for deposit in the United States.  The Huntington National Bank representative further advised that the processing time for the foreign cashier's check to clear would be longer than a domestic check due to transit times as the representative further explained that this process requires delivery of the physical check to the bank in Lebanon via international courier to be cleared and paid.

54.     On November 24, 2019, I wrote to BLC Bank confirming that Karen and I were only accepting the check based on BLC Bank's ongoing refusal to execute a wire transfer and BLC Bank's repeated assurances that the check drawn against BDL could be deposited in the United States.

55.     On November 28, 2019, BLC Bank issued the check in the amount of $7,525,000.00 USD, which was drawn by BDL against BDL.  The check was signed by Zakhia and another representative of BLC Bank.  Karen Daou and I were the payees. Attached hereto as **Exhibit 5** is a true and correct copy the cashier's check and receipt for the check.

56.     Zakhia advised that BLC Bank and Zakhia were authorized by BDL to issue the checks.  BLC Bank again represented that the check was valid and could be deposited in the United States. In response, I notified BLC Bank that I would be sending the check home via DHL Courier

to deposit in the United States.  The copy of the check and the receipt stated in handwriting "valid for deposit in USA" and Zakhia initialled it.

57.     Karen and I deposited the $7,525,000.00 USD check at Huntington National Bank in the United States.

58.     On December 23, 2019, Huntington National Bank advised that the check had been dishonored.  Huntington National Bank stated that the reason for rejection was: "We are returning the attached check which was presented to us for collection.  The check is being returned unpaid for reason of LEBANON IS NOT ACCEPTING CHECKS FOR COLLECTIONS.  CHECKS MUST BE PRESENTED AT LOCAL BANK IN LEBANON." Attached hereto as **Exhibit 6** is a true and correct copy of the correspondence from Huntington National Bank.

59.     On December 30, 2019, Karen Daou and I deposited the $7,525,000.00 USD check at the Bank of America in Florida. On January 7, 2020, Bank of America returned the $7,525,000.00 USD check.  Bank of America wrote: "We're unable to process your collection item for the following reason:  The financial institution that the check is drawn on no longer supports presentments for payment." Bank of America also wrote: "If you have concerns about the check being returned, you may contact the maker of the check and request an alternate payment method, such as a cashier's check or money order; or a wire or ACH funds transfer."  This is precisely what I had attempted but which Defendants steadfastly refused. Attached hereto as **Exhibit 7** is a true and correct copy of the correspondence from Bank of America.

60.     When I attempted to contact BDL to discuss BDL's misconduct and attempt to mitigate Karen and my damages, BDL refused to communicate with us.

61.    BDL and BLC Bank intentionally passed bad checks to Karen and me, United States citizens, in furtherance of their conspiracy to defraud American depositors like myself and misappropriate our USD.

62.    After the check was dishonored, my Lebanese counsel issued a demand letter to BLC Bank to execute a wire transfer of our USD to our bank account in the United States. A true and correct copy of my Lebanese counsel's demand letter is attached hereto as **Exhibit 8**.

63.    On January 31, 2020, I sent an email to Khoury and Zakhia demanding execution of the wire transfer to Karen's and my Huntington Bank account because the worthless check was dishonored.  I also requested that BLC Bank credit my BLC Bank account in the amount of the worthless check. BLC Bank refused to transfer our dollars and spitefully reduced our account at BLC Bank in the amount of the worthless check BLC Bank issued.  BLC Bank had misappropriated our USD.

64.    Karen and I were therefore left with worthless checks and a nominal balance in our BLC Bank account.  Despite having $7,525,000.00 USD on deposit with BLC Bank and never receiving anything but a worthless check, as of April 8, 2020 our BLC Bank account balance showed as $27.08.  Attached hereto as **Exhibit 9** is a true and correct copy of the bank statement from BLC Bank.

65.    BLC Bank issued another worthless check in the amount of the remaining account balance, $27.08, with a notary public in Beirut, Lebanon.  BLC Bank then closed our bank account and mailed a letter to Karen and me in the United States notifying us of the issued check and closing of the account.

**CL Bank**

66.    Karen and I were also targeted and solicited by CL Bank into depositing USD into the Lebanese banking system.

67.     Karen and I were introduced to CL Bank through Nadim Issa ("Issa"), the Regional Manager of the Jbeil and North branches.  Issa pursued us as a client, and he solicited us to deposit our USD in Lebanon.

68.     In March 2016, Issa visited me in Kaslik, Lebanon to introduce CL Bank's Jounieh branch staff, including Michel Ghalieh ("Ghalieh") as the Jounieh Branch Manager, and another employee of that branch.  Ghalieh would be the person to assist Karen and I with our day-to-day banking services.  Issa represented to us, on behalf of CL Bank, that CL Bank would pay high interest rates for our USD deposits and that Karen and I could still freely transfer our USD outside of Lebanon.

