UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH A. DAOU and KAREN M. DAOU,

                Plaintiffs,

vs.

BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., AL-MAWARID BANK, S.A.L., and BANQUE DU LIBAN,

                Defendants.

Case No. 1:20-cv-04438-DLC

**DECLARATION OF ALINE EL KHOURY**

I, Aline Michel El Khoury, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am a lawyer licensed to practice law in Lebanon. I have been a member of the Beirut Bar Association since 1996. I am a principal in my private law firm named "El Khoury Law Firm," which maintains its office in Beirut, Lebanon. On behalf of the El Khoury Law Firm, I act as counsel and litigator, with a team of five professionals.

2. In addition to my legal training, I hold a Diplôme d'études approfondies (in English, a degree in in-depth studies) "DEA," which is similar to a bachelor's degree in the U.S., in banking and Finance from "La Sagesse University," and I have extensive experience as a counsel and litigator in banking matters and corporate matters, civil litigation and arbitration. My curriculum vitae is attached hereto as Annex 1.

3. I have been engaged by the law firm of Meister Seelig & Fein LLP ("MSF") to provide my expert opinions concerning the Lebanese legal system, the Lebanese banking system, and Lebanese law in connection with the lawsuit filed by MSF's clients Mr. Joe Daou and Mrs. Karen Daou.

1

4.  I am a native Arabic and French speaker. I am also fluent in English. I prepared this declaration in English.

5.  For the purpose of this Declaration, I have reviewed the following documents:

   a.  A copy of the "Customer-Bank Relationship Contract" signed with Al Mawared Bank s.a.l. (AM Bank) on the 3rd of December 2019;

   b.  A copy of the "General Operating Account" signed with BLC Bank s.a.l. on the 26th and 27th of April 2016;

   c.  A copy of the "Agreement of opening account/Accounts in our Names at your Bank with a request to issue Bank Payment Cards and Subscribe to the Bank's Electronic Services" signed with Credit Libanais Bank s.a.l. (CL Bank) on the 9th of March 2016;

   d.  A copy of the following Checks: Check no. /443219/ drawn by AM Bank on Banque Du Liban (BDL) to the order of the Plaintiffs dated 7 March 2020 for the amount of /5,811,500/USD; Check no. /115982/ drawn by BLC Bank on BDL to the order of the Plaintiffs dated 28 November 2019 for the amount of /7,525,000/USD; and Check no. /036018/ drawn by CL Bank on BDL to the order of the Plaintiffs dated 21 November 2019 for the amount of /5,300,000/USD; and Check no. /036022/ drawn by CL Bank on BDL to the order of the Plaintiffs dated 2 December 2019 for the amount of /40,180/USD;

   e.  A copy of the original Complaint filed by the Plaintiffs on or about June 10, 2020;

f.  A copy of the First Amended Complaint file by the Plaintiffs on or about October 30, 2020; and

g.  A copy of the motions to dismiss the First Amended Complaint and supporting papers filed by the Defendants AM Bank on November 20, 2020, BLC Bank on November 20, 2020, CL Bank on November 20, 2020, and Banque Du Liban ("BDL") on December 1, 2020.

A. **The Lebanese legal system and the structure of the Lebanese court system**

6.  The Lebanese legal system is a system governed by codes of law promulgated and amended by the Parliament, by decrees implemented by the Government, and by custom. The codes include the Code of Obligations and Contracts (civil law), the Code of Civil Procedure, the Code of Commerce, The Penal Code and the Code of Criminal Procedure.

7.  Moreover, for the matters that are not regulated by law, we can have recourse to the decisions rendered by the Lebanese courts in relation to said matters and especially the decisions rendered by the Supreme Court, in addition to the general principles of law and custom. In this respect the Code of Civil Procedure stipulates clearly in the last paragraph of article /4/ that in the event there is no law regulating a matter the judge should rely on the general principles of law, the custom and fairness.

8.  The judicial system comprise the Constitutional Council, the Administrative Court, the Civil court (which includes civil, commercial, personal statutes and criminal

courts), in addition to exceptional courts that include the Labor court, Real Estate court, Military court and Juvenile courts.

9. The structure of the judicial system is arranged in a three-degree system as follows:

a. The courts of First Instance, constituted by one Judge or a panel of three judges;

b. The courts of Appeal, constituted by a panel of three judges and serving as a second-degree court, they review the decisions of the courts of the First Instance; and

c. The Court of Cassation, the Supreme Court, located in Beirut, serving as the final judicial recourse, third degree court. The Supreme Court reviews the decisions of the Appeal courts.

