UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH A. DAOU and KAREN M. DAOU,    :
                     Plaintiffs,    :    Case No. 1:20-cv-04438-DLC

              vs.    :

                          :    **DECLARATION OF**
BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L.,    :    **DR. KARIM HENRI TORBEY**
AL-MAWARID BANK, S.A.L., and BANQUE DU    :
LIBAN,    x
             Defendants.

I the undersigned, **DR. KARIM HENRI TORBEY,** declare the following:

1.    I have been engaged by the law firm of Meister Seelig & Fein LLP to provide analysis of Lebanese law in connection with the above-captioned lawsuit filed in this Court by Joseph A. Daou and Karen M. Daou ("Plaintiffs") against BLC Bank, S.A.L. ("BLC Bank"), Credit Libanais, S.A.L. ("CL Bank"), Al Mawared Bank, S.A.L. n/k/a A.M. Bank S.A.L. ("AM Bank" and together with BLC Bank and CL Bank, the "Banks"), and Banque Du Liban ("BDL").

2.    In connection with my analysis, I have reviewed Plaintiffs' Complaint; Plaintiffs' Amended Complaint. In addition, I have reviewed: (a) the motion papers filed by BLC Bank and CL Bank in support of their joint motion to dismiss; (b) the motion papers filed AM Bank in support of its motion to dismiss; and (c) the motion papers filed by BDL in support of its motion to dismiss.

3.    I respectfully submit this declaration to the Court.
**Declarant's Background and Credentials**

4.    I am a lawyer licensed to practice law in Lebanon. I have been registered with the Beirut Bar Association since 1996.

5.    I am also a lecturer at the Faculty of Law and Political Sciences at Saint Joseph University of Beirut in Beirut, Lebanon where I have been teaching civil law since 2008.

6.    I received a PhD in private law from the University Pantheon-Assas (Paris II) in 2001.

7.    I am the author of a legal work *"Les contrats de franchise et de management a l 'epreuve du droit des societes"* (Franchise and management contracts put to the test of corporate law), which was crowned by Pantheon Assas University.

8.    In addition, I have to my credit a number of corporate law publications in Lebanon and France.

9.    Having represented the Beirut Bar Association for several years before the Parliament's administration and justice committee, I contributed to the amendment of the Lebanese commercial law, this amendment was adopted by the Lebanese Parliament in 2019.

10.    I also represented the Beirut Bar Association in the study of the draft amendment of the Code of Civil Procedure.

1

11.     As a member of the Lebanese Franshise Association, I provide legal advice on franchising and network development in Lebanon and abroad.

12.     I am the managing partner of a law firm named Torbey Law Office, which is located at Place de l'Etoile in Beirut, Lebanon.  Our law firm specializes in private law, commercial law, corporate law and banking law. Since the onset of the financial and monetary crisis in 2019, we were in charge of a certain number of lawsuits filed by depositors against banks to force them transfer money abroad. Therefore, the opinion contained in this declaration is the result of the study of the file submitted to me as well as the fruit of my knowledge, research and professional and academic experience.

## Factual Background

13.     I include below a brief overview of Plaintiffs' the allegations in this action to provide context for my analysis and opinions. However, this summary of Plaintiffs' allegations is obviously not part of the opinions I am offering to the Court in this action.

14.     By way of background, it is my understanding that the plaintiffs are United States citizens with joint United States Dollars ("USD") accounts at the Banks.

15.     Between October 28, 2019 and November 19, 2019, Plaintiffs requested that BLC Bank and CL Bank wire transfer Plaintiffs' USD to their account in the United States.  BLC Bank and CL Bank had previously executed Plaintiffs' wire transfer instructions.

16.     In December 2019, Plaintiffs requested that AM Bank execute a wire transfer of Plaintiffs' USD to Plaintiffs' account in the United States.

17.     The Banks each made representations to Plaintiffs that they would execute the wire transfers to Plaintiffs' account in the United States.  However, the Banks never made the wire transfers as instructed by Plaintiffs.

18.     Instead, the Banks persuaded Plaintiffs to accept bank checks drawn on BDL, and advised Plaintiffs the bank checks could be deposited in the United States.

19.     Plaintiffs deposited the bank checks in the United States, but BDL refused to pay the USD when the United States banks attempted collection on the check.  Therefore, Plaintiffs never received their USD.

20.     Plaintiffs filed this lawsuit to collect their USD in the United States.

## Analysis

21.     Wire transfers abroad have always been an integral part of banking activity in Lebanon.  Wire transfers were part of the services provided by Lebanese banks to their customers.  Wire transfers contributed greatly to make the banking sector an attractive sector, particularly for attracting foreign investment.

