# EXHIBIT

# 28

# Crisis in Lebanon
## Anatomy of a Financial Collapse

**James Rickards**
**August 2020**



FOUNDATION FOR DEFENSE OF DEMOCRACIES



CEFP | Center on Economic and Financial Power

# Crisis in Lebanon
## Anatomy of a Financial Collapse

**James Rickards**

August 2020



FDD PRESS

A division of the
FOUNDATION FOR DEFENSE OF DEMOCRACIES
Washington, DC



# Table of Contents

FOREWORD ............................................................................................................................ 4

INTRODUCTION .................................................................................................................. 6

LEBANON'S UNRAVELING ............................................................................................. 8

BANQUE DU LIBAN – THE CENTRAL BANK OF LEBANON ........................... 9

LEBANESE COMMERCIAL BANKS .......................................................................... 12

THE NONVIABLE BANKS.............................................................................................. 14

THE VIABLE BANKS ....................................................................................................... 17

EUROBONDS AND EXTERNAL DEBT ..................................................................... 20

GOLD..................................................................................................................................... 23

THE SYSTEM: HEZBOLLAH'S INTERNATIONAL CRIMINAL NETWORK............................. 25

RESCUE PLANS ................................................................................................................. 27

COMMENTS AND ALTERNATIVES TO THE IMF PLAN............................................. 30

FORECAST ........................................................................................................................... 34

CONCLUSION .................................................................................................................... 37

APPENDIX 1: THE LEBANESE EXCHANGE RATE CRISIS ........................... 38

APPENDIX 2: THE 14 BANKS...................................................................................... 41



# Foreword

Lebanon is unraveling. Last year's massive public protests over the government's inability to collect trash or provide other key services now seem like a minor problem. The COVID-19 pandemic has all but wiped out already falling remittances from the Lebanese diaspora. With its economy in a tailspin, the government missed a payment on a $1.2 billion eurobond in March and effectively defaulted on all outstanding eurobond obligations, including an additional $2.7 billion of payments due in April and June.

The International Monetary Fund (IMF), World Bank, and others are working to assess the problem and offer solutions. But with Lebanon, it will not be easy. The Foundation for Defense of Democracies (FDD) commissioned renowned economist James Rickards to assess the challenges and damage. Mr. Rickards, who is an advisor to FDD's Center on Economic and Financial Power and has advised governments and banks on past bailouts, spent more than four months studying Lebanon's economic implosion. He makes it clear that this crisis will be an enduring one.

First, Lebanon has a Hezbollah problem. Hezbollah controls the health ministry and is the majority partner in the current coalition. It is designated as a terrorist group by the United States, the United Kingdom, Germany, the Netherlands, Canada, the Arab League, the Gulf Cooperation Council, and several Latin American countries. International donors cannot in good faith bail out a government controlled by a terrorist group that answers to the Islamic Republic of Iran, the world's leading state sponsor of terrorism, according to both Democratic and Republican administrations.

A direct consequence of Hezbollah's political control is that Lebanon's financial system is rife with corruption, money laundering, drug smuggling, and other illicit finance. As a result, many of Lebanon's most important financial institutions are in the crosshairs of a lawsuit in the United States: *Bartlett v. Société Générale de Banque au Liban S.A.L. (SGBL), et al.* The complaint alleges that these banks provided financial services to Hezbollah and

"facilitated the flow of U.S. dollar-denominated funds Hezbollah used to bankroll its operations in Iraq." These operations killed Americans. This introduces liabilities, potentially in the form of liens on bailout funds, the donor community cannot ignore. A banking sector purge and overhaul is urgently needed.

What Mr. Rickards does not note explicitly is that Hezbollah physically controls chunks of Lebanese territory – the Bekaa Valley, southern Lebanon, and a Beirut suburb known as Dahiyeh. The group maintains a missile arsenal larger than that of any European country in NATO. Iran furnished Hezbollah with more than 150,000 rockets that threaten its southern neighbor, Israel. And Hezbollah's recent acquisition of precision-guided munitions from Iran threatens to devastate Israel's civilian areas, prompting Jerusalem to openly mull preemptive strikes. The risk of another ruinous Lebanon war triggered by Hezbollah is an additional red flag for donors. Why finance a country that will be flattened shortly thereafter in a predictable – and avoidable – war?

There is also the question of how much cash Lebanon needs. Using an unofficial exchange rate of 4,000 Lebanese pounds to the dollar, Mr. Rickards finds that the amount of fresh money needed to stabilize Lebanon's banking sector is a whopping $67 billion. That does not include $22 billion in losses incurred by Lebanon's central bank, the Banque du Liban (BdL). Nor does it include anticipated net losses of $4.2 billion or more from defaulted eurobonds that are now the subject of restructuring negotiations. The total cost of a bailout would thus exceed $93 billion. But, as Mr. Rickards acknowledges, even that figure is probably a lowball, as the real exchange rate is pushing 9,000 or higher as of this writing.

Lebanon may be in a $100 billion hole. And that is without public infrastructure and other needs. For context, the IMF's largest-ever bailout was $57 billion for Argentina in 2018.

Mr. Rickards is unambiguous about how Lebanon accrued this staggering debt. It was a Ponzi scheme. Banks took foreign currency deposits from Lebanese





*Anti-government protesters in Beirut, Lebanon, on May 30, 2020. (Photo by Marwan Naamani/picture alliance via Getty Images)*

customers at home and the Lebanese diaspora, including from Hezbollah's drug smuggling and other illicit operations. The banks used these deposits to make their own deposits with the BdL. The BdL used these funds for government spending, such as imports and interest payments – all at favorable exchange rates that defied the realities of a country that generates little foreign currency and has no exports to speak of. The entire financial system, led by the BdL, assured the Lebanese people that their dollar and pound deposits were safe, even as the system crumbled.

The Lebanese government knew what was happening. Those atop the system perpetuated the fraud. Today, those same people are asking for help. Mr. Rickards does not say how the political elite should be held accountable. But he does imply how Lebanon can subsidize at least part of its own bailout: gold.

Lebanon held an astonishing 286.8 metric tons of gold in its official reserve as of May 2020. This ranks Lebanon as the 20th-largest holder of gold among countries reporting to the IMF. At $1,800 per ounce (the market price as of June 30, 2020), that

is approximately $16.5 billion. It is not $93 billion, but it is a start.

Where Lebanon goes from here is anyone's guess. Under the grip of Hezbollah (and, by extension, the Islamic Republic of Iran), beset with corruption and political dysfunction, saddled with staggering debt, inundated with Syrian refugees, and struggling amidst the COVID-19 pandemic, huge challenges lie ahead. But, as Mr. Rickards warns, a simple bailout is not the answer – even if one were feasible. An overhaul of the system is needed. Anything less risks transferring billions to a global terrorist organization and perpetuating one of the largest Ponzi schemes in history.



*Mark Dubowitz
Chief Executive,
FDD*



*Jonathan Schanzer
Senior Vice President for Research,
FDD*


# Introduction

Lebanon is in acute financial distress. Over the past 200 years, responsible parties have developed a playbook for dealing with such distress and reviving the injured entity. My training and experience leave me well-acquainted with this playbook and its application to specific cases. Unfortunately, Lebanon is uniquely unsuited for a playbook-style rescue. Lebanon may actually be beyond help, despite the willingness of some entities to assist. Instead, a systemic failure and humanitarian crisis may be on the horizon. This report will explain the reasons for this dire forecast.

Financial crises occur with surprising frequency. These crises take many forms. Bank runs were routine in the days before deposit insurance. They still occur when large, uninsured depositors or counterparties to short-term repurchase agreements decide to withdraw funding. Meltdowns in hedge funds can cause financial panic not because of the hedge fund itself, but because of the risk of contagion to bank and dealer counterparties that will be left holding unhedged positions if the fund fails.

Some panics are caused by liquidity crises, wherein net assets exist but short-term cash is unavailable. Other panics are solvency crises, wherein net worth is negative and new capital injections or an orderly allocation of losses is needed. Some crises involve sovereign states, while others involve banks and brokers. Still others involve end users such as investment funds or high-net-worth individuals.

What these various crises have in common is the need for a third party – a central bank, an international financial institution (such as the IMF), a private bank syndicate, or an ultra-wealthy investor – to intervene to rescue the entity in distress.

Inevitably, the party providing the lifeline imposes conditions on the distressed party. Reforms are demanded. Accountability and transparency are imposed. And the distressed party offers attractive returns to the rescuer (assuming affairs do not go from

bad to worse). A sense of calm returns. The rescue deal is unwound with a nice profit for the rescuer and a lesson learned for the debtor.

Landmark financial crises of the past 125 years include the Panic of 1907, the stock exchange shutdowns at the start of World War I, the stock market crash of 1929, the UK banking crisis of 1931, the U.S. bank run in 1933, the stock market "flash crash" in 1987, the Mexican Tequila Crisis of 1994, Russia's Long-Term Capital Management (LTCM) crisis in 1998, the dot-com collapse of 2000, the global financial crisis of 2008, the 2010–2015 European sovereign debt crisis involving Greece, Cyprus, Italy, and other EU members, and the coronavirus crash of 2020.

The world champion of distress and financial crisis is Argentina, which suffered serial defaults in 1827, 1890, 1951, 1956, 1982, 1989, 2001, 2014, and 2020. New Argentinian bonds should be available by next year in preparation for the next default.

My career as a lawyer and banker has provided a window into many of these crises. I was international tax counsel at Citibank during the early 1980s at the peak of the Latin American debt crisis. I was chief credit officer at a major investment bank during the 1987 stock market meltdown. I was involved in a major hedge fund launch in 1994 in which we made huge profits buying assets on the cheap from distressed sellers in the bond market rout that year. I was the lead negotiator in the rescue of the hedge fund LTCM during the 1998 financial crisis. The global financial system was just hours away from a total lockdown when a $4 billion all-cash rescue of Long-Term Capital Management by 14 Wall Street banks finally closed after five days of around-the-clock negotiation. I ran a high-tech electronic stock exchange in 2000 when our planned initial public offering was derailed by the dot-com collapse.

More recently, I have worked with the Central Intelligence Agency, the Pentagon, and the U.S. Army War College on financial warfare. My first two books, *Currency Wars* (2011) and *The Death of Money* (2014), analyzed the contemporaneous sovereign debt crisis


and correctly predicted that the euro would survive intact, even when Nobel Prize-winning economists said the opposite.

Over the years, I have observed that there is a template for how to deal with such a crisis. No two crises are alike, and some improvisation is always needed. Yet the basic playbook goes as follows: The first step is to ascertain the size of the losses of the party in distress. No lenders or investors will provide new funding to a party in distress unless they have some sense of the scope of the problem and some assurance that the rescue funds will be sufficient to solve the problem. No one is interested in throwing good money after bad.

> **The basic playbook goes as follows: The first step is to ascertain the size of the losses of the party in distress. No lenders or investors will provide new funding to a party in distress unless they have some sense of the scope of the problem and some assurance that the rescue funds will be sufficient to solve the problem. No one is interested in throwing good money after bad.**

The second step is to identify the source of new funding, which can be a single institution or a consortium. The third step is to allocate losses among the stakeholders in the distressed party. This typically involves wiping out equity, forcing depositors or creditors to take a "haircut"[1] (which varies by the size of the losses), and allocating new equity, partly to the rescuer and partly as compensation to creditors for their haircuts.

Next, bad assets are stripped out of the failing institutions and put in a separate entity (either a "bad bank" or some form of trust for the benefit of creditors or taxpayers) so the rescued entity can start over with a clean balance sheet. Finally, conditions are imposed to prevent another default, protect the interests of the party providing new funds, and provide oversight and transparency so that bailout funds are used for their intended purpose. Once these steps have been completed, the deal can be closed and the distressed party can return to business as usual.

There are many variations of this playbook. When a systemic crisis includes multiple failures, a form of triage is used, whereby banks are divided into three categories: sound, illiquid, and insolvent. The sound banks provide liquidity to the illiquid banks, while the insolvent banks are allowed to fail. This method stops the crisis and cleans out some rot at the same time. The 19th-century British economist Walter Bagehot described this triage method in his book *Lombard Street* (1873), and Pierpont Morgan put it to use in the Panic of 1907. This led directly to the creation of the Federal Reserve in 1913 as an institutionalized lender of last resort.

Sovereign debt crises are more difficult to resolve than private crises because, as the legendary banker Walter Wriston observed, "the country does not go bankrupt." This gives the sovereign some staying power that a private debtor might not have. Holdouts among creditors who refuse to join good-faith negotiations are a perennial problem. Corruption, the absence of the rule of law, and incompetence also impede successful negotiations and rescues. That said, the playbook usually works – provided the parties are dealing in good faith and placing the long-term benefits of a rescue above short-term self-interest.

Unfortunately, that is not the case with Lebanon. Applying the traditional playbook, even with variations, reveals that Lebanon does not meet *any* of the conditions for a viable bailout. Lebanon fails the first test of being able to estimate the size of its losses. The assessments provided in this report and by the IMF estimate total losses at $93 billion and $100 billion, respectively. Yet the Lebanese government's estimate is less than two-thirds of these figures.

---

**1.** The term "haircut" refers to a write-down for credit losses not covered by existing loan-loss reserves, or devaluation.


Moreover, there is no consensus in Lebanon on how the inevitable losses should be allocated among stockholders, depositors, creditors, government employees, and other stakeholders. There is no agreement on which banks, if any, should be closed or which assets could be transferred to surviving banks or a trust fund. There is no existing hard currency capital (apart from gold reserves) to serve as a foundation for a rescue. There is little transparency or accountability in either the government or private enterprise. There is no agreement on which forms of conditionality might be accepted or how the conditions would be implemented.

Recently, government officials have resigned out of frustration with the government's inability to engage constructively with the IMF. To make matters more complicated, there is no plan for curtailing the terrorist and criminal roles of Hezbollah – an Iran-backed group that holds immense power in the country. Finally, there is no consensus on how to allocate rescue funds among creditors, needed imports, critical infrastructure, and civil society.

In short, Lebanon requires sweeping reforms. The country is in desperate need of new, clean financial institutions outside the existing system and subject to international oversight. This option is discussed later in this report.

## Lebanon's Unraveling

Lebanon's economy was effectively a Ponzi scheme. Such schemes can last a long time. They are based on their participants' confidence in the solvency and liquidity of the scheme. Inevitably, however, one or both of those pillars breaks down. That is when the system collapses.

In Lebanon's case, remittances began to decline sharply in 2014 with the first oil price collapse from around $100 to $24 per barrel. Much of the Lebanese diaspora lives in oil-producing countries in West Africa and the Persian Gulf. As the oil industry suffered, Lebanese oil workers and diaspora merchants lost jobs, took

pay cuts, or saw their businesses suffer. Remittances dropped as a result.

At the same time, Lebanese banks came under threat of U.S. sanctions and private civil litigation because of their alleged involvement in Hezbollah's global money laundering network, commonly referred to as "The System." The solvency of the central bank was questioned for "financial engineering." It was paying one rate on banks' dollar deposits with the central bank and a higher rate on local currency notes held by the banks. The banks could thus earn a "spread" while ignoring exchange-rate risk.

> **"Lebanon today is broke. The entire country has been picked clean by terrorists, criminals, elites, and the political class. The central bank claims to have gross amounts of foreign exchange available, but the central bank is insolvent on a net basis once bad assets are written down against capital."**

A silent run on the banks began. Elites were forewarned and transferred large dollar deposits out of Lebanon ahead of capital controls. Ordinary businesses and retail depositors trusted the central bank's fixed exchange rate and left dollar deposits in the banks until it was too late. With remittances drying up and depositors queuing up to withdraw cash, capital controls were inevitable. Now those dollar deposits are frozen and effectively worthless.

Lebanon today is broke. The entire country has been picked clean by terrorists, criminals, elites, and the political class. The central bank claims to have gross amounts of foreign exchange available, but the central bank is insolvent on a *net* basis once bad assets are written down against capital. The commercial banks are also insolvent despite claims of having assets on deposit with the insolvent central bank. This is all accounting smoke and mirrors. No one can pay anyone, except in increasingly worthless local currency. Indeed, based on calculations presented in this report, Lebanon's



financial system stands to suffer aggregate gross losses of over $93 billion.

The only solution is new money from outside Lebanon. A maximum of $30 billion may be available from the IMF, World Bank, and CEDRE (a Paris-based rescue club). However, this money will not be forthcoming without extreme austerity, monetary and fiscal reform, legal reform, a complete reorganization of the banking system, and an end to money laundering. Given Lebanese political dysfunction and the significant role of Hezbollah in the political system, such reform is unlikely.

Without reform, Lebanon could descend into chaos, hyperinflation, and social disorder. Intervention by the United States, France, Saudi Arabia, Iran, Syria, or Turkey is unlikely, as they are all facing economic, epidemiological, and political problems of their own. Amidst a global crisis, Lebanon is headed for a catastrophic meltdown to which there is no clear solution.

## Banque du Liban – The Central Bank of Lebanon

The Banque du Liban (BdL) is the central bank of Lebanon. It was formed on August 1, 1963, and commenced operations on April 1, 1964. The BdL is headquartered in Beirut and has branches in Aley, Baalback, Bikfaya, Jounieh, Nabatiye, Sidon, Tripoli, Tyre, and Zahlé. It is 100 percent owned by the Lebanese state. The BdL's currency of issue is the Lebanese pound (LBP). Apart from regulating the money supply, the BdL is also responsible for maintaining a sound banking sector and the regulation of money transfers.

By custom, the BdL governor is always a Maronite Christian. The governor is supported by four vice-governors and a seven-member Central Council, but in practice, authority is highly centralized in the governor's hands. The governor is appointed to a six-year term by the Lebanese Council of Ministers (Cabinet) upon the recommendation of the finance minister. The current

BdL governor is Riad Salameh, whose term as governor ends in 2025. He can technically be dismissed, but only in certain extraordinary circumstances.

The BdL was a key actor in Lebanon's Ponzi scheme. Such schemes can continue indefinitely as long as the new cash entering the scheme is greater than the demand for cash by the victims. When the scheme is run by a government or central bank, the unravelling can be postponed with capital controls, account freezes, and false declarations, but the relief is temporary. The end is the same.

Lebanon's Ponzi scheme included the following participants: The "suckers" who lost money are the people of Lebanon, the Lebanese diaspora, external creditors, bank depositors, and businesses that relied on the banking system for commercial credit and international trade finance. The "winners" were bankers and elites who made windfall profits from the BdL's financial engineering or were able to move dollars offshore before capital controls were imposed. Other winners include property developers who used cheap loans and hard currency from the commercial banks to develop apartments and luxury properties sold to individuals, corporations, and property managers. One other winner was Hezbollah, which used the banking system for multibillion-dollar money laundering schemes and terrorism finance.

> **Without reform, Lebanon could descend into chaos, hyperinflation, and social disorder. Intervention by the United States, France, Saudi Arabia, Iran, Syria, or Turkey is unlikely, as they are all facing economic, epidemiological, and political problems of their own.**

The scheme worked as follows: Commercial banks received fresh inflows of U.S. dollars and euros in the form of bank deposits from the Lebanese diaspora's remittances, tourism, and a modest export sector. These deposits were funneled to the BdL in the form of commercial bank deposits. The deposits at the BdL paid for imports, supported government spending, and



paid interest on dollar deposits and dollar debt. The structure was supported with a fixed exchange rate of LBP 1,507.5 to the dollar. This gave all participants confidence that dollars and pounds were effectively interchangeable, and thus reduced the demand for dollar withdrawals. The BdL had a modest negative cash flow in dollars prior to 2011. This net outflow was obfuscated by opaque disclosure and limited demand for dollars by the commercial banks and their depositors.

Stress on the Ponzi scheme increased after 2011. The dollar grew stronger (the dollar's all-time low was August 2011), which increased demand for dollars at the artificial LBP-to-dollar exchange rate. Lebanon plugged the gap to some extent by issuing dollar-denominated eurobonds. Proceeds were deposited at the BdL. At the same time, Lebanese commercial banks were encouraged to buy the eurobonds using proceeds of their dollar deposits. This was a way to recycle dollars from commercial banks to the BdL (and to the government), using the eurobonds as an intermediate asset. The eurobonds were determined to be "money good" on the books of the banks, even though the creditor (Lebanon) was weak and the exchange rate was untenable.

The Ponzi scheme began to unravel after 2014. The price of oil collapsed from $100 per barrel to $24 per barrel from mid-2014 to early 2016. Many in the Lebanese diaspora working in oil-producing nations, such as the United Arab Emirates, Saudi Arabia, Nigeria, and Ghana, began to lose their jobs or suffer wage cuts. Remittances started to dry up.

