# EXHIBIT

# 45

An official website of the United States government  Here's how you know

○

REPORT OVERVIEW

★ ★ ★

# 2020 Investment Climate Statements: Lebanon

**Share** ⤴

**IN THIS SECTION** /
**EXECUTIVE SUMMARY**

## EXECUTIVE SUMMARY

Lebanon's economy is in crisis.  GDP contraction could top 20 percent in 2020, the local currency has lost more than 60 percent of its value on secondary exchange markets, and most banks are dollar insolvent.  Since October 2019, Lebanon's financial sector imposed *ad hoc* capital controls, preventing most Lebanese from transferring any money overseas or withdrawing dollars from their bank accounts, despite the fact that 75 percent of accounts in Lebanese banks are denominated in dollars.  On March 7, 2020, Lebanon announced it would default on and restructure its nearly USD 31 billion in dollar-denominated debt, the first such default in Lebanon's history.  On April 30, the government published an economic plan with a focus on restructuring its financial sector and attracting foreign assistance; the next day Lebanon signed an official request for IMF assistance.  Most analysts assess that Lebanon's near- and medium-term economic future is bleak, with likely fiscal austerity, continuing capital controls, further devaluation, and a potential loss of value applied to wealthy accountholders to recapitalize the banking sector.  The Minister of Finance in May said Lebanon needs USD 28 billion in financial assistance over the next four years.  The World Bank projected that the poverty rate will reach 40-50 percent by the end of this year.

These developments hold consequences for Lebanon's potential as a destination for foreign investment.  Much depends on how Lebanon implements overdue economic and governance reforms, including in connection with its negotiation and implementation of a potential IMF program.  If the country is able to implement necessary reforms, attract foreign capital, stabilize the exchange rate, and recapitalize its financial sector, opportunities remain for U.S. companies.  To date, Lebanon has the legal underpinnings of a free-market economy, a highly-educated labor force, and limited restrictions on investors.  The most alluring sector is the energy sector, particularly for power production, renewable energies, and oil and gas exploration, though challenges remain with corruption and a lack of transparency.  Information and communication technology, healthcare, safety and security, waste management, and franchising have historically attracted U.S. investments.  However, corruption and a lack of transparency have continued to cause frustration among local and foreign businesses.  Other concerns include over-regulation, arbitrary licensing, outdated legislation, ineffectual courts, high taxes and fees, poor economic infrastructure, and a fragmented and opaque tendering and procurement processes.  Social unrest driven by a decline in public services and growing food insecurity may further hamper the investment climate.

If Lebanon is able to reform its business environment – a likely condition as part of an overarching IMF program – it may one day regain its role as a hub for foreign investment in the Middle East.  Lebanon's economic crisis is likely to be long and painful, however, and recovery can only be accelerated through quick but careful implementation of reforms.

## Table 1: Key Metrics and Rankings

| Measure | Year | Index/Rank | Website Address |
|---|---|---|---|
| **TI Corruption Perceptions Index** | 2019 | 137 of 180 | http://www.transparency.org/research/cpi/overview |
| **World Bank's Doing Business Report** | 2019 | 143 of 190 | http://www.doingbusiness.org/en/rankings |
| **Global Innovation Index** | 2019 | 88 of 129 | https://www.globalinnovationindex.org/analysis-indicator |
| **U.S. FDI in partner country ($M USD, historical stock positions)** | 2019 | $407 million | https://apps.bea.gov/international/factsheet/ |
| **World Bank GNI per capita** | 2019 | $7,600 | http://data.worldbank.org/indicator/NY.GNP.PCAP.CD |

# 1. Openness To, and Restrictions Upon, Foreign Investment

**Policies Towards Foreign Direct Investment**

Lebanon is open to Foreign Direct Investment (FDI). The Investment Development Authority of Lebanon (IDAL) is the national authority responsible for promoting local and foreign investment in Lebanon covering eight priority sectors: industry, media, technology, telecommunications, tourism, agriculture, and agroindustry. IDAL has the authority to award licenses and permits for new investment in specific sectors. It also grants special incentives and tax exemptions for projects implemented by local and foreign investors based on an investment's geographic location, sector, and number of jobs created (Investment Law No. 360). IDAL publishes its investment incentives online by sector at

**http://investinlebanon.gov.lb/en/sectors_in_focus**　　.

IDAL seeks to facilitate international and local partnerships through joint ventures, equity participation, acquisition, and other mechanisms. Moreover, it provides business intelligence, market studies, and legal and administrative advice to potential investors. In February 2018, IDAL established the Business Support Unit (BSU), which provides free legal, accounting, and financial advice to startups across sectors. IDAL is mandated by law to attract, facilitate, and retain investment in Lebanon. There are currently no formal mechanisms for investor dialogue, although IDAL plans to establish an Investor Advisory Committee, which was discussed with UNCTAD when IDAL launched its Investor Policy Review in 2017. IDAL is involved in providing after-care services to local and foreign investors alike, and following Lebanon's unfolding financial crisis and the spread of COVID-19, IDAL has held a series of roundtables and webinars with investors to identify their issues and work with relevant government agencies to solve them.

**Limits on Foreign Control and Right to Private Ownership and Establishment**

Foreign private entities may establish, acquire, and dispose of interests in business enterprises and may engage in all types of remunerative activities. Lebanese law allows the establishment of joint-stock corporations, limited liability, and offshore and holding companies.

According to UNCTAD's latest investment policy review of Lebanon, the country allows only Lebanese nationals to obtain licenses to manufacture and trade products related to defer weapons (Legislative Decree 137 of 12 June 1959, Weapons and Ammunition Law). Only

Lebanese nationals can own political newspapers and all broadcast media (Press Law of 14 September 1962, Broadcast Law 382 of 4 November 1994). A series of regulatory requirements also effectively restrict FDI in other instances: Two sectors, fixed line telephony and energy transmission, are closed to domestic and foreign investors as they are currently operated by state-owned enterprises, which have a *de facto* monopoly. Only Lebanese nationals are permitted to practice law.

Legislative Decree No. 35 (August 5, 1967), under the Lebanese Commercial Code, permits foreigners to own and manage 100 percent of limited liability companies (LLC or Société à Responsabilité Limitée – SARL), except if the company engages in certain commercial activities such as exclusive commercial representation. In these cases, Lebanese citizens must hold a majority of capital, and the manager must be Lebanese (Legislative Decree No. 34 dated August 5, 1967). An amendment introduced in 2019 allowed the formation of LLCs by only one person.

Legislative Decree No. 304 of the Commercial Code (December 24, 1942) governs joint-stock corporations (Société Anonyme Libanaise – SAL), and was amended by Law No. 126 on March 29, 2019. Limitations related to foreign participation stipulate that: 1) one-third of the board of directors should be Lebanese (Article 144 amended); 2) board members can be either shareholders or non-shareholders (Article 147 amended); 3) one-third of capital shares should be held by Lebanese for companies that provide public utility services (Article 78); and 4) capital shares and management in cases of exclusive commercial representation are limited (Legislative Decree No. 34 dated August 5, 1967). Banking, insurance, and cargo, which can only operate as JSCs, are required to have a Lebanese majority on the board, which makes them, in practice, restricted for FDI.

Holding and offshore companies are structured as joint-stock corporations and governed by Legislative Decree No. 45 (on holdings) and Legislative Decree No. 46 (on offshore companies), both dated June 24, 1983. The law on offshore companies was amended by Law No. 85, dated October 18, 2018, whereby all board members may be non-Lebanese (Article 2, para 4) and the company may be formed by one person (Article 1 in the amendment of the Commercial Code). A foreign non-resident chairman/general manager of a holding or an offshore company is exempt from the obligation of holding work and residency permits. Law No. 772, dated November 2006, exempts holding companies from the obligation to have two Lebanese persons or legal entities on their board of directors. All offshore companies must register with the Beirut Commer

Registry.  The law does not permit offshore banking, trust, and insurance companies to operate in Lebanon.

There are size and quota limits that effectively curb foreign ownership of real estate as well.  Law No. 296, dated April 3, 2001, amended the 1969 Law No. 11614 that governs acquisition of property by foreigners.  The 2001 law eased legal limits on foreign ownership of property to encourage investment in Lebanon, especially in industry and tourism, abolished discrimination for property ownership between Arab and non-Arab nationals, and set real estate registration fees at approximately six percent for both Lebanese and foreign investors.  The law permits foreigners to acquire up to 3,000 square meters (around 32,000 square feet) of real estate without a permit but requires cabinet approval for acquisitions exceeding this threshold.  The cumulative real estate acquisition by foreigners may not exceed three percent of total land in any district.  Cumulative real estate acquisition by foreigners in the Beirut region may not exceed ten percent of the total land area.  The law prohibits individuals not holding an internationally-recognized nationality from acquiring property in Lebanon.  In practice, this restriction attempts to prevent Palestinian refugees who are long-term residents in Lebanon from owning property.

The Lebanese Government does not review FDI transactions for national security considerations.

**Other Investment Policy Reviews**

Lebanon is not a member of either the Organization for Economic Cooperation and Development (OECD) or the World Trade Organization (WTO).  The United Nations Conference on Trade and Development (UNCTAD), in collaboration with IDAL, published a comprehensive Investment Policy Review for Lebanon in December 2018, which it officially launched in Beirut in March 2019.  The report provides a thorough assessment of Lebanon's business environment, with concrete short-, medium-, and long-term recommendations to revitalize Lebanon's investment climate.  These include creating an FDI promotion strategy and passing or amending legislation, rules, and regulations in the taxation, labor, competition, and governance regimes towards a more conducive business environment.  The full report is available at
 **https://unctad.org/en/PublicationsLibrary/diaepcb2017d11_en.pdf**

**Business Facilitation**

According to the World Bank's Doing Business Report, Lebanon ranks 151 out of 190 countries in ease of starting a business.  Lebanon does not have a business registration website; rather, IDAL provides an information portal about doing businesses in Lebanon and outlines requirements at **http://investinlebanon.gov.lb/en/doing_business**    .

According to UNCTAD, company establishment is cumbersome and costly in Lebanon.  It takes, on average, more than 15 days to establish an LLC with 15 employees or more in Beirut.  Companies must typically register with one of five trade registers (Beirut, Bekaa, Mount Lebanon, North and South), overseen by a magistrate, that operate in the country and are closest to the company's location.  LLCs and JSCs must also retain the services of a lawyer and one auditor on a yearly basis, pay registration fees at the Ministries of Finance and Justice, and register employees at the National Social Security Fund (NSSF).  Foreign companies seeking to establish branches in Lebanon must additionally register at the Ministry of Economy.  Online establishment is not available for companies wishing to incorporate in Lebanon, and information on establishment is scattered.  Foreign branches and representative offices can be partly registered online, but heavy administrative requirements remain. All foreign documents must be certified by the trade register in the company's country of incorporation and legalized by the Lebanese embassy or consulate there, and translated into Arabic.

**Outward Investment**

Lebanon neither promotes nor incentivizes outward investment, nor does it restrict domestic investors from investing abroad.  However, informal *ad hoc* capital controls imposed by the Lebanese financial sector since October 2019 prevent most external transfers, deterring outward investment from Lebanon.

## 2. Bilateral Investment Agreements and Taxation Treaties

Lebanon has signed bilateral investment treaties with the following partners (in alphabetical order, as of May 2020):  Armenia, Austria, Azerbaijan, Bahrain, Belarus, Belgium/Luxemburg, Benin, Bulgaria, Canada, Chad, Chile, China, Cuba, Cyprus, Czech Republic, Egypt, Finland, France, Gabon, Germany, Greece, Guinea, Hungary, Iceland, Iran, Italy, Jordan, Korea (Republic of), Kuwait, Malaysia, Mauritania, Morocco, Netherlands, OPEC Fund, Pakistan, Qatar, Romania, Russia, Slovak Republic, Spain, Sudan, Sultanate of Oman, Sweden, Switzerland, Syria, Tur Turkey, United Arab Emirates, Ukraine, United Kingdom, and Yemen.  For more information,

please visit the Ministry of Finance's website on: **http://www.finance.gov.lb/en-us/Finance/IA/IPA/** _

Lebanon is a member of the Pan-Arab Free Trade Area (PAFTA), which includes: Algeria, Bahrain, Egypt, Iraq, Jordan, Kuwait, Lebanon, Libya, Morocco, Oman, Palestinian territories, Qatar, Saudi Arabia, Sudan, Syria, Tunisia, United Arab Emirates, and Yemen. Lebanon has a free trade agreement with the European Union as well as the European Free Trade Association (EFTA), which includes Iceland, Liechtenstein, Norway, and Switzerland. Lebanon launched free trade agreement negotiations with MERCOSUR countries in 2016, but negotiations are unlikely to continue in the short term. The accession of Lebanon to the Agadir Free Trade Agreement (Egypt, Morocco, Jordan, and Tunisia) has been approved by member countries and awaits Lebanese Parliament's ratification to enter into effect.

Lebanon does not have a bilateral taxation treaty with the United States. It has bilateral taxation treaties with Algeria, Armenia, Bahrain, Belarus, Bulgaria, Cuba, Cyprus, Czech Republic, Egypt, France, Gabon, Iran, Italy, Jordan, Kuwait, Malaysia, Malta, Morocco, Pakistan, Poland, Qatar, Romania, Russia, Senegal, Sudan, Sultanate of Oman, Syria, Tunisia, Turkey, UAE, Ukraine, and Yemen. For more information, please visit: **http://www.finance.gov.lb/en-us/Finance/IA/TC/Pages/default.aspx**

Lebanon formally requested an IMF program on May 1, and on April 30, the Lebanese Cabinet approved an economic reform plan that includes fiscal reform measures designed to help Lebanon achieve a budget surplus by 2024. This includes some tax increases, including on corporate tax rates, interest income, high salaries, capital gains, and VAT for luxury goods only. No new taxes have been implemented yet, however.

## 3. Legal Regime

### Transparency of the Regulatory System

Private firms should exercise caution when bidding on public projects. Lebanese Government agencies often sole-source contracts, undertaking direct contracting processes that operate according to differing standards and without a formal competitive solicitation. Public institutions evade regulations that promote full and open competition by splitting contract requireme... smaller solicitations whose values do not exceed government agency procurement limits. ...

is no unified procurement law.  A modern procurement law is currently under preparation and will require the Cabinet's and Parliament's ratification.  The Public Procurement Management Administration (PPMA), known as the "Tender Board," technically has the authority to review terms of reference and evaluate bids for GoL contracts.  The Tender Board is generally transparent, but corruption often arises within the scope of the tenders and the ministries that issue them.  The Central Inspection Board (CIB), an oversight body within the Office of the Prime Minister, oversees government administrative processes, and the Court of Audit has oversight over public expenditures. The Social Security Fund and the Council for Development and Reconstruction, public entities that manage large funding flows, remain outside the CIB jurisdiction.

Excessive regulation hampers procedures for business entry, operation, and exit.  However, the process does not discriminate against foreign investors.  International companies face an unpredictable and opaque operating environment and often encounter unanticipated obstacles or costs late in the process.

Trademark registration, economic and trade indicators, and market surveillance reports are available online at:  **http://www.economy.gov.lb**    .  Some procedures, including those related to branch offices or representative offices of companies, or to protecting intellectual property rights, still require the right-holder to visit the ministry in person to finalize and pay required dues.

All legislation, government decrees, decisions, and official announcements are published in the Official Gazette.  The government does not publish proposed draft laws and regulations for public comment, but a parliamentary commission may invite private sector stakeholders to comment on legislation.  Telecom Law No. 431 requires the Telecommunication Regulatory Authority (TRA) to issue regulations in draft for public consultation to promote transparency and enable the general public to shape future regulations.  The TRA has not introduced new regulations since the term of its executive board expired in February 2012.  Publicly listed companies adhere to international accounting standards.  In general, legal, regulatory, and accounting systems for Lebanese businesses in the formal sector accord with international norms.

Lebanon passed the Access to Information Law in January 2017 to promote transparency the public sector.  The law permits anyone, including foreigners, to request information fror.

government agencies.  A Whistleblower Protection law also passed in October 2018.  While the Whistleblower law is in force, the establishment of a National Anti-Corruption Commission to oversee the law's implementation was only approved by Parliament in April 2020 and has yet to be staffed.  In January 2017, Lebanon announced its intent to join the Extractive Industries Transparency Initiatives (EITI), a global standard to promote transparency of the extractive sector, though it has not yet joined.  In September 2018, Parliament adopted the Transparency in Oil and Gas Law to facilitate the EITI accession process.  To complete Lebanon's candidacy, the Minister of Energy and Water announced that Lebanon would form a Multi-Stakeholder Group (MSG), with representatives from government, private firms operating in Lebanon, and civil society.  In March 2019, the Minister of Energy and Water invited civil society to choose independently its representative to the MSG, as per the EITI's requirements. EITI membership will require annual data disclosures on licenses, contracts, beneficial ownership, payments, revenues, and production.

Lebanon's public finances are not transparent; budget documents did not present a full picture of Lebanon's expenditures and revenue streams, and Lebanon has not published an end-of-year report.  Details regarding allocations to and earnings from state-owned enterprises were limited. The information in the budget was not considered reliable or reasonably accurate and did not correspond to actual revenues and expenditures.  Lebanon's supreme audit institution did not make its audit reports publicly available.  While Lebanon's debt obligations are transparent, some analysts have questioned the Central Bank's reported foreign currency position.  The Lebanese government hired three private auditors to audit its Central Bank as part of its economic reform plan, approved by the Cabinet on April 30.

**International Regulatory Considerations**

Lebanon is not part of any regional economic block.  It adopts a variety of standards based on the type of product and product destination.  Lebanon is not a member of the World Trade Organization (WTO), but has held observer status since 1999.  Lebanon does have a WTO/TBT (technical barriers to trade) Enquiry Point that handles enquiries from WTO Member States and other interested parties.

**Legal System and Judicial Independence**

Lebanon has a civil (roman and codified law) legal system inspired by the French civil procedure code (three degrees of jurisdictions:  First Instance, Appeal, and Supreme Court).  Ownership of property is enforced by registering the deed in the Property Registry.  Lebanon has a written commercial law and contractual law.  Lebanon has commercial, civil, and penal courts, but no specialized courts to hear intellectual property (IP) claims.  Civil and/or penal courts adjudicate IP claims.  Lebanon has an administrative court, the State Council, which handles all disputes involving the state.  Lebanon has a labor court in seven out of its nine governorates to hear claims of unfair labor practices.

Local courts accept investment agreements subject to foreign jurisdictions, if they do not contravene Lebanese law.  Judgments of foreign courts are enforced subject to the Exequatur obtained.  Weak judicial capacity (i.e., shortage of judges, inadequate support structures, administrative delays) results in delays in the handling of cases.  The Lebanese Constitution guarantees the judicial system's independence.  However, politicians and powerful lobbying groups often interfere in the court system.

**Laws and Regulations on Foreign Direct Investment**

A foreigner may establish a business under the same conditions as a Lebanese national but must register the business in the Commercial Registry.  Foreign investors who do not manage their business from Lebanon need not apply for a work permit.  However, foreign investors who own and manage their businesses within Lebanon must apply for an employer work permit and a residency permit.  Employer work permits stipulate that a foreign investor's capital contribution cannot be less than USD 67,000.  The investor must also hire three Lebanese employees and register them in the National Social Security Fund (NSSF) within the first six months of employment.

Companies established in Lebanon must abide by the Lebanese Commercial Code and are required to retain the services of a lawyer to serve as a corporate agent.  Local courts are responsible for enforcing contracts.  There are no sector-specific laws on acquisitions, mergers, or takeovers, with the exception of bank mergers.

Lebanese law does not differentiate between local and foreign investors, except in land acquisition (see Real Property section).  Foreign investors can generally establish a Lebane company, participate in a joint venture, or establish a local branch or subsidiary of their co.

without difficulty.  Specific requirements apply for holding and offshore companies, real estate, insurance, media (television and newspapers), and banking.

Lebanese law allows the establishment of joint-stock corporations, limited liability, offshore, and holding companies.  However, offshore and holding companies must be joint-stock corporations (Société Anonyme Libanaise – SAL).  The Lebanese Commercial Code governs these entities.

IDAL's website (**http://investinlebanon.gov.lb/**    ) provides investors information on investment legislation, regulations, and starting a business.  IDAL's proposed changes to investment-related laws and regulations, including amending requirements for IT companies to benefit from IDAL incentives, are pending government approval.  IDAL is finalizing a detailed ICT plan aimed at expanding facilities, developing incentives, and facilitating investments in the ICT sector.  IDAL intends to focus its investment promotion strategy on attracting high value-added innovative investments related to all of the sectors under its mandate.

**Competition and Anti-Trust Laws**

Lebanon has not enacted a law that governs competition.  Local courts review claims on competition-related issues under various laws.

**Expropriation and Compensation**

Land expropriation in Lebanon is relatively rare.  The Law on Expropriation (Law No. 58, dated May 29, 1991, Article 1) and Article 15 of the Constitution specify that expropriation must be for a public purpose and calls for fair and adequate compensation.  The government pays compensation at the time of expropriation, but the rate is often perceived as below fair market value.  The government does not discriminate against foreign investors, companies, or their representatives on expropriations.

The government established three real estate companies in the mid-1990s to encourage reconstruction and development in Greater Beirut following the Lebanese Civil War:  1) private corporation Solidere for the development and reconstruction of Beirut's downtown commercial district, 2) private corporation Linord, for northern Beirut, and 3) public institution Elyssar for the southwest suburbs of Beirut.  Linord has been dormant for years, and Elyssar's projects ha stalled since 2007.  The government granted these three companies the authority to expro

certain lands for development under the Law on Expropriation.  Landowners and squatters have challenged the land seizures in court.

**Dispute Settlement**

*ICSID Convention and New York Convention*

Lebanon is a member of the International Center for the Settlement of Investment Disputes (ICSID Convention).  Lebanon ratified the 1958 Recognition and Enforcement of Foreign Arbitral Awards (New York Convention) in 2007.  Lebanese law conforms to both conventions.

*Investor-State Dispute Settlement*

The government accepts international arbitration related to investment disputes.  In cases involving concessions or public projects, the government does not accept binding international arbitration unless the contract includes an arbitration clause that was obtained through prior approval by Cabinet decree.  However, there is an exception for investors from countries that have a signed and ratified investment protection agreement with Lebanon that provides for international arbitration in the case of disputes.  In the past, the government has faced challenges related to previously-awarded contracts and resorted to international arbitration for resolution.  To post's knowledge, there are no known new cases.  In 2010, the government settled a dispute with a Chinese contracting company working to expand the northern port of Tripoli.

*International Commercial Arbitration and Foreign Courts*

International arbitration is accepted as a means to settle investment disputes between private parties.  The Lebanese Centre for Arbitration was created in 1995 by local economic organizations, including the Lebanese chambers of commerce, industry, and agriculture.  The Centre resolves domestic and international conflicts related to trade and investment.  Its statutes are similar to those of the International Chamber of Commerce (ICC) in Paris, and its conciliation and arbitration rules are modeled on those of the Paris ICC.  Judgments of foreign courts are enforced subject to the exequatur obtained.

**Bankruptcy Regulations**

Lebanon does not have a Bankruptcy Law.  However, the Commercial Code (Book No. 5, Articles 459-668) and the Penal Code govern insolvency and bankruptcy.  Workers may resort to the Labor Court and the National Social Security Fund to recover pay and benefits from local and foreign firms that go bankrupt.  The law criminalizes fraudulent bankruptcy.

# 4. Industrial Policies

**Investment Incentives**

Lebanon's Investment Law No. 360 encourages investment in information technology, telecom, media, tourism, industry, agriculture, and agro-industry.  The law divides the country into three investment zones, with different incentives in each zone.  These include facilitating permits for foreign labor and tax benefits, which range from a five-year, 50 percent reduction on income and dividend distribution taxes to a total exemption of these taxes for 10 years, starting from the date of operation (tied to the issuance of the first invoice).  Companies that list 40 percent of their shares on the Beirut Stock Exchange (BSE) are exempt from income tax for two years.  The law also introduces tailored incentives through package deals for large investment projects, regardless of the project's location.  These may include tax exemptions for up to 10 years, reductions on construction and work permit fees, and a total exemption on land registration fees.  IDAL exempts joint-stock companies that benefit from package deal incentives from the obligation to have a majority of a board of directors be Lebanese nationals (Law No. 771, dated November 2006).  Investors who seek to benefit from work permit incentives under package deals must hire two Lebanese for every foreigner and register them with the NSSF.  IDAL is working on several amendments to Investment Law 360 that would expand incentives to sectors, including ICT.  The government does not have a practice of issuing guarantees or jointly financing foreign direct investment projects.

Other laws and legislative decrees provide tax incentives and exemptions depending on the type of investment and its geographical location.  Industrial investments in rural areas benefit from tax exemptions of six or 10 years, depending on specific criteria (Law No. 27, dated July 19, 1980, Law No. 282, dated December 30, 1993, and Decree No. 127, dated September 16, 1983).  Exemptions are also available for investments in South Lebanon, Nabatiyeh, and the Bekaa Valley (Decree No. 3361, dated July, 2, 2000).  For example, new industrial establishments manufacturing new products benefit from a 10-year income tax exemption.  Factories currently based on the coast, which relocate to rural areas or areas in South Lebanon, Nabatiyeh, or the Bekaa Vally

benefit from a six-year income tax exemption.  Parliament enacted a law in April 2014 to reduce income tax on industrial exports by 50 percent.  More information can be found on IDAL's website at **http://investinlebanon.gov.lb/en/doing_business/investment_incentives**    .

Domestic and foreign investors may benefit from Central Bank-subsidized loans covering housing, investment in productive sectors, energy efficiency and renewable energy, and financing projects.  The Central Bank continues, in cooperation with the European Investment Bank (EIB) (Euro 50 million) and AFD (Agence Francaise de Developpement, the French USAID counterpart) to subsidize loans for energy efficiency projects.  The Central Bank has made preparations to launch "The Oxygen Fund" to support the import of raw materials to Lebanese industries and has pledged USD 100 million to this fund; it has also committed an additional USD100 million as a bridge loan for industrialists to import raw materials until this fund becomes operational. Analysts question whether such efforts, absent external assistance, will be enough.

The government grants customs exemptions to industrial warehouses for export purposes. Companies located in the Beirut Port or the Tripoli Port Free Zone benefit from customs exemptions and are exempt from the value-added tax (VAT) for export purposes.  They are also not required to register their employees with the NSSF, if they provide equal or better benefits.

As part of its mandate, IDAL promotes and supports Lebanese exports, especially in the agriculture, agro-industry, and industry sectors, by providing assistance on export requirements and studies on potential new markets, supporting exporter participation in international fairs and exhibitions, as well as subsidizing export transportation costs.

Lebanon does not have a practice of issuing guarantees or jointly financing foreign direct investment projects.

### Foreign Trade Zones/Free Ports/Trade Facilitation

Foreign-owned firms have the same investment opportunities as Lebanese firms.  Lebanon has one duty-free zone at Beirut-Rafik Hariri International Airport and two free trade zones, the Beirut Port and the Tripoli Port.  The WTO-compatible Customs Law issued by Decree No. 4461 fosters the development of free zones (Articles 242-261 cover free trade zones and Articles 262-266 cover duty free zones) and is available online at **www.customs.gov.lb**    .  The gover enacted Law No. 18, dated September 5, 2008, that established the Tripoli Special Econom

(TSEZ) to attract investment in trade, industry, services, storage, and other services, as well as to grant investors tax exemptions and offer other incentives such as relaxed allowances for foreign labor and unrestricted currency conversion.  On April 9, 2015, the Cabinet appointed a TSEZ Authority to regulate the zone, and according to the TSEZ Authority, efforts are underway with the International Finance Corporation to build and develop the zone.  The TSEZ Authority has completed an interim licensing regime to grant licenses for logistics activities, and is working with the IFC towards a full-fledge licensing regime, expected to be ready by the end of 2020 or early 2021.  The master plan for the industrial and logistics site next to Tripoli Port is completed and awaits Cabinet approval.

On March 29, 2018, the Cabinet approved expanding the geographical area of the TSEZ to include an additional 75,000 square meters of the Rachid Karami Fair in Tripoli and to establish a knowledge-innovation center.  The Authority has completed the architectural concept for the Rachid Karami zone for knowledge and innovation center and will start with the Master Plan this year.  The Authority expects the TSEZ will begin logistics activities in early 2021.

**Performance and Data Localization Requirements**

The government mandates local employment, and the Ministry of Labor publishes annually a list of jobs restricted to Lebanese nationals.  Foreign and local participation on the board of directors is contingent upon the firm's structure as defined in Lebanese commercial law.  Foreign investors enjoy the same incentives as local investors.

Foreigners doing business in Lebanon through a company, factory, or office must hold work and residency permits.  There are no discriminatory or excessively onerous visa, residence, or work permit requirements.  Travelers who hold passports that contain visas or entry/exit stamps for Israel will likely be denied entry into Lebanon and may be subject to arrest or detention.  Even if travel documents contain no Israeli stamps or visas, persons who have previously traveled to Israel may still face arrest and/or detention if prior travel is disclosed.

Registration with a chamber of commerce is required to import and handle a limited number of products that are subject to control requirements for safety reasons.  Products with such special import requirements constitute less than one percent of total tradable goods.  Registration with a chamber of commerce is required to ensure that established facilities meet safety, handlir storage requirements.

Lebanon does not follow any forced localization policy and does not require foreign IT providers to turn over source code or provide access to surveillance. Lebanon's Central Bank requires all banks to keep data backups in Lebanon, while service providers are required to do the same.

# 5. Protection of Property Rights

**Real Property**

The right to private ownership is respected in Lebanon. The concept of a mortgage exists and secured interests in property, both movable and real, are recognized and enforced. Such security interests must be recorded in the Commercial Registry and the Real Estate Registry. The Real Estate Law governs acquisition and disposition of all property rights by Lebanese nationals, while Law No. 296, dated April 3, 2001, governs real estate acquisition by non-Lebanese. Over ten percent of land, mostly in rural and remote areas, does not have clear title. The government is undertaking efforts to identify property owners and register land titles.

**Intellectual Property Rights**

While Lebanon is not a WTO member, its intellectual property rights (IPR) legislation is generally compliant with Trade-Related Intellectual Property Rights (TRIPS) standards. . The Ministry of Energy and Trade's (MoET) Intellectual Property Protection Office (IPPO) has led efforts to improve the IPR regime but suffers from limited financial and human resources, and insufficient political support. Lebanon's Internal Security Forces (ISF) and Customs play roles in enforcement. While IPR awareness within the Lebanese judiciary has improved somewhat in recent years, gaps remain with regards to understanding the negative economic impact that IPR violations have on the economy. The MoET's new draft laws and amendments to existing laws aimed at improving the IPR environment, notably for industrial design, trademark, geographical indications, as well as amendments to the copyright law, await parliamentary approval.

Existing IPR laws cover copyright, patent, trademarks, and geographical elements. Lebanon's 1999 Copyright Law largely complies with WTO regulations and needs only minor amendments to become fully compatible. Copyright registration in Lebanon is not mandatory, and copyright protection is granted without the need for registration. The MoET launched an online registration service in January 2013 for copyrights and trademarks on

**https://portal.economy.gov.lb/** . This service simplified the registration process and o

80 percent of registrations of trademarks and copyrights now take place online. Due to the complexity of copyrights and patents, registration is still accepted in person at the MoET, and payment must also take place in person. The switch to an objection system for trademarks also remains stalled due to the need for parliamentary approval. However, the MoET noted that it implements the objection system in practice.

Lebanon's Parliament ratified the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty (WPPT) in February 2010. Ratification documents have not yet been deposited with WIPO, however, since this would also require amendments to the Copyright Law.

A modern TRIPS-compatible Patent Law, approved in 2000, provides general protection for semiconductor chip layout designs and plant varieties. Data protection and undisclosed information fall under Article 47 of the Patent Law, but current provisions for pharmaceutical registration are subject to interpretation. Generic manufacturers in Lebanon are not prohibited from using original data (e.g., data published on the U.S. Food and Drug Administration website) to register competing products that are identical to original products. Decree No. 571 on the conditions of registering, importing, marketing, and classifying pharmaceuticals, which should have improved the process of drug registration and reduced the number of copycat drugs being registered, still leaves some room for interpretation. There are no current plans to amend the Patent Law. On patent registrations, the Lebanese legal regime does not require examination for novelty, utility, and innovation. Simple patent deposit is required at the MoET, where the application is examined only for conformity with general laws and ethics.

The Internal Security Force (ISF) Cybercrime and IP Unit under ISF's Judicial Police directorate focuses its efforts on online counterfeiting and copyright violations, whereas the Money Laundering and Financial Crimes Unit investigates trademark violations associated with counterfeit physical goods. Lebanese Customs also plays a direct role in IPR enforcement by seizing counterfeits and an indirect role as part of its efforts to combat smuggling. The U.S. Trade Representative's Special 301 annual review of intellectual property protection worldwide has retained Lebanon on its watch list since 2008.

The IPPO acts upon the requests of rights holders or in an *ex officio* capacity. The ISF cannot act in an *ex officio* capacity and still requires a criminal complaint to be filed with the prosecutor's office in order for it to take action. The sale and distribution of pirated, counterfeit, and co products continued across Lebanon, in commercial establishments and through street ven

This included leather goods, apparel and luxury items, fast-moving consumer goods (FMCGs), software, optical media, and pharmaceuticals.

For additional information about national laws and points of contact at local IP offices, please see WIPO's country profiles at **http://www.wipo.int/directory/en/**   .

# 6. Financial Sector

**Capital Markets and Portfolio Investment**

There are no restrictions on portfolio investment, and foreign investors may invest in Lebanese equities and fixed income certificates.  While legally Lebanon is a free market economy and does not restrict the movement of capital into or out of the country, Lebanon's financial sector imposed *ad hoc* capital controls on financial outflows from Lebanon since October 2019 due to dollar illiquidity.  There are *de facto* restrictions on outbound payments and transfers for current international transactions, although these have yet to be codified into law.  Money transfer services such as Western Union and MoneyGram must now disburse inbound transfers in local currency.  The Banking Control Commission of Lebanon (BCCL) has a department which oversees and conducts on-site and off-site audits of money exchange institutions and electronic money transfer firms operating in Lebanon using a risk-based supervision approach.

Credit is allocated on market terms, and foreign investors may obtain credit facilities on the local market.  However, as Lebanon entered its economic crisis in  the fall of 2019 and defaulted on its dollar-denominated debt in March 2020, local and international credit is virtually nonexistent. The private sector may access overdrafts and discounted treasury bills in addition to a variety of credit instruments, such as housing, consumer, or personal loans, as well as corporate loans for SMEs.

Government legislation allows the listing of tradable stocks on the Beirut Stock Exchange (BSE).  By regulation, an investor should inform the BSE when her/his portfolio of shares in any listed company reaches ten percent and five percent in any listed bank.  For an investor to acquire more than five percent of shares of any listed bank requires prior approval from the Central Bank.  Currently, the BSE lists six commercial banks, four companies including Solidere — one of the largest publicly held companies in the region — and eight sovereign Eurobond (all in U.S. dollars).  However, the BSE suffers from a lack of liquidity and low trading volume

the absence of significant institutional and foreign investors and had an annual trading volume of only 2.6 percent of market capitalization in 2019.  Weak market turnover discourages investors from committing funds to the market and discourages issuers from seeking listings on the BSE.

Traditional businesses owned by commercially powerful families dominate most sectors.  The government is trying to improve the transparency of such firms to help solidify an emerging capital market for company shares.  The Cabinet approved in September 2017 a decree to establish the Beirut Stock Exchange SAL (BSE SAL) as a joint-stock company that will replace the current BSE.  Initially, the Lebanese state will own the capital of BSE SAL and will privatize the company within one year.  The delay in the process triggered the CMA to issue in January 2019 a Request for Proposal (RFP) for an electronic trading platform that will allow trading in products not traded in the BSE, such as foreign currencies, commodities, and listed SMEs and start-ups.  The CMA has granted the winning consortium of Bank Audi and the Athens Stock Exchange (ATHEX) a license to set up and operate an electronic trading platform (ETP).  The consortium will contribute capital of $20 million to a special purpose vehicle (SPV) that will be created to operate the platform.  The consortium has opened the door for banks and financial institutions to also contribute to the SPV's capital.  After ten years of operating the ETP, the consortium will have to list nearly 60 percent of the SPV shares on the ETP.  More information can be found on: www.cma.gov.lb/.  Lebanon hosts the headquarters of the Arab Stock Exchanges.

**Money and Banking System**

Lebanon's financial sector entered an unprecedented crisis in late 2019.  Lebanon relied on dollar inflows from abroad to finance imports and public spending and to maintain the Lebanese lira-to-USD peg, in place since 1997.  Those dollars were deposited in Lebanese banks, which in turn lent them to the state in the form of deposits at the Central Bank or Lebanese debt instruments.  Nearly 70 percent of bank assets are tied to the sovereign in those two forms.  As dollar inflows dried up and banking sector assets were tied to long-term deposits at the Central Bank and illiquid debt instruments, banks had trouble meeting their dollar obligations to clients.

This illiquidity continued for rest of 2019 and the first quarter of 2020, during which most banks stopped providing any dollars to clients.  Banks are no longer serving their core functions: making productive loans or allowing those with dollar deposits to withdraw them.  Clients cannot transfer money overseas, except in "emergency" cases, as determined by individual banks. Lebanon has yet to adopt formal capital controls legislation, but most economic analysts b

such a law is necessary to preserve what limited foreign currency is left in the country and provide a level playing field to all Lebanese.  At the behest of the Central Bank, in April 2020, banks began providing Lebanese lira at rates double the official pegged rate to customers with dollar-denominated accounts.

Lebanon's default on its dollar-denominated debt in March 2020 – Lebanese banks at the time held $12.7 billion in Lebanon's dollar bonds – further eroded the balance sheets of Lebanese banks.  Analysts estimate that perhaps 30 percent of loans from Lebanese banks are non-performing.  This number is expected to rise in 2020.  Bankers report that correspondent banks overseas have stopped providing them with lines of credits – or only provide facilities with onerous conditions – further hampering bank efficacy in Lebanon.  On April 30, the Cabinet approved an economic rescue plan, which noted the Lebanese financial sector experienced losses of nearly USD 80 billion, meaning that it will be unable to repay all what it owes to Lebanese with dollar-denominated accounts.  The economic plan hints at a potential "haircut" on dollar deposits, in which wealthy account holders could lose some of their deposits to help recapitalize banks after shareholders "bail-in" (convert their deposits into bank shares) their financial institutions.

The Lebanese banking sector covers the entire country with 1,051 operating commercial and investment bank branches as of November 2019.  There are 4,757 residents per branch in Lebanon (assuming five million inhabitants), which compares favorably to regional and emerging markets.  According to World Bank Development indicators, there are 534 depositors with commercial banks per 1,000 adults, 215 borrowers from commercial banks per 1,000 adults, and 38 ATMs per 100,000 adults.  The total domestic assets of Lebanon's five largest commercial banks reached approximately $115 billion as of the end of 2019 (about 51.4 percent of total banking assets), according to Central Bank data.

Lebanon's Central Bank was established in 1963.  Lebanon's Central Bank imposes strict compliance with regulations on banks and financial institutions, and commercial banks, in turn, maintain strict compliance regimes.  However, the United States designated Jammal Trust Bank in August 2019 as a Specially Designated Global Terrorist for its role in financing Foreign Terrorist Organization Hizballah.  Foreign banks and branches need the Central Bank's approval to establish operations in Lebanon.  Moreover, any shareholder with more than five percent of a bank's share capital must obtain prior approval from the Central Bank to acquire addition shares in that bank, and must inform the Central Bank when selling shares.  In addition, any

shareholder needs to obtain prior approval from the Central Bank if he/she wants to become a board member.   The use of cryptocurrencies is prohibited in Lebanon by the Central Bank.  The Central Bank announced that it is developing a digital currency that it plans to issue in Lebanese Pounds for domestic use only.

There are no restrictions in Lebanon on a foreigner or non-resident's ability to open a bank account in local currency or foreign currencies, provided they abide by Lebanese compliance rules and regulations.  Banks claim they have stringent inquiry mechanisms to ensure compliance with international and domestic regulations and implement Lebanon's anti-money laundering and counter-terror finance laws.  Banks inform customers of Know-Your-Customer requirements and ask them about the purpose of opening new accounts and about the sources of funds to be deposited.  Lebanese banks note they are compliant with the Foreign Account Tax Compliance Act (FATCA).  Lebanon adopted the OECD Common Reporting Standards since January 1, 2018.

## Foreign Exchange and Remittances

*Foreign Exchange*

For the first time in Lebanon's history, commercial banks in late 2019 introduced *ad hoc* capital controls on Lebanese depositors to stem the outflow of foreign currency.  Depending on a client's individual bank and account size, he or she is subject to strict limits on foreign transfers for "emergency" purposes only, as defined by a client's bank.  Clients with Lebanese lira (LBP) denominated accounts can only convert their lira to dollars outside of banks at licensed and unlicensed money exchange houses.

As of May 2020, Lebanon in practice had several different exchange rates.  Since 1997, the LBP has been pegged to the U.S. dollar at 1,507.5 LBP to USD.  However, as Lebanese continue to demand scarce dollars in the Lebanese financial system, the currency has depreciated on secondary markets.  The Central Bank only made dollars available to importers at the official rate for imports of fuel, wheat, and medicine.  For inbound electronic transfers, the Central Bank set the rate at 3,800 LBP/1 USD as of May 2020.  Licensed money exchange houses have sold dollars for as high as 4,400 LBP/1 USD, but as of May 2020, most had closed in response to a government crackdown on purported price gouging.  Unlicensed money exchange houses – black market – continued to sell dollars in May 2020 at rates ranging from 4,000 to 4,500 L

USD. Banks allowed clients to withdraw LBP from their dollar-denominated accounts at 3,000 LBP/1 USD. Finally, banks offered another preferential exchange rate for those willing to bring new dollar banknotes to bank counters. Different stores and shops offered varying exchange rate conversions at *ad hoc* rates as well.

The conversion of foreign currencies or precious metals is unfettered. Lebanon's Central Bank posts a daily local currency-exchange rate on its website: **http://www.bdl.gov.lb/** . Lebanon has one of the most heavily dollarized economies in the world, and businesses commonly accept payment (and return change) in a combination of LBP and U.S. Dollars.

*Remittance Policies*

While capital controls curtailed the ability of those holding dollar-denominated bank accounts in Lebanon to withdraw or transfer their currencies overseas, those in Lebanon with access to "fresh dollars" (i.e., new dollar bills from abroad or not within the local financial system) were able to access, withdraw, and transfer overseas dollars. For the vast majority of Lebanese and businesses in Lebanon, remitting any money overseas, including investment returns, remained nearly impossible. Analysts believe capital controls must continue for the foreseeable future to prevent a bank run and preserve the limited foreign currency remaining in Lebanon.

**Sovereign Wealth Funds**

Lebanon does not have a sovereign wealth fund. The government's economic rescue plan, approved by the Cabinet on April 30, calls for the creation of a Public Asset Management Company that would include state assets and properties to help restore depositors' funds and boost economic recovery. Lebanon's Offshore Petroleum Resource Law states that proceeds generated from oil and gas exploration must be deposited in a Sovereign Wealth Fund. Creating the fund requires a separate law, which the government has yet to adopt. Lebanon currently receives no proceeds from natural resources that could flow into a sovereign wealth fund.

# 7. State-Owned Enterprises

The Lebanese government maintains several state-owned monopolies. State-owned Ogero owns and operates all fixed line telecommunications in Lebanon, while the two mobile operator Touch and Alfa, are also owned by the state. While they were previously managed by Kuw.

Zain and Egypt's Orascom Telecom, the Ministry of Telecommunications took over management of the two mobile operators and will prepare tenders for new management contracts later in 2020.  Electricité du Liban (EdL) provides nationwide electricity production and transmission, and four regional authorities provide water service.

La Régie des Tabacs et Tombacs conducts tobacco procurement, manufacturing, and sales, and Casino du Liban operates as a mixed public-private enterprise.  The Central Bank owns 99.23 percent of the air carrier Middle East Airlines, whose monopoly is scheduled to end in 2024.  Other major state-owned enterprises or public institutions include the Beirut, Tripoli, Sidon, and Tyre ports, the Rashid Karami International Fair (in northern Lebanon), the Sports City Center, and real estate development institution Elyssar.  The government also owns shares in Intra Investment Co., a mixed public-private investment company that owns 96.62 percent of Finance Bank, a Lebanese commercial bank.

There is no uniform definition of State-Owned Enterprises (SOEs), and each has separate internal by-laws.  Decree 4517 (dated 1972) establishes two types of public institutions, one administrative category that involves public enterprises such as the Lebanese University, and a second that holds commercial institutions such as EdL and La Régie.  The Ministry of Finance maintains an unpublished list of SOEs and public institutions.  SOEs and public institutions may purchase or supply goods or services from the private sector or foreign firms.  Their procurement process is governed by separate regulations but under the same terms and conditions as public procurement.  SOEs and public institutions benefit from certain tax exemptions.

The state electricity monopoly restricts production to EdL alone, but numerous private investors operate unregulated generators across the country and sell electricity to citizens at significantly higher rates during the country's frequent power cuts.  EdL awarded several concessions to privately-owned companies for power distribution in specific regions, and these companies are interested in meeting customer demand.  Independent Power Producers (IPP) may provide municipalities with 10 MW of electricity without receiving a direct concession from EdL.  In April 2014, Parliament granted the Cabinet authority through 2018 to license private companies to generate electricity (Law 288).  On April 17, 2019, Parliament extended Law 288 and granted the Public Tender Office authority to oversee electricity contracts as part of the government's electricity sector reform.  Law 462 of 2002 called for the corporatization and privatization of the electricity sector, and the creation of an electricity regulatory authority (ERA).  However, as implementation of the privatization law stalled, Law 288 delegated issuance of production

permits and licenses for new electricity projects from ERA to the Lebanese government.  Since 2012, EdL has contracted three private companies to manage bill collection, maintenance, and power distribution.

Lebanon's SOEs report to shareholders, whereas public institutions are subject to oversight by the concerned ministries as well as by the Ministry of Finance.  Public institutions require the approval of concerned ministries for major business decisions.  SOEs may independently prepare their budgets, which must be approved only by their board of directors.  The SOEs and public institutions are required by law to publish an annual report, submit their books for independent audits, and transmit their books to the Court of Audit.

The Lebanese Government currently has no formal plans to privatize SOEs or public institutions. The April 30 economic reform plan did not specify any government privatization plans other than noting it would likely sell Casino du Liban.  The plan also suggested the creation of a Public Asset Management Company (PAMC) to hold government assets, including government stakes in the "main state-owned enterprises and real estate."  Profits from the PAMC would go to fund capital increases of the Central Bank, which would in turn allow it to repay its liabilities to the local financial sector.  The plan did not specify which state-owned assets would go into the PAMC or which would be privatized.  Some political leaders and economists have called for SOE privatization to be a larger part of the government's reform efforts.  The Governor of the Central Bank previously stated plans to list 25 percent of Middle East Airlines (which is 99.23 percent owned by the Central Bank) on the BSE, but this has not happened.

SOEs and public institutions have independent boards staffed primarily by politically-affiliated individuals, appointed by the Cabinet for public institutions, and by shareholders for SOEs. These boards always include a cabinet-appointed Government Commissioner who reports to the concerned ministries.  SOEs do not currently adhere to the Organization for Economic and Cooperative Development (OECD) Corporate Governance Guidelines.

**Privatization Program**

Lebanon enacted laws in 2002 for the privatization of the telecom sector (Law 431) and the electricity sector (Law 462).  However, neither has been implemented.

Parliament passed a two-year law authorizing the Cabinet to issue Independent Power Producers (IPP) licenses to investors in April 2014.  It later amended the law to extend its application through April 2018.  On April 17, 2019, Parliament passed a new law extending the application of Law 288 through April 2021, granting the Tender Office authority to tender IPP projects.  The Ministry of Energy and Water launched tenders in March 2017 for solar power plants under the IPP law and has issued three wind power plants licenses under IPP.  It planned to issue tenders for two combined cycle gas turbine IPPs in September 2019, but those efforts stalled.  The government reportedly now aims to procure IPPs on a bilateral government-to-company negotiation process.

The High Council for Privatization and Partnerships (HCP) manages privatization and public-private sector partnership (PPP) projects.  In accordance with the provisions of the Privatization Law 228 and the PPP Law 48, the HCP conducts competitive tendering processes for both privatization and PPP projects.  The PPP law introduced a legal framework to attract local and international private investments in infrastructure projects.  The PPP legislation is published on the HCP website **http://hcp.gov.lb**    .  The HCP has yet to fully manage or complete any privatization project.

The Capital Markets Law calls for the corporatization and subsequent privatization of the Beirut Stock Exchange (BSE) within a two-year period from the date that the Capital Markets Authority (CMA) is appointed.  The Cabinet appointed the CMA in June 2012, and in September 2017 issued a decree to corporatize the BSE.  The corporatization has yet to occur.

# 8. Responsible Business Conduct

Lebanese firms are aware of corporate social responsibility (CSR) and responsible business conduct (RBC), including on environmental, social, and governance issues.  This is true for the banking sector as well as companies in industry, which are slowly creating sustainable supply chains or pursuing social initiatives to appeal to consumers.  The Lebanese Standards Institution (LIBNOR), part of the Ministry of Industry, strives to expand the use of the ISO 26000 standard on Social Responsibility (SR) in Lebanon, one of the eight pilot countries in the Middle East.  However, laws related to human and labor rights, consumer protection, and environment protections are unevenly enforced.

The Central Bank of Lebanon works with banks to direct their financial resources towards projects that improve society and the environment.  This includes issuing circulars to create

favorable environmental and educational loans, encourage entrepreneurship through private equity investments, and facilitate improved governance through customer protection.  Lebanon's economic crisis, however, has frozen project  and corporate lending.  In 2015, the banking sector started to implement Central Bank Circular No. 134, requiring banks to apply measures to ensure transparent and fair dealings with their customers, a reflection of the CSR principles of corporate governance and consumer protection.  The Central Bank also established the Institute for Finance and Governance (IFG).  Some Lebanese banks attempt to align their business plans and CSR policy with the UN Sustainable Development Goals.  Several banks issue their own annual CSR reports.

The government does not require or encourage private companies to establish internal codes of conduct.  However, several companies have adopted a Code of Ethics and corporate governance codes, including the business association 'Rassemblement de Dirigeants et Chefs d'Entreprises Libanais' (RDCL, or the Group of Lebanese Business Owners) Code of Business Ethics, and the Lebanese Code of Corporate Governance (CG), which is under the auspices of the Lebanese Transparency Association (LTA).  However, these codes are strictly voluntary and the government provides no incentives or enforcement for their adoption.

## 9. Corruption

U.S. firms have identified corruption as an obstacle to FDI, including in government procurement, award of contracts, dispute resolution, customs, and taxation.  A key demand of the anti-government protest movement that led to resignation of the previous government in October 2019 was stricter anti-corruption measures.  Corruption is reportedly more pervasive in government contracts (primarily in procurement and public works), taxation, and real estate registration, than in private sector transactions.  Lebanese law provides criminal penalties for official corruption, but they are not implemented effectively.  For instance, Lebanon does not effectively enforce the Illicit Wealth Law.  The Illicit Wealth Law applies to all state employees, government and senior officials, and municipality members and extends to family members.  The law does not extend to political parties.  The legislation has articles to counter conflict-of interest in awarding contracts and government procurement, but they are not enforced.  The Access to Information Law is not effectively implemented.

In April 2020, Parliament approved several laws seen as key to anti-corruption efforts:  an corruption law targeting public sector employee and creating a National Committee to Con...

Corruption, and a law to lift immunity of (low-level) public service employees. Implementations of these laws will be critical to their success. In May 2020, the government approved its National Anti-Corruption Strategy, while Parliament approved a law allowing the committee and Lebanon's Financial Intelligence Unit to lift bank secrecy for top government officials. It also approved a law changing appointments of top civil servants to a merit-based system, but implementation for all of these changes remains key to determining how they will combat entrenched corruption.

Lebanon ratified the UN Anticorruption Convention in April 2009. Lebanon is not a signatory to the OECD Convention on Combatting Bribery of Foreign Public Officials in International Business Transactions.

As for civil society, the Lebanese Transparency Association (LTA) is a key advocate for stronger anti-corruption enforcement. The LTA also established the Lebanese Advocacy and Legal Advice Center (LALAC) to inform citizens of their rights and to encourage victims and witnesses to take action against cases of corruption. LALAC operates a hotline for victims and witnesses to report cases of corruption and receive free legal advice and assistance with their case. The program is currently funded by Transparency International (TI) and the German Foreign Office. LTA also conducted several workshops targeting municipalities, public servants, investigative journalists, and civil society groups promoting access to information right in Lebanon.

*Resources to Report Corruption*

Lebanese Transparency Association

Sami El Solh Avenue, Kaloot Bldg, 9th Floor

Badaro, Beirut

P.O. Box 50-552, Lebanon

Tel/Fax: +961-1-388113/4/5

Cell: 70-035777

Email: info@transparency-lebanon.org

# 10. Political and Security Environment

Sustained anti-government protests began on October 17, 2019, and led to resignation of the previous government on October 29. The protests continued for months, with demonstrators demanding an end to corruption, poor governance, and economic stagnation. A new

government, which drew support from Foreign Terrorist Organization (FTO) Hizballah, did not form until January 21, 2020.  Public demonstrations continued since October, albeit with lesser frequency.  Since October 2019, some protests have turned violent and targeted property, particularly banks and public institutions.

Hizballah continued fighting in Syria on behalf of the Assad regime, while some Lebanese Sunnis reportedly lent support to the Syrian opposition.  Lebanon continues to host more refugees per capita than any other country in the world.  The refugee presence led to increased social tensions and competition for low-skill jobs, and strained infrastructure and provision of public services.

The U.S. government considers the potential threat to U.S. Embassy personnel assigned to Beirut sufficiently serious enough to require all official personnel to live and work under security restrictions.  These limitations occasionally prevent the movement of U.S. Embassy officials and the provision of consular services in certain areas of the country.  U.S. citizen visitors are encouraged to contact the Embassy's Consular Section for the most recent safety and security information concerning travel to Lebanon.  On March 18, 2020, the Department of State required the ordered departure of non-emergency U.S. government employees and associated family members in Lebanon due to COVID-19-related concerns, including travel restrictions and quarantine procedures that affected commercial flights.  More information may be found at **https://lb.usembassy.gov/u-s-citizen-services**.

## 11. Labor Policies and Practices

The 1946 Labor Law provides for written and oral contracts and specifies a maximum workweek of 48 hours (with several exceptions, notably agricultural and domestic workers, who are not covered under the Labor Law).  The legal minimum wage was raised in 2012 to 675,000 LBP (USD 450 per the official exchange rate, but closer to $155 per the market exchange rate as of May 2020) per month.  Lebanon is a member of the International Labor Organization (ILO) and signatory to all of its fundamental conventions except on the Freedom of Association and Protection of the Right to Organize. The Ministry of Labor issues an annual list of jobs restricted to only Lebanese.  Local unskilled labor is in short supply.  Arab (mainly Syrian, Egyptian, and Palestinian), Asian, and African laborers are hired to work in construction, agriculture, industry, and households.

The law provides for the right of private sector workers to form and join trade unions, strike, and bargain collectively, although the law places a number of restrictions on these rights.  It provides protection against anti-union discrimination but enforcement is weak and anecdotal evidence suggests anti-union discrimination was widespread.  Lebanon has a government-recognized General Labor Confederation (CGTL), whose membership is limited exclusively to Lebanese workers.  The CGTL's activities are mainly limited to demanding cost-of-living increases and other social benefits for workers.  The general labor-management relationship remains difficult and the Labor Law is not always properly enforced.  Strikes and demonstrations are not uncommon, and are usually aimed at pressuring the government for better employment conditions.  The law requires businesses to adhere to safety standards, but enforcement is weak.

Lebanon's labor force (defined locally as aged 15 and above) totals 2.4 million in 2019, including foreign residents but excluding the seasonal work force, according to the World Bank. The World Bank estimated Lebanon's total population, including refugees, at 6.8 million as of 2018.  There are no official statistics on unemployment.  The Lebanese Finance Minister estimated the unemployment rate above 35 recently, and the World Bank estimated unemployment at 35 percent for youth under 35 years of age in 2019.  The last study on unemployment in Lebanon, conducted by Lebanon's Central Administration of Statistics (CAS) in partnership with the International Labor Organization in 2018, revealed a general unemployment rate of 11.4 percent and 23.3 percent among younger workers before the economic crisis.  The Minister of Economy and Trade publicly noted that there was competition between Lebanese and Syrian labor for low-to high-skilled jobs and also at the level of micro to small enterprises.  There were widespread anecdotal reports of arbitrary dismissals of Lebanese who were then replaced by non-Lebanese, particularly Syrians, in various economic and productive sectors.  However, there were no official statistics to confirm or quantify the scale of such dismissals.

## 12. U.S. International Development Finance Corporation (DFC) and Other Investment Insurance Programs

In 1981, Lebanon and the United States signed an Overseas Private Investment Corporation (OPIC) agreement, which become operational in 1996.  OPIC is currently active in Lebanon in insurance, financing, and investment.  To date, OPIC has provided more than USD 300 million in credit line guarantees for transactions in Lebanon.

The Lebanese government's National Investments Guarantee Corporation (NIGC) continue insure new investments against political risks, riots, losses due to non-convertibility of currencies,

and transfer of profits.  Lebanon has been a member of the Multilateral Investment Guarantee Agency (MIGA), part of the World Bank, since 1994.

# 13. Foreign Direct Investment and Foreign Portfolio Investment Statistics

**Table 2: Key Macroeconomic Data, U.S. FDI in Host Country/Economy**

| Economic Data | Host Country Statistical source* | | USG or international statistical source | | USG or International Source of Data: BEA; IMF; Eurostat; UNCTAD, Other |
|---|---|---|---|---|---|
| | Year | Amount | Year | Amount | |
| Host Country Gross Domestic Product (GDP) ($M USD) | 2018 | $54,961 | 2019 | $53,367 | https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?locations=LB |
| **Foreign Direct Investment** | **Host Country Statistical source*** | | **USG or international statistical source** | | **USG or international Source of data: BEA; IMF; Eurostat; UNCTAD, Other** |
| U.S. FDI in partner country ($M USD, stock positions) | 2018 | $26.3 | 2019 | $407 | BEA data available at https://www.bea.gov/international/direct-investment-and-multinational-enterprises-comprehensive-data |
| Host country's FDI in the United States ($M USD, stock positions) | 2018 | $0 | 2019 | $16 | BEA data available at https://www.bea.gov/international/direct-investment-and-multinational-enterprises-comprehensive-data |
| Total inbound stock of FDI as % host GDP | N/A | N/A | 201 | 129.1% | UNCTAD data available at https://unctad.org/en/Pages/DIAE/World%20Investment%20Report/Country-Fact-Sheets.aspx |

* Source for Host Country Data: The Lebanese Central Administration of Statistics (CAS).  The BDL is compiling FDI statistics without geographical breakdown. Accordingly, the inward/outward FDI positions from/to US are considered as partial figures and resulting from the Coordinated Direct Investment Survey (CDIS) addressed to banking, financial, and insurance sectors.  CDIS data of 2019 is not yet available

## Table 3: Sources and Destination of FDI

**Direct Investment from/in Counterpart Economy Data**

**From Top Five Sources/To Top Five Destinations** *(US Dollars, Millions)*

| Inward Direct Investment | | | Outward Direct Investment | | |
|---|---|---|---|---|---|
| Total Inward | $2,168 | 100% | Total Outward | $3,923 | 100% |
| Luxembourg | $804 | 37.1% | France | $847 | 21.6% |
| France | $301 | 13.9% | Egypt | $510 | 13.0% |
| Libya | $198 | 9.1%% | Turkey | $478 | 12.2% |
| United Arab Emirates | $165 | 7.6% | Jordan | $278 | 7.1% |
| Egypt | $147 | 6.8% | Luxembourg | $214 | 5.5% |

"0" reflects amounts rounded to +/- USD 500,000.

Source: BdL; IMF Coordinated Direct Investment Survey-CDIS, June 2019

N.B. BdL statistical data sources include International Transactions Reporting System (public and private sectors), Ministry of Finance Land Registry Directorate and CDIS.

CDIS data of 2019 is not yet available.

## Table 4: Sources of Portfolio Investment

**Portfolio Investment Assets**

**Top Five Partners (Millions, current US Dollars)**

| Total | | | Equity Securities | | | Total Debt Securities | | |
|---|---|---|---|---|---|---|---|---|
| All Countries | $3,079 | 100% | All Countries | $1,580 | 100% | All Countries | $1,499 | 100% |
| United States | $1,086 | 39.1% | United States | $549 | 34.7% | United States | $537 | 35.8.% |
| France | $318 | 9.1% | Luxembourg | $164 | 10.4% | United Kingdom | $234 | 15.6 |
| United Kingdom | $299 | 6.9% | France | $148 | 9.4% | France | $170 | 11.3% |
| Luxembourg | $178 | 4.3% | Jordan | $102 | 6.5% | United Arab Emirates | $54 | 3.6% |
| Switzerland | $137 | 4.13% | Bahrain | $99 | 6.3% | Switzerland | $40 | 2.7% |

Source: BdL; IMF Coordinated Portfolio Investment Survey-CPIS, June 2019.

N.B. CPIS data of Dec-2019 is not yet available.

# 14. Contact for More Information

Neil Gundavda

Economic and Commercial Officer

U.S. Embassy Beirut

GundavdaN@state.gov

**TAGS**

Bureau of Economic and Business Affairs    Bureau of Near Eastern Affairs    Lebanon

★ ★ ★

# Related Articles



NOVEMBER 27, 2020

New Sanctions Under the Iran, North Korea, and Syria Nonproliferation Act (INKSNA)

STATEMENT BY SECRETARY OF STATE
MICHAEL R. POMPEO

NOVEMBER 27, 20

The United States Sanctions Libyan Individual and Militia Commander over Serious Human Rights Abuse in Libya

STATEMENT BY SECRETARY OF STATE
MICHAEL R. POMPEO



---

——— NOVEMBER 21, 2020

## This Week in Iran Policy

**READ MORE**

---



White House

USA.gov

Office of the Inspector General

Archives

Contact Us

---

f    𝕏    ⬭    ▶    ⬩

---

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act