UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH A. DAOU and KAREN M. DAOU,<br><br>            Plaintiffs,<br><br>  -against-<br><br>BLC BANK, S.A.L.; CREDIT LIBANAIS, S.A.L.; AL-MAWARID BANK, S.A.L.; and BANQUE DU LIBAN,<br>            Defendants. | Case No. 1:20-cv-04438 (DLC) |

## DECLARATION OF WADDAH H. EL CHAER

I, WADDAH H. EL CHAER, hereby declare the following pursuant to 28 U.S. Code § 1746:

1. I am an attorney and member of the Beirut Bar Association. I have been licensed to practice law in Lebanon since 1994. I founded El Chaer Law Firm, a Lebanese law firm based in Beirut, in 1996 and I advise and represent numerous Lebanese banks and financial institutions.

2. I have been retained by the law firm of Squire Patton Boggs (US) LLP, on behalf of its client AM Bank S.A.L. ("AM Bank"), to submit this declaration in the above-captioned lawsuit (the "Lawsuit").

3. I have reviewed documents in connection with the Lawsuit, including the Customer-Bank Relationship Contracts (the "General Agreements"), the Memorandum of Law in Support of Motion to Dismiss of AM Bank S.A.L., the First Amended Complaint, and the declarations of Mr. Youssef Hanna El Khoury, Dr. Karim Henri Torbey, Ms. Aline El Khoury, Mr. Joseph A. Daou, Mr. Malek Arslan, and Mr. Christopher J. Major. I respectfully submit my legal opinion in connection with the Lawsuit on the jurisdiction of

1

Lebanese courts over the claims made by the Plaintiffs, the applicable law, and AM Bank's legal obligations, and to reply to the declarations of Dr. Karim Henri Torbey and Ms. Aline El Khoury.

4. Article 100 of the Lebanese Code of Civil Procedure provides that, in lawsuits related to civil or commercial contracts, jurisdiction will lie in the court (1) where the defendant resides; (2) where the contract was signed, on condition that one of the main obligations of the contract will be performed there; and (3) where the whole contract will be performed. Pursuant to article 100, the courts that have jurisdiction to hear the Lawsuit are all in Lebanon. Specifically, AM Bank's headquarters is located in Beirut; the accounts were opened in Lebanon; the deposit was made in Lebanon; and AM Bank provided the Plaintiffs' representative with a check for their funds in Lebanon, payable in Lebanon and to be cleared in Lebanon, which means that the obligations of the contract will be performed in Lebanon. Accordingly, Lebanese courts would find that Lebanon is the proper forum for this dispute.

5. Please note that parties to a contract may agree to pick one of the three competent courts identified in article 100 of the Lebanese Code of Civil Procedure and assign exclusive jurisdiction to that court. Specifically, Article 166 of the Code of Obligations and Contracts provides that parties to a contract are free to agree on the terms and conditions of their transactions as long as they are not contradictory to public order or Lebanese law. Here, the parties chose the courts of Beirut, which plainly have jurisdiction, as the forum to resolve their disputes.

6. The parties did so through article 68 of the General Agreements, which states that "the Beirut courts shall have the exclusive jurisdiction to hear any case or dispute brought up by the Second Party against the Bank. However, the Bank may choose to prosecute the Second Party and/or its guarantors either in the Beirut courts and its enforcement departments and/or the courts of the Second Party's residence and/or its sponsors and/or the location of the real estate or the commercial establishment that is the subject of the execution, and the Second Party refrains from raising any plea related to the invalidity, indicating that its place of resident or residence differs from its elected domicile."

7. Pursuant to article 68 of the General Agreements, the parties have agreed that Beirut courts shall have exclusive jurisdiction to hear any case or dispute brought by the Second Party (the Plaintiffs) against the Bank. Article 68 of the General Agreements is enforceable because, as noted above, article 100 of the Code of Civil Procedure gives the parties the option to choose one of the three above-mentioned courts to hear disputes arising from the contract.

8. Pursuant to article 172 of the Lebanese Code of Obligation and Contracts, contracts of adhesion are generally recognized as valid and enforceable under Lebanese law. Specifically, article 172 provides that when one of the parties accepts a standard draft contract submitted to him, the content of which he is not authorized to negotiate, whether as a matter of law or fact, the contract is said to be formed by adhesion. Article 172 provides railway transportation contracts and insurance contracts as examples of contracts of adhesion. Pursuant to article 172, Lebanese courts will enforce an adhesion contract unless it is considered to be fundamentally flawed as described in article 177 of the Code of Obligations and Contracts.

9. To invalidate a clause within an adhesion contract, there must be evidence that the clause is contrary to public order or the law, or that it randomly restricts or prohibits basic human rights such as the right to vote or the right of marriage, or that has its enforcement dependent on one party's will pursuant to articles 82, 83, and 84 of the Code of Obligations and Contracts.

10. Lebanese courts determine that a contract is an adhesion contract when the bargaining power of the parties is extremely unequal in a manner that exploits the signer of the contract and is inconsistent with the signing party's reasonable expectations of their economic power stipulated in the contract's provisions. It is my understanding that these circumstances do not exist in this case.

11. The personal opinion or preference of the Plaintiffs, after they have both read, understood, accepted, and signed the General Agreements, that it is unfair to require them to litigate

their claims in Lebanon due to the crisis would, in my opinion, be considered irrelevant to a Lebanese court's determination of the jurisdiction of the Beirut courts. This is particularly true because the Plaintiffs' accounts were opened in December 2019, in the midst of the economic and banking crisis in Lebanon, and therefore the Plaintiffs cannot plausibly claim any material change in circumstances since then, at least in terms of litigating their disputes in the courts of Lebanon.

12. Article 378 of the Code of Civil Procedure provides that parties must be represented by counsel in lawsuits involving claims exceeding 1 million Lebanese pounds or for which the amount of the claim is not determined, as well as certain other cases in which the law requires representation by counsel. It is my understanding that the Plaintiffs are seeking damages from AM Bank in USD, in an amount equivalent to more than 1 million Lebanese pounds. Therefore, in the event that the Plaintiffs filed a lawsuit in Lebanon against AM Bank, they would be required to be represented by counsel in that lawsuit, and they would not be required to physically appear in Lebanon. They would instead hire a lawyer who is licensed to practice in Lebanon, sign a power of attorney, and have the Lebanese lawyer appear and litigate the case on their behalf. There would be no need for the Plaintiffs to travel to Lebanon to litigate the case.

13. For all the reasons set forth above, it is my opinion that Lebanese courts would find that the courts of Lebanon, particularly the courts in Beirut, have exclusive jurisdiction over the claims made by the Plaintiffs in this case pursuant to article 100 of the Code of Civil Procedure and would enforce the exclusive jurisdiction provision of article 68 of the General Agreements. Moreover, even in the unlikely event that a Lebanese court chose not to enforce article 68 of the General Agreements, it would still find that Lebanon is the proper forum for this dispute under article 100 of the Code of Civil Procedure and for the reasons set forth above.

14. It is also my opinion that Lebanese courts will apply Lebanese law to the Plaintiffs' claims and to article 68 of the General Agreements since the General Agreements are between a Lebanese bank and Lebanese citizens, the accounts were opened in Lebanon, the deposit

was made in Lebanon, the main obligations of the General Agreements are to be performed in Lebanon, and the General Agreements continuously reference Lebanese laws. In addition, article 1 of the General Agreements states that "[a]ll funds deposited in the accounts which the Bank agrees to open for the Second Party and the transactions that the 'Bank' agrees to conduct for the benefit of the Second Party … are subject to (a) any policies or directives currently implemented or will be implemented in the future at the 'Bank,' (b) any governmental laws or regulations, whether applicable currently or in the future, especially Lebanese laws and regulations, and (c) the terms and conditions of this agreement." Thus, it is my opinion that the courts will find that the governing law in a dispute arising from the enforcement of the General Agreements is Lebanese law, and courts will apply the Lebanese Code of Money and Credit, basic and intermediate Banque du Liban ("BdL") circulars, and any other related Lebanese laws or regulations.

15. Article 307 of the Lebanese Commercial Code states that a bank that receives a sum of money as a deposit must return the money to the depositor upon request in one payment or several installments, pursuant to the contractual relationship between them. In this regard, pursuant to Article 307, and as discussed in the explanatory notes thereto by Charles Fabia and Pierre Safa (Précis de droit commercial libanais: Code de commerce annoté, article 307), the method of returning the funds to the depositor may be similar to the method in which the funds were deposited.

16. It is my understanding that the Plaintiffs deposited their funds with AM Bank using a check drawn on BdL and to be cleared in Lebanon. Thus, AM Bank is within its rights to return the funds using a check drawn on BdL and to be payable in Beirut or cleared in Lebanon.

17. In the introductory paragraph of the General Agreements, AM Bank and the Plaintiffs agreed that "Whereas the Second Party declares that … it realizes that its mere signing of [the contract] does not entitle it to the right of benefiting from the services or facilities that the 'Bank' provides, but rather it governs the relation that might form between it and the 'Bank' in case the latter approves any written or verbal request from the Second Party that aims to benefit from its services. Whereas the 'Bank's' approval of any request from the Second Party that aims to benefit from a specific service that the 'Bank' provides must be

issued by those with authority thereof at the 'Bank,' especially in relation to credits, facilities and guarantees, where such approval may include, when necessary, special additional conditions that the 'Bank' may deem to make its obligation contingent upon their occurrence, and which the 'Bank' may modify later in order to accept the continuation of its obligation thereto."

18. One of the services that AM Bank offers is international wire transfers. However, the Bank did not agree to provide that service to Plaintiffs when it signed the General Agreements. Instead, the Bank kept the means of the repayment of Plaintiffs' funds within its discretion. Hence, as explained below, the Bank is not obligated to provide Plaintiffs with international transfers of their funds, since it did not agree to provide that service when the General Agreement was signed.

19. Checks are a valid means of payment under the Lebanese Commercial Code and offer a secure and reliable method of payment. The Code of Money and Credit does not list wiring money internationally as one of the banking obligations of a Lebanese bank, and based on the preamble of the General Agreements, AM Bank is not contractually bound to transfer the Plaintiffs' money internationally. Accordingly, the Bank has the right to decline the Plaintiffs' request for an international wire transfer of their funds into the U.S. AM Bank is only required to provide Plaintiffs with their funds upon request, which it may do in the form of a check payable in Lebanon.

20. It is my understanding that AM Bank has offered to, and did, attempt to return the Plaintiffs' funds by check drawn on the BdL. Thus, AM Bank is not under any legal or contractual obligation to return Plaintiffs' funds by means of an international wire transfer into the U.S.

21. Article 254 of the Code of Civil Procedure states that contradicting a written proof may be performed only by providing evidence of another writing. Thus, Plaintiffs' attempt to contradict the terms of the General Agreements, which specify the terms of the agreement between the parties, by claiming that AM Bank gave Mr. Joseph Daou oral assurances that

the Bank would process transfers of his funds to the U.S. in January 2020 would be prohibited under Lebanese law.

22. In this regard, article 307 of the Lebanese Commercial Code states that all evidence of banking operations in connection with deposits and refunds of the deposited funds must be stated in writing. Accordingly, it is my opinion that a Lebanese court would not accept Mr. Joseph Daou's claim that the Bank gave him oral assurances that it would wire the Plaintiffs their funds in the U.S. as evidence against the General Agreements, as there is no written evidence of such assurances.

23. It is important to note that Lebanese courts are handling cases brought by depositors against Lebanese banks seeking to get their money out of the banks in connection with the ongoing crisis in Lebanon. The courts are treating these cases objectively and fairly, and have issued rulings against banks, including requiring banks to pay depositors their money in U.S. dollars; imposing travel restrictions on members of the board of directors of Lebanese banks who are under investigation; and freezing and attaching assets of the governor of Lebanon's central bank, BdL, and members of the other banks' boards of directors. These rulings include:
    - The Court of First Instance in Beirut ordered a Lebanese bank to accept early payment of a loan denominated in US dollars in Lebanese pounds (Decision no. 289/2020 on 1/12/2020).
    - The Judge of Urgent Matters in Beirut ordered a Lebanese bank to pay a depositor his money in US dollars based on the depositor's request to withdraw his money (Decision of 18/11/2020).
    - The Judge of Urgent Matters in Beirut also ordered a Lebanese bank to wire money internationally (Decision of 3/1/2020).
    - The Judge of Urgent Matters in Nabatiyeh ordered a Lebanese bank to wire a depositor's money internationally (Decision no. 4/2020 on 7/1/2020, Decision of 25/11/2019 and Decision of 15/12/2020).

- The Judge of Urgent Matters in Sour ordered a Lebanese bank to pay a depositor an amount of money in US dollars based on the depositor's request to withdraw his money (Decision no. 42/2020 on 8/4/2020).
- The Judge of Urgent Matters in Sour also ordered travel restrictions on the general manager and board of directors of a Lebanese bank (Decision no. 26/2020 on 5/5/2020).
- The Enforcement Division in Beirut ordered the attachment of assets of the BdL's governor, assets of twenty Lebanese banks and assets of their general managers (Attachment no. 501/2020 in the case of the Legal Division of "Al Shaeb Youreed Islah Al Neezam" v. Mr. Riad Salameh and Attachment of 5/3/2020).

24. In my opinion, and based on the cases discussed above, the claim that Lebanese courts handling cases brought by depositors against Lebanese banks seeking to get their money out of the banks are unfairly favoring banks over depositors is false.

25. In conclusion, pursuant to the Code of Obligations and Contracts, Code of Civil Procedure, Code of Money and Credit, and the General Agreements:

    a. Lebanese courts have and would enforce exclusive jurisdiction over the claims of the Plaintiffs pursuant to article 100 of the Code of Civil Procedure and article 68 of the General Agreements.
    b. Lebanese courts would apply Lebanese law to this dispute, and courts will enforce article 68 of the General Agreements.
    c. Lebanese law does not require banks to return funds to depositors by means of international wire transfer, especially after the depositors agree to accept as payment a check drawn on the BdL and stamped as payable in Beirut, or to be cleared in Lebanon. Further, pursuant to the General Agreements, AM Bank has the discretion to accept, deny, or place additional conditions on any customer request.
    d. Pursuant to article 254 of the Code of Civil Procedure and article 307 of the Lebanese Commercial Code, Lebanese civil courts will not accept into evidence claims about oral assurances which contradict the parties' written contract.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Beirut, Lebanon on the 7th day of January, 2021.

_____
Waddah H. El Chaer