69.     Issa offered me even higher interest rates if we would agree to longer-term maturity deposits.  I steadfastly refused and reiterated that Karen and I needed ready access to our USD.  I advised that we would only deposit our USD if CL Bank could assure us of, at most, one-month reoccurring maturity dates.

70.     CL Bank, through Issa, represented that Karen and I could readily withdraw or transfer our USD outside Lebanon.

71.     Issa further represented to me that CL Bank maintained correspondent banking relationships with the largest U.S. banks and that CL Bank could therefore quickly and reliably effectuate large transactions in USD on Karen and my behalf as it has done for many of its other United States customers.

72.     Karen and I relied on these repeated representations and were induced to enter into a banking relationship with CL Bank. We were also induced to deposit our USD with CL Bank.

73.     During our meeting, Issa and Ghalieh repeatedly told me that they would open the account for me as a U.S citizen and, accordingly, I would be required under FATCA to report

information to the United States government and subject to United States tax obligations. I informed them that I understood such and wanted the account to be opened for me as a U.S. citizen.

74.     On March 9, 2016, and while physically present in Kaslik, Lebanon, I opened a joint bank account on behalf of my wife, Karen, and I with CL Bank.  Issa and a CL Bank Jounieh Branch employee named Sandra Saliba ("Saliba") were present at the time I opened the account. After I signed the account opening documents, Saliba confirmed that she would, on behalf of CL Bank, mail the account opening documents to our residence in Florida so Karen could sign the account opening documents.

75.     CL Bank knew, based on account opening documents, including but not limited to, FATCA disclosures, W-9, and KYC forms, that Karen and I were U.S.  citizens residing in Florida. Specifically, the account opening documents included a FATCA disclosure, which my wife and I signed, expressly declaring that my wife and I are U.S. citizens and accordingly, CL Bank was authorized to provide U.S. authorities with required banking information and documents. Further, the W-9 forms included in our account opening documents expressly state that my wife and I are Florida residents.  The KYC forms completed for us also stated that we presented our U.S. passports to CL Bank when opening our account.  CL Bank was also aware of the fact that it was directing wire communications and mail communications into the United States.  Attached as **Exhibit 10** is a true and correct copy of the opening account documents.

76.     For USD transactions, CL Bank maintains correspondent bank accounts in New York with Citibank, N.A., JPMorgan Chase Bank, N.A., Standard Chartered Bank, and the Bank of New York Mellon.  CL Bank utilized these correspondent banks in New York to transact with Karen and me, including to accept deposits of our USD.

77.     On April 7, 2016, I transferred $2,500,000.00 USD from Karen and my account at Fifth Third Bank, N.A. in the United States to CL Bank in Lebanon. Attached hereto as **Exhibit 11** is a true and correct copy of the wire transfer, with account numbers redacted.

78.     CL Bank utilized its correspondent bank account in New York to accept the April 7, 2016 wire transfer deposit of $2,500,000.00 USD.

79.     Since 2016, the banking relationship between CL Bank and us was conducted mostly through WhatsApp voice messages and WhatsApp text messages as Karen and I resided in the United States.  CL Bank delivered our account statements in the United States via WhatsApp text messages.

80.     On February 5, 2018, Karen and I deposited $825,000.00 USD in our CL Bank account by transferring $825,000.00 USD from our account at BMO Harris Bank in the United States to our account with CL Bank in Lebanon.  Attached hereto as **Exhibit 12** is a true and correct copy of the bank transfer.

81.     CL Bank utilized its correspondent bank in New York to accept the transfer of Karen's and my $825,000.00 USD deposit on February 5, 2018.

82.     On August 20, 2018, and subsequent to my request via phone for a wire transfer, CL Bank initiated a wire transfer of $3,699,995.00 USD to our account at BMO Harris Bank in the United States.  Attached hereto as **Exhibit 13** is a true and correct copy of the bank transfer.

83.     CL Bank used its correspondent bank in New York to effectuate the August 20, 2018 transfer to our account in the United States.

84.     On October 22, 2018, Karen and I deposited $4,699,994.00 USD in our CL Bank account by transferring $4,699,994.00 USD from our account at Huntington National Bank in the

United States to our account with CL Bank in Lebanon. Attached hereto as **Exhibit 14** is a true and correct copy of the wire transfer.

85.     CL Bank utilized its correspondent bank in New York to accept the transfer of our $4,699,994.00 USD transfer on October 22, 2018.

86.     Throughout my discussions with Issa, I made it clear to Issa and he understood that I required that our USD were readily transferable outside of Lebanon.

87.     On behalf of CL Bank, Issa repeatedly represented via telephone and written electronic communications to me, including while I was physically present in the United States, that our deposits would earn substantial interest rates in USD and that we could promptly withdraw or transfer our USD outside Lebanon.

88.     On January 12, 2019, I sent Issa a text message to inquire about the situation in Lebanon and asked why I was receiving higher interest rates at other banks.

89.     On January 14, 2019, I showed Issa a forwarded text message demonstrating that I was getting 9.75% net interest from another bank.

90.     On January 14, 2019, Issa replied that CL Bank does not offer interest rates equal to what I was receiving at other Lebanese banks.

91.     Issa further explained that some banks needed the USD cash because they "mismatched" their investment.  Specifically, Issa asserted that other banks were themselves paying high interest rates to borrow money to pay their debts, and thus were willing to pay high interest rates to depositors to gain USD deposits.

92.     Issa maintained that only Lebanese banks that needed USD cash were giving customers that high of an interest rate.  Issa represented that CL Bank was not in the same financial condition.

93.     On January 16, 2019, I sent a message to Issa advising that I had been trying to call him with no success.  I advised that our next monthly account maturity date was approaching, and we wanted to know if CL Bank would match the 9.75% interest rate we were receiving at other Lebanese banks.  I further advised that if CL Bank would not match the interest rate, we would withdraw our USD from CL Bank.

94.     Issa responded in a WhatsApp text message advising that he was unable to discuss any interest rates with CL Bank's General Manager and that he would be doing that the next day. On January 17, 2019, Issa asked for additional time because the General Manager wanted to talk to Joseph Torbey ("Torbey"), Chairman and General Manager of CL Bank, before they could give him a final answer on the interest. On January 21, 2019, Issa left a voicemail advising that the Chairman of CL Bank approved the 9.75% interest rate for our USD.  Issa stated that CL Bank did not want to lose Karen and I as clients, and therefore the Chairman approved the request even though it was the first request of this kind.

95.     On September 4, 2019, I contacted Issa via WhatApp inquiring about the risk of Karen and I keeping our USD in Lebanon and inquired about the best time for us to withdraw our USD.  On September 5, 2019, Issa responded.  Issa thanked me for my trust.  Issa represented that the Lebanese banking system was still very solid and there were no risks for our USD.  Issa stated that he wished that we would not withdraw our USD from CL Bank, while providing further assurances.

96.     On September 23, 2019, Issa offered further assurance, representing to my international business agent, Vanessa Mikhael ("Mikhael"), that our USD was safe in Lebanon and we should not have any concerns about the same.  To support his representation, Issa asserted that CL Bank recently received $100,000,000.00 USD from a European Bank which, according to

Issa, was a sign of safety and security.  Issa's representations on behalf of CL Bank induced me to retain our USD in Lebanon and with CL Bank.

97.     On October 21, 2019, I asked Issa whether the rumors of wire transfers outside of Lebanon being prohibited were true.  Issa represented that there was nothing even close to such a prohibition, because banks cannot stop people from withdrawing their funds.  On October 22, 2019, Issa represented that there were no capital controls whatsoever and the rumors about the same were not true.

98.     On October 28, 2019, I contacted Issa, and instructed that CL Bank wire transfer the balance of $7,000,000.00 USD. In response, on October 28, 2019, Issa confirmed that he could arrange to send the wire to the United States in the amount of $7,000,000.00 USD.  Issa further represented that the wire transfer had already been approved by CL Bank's Board.

99.     Issa subsequently reneged in part and requested that the wire transfer be delayed until November 14, 2019.  In response, I explained that the wire transfer was required promptly so that the funds could be used to satisfy funding obligations for Karen's and my acquisition of multi-family real estate projects in Virginia Beach and South Florida.

100.    On October 29, 2019, Karen and I, through Mikhael, provided Issa with the formal instructions for the requested wire transfer.

101.    After receiving the instruction, Issa phoned Mikhael requesting that the wire transfer be delayed until November 14, 2019.

102.     In response, Mikhael inquired about the reason for the delay.

103.    Issa confirmed to Mikhael that there were no restrictions whatsoever, but the delay would let Issa close the month with higher USD in the accounts originated by him, and that his request is purely personal.

104. Issa concealed from Mikhael the fact that Defendants had already collusively enacted informal capital controls by only allowing politically connected depositors to transfer their USD outside Lebanon for safekeeping while agreeing to prohibit withdrawals and transfers outside Lebanon by depositors without political connections.

105. On October 29, 2019, I sent Issa, via WhatsApp, a lengthy explanation of the United States real estate investments that Karen and I secured in Virginia Beach and South Florida and that the contract we signed. I explained to Issa that this had been discussed a few months prior and CL Bank was aware of that through a regional manager who confirmed that Karen and I could transfer the USD out of Lebanon.

106. On November 5, 2019, Issa and I discussed the pending wire transfer again. I explained that the latest the wire could be executed was November 14, 2019, but that I preferred that it be executed by November 13, 2019 in order to fulfil Karen's and my funding obligations. Issa confirmed that CL Bank would execute the requested wire transfer on November 14, 2019.

107. Furthermore, Issa falsely represented to Mikhael that he would notify the CL Bank Board of Directors of his resignation should the wire transfer not get executed to us on the promised date, November 14, 2019. Issa was clearly trying to increase our confidence that the wire would be made, and to cement our personal relationship. CL Bank never executed the wire transfer, but Issa remains employed by CL Bank as one of five of its Regional Managers.[2]

108. On November 7, 2019, I discussed with Issa the informal constraints on cash withdrawals being reported in the press. Issa conceded that CL Bank was indeed restraining cash withdrawals but reassured that my pending wire transfer was not impacted and would be "no problem."

---

[2] *See* https://www.creditlibanais.com.lb/GroupProfile/CorporateGovernance/10.

109.     On November 8, 2019, Issa again provided reassurances that the wire transfer would proceed as planned on November 14, 2019, regardless of whether the bank was closed because, according to Issa, CL Bank's back office which would execute the wire transfer was still functioning. Issa additionally assured my representative, Mikhael, during a telephone conversation, that even if CL Bank could not initiate the wire transfer from Lebanon, CL Bank has the full capability of initiating the wire transfer of $7,000,000.00 USD from CL Bank's correspondent bank in New York to Karen's and my United States bank account and assured Mikhael that CL Bank would do so if necessary.

110.     On November 11, 2019, when I learned the news of a nationwide strike by bank tellers who were refusing to work without better security given the civil unrest in Lebanon as the banking crisis was deepening, I contacted Issa to determine whether the bank strike could impact the wire transfer.  Issa once again sent assurances that CL Bank's back office remained open and therefore the strike would not impact the wire transfer.  Issa further confirmed that CL Bank was not the subject of an insolvency proceeding and that the Lebanese government had not imposed any capital controls on CL Bank or the other Lebanese banks.

111.     On November 12, 2019, I sent written communication to Issa requesting confirmation that the wire transfer would be performed as requested.  Issa provided reassurances that the transfer would be completed as requested.

112.     On November 13, 2019, Issa advised that the wire transfer was approved by Torbey.  Issa provided assurances that the $7,000,000.00 USD would be in my account the following morning of November 14, 2019 when my team woke up in the United States.

113.    CL Bank never executed the wire transfer, despite repeatedly assuring me that it would.  Issa turned his phone off and refused to take any further phone calls or messages from me or Mikhael.

114.    On November 19, 2019, I appeared in CL Bank's offices in Lebanon to meet with Ghalieh.  As I always did when travelling to Lebanon for banking or any other purposes, I travelled using my United States passport.

115.     Ghalieh again advised that CL Bank would not make a wire transfer of Karen's and my USD to our account in the United States.  Instead, Ghalieh proposed that CL Bank issue a cashier's check which I could deposit in the United States.  I continued to insist upon receiving a wire transfer, and implored Ghalieh to explain the reason CL Bank was refusing to follow my instruction to execute the delinquent wire transfer.

116.    On November 19, 2019, I contacted Ghalieh requesting that CL Bank reconsider executing the wire transfer per my instruction to avoid the substantial economic damages CL Bank's unlawful activities were causing, not only my wife and I, but our company.  I further reiterated to CL Bank that I committed to fund $8,000,000.00 USD for our investment in a Virginia Beach multi-family project and advised CL Bank that its continued misappropriation of our USD was impeding the consummation of the acquisition and exposing us to substantial potential liability.

117.    As of November 20, 2019, Karen and I had $5,298,845.03 USD on deposit with CL Bank in one account and $413,027.25 USD in another account.

118.    On November 20, 2019, I appeared at the Jounieh branch of CL Bank and met with Ghalieh demanding a wire transfer to our United States account.

119.    Ghalieh again refused, citing his superiors' instructions.  When I asked why CL Bank was refusing my instructions, Ghalieh showed me a November 17, 2019 decision of the Association of Banks in Lebanon ("ABL") purporting to prohibit wire transfers outside Lebanon.

120.    Ghalieh again suggested a cashier's check and represented that the check could be deposited in the United States.  Ghalieh also advised that CL Bank was not subject to any insolvency proceeding, and represented that he confirmed with CL Bank's headquarters, specifically Michel Khadige ("Khadige"), Executive Board Member and Deputy General Manager of Corporate Banking and Financial Institutions at CL Bank, that Karen and I could deposit the cashier's check in the United States.

121.    On November 21, 2019, I visited the Jounieh branch of CL Bank and demanded that CL Bank follow my instructions and execute the wire transfer I first requested in September 2019.  I also wrote to Ghalieh that day demanding the wire transfer of the balance in our accounts.

122.    On November 21, 2019, Ghalieh, CL Bank branch manager, again proposed that CL Bank would deliver a cashier's check drawn against BDL and represented to me that I could deposit the check in the United States.

123.    On November 21, 2019, CL Bank provided a cashier's check drawn by BDL against BDL in the amount of $5,300,000.00 USD.  The check was signed by Ghalieh and another representative of CL Bank.  The account transfer debit advice states "Deposit in USA."  The copy of the check stated "Original Received.  To be deposited and authorized in the USA.  Declined to make a wire transfer."  The copy of this statement was signed and stamped by Ghalieh.  Attached hereto as **Exhibit 15** is a true and correct copy of the check and the account transfer debit advice accompanying the check.

124.    With Ghalieh's permission, I recorded the conversation between Ghalieh and I during which Ghalieh stated that the check would be valid for deposit in the U.S.  During that conversation, Ghalieh called Khadige who also assured me that the check would be valid for deposit in the U.S.

125.    At the time CL Bank issued the check, CL Bank knew that I would send the check to the United States via DHL Courier for deposit in the United States.

126.    On behalf of CL Bank, Ghalieh provided assurances that we could deposit the cashier's check in the United States, and that there were sufficient funds on deposit with BDL for the check to clear.  Ghalieh also represented to me that CL Bank was authorized to issue checks drawn on BDL.

127.    CL Bank knew that I would be depositing the check in the United States for immediate deployment for Karen's and my real estate investments.

128.    CL Bank requested that I speak with a representative from my United States bank to confirm whether it would accept the cashier's check issued by CL Bank.  Accordingly, I had my representative contact a representative at Huntington National Bank and show the Huntington National Bank representative a picture of the check.  The Huntington National Bank representative confirmed and was informed by her bank that the cashier's check was a normal foreign check which would be accepted for deposit in the United States.  The Huntington National Bank representative further advised that the processing time for the foreign cashier's check to clear would be longer than a domestic check due to transit times as the representative explained that this process would require delivering the physical check to the bank in Lebanon via international courier for it to be cleared and paid.

129.     Karen and I deposited the $5,300,000.00 USD check drawn by BDL against BDL at Huntington National Bank.

130.     Huntington National Bank acknowledged on December 4, 2019 that it was attempting to clear the check, but BDL refused to honor the check, just as BDL and CL Bank always intended.

131.     On December 23, 2019, Huntington National Bank advised that the reason for rejection was: "The check is being returned unpaid for reason of LEBANON IS NOT ACCEPTING CHECKS FOR COLLECTIONS.  CHECKS MUST BE PRESENTED AT LOCAL BANK IN LEBANON." Attached hereto as **Exhibit 16** is a true and correct copy of the correspondence from Huntington National Bank.

132.     Karen and I subsequently attempted to deposit the $5,300,000.00 USD check with Bank of America on December 30, 2019.

133.     However, on January 7, 2020, Bank of America returned the $5,300,000.00 USD check.  Bank of America wrote: "We're unable to process your collection item for the following reason:  The financial institution that the check is drawn on no longer supports presentments for payment."

134.     Bank of America also wrote advising the following: "If you have concerns about the check being returned, you may contact the maker of the check and request an alternate payment method, such as a cashier's check or money order; or a wire or ACH funds transfer."  Of course, that is exactly what Karen and I had attempted, but which Defendants steadfastly refused.  Attached hereto as **Exhibit 17** is a true and correct copy of the correspondence from Bank of America.

135.    The check was worthless.  CL Bank deducted the amount of their worthless check from our CL Bank account when they issued the check.

136.    On December 2, 2019, CL Bank issued a further check in the amount of $40,180.00 USD.  CL Bank handed the check to my agent in Lebanon knowing our agent would use the mails to deliver the check to the United States for deposit in the United States.  The drawer of the check was BDL, and BDL was the drawee.  Attached hereto as **Exhibit 18** is a true and correct copy of the cashier's check and the release accompanying the check. On December 11, 2019, Karen and I attempted to deposit the $40,180.00 USD check at BMO Harris Bank N.A.  BDL refused to honor the $40,180.00 USD check.

137.    BMO Harris Bank N.A. rejected the $40,180.00 USD check, stating that the check could not be negotiated outside Lebanon.

138.    On December 30, 2019, Karen and I attempted to deposit the $40,180.00 USD check in BMO Harris Bank N.A.

139.    On January 7, 2020, Bank of America returned the $40,180.00 USD check.  Bank of America wrote: "We're unable to process your collection item for the following reason:  The financial institution that the check is drawn on no longer supports presentments for payment." Attached hereto as **Exhibit 19** is a true and correct copy of the correspondence from Bank of America.

140.    The check was worthless.  Nevertheless, CL Bank deducted the amount of their worthless check from our CL Bank account.  Attached hereto as **Exhibit 20** is a true and correct copy of the bank statement from CL Bank.

141.    After the checks were dishonored, our Lebanese counsel issued a demand letter to CL Bank to execute a wire transfer of our USD to our United States bank account.  Attached hereto as **Exhibit 21** is a true and correct copy of the demand letter.

142.    CL Bank refused, and spitefully will not even allow either Karen or I to access our account at CL Bank.

**AM Bank**

143.     Karen and I were also targeted and solicited by AM Bank into depositing USD into the Lebanese banking system.

144.    As of December 2, 2019, I had a pre-existing friendship through a mutual friend with AM Bank's Vice President of International Business Development, Youssef Hanna El-Khoury ("El-Khoury").

145.    I had not previously done business with AM Bank because El-Khoury and AM Bank had not previously offered interest rates equal to what was offered by BLC Bank and CL Bank (i.e., approximately ten percent) for short-term maturity accounts.

146.    On December 2, 2019, El-Khoury solicited my USD deposit with AM Bank.  AM Bank, through their agent, El-Khoury, offered to pay interest of eleven percent on our USD. He represented that we could withdraw or transfer our USD outside Lebanon in early January. Specifically, El-Khoury represented that it would be beneficial for him and AM Bank to have Karen's and my USD on deposit through the end of the 2019, but that we could withdraw or transfer our USD outside Lebanon in early January so we could deploy our USD for our funding obligations for the real estate transactions we were closing.

147.    I informed El-Khoury that I was only interested in a short-term deposit in order to be able to wire transfer money to the United States to satisfy a real estate investment funding obligation due in January 2020.

148.    El-Khoury provided assurances that AM Bank will initiate the requested wire transfer after New Year's Day in 2020.

149.    On December 3, 2019, while relying on AM Bank's representation and physically present in Lebanon, I opened a bank account at AM Bank through its branch in Jounieh.  I travelled to Lebanon using my U.S. passport.  AM Bank's Jounieh Branch manager, under the supervision of El-Khoury, opened the account on AM Bank's behalf.

150.    AM Bank knew, based on account opening documents, including but not limited to, the FATCA disclosures, W-9 and KYC forms, that Karen and I were U.S. citizens residing in Florida.  Specifically, the account opening documents included a FATCA disclosure, which my wife and I signed, expressly declaring that my wife and I were U.S. citizens and accordingly, AM Bank was authorized to provide U.S. authorities with required banking information and documents.  Further, the KYC forms completed for us stated that Karen and I presented our U.S. passports for identification when opening the account. The W-9 forms included in our account opening documents expressly state that my wife and I are Florida residents.    A true and correct copy of the AM Bank's opening account documents is attached as **Exhibit 22.**

151.    AM Bank maintains a correspondent bank account in New York with the Bank of New York Mellon.  AM Bank utilized these correspondent banks in New York to transact with Karen and me, including to accept deposits of USD.

152.     On December 3, 2019, upon opening the account, I deposited $5,735,928.67 USD into the account.  AM Bank utilized its New York correspondent bank account to accept this deposit.

153.     On December 13, 2019, upon my return to the United States and during my tour of the secured properties in Texas, I communicated with El-Khoury and sent him the information related to the investment in the multi-family properties in Austin, Texas and Houston, Texas that Karen and I had secured. I explained to El-Khoury that Karen and I required transfer of our USD on deposit with AM Bank to the United States so that we could meet our funding obligations for this upcoming closing on a real estate transaction in the United States, as previously discussed at the time of the opening of the account.

154.     El-Khoury again provided assurances that AM Bank will initiate the requested wire after New Year's Day 2020.

155.     In December 2019, while I was in the United States, I sought to open a joint account for Karen and myself at AM Bank.

156.     Chirine Aoun ("Aoun"), AM Bank's Jounieh Branch manager, opened the joint bank account, under the supervision of El-Khoury, and delivered the opening documents to our residence in Clearwater Beach, Florida via DHL Courier.  The documents included, but were not limited to, KYC documents and FATCA compliance forms identifying us as United States citizens and residents.

157.     From this point forward, all of AM Bank's communications were wire communications directed into the United States, including the false representations by El-Khoury of AM Bank described below.

158.    On January 3, 2020, I emailed El-Khoury instructing AM Bank to initiate the wire transfer to the United States of our USD.

159.    El-Khoury advised that he had to wait for AM Bank's Chief Executive Officer, Marwan Kheireddine ("Kheireddine"), to return from a trip on January 7 or 8, 2020 so Kheireddine could approve the wire transfer.

160.    On January 11, 2020, AM Bank advised through El-Khoury that, at the direction of BDL, AM Bank was unilaterally and unlawfully lowering the interest rate on Karen's and my account to five percent.  AM bank further advised that the interest payment of the five percent would be made partially in Lebanese Lira and not completely in USD.

161.    On January 12, 2020, I emailed El-Khoury again to follow up on his wire transfer instruction after learning that Kheireddine had appeared on Lebanese national television acknowledging that the wire restrictions in Lebanon were unlawful and fraudulent.

162.    I inquired about AM Bank unlawfully lowering the interest rate without my approval. At that time, I also informed El-Khoury that Karen and I were demanding an immediate wire transfer of the full amount deposited at AM Bank to our bank account in the United States.  I further objected to the interest payments being made in Lebanese Lira as this measure was unfair because the funds on deposit were in USD and the Lebanese Lira was in free fall versus USD.

163.    On January 15, 2020, El-Khoury responded via email stating that due to the external wire transfers restrictions in Lebanon, AM Bank refuses to initiate any wire transfers for Karen and me.  El-Khoury also stated that the decision to unilaterally and unlawfully lower the interest rate was made by BDL.

164.    I explained to El-Khoury that Karen and I required transfer of our USD on deposit with AM Bank to the United States to meet our funding obligations for an upcoming closing on a real estate transaction in the United States.

165.    El-Khoury responded that he would need to inquire with his superiors about whether he could follow Karen's and my instruction and execute the wire transfer of our USD to the United States.  El-Khoury stated that he would have an answer within one week.

166.    However, El-Khoury failed to provide an answer within one week as promised. Therefore, between January 9 and 15, 2020, desperate for answers and a response, I repeatedly followed up with El-Khoury imploring him to respond about the interest issue and wire transfer instruction.

167.    On January 15, 2020, El-Khoury finally responded via email that AM Bank would not execute the wire instruction because "all the external transfers are restricted for the time being," and claimed that AM Bank was unilaterally reducing the interest rate on Karen's and my account at the direction of BDL.

168.    On January 17, 2020, while I was in Florida, El-Khoury and I had a telephone conversation during which El-Khoury falsely represented that AM Bank would execute the wire transfer.

169.    On January 23, 2020, I wrote to El-Khoury once again requesting the wire transfer so that Karen and I would have our USD available for our funding obligations for our real estate transaction which was due to close in February 2020.  Thus, I instructed AM Bank to execute a wire transfer in the amount of $5,735,930.00, plus all accrued interest on February 3, 2020 to our account at Huntington National Bank in the United States.

170.    AM Bank refused to comply with my instruction and continued misappropriating Karen Daou and my USD.

171.    From February 22, 2020 to February 29, 2020, I continued to demand that AM Bank comply with my instruction and execute a wire transfer of our USD to our account in the United States.  I also continued to provide AM Bank with notice of the fact that AM Bank's ongoing unlawful misappropriation of our USD was jeopardizing our pending real estate transaction in the United States.

172.    AM Bank still refused to comply with my instruction and execute a wire transfer of our USD to our account in the United States.  Instead, AM Bank suggested that we instead accept a cashier's check drawn by BDL against BDL which could be deposited in the United States.  AM Bank represented that it was authorized to issue checks drawn on BDL.

173.    El-Khoury separately advised our representative Mikhael that if AM Bank made the wire transfer, BDL would shut down AM Bank.

174.    On February 25, 2020, my wife Karen requested via e-mail to El-Khoury that our funds be transferred from my savings account with AM Bank to our current joint account with AM Bank.  AM Bank complied with this instruction.  AM Bank delivered the internal transfer authorization form to our residence in the United States via DHL.

175.    By March 4, 2020, AM Bank's ongoing and unlawful refusal to execute the wire transfer had coerced Karen and I into accepting, under duress, a cashier's check which AM Bank assured us could be deposited in the United States.  While we were of course by now skeptical given that BDL, BLC Bank, and CL Bank had already defrauded us with worthless BDL checks, we had no choice but to try.  AM Bank was misappropriating our USD and unequivocally stated repeatedly for two months that it would not execute a wire transfer.

176.    AM Bank represented that Karen and I could deposit the check in the United States.

177.    In reliance on AM Bank's representations, on March 4, 2020 I wrote to El-Khoury as follows: "per our phone conversation since your bank declined to make a wire transfer to the USA, I would have to accept a bank check drawn on Bank Du Liban (BDL).  The check will be valid to deposit in USA."

178.    On March 7, 2020, AM Bank issued a cashier's check payable to Karen and I in the amount of $5,811,500.00 USD.  BDL was the drawer and drawee of the $5,811,500.00 USD check. The check was signed by El-Khoury and Aoun of AM Bank. The check was delivered to our representative in Lebanon who informed AM Bank that he would deliver the check to us in the United States via DHL Courier. The copy of the check stated "Accepted check since declined to wire transfer. Valid to deposit in the USA."  The copy of this statement was stamped with a bank stamp by Aoun.  Attached hereto as **Exhibit 23** is a true and correct copy of the cashier's check.

179.    On March 10, 2020, Karen and I attempted to deposit the $5,811,500.00 USD check with Fifth Third Bank in the United States.

180.    On April 15, 2020, Fifth Third Bank returned the $5,811,500.00 USD check to advising that the "Reason for return:  Unable to clear – Refer to Maker." Attached hereto as **Exhibit 24** is a true and correct copy of the correspondence from First Third Bank.  AM Bank debited our account in the amount of the worthless check.  AM Bank later credited our account in the amount of the worthless check it issued, but the gesture is worthless because AM Bank will not allow Plaintiffs to have their USD.

181.    While AM Bank now asserts that it did not receive our USD through a correspondent bank account in New York (an assertion we intend to challenge and pursue in discovery) extensively and repeatedly represented to me that AM Bank could and would effect an

electronic transfer in January 2020 to Karen and me in the United States because AM Bank had correspondent bank accounts in New York.  Karen and I never would have deposited our USD with AM Bank if AM Bank had not made that representation to us.  We were desperately seeking to return our USD to the United States, and without that representation there would be no reason to deposit our USD with AM Bank.  Indeed, all of the Banks boast about their New York correspondent banking relationships to enhance their credibility and to assure customers that they can make transfers of USD around the world at the customers' instruction.

182.    The Vice President of International Business Development at AM Bank, El Khoury, assured Mikhael and I that, even if AM Bank as an entity was unable to wire my money to me, AM Bank's CEO, Kheireddine, would personally send me the money owed directly from his own U.S. bank accounts because he is a "tycoon" in the United States.  El Khoury assured us numerous times that Kheireddine had accounts and businesses in the USA.

183.    Karen and I still have not received any of our USD as deposited with the Banks. We have not returned to Lebanon for any purpose, including banking purposes, since my last visit in December of 2019 due to fears and concerns regarding our safety in Lebanon.

184.    I have received multiple telephone calls from friends and family in Lebanon who continuously ask me "Do you know what you're doing? Do you know what will happen if you come to Lebanon?" They also tell me that "This is the end of you coming to Lebanon. If you come, you will put yourself and your family in danger."

185.    I was also warned by a high ranking General in the Interior Defense Force with whom I have been friends for more than twenty-five years.  He told me that I should not come to Lebanon because I would be putting myself in danger for suing some of the most connected figures in Lebanon and therefore, he would not be able to protect me.

186.    My family members in Lebanon have also received calls warning them of threats against me, and spreading disinformation that I am taking money from the People of Lebanon.  My brother was repeatedly told that something bad will happen to me for pursuing my claims. These threats became so frequent that my brother left Lebanon and travelled to the United States in October 2020.  For his safety, my brother does not intend to return to Lebanon until this litigation is resolved and he feels safe.

187.    My family and I are also aware of what happened to Lara George Mansour ("Mansour") and her husband. She and her husband were unlawfully arrested, interrogated and detained in Lebanon's prison until Mansour agreed to withdraw her federal lawsuit in the United States against politically connected Lebanese citizens, including a judge. Mansour's husband was also threatened by the kidnapping of their daughter if he did not convince Mansour to dismiss the lawsuit in the United States.  My wife, my daughters and I are very concerned that we would be subject to the same or worse treatment if we return to Lebanon for any reason.

188.    We have sued in the United States District Court for the Southern District of New York because the Banks and BDL are all subject to jurisdiction in this District.  It is appropriate for Defendants to answer for their misconduct in this District because the Banks regularly utilize correspondent bank accounts in this District to carry out their businesses and their wrongdoing. The Banks accepted our USD knowing the USD was coming through correspondent bank accounts in New York.

189.    For the foregoing reasons, I respectfully request that the Court deny Defendants'

respective motions to dismiss the First Amended Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Dated this ⎟8th day of December 2020
Chicago, Illinois

JOSEPH A. DAOU