10. The Minister of Justice maintains the power to appoint, promote, demote, and transfer judges throughout Lebanon.

**B.   Jurisdictional Issues**

11. Lebanese law on territorial jurisdiction are either "elective" or "compulsory" which cannot be contradicted by mutual agreement, as stated in Article 96 of the Civil Procedure code (Annex 2).

12. The jurisdiction of the Lebanese court is submitted, in principle, to the rules related to the internal territorial jurisdiction without discrimination between Lebanese and foreigners, according to Article 74 of the Civil Procedure code (Annex 2).

4

13. The jurisdiction of the Lebanese courts is exercised with consideration of the jurisdictional rules of foreign jurisdictions; it can be elective unless it is related to a compulsory jurisdiction, as stated in Article 80 of the Civil Procedure Code (Annex 2).

14. "Elective" jurisdiction stated in contracts is considered under Lebanese law only when the two following conditions are satisfied: (a) the contract is signed in Lebanon, and (b) at least one of the main obligations shall be executed in Lebanon, according to Article 100 of the Civil Procedure Code. Consequently, in the event one of the said conditions is not satisfied, another jurisdiction may be a competent jurisdiction if the other court has grounds to assert jurisdiction under its laws (Annex 2).

15. A territorial "elective" jurisdiction under Lebanese law in a tort proceeding is either the court of the domicile of the defendant, the court where the tort had place, or the court where the damages had place, according to Article 102 of the Civil Procedure Code (Annex 2).

16. CL Bank's form agreement does not include a clause giving jurisdiction to Lebanese courts in the event the Account Holder decides to file a lawsuit against the Bank. In fact, Article 11 of the parties' agreement states that for any dispute between the bank and the Account Holder(s) regarding the agreement, the Bank reserves the right to take legal action against the Account Holder(s) either in the Courts of Beirut or in the place of residence of the Account Holder(s).

17. BLC Bank's form agreement does not include a clause giving jurisdiction to Lebanese courts in the event a bank customer files a lawsuit against the Bank. In fact, Article X-2 of the agreement stipulates that the exclusive jurisdiction of Beirut Courts is

for the benefit of the Bank, which according to the text should be entitled to take action against the customer in any Lebanese or foreign court of its choice in order to defend its rights.

18. The agreement signed with AM Bank stipulates in Article 68 that the Beirut courts shall be the exclusive jurisdiction to hear any case or dispute initiated by the customer against the Bank, gives AM Bank the choice to prosecute the customer either in the Beirut courts, or the courts of the customer's residence (which, in this case, is Florida, U.S.A.). This clause may be challenged under Lebanese law because it does not respect the principle of justice and equality between the rights and obligations of the respective parties, and because it is a clause inserted by the party without power to negotiate and will be most likely considered null and void. In fact, the said agreement is a contract of adhesion under Lebanese law, according to Article 172 of the Code of Obligations and Contracts (Annex 2), which stipulates that when one of the parties must adhere to a standardized contract dictated to it and to which such party does not have the right to negotiate its content, the agreement is a contract of adhesion. In the event such agreements include a discretionary condition, under Lebanese law the judge has an extensive power by law to evaluate such conditions, and if the judge considers that they are discretionary the judge has full right to annul such conditions and spare the party subject to the provision from its application. (Encyclopedia of Civil and Commercial Agreements- Judge Dr. Elias Nassif- Part One- Contract regulations- Adherence Agreement- pages 84-85-86) (Annex 3).

19. As a result of the crisis Lebanon is facing, victims have filed countless law suits against the Lebanese banks to enforce the banks' obligation to wire transfer their

money abroad at their instruction. However, the depositors are not obtaining any protection from the Lebanese courts. Rather, the Lebanese banks are offering bankers checks in lieu of actual USD, which are only a piece of paper which the depositor cannot cash the value in any way.

20. Based on the above, it is my expert opinion that the territorial jurisdiction of Lebanon in the case opposing the Plaintiffs to CL Bank, BLC Bank, AM Bank and BDL Bank is not compulsory; it can be agreed otherwise by the parties, or in the event another jurisdiction has sufficient grounds to retain its competence, the case may be submitted to the other jurisdiction, for the following reasons:

a. The contractual jurisdiction rule in Lebanon, and one of the two required conditions is not satisfied, because Ms. Karen Daou signed the agreements in the USA not in Lebanon;

b. The territorial jurisdiction law in Lebanon governing tort claims is "elective" because the damages are caused in the USA where the Plaintiffs had to honor their obligations in the US territory with the required money to be wire transferred; and

c. The agreements signed with the CL and BLC Banks do not include any clause giving exclusive jurisdiction to Lebanese courts in the event the Client decides to file a lawsuit against the Bank, and the clause inserted in AM Bank agreement may be challenged and will most likely be considered as null and void for the above-mentioned reasons under Lebanese law, including because the rights of the Plaintiffs to get their money in the U.S.A. are not protected by the Lebanese courts.

## C.  Governing Law

21. Provisions in agreements to select governing law are not considered binding upon the parties before their signature by all the parties, when said signature is affixed at the same place and time by all the parties the agreement is considered as final at that same date and place, but when the signature is affixed by the parties at different places and time then the agreement shall be considered as final at the place and time of the signature of the last party, according to Article 184 of the Code of Obligations and Contracts (Annex 2). (President Moustafa Aougi- Civil Law- Part One- The Contract- page 239-240) (Annex 4).

22. The agreement with CL Bank does not include a clause specifying the governing law, although it refers to Lebanese laws in one of the clauses.

23. The agreement with BLC Bank includes a clause specifying that the governing law is the Lebanese law. In this respect I reiterate what I have explained above in relation to adherence agreement, which leads to easily challenge such clause null and void for the same reasons.

24. The agreement with AM Bank does not include a clause specifying the governing law, although it refers to Lebanese laws in some articles.

25. Under Lebanese law the place of commitment of the Plaintiffs shall be considered the USA since the three agreements were signed by one of the parties Mrs. Karen Daou in the USA after the signature of the other parties including the Banks. The nationality of the Plaintiffs as declared to the Banks is the U.S.A. nationality. The place of payment should be in the U.S.A. where the Plaintiffs deposited the Bankers checks, and

the currency is the US Dollars, and all the three Banks submitted their agreements to FACTA law either within the agreement itself or in a separate document.

26. Consequently, it is my opinion that U.S.A. law should be adopted to govern the CL Bank and AM Bank agreements which do not include a clause specifying the governing law and for which all the required indications to apply the U.S.A. law are satisfied as mentioned in paragraph 24 above, as for the BLC Bank agreement the U.S.A. law should be applied following to the annulment of the governing law clause according to the reasons mentioned above.

**D.**     **Wire Transfer Regulations in Lebanon**

27. There are no specific laws in Lebanon regulating the wire transfer, on the other hand there are no regulations forbidding or limiting the execution of wire transfers. The wire transfers are part of the Banking operations as a way of payment similar to cash payment.

28. According to Lebanese Laws, for the matters that are not regulated, the provisions of the basic laws in force in Lebanon, namely the Code of Obligations and Contracts and the Commerce Code may be applied along with the Banks' usages and the custom.

29. Article 221 of the Code of Obligations and Contracts (COC) stipulates the following;

> "The agreements legally made are binding upon the parties and must be understood, interpreted and implemented in accordance with good faith, fairness and custom." (Annex 2)

9

30. Article 4 of the Commercial Code stipulates clearly the following:

"The judge shall, in his evaluation of the outcome of a commercial act, apply well established usages, unless it becomes apparent that the parties had agreed to derogate them, and unless such usages contradict an imperative legal provision." (Annex 2)

31. The Court of Appeal in Beirut considered in the decision no. /11/ dated 6/3/1986 that the wire transfer is an operation similar to the operation of payment executed by the Bank to a specific person upon an order of payment received from its Client, thus it is simply considered as a payment similar to the payment in cash or by check. (Court of Appeal in Beirut – decision no. 11 dated 6/3/1986- Sader between the legislation and the court decisions - The Banks- page 561- paragraph 66) (Annex 5).

32. Under Lebanese law there is no restriction of the Client's rights to make wire transfers internal or external. Rather, the principle of the Private Property Right of each person protected by the Constitution would prohibit any such restriction.

33. Ripert and Roblot two French authors have defined the wire transfer as a banking operation similar to the withdrawal of a cash amount from someone's bank account and the registration of the said amount in the account of another person, such operation is executed as if the owner of the account has withdrawn a cash amount from the Bank and deposited it at the Bank in the account of the other person, the creditor. (Dr. Elias Nassif - Banking Agreements- T2- page 13) (Annex 6).

34. The agreement signed with CL Bank does not include any clause that forbids, rejects or submits the wire transfer to any prior approval nor to any specific consent,

10

knowing that the payment by wire transfer is a usual common and daily operation executed by Banks similar to payments in cash.

35. The agreement signed with BLC Bank stipulates clearly that the Client has the right to receive payment by wire transfer, without any restriction or prior conditions and without the need of any specific approval by the Bank, since it is considered as a simple way of payment similar to payment in cash, please refer to Chapter 02 section I article 1 which stipulates the following:

> "The Account Holder has access to sums deposited in sight deposit accounts by way of deposits or withdrawals made directly at the Bank's counters (including ATM machines) or by way of any payment instrument made available to the Client by the Bank, and in particular wire transfer, payment cards and/or cheques."

36. The agreement signed with AM Bank stipulates clearly that the Client has the right to receive payment by wire transfer upon his written request, without any restriction or prior conditions and without the need of any specific approval by the Bank, since it is considered as a simple way of payment similar to payment in cash, please refer to article 28 paragraph 2 which stipulates the following:

> "2- Withdrawals from aforementioned foreign currencies shall be made either by bank transfer issued by the Bank or by wire transfer in those foreign currencies issued upon the written request of the Second Party."

37. There is no law to date enacted by the Parliament to implement capital control. However, there are de facto measures illegally limiting the depositors' access to their own money.

11

38. Based on the above, it is my opinion that it is illegal to refuse the execution of the required wire transfer, and the Banks should perform the payment by wire transfer when requested by the Client, for the following reasons:

 a. There are no laws forbidding or limiting the execution of wire transfers; and

 b. The agreements with the Banks stipulate that the payment can be made in cash by check or wire transfer according to the clients' request without any further conditions, and

 c. The agreements must be understood, interpreted and implemented in accordance with good faith, fairness and custom when they are not clearly and explicitly forbidding the payment by wire transfer, and

 d. The wire transfer is simply a usual way of payment performed by the bank similar to payment in cash.

E. **Check regulations in Lebanon**

39. The Check is considered as a payment in cash if it is payable at sight and any mention to the contrary is reputed unwritten according to article /425/ of the Code of Commerce (Annex 2).

40. The Banks have the obligation to pay the depositors the deposited amount in one or several installments according to article /307/ of the Code of Commerce (Annex 2) which stipulates:

> "The bank which receives a sum of money as deposit acquires ownership thereof. It must refund it in one or several installments of equivalent value on the depositor's first request or within the terms of time-limit or prior notice specified in the contract."

41. The depositor has the right to receive payment of his deposited amount in cash, and there is no clause in the Lebanese law which compel the creditor/depositor to accept payment by check.. A check is supposed to be same as money.

42. It is well-known that the check is a way of payment similar to the payment in cash, (Sader between the legislation and the court decisions - The Banks- page 561- paragraph 66- op.cit.- Paragraph 31 above) and the cash circulation is free and legal inside the country as outside the country especially when the currency is US Dollars.

43. The Lebanese law does not distinguish between the check drawn by a Lebanese Bank deposited in Lebanon, and the check drawn by a foreign bank and deposited in Lebanon (article 426 of the Code of Commerce) (Annex 2), moreover the Lebanese law does not forbid the deposit of a check drawn by a Lebanese Bank at any foreign bank, this operation is totally accepted and legal.

44. The checks and the international transfers were an ordinary operation made by the banks without any special requirement;

> "2.3 **Non-cash payments**
> Non-cash payments in Lebanon are made using a number of instruments (Tables 7 no 10). Credit transfers through the BDL (including both SWIFT and non-SWIFT and non-SWIFT transfers – see Section 3.2) account for the highest total values of payments made in the economy, but represent mainly payments between members of the banking and financial sectors. Cheques are the predominant instrument in use among non-banks, for both high and low-value payments. If credit transfers through the BDL are excluded, cheques account for more than 90% of the total value of other payments. Cheques are

issued both in Lebanese pounds and in foreign currencies. USD cheques account for almost 100% of foreign currency cheques reflecting the importance of the US holler in economic and financial transactions in Lebanon (Table C)."

**Taken from Payment systems in Lebanon, prepared by the Central BANK and the Committee on Payment and Settlement Systems of the Central Bank of the Group of Ten Countries- November 2003, (Page 11, note 2.3) (Annex 7)**

45. The mention of the place where the payment is to be effected shown on the check does not refrain the payee to deposit the check in any other bank in Lebanon or abroad, since, as mentioned above, the check is equivalent to the payment in cash, consequently the payee can either come to the place of the bank mentioned on the check or to any of its branches to receive payment in cash, or he can deposit the check –as cash money- in any other bank in Lebanon or abroad, in the latter case the payee endorses the check and gives it to his bank, such endorsement equivalent to a proxy, allows the said bank to require from the drawee Lebanese bank – in the place mentioned on the check - to make the required payment which is usually made according to the international banking transactions through a correspondent bank and to deposit it in the payee account.

46. When a check bears the mention "Payable in Beirut", it refers to the location of the drawee regardless of the location of the financial institution where the beneficiary of the check is depositing such check. If the beneficiary deposits the check in any city other than Beirut <u>within the territory of Lebanon,</u> the check will be paid <u>through the Compensation Chamber</u> (Clearing House) and credited to the beneficiary account in the said city even though it states "Payable in Beirut." If the beneficiary deposits the check in

London or anywhere <u>outside the territory of Lebanon</u>, the check will be paid through a correspondent bank of the drawee.

47. The law does not distinguish between the check issued and signed by the drawer and the bank check issued and signed by the bank, therefore all the rules and regulations that applies on the regular check apply on the bank check. The difference between a bank check issued by the bank on itself and a bank check issued by the bank on BDL is in the way of settlement of the said bank check, the bank check issued by the bank on itself and deposited abroad should be compensated through the correspondent bank of the drawee in the place of the check deposit without passing via BDL, while the bank check issued by the bank on BDL and deposited abroad should be compensated through its standard way of compensation used by BDL.

48. Wire transfers and the deposit of checks drawn on Lebanese banks abroad have been usual, common and daily operations (except where red flags were raised). It is only since late 2019 that the banks started to refuse depositor's wire transfer instructions and started issuing bank checks they would not honor and would not pay in cash upon presentment.

49. The financial crisis in Lebanon cannot be considered as a Force Majeure allowing the Banks to refuse payment of the Plaintiffs money because legally under Lebanese Law (Art 341 of the Code of Obligations and Contracts) **the Force Majeure requires the obligation to be impossible to execute and not difficult to execute;** which is contradictory to Esq. Nasri Antoine Diab statement in page 9 paragraphs 18 and 19 of his declaration. (I refer to the Article written by Esq. Nasri Antoine Diab, a declarant for

BLC Bank in this case, published in Al Adel, 1987, page 130; extract attached in Annex 8).

50. Based on the above, it is my opinion that the issuance of the bank checks by CL Bank, BLC Bank and AM Bank which were not paid by BDL, is not a payment of the deposited amounts of the Plaintiffs and the said Banks by doing so did not fulfill their obligations towards the Plaintiffs.

## F. Conclusion

Based on the above, I am of the opinion that:

1- The Territorial jurisdiction of Lebanon in the case opposing the Plaintiffs to CL Bank, BLC Bank, AM Bank and BDL Bank is not compulsory; it can be of the jurisdiction of U.S.A. Courts because Plaintiffs are U.S.A. citizens, the bank agreements were signed in the US, the place of effective payment is the U.S.A. where the Plaintiffs have deposited the checks, the currency is the US Dollars, and the agreements are submitted to FACTA law.

2- The current restrictions imposed by the Banks are with no legal grounds in the absence of a law implementing the capital control on the funds in Lebanon.

3- It is illegal to refuse the execution of the wire transfers required by the Plaintiffs, since it is contrary to the law and the Constitution. By refusing to execute a transfer outside Lebanon or to pay the deposited amounts of the Plaintiffs in the USA, the Banks are imposing indirectly an illegal capital control.

4- The economic and financial crisis in Lebanon does not qualify as a force majeure event because the contractual obligation of the Banks is not impossible, it is only expensive;

5- The payment by bankers check by CL Bank, BLC Bank and AM Bank, cannot be considered as payment of the deposited amounts of the Plaintiffs where such funds will not be available that way in the USA for the Plaintiffs and by doing so the said Banks failed to fulfill their obligations towards the Plaintiffs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 18, 2020
       Beirut, Lebanon                                  Aline El Khoury