22.     Lacking substantial natural resources or heavy industry, Lebanon has always been a country of services whose banking sector is the backbone of the economy.  The success of this sector is due to three factors, namely: (a) the Bank Secrecy Law of 1956 (which does not directly concern us here); (b) the free flow and use of USD; and (c) the flexibility of the banking

2

sector (which I explain further below).

23.    The USD has been critical to Lebanon and its banking sector. Access to this stable currency has protected depositors against the instability of the Lebanese Lira, and the ready acceptance of USD around the world enables Lebanese and foreign depositors to transact business around the world using their USD on deposit in Lebanon.

24.    Lebanese banking laws, in particular the Monetary and Credit Act, and the attendant practices of the banking sector had a dual objective to (a) develop savings and (b) protect depositors. These objectives could not have been achieved without the flexibility of the banking sector, which is reflected in the diversity of services provided by banks to their customers, including cash services (receipt of funds and cash withdrawals without limits and without the need for any justification, transfers abroad upon mere instructions often sent by fax or telephone).

25.    Transfers abroad were essential to the Lebanese commercial and banking activity especially when we know that Lebanon imports most of its consumer products. They thus constituted well-established practices under Article 4 of the Commercial Law, which gives commercial practices the force of law: In his assessment of the effects of a commercial transaction, the judge shall apply well-established usages, unless it becomes apparent that the parties had agreed to derogate to said usages, and unless such usages are contrary to imperative legal provisions.

26.    Since the creation of the banking sector, transfers abroad have not been a source of litigation between banks and their customers, as evidenced by the absence, until recently, of case law in the matter. It is only recently, with the outbreak in October 2019 of the monetary and financial crisis that the courts in Lebanon have received disputes relating to this subject.

27.    The structure of the judicial system is arranged in a three-degree system as follows: (a) the courts of First Instance, constituted by one Judge or a panel of three judges; (b) the courts of Appeal, constituted by a panel of three judges and serving as a second degree court, they review the decisions of the courts of the First Instance; and (c) the Court of Cassation, the Supreme Court, located in Beirut, serving as the final judicial recourse, third degree court. The Supreme Court reviews the decisions of the Appeal courts.

28.    In the earlier cases, depositors were, on paper, successful in obtaining rulings in their favor. This should be unsurprising because the positions taken by the banks in the cases are completely contrary to Lebanese law. Since the bank must return the amount of its deposit to its customer, when the customer orders the bank to transfer amounts abroad, it must execute the customer's instructions and has no discretionary power in this respect.

29.    However, as the crisis has carried on, Lebanese courts have begun to ignore Lebanese law on these issues and have not been ruling against the banks for their clear violations of Lebanese law.

30.    In addition, I note for the Court that an application by a depositor against a bank to compel a wire transfer would qualify for a very speedy proceeding before the courts of urgent matters in Lebanon. Such a proceeding would ordinarily be concluded in approximately one week. However, these matters are now languishing.

31.    In a decision rendered on January 22, 2020 under number 52/2020, the judge of

urgent matters in Metn ordered Credit Bancaire to transfer funds to the plaintiff's account in the United Arab Emirates after rejecting the allegations of the bank, which expressed its readiness to honor its debt to the plaintiff by issuing a bank check for the claimed amount. The decision is justified by the liberal system and free trade in addition to the fact that the transfer is not a consensual contract but a means of execution of the bank deposit. The bank has appealed, and nothing has occurred before the Court of Appeal. I have reviewed the records in the execution department and there is no indication that the judgment has been satisfied by the bank.

32.     In a decision rendered on January 15, 2020 under number 275/2020, the Judge of urgent matters ordered BLOM Bank to transfer funds to the plaintiff's account in the United Kingdom on the grounds that the transfer is a banking transaction like the cash service, which does not entitle the bank to inquire into its cause. This is a transaction that is part of the practice and that is mandatory for the bank. This obligation finds its origin in the account opening agreement, and it is ordinary supplemented by banking practices. The bank has appealed, and nothing has occurred before the Court of Appeal. I have reviewed the records in the execution department and there is no indication that the judgment has been satisfied by the bank.

33.     In a decision rendered on August 24, 2020 under number 47/2020, the Court of Cassation stayed the execution of a decision of the Court of Appeal, which had ordered Byblos Bank to transfer funds to the plaintiffs account in Abu Dhabi. This decision did not rule on the merits, it only took an interim measure (a stay of execution of the decision rendered by the Court of Appeal). Nevertheless, the decision demonstrates how the banks have been successful in blocking depositors from actually collecting their USD even if they obtain rulings in their favor in the lower courts. its grounds investigate/are related to the merits of the dispute and give an idea about the final decision which will be rendered by the Court of cassation. Among its reasons, the Court of Cassation considered that the judges of the Court of appeal did not assess the grounds for appeal invoked by the bank and which are based on the nature of its agreement with its customer and the commitments resulting from this agreement, in particular the extent of the bank's obligation to transfer amounts abroad and the determination of the nature of such a transfer, and therefore the court ruled that the decision of the Court of appeal lacks legal grounds. The assessment and interpretation of the terms of the agreement entered between the bank and its customer do not lie within the jurisdiction of the judge of urgent matters, and fall within the jurisdiction of the trial judge, which justifies the stay of execution of the decision of the Court of appeal.

34.     The case betrays a fundamental right to receive money on deposit, including through wire transfers, which is inherent to the Lebanese banking system and the Lebanese economy. The courts' reluctance to enforce this right shows that the courts are not providing protection of the depositors but rather are providing protection for the banks that are engaging in a blatant violation of Lebanese law.

35.     This decision will have authority over the trial judges of course, as they know that if they do not respect the decisions of the Court of cassation, their decisions will be quashed (F. Terre, Introd au droit, Dalloz 2018, p. 294). And we have seen this concern come to reality.

36.     In a decision dated September 14, 2020 under number 122/2020, the judge of urgent matters in Baabda rejected a transfer request brought against Byblos bank to compel the bank to transfer Euros for use in paying tuition. Incredibly, the judge found the plaintiff placed herself in the difficult position by applying to the university when she should have known the bank would not transfer her Euros abroad at her request. The judge also based the decision was based on several grounds, none of which

4



have merit under Lebanese law. First, the judge considered that the urgency specified in article 579 of the Code of Civil Procedure is not met, and that the urgency is assessed in the light of the law we seek to protect and not in the light of the plaintiff's claims. The judge took into account the banking and financial crisis raging in Lebanon and the circulars of BDL, which limited transfers abroad. The judge also held that the application of article 579 of the Code of Civil Procedure (for urgent matters) is subordinated to the absence of a ruling on the merits of the dispute, which is not the case here since the required transfers will be final. The circumstances justifying the intervention of the judge of urgent matters are the absence of a serious dispute as to the certainty and clarity of the violation of the law, and the judge of urgent matters retains the power to assess the reality of this violation and the absence of a serious dispute. Upon examination of the documents contained in the file, in particular the account opening agreement, it appeared that the bank was not bound to return abroad the amount of the bank deposit. Moreover, the agreement did not require the bank to make transfers abroad, and the search for this obligation requires an interpretation of the agreement, which does not lie within the competence of the judge of urgent matters and fall within the competence of the trial judge. The judge ordered the student to pay the banks' legal fees and expenses.

37.    The judge's decision is contrary to Lebanese law. The court of first instance is available for a depositor seeking access to his or her funds. There is no dispute that the money is on deposit, and BDL's circulars are not binding law. In addition, the threat of being expelled from the university clearly creates sufficient urgency to enlist the judge of urgent matters to provide prompt relief. Requiring the student to litigate the action in full would take years in Lebanon, and the student's time for education school would be over by the time a decision was rendered.

38.    In a much-noticed decision by the judge of urgent matters in Metn on December 3, 2020 under number 455/2020, in a case brought against Fransabank the plaintiff requested the judge to order the bank to transfer funds to his account in Switzerland to help his daughter, a student, buy a studio. I note for the Court as a matter of disclosure that I was the lawyer for the plaintiff. I filed the proceeding in July 2020, and did not receive a decision until December 3, 2020, which is an inordinate delay in this court.

39.    In the Fransabank case, the bank, which was duly notified of the trial and the date of the hearing, did not appear at the hearing and did not submit a defense. Despite this, Judge Karkabi dismissed the trial on the main ground that the financial and banking crisis prevailing since October 2019 has imposed restrictions on withdrawals and transfers. He considered that the violation of the rights invoked by the plaintiff does not apply strictly to him but to all of the depositors who are in the same situation and therefore, if he accepts the plaintiffs request, he would break the equality among depositors who suffer from the same restrictions.

40.    This judgment is extremely serious for the following reasons. First, it was rendered without the bank defending the case on the merits and without even appearing at the hearing, which entails the illegality of the decision and hence raises questions about the judge's impartiality. Second, it is not based on any legal ground. No capital control law has been passed (if a capital control law is ever passed, it would have to be evaluated to determine if it violates Lebanese law or the Constitution). And most importantly, it assumed that the capital control imposed by the banks is legal, and drew the resulting conclusions in the reasoning of the decision. Third, it ignored that freedom of capital flows enshrined in the existing laws and ignored the banking practices in terms of overseas transfers. Fourth, it ignored the judge's mission, which is to protect the depositors' personal and fundamental rights and gave itself the power to regulate the banking activity, and was concerned with preserving what it called equality among depositors instead of protecting depositors by enforcing the law.

5

41.     These recent decisions demonstrate a disturbing trend in the Lebanese courts to disregard binding law and ignore the facts in order to place the interests of the banks ahead of the interests of depositors.

42.     There is an obvious link between the legal action and the law it seeks to protect. This link derives from Article 9 of the Code of Civil Procedure, which provides that the action is lawful to anyone who has a current legal interest or to anyone who wants to confirm the existence of a right that has been disregarded. In our case, the lawsuits aim to have the court recognize an old and well- established right in banking practice, that of transferring money abroad. This right is similar to the property right protected by the Constitution and the law, and it is at the heart of our liberal economic system. Normally, in view of the facts and texts, the courts should have taken the quickest and most radical measures to protect and implement transfers abroad, by issuing a decision in ex parte proceedings, but this protection is non-existent.

43.     Decisions in ex parte proceedings are defined by article 604 of the Code of Civil Procedure as decisions rendered without the presence of all the parties to the dispute in cases where the plaintiff is entitled not to serve a writ of summons on the other party. These claims are submitted to the judge of urgent matters. The law has specified their scope, that is the cases of absolute urgency (art 606 para. 2). Usually, when a depositor wants to transfer money ab road, there is often an emergency. The bank's refusal constitutes a flagrant violation of a well-recognized right and requires the issuance of a decision in ex parte proceedings on the basis of the aforementioned texts and principles. However, experience shows that judges of urgent matters reject such claims. As an example, we cite a case we examined: a Turkish plaintiff wanted to transfer money to Switzerland to finance his daughter's studies. He submitted to the judge of urgent matters an application for a decision in ex parte proceedings along with the supporting documents proving the urgency. By a decision rendered on June 24, 2020, the judge rejected the claim, which prompted the plaintiff to file an adversary proceeding. However, the adversary proceeding, in addition to the fact that it gives uncertain results as shown by the aforementioned case law, it does not respect the principle of a speedy trial, which is an integral part of the right to a fair trial.

44.     The right to a trial within a reasonable time is an element of a fair trial. Justice would not be fair, credible or effective if the decision ending the dispute were rendered after too long a process. The judgment would lose interest for the litigant. This raison d'etre is reflected by the English saying: "justice delayed, justice denied" (S. Guinchard, droit et pratique de la representation civile, p. 511). This requirement of a speedy trial is not met by the Lebanese judges in the matter, as recognized by Professor Nasri Diab, who says that the appeal proceedings are still pending. Moreover, the decision rendered by the Court of appeal may be challenged before the Court of Cassation. As we know, this can stop the execution of the Court of Appeal's decision as it already did in its decision rendered on 24/08/2020. This slowness is incompatible with the fundamental right to a fair trial, especially since it is a question of protecting a fundamental right, which is the right to freely dispose of one's property (the bank accounts).

45.     As we have noticed, the decisions rendered by the judges of urgent matters are contradictory decisions. Some have ordered the banks to make transfers, others have rejected the request, not to mention that these are first instance decisions which are still pending before the Court of Appeal. Hence, the uncertainty related to the substance of the decision. The effect of the decision rendered by the Court of cassation on 24/08/2020 is also contributing to this uncertainty.



## Conclusions

46.     In conclusion, my opinion is that the right to make transfers abroad is a fundamental right, which is an integral part of banking usage and practice in Lebanon.

47.     The refusal of a bank to make transfers abroad to authorized countries is a violation of this fundamental right as well as a violation of the right to freely dispose of its property, and it reverts to the judges to take the most expedient measures to put an end to this violation.

48.     An examination of the Lebanese case law in this field reveals that in light of the Court of Cassation's ruling the courts of Lebanon have begun denying depositors relief on dubious grounds.

I declare under penalty of perjury under the laws of the United States that the above is true and accurate.

Dated: December 17, 2020
Beirut, Lebanon

Dr. Karim Torbey

7

## DECLARATION OF DR. KARIM HENRI TORBEY
### Appendix of Cited Cases

| | |
|---|---|
| **¶31** | **Exhibit 1:** Summary Order dated January 22, 2020, Case Number 52/2020 |
| **¶32** | **Exhibit 2:** Summary Order dated January 15, 2020, Case Number 275/2020 |
| **¶33** | **Exhibit 3:** Summary Order dated August 24, 2020, Case Number 47/2020 |
| **¶36** | **Exhibit 4:** Summary Order dated September 14, 2020, Case Number 122/2020 |
| **¶38** | **Exhibit 5:** Summary Order dated December 3, 2020, Case Number 455/2020 |