The BdL, meanwhile, increased the tempo of eurobond borrowings, with $3 billion of new issues from April to May 2016. The BdL's other solution was financial engineering. In this scheme, the BdL offered above-market interest rates on dollar deposits by commercial banks; commercial banks also offered these higher rates to encourage dollar deposits and

remittances. The BdL also made local currency deposits at commercial banks (using printed money), taking back the local currency from the commercial banks (as deposits with the BdL) at much higher interest rates. The spread between what the commercial banks paid and what they received on the local currency "round-trip" could be as high as 11 percent. The commercial banks made huge windfall profits on this scheme. Theoretically, there was exchange rate risk and credit risk on the round-trip swap, but these risks were covered up by the unsustainable pound-to-dollar peg, by carrying the eurobonds, and by round-trip deposits at book value.[2]

> **The protests also ended any remaining confidence in the Lebanese financial system. Remittances almost completely evaporated. Tourism, which had suffered from tensions with the Gulf Arab states due to Hezbollah's sway over the Lebanese government, declined precipitously.**

Throughout 2017 and 2018, Lebanon took out $10.2 billion in new eurobond issues. The financial engineering expanded, and the currency peg fiction was maintained. Because of the high yields and positive spreads for commercial banks (and their depositors), the Ponzi scheme expanded. It collapsed, however, in October 2019 with demonstrations by civil society. The proximate cause of the demonstrations was proposed taxes on tobacco, gasoline, and some mobile phone message traffic (notably WhatsApp). The focus of the demonstrations soon expanded to include sectarian rule, a weak economy, and corruption. The protests catalyzed a political crisis, which led to a new prime minister and the search for a new Cabinet. The protests also ended any remaining confidence in the Lebanese financial system. Remittances almost completely evaporated. Tourism, which had

---

**2.** Lebanon's banks were not forced to participate in this scheme. However, the terms were so attractive that all of the large banks appear to have participated. For more, see: Sami Halabi and Jacob Boswall, "Extend and Pretend: Lebanon's Financial House of Cards," Working Paper Series "Who Will Foot the Bill?" *Triangle*, November 2019. (http://www.thinktriangle.net/extend-and-pretend-lebanons-financial-house-of-cards-2/)


suffered from tensions with the Gulf Arab states due to Hezbollah's sway over the Lebanese government, declined precipitously.

Lebanon was subsequently shut out of the eurobond market (the last new issue was May 17, 2018). Without new dollar inflows, the Ponzi scheme collapsed quickly. The BdL imposed capital controls; dollar deposit withdrawals were prohibited with limited exceptions. Certain elites were tipped off that capital controls were coming, and they initiated large dollar transfers to overseas bank accounts. Ordinary Lebanese citizens were not warned and fell victim to account freezes.

The BdL and government officials continue to claim that dollar deposits in commercial banks are "money good" and not subject to controls. Both claims are lies. The likely outcome is that the deposits will receive haircuts and be converted into local currency before withdrawals can resume. The books of the BdL and the commercial banks carry eurobonds at book value, but those institutions are in default, and there is no liquidity to resume payment. The BdL claims to have hard currency (mostly dollar) reserves of $38 billion. However, that figure is "gross" before accounting for asset write-downs. When approximately $60 billion of unpayable dollar-denominated deposits from commercial banks are taken into account, the BdL is insolvent. Of course, the BdL's insolvency derives from the commercial banks' insolvency, since the same deposits the BdL cannot pay are impaired assets of the commercial banks.

To make matters worse, the BdL does not publish audited financial statements. The last annual report was for 2018. It does publish internal balance sheets. The most recently available detailed information is for May 30, 2019, and a less detailed "Interim Balance Sheet" is available for June 15, 2020.[3] These balance sheets show that the BdL holds approximately $5 billion in eurobonds and $15 billion in loans to commercial banks. The BdL balance sheets show "capital accounts" of $3.7 billion. Writing down these $20 billion in assets by even 50 percent is enough to push the BdL into a negative capital position of negative $16.3 billion.

The BdL's situation is even more dire because its loans to commercial banks are mostly denominated in U.S. dollars and are carried at the official exchange rate of LBP 1,507.5 to the dollar. If those loans to commercial banks were converted into U.S. dollars at the actual exchange rate, which fluctuates but hovers at roughly LBP 4,000 to the dollar,[4] an additional write-down of approximately $9 billion would be required. (The BdL could also decrease its liabilities and increase its net worth by making the same conversion at the actual exchange rate, but the bank and government have rejected this option so far by declaring that dollar deposits will not be subject to haircuts. That will change as part of any restructuring).

An even simpler analysis is that the BdL has approximately $38 billion of foreign currency reserves to pay for imports but owes approximately $60 billion on dollar-denominated deposits from commercial banks. The BdL's net dollar position is therefore negative $22 billion.

---

**3.** Banque du Liban, "Quarterly Bulletin, Fourth Quarter 2019," accessed June 29, 2020. (https://www.bdl.gov.lb/publications.html); Banque du Liban, "Central Bank of Lebanon Interim Balance Sheet 6/15/2020," June 15, 2020. (https://www.bdl.gov.lb/tabs/index/6/287/BDL-Balance-Sheet.html)

**4.** Calculations in this report were made using an exchange rate of LBP 4,000 to the dollar, except as otherwise noted. The Lebanese pound has depreciated further in recent trading, falling as low as LBP 12,000 to the dollar. This trend likely will continue as the situation in Lebanon moves toward hyperinflation. The balance of assets and liabilities in the Lebanese financial system is such that progressively lower valuations of the Lebanese pound make the situation progressively worse and will require a commensurately larger hard currency bailout from outside parties (principally the IMF) to keep depositors whole. Since a full bailout is not feasible at LBP 4,000 to the dollar, it will be no more feasible as the Lebanese pound continues to depreciate. The reader is advised to weigh the extent of the crisis in constant U.S. dollars (as expressed in the report), since the lack of sufficient outside support effectively forecloses any prospect of redeeming dollar liabilities, regardless of the LBP-dollar exchange rate. For further discussion of Lebanon's ongoing exchange rate crisis and its effect on the calculations in this report, see Appendix 1.


The BdL will not pay dollar deposits to commercial banks, due to capital controls and account freezes. It will not pay dollar interest on government eurobonds in default. In the short run, the BdL is free to use its $38 billion in hard currency to pay for needed imports, since it is not meeting dollar liabilities. This situation is unsustainable because the inflow of new dollars has disappeared, apart from small amounts from exports. The Lebanese economy is in rapid decline. GDP will likely fall by at least 10 percent in 2020 due to the combination of social unrest, bank insolvency, and the impact of the global pandemic.[5]

The BdL is insolvent, has no immediate hope for a rescue, and is rationing its dollar reserves for needed imports. Soon, there will be no dollars (or euros) in Lebanon, and imports will disappear. The country is now subject to hyperinflation. The banking sector is insolvent. And the system is accused of facilitating terrorism finance.

## Lebanese Commercial Banks

Identifying the most important banks in Lebanon is a fraught exercise. It depends on whether one uses asset size, market capitalization, or profits. Even that exercise depends on whether the figures utilized are up to date (recent figures are uncertain) and accurate (most banks have not published recent audited balance sheets).

That said, the BdL publishes a list of 142 commercial banks incorporated in Lebanon.[6] There are a number of smaller banks in Lebanon as well as large foreign banks with Lebanese branches or affiliates, including Citibank, ABN AMRO, and Banca di Roma. These banks are outside the scope of this report. The following are 14 of the most important banks in Lebanon, based on their Alpha Bank status (holding deposits in excess of $2 billion); their allegedly close relations with Hezbollah, as alleged in a civil law suit; their asset size and deposit base, calculated using the most reliable sources available; and their political importance:

- Bank Audi S.A.L.
- Bank of Beirut S.A.L.
- Bank of Beirut and the Arab Countries S.A.L.
- Bankmed S.A.L.
- Banque Libano-Française S.A.L.
- BLOM Bank S.A.L.
- Byblos Bank S.A.L.
- Crédit Libanais S.A.L.
- Fenicia Bank S.A.L.
- Fransabank S.A.L.
- IBL Bank S.A.L.
- Lebanon and Gulf Bank S.A.L.
- MEAB Bank S.A.L.
- Société Générale de Banque au Liban S.A.L.

The banks listed above have substantial assets and liabilities denominated in dollars and euros. Their balance sheets are denominated in Lebanese pounds at the official exchange rate of LBP 1,507.5 to the dollar. These line items are restated in Lebanese pounds (where indicated) using the actual exchange rate of LBP 4,000 to the dollar to present an accurate picture of bank solvency. The official rate is a fiction due to capital controls and the inability of dollar depositors or creditors to obtain dollars from the banks. The black market rate is the true rate, and the BdL is moving quickly to that position as the crisis unfolds.

Unfortunately, the banks' financial statements do not provide sufficient information to make currency conversions with complete accuracy. Still, there is enough publicly available information for a close

---

**5.** David Gardner, "Lebanon's warning of economy 'in freefall' is an understatement," *Financial Times* (UK), May 6, 2020. (https://www.ft.com/content/1f790e5c-8ed2-11ea-9e12-0d4655dbd44f); "The Lebanese Government's Draft Reform Program," *Finance 4 Lebanon*, April 8, 2020. (https://finance4lebanon.com/the-lebanese-governments-draft-reform-program-update/)
**6.** Banque du Liban, "List of Financial Institutions," March 12, 2020. (https://www.bdl.gov.lb/pages/index/4/25/List-of-Institutions-Supervised-by-BDL.html)



approximation. This can be done by identifying the line items denominated in U.S. dollars or euros, then converting these to Lebanese pounds at the actual local currency value. Further adjustments can be made for haircuts. Once these adjustments are made, a revised shareholders' equity amount can be calculated, and the solvency of the bank can be estimated.

Lebanese banks' financial difficulties are not limited to the imbalance of assets and liabilities. All of the banks assessed in this report – with the exceptions of Bankmed, Crédit Libanais, and IBL Bank – are defendants in the case of *Bartlett v. Société Générale de Banque au Liban S.A.L. (SGBL), et al.* (hereafter: *Bartlett*), which this report will discuss in greater detail in the section titled "The System." To be sure, the outcome of this case is a long way off. But the mere complaint is likely to have a chilling effect on entities weighing a rescue package for Lebanon. The plaintiff alleges that the 11 banks implicated in the case:

> purposefully and deliberately used [their] New York correspondent banks to 'clear' U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network … and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.[7]

The *Bartlett* case contains hundreds of pages of evidence to support these claims, including names of correspondent banks, account numbers, individuals alleged to have facilitated the scheme, and a detailed look at Hezbollah's modus operandi for criminal sales of drugs, diamonds, used cars, and other merchandise. The complaint identifies cut-outs for money laundering and the role of Lebanon's banks in executing money laundering operations through New

York correspondent banks, all with direct access to the dollar-denominated system.

The federal civil case is now proceeding in the Eastern District of New York in Brooklyn. Damages could easily reach into the billions of dollars. Individual banks could be jointly and severally liable. Regardless of final outcome or the veracity of the claims, the mere existence of the case could impede new capital injections into any of the named defendant banks or their ongoing operations. A verdict against the defendant banks could result in the termination of their correspondent bank relationships in the dollar payments system and the freezing of their assets for the plaintiffs' benefit. Parallel investigations by the U.S. Treasury Department could lead to U.S. sanctions against these banks.

> **"The complaint identifies cut-outs for money laundering and the role of Lebanon's banks in executing money laundering operations through New York correspondent banks, all with direct access to the dollar-denominated system."**

Some in Lebanon argue that the relationship is more complicated. Hezbollah, after all, has targeted some of these banks, particularly as the United States applied pressure on Hezbollah finance in the Lebanese system. The terrorist group was believed to be responsible for bombing BLOM Bank's Beirut headquarters in 2016. Hezbollah also threatened the CEO of Société Générale de Banque au Liban in 2020, accusing him of being a "Zionist." The facts of the case will ultimately help settle this debate.

The 14 banks listed above can be divided into two groups: the 11 banks implicated in the *Bartlett* case and the three banks that are not. The latter may ultimately serve as viable banks in a restructuring of the Lebanese financial system. But both groups are highly insolvent.

---

**7.** Amended Complaint, *Bartlett v. Société Générale de Banque au Liban S.A.L. (SGBL), et al.*, 19-cv-007 (CBA) (VMS) (E.D.N.Y. filed August 2, 2019), pages 56 and 58-59. (https://www.osenlaw.com/sites/default/files/BartlettAmended-2019-cv-00007.pdf)


## The Nonviable Banks

| Bank | Consolidated Shareholders' Equity | Dollar/Euro Liabilities | Dollar/Euro Assets | Adjusted Shareholders' Equity | Capital Injection Needed |
|---|---|---|---|---|---|
| **Bank Audi S.A.L.** | LBP 5.74 trillion ($1.46 billion at actual exchange rate; $3.8 billion at official exchange rate).[8] | LBP 37 trillion ($24.5 billion at official rate). LBP 98 trillion after converting back at actual rate. | LBP 35.6 trillion. After 50 percent haircut, book value = LBP 17.8 trillion ($11.8 billion at official rate). LBP 47.2 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 49.4 trillion, rendering the bank insolvent. | $11 billion |
| **Bank of Beirut S.A.L.** | LBP 2.7 trillion ($675 million at actual exchange rate; $1.8 billion at official exchange rate). | LBP 14.5 trillion ($9.6 billion at official rate). LBP 38.5 trillion after converting back at actual rate. | LBP 15.4 trillion. After 50 percent haircut, book value = LBP 7.7 trillion ($5.1 billion at official rate). LBP 20.4 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 19 trillion, rendering the bank insolvent. | $4.7 billion |
| **Bank of Beirut and the Arab Countries S.A.L.** | LBP 963 billion ($240 million at actual exchange rate; $639 million at official exchange rate). | LBP 6.5 trillion ($4.3 billion at official rate). LBP 17.3 trillion after converting back at actual rate. | LBP 6.8 trillion. After 50 percent haircut, book value = LBP 3.4 trillion ($2.3 billion at official rate). LBP 9.0 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 8.6 trillion, rendering the bank insolvent. | $2.2 billion |
| **Banque Libano-Francaise S.A.L.** | LBP 1.99 trillion ($497 million at actual exchange rate; $1.3 billion at official exchange rate). | LBP 12.4 trillion ($8.2 billion at official rate). LBP 32.8 trillion after converting back at actual rate. | LBP 13.7 trillion. After 50 percent haircut, book value = LBP 6.85 trillion ($4.5 billion at official rate). LBP 18.0 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 16.1 trillion, rendering the bank insolvent. | $3.5 billion |

---

**8.** Note: The term "actual exchange rate" refers to an exchange rate of LBP 4,000 to the dollar. The "official exchange rate" is LBP 1,507.5 to the dollar.


| Bank | Consolidated Shareholders' Equity | Dollar/Euro Liabilities | Dollar/Euro Assets | Adjusted Shareholders' Equity | Capital Injection Needed |
|---|---|---|---|---|---|
| **BLOM Bank S.A.L.** | LBP 4.93 trillion ($1.23 billion at actual exchange rate; $3.27 billion at official exchange rate). | LBP 28.5 trillion ($18.9 billion at official rate). LBP 75.5 trillion after converting back at actual rate. | LBP 28.9 trillion. After 50 percent haircut, book value = LBP 14.5 trillion ($9.6 billion at official rate). LBP 38.4 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 37.5 trillion, rendering the bank insolvent. | $11.9 billion |
| **Byblos Bank S.A.L.** | LBP 2.8 trillion ($700 million at actual exchange rate; $1.85 billion at official exchange rate). | LBP 22.0 trillion ($14.6 billion at official rate). LBP 58.4 trillion after converting back at actual rate. | LBP 23.3 trillion. After 50 percent haircut, book value = LBP 11.7 trillion ($7.7 billion at official rate). LBP 30.9 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 28.8 trillion, rendering the bank insolvent. | $7.4 billion |
| **Fenicia Bank S.A.L.** | LBP 232 billion ($58 million at actual exchange rate; $153 million at official exchange rate). | LBP 1.6 trillion ($1.1 billion at official rate). LBP 4.25 trillion after converting back at actual rate. | LBP 1.6 trillion. After 50 percent haircut, book value = LBP 800 billion ($530 million at official rate). LBP 2.1 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 2.15 trillion, rendering the bank insolvent. | $550 million |
| **Fransabank S.A.L.** | LBP 3.3 trillion ($825 million at actual exchange rate; $2.2 billion at official exchange rate). | LBP 18.5 trillion ($12.3 billion at official rate). LBP 49.1 trillion after converting back at actual rate. | LBP 19.6 trillion. After 50 percent haircut, book value = LBP 9.8 trillion ($6.5 billion at official rate). LBP 26.0 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 24.2 trillion, rendering the bank insolvent. | $5.6 billion |


| Bank | Consolidated Shareholders' Equity | Dollar/Euro Liabilities | Dollar/Euro Assets | Adjusted Shareholders' Equity | Capital Injection Needed |
|---|---|---|---|---|---|
| **Lebanon and Gulf Bank S.A.L.** | LBP 700 billion ($175 million at actual exchange rate; $464 million at official exchange rate). | LBP 4.9 trillion ($3.25 billion at official rate). LBP 13.0 trillion after converting back at actual rate. | LBP 5.2 trillion. After 50 percent haircut, book value = LBP 2.6 trillion ($1.7 billion at official rate). LBP 6.9 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 6.4 trillion, rendering the bank insolvent. | $1.7 billion |
| **MEAB Bank S.A.L.** | LBP 275 billion ($69 million at actual exchange rate; $182 million at official exchange rate). | LBP 1.6 trillion ($1.1 billion at official rate). LBP 4.25 trillion after converting back at actual rate. | LBP 1.6 trillion. After 50 percent haircut, book value = LBP 800 billion ($530 million at official rate). LBP 2.1 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 2.15 trillion, rendering the bank insolvent. | $550 million |
| **Société Générale de Banque au Liban S.A.L** | LBP 2.9 trillion ($725 million at actual exchange rate; $1.9 billion at official exchange rate). | LBP 24.0 trillion ($15.9 billion at official rate). LBP 63.7 trillion after converting back at actual rate. | LBP 24.9 trillion. After 50 percent haircut, book value = LBP 12.5 trillion ($8.3 billion at official rate). LBP 33.2 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 31.4 trillion, rendering the bank insolvent. | $7.2 billion |

Requiring massive amounts of new equity to repair their balance sheets and achieve capital adequacy, these banks will likely be hindered in raising any new capital by pending litigation, possible damages, and U.S. sanctions. The likely path for these banks is a complete shutdown with massive losses for shareholders, depositors, and other creditors. These banks can survive only as part of a banking system reorganization that includes mergers of weak banks, haircuts on depositors and creditors, the stripping of defaulted assets into "segregated entities," and new capital, perhaps from the IMF or other multilateral sources. These reforms would have to be combined with new management, improved anti-money laundering rules, and a halt to transactions with Hezbollah, corrupt non-bank currency exchange houses, and other criminal or terrorist entities.



# The Viable Banks

| Bank | Consolidated Shareholders' Equity | Dollar/Euro Liabilities | Dollar/Euro Assets | Adjusted Shareholders' Equity | Capital Injection Needed |
|---|---|---|---|---|---|
| **Bankmed S.A.L.** | LBP 1.9 trillion ($475 million at actual exchange rate; $1.26 billion at official exchange rate).[9] | LBP 16.4 trillion ($10.9 billion at official rate). LBP 43.6 trillion after converting back at actual rate. | LBP 16.5 trillion. After 50 percent haircut, book value = LBP 8.3 trillion ($5.5 billion at official rate). LBP 21.9 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 21.8 trillion, rendering the bank insolvent. | $5.7 billion |
| **Crédit Libanais S.A.L.** | LBP 1.5 trillion ($375 million at actual exchange rate; $1.0 billion at official exchange rate). | LBP 9.2 trillion ($6.1 billion at official rate). LBP 24.4 trillion after converting back at actual rate. | LBP 9.7 trillion. After 50 percent haircut, book value = LBP 4.9 trillion ($3.2 billion at official rate). LBP 12.9 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 12.0 trillion, rendering the bank insolvent. | $3.1 billion |
| **IBL Bank S.A.L.** | LBP 958 billion ($240 million at actual exchange rate; $635 million at official exchange rate). | LBP 5.4 trillion ($3.6 billion at official rate). LBP 14.2 trillion after converting back at actual rate. | LBP 4.0 trillion. After 50 percent haircut, book value = LBP 2.0 trillion ($1.3 billion at official rate). LBP 5.3 trillion after converting back at actual rate. | Shareholders' equity reduced by LBP 7.5 trillion, rendering the bank insolvent. | $1.9 billion |

In need of massive amounts of new equity to repair their balance sheets and achieve capital adequacy, the likely path for these banks is a complete shutdown with massive losses for shareholders, depositors, and other creditors. They can survive only as part of a banking system reorganization that includes mergers of weak banks, haircuts on depositors and creditors, the stripping of defaulted assets into "segregated entities," and new capital, perhaps from the IMF or other multilateral sources. These reforms would have to be combined with new management and improved anti-money laundering rules. Because they are not directly implicated in the *Bartlett* case, these three could serve as viable banks into which other banks are merged.

---

**9.** Note: The term "actual exchange rate" refers to an exchange rate of LBP 4,000 to the dollar. The "official exchange rate" is LBP 1,507.5 to the dollar.



* * *

The 14 banks reviewed in this report are among Lebanon's largest and most systemically important. All 14 are deeply insolvent. Their balance sheets obscure this insolvency because assets are held at historical cost rather than reflecting a credit loss and the widespread insolvency of the Lebanese economy, and because the balance sheets maintain the fiction of an LBP 1,507.5-per-dollar official exchange rate instead of the more realistic (but unofficial) rate of LBP 4,000 to the dollar. Still, the devaluation and credit losses are real.

Since all 14 banks are deeply insolvent, one can reasonably infer that almost every other Lebanese bank, and the banking sector as a whole, is insolvent. Some small banks may be solvent, but they are not material relative to the size of the system as a whole.

**"Since all 14 banks are deeply insolvent, one can reasonably infer that almost every other Lebanese bank, and the banking sector as a whole, is insolvent. Some small banks may be solvent, but they are not material relative to the size of the system as a whole."**

These solvency problems are compounded by the "qualified" opinions issued by the auditors of the banks' financial statements, which are an indication of other serious accounting and financial problems. Eight of the 14 banks surveyed have not provided interim financial statements after December 31, 2018, and one bank – MEAB Bank – has not produced an audited financial statement or update since December 31, 2017. Given the current financial chaos in Lebanon, along with the effects of COVID-19, financial statements for the period ending December 31, 2019, will likely be delayed, qualified, or not released at all.

Using the methodology described at length in Appendix 2, the capital needed to cover existing losses and to

recapitalize the 14 banks to international norms will likely be as follows:

| Bank | Capital Required |
| --- | --- |
| Bank Audi S.A.L. | $11.0 billion |
| Bank of Beirut S.A.L. | $4.7 billion |
| Bank of Beirut and the Arab Countries S.A.L. | $2.2 billion |
| Bankmed S.A.L. | $5.7 billion |
| Banque Libano-Française S.A.L. | $3.5 billion |
| BLOM Bank S.A.L. | $11.9 billion |
| Byblos Bank S.A.L. | $7.4 billion |
| Crédit Libanais S.A.L. | $3.1 billion |
| Fenicia Bank S.A.L. | $0.55 billion |
| Fransabank S.A.L. | $5.6 billion |
| IBL Bank S.A.L. | $1.9 billion |
| Lebanon and Gulf Bank S.A.L. | $1.7 billion |
| MEAB Bank S.A.L. | $0.55 billion |
| Société Générale de Banque au Liban S.A.L. | $7.2 billion |
| **Total** | **$67 billion** |

A $67 billion rescue of the Lebanese banking sector is unrealistic. Any new money from the World Bank would presumably go to infrastructure or specific development projects, not to the banks. The maximum rescue package might provide $26 billion in new money, including a $15 billion rescue loan on concessionary terms from the IMF and $11 billion in soft loans from CEDRE. These loans might fall short of those maximums because Lebanon is unlikely to meet the required conditionality. Moreover, there is no scenario in which the full proceeds of IMF or CEDRE loans will be used exclusively to rescue the banks. This is compounded by the fact that all but three of these banks stand accused of financing Hezbollah and money laundering.

The estimated capital shortfall consists of the full amount of negative net worth plus 10 percent of total assets as a new capital cushion (called "Tier One" capital). With regulatory approval, it would be possible to reduce the capital cushion from 10 percent of assets to 5 percent of assets. However, that reduction would not materially diminish the total capital shortfall, because most of the shortfall


comes from the negative net worth component, not the new capital cushion. About $60 billion would still be required – an amount that remains far beyond available resources.

With regulatory approval, it might be possible to amortize losses over five years. This is known in banking circles as "extend and pretend." Something similar was done in the United States during the savings and loan (S&L) crisis in the late 1980s. Many S&L institutions (including many of the largest) were technically insolvent. Total losses were approximately $200 billion. Regulators allowed institutions to create an intangible asset called "regulatory goodwill" as an offset to what would otherwise be a negative net worth. This asset was amortized over time as the S&Ls dealt with bad loans and disposed of assets. However, regulators shut down the weakest institutions, while protecting insured depositors. Losses were absorbed mostly by stockholders, unsecured creditors, and the U.S. deposit insurance system. Some executives went to jail. The crisis, which became acute in 1985, was mostly resolved by 1992.

The easiest and fastest way to resolve the Lebanese crisis is to merge the 14 listed banks into perhaps five banks. The five survivors might be Bankmed, Crédit Libanais, and IBL Bank (because they are relatively clean with regard to allegations of exposure to Hezbollah) along with Bank Audi and BLOM Bank (because of their large size and relatively strong management). Stockholders and unsecured creditors of the other banks would be wiped out. This merger would cause massive layoffs and branch closures because of redundancy and economies of scale.

The single most important step to ensure bank solvency – for both surviving banks and banks merged out of existence – is to haircut depositors. This could be done in several ways. Bank regulators could insist that dollar (and euro) deposits align with the devalued Lebanese pound. For example, a $100,000 deposit made at an exchange rate of LBP 1,507.5 to the dollar would be redenominated $37,500 at the actual exchange rate of LBP 4,000. Alternatively, a depositor could elect to convert larger deposits at a combination of the official and actual exchanges rates. Depositors might receive stock in a reorganized bank as partial compensation for the haircut on their deposits. Sight deposits might also be converted into time deposits with one-year, three-year, or five-year maturities to better align with the banks' amortization of losses.

Haircutting deposits might cut the cost of the bank bailout by half. Amortizing losses over five years would cut the cost of the bailout by 10 percent in the first year. Regulatory forbearance (that is, "regulatory goodwill") could bridge the solvency gap from an accounting perspective while other measures take hold and future profits come online. Wiping out equity and unsecured creditors would also contribute to solvency. Extending the maturity of deposits to up to five years would ease liquidity constraints that exist alongside the solvency issue. Deploying these techniques in a coordinated manner could reduce the first-year cash costs of a system-wide bailout to as little as $5 billion, which would be consistent with a $26 billion multilateral loan program.

This plan to wipe out equity, extend maturities, and haircut deposits and bonds is broadly consistent with the conversion of bank rescues from bailout to "bail-in"[10]

---

10. The term "bail-in" was developed as an antidote to the more well-known term "bailout." During the 2008 financial crisis (and earlier crises), financial institutions were rescued with taxpayer funds or central bank money-printing and guarantees. The result was that ordinary investors suffered, while elite financial institutions and their CEOs were mostly unaffected. This generated enormous public resentment. In response, the November 2014 G20 Leaders' Summit in Brisbane approved a comprehensive new plan for dealing with the failure of financial institutions. In future crises, losses in financial institutions would fall first on stockholders. Once equity was wiped out, bondholders would suffer haircuts (reductions in principal owed), and depositors would suffer losses on amounts in excess of insured deposits (typically about $250,000 or €100,000). Only when creditors' and depositors' funds were exhausted would government resources be used in a rescue. Some banks would not be rescued, but would instead be wound-up in an orderly fashion and consolidated with solvent banks. Banks were ordered to prepare "living wills," basically pre-established plans for liquidation or reorganization consistent with the new bail-in rules. While the bail-in rules were well-intentioned, they have yet to be tested in an extreme financial crisis. It remains to be seen whether regulators will, in fact, treat major banks as the bail-in rules intend.



endorsed at the November 2014 G20 Leaders' Summit in Brisbane, Australia, as implemented by the Financial Stability Board on June 21, 2018.[11]

While a plan of this type is feasible, the impediments are obvious. The Lebanese government has pledged not to haircut bank deposits. This claim is difficult to take seriously. Redeeming dollar deposits at the actual exchange rate (LBP 4,000 to the dollar) is one of the leading causes of the bank insolvencies. The government's posture is that the dollar deposits are "money good." Meanwhile, the deposits are frozen (except for withdrawals in accordance with BdL Circular 151 of April 21, 2020, which permits withdrawals of up to $5,000 per month in *local currency only*).[12] The longer the government maintains the pretense of value in these dollar-denominated accounts, the more the currency will devalue and the more insolvent the banks will become. In an effort to spare depositors from haircuts (about a 62 percent loss relative to the official exchange rate), the government is increasing the likelihood that depositors will suffer a 100 percent loss from a banking system collapse.

To the extent that Hezbollah and its operational entities or front organizations are depositors (assuming their funds have not already been withdrawn and sent abroad), fierce political opposition to any deposit haircuts can be expected. Elites and bank owners may also object strenuously to the elimination of bank equity. Of course, they are most responsible for destroying Lebanon's financial system. They deserve to lose their equity investments, if not more.

Depositors will undoubtedly object to the conversion of sight deposits into time deposits. But the purpose is to buy time to raise capital, work out bad assets, and generate new earnings. The tradeoff is not between immediate liquidity (there is none) and delay. The tradeoff is between a complete loss and a partial recovery over time.

Unfortunately, a large portion of the losses on dollar- and euro-denominated deposits resulting from haircuts will fall on the Lebanese diaspora in the United Arab Emirates, Saudi Arabia, and other Persian Gulf oil-producing states and in Nigeria and francophone West Africa and North Africa. These emigrants have trusted the banking system as a safe depository for remittances to benefit family members in Lebanon. These remittances have dried up over fears of bank instability. The question now is whether they might be revived in a reformed banking sector. Large haircuts on existing deposits may permanently erode confidence among the diaspora and lead to a lasting reduction in hard currency inflows into Lebanon.

Still, the choice is not between bailout or bail-in. There is no money for a full bailout. And potential lenders have no interest in preserving the current system. There might be enough money, say $5 billion, for a rescue conducted along bail-in principles as described above. But the real choice is between a bail-in (with haircuts, equity conversions, and outright losses) or a complete collapse (with 100 percent losses, followed by chaos). The Lebanese leadership has not acknowledged this. The longer Lebanon's leaders deny reality, the greater the probability of a complete collapse.

## Eurobonds and External Debt

As of January 1, 2020, Lebanon had $28.3 billion of dollar-denominated eurobonds issued and outstanding, excluding interest. The interest coupons associated with those bonds are $15.5 billion, making the total liability $43.8 billion. In addition, Lebanon has issued a "special treasury bond" (not technically a eurobond)

**11.** See: Financial Stability Board, "Principles on Bail-in Execution," June 21 2018. (https://www.fsb.org/wp-content/uploads/P210618-1.pdf); Phillip Inman, "G20 agreement on banking regulation will end bailouts, says Carney," *The Guardian* (UK), November 9, 2014. (https://www.theguardian.com/business/2014/nov/09/g20-deal-banking-regulation-mark-carney)
**12.** Sara Hadchiti, "BDL Circular 151 Enables Bank Depositors to Convert their Foreign Currency Accounts to Lebanese Lira at Market Rates," *Blominvest Bank*, April 24, 2020. (https://blog.blominvestbank.com/33289/bdl-circular-no-151-enables-bank-depositors-to-convert-their-foreign-currency-accounts-to-lebanese-lira-at-market-rates/)


in the amount of $1.4 billion, which brings the country's total sovereign dollar-denominated liability to $45.2 billion.

The eurobonds were issued in 27 separate transactions between April 4, 2016, and May 17, 2018. Maturity dates on these bonds range from March 9, 2020, to March 23, 2037. The bonds' principal amounts range from $2.5 billion (issued in November 2013, with 7.15 percent interest) to $300 million (issued in April 2031, with 7 percent interest). Various international and local lead managers were used to place the bonds. Among the largest international lead managers were: BNP Paribas, Credit Suisse, Citibank, HSBC, Deutsche Bank, Standard Chartered, JPMorgan, and Barclays. The largest local placement agents include: BLOM Bank, Byblos Bank, Société Générale de Banque au Liban, Bank Audi, Fransabank, Bank of Beirut, and Bankmed. The issuer (the Lebanese government)

placed $11.1 billion of the eurobonds directly, without the services of a lead manager.

The graph below shows the maturity structure of principal payments (blue) and coupon payments (red) on the outstanding Lebanese eurobonds as of April 2019 through 2037. Amounts are shown in millions of U.S. dollars. The schedule of amounts due exceeds $2 billion per year in every year except 2029 and between 2032 and 2037. The years with amounts due in excess of $3.5 billion are 2020, 2021, and 2022.[13]

The 2019 maturities were paid as agreed. Bonds due on March 9, 2020 ($1.2 billion principal), April 14, 2020 ($700 million principal), April 16, 2020 (the $1.4 billion-principal special treasury bond), and June 19, 2020 ($600 million principal) are all now in default due to non-payment.[14] Total missed payments to date are $3.9 billion, while total defaults on all bonds are



**Republic of Lebanon Eurobonds** April 2019 – 2037 Redemption Profile

*Source: Lebanese Ministry of Finance*

---

**13.** Republic of Lebanon Ministry of Finance, "Amortization Schedule of Outstanding Eurobonds (as of March 31, 2019)," accessed June 29, 2020. (http://finance.gov.lb/en-us/Documents/Outstanding%20Eurobonds%20as%20of%2031%20March%202019.pdf)
**14.** "S&P downgrades Lebanon to selective default," *The Daily Star* (Lebanon), May 12, 2020. (https://www.dailystar.com.lb/Business/Local/2020/Mar-12/502643-sp-downgrades-lebanon-to-selective-default.ashx)



$45.2 billion, subject to restructuring negotiations. As a matter of law and contract, all $45.2 billion are considered in default, per the cross-default clauses in those bond issues and the stated intention of the government. The Lebanese government announced on March 23, 2020, that it intended to withhold payments on all foreign currency-denominated bonds. As a practical matter, this puts in default all $45.2 billion of principal and interest due.

> **Lebanon has no net hard currency reserves and no prospects of receiving any significant amount in the near term. This presents bondholders with an opening position of a total default, something unprecedented in the history of sovereign eurobond issuance.**

Lebanon is unusual in that most of the eurobonds it has issued are held internally by the country's banks.[15] Typically, eurobonds are held externally by institutional investors. Estimates vary as to the value of the eurobonds held by the Lebanese banking system. Using the $28.3 billion principal figure, between $16 billion to $23 billion is held by Lebanese banks.[16] As much as $500 million of Lebanese eurobonds were reportedly sold to a single emerging markets investment fund, Ashmore Group plc, based in London. This transaction is currently under investigation by a public prosecutor in Lebanon, since it may have represented a capital transfer in violation of capital controls.[17] Ashmore's total position in Lebanese eurobonds may be as high

as $1 billion, including approximately $300 million of the March 2020 maturity now in default.[18]

Restructuring Lebanon's eurobond debt will be highly problematic. This is not a case in which bondholders might be asked to take a 10 to 15 percent haircut (in the form of extended maturities and lower interest rates) as part of a restructuring plan. Lebanon has no net hard currency reserves and no prospects of receiving any significant amount in the near term. This presents bondholders with an opening position of a total default, something unprecedented in the history of sovereign eurobond issuance. Of course, a debt restructuring could extend the maturities of $6.6 billion in bonds maturing in 2020, 2021, and 2022 for, say, 10 years. This would allow Lebanon to restructure its banking system and internal laws in a manner that enables substantial foreign exchange to be accumulated (through renewed remittances, increased exports, foreign direct investment, and a devalued currency) and allows resumption of interest and principal payments by 2023. Such restructuring is entirely dependent on new money from an IMF-led loan accompanied by a stringent austerity program. Absent that type of program, it is unclear how Lebanon can bridge the gap between its current insolvency and some prospect of repayment in several years.

The Lebanese eurobond indentures also lack a "collective action" clause. This provision allows a sovereign issuer to negotiate a debt restructuring plan with creditors and then call them to hold an issue-by-issue vote

---

**15.** All of the eurobonds were sovereign issues by the Republic of Lebanon. The commercial banks bought most of these bonds from the underwriters, using hard currency deposits from the diaspora and other sources. In effect, government bonds were sold to the diaspora, using commercial banks as intermediaries. The commercial banks were voluntary buyers. It is unclear if the BdL applied some pressure to get the banks to go along. In any case, it was profitable business for the banks because the yields on the eurobonds were higher than the deposit rates paid to the diaspora. This was definitely part of the Ponzi scheme, as Lebanon had no hope of paying off old bonds without issuing new ones, and there were few buyers for the new bonds, except banks using diaspora deposits. When the diaspora remittances dried up, the Ponzi scheme collapsed with a slight lag.

**16.** Michael Arnold, "Lebanon defaults on its Eurobonds – what comes next?" *TRT World* (Turkey), March 13, 2020. (https://www.trtworld.com/opinion/lebanon-defaults-on-its-eurobonds-what-comes-next-34531)

**17.** "Lebanon inquiring into local banks' sale of Eurobonds -judicial source," *Reuters*, February 19, 2020. (https://www.reuters.com/article/lebanon-crisis-eurobonds-sale/lebanon-inquiring-into-local-banks-sale-of-eurobonds-judicial-source-idUSL8N2AJ6NJ)

**18.** Kenza Ouazzani, "Debt Restructuring: the untold story of how Lazard and Cleary Gottlieb were chosen," *L'Orient-Le Jour* (Lebanon), March 2, 2020. (https://www.lorientlejour.com/article/1208602/debt-restructuring-the-untold-story-of-how-lazard-and-cleary-gottlieb-were-chosen.html)


to approve the plan, with approval requiring an affirmative vote by creditors whose collective holdings add up to at least 75 percent of the total debt. This increases the likelihood of a deal, since creditors with small positions (5 to 10 percent) cannot use holdout tactics to block restructuring. Collective action clauses have been widely used in sovereign debt issuance since only 2015. Almost $16 billion of the Lebanese eurobonds were issued during or prior to 2015, with the remaining $12.3 billion issued from 2016 to 2018. None of the eurobonds contain collective action clauses. Some Lebanese officials have accused bond counsel of incompetence and conflicts of interest for not including the clauses in the $12.3 billion of issues from 2016 or later.

One immediate concern is that Ashmore has a 25 percent blocking position in the defaulted issue that matured in March 2019 (and possibly in other issues as well, based on its total holdings of $1 billion). This means Lebanon will have to devise terms acceptable to Ashmore or face protracted litigation and the potential for account freezes and asset seizures in its international dealings.

One mitigating factor is that losses on the $16 billion to $23 billion of eurobonds held by Lebanese commercial banks would be included in the 50 percent haircut on all dollar-denominated assets of those banks, which include the eurobonds. That portion of the bond debt should not be included again when totaling the cost of a Lebanese bailout. Using $20 billion as an approximation of the principal amount of eurobonds held by domestic banks leaves a residual $8.3 billion of eurobonds held outside the banking system by other investors, such as Ashmore. If the same 50 percent haircut previously applied to bank holdings were applied to that $8.3 billion of nonbank-owned eurobonds, an additional $4.2 billion of losses would result, in addition to losses arising in the banking system. A restructuring for that $4.2 billion is feasible subject to two conditions: First, regulators or the BdL would have to force Lebanon's commercial banks to approve the plan (leaving aside

the issue of non-bank holdouts, which may prove problematic). Second, some of the IMF new money (assuming an IMF plan is approved) would have to be applied to assure bondholders that initial payments on the restructured bonds can be paid as agreed. In effect, the eurobond restructuring will become a subset of the larger IMF-led restructuring of the entire Lebanese financial and banking sector.

# Gold

Lebanon possesses 286.8 metric tons of gold in its official reserve position as of May 2020, according to World Gold Council reports based on the IMF's *International Financial Statistics*.[19] This ranks Lebanon as the 20th-largest holder of gold reserves among the 100 countries that report to the IMF (some nations do not report, and some have no gold reserves). At the market price of $1,740 per ounce (as of May 31, 2020), Lebanon's gold reserves are worth approximately $16 billion. This is likely the largest – and perhaps only – liquid asset left in the hands of the Lebanese government.

Based on Lebanon's GDP of approximately $57 billion, this gold hoard gives Lebanon a 28 percent gold-to-GDP ratio, one of the highest in the world. (By comparison, the U.S. gold-to-GDP ratio is approximately 2.3 percent). Lebanon's population today is approximately 6.8 million people. This gives Lebanon roughly 1.35 ounces of gold per capita, estimated to be the second-highest ratio in the world after Switzerland. (By comparison, the United States has approximately 0.80 ounces of gold per capita, just 60 percent of Lebanon's ratio).

Lebanon's gold reserves are legally held by the BdL. These reserves were acquired mainly during the 1960s and 1970s, a time of relative prosperity and positive inflows. The exact location of this gold is difficult to ascertain. Initially, the gold was held in the BdL's vaults. Legend holds that BdL Governor Edmond Naim slept at the bank to protect the gold during the

---

**19.** See: "World Official Gold Holdings," *World Gold Council*, May 2020. (https://www.gold.org/goldhub/data)



civil war from 1976 to 1990.[20] The gold was moved to safekeeping outside of Lebanon in the late 1970s.[21] The best estimate is that today, approximately 60 percent of the gold (172 metric tons) is held at the Federal Reserve Bank of New York, and the remaining 40 percent (114 metric tons) is held at either the French central bank or the UK central bank.

In 1986, the Lebanese Parliament issued Law No. 42, which prohibits "the disposal of gold assets with or on behalf of the Banque du Liban, and under any circumstances."[22] It is unlikely that Lebanon's gold has been seized, frozen, or otherwise hypothecated. The laws governing the central banks that hold Lebanon's gold – the Federal Reserve and the French and UK central banks – generally do not recognize claims against sovereign governments, including their central banks, under the principle of sovereign immunity and applicable statutes. Limited exceptions to sovereign immunity may exist where the sovereign has waived immunity, such as in the case of sovereign eurobond issuance. However, those waivers do not cover central bank assets, including gold. BdL Governor Riad Salameh recently affirmed the untouchability of Lebanon's gold, noting that the country would not use gold reserves to pay maturing eurobond debt.[23]

Given Lebanese law, custody by the BdL, and subcustody by the Federal Reserve and French and UK central banks, it is unlikely that Lebanon's gold can be used in a financial rescue package, except as part of a broader plan that has the consent of the Lebanese Parliament and the BdL. Such a plan would involve the IMF and CEDRE as likely parties to provide material hard currency outside relief. That said, there will be a multibillion-dollar gap between the amount of new funding available in any rescue plan and the amount actually needed to put the Lebanese economy and financial sector on a firm footing.

> **Given Lebanese law, custody by the BdL, and subcustody by the Federal Reserve and French and UK central banks, it is unlikely that Lebanon's gold can be used in a financial rescue package, except as part of a broader plan that has the consent of the Lebanese Parliament and the BdL.**

As noted above, full stabilization of Lebanon will require between $65 billion and $70 billion, while cosmetic stabilization (assuming regulatory forbearance on bank balance sheets) will require $5 billion per year for five or more years. Conditional funding from the IMF might be limited to $10 billion disbursed over five years. A sale of a substantial part of Lebanon's gold might provide a bridge between needed and available funds.

Such a sale could be managed by the Bank for International Settlements (BIS), a central bank for central banks and clearinghouse based in Basel, Switzerland. The BIS provides anonymity and ready access to other central banks that might be willing buyers, including the Chinese and Russian central banks. Such a sale would have to be carefully managed

---

**20.** "Bullion for you," *The Economist* (UK), April 17, 2011. (https://www.economist.com/graphic-detail/2011/04/27/bullion-for-you)

**21.** Osama Habib, "Should Lebanon bring back its gold from the U.S.?" *The Daily Star* (Lebanon), October 10, 2019. (http://www.dailystar.com.lb/Business/Local/2019/Oct-10/493201-should-lebanon-bring-back-its-gold-from-us.ashx#); Note: This article reports that Lebanese gold was removed to "Fort Knox." That location reference is almost certainly incorrect. Fort Knox (and West Point) are the main repositories of official U.S. gold reserves. Any gold held in custody for third parties (usually the IMF or foreign central banks) is held in separate vaults at the Federal Reserve Bank of New York.

**22.** Banque du Liban, "Prohibiting the Sale of BDL Gold Reserves," September 24, 1986. (https://bdl.gov.lb/laws/index/5/32/Laws.html); Mike Azar, "Can the BdL gold be seized if we default?" *Finance 4 Lebanon*, December 8, 2019. (https://finance4lebanon.com/can-the-bdl-gold-be-seized-if-we-default/)

**23.** Eric Kencht and Samia Nakhoul, "Lebanon c.bank governor: gold reserves won't be 'touched' for Eurobond payments – MTV," *Reuters*, March 2, 2020. (https://www.reuters.com/article/lebanon-crisis-cenbank/lebanon-cbank-governor-gold-reserves-wont-be-touched-for-eurobond-payments-mtv-idUSS8N27C01G)


so as not to disrupt existing gold markets, principally the COMEX gold futures market, which is part of the CME Group, and the London physical gold bullion market run by members of the London Bullion Market Association. Lebanon would also have to insulate its cash proceeds from gold sales against liens obtained by third-party creditors. Sovereign immunity laws do not afford as much protection to cash deposits as they do to central bank gold. Lebanon could insulate proceeds through the use of escrows and custodians or by obtaining waivers or consents from third-party claimants.

## The System: Hezbollah's International Criminal Network

"The System" is shorthand for Hezbollah's global network of drug smuggling, terrorism, money laundering, tax evasion, bribery, and other crimes facilitated through drug cartels, corrupt banks, exchange houses, cut-outs, trade networks, and a large expatriate network. Lebanese banks are critical links in The System, but they are enabled by U.S. correspondent banks. Profits from The System enrich Hezbollah leadership, bankers, politicians, and government officials who turn a blind eye to its operation.

It is beyond the scope of this report to fully describe The System.[24] Yet a report on Lebanon's financial system would be incomplete without some description.

Hezbollah has a huge cohort of sympathetic Shiite Lebanese expatriates in the Tri-Border Area where Brazil, Paraguay, and Argentina converge. The principal cities there are Brazil's Foz do Iguaçu and Paraguay's Ciudad del Este. From that base, Hezbollah has established strong connections to the South American cocaine trade. Hezbollah has built business ties with Los Zetas and other violent Mexico-based drug cartels. It also has links to the Shiite Lebanese expatriate community in West Africa, particularly Sierra Leone, Côte d'Ivoire, the Gambia, Senegal, Ghana, and Nigeria. Additionally, Hezbollah has agents in the United States dealing in used cars. Finally, Hezbollah has agents in China and Southeast Asia involved in consumer goods such as clothing and textiles.

This network engages in the following flows of goods and cash: Cocaine is shipped from South America to Europe via West Africa. Used cars are shipped from the United States to West Africa. Consumer goods are shipped from Asia to South America in partial payment for the cocaine. Blood diamonds are shipped from West Africa to Europe and Lebanon. Cash proceeds from the sale of cocaine, blood diamonds, and used cars are directed to exchange houses for money laundering and subsequent deposit in Lebanese commercial banks. These Lebanese banks then launder the money through their U.S. correspondent banks. Cut-outs and front companies are the account holders. Once the money is laundered, it is dispersed via wire transfers to pay for more used cars, cocaine, and Asian consumer goods. Net profits are deposited with Hezbollah for terrorism, social programs, and bribes. All of the banks listed in the "Lebanese Commercial Banks" section of this report – with the exceptions of Bankmed, Crédit Libanais, and IBL Bank – are involved in The System, according to allegations in made in the *Bartlett* case.[25]

---

24. The most comprehensive description of The System, including names, account data, correspondent banking relationships, political interaction, and terrorist connections, is available in an 822-page amended complaint filed in the *Bartlett* case: *Bartlett v. Société Générale de Banque au Liban S.A.L. (SGBL), et al.*, 19-cv-007 (CBA) (VMS) (E.D.N.Y. filed August 2, 2019). (https://www.osenlaw.com/sites/default/files/BartlettAmended-2019-cv-00007.pdf)

25. The *Bartlett* case was, in part, the fruit of prior U.S. government actions taken to combat Hezbollah illicit finance, most notably the Treasury Department's 2011 decision to identify the Lebanese Canadian Bank and its subsidiaries as a "primary money laundering concern" pursuant to Section 311 of the USA PATRIOT Act. U.S. Department of the Treasury, Press Release, "Treasury Identifies Lebanese Canadian Bank Sal as a 'Primary Money Laundering Concern,'" February 10, 2011. (https://www.treasury.gov/press-center/press-releases/Pages/tg1057.aspx)




*Source: The New York Times*[26]

This network of illicit activity is presented in the diagram above.

For purposes of this report, it is important to examine the role of the Lebanese financial system in the money laundering process. Cash proceeds of drug, used-car, and blood diamond sales are deposited in corrupt banks in West Africa or transported in cash to Lebanon. (One million dollars in $100 bills weighs 22 pounds and fits easily in a small bag).

The illicit activities conducted in the Tri-Border Area are estimated to generate as much as $18 billion per year. The exact share of these proceeds syphoned to Hezbollah for use in The System is difficult to ascertain, but estimates range from $500 million to $1 billion per year.[27] The Central Intelligence Agency assesses that Iran may have historically financed Hezbollah in the amount of $700 million per year, and that Iranian support has continued in some form despite U.S. sanctions, the decline in oil prices, and the impact of

---

**26.** "Money Laundering at Lebanese Bank," *The New York Times*, December 13, 2011. (https://archive.nytimes.com/www.nytimes.com/interactive/2011/12/13/world/middleeast/lebanese-money-laundering.html?action=click&module=RelatedCoverage&pgtype=Article&region=Footer)

**27.** Emanuele Ottolenghi, "Stop Iran funding? Hezbollah's Financial Activities Should be Israel's Top Priority," *Foundation for Defense of Democracies*, February 6, 2020. (https://www.fdd.org/analysis/2020/02/06/stop-iran-funding%3F-hezbollahs-financial-activities-should-be-israels-top-priority/)


COVID-19 on Iran's economy.[28] Thus, between The System and Iran, Hezbollah brings in as much as $1.2 billion to $1.7 billion per annum.

Laundering satchels of $100 bills into digital balances enables Hezbollah to send wire transfers around the world. Exchange houses in Lebanon are a vehicle for this. The exchange houses are not banks. They are loosely regulated and do not subscribe to international anti-money laundering or "know your customer" (AML/KYC) due diligence standards. They accept cash deposits with no questions asked. Legitimate deposits from vendors and markets are accepted side-by-side with money from Hezbollah bagmen.

Illicit cash is converted into an account at these exchange houses and then easily wired to a Lebanese commercial bank. Since the exchange houses have longstanding relationships with the commercial banks and provide legitimate services for many customers, these transfers pass the banks' AML/KYC standards, although those standards are not rigorously applied. Once the digital account balances transfer to commercial banks, the funds can be further transferred through U.S. correspondent banks. Once the funds are in the dollar-denominated system, the money laundering cycle is complete, and the funds are available for perpetuating The System (as payment for used cars or consumer goods) or for other uses as directed by Hezbollah and its agents.

Dismantling The System through intelligence collection, criminal investigations, sanctions, and account freezes is a high priority of U.S. and Israeli national security efforts. The System is also threatened by civil litigation in the United States that could result in damage awards against Lebanese commercial banks (among other defendants) measuring in the billions of dollars. Litigation will take years, but it could cripple some Lebanese banks in the future, even if they survive the current chaos. The mere existence of such litigation could be an impediment to a near-term bailout scenario. Potential lenders such as the IMF will not

want to finance the Lebanese government if the funds could be forfeited to plaintiffs in the *Bartlett* case.

> **The report stated that in Lebanon, 'efforts are critically needed to ensure macroeconomic stability against a difficult economic situation with high debt, twin deficits and a weak external position.'**

The United States could easily hasten the collapse of the Lebanese financial system – and, by extension, the Lebanese government and civil society – by imposing sanctions and terrorist designations on major Lebanese commercial banks. Ample information exists to support such sanctions; much of the evidence in the *Bartlett* case is derived from U.S. law enforcement agencies and the U.S. intelligence community as well as from open sources. Sanctions would result in the termination of correspondent banking relationships between Lebanese commercial banks and major international banks in the U.S. dollar payments system.

U.S. officials understand that sanctioning Lebanese commercial banks would destroy the Lebanese banking system and economy, collapse the current government, spark social unrest, and precipitate a major humanitarian crisis. This would be the high cost of dismantling Hezbollah's support structure. Thus, until now, the Treasury and State departments have sporadically targeted individual Lebanese banks. Designated banks include the Lebanese Canadian Bank (2011) and Jamal Trust Bank (2019). These actions have cut off some of Hezbollah's money laundering channels without collapsing the financial system in one go. More targeted designations may be necessary to achieve a greater impact on Hezbollah's illicit financial activities.

## Rescue Plans

Efforts of the Lebanese government to devise a financial rescue plan began as early as September 11, 2019, when the IMF completed its Article IV consultation

---

**28.** Conversation with a former CIA official on April 28, 2020.



with Lebanese officials. An Article IV consultation is routinely conducted with all IMF members. An IMF report released on October 17, 2019, warned of "low confidence, high uncertainty, tight monetary policy and a substantial contraction in the real estate sector" in Lebanon. The report also stated that in Lebanon, "efforts are critically needed to ensure macroeconomic stability against a difficult economic situation with high debt, twin deficits and a weak external position."[29] The IMF was candidly describing the difficulties in Lebanon that the BdL and the commercial banks had covered up.

Immediate action by Lebanese officials on a rescue plan was delayed by civil unrest and the collapse of the government on October 29, 2019. It was not until the selection of a new prime minister on December 19, 2019, and the installation of a consensus Cabinet on January 21, 2020, that further steps could be taken. A confidence vote on February 11, 2020, allowed the new government to formally take office and begin working on a plan.[30]

By February 19, 2020, the Lebanese government was already in discussions with the IMF on a financial and economic rescue plan.[31] On February 25, the Cabinet announced the selection of Lazard as the government's financial advisor and Cleary Gottlieb Steen & Hamilton as counsel to represent Lebanon in negotiations with

bondholders and the IMF.[32] On March 9, Lebanon formally defaulted on a eurobond issue, the first default in the country's history.[33] A draft reform program was released on April 6.[34] After further IMF discussions, debate within the Cabinet, and input from the Lebanese banks and sectarian leaders, the Cabinet released a final version of the plan to the public on April 30.[35]

By early May, the prime minister, Cabinet, Hezbollah, and former Prime Minister Saad Hariri endorsed the plan, and negotiations were underway with the IMF. The government sought $10 billion from the IMF (disbursed over five years, subject to IMF conditionality), which Beirut hoped would unlock another $11 billion pledged on April 6, 2018, by CEDRE.[36] The $21 billion from the IMF and CEDRE, combined with fiscal, monetary, and legal reforms by the Lebanese government, were expected to recapitalize the BdL and the commercial banks, restructure the eurobond debts, encourage exports, and revive the Lebanese economy.

The following are details of the IMF plan, subject to revision and negotiation. The plan follows the IMF's basic template, with adaptations that deal specifically with the situation in Lebanon. The Lebanese Cabinet approved the plan on April 30, 2020. It was developed by the government, financial advisors from Lazard, and legal advisors from Cleary Gottlieb Steen & Hamilton.

**29.** International Monetary Fund, Middle East and Central Asia Department, "Lebanon: 2019 Article IV Consultation-Press Release; Staff Report: Informational Annex; and Statement by the Executive Director for Lebanon," October 17, 2019. (https://www.imf.org/en/Publications/CR/Issues/2019/10/17/Lebanon-2019-Article-IV-Consultation-Press-Release-Staff-Report-Informational-Annex-and-48733)
**30.** "Lebanon's New Government Steels Itself for Painful Reforms," *Stratfor*, February 12, 2020. (https://worldview.stratfor.com/article/lebanon-new-government-faces-difficult-reforms)
**31.** "Lebanon: IMF Advisers Confer With New Government Over Economic Crisis," *Stratfor*, February 20, 2020. (https://worldview.stratfor.com/situation-report/lebanon-imf-advisers-confer-new-government-over-economic-crisis)
**32.** Kenza Ouzzani, "Debt Restructuring: the untold story of how Lazard and Cleary Gottlieb were chosen," *L'Orient-Le Jour* (Lebanon), March 2, 2020. (https://www.lorientlejour.com/article/1208602/debt-restructuring-the-untold-story-of-how-lazard-and-cleary-gottlieb-were-chosen.html)
**33.** "For the first time, Lebanon defaults on its debts," *The Economist* (UK), March 12, 2020. (https://www.economist.com/middle-east-and-africa/2020/03/12/for-the-first-time-lebanon-defaults-on-its-debts)
**34.** "The Lebanese Government's Draft Reform Program," *Finance 4 Lebanon*, April 8, 2020. (https://finance4lebanon.com/the-lebanese-governments-draft-reform-program-update/)
**35.** Lauren Holtmeier, "Lebanon government approves financial economic plan," *Al Arabiya* (UAE), April 30, 2020. (https://english.alarabiya.net/en/News/middle-east/2020/04/30/Lebanon-government-approves-financial-economic-plan)
**36.** See: CEDRE, "Joint Statement," April 6, 2018. (https://www.diplomatie.gouv.fr/IMG/pdf/cedre_statement-en-_final_ang_cle8179fb.pdf)


1. A bank bail-in. This means bank equity is wiped out, large deposits are converted into equity, and bank creditors take a large haircut and agree to debt restructuring. Recovery of bank dividends and "excessive interest income" paid by banks in recent years will be attempted. Some banks will be closed. Some will be merged with other banks. The result will be a smaller, more compact banking sector.

2. Restructuring and refinancing the BdL.

3. A currency devaluation. This is proposed to be done in stages, with an immediate target exchange rate of LBP 3,500 to the dollar. The Lebanese pound would be devalued further in stages until it reaches LBP 4,297 to the dollar in late 2024.

4. Cuts in public expenditure. These will fall mostly on military salaries and military pensions. Other cuts include reduced civil salaries, termination of government contract workers, a freeze on new hiring, reduced tuition assistance, and more.

5. An end to electricity subsidies, and the reform of Electricité du Liban (EDL), Lebanon's state-subsidized electricity utility.

6. Tax increases on individuals and corporations and a higher value-added tax. Reform will also include broadening the tax base.

7. Government debt restructuring.

8. An improved environment for foreign direct investment. This includes legislative changes relating to competition, secured lending, reformed commercial code, customs reform, stock exchange privatization, labor laws, an independent judiciary, and laws pertaining to water, waste, and air quality.

9. A crackdown on corruption, waste, fraud, and abuse. This includes efforts at recovery of dollars sent out of Lebanon in violation of capital controls, and criminal prosecution of perpetrators and facilitators. Recovered funds will be placed in a "dedicated deposit recovery fund" for the benefit of "potential long-term recovery" of deposit haircuts and freezes on large deposits.

10. Improvements in tax collection and tax administration.

11. Development of oil and natural gas assets.[37]

12. Sales or leases of some state assets and more efficient utilization of others.

13. Temporary maintenance of capital controls. These controls will be relaxed in stages beginning in 2021.

14. Net external financing requirements (for food, medicine, and essential imports) amount to an estimated $10 billion over the next five years. Since this exceeds the amounts likely available to the BdL or the government, external financing will be required to fill this gap and avoid a humanitarian crisis.

The government's report contains detailed fiscal projections, including net external financing requirements, budget reforms, and programs targeted for spending reductions.[38]

The IMF plan estimates aggregate gross losses in the financial system at $60.25 billion (using an exchange rate of LBP 4,000 to the dollar) or $160 billion (using the official exchange rate of LBP 1,507.5 to the dollar). Since the government has acknowledged the need for official devaluation (a black market devaluation has already occurred), the $60.25 billion figure seems a reasonable estimate. The plan reduces the loss figure to $38.5 billion using "available resources." However, those offsets are mostly illusory (involving bank capital accounts) and rely on accounting gimmicks. The $60.25 billion loss is closer to the true amount.

Both government figures fall short of the previously mentioned $93.2 billion in losses, which include

---

37. Timour Azhari, "Lebanon's first offshore gas drill is a huge disappointment," *Al Jazeera* (Qatar), April 27, 2020. (https://www.aljazeera.com/ajimpact/lebanon-offshore-gas-drill-huge-disappointment-200427182315344.html)

38. "The Lebanese Government's Financial Recovery Plan," *Lebanon Opportunities* (Lebanon), April 30, 2020. (http://www.leadersclub.com.lb/Download/GovernmentPlanApril302020.pdf)



$22 billion for the BdL, $4.2 billion for eurobond holders, and $67 billion for the commercial banks. However, when permanent losses on eurobonds and dollar-denominated bank accounts (haircuts) are subtracted from the gross losses calculated in this report, the government's $60.25 billion estimate is a realistic starting place. Of course, both figures far exceed the amount of new capital available under any scenario ($21 billion from the IMF and CEDRE). The difference can be bridged only by amortizing the losses over five years and relying on new revenues from tax and budget reforms and on new hard currency inflows from exports, tourism, and remittances.

The IMF plan is comprehensive, covering every aspect of the needed reforms, including banking, government finance, investment climate, write-offs, et cetera. The plan could work if it is implemented fully, assuming anticipated benefits – new investment, renewed remittances, a return of tourism, and expanded exports – all materialize in a timely fashion.

The key question is whether the plan is just to attract new money or is a serious, multi-year effort at real reform. If it is the former, then the Lebanese collapse will be postponed for a year or two, at most. Any new money would simply be added to the unpayable debt once the fraud plays out.

On a positive note, the plan imposes minimal pain on the poorest Lebanese and even offers some social safety net features. Since Hezbollah represents some of the poorest segments of Lebanese society, the plan actually has Hezbollah's support at the Cabinet level. At the same time, the plan will impose costs on middle- and upper-income Sunnis and Christians, who derived the most benefit from an overvalued currency and diversion of remittances. That said, the Sunnis and Christians have much to lose if the economy collapses. This may be enough to gain their support.

There are issues the IMF plan does not address. Insufficient electricity, garbage collection, and waste disposal are longstanding problems to which no effective solutions have been offered. The drop in remittances may be a long-term challenge, too, as

the diaspora's confidence may be difficult to restore. Tourism will also likely suffer because of COVID-19 despite sectoral reforms.

Holdouts by eurobond creditors, especially London hedge funds, may lead some to refuse to participate in debt restructurings as they seek legal recourse. This could tie up Lebanese assets and payments in amounts far greater than the amounts owed. Cuts in salaries, pensions, and public sector jobs may lead to demonstrations, strikes, and riots. In short, political will notwithstanding, the IMF plan has many potential points of failure.

The United States has enormous leverage here because of U.S. control of the dollar payments system and de facto control of the multilateral lending institutions. Indeed, U.S. leverage can be used to destroy Lebanon or to save it. This means that the United States is in a position to extract meaningful concessions from Lebanon's leadership – and perhaps even from Hezbollah.

## Comments and Alternatives to the IMF Plan

Many steps taken by the Lebanese government in response to the financial crisis – capital controls, devaluation, steps toward a bail-in, et cetera – are fairly customary responses. However, Lebanon initiated these responses in an opaque and tentative manner that has diluted the benefits and amplified uncertainty. This hesitant process is likely a reflection of the divisions and self-interest embedded in Lebanese society. It has undermined the start of the reform program.

One obvious example is in the area of currency devaluation. The BdL missed a historic opportunity in late 2019 to devalue the Lebanese pound in a controlled manner that would distribute losses equitably, promote exports, and lay the foundation for a new, stable monetary regime. A swift across-the-board devaluation to LBP 4,000 to the dollar (where the black market was headed) would have encouraged


new capital inflows. It also would have provided clarity for a future path, which is critical to encourage entrepreneurs and capital investment.

The BdL instead allowed the pound to devalue on the black market in a chaotic fashion that destroyed its credibility. This process allowed the rich to get their money out of Lebanon at the old, higher exchange rate, while smaller enterprises and retail depositors suffered the full impact of devaluation through capital controls, frozen accounts, and inflation.

> **This process allowed the rich to get their money out of Lebanon at the old, higher exchange rate, while smaller enterprises and retail depositors suffered the full impact of devaluation through capital controls, frozen accounts, and inflation.**

An extreme devaluation, which the IMF plan seeks on a multi-year basis, requires haircuts on dollar-denominated bank deposits to avoid a windfall to depositors. If a $100,000 deposit were worth LBP 150 million at the old rate, it would be worth LBP 400 million at the new rate. Reducing the balance to $37,500 (a 62.5 percent haircut) seems warranted to equilibrate the dollar deposit to the new exchange rate in terms of local purchasing power. Of course, this haircut would be unpopular and resisted by both banking and depositor interests. But it is an example of the adjustments needed for reform and to distribute losses equitably.

Another mistake would be to implement devaluation in stages over four years. Once such a plan is announced, market participants will focus on the end stage – LBP 4,297 to the dollar – and treat it as the de facto exchange rate today. Even at a more advantageous exchange rate in the interim – between LBP 3,500 and LBP 3,878 to the dollar until 2023 – Lebanese citizens

and businesses will be motivated to evade capital controls through over-invoicing, smuggling, bribery, and other techniques to capture the higher dollar conversion before it disappears. This encourages capital flight and the purchase of fine art, luxury cars, and real estate as an alternative to holding cash balances in the banking system.[39]

One way to increase benefits from a rapid devaluation is to create a currency board funded with a combination of the new money and Lebanon's gold. A currency board's sole purpose is to maintain a fixed exchange rate. It does this by using dedicated hard currency reserves to act as a willing buyer of the local currency at the fixed rate. (It can also be a seller in the event the exchange rate produces local currency values above the targeted rate.) This inspires confidence in the exchange rate and lessens the need to use reserves to fix the rate. Currency boards have been successfully implemented worldwide, most prominently in Hong Kong. The benefits of higher confidence in the new exchange rate outweigh the one-time losses to depositors and others stemming from the rapid devaluation itself.

Another alternative to devaluation (followed by either capital controls or a currency board) is to adopt a floating exchange rate. In practice, the Lebanese pound would immediately adjust to its current black market level of about LBP 4,000 to the dollar. Thereafter, the exchange rate would be set by banks and dealers based on market supply and demand, without intervention by the BdL, except in cases of illegal manipulation or disorderly markets. The exchange rate could then float lower to LBP 5,000 or could even rally to LBP 3,000 as confidence is restored. A floating exchange rate would relieve the BdL of the burden of continually using scarce hard currency reserves to support a fixed rate. This may prove politically popular if it deprives elites of higher-than-market exchange rates and serves as a boon to ordinary Lebanese, who could make market-based decisions about investment, savings, and travel plans. In this respect,

---

**39.** Dion Nissenbaum and Nazih Osseiran, "Cash in the Bank? Lebanese See Sports Cars, Ski Chalets and Italian Sculptures as Safer Investments," *The Wall Street Journal*, June 2, 2020. (https://www.wsj.com/articles/cash-in-the-bank-lebanese-see-sports-cars-ski-chalets-and-italian-sculptures-as-safer-investments-11591090920)



Lebanon would resemble countries that have floating exchange rates, such as the United States, the United Kingdom, members of the eurozone, and Japan.

A bail-in plan for commercial banks seems inevitable. This involves firing top management, wiping out existing bank equity, imposing large haircuts (perhaps 60 percent or more) on depositors and creditors (with possible equity grants in new banks as partial compensation), stripping out bad assets (to be held in trust, with future recoveries reserved for the benefit of the Lebanese people), injecting new capital, and relaunching "clean banks." This would probably consolidate Lebanon's more than 100 banks into perhaps 10 national banks that could achieve economies of scale and other operating efficiencies. This is familiar ground for the IMF, which will likely suggest such proposals as part of a loan negotiation process, whether these proposals are included in the government's original plan or not.

Direct bilateral aid from other nations, outside of IMF auspices, seems highly unlikely. The United States will refrain because such aid would constitute direct or indirect assistance to Hezbollah. In fact, the United States may stand in opposition to an IMF bailout for this reason, particularly given Hezbollah's defiance of U.S. sanctions targeting Syria's Assad regime. As Washington imposes tougher Syria-related sanctions under the Caesar Syria Civilian Protection Act, which came into effect on June 17, Hezbollah's likely refusal to sever its military and commercial ties with the Assad regime may harden U.S. opposition to an IMF bailout for Lebanon.[40]

Saudi Arabia, meanwhile, is unlikely to provide aid given its internal financial difficulties due to the recent oil price collapse. Riyadh has already said it would not provide aid in ways that might benefit Iran's client Hezbollah. France (and the CEDRE group it leads) may not provide significant support, because of the impact of COVID-19, economic woes, internal lockdowns, and other challenges. Despite reports that Iran may have historically provided as much as $700 million per year directly to Hezbollah, Tehran is unlikely to provide financial support to the Lebanese state, due to a catastrophic combination of U.S. sanctions, lower oil prices, the impact of COVID-19, and Iran's own internal unrest. Lebanon is of no strategic or natural resource value to other potential benefactors such as China. Russia is unlikely to help, because it has its own internal difficulties with lower oil prices and COVID-19 and already has a full plate with its deployment in Syria.

With no likely benefactors, Lebanon is on its own with the IMF. Negotiations are off to a constructive start. Still, there are several financial and political hurdles that must be overcome.

An important group of former Lebanese government officials and civil society leaders has begun a petition calling on the IMF not to provide funding to Lebanon unless the plan includes "putting the country on a sustainable path and implementing long overdue and critical reforms." According to published reports, the petition's signatories include former Minister of Economy and Industry Nasser Saidi, former Labor Minister Camille Abousleiman, former Interior Minister Ziad Baroud, and former Member of Parliament Ghassan Moukheiber, along with representatives of finance and industry groups, trade syndicates, and good-governance advocates.[41]

Political pressure is growing in Japan to oppose an IMF plan unless Lebanon extradites fugitive Carlos Ghosn,

**40.** "Iran, Hezbollah say US sanctions will worsen Syrians' suffering," *Al Jazeera* (Qatar), June 18, 2020. (https://www.aljazeera.com/news/2020/06/iran-hezbollah-sanctions-worsen-syrians-suffering-200618073657260.html); David Adesnik, "New Sanctions on Assad Aim to Prevent Atrocities," *War on the Rocks*, June 26, 2020. (https://warontherocks.com/2020/06/new-sanctions-on-assad-aim-to-prevent-atrocities)
**41.** Abby Sewell, "The IMF should not give Lebanon funding without deep governance reforms: Petition," *Al Arabiya* (UAE), May 31, 2020. (https://english.alarabiya.net/en/features/2020/05/31/The-IMF-should-not-give-Lebanon-funding-without-deep-governance-reforms-Petition)



the former chairman of Nissan, who is wanted in Japan on financial fraud charges.[42] This issue may be defused if Ghosn finds sanctuary in Brazil, a possibility he is negotiating.

However, the largest impediment to a successful IMF bailout plan is the chronic internal political dysfunction in Lebanon. In any plan, losses are inevitable among external creditors, stockholders, bank depositors, government agencies, pensioners, businesses, and many other stakeholders. The blame game has started among current and former government officials, the BdL, party leaders, confessional leaders, and other stakeholders. The only blameless parties may be the members of civil society who favor an end to confessional politics, major governmental reforms, and a more modern secular society. Civil society has limited political standing, but that could change if the rescue fails and social disorder spreads. A continuation of the demonstrations of October 2019 and the emergence of a revolt movement cannot be ruled out.

Alternatives to the IMF bailout include extreme austerity, social disorder, a humanitarian crisis, a descent into violence, and the dissolution of the state itself. The outcome of this crisis is still unwritten. The United States can be a deciding voice in how matters in Lebanon proceed. However, the United States is currently preoccupied with an epidemic, economic depression, social disorder, and upcoming elections. The world and the Lebanese people are waiting.

## The New Bank Solution

Lebanon's inability and unwillingness to structure a financial rescue along the lines of the standard IMF playbook bode ill for the country's future. The only solution may be to devise a new playbook with unorthodox approaches that have not been used before but may be better suited to Lebanon's situation.

Typically, bailouts are implemented through the government using the finance ministry, a central bank,

or perhaps a sovereign wealth fund. Private bailouts are done by selecting relatively sound institutions from among those in distress and transferring good assets to sound survivors while insolvent and corrupt entities are allowed to fail. Some consideration may be given to innocent depositors in such situations. Lebanon is not amenable to these approaches, because the government is dysfunctional and the private banks are both inflexible and insolvent beyond repair.

As an alternative, a group of international lenders (IMF, CEDRE, and the United States) might form a new legal entity under UK or Swiss law and provide it with substantial capital. This new entity – call it the New Lebanon Bank (NLB) – would begin with a clean balance sheet and a large capital base. The NLB would have new management appointed from among Lebanese financial experts and seasoned operations professionals with no history of corruption, no connections to government agencies, and no ties to Hezbollah. NLB management would be subject to the supervision of an oversight board that includes IMF officials and representatives of nations that advanced rescue funds. Independent auditors and outside counsel from highly reputable firms would support management and provide further oversight. Strict AML/KYC policies and procedures would be implemented and supervised by reputable independent professionals.

Once established, the NLB would proceed to acquire assets from the existing Lebanese banks on a highly selective basis. Eligibility for inclusion in the NLB portfolio would be restricted to fully collateralized notes and to performing loans from businesses that were themselves solvent. The NLB would then expand its balance sheet by accepting local currency and dollar-denominated deposits and by making new loans to eligible borrowers that pass strict scrutiny in terms of criminal or terrorist affiliation. The NLB could also acquire Lebanese eurobonds (at a deep discount) and finance government debt through overcollateralized

---

**42.** Tommy Hilton, "Japan will only back Lebanon IMF bailout if it deports Carlos Ghosn: Nissan Lawyer," *Al Arabiya* (UAE), May 31, 2020. (https://english.alarabiya.net/en/News/middle-east/2020/05/31/Japan-will-only-back-Lebanon-IMF-bailout-if-it-deports-Carlos-Ghosn-Nissan-Lawyer.html)


short-term repurchase agreements that could be terminated and liquidated without impediment in case of specified events of default.

The NLB would, in effect, act like a portal from a dysfunctional and insolvent banking system to a new, clean banking system. The NLB would offer its own non-voting stock in exchange for the clean assets it acquired, giving sellers a vested interest in the NLB's long-term success, as well as potential liquidity through futures sales of the stock in secondary markets. The NLB would be the bank of choice among legitimate entrepreneurs in Lebanon. It could provide trade finance to help jumpstart the anemic export sector. The NLB could open new correspondent banking relations with U.S. clearing banks, perhaps in conjunction with U.S. banks' termination of relationships with existing problematic banks.

The new bank approach need not be limited to a single bank. Multiple NLBs could be established to perform the same functions, perhaps with some specialization geared toward retail, institutional, and international customers. In effect, Lebanon would not attempt to clear up the existing banking system. Instead, the existing system would be displaced in its entirety. Confidence in this new system could regenerate diaspora remittances and hard currency deposits from successful exporters and resort operators. The existing system would wither and ultimately disappear through the gradual migration of good assets and good customers to the new banks.

One enormous benefit of this new bank approach would be the opportunity to cut off Hezbollah's access to hard currency transfer channels. If Hezbollah could be banned from the NLB, and if U.S. correspondent banks terminate dollar clearing arrangements with bad Lebanese banks, then Hezbollah would be deprived of its lifeblood: dollar payment channels.

There are numerous legal, regulatory, and operational hurdles to such a system. Still, as an alternative to the existing rescue playbook, it may represent a partial solution to Lebanon's financial crisis and as an intermediary for both new money from abroad and clean money from inside Lebanon itself.

# Forecast

One cannot escape the reality that Lebanon is broke and set to lose an estimated $93.2 billion or more. Looking ahead, the eventual outcome in Lebanon is likely to fit into one of three broad categories: New Money Rescue, Austerity and Muddling Through, or Collapse.

## New Money Rescue

In this scenario, the Lebanese Parliament and Cabinet enact most of the elements of the IMF plan. This includes tax increases and improved tax collections; reductions in EDL subsidies and improvements in EDL's electricity generation capacity; public debt restructuring; currency devaluation; recapitalization of the banking sector, including bail-ins that eliminate existing equity and haircut depositors; pension reforms; reduced government expenditures; and legal reforms pertaining to commercial law, anti-trust, fair trade, property rights, and litigation. Above all, Lebanon would mount a sustained effort to reduce corruption, recover stolen assets, and enforce strict AML/KYC protocols. The overall effort would be to recognize losses equitably while laying the foundation for both domestic investment and new foreign direct investment.

Even if the goals of this plan are not ultimately achieved (there are ample reasons to doubt they will be), the effort itself may be enough to induce the IMF, World Bank, and CEDRE to advance part of the amounts requested by Lebanon ($10 billion from the IMF) or pledged by the CEDRE group ($11 billion). World Bank loans would be committed on a case-by-case basis, based on worthwhile infrastructure and development projects.

The result could be upwards of $25 billion of new money for the Lebanese economy over the next several years. That could be amplified both by private capital, with the IMF loan serving as a seal of approval, and by a return of remittances based on a view that Lebanese banks are safe for deposits. The New Bank Solution described above could play a constructive role in this process. Private capital and remittances could increase


new capital to $35 billion or more when combined with the IMF and CEDRE funds. This could jumpstart the Lebanese financial system and provide a foundation for sustained growth. In this scenario, however, it is critical that new money be used to promote new growth and not to reimburse old losses. The financial damage already done to Lebanon must be absorbed as permanent losses by responsible parties or society in general before the economy can move forward with moderate growth.

Since Lebanon is a member in good standing at the IMF, with a fully paid-up capital account, and has never borrowed in the past, it is a good candidate for a loan. The IMF recently expanded its lending capacity, in part to deal with the economic impact of COVID-19. While Lebanon's financial crisis does not stem from the pandemic, a loan request could be considered because Lebanon does have a COVID-19 outbreak and the IMF lending window is wide open. CEDRE could advance funds (to some extent) under the umbrella of an even larger IMF program. Lebanon has no shortage of possible infrastructure projects eligible for World Bank support.

The main impediments to this outcome are the Lebanese political process and Hezbollah. Lebanon has proclaimed the reform of its electricity sector for over ten years, without success. The government has made no effort to enforce anti-money laundering rules or to sanction its own banks. Lebanon has shown no ability to reduce imports, promote exports, manage its foreign exchange rate, or balance its budget. Apart from lip service and going through the motions, there is nothing to suggest that Lebanon can adopt and adhere to the needed reforms.

Likewise, there is no reason to expect that Hezbollah will curtail either its terrorist ambitions or its criminal enterprises. It may be the case that Lebanese banks will be less accommodating to terrorist money laundering in future, but this will, at most, simply force Hezbollah funds into other channels (possibly with drug cartel or Iranian help) or into cash. At best, international lenders will have to turn a blind eye to Hezbollah's significant role in Lebanon's economy and politics, even if the financial sector has emerged cleaner.

A New Money Rescue is a possibility but is not the expected case. Such a plan has a 35 percent probability of being implemented.

## Austerity and Muddling Through

In this scenario, large amounts of new money are not made available, but the Lebanese financial system and economy nevertheless avoid a complete collapse. This is a scenario described by sociologists and political scientists as "muddling through" – achieving a degree of success without much planning or effort.

Some elements of a New Money Rescue would appear in this scenario despite the absence of new money. The currency would be steeply devalued, either formally by the central bank or informally by the black market. The devaluation would cause inflation initially and lay the groundwork for possible hyperinflation in the near future. The losses from inflation, in terms of both worthless local currency and conversion of dollar-denominated deposits into pounds, would be tantamount to haircuts on deposits under a more formal plan.

Most existing commercial banks would collapse due to insolvency, but a managed plan of mergers might allow two or three banks to remain. These banks would operate on local currency capital and deposits, without the benefit of dollar deposits or access to correspondent banks in the dollar payments system. The BdL would become the sole repository of hard currency balances (if any) and would allocate that scarce hard currency for essential imports only. The banking sector would more closely resemble those found in sub-Saharan Africa rather than those in the European Union to which it aspired.

Lebanon's budget would be balanced not because of a desired policy, but because there would be no funds available to run a deficit. Imports would dry up due to the lack of hard currency. Exports might get a boost from a cheaper local currency, but Lebanon would


not benefit greatly from this, because it has neither a robust export sector nor the resources to create one. For example, Lebanon historically earns export profits from precious jewelry and diamonds (about 17 percent of the country's total exports) sold to Saudi Arabia, Turkey, and the United Arab Emirates. But that industry would wither without hard currency to import gold and diamonds in the first place. Tourism might benefit from a cheap local currency, but this must be weighed against the ability of Lebanese establishments to import the food, wine, and amenities that tourists expect.

Lebanon's ability to pursue contracts, certain infrastructure projects, and foreign direct investment would likely be impeded by litigation over bond defaults and civil lawsuits aimed at the banking system for abetting Hezbollah. Regardless of the outcome of these lawsuits, their pendency will cause investors and lenders to avoid dollar payment channels that might be frozen or seized to satisfy claims. Plaintiffs might also cloud legal titles by placing liens on Lebanese assets both inside the country and abroad. Lebanon will not have the resources to settle these claims; litigation and liens may persist for years or even decades.

The effects of involuntary austerity would be felt most acutely by the poor. Government budget constraints would cause a loss of social services, while business failures and shutdowns would cause jobs to disappear. Inflation would destroy what remains of any income or savings. Violence and criminality would likely increase as desperate individuals turn to crime to pay for food and housing. Outbreaks of disease would increase. Humanitarian assistance from the United Nations, France, or Arab League might come, but it would do little to reverse the decline.

The political class would try to perpetuate the current system, but there would be less to distribute among them. Annual GDP per capital would erode from the current level of $6,250 down to $4,000, comparable to Syria. Hezbollah would continue to earn billions of dollars from its criminal enterprises, but even these proceeds would be more difficult to move in the absence of correspondent banks in the dollar payments system. Hezbollah would have to keep its profits with Iranian correspondents or in cash hoards.

In short, Lebanon would survive, but it would be poorer, more violent, and more unstable. Hezbollah could continue its existence as a state within a state, but with reduced resources due to the blocking of money laundering channels and increased claims for social welfare from its Shiite constituents. Austerity and poverty could persist for years.

Austerity and Muddling Through is the expected case. It has a 40 percent probability of emerging.

## Collapse

This is the most extreme scenario for Lebanon, but it cannot be ruled out. It would begin in much the same way as the Austerity and Muddling Through scenario: no new money, no hard currency, business failures, lost jobs, declining incomes, and increasing violence. Where the Collapse scenario diverges is in the response from civil society and the confessional clans.

Lebanon has a growing group of younger secularists who seek a better future, free of corruption, nepotism, and the allocation of spoils. This segment includes some civil society groups of the Cedar Revolution, which erupted after the assassination of former Prime Minister Rafic Hariri on February 14, 2005. However, the Cedar Revolution was more tied to the political parties and was quickly absorbed into the so-called March 14 Alliance. By 2010, the March 14 Alliance included the Future Movement political party led by Saad Hariri, the son of Rafic Hariri.

The new movement rejects the confessional roots of the Future Movement and the other March 14 parties, instead favoring a secular, non-confessional view. Adherents of this movement were already staging protests in October 2019 against government corruption. The protests were put on hold in February 2020 in response to the emergence of COVID-19 and the resulting lockdown.


Anti-government protests erupted again in late April 2020 in reaction to capital controls, surging inflation, the freezing of dollar deposits, and the collapse of the Lebanese pound. Small bombs and Molotov cocktails targeted bank branches in Tyre and Sidon. Protests quickly spread to downtown Beirut. Highways were shut down with barricades and burning tires. One protestor was killed by the Lebanese Armed Forces, and dozens more protesters and troops were injured.

Under the Collapse scenario, the protests would continue and grow. Younger, secular protesters would be joined by merchants and the poor, who are also suffering from inflation, unemployment, and a collapsing economy. While most protestors are non-violent, violent elements would bomb banks and government agencies. This could prompt an armed response by government troops and set off episodes of violence. Confessional militias (Hezbollah, Amal, the Lebanese Forces, and others) might reform or bolster their ranks in support of their political and community interests.

Political accountability would hit a new low in this scenario. Both scheduled elections and the appointment of a new government would be postponed. Either a caretaker prime minister or a figurehead president may hold office, but he would have little control. Remaining remittances would disappear, and brain drain would deprive Lebanon of its future.

At this point, the stage would be set for rounds of civil violence, albeit different from those from 1975 to 1990. The difference would be that this conflict may have a prominent economic layer on top of the traditional sectarian layer. Little more than a rudimentary local currency banking system would exist. Syrian and Palestinian refugees might add to the chaos in response not only to the deteriorating conditions but also to their own longstanding grievances about housing, jobs, and legal status. Lebanon would become a truly failed state like Venezuela, Syria, or Yemen.

While foreign intervention (French, Syrian, Israeli, or American) is not unusual in Lebanon, no foreign powers would be likely to intervene, owing to their respective internal difficulties and the global depression triggered by the COVID-19 pandemic.

Collapse is not the expected case, but it is not impossible. This scenario has a 25 percent probability of emerging.

## Conclusion

The New Money Rescue is entirely feasible. The government's plan is closely modeled on a standard IMF template used many times in South Asia, Latin America, and Africa. The needed legislation will require focus and determination, but it is not outside the bounds of well-tested international best practices. In that sense, Lebanon would not be making a sacrifice; it would be joining the community of nations in attacking fraud and money-laundering.

Whether Lebanon can move beyond political dysfunction is the critical question. A younger, more secular civil society movement will push in that direction, although their political clout is negligible. A more promising scenario is one in which the elites themselves see reform as serving their own interests.

Hezbollah is a bigger impediment. The group cannot join forces with civil society or reform-minded elites, because it is a criminal and terrorist organization with no credentials under any rule-of-law regime. This is where the United States and its allies can play a critical role. Using maximum pressure, criminal enforcement, sanctions, asset seizures, and other policy tools, the United States, Europe, Brazil, Argentina, and Japan can strangle Hezbollah financially. Terrorism will not end overnight, and Iran will still provide a lifeline, but marginalizing Hezbollah could provide a chance to breathe new life into Lebanon's moribund system.

That is the best-case scenario. It could happen. Still, it must happen quickly if it is to happen at all. Poverty and violence await if the center cannot hold.


# Appendix 1: The Lebanese Exchange Rate Crisis

Unless otherwise indicated, this report uses an exchange rate of LBP 4,000 to the dollar to estimate losses in the Lebanese financial system, expressed in U.S. dollars. These losses consist of net liabilities in the commercial banking system, net liabilities of the BdL, and amounts owed to holders of dollar-denominated debt.

The BdL's official exchange rate is LBP 1,507.5 to the dollar, but that rate does not reflect reality. Few material transactions are being conducted at that rate, due to capital controls and asset freezes. The BdL appears to be using that rate as a kind of placeholder for accounting purposes (including bank financial accounting) until a new official rate can be established pursuant to ongoing financial rescue efforts and negotiations with the IMF. Where this report uses the LBP 1,507.5 rate, it clearly indicates so.

The LBP 4,000 rate in this report is based on extensive black market transactions and reporting from media and government sources in Lebanon. The BdL recently recognized the devaluation of the Lebanese pound by implementing programs that use an exchange rate close to the LBP 4,000 rate.

In early July 2020, Lebanon experienced a currency devaluation crisis and resulting local-currency price increases that met some definitions of hyperinflation. The following is a brief chronology of these developments, based on news reports.

On July 2, 2020, the Associated Press reported, "Major retailers in Lebanon announced ... they will temporarily shut down in the face of an increasingly volatile market and their inability to set prices while the Lebanese pound plunges against the dollar. [...] The Lebanese pound recorded a new low [on July 2], selling at nearly 10,000 for a dollar."[43]

On July 3, 2020, *The Daily Star* reported, "The dollar rate on the black market retreated ... to an average of [LBP] 8,200 after the reopening of Rafik Hariri International Airport and the pledge of the Central Bank to provide lenders with hard currency to finance imports. The U.S. dollar reached [LBP] 10,000 [on July 2] on the black market but the rate suddenly retreated. [...] Central Bank Governor Riad Salameh ... agreed with the government [on July 2] to supply importers with dollar banknotes to buy goods from abroad at a rate of [LBP] 3,200. BDL and the Economy Ministry are also planning to subsidize 280 consumption items at a rate of [LBP] 3,200."[44]

Only July 5, 2020, *The Daily Star* reported, "The dollar rate on the black market retreated [on July 5], trading at an average of [LBP] 7,600... The sudden drop comes as a surprise after the US dollar surged to [LBP] 10,000 [on July 2]... The head of the Syndicate of Money Changers, Mahmoud Halawi told The Daily Star ... that travelers are bringing dollar banknotes into the country and this has helped ease demand for the greenback on the black market."[45]

On July 6, 2020, *The Daily Star* reported, "The Lebanese pound shed value against the dollar once again [on July 6], trading at around [LBP] 9,100 on the black market after a modest recovery toward the end of last week. [...] Banque du Liban meanwhile set the respective sell and buy rates at [LBP] 3,900 and [LBP]

**43.** Sarah El Deeb, "Lebanese major retailers to shut down amid economic crisis," *Associated Press*, July 2, 2020. (https://apnews.com/3a2790e52ffac84623055d40a17e2c68)

**44.** Osama Habib, "Dollar rate retreats to LL8,200 on black market," *The Daily Star* (Lebanon), July 3, 2020. (http://www.dailystar.com.lb/Business/Local/2020/Jul-03/508492-dollar-rate-retreats-to-ll8200-on-black-market.ashx)

**45.** "Dollar maintains retreat to LL7,600 on black market," *The Daily Star* (Lebanon), July 5, 2020. (https://www.dailystar.com.lb/News/Lebanon-News/2020/Jul-04/508513-dollar-maintains-retreat-to-ll7600-on-black-market.ashx)


3,850 on its Sayrafa platform, which is used by licensed currency exchangers."[46]

In a separate story on July 6, 2020, *The Daily Star* also reported, "The Central Bank said … that it will provide foreign currencies to Lebanese banks to finance the import of basic food items at an exchange rate of [LBP] 3,900 against the US dollar." *The Daily Star* quoted a BdL statement saying that the BdL "will secure the necessary amounts in foreign currencies to meet the needs of importers and manufacturers of basic food products and raw materials … on the basis of a fixed exchange rate of [LBP] 3,900 for the dollar. The requests will be submitted to banks and paid their value in cash in Lebanese pounds to the lenders, which in turn will hand it over to BDL, and the latter will convert them to dollars."[47]

Finally, on July 6, 2020, *Bloomberg News* reported:

Lebanon's economic crisis is fast slipping out of control, driven by a currency collapse that's decimating businesses and plunging families into destitution. […] The country's pound has lost nearly 60 percent of its value on the black market in the past month, threatening to suck the economy into a hyper-inflation spiral. […] "We reached the point that we feared most," said opposition lawmaker Sami Gemayel. "Nothing is going to stop the collapse, which is now on all levels."[48]

Prices rose more than 56 percent year-over-year in May, with food costs up about 190 percent, according to official figures. The official peg of LBP 1,507.5 to the dollar was effectively used only for imports of wheat, fuel, and medicine. Basic foods were subsidized through a rate of LBP 3,900.

As of this writing, citizens with dollar deposits cannot transfer their money abroad and can withdraw only limited amounts in pounds at a rate of LBP 3,850, forcing savers to suffer losses. Those who can are stockpiling canned food, cooking gas, and other essentials in anticipation of shortages.

In a sense, Lebanon has a de facto three-tiered foreign exchange system. The official rate of LBP 1,507.5 to the dollar maintained by the BdL is used for almost no transactions (except for limited imports of fuel, food, and medicine), due to the insolvency of the BdL, capital controls, and an acute shortage of dollars. The semi-official rate of LBP 3,900 to the dollar, which the BdL supports through the commercial banks and currency exchangers, is used for a wider array of imports, including food, raw materials used in food production, and other goods that might be used to manufacturer finished goods for export or to support the recovering tourist trade. Finally, a black market rate is available for nonessential goods and for importers without ready access to banking channels. This rate varied between LBP 7,600 and LBP 10,000 in July, although the pound trended slightly stronger after a sharp devaluation on July 2, 2020.

Volatility in the black market will likely persist, and it is too soon to conclude whether the BdL's plan to support a rate of LBP 3,900 for most imports is sustainable. Right now, the BdL is relying on a fresh injection of hard currency from arriving visitors as the economy slowly reopens from its COVID-19 lockdown. This inflow is relatively small compared to the prior level of remittances from the diaspora and may not be sustainable as the outflow of talented entrepreneurs and professionals gathers momentum. Regardless, the net outflow of dollars for imports continues, and the drawdown of hard currency reserves will not reverse

46. "Lebanese pound drop ends brief recovery," *The Daily Star* (Lebanon), July 6, 2020. (http://www.dailystar.com.lb/Business/Local/2020/Jul-06/508586-lebanese-pound-drop-ends-brief-recovery.ashx#:~:text=The%20Lebanese%20pound%20shed%20value,the%20end%20of%20last%20week)

47. "BDL: Exchange rate for food industry at 3,900LL," *The Daily Star* (Lebanon), July 6, 2020. (https://www.dailystar.com.lb/News/Lebanon-News/2020/Jul-06/508593-central-bank-announces-3900ll-exchange-rate-for-food-industry-importers-and-manufacturers.ashx)

48. Lin Noueihed and Dana Khraiche, "Lebanon's Economic Crisis Is Spinning Out of Control, Fast," *Bloomberg News*, July 6, 2020. (https://www.bloomberg.com/news/articles/2020-07-07/lebanon-s-economic-collapse-is-gathering-pace?sref=LGSlKKkN)


without foreign loans or other assistance from the IMF, World Bank, CEDRE, or others. There is no early prospect of any of those sources providing hard currency to Lebanon.

Given that the BdL's semi-official rate of LBP 3,900 is quite close to this report's estimated rate of LBP 4,000 (which is based on earlier black market transactions), and that the BdL has had some limited success using fresh dollars from visitors plus existing reserves to maintain this rate for most imports, this report's dollar estimates hold up despite the new currency crisis.

That said, when a country lacks sufficient hard currency to defend a fixed exchange rate indefinitely or to create a currency board, the situation almost invariably gets worse. Today's black market rate could become tomorrow's semi-official rate. The value of the Lebanese pound could conceivably fall as low as LBP 15,000 or LBP 20,000 in the coming months.

While such a currency collapse would have an enormous impact in humanitarian terms, it would have surprisingly little impact on the dollar estimates in this report. Since Lebanon's economy and banking system were largely dollarized before this crisis, the dollar value of the losses will remain largely unchanged by further depreciation of the Lebanese pound.

The $4.2 billion estimate for eurobond losses (those not already counted in the commercial bank loss calculations) would be unchanged because the bonds are denominated in dollars. It is true that the local currency equivalent may soar, but since the bonds are payable in dollars and the rescue funds will arrive in dollars (or IMF "special drawing rights" convertible to dollars), the value of the loss itself will remain unchanged.

The $16 billion estimate for the value of Lebanon's gold hoard will change with the dollar value of gold, but this estimate will not change based on a Lebanese currency devaluation. The dollar value of Lebanon's gold rose by about $600 million in early July 2020, bringing the value to $16.6 billion, but this increase is unrelated to the currency collapse in Lebanon.

This report's calculations pertaining to the commercial banks' negative net worth would change with an exchange rate of LBP 9,000 to the dollar, but the impact is muted because these banks have both assets and liabilities denominated in hard currency (mainly dollars and euros). The liabilities will be magnified when expressed in local currency, but the assets will also increase in LBP terms as dollar assets are converted at the new black market exchange rate. In effect, the banks are partially hedged against devaluation, because they possess both assets *and* liabilities in hard currency. The dollar amount needed to eliminate the negative net worth of Lebanese banks and provide a capital cushion would increase from $67 billion to an estimated $72.5 billion as a result of the pound's further devaluation from LBP 4,000 to LBP 9,000.

Finally, this report's $22 billion estimate for the negative net worth of the BdL does not require material adjustment. This is because the assets (mostly foreign currency reserves for imports) and liabilities (deposits from commercial banks) are almost exclusively denominated in dollars. The dollar estimate of the BdL's negative net worth will therefore be unaffected by further devaluation of the Lebanese pound. Of course, extreme devaluation will have other effects, including potential hyperinflation in the domestic economy and major headwinds for businesses and entrepreneurs trying to revive the Lebanese economy.

Between eurobonds, commercial bank solvency, and the BdL's solvency, this report's estimate of the total cost of rescuing the Lebanese financial system could increase from $93.2 billion to $98.7 billion. The estimate of the dollar value of gold available to contribute to a rescue increases from $16 billion to $16.6 billion.

If there was no way Lebanon could receive a $93.2 billion rescue, a $98.7 billion rescue is no more likely. The key to a rescue remains a combination of hard currency loans in the amount of $10 to $20 billion, forbearance of negative equity in the banking system for an extended period of time, and actual losses forced on depositors, bank stockholders, and eurobond investors as part of a broader reform program designed to revive the Lebanese economy over five to 10 years.



# Appendix 2: The 14 Banks

The following is a fuller assessment of the banks analyzed in this report.

## The Nonviable Banks

### Bank Audi S.A.L.

Bank Audi S.A.L. is one of the largest banks in Lebanon, with 86 branches in Beirut and other major cities. It was established in 1830 and incorporated in its present form in 1962. Bank Audi has foreign subsidiaries or affiliates in 11 countries in Europe and the Middle East. Headquartered in Beirut, Bank Audi's total assets are LBP 71.6 trillion, as disclosed in its most recent financial report.

Bank Audi's most recent publicly available audited financial statements cover the year ending December 31, 2018. The 2018 audit was conducted jointly by Ernst & Young (Beirut) and BDO, Semaan, Gholam & Co. (Beirut). The auditors' letter offered a "qualified opinion" due to overstated risk provisions and understated equity (resulting from regulatory changes) not in accordance with International Financial Reporting Standards.[49] Bank Audi's audited financial statements for the year ending December 31, 2019, have not been released. (The 2018 financial statements were finalized on March 20, 2019, suggesting that the 2019 statements are delayed). Bank Audi released unaudited "consolidated financial highlights" for the period ending June 30, 2019.[50] These highlights include a balance sheet and an income statement but are not complete financial statements and contain no notes.

Bank Audi reports consolidated shareholders' equity of LBP 5.74 trillion as of June 30, 2019. This converts to $1.46 billion at the actual exchange rate of LBP 4,000 to the dollar (or $3.8 billion at the official exchange rate). Bank Audi's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, very different balances would result.

Using the conversion methodology described above, Bank Audi has approximately LBP 37 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $24.5 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 98 trillion – nearly three times what is listed.

The balance sheet shows assets of approximately LBP 35.6 trillion that are denominated in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and customer loans or advances). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent haircut reduces the book value to LBP 17.8 trillion. Those assets (after adjustment) are worth approximately $11.8 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 47.2 trillion.

After adjustments, Bank Audi's assets increase by LBP 11.6 trillion, and its liabilities increase by LBP 61 trillion. The net effect is a reduction of shareholders' equity by LBP 49.4 trillion. Since stated shareholders' equity is LBP 5.74 trillion, this would render Bank Audi insolvent.[51] Bank Audi would need a new capital

**49.** "Annual Report 2018," *Bank Audi*, accessed June 29, 2020. (https://pwstg02.blob.core.windows.net/pwfiles/ContentFiles/10849PublicationFile.pdf)

**50.** "Consolidated Activity Highlights at End-June 2019," *Bank Audi*, June 30, 2019. (https://pwstg02.blob.core.windows.net/pwfiles/Library/Assets/Gallery/Group/QuarterRelease/June2019/Financial-Statements-in-LBP.pdf)

**51.** Bank Audi's audited "Annual Report 2018" includes a section titled "The Group's Exposure to Currency Risk." However, this exposure is calculated using a 1 percent change in currency valuations relative to the U.S. dollar, the euro, and the Turkish lira. This adjustment bears no relationship to the nearly 300 percent devaluation that has actually occurred. "Annual Report 2018," *Bank Audi*, accessed June 29, 2020, page 192. (https://pwstg02.blob.core.windows.net/pwfiles/ContentFiles/10849PublicationFile.pdf)


injection in the form of shareholders' equity (not debt) equal to approximately $11 billion to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

In desperation, Bank Audi recently offered depositors a two-for-one deal. Depositors who place fresh dollars with Bank Audi will receive accounts with a dollar balance of 2.1 times the deposit.[52] This partially compensates for the difference between the official and actual (LBP 4,000) exchange rates (the latter is roughly 2.65 times the former). However, new accounts are subject to capital controls, which means that dollars cannot be withdrawn. Once the bank is closed or recapitalized (discussed further in the section titled "Rescue Plans"), those deposits will be practically worthless. Bank Audi's two-for-one deal is thus tantamount to fraud.

### Bank of Beirut S.A.L.

Bank of Beirut S.A.L. (BoB) provides consumer, commercial, and corporate banking through 70 branches in Lebanon, 24 branches abroad (Australia, Cyprus, Qatar, Oman, and the United Kingdom), and representative offices in Nigeria, Ghana, and the United Arab Emirates serving the Lebanese diaspora. BoB was established in 1963, and in 1997 it was listed on the Beirut Stock Exchange. BoB's head office is located in Beirut. The bank's total assets are LBP 26.3 trillion as of its most recent financial report.

BoB's most recent publicly available audited financial statements cover the year ending December 31, 2018. The 2018 audit was conducted jointly by Deloitte & Touche (Beirut) and DFK Fiduciaire du Moyen-Orient

(Beirut). The auditors' letter is not technically a qualified opinion, yet it does include extensive disclosures regarding the treatment of impaired financial assets, impaired goodwill, and impaired related-party investments, which is unusual in an opinion letter.[53] BoB's audited financial statements for the year ending December 31, 2019, have not been released. (The 2018 financial statements were finalized on April 23, 2019, suggesting that the 2019 financial statements are delayed). BoB released unaudited "Financial Highlights" for the period ending June 30, 2019.[54] These highlights include a balance sheet and an income statement but are not complete financial statements and contain no notes.

BoB reports consolidated shareholders' equity of LBP 2.7 trillion as of June 30, 2019. This converts to $675 million at the actual exchange rate of LBP 4,000 to the dollar (or $1.8 billion at the official exchange rate). BoB's balance sheet, however, is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, very different balances would result.

Using the conversion methodology described above, BoB has approximately LBP 14.5 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $9.6 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 38.5 trillion.

The balance sheet shows assets of approximately LBP 15.4 trillion denominated in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans

---

**52.** "Bank Audi offers clients option to double fresh dollars if converted to local account," *The Daily Star* (Lebanon), April 24, 2020. (https://www.dailystar.com.lb/Business/Local/2020/Apr-24/504877-bank-audi-offers-clients-option-to-double-fresh-dollars-if-converted-to-local-account.ashx)

**53.** "Annual Report 2018," *Bank of Beirut*, accessed June 29, 2020. (https://www.bankofbeirut.com/content/uploads/FinancialHighlight/BankofBeirut-Annual%20Report-2018200505010201027~.pdf)

**54.** "Consolidated Unaudited Balance Sheet," *Bank of Beirut*, June 30, 2019. (https://www.bankofbeirut.com/content/uploads/FinancialHighlight/Bank%20of%20Beirut%20-%20CONSOLIDATED%20UNAUDITED%20BALANCE%20SHEET200123121059488~.pdf)


and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent haircut reduces the book value to LBP 7.7 trillion. Those assets (after haircut) are worth approximately $5.1 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 20.4 trillion.

After adjustments, assets increase by LBP 5 trillion, and liabilities increase by LBP 24 trillion. The net effect is to reduce shareholders' equity by LBP 19 trillion. Since stated shareholders' equity is LBP 2.7 trillion, these adjustments would render BoB highly insolvent. BoB would need a new capital injection in the form of shareholders' equity (not debt) equal to approximately $4.7 billion in order to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

### *Bank of Beirut and the Arab Countries S.A.L.*

Bank of Beirut and the Arab Countries S.A.L. (BBAC) provides consumer, commercial, and corporate banking as well as private banking and insurance through 41 branches in Lebanon and overseas offices in Cyprus, Iraq, the United Arab Emirates, and Nigeria that serve the Lebanese diaspora. Established in 1956, BBAC's head office is located in Beirut. The Assaf family owns roughly 54.5 percent of BBAC, with another 37.1 percent owned by Fransabank S.A.L. (discussed later in the report). Total assets are LBP 12.2 trillion, per the bank's most recent financial report.

BBAC's most recent publicly available audited financial statements cover the year ending December 31, 2018. The 2018 audit was conducted jointly by PricewaterhouseCoopers (Beirut) and KPMG (Beirut). The auditors' letter is not technically a qualified opinion, yet it does include extensive disclosures regarding the treatment of expected credit losses, which is unusual in

an opinion letter.[55] Audited financial statements for the year ending December 31, 2019, have not been released. (The 2018 financial statements were finalized on May 31, 2019). No interim financial statements have been released since the 2018 annual report.

BBAC reports consolidated shareholders' equity of LBP 963 billion as of December 31, 2018. This converts to $240 million at the actual exchange rate of LBP 4,000 to the dollar (or $639 million at the official exchange rate). BBAC's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, very different balances would result.

Using the conversion methodology described above, BBAC has approximately LBP 6.5 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $4.3 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 17.3 trillion.

The balance sheet shows assets of approximately LBP 6.8 trillion denominated in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent haircut reduces the book value to LBP 3.4 trillion. Those assets (after haircut) are worth approximately $2.3 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 9.0 trillion.

With these adjustments, assets increase by LBP 2.2 trillion, and liabilities increase by LBP 10.8 trillion. The net effect is to reduce shareholders' equity by LBP 8.6 trillion. Since stated shareholders' equity is LBP

---

**55.** "Annual Report 2018," *Bank of Beirut and the Arab Countries*, accessed June 29, 2020. (https://www.bbacbank.com/sites/default/files/2018%20Annual%20Report_0.pdf)


963 billion, these adjustments render BBAC highly insolvent.[56] BBAC needs a new capital injection in the form of shareholders' equity (not debt) equal to approximately $2.2 billion to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

### Banque Libano-Française S.A.L.

Banque Libano-Française S.A.L. (BLF) provides consumer, commercial, and corporate banking as well as insurance and private banking through 60 branches in Lebanon and overseas offices in Iraq, Abu Dhabi, Nigeria, France, Cyprus, and Switzerland that provide offshore accounts and serve the Lebanese diaspora. Established in 1930 and reorganized under a new banking law in 1967, BLF is headquartered in Beirut. Total assets are LBP 19.7 trillion as of BLF's most recent financial report (June 2019).

The most recent publicly available audited financial statements cover the year ending December 31, 2017. The 2017 audit was conducted jointly by Deloitte & Touche (Beirut) and DFK Fiduciaire du Moyen-Orient (Beirut). The auditors' letter is not technically a qualified opinion, yet it does include extensive disclosures regarding the treatment of impaired loans and advances, which is unusual in an opinion letter.[57] BLF's audited financial statements for the year ending December 31, 2018, and December 31, 2019, have not been released. This serious delinquency suggests material accounting or financial problems at the

bank. BLF has released unaudited financial statements covering the year ending December 31, 2018,[58] as well as a summary financial update with key figures covering the period ending June 30, 2019.[59]

BLF reports consolidated shareholders' equity of LBP 1.99 trillion as of June 30, 2019. This converts to $497 million at the actual exchange rate of LBP 4,000 to the dollar (or $1.3 billion at the official exchange rate). BLF's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, very different balances would result.

Using the conversion methodology described above, BLF has approximately LBP 12.4 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $8.2 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 32.8 trillion.

The balance sheet shows assets of approximately LBP 13.7 trillion that are denominated in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers). Applying a 50 percent haircut reduces the book value to LBP 6.85 trillion. Those assets (after haircut) are worth approximately $4.5 billion at the official exchange rate. Converting

---

**56.** BBAC's audited "Annual Report 2018" includes a section titled "Foreign Exchange Risk." However, this exposure is calculated using a 2 percent change in currency valuations relative to U.S. dollars and euros. This hypothetical adjustment bears no relationship to the nearly 300 percent devaluation that has actually occurred. "Annual Report 2018," *Bank of Beirut and the Arab Countries*, accessed June 29, 2020, pages 112-116. (https://www.bbacbank.com/sites/default/files/2018%20Annual%20Report_0.pdf)

**57.** "Annual Report 2017," *Banque Libano-Française S.A.L.*, accessed June 29, 2020. (https://blfblob.blob.core.windows.net/files/Library/Assets/Gallery/BLF/Publications/Annual%20Reports/BLF%20Reports/Download%202017%20Annual%20Report/AnnualReport2017BLF.pdf)

**58.** "Consolidated Financial Statements Year ended December 31, 2018," *Banque Libano-Française S.A.L.*, accessed June 29, 2020. (https://blfblob.blob.core.windows.net/files/Library/Assets/Gallery/BLF/Publications/Consolidated%20Financial%20statements/2018ConsolidatedFinancialStatements/consolidated-financial-statements-2018.pdf)

**59.** "Financials, Key Figures As at end June 2019," *Banque Libano-Française S.A.L.*, accessed June 29, 2020. (https://www.eblf.com/english/the-group/financials)



back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 18.0 trillion.

With these adjustments, assets increase by LBP 4.3 trillion and liabilities increase by LBP 20.4 trillion. The net effect is to reduce shareholders' equity by LBP 16.1 trillion. Since stated shareholders' equity is LBP 1.99 trillion, these adjustments would render BLF insolvent.[60] BLF would need a new capital injection in the form of shareholders' equity (not debt) equal to approximately $3.5 billion to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

### BLOM Bank S.A.L.

BLOM Bank S.A.L. provides consumer, commercial, and corporate banking as well as private banking and insurance through 77 branches in Lebanon and overseas offices in Cyprus, Switzerland, France, Romania, the United Kingdom, Iraq, the United Arab Emirates, Saudi Arabia, Egypt, Qatar, and Jordan, where the bank provides offshore accounts and serves the Lebanese diaspora. Established in 1951, BLOM Bank is headquartered in Beirut. Total assets are LBP 58.0 trillion as of the most recent financial report, which covers the period ending June 30, 2019.

BLOM Bank's most recent publicly available audited financial statements cover the year ending December 31, 2018. The 2018 audit was conducted jointly by Ernst & Young (Beirut) and BDO, Semaan, Gholam & Co. (Beirut). The auditors' letter is a qualified opinion, meaning the financial statements are not in conformity with International Financial Reporting Standards.[61] BLOM Bank has also released an unaudited statement

of financial results for the period ending June 30, 2019. No more recent financial statements are available.

BLOM Bank reports consolidated shareholders' equity of LBP 4.93 trillion as of June 30, 2019. This converts to $1.23 billion at the actual exchange rate of LBP 4,000 to the dollar (or $3.27 billion at the official exchange rate). The difficulty is that BLOM Bank's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, very different balances would result.

Using the conversion methodology described above, BLOM Bank has approximately LBP 28.5 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $18.9 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 75.5 trillion.

The balance sheet shows assets of approximately LBP 28.9 trillion denominated in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent haircut reduces the book value to LBP 14.5 trillion. Those assets (after haircut) are worth approximately $9.6 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 38.4 trillion.

With these adjustments, assets increase by LBP 9.5 trillion, and liabilities increase by LBP 47.0 trillion. The net effect is to reduce shareholders' equity by LBP

**60.** The Banque Libano-Française S.A.L. audited "Annual Report 2017" includes a section titled "Foreign Exchange Risk." However, this exposure is calculated using a 1 percent change in currency valuations relative to the U.S. dollar and the euro. This hypothetical adjustment bears no relationship to the nearly 300 percent devaluation that has actually occurred. "Annual Report 2017," *Banque Libano-Française S.A.L.*, accessed June 29, 2020, pages 137-138. (https://blfblob.blob.core.windows.net/files/Library/Assets/Gallery/BLF/Publications/Annual%20Reports/BLF%20Reports/Download%202017%20Annual%20Report/AnnualReport2017BLF.pdf)
**61.** "2018 Annual Report," *BLOM Bank*, May 30, 2019. (https://www.blombank.com/Library/Assets//Gallery/files/AnnualReports/BLOMBANKConsolidatedAnnualReports/2018/2018%20Lebanon%20Annual%20Report.pdf)



37.5 trillion. Since stated shareholders' equity is LBP 4.9 trillion, these adjustments would render BLOM Bank highly insolvent.[62] BLOM Bank would need a new capital injection in the form of shareholders' equity (not debt) equal to approximately $11.9 billion to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

As noted in the report, BLOM Bank is accused of aiding Hezbollah in the *Bartlett* complaint, but tensions exist between the bank and the Iran-backed terror group. When the bank's headquarters was bombed in 2016, Hezbollah was widely believed to be the culprit.[63] BLOM Bank had recently been pressured by the United States to purge Hezbollah accounts, and the bombing was believed to be a warning. BdL Governor Riad Salameh intervened and clarified that no accounts should be closed without consulting BdL.[64] Druze leader Walid Jumblatt called for "a roadmap between Hezbollah and the banks."[65]

### Byblos Bank S.A.L.

Byblos Bank S.A.L. provides consumer, commercial, and corporate banking as well as private banking and insurance through 92 branches in Lebanon and overseas offices in Armenia, Belgium, Cyprus, France, Iraq, Syria, Nigeria, the United Arab Emirates, and the United Kingdom, where the bank provides offshore accounts and serves the Lebanese diaspora. Founded in 1950 and reincorporated under a new banking law in 1963, Byblos Bank is headquartered in Beirut. Total assets are LBP 38.7 trillion as of the most recent financial report, which covers the period ending June 30, 2019. Byblos Bank stock is listed on the Beirut Stock Exchange and the London Stock Exchange.

The most recent publicly available audited financial statements cover the year ending December 31, 2018. The 2018 audit was conducted jointly by Ernst & Young (Beirut) and BDO, Semaan, Gholam & Co. (Beirut). The auditors' letter is a qualified opinion, meaning the financial statements are not in conformity with International Financial Reporting Standards.[66] Byblos Bank has also released unaudited Consolidated Financial Statements for the period ending June 30, 2019.[67] No other recent financial statements are available.

Byblos Bank reports consolidated shareholders' equity of LBP 2.8 trillion as of June 30, 2019. This converts to $700 million at the actual exchange rate of LBP 4,000 to the dollar (or $1.85 billion at the official exchange rate). The difficulty is that Byblos Bank's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, very different balances would result.

---

**62.** BLOM Bank's audited "Annual Report" for 2018 includes a section titled "The Group's Exposure to Currency Risk." However, this exposure is calculated using a 1 to 3 percent change in currency valuations relative to the U.S. dollar and the euro. This adjustment bears no relationship to the nearly 300 percent devaluation that has actually occurred. "2018 Annual Report," *BLOM Bank*, May 30, 2019, page 194. (https://www.blombank.com/Library/Assets//Gallery/files/AnnualReports/BLOMBANKConsolidatedAnnualReports/2018%20Lebanon%20Annual%20Report.pdf)

**63.** "Beirut's BLOM Bank bombing keeps spotlight on Hezbollah funding debate," *Al Bawaba* (Jordan), June 13, 2016. (http://www.naharnet.com/stories/ar/211393)

**64.** "Lebanon central bank says must comply with U.S. Hezbollah law," *Reuters*, May 17, 2016. (https://www.reuters.com/article/us-lebanon-banking-hezbollah-idUSKCN0Y8219)

**65.** "Jumblatt links Blom bank explosion to Hezbollah, warns of a wave of bombings," *Ya Libnan* (Lebanon), June 13, 2016. (https://yalibnan.com/2016/06/13/jumblatt-links-blom-bank-explosion-to-hezbollah-warns-of-a-wave-of-bombings/)

**66.** "Annual Report 2018," *Byblos Bank*, accessed June 29, 2020. (https://www.byblosbank.com/Library/Assets/Gallery/FinancialResult/AnnualReports/Downloadthefull2018AnnualReport/Annual%20Report%202018.pdf)

**67.** "Consolidated Financial Statements as at 30 June 2019," *Byblos Bank*, June 30, 2019. (https://www.byblosbank.com/Library/Assets/Gallery/FinancialResult/FinancialReports/Quarterly%20Consolidated%20Financial%20Statements/Quarterly%20Consolidated%20Financial%20Statements/Byblos%20Bank%20Unaudited%20Consolidated%20FS%20Q2%202019%20English.pdf)


Using the conversion methodology described above, Byblos Bank has approximately LBP 22.0 trillion in principally dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $14.6 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 58.4 trillion.

The balance sheet shows assets of approximately LBP 23.3 trillion, denominated principally in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent haircut reduces the book value to LBP 11.7 trillion. Those assets (after haircut) are worth approximately $7.7 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 30.9 trillion.

With these adjustments, assets increase by LBP 7.6 trillion, and liabilities increase by LBP 36.4 trillion. The net effect is to reduce shareholders' equity by LBP 28.8 trillion. Since stated shareholders' equity is LBP 2.8 trillion, these adjustments would render Byblos Bank highly insolvent.[68] Byblos Bank would need a new capital injection in the form of shareholders' equity (not debt) equal to approximately $7.4 billion to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

### *Fenicia Bank S.A.L.*

Fenicia Bank S.A.L. provides consumer, commercial, and corporate banking as well as private banking through 18 branches in Lebanon. It has no overseas offices. Founded in 1959, Fenicia Bank's head office is in Beirut. Fenicia Bank is owned almost entirely by three families: the Achour Family (74 percent), the Macaron Family (15 percent), and the Merhi Family (10 percent). Fenicia Bank's total assets are LBP 2.8 trillion, per its most recent financial report, which covers the year ending December 31, 2018.

The most recent audited financial statements available are for the year ending December 31, 2018. The 2018 audit was conducted jointly by PricewaterhouseCoopers (Beirut) and Kudos (Beirut). The auditors' letter is not a qualified opinion, yet there is extensive commentary on matters of concern to the auditors, including measurement of expected credit losses.[69] The audit for 2018 was completed on June 15, 2019. No more recent financial statements are available.

Fenicia Bank reports consolidated shareholders' equity of LBP 232 billion as of December 31, 2018. This converts to $58 million at the actual exchange rate of LBP 4,000 to the dollar (or $153 million at the official exchange rate). Fenicia Bank's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, very different balances would result.

Using the conversion methodology described above, Fenicia Bank has approximately LBP 1.6 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $1.1 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 4.25 trillion.

---

**68.** Byblos Bank's audited "Annual Report 2018" includes a section titled "Group's sensitivity to currency exchange rates." However, this exposure is calculated using a 1 percent change in currency valuations relative to the U.S. dollar and the euro. This hypothetical adjustment bears no relationship to the nearly 300 percent devaluation that has actually occurred. "Annual Report 2018," *Byblos Bank*, accessed June 29, 2020, page 211. (https://www.byblosbank.com/Library/Assets/Gallery/FinancialResult/AnnualReports/Downloadthefull2018AnnualReport/Annual%20Report%202018.pdf)
**69.** "Annual Report 2018," *Fenicia Bank*, accessed June 29, 2020. (http://www.feniciabank.com/Content/uploads/AnnualReport/190913041553588-Fenicia%20Annual%20Report%202018%20FINAL.pdf)


The balance sheet shows assets of approximately LBP 1.6 trillion, denominated principally in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers). Applying a 50 percent haircut reduces the book value to LBP 800 billion. Those assets (after haircut) are worth approximately $530 million at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 2.1 trillion.

With these adjustments, assets increase by LBP 500 billion, and liabilities increase by LBP 2.65 trillion. The net effect is to reduce shareholders' equity by LBP 2.15 trillion. Since stated shareholders' equity is LBP 232 billion, these adjustments would render Fenicia Bank highly insolvent. Fenicia Bank would need a new capital injection in the form of shareholders' equity (not debt) equal to approximately $550 million to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

### *Fransabank S.A.L.*

Fransabank S.A.L. provides consumer, commercial, and corporate banking as well as leasing, private banking, and insurance. Fransabank operates through 126 branches in Lebanon and overseas offices in Algeria, France, Sudan, Belarus, Iraq, the United Arab Emirates, and the Ivory Coast, where the bank provides offshore accounts and serves the Lebanese diaspora. It was founded in 1921, making it one of Lebanon's oldest banks, and was reincorporated in 1963 under a new banking law. Headquartered in Beirut, Fransabank's total assets are LBP 35.6 trillion as of its most recent financial report, which covers the year ending December 31, 2018.

The most recent publicly available audited financial statements cover the year ending December 31, 2018. The 2018 audit was conducted jointly by Deloitte & Touche (Beirut) and DFK Fiduciaire du Moyen-Orient (Beirut). The auditors' letter is not a qualified opinion, yet there is extensive commentary on matters of concern to the auditors, including impairment of financial assets and the timeliness of updated credit risk assumptions.[70] The audit for 2018 was completed on May 15, 2019. No more recent financial statements are available. Fransabank stockholders approved a dollar-denominated capital increase on January 21, 2020, but the bank has yet to implement it.[71]

Fransabank reports consolidated shareholders' equity of LBP 3.3 trillion as of December 31, 2018. This converts to $825 million at the actual exchange rate of LBP 4,000 to the dollar (or $2.2 billion at the official exchange rate). Fransabank's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, very different balances would result.

Using the conversion methodology described above, Fransabank has approximately LBP 18.5 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $12.3 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 49.1 trillion.

The balance sheet shows assets of approximately LBP 19.6 trillion, denominated principally in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent

---

**70.** "Annual Report 2018," *Fransabank Group*, accessed June 29, 2020. (https://www.fransabank.com/_layouts/fransabank/PDFViewer. aspx?pdf=/English/MediaCenter/Publications/AnnualReports/Documents/Fransabank%20Annual%20Report%202018.pdf)

**71.** Fransabank Group, Press Release, "Increase in Equity," January 27, 2020. (https://www.fransabank.com/English/MediaCenter/ GroupNews/Pages/Increase-in-Equity.aspx)



haircut reduces the book value to LBP 9.8 trillion. Those assets (after haircut) are worth approximately $6.5 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 26.0 trillion.

With these adjustments, assets increase by LBP 6.4 trillion, and liabilities increase by LBP 30.6 trillion. The net effect is to reduce shareholders' equity by LBP 24.2 trillion. Since stated shareholders' equity is LBP 3.3 trillion, these adjustments would render Fransabank highly insolvent. Fransabank would need a new capital injection in the form of shareholders' equity (not debt) equal to approximately $5.6 billion to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

### *Lebanon and Gulf Bank S.A.L.*

Lebanon and Gulf Bank S.A.L. (LGB) provides consumer, commercial, and corporate banking as well as private banking. LGB operates through 18 branches in Lebanon and has overseas offices in Cyprus and Dubai, where the bank provides offshore accounts and serves the Lebanese diaspora. Founded in 1963, LGB is headquartered in Beirut. Total assets are LBP 9.7 trillion as of the most recent financial report, which covers the period ending June 30, 2019.

The most recent publicly available audited financial statements cover the year ending December 31, 2018. The 2018 audit was conducted jointly by BDO, Semaan, Gholam & Co. (Beirut), and KPMG (Beirut). The auditors' letter is a qualified opinion, which means that the financial presentation is not in line with International Financial Reporting Standards. The auditors expressed concern about deferred revenue in connection with the sale of government bonds and other matters.[72] The audit for 2018 was completed on May 31, 2019. LGB also released an unaudited

Statement of Financial Position that covers the period ending June 30, 3019.[73]

On January 14, 2020, LGB completed a capital increase equal to 10 percent of Tier One Common Equity as of December 31, 2018.[74] This increase is accounted for in this analysis as an adjustment to published figures for December 31, 2018, and June 30, 2019.

LGB reports consolidated shareholders' equity of LBP 678 billion as of June 30, 2019. Accounting for the Tier One capital increase, this figure increases to LBP 700 billion. This converts to $175 million at the actual exchange rate of LBP 4,000 to the dollar (or $464 million at the official exchange rate). LGB's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, different balances would result.

Using the conversion methodology described above, LGB has approximately LBP 4.9 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $3.25 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 13.0 trillion.

The balance sheet shows assets of approximately LBP 5.2 trillion, denominated principally in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent haircut reduces the book value to LBP 2.6 trillion. Those assets (after haircut) are worth approximately $1.7 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 6.9 trillion.

---

**72.** "Annual Report 2018," *LGB Bank*, accessed June 29, 2020. ([http://www.lgbbank.com/en/news/publications](http://www.lgbbank.com/en/news/publications))

**73.** "Unaudited Balance Sheet 30.06.2019," *LGB Bank*, June 30, 2019. ([http://www.lgbbank.com/en/page/477/](http://www.lgbbank.com/en/page/477/))

**74.** LGB Bank, Press Release, "LGB Bank s.a.l. Capital Increase," January 14, 2020. ([http://www.lgbbank.com/en/news/press_releases](http://www.lgbbank.com/en/news/press_releases))



With these adjustments, assets increase by LBP 1.7 trillion, and liabilities increase by LBP 8.1 trillion. The net effect is to reduce shareholders' equity by LBP 6.4 trillion. Since stated shareholders' equity is LBP 700 billion, these adjustments would render LGB highly insolvent. LGB would need a new capital injection as shareholders' equity (not debt) equal to approximately $1.7 billion to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

### *MEAB Bank S.A.L.*

MEAB Bank S.A.L. provides consumer, commercial, and corporate banking as well as leasing, private banking, and insurance. MEAB Bank is headquartered in Beirut. It operates 20 branches in Lebanon and two offices in Iraq, where the bank serves the Lebanese diaspora. MEAB Bank was founded in 1991, making it one of Lebanon's newer banks. Thought it is the 18th-largest bank in Lebanon by deposits, MEAB Bank is not counted among the Alpha Bank Group. Total assets are LBP 3.1 trillion as of the most recent financial report, which covers the year ending December 31, 2017.

The most recent publicly available audited financial statements cover the year ending December 31, 2017. MEAB Bank has failed to produce an audited financial statement for 2018, which normally would have been completed by May 2019 or sooner. This is a serious deficiency that suggests material accounting and financial problems at MEAB Bank.

The 2017 audit was conducted jointly by Kudos (Beirut) and PricewaterhouseCoopers (Beirut). The auditors' letter is a qualified opinion, which means the financial statements were not presented in line with International Financial Reporting Standards. The auditors express concern on material matters, including the impairment of financial assets.[75] The audit for 2017 was completed on September 25, 2018. No more recent financial statements are available.

MEAB Bank reports consolidated shareholders' equity of LBP 275 billion as of December 31, 2017. This converts to $69 million at the actual exchange rate (or $182 billion at the official exchange rate). MEAB Bank's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, different balances would result.

Using the conversion methodology described above, MEAB Bank has approximately LBP 1.6 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $1.1 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 4.25 trillion.

The balance sheet shows assets of approximately LBP 1.6 trillion, denominated principally in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent haircut reduces the book value to LBP 800 billion. Those assets (after haircut) are worth approximately $530 million at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 2.1 trillion.

With these adjustments, assets increase by LBP 500 billion, and liabilities increase by LBP 2.65 trillion. The net effect is to reduce shareholders' equity by LBP 2.15 trillion. Since stated shareholders' equity is LBP 275 billion, these adjustments would render MEAB Bank highly insolvent. MEAB Bank would need a new capital injection in the form of shareholders' equity (not debt) equal to approximately $550 million to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

---

**75.** "Annual Report 2017," *MEAB Bank S.A.L.*, accessed June 29, 2020. (https://www.meabank.com/sites/default/files/MEABAnnualReport2017.pdf)


### Société Générale de Banque au Liban S.A.L.

Société Générale de Banque au Liban S.A.L. (SGBL) provides consumer, commercial, and corporate banking as well as private banking and insurance. SGBL operates 70 branches in Lebanon and overseas offices in France, Jordan, Cyprus, and the United Arab Emirates, where the bank provides offshore accounts and serves the Lebanese diaspora. Founded in 1953, SGBL is headquartered in Beirut. Total assets are LBP 38.9 trillion as of the most recent financial report, which covers the year ending December 31, 2018.

The most recent publicly available audited financial statements cover the year ending December 31, 2018. The 2018 audit was conducted jointly by Ernst & Young (Beirut) and BDO, Semaan, Gholam & Co. (Beirut). The auditors' letter is a qualified opinion, which means the financial statements are not presented in accordance with International Financial Reporting Standards. The auditors expressed concern about timing differences that overstated 2018 profits and about allowances for credit losses.[76] The audit for 2018 was completed on April 20, 2019. No more recent financial statements are available.

SGBL reports consolidated shareholders' equity of LBP 2.9 trillion as of December 31, 2018. This converts to $725 million at the actual exchange rate of LBP 4,000 to the dollar (or $1.9 billion at the official exchange rate). SGBL's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, very different balances would result.

Using the conversion methodology described above, SGBL has approximately LBP 24.0 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $15.9 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 63.7 trillion.

The balance sheet shows assets of approximately LBP 24.9 trillion, denominated principally in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent haircut reduces the book value to LBP 12.5 trillion. Those assets (after haircut) are worth approximately $8.3 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 33.2 trillion.

With these adjustments, assets increase by LBP 8.3 trillion, and liabilities increase by LBP 39.7 trillion. The net effect is to reduce shareholders' equity by LBP 31.4 trillion. Since stated shareholders' equity is LBP 2.9 trillion, these adjustments would render SGBL highly insolvent.[77] SGBL would need a new capital injection the form of shareholders' equity (not debt) equal to approximately $7.2 billion to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

As noted in the report, even as SGBL has been accused of aiding Hezbollah, tensions between the bank and the Iran-backed terror group have recently become public. Hezbollah has accused the bank of smuggling dollars out of Lebanon in defiance of capital controls.[78]

---

**76.** "Annual Report 2018," *SGBL Group*, accessed June 29, 2020. (http://www.sgbl.com.lb/sgbl_en/NosPublications/Annual%20Report/Annual%20Report%202018.pdf)

**77.** SGBL Group's "Annual Report 2018" includes a section titled "Currency Risk." However, this exposure is calculated using a 2.5 percent change in currency valuations relative to the U.S. dollar and the euro. This hypothetical adjustment bears no relationship to the nearly 300 percent devaluation that has actually occurred. "Annual Report 2018," *SGBL Group*, accessed June 29, 2020, page 130. (http://www.sgbl.com.lb/sgbl_en/NosPublications/Annual%20Report/Annual%20Report%202018.pdf)

**78.** "Suspect of a bank that smuggles dollars," *Saudi 24 News* (Saudi Arabia), May 21, 2020. (https://www.saudi24news.com/2020/05/suspect-of-a-bank-that-smuggles-dollars-2.html)


# The Viable Banks

### Bankmed S.A.L.

Bankmed S.A.L. provides consumer, commercial, and corporate banking as well as insurance and wealth management through its 59 branches in Lebanon and its overseas offices in Cyprus, Dubai, Iraq, Switzerland, Turkey, and Saudi Arabia, where the bank provides offshore accounts and serves the Lebanese diaspora. Established in 1944, Bankmed maintains its headquarters in Beirut. Total assets are LBP 28.7 trillion as of the most recent financial report. Bankmed is one of the few banks included in this survey that is not a named defendant in the *Bartlett* case.

The most recent publicly available audited financial statements available cover the year ending December 31, 2018. The 2018 audit was conducted jointly by Deloitte & Touche (Beirut) and Ernst & Young (Beirut). The auditors' letter is not technically a qualified opinion, but it includes extensive disclosures regarding expected credit losses and impairment of goodwill, which is unusual in an opinion letter.[79] Bankmed's audited financial statements for the year ending December 31, 2019, have not been released. (The 2018 financial statements were finalized on April 5, 2019, suggesting that 2019 financial statements are delayed). No interim financial statements have been released since the 2018 annual report.

Bankmed reports consolidated shareholders' equity of LBP 1.9 trillion as of December 31, 2018. This converts to $475 million at the actual exchange rate of LBP 4,000 to the dollar (or $1.26 billion at the official exchange rate). Bankmed's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, very different balances would result.

Using the conversion methodology described above, Bankmed has approximately LBP 16.4 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $10.9 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 43.6 trillion.

The balance sheet shows assets of approximately LBP 16.5 trillion denominated in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent haircut reduces the book value to LBP 8.3 trillion. Those assets (after haircut) are worth approximately $5.5 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 21.9 trillion.

With these adjustments, assets increase by LBP 5.4 trillion, and liabilities increase by LBP 27.2 trillion. The net effect is to reduce shareholders' equity by LBP 21.8 trillion. Since stated shareholders' equity is LBP 1.9 trillion, these adjustments would render Bankmed highly insolvent. Bankmed would need a new capital injection in the form of shareholders' equity (not debt) equal to approximately $5.7 billion in order to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

### Crédit Libanais S.A.L.

Crédit Libanais S.A.L. provides consumer, commercial, and corporate banking as well as leasing, insurance, and wealth management through 71 branches in Lebanon and overseas offices in Cyprus, Bahrain, Iraq, Canada, and Senegal, where the bank provides offshore accounts and serves the Lebanese diaspora. It was

---

**79.** "2018 Annual Report," *Bankmed*, accessed June 29, 2020. (https://www.bankmed.com.lb/BOMedia/subservices/categories/News/20200416065922082.pdf)


established in 1961. Crédit Libanais is headquartered in Beirut. Total assets are LBP 18.8 trillion as of the most recent financial report, which covers the year ending December 31, 2018. Crédit Libanais is one of the few banks included in this survey not a named defendant in the *Bartlett* case.

The most recent audited financial statements available cover the year ending December 31, 2018. The 2018 audit was conducted jointly by KPMG (Beirut) and DFK Fiduciaire du Moyen-Orient (Beirut). The auditors' letter is not technically a qualified opinion, but it includes extensive commentary on audit matters, including impairment for credit losses.[80] Crédit Libanais' audited financial statements for the year ending December 31, 2019, have not been released. (The 2018 financial statements were finalized on April 16, 2019, suggesting that the 2019 financial statements are delayed). No interim financial statements have been released since the 2018 annual report.

Crédit Libanais reports consolidated shareholders' equity of LBP 1.5 trillion as of December 31, 2018. This converts to $375 million at the actual exchange rate of LBP 4,000 to the dollar (or $1.0 billion at the official exchange rate). Crédit Libanais' balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate of LBP 4,000 to the dollar, different balances would result.

Using the conversion methodology described above, Crédit Libanais has approximately LBP 9.2 trillion in primarily dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $6.1 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 24.4 trillion.

The balance sheet shows assets of approximately LBP 9.7 trillion that are denominated principally in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent haircut reduces the book value to LBP 4.9 trillion. Those assets (after haircut) are worth approximately $3.2 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 12.9 trillion.

With these adjustments, assets increase by LBP 3.2 trillion, and liabilities increase by LBP 15.2 trillion. The net effect is to reduce shareholders' equity by LBP 12.0 trillion. Since stated shareholders' equity is LBP 1.3 trillion, these adjustments would render Crédit Libanais highly insolvent.[81] Crédit Libanais would need a new capital injection in the form of shareholders' equity (not debt) equal to approximately $3.1 billion to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity would be required.

### *IBL Bank S.A.L.*

IBL Bank S.A.L. provides consumer, commercial, and corporate banking through 21 branches in Lebanon. IBL Bank also operates overseas offices in Iraq and Cyprus, where it provides offshore accounts and serves the Lebanese diaspora. Established in 1961, IBL Bank is headquartered in Beirut. Total assets are LBP 11.8 trillion as of the most recent financial report, which covers the year ending December 31, 2018. IBL Bank is one of the few banks included in this survey that is not a named defendant in the *Bartlett* case.

---

**80.** "Annual Report 2018," *Crédit Libanais Banking Group*, accessed June 29, 2020. (https://www.creditlibanais.com.lb/content/uploads/AnnualReport/AR18-Web-version.pdf)
**81.** Crédit Libanais' "Annual Report 2018" includes a section titled "Exposure to Currency Risk." However, this exposure is calculated using a 1 percent change in currency valuations relative to the U.S. dollar and the euro. This hypothetical adjustment bears no relationship to the nearly 300 percent devaluation that has actually occurred. "Annual Report 2018," *Crédit Libanais Banking Group*, accessed June 29, 2020, pages 170-172. (https://www.creditlibanais.com.lb/content/uploads/AnnualReport/AR18-Web-version.pdf)


The most recent publicly available audited financial statements cover the year ending December 31, 2018. The 2018 audit was conducted jointly by Deloitte & Touche (Beirut) and DFK Fiduciaire du Moyen-Orient (Beirut). The auditors' letter is not technically a qualified opinion, but it includes extensive disclosures regarding the loan impairment and the treatment of expected credit losses, which is unusual in an opinion letter.[82] IBL Bank's audited financial statements for the year ending December 31, 2019, have not been released. (The 2018 financial statements were finalized on June 11, 2019). No interim financial statements have been released since the 2018 annual report.

IBL Bank reports consolidated shareholders' equity of LBP 958 billion as of December 31, 2018. This converts to $240 million at the actual exchange rate (or $635 million at the official exchange rate). IBL Bank's balance sheet is a mixture of LBP assets and liabilities as well as dollar- and euro-denominated assets and liabilities. If those dollar and euro assets and liabilities were converted into Lebanese pounds at the actual exchange rate, different balances would result.

Using the conversion methodology described above, IBL Bank has approximately LBP 5.4 trillion in dollar- and euro-denominated liabilities (mainly customer deposits). These deposits are worth $3.6 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make the deposit liability LBP 14.2 trillion.

The balance sheet shows assets of approximately LBP 4.0 trillion denominated in dollars and euros (cash and balances with the BdL, correspondent bank balances, debt instruments, financial instruments, and loans and advances to customers). Those assets are badly impaired due to illiquidity at the BdL, at other banks, and among customers. Applying a 50 percent haircut reduces the book value to LBP 2.0 trillion. Those assets (after haircut) are worth approximately $1.3 billion at the official exchange rate. Converting back at the actual exchange rate of LBP 4,000 to the dollar would make those assets worth LBP 5.3 trillion.

With these adjustments, assets increase by LBP 1.3 trillion, and liabilities increase by LBP 8.8 trillion. The net effect is to reduce shareholders' equity by LBP 7.5 trillion. Since stated shareholders' equity is LBP 958 billion, these adjustments would render IBL Bank highly insolvent. IBL Bank would need a new capital injection in the form of shareholders' equity (not debt) equal to approximately $1.9 billion to top up the negative equity and support the balance sheet in accordance with international norms. If the pound depreciates beyond LBP 4,000 to the dollar, additional equity will be required.

---

**82.** "2018 Annual Report," *IBL Bank*, accessed June 29, 2020. (https://www.ibl.com.lb/library/assets/Gallery/IBL/AnnualReports/Annual-2018-Web-2.pdf)



## Acknowledgments

Every writer knows that a report of this type is not a solo effort, but rather is a collaboration of many talented individuals working toward the finished product. The author wishes to thank the team at the Foundation for Defense of Democracies, including President Clifford May, Chief Executive Mark Dubowitz, Senior Vice President for Research Jonathan Schanzer, Senior Vice President for Government Relations and Strategy Toby Dershowitz, Deputy Director of Project Strategy and Management Allie Shisgal, Deputy Director of the Center on Cyber and Technology Innovation Annie Fixler, Senior Fellow and Director of Research David Adesnik, Research Fellow Tony Badran, Research Manager John Hardie, and Senior Advisor Richard Goldberg, for their guidance, encouragement, and expert assistance in the preparation of this report. All of these individuals brought not only expert input but also camaraderie to a critical study of a topic that was evolving in real time as the report progressed. Thank you all. Of course, any errors in this report are solely the author's responsibility.

Cover Illustration by Daniel Ackerman



## About the Author



James Rickards sits on the Advisory Board of FDD's Center on Economic and Financial Power. He is the Editor of *Strategic Intelligence*, a financial newsletter. He is the *New York Times* bestselling author of *Aftermath* (2019), *The Road to Ruin* (2016), *The New Case for Gold* (2016), *The Death of Money* (2014), and *Currency Wars* (2011) from Penguin Random House. He is an investment advisor, lawyer, inventor, and economist and has held senior positions at Citibank, Long-Term Capital Management (LTCM), and Caxton Associates. In 1998, he was the principal negotiator of the rescue of LTCM sponsored by the Federal Reserve. His clients include institutional investors and government directorates. He is an op-ed contributor to *Financial Times*, *Evening Standard*, *The Telegraph*, *The New York Times*, and *The Washington Post*, and he has been interviewed by BBC, CNN, NPR, C-SPAN, CNBC, Bloomberg, Fox News, and *The Wall Street Journal*. Mr. Rickards is a guest lecturer at Georgetown University, the Kellogg School at Northwestern, the U.S. Army War College, and the Nitze School of Advanced International Studies (SAIS) at Johns Hopkins University. He has presented papers on risk at Singularity University, the Applied Physics Laboratory, and the Los Alamos National Laboratory. He is an advisor on capital markets to the U.S. intelligence community and the Office of the Secretary of Defense. Mr. Rickards holds an LL.M. (Taxation) from the New York University School of Law; a J.D. from the University of Pennsylvania Law School; an M.A. in international economics from SAIS, and a B.A. (with honors) from Johns Hopkins. He lives in New Hampshire.

## About the Foundation for Defense of Democracies

FDD is a Washington, DC-based, nonpartisan policy institute focusing on national security and foreign policy. FDD does not accept donations from any foreign governments. For more information, please visit www.fdd.org.

## About FDD's Center on Economic and Financial Power

FDD's Center on Economic and Financial Power (CEFP) studies national economic security, with a focus on how the United States can leverage its economic and financial power to achieve its national security objectives. Experts at CEFP track and analyze changes in the international economy and how allies and rivals are adapting to these developments. CEFP also promotes greater understanding of how the U.S. government can employ its economic and financial authorities to best counter its adversaries.

*FDD and its Center on Economic and Financial Power value diversity of opinions and the independent views of scholars, fellows, and board members. The views of the author do not necessarily reflect the views of FDD, CEFP, its staff, or Board of Advisors.*



P.O. Box 33249
Washington, DC 20033-3249
(202) 207-0190
www.fdd.org