# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH A. DAOU and KAREN M. DAOU,

        Plaintiffs,

v.

BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., AL-MAWARID BANK, S.A.L., and BANQUE DU LIBAN,

        Defendants.

Case No. 1:20-cv-4438

**SECOND DECLARATION OF PATRICK SOUMRANI, Esq.**

I, Patrick Soumrani, declare pursuant to 28 U.S.C. § 1746:

1. I have submitted a first declaration dated 7 October 2020 (the "First Declaration") in support of Credit Libanais S.A.L.'s (the "Bank" or "CL Bank") motion to dismiss plaintiffs Joseph and Karen Daou's (the "Plaintiffs") complaint (the "Complaint") and their Motion to Attach (the "Motion").

2. I am a native Arabic and French speaker and fluent in English, and for ease of the parties and the Court, I prepared this declaration in English.

3. CL Bank has requested that I provide my legal opinion on (i) the declaration of Dr. Karim Torbey dated 17 December 2020, (ii) the Declaration of Ms. Aline El Khoury dated 18 December 2020, and (iii) certain of the Plaintiffs' allegations based thereon, to the extent that such declarations and allegations contradict the First Declaration.

4. I am submitting this declaration (the "Second Declaration"), in which capitalized words and expressions, unless otherwise defined herein, have the same meanings as the ones ascribed to them in the First Declaration.

5. For the purpose of this Second Declaration, I have reviewed scanned copies of the following documents:
   a. The declaration of Dr. Karim Torbey, Lebanese legal expert, dated 17 December 2020 (the "Torbey Declaration") and submitted in support of the Plaintiffs' opposition to the Bank's motion to dismiss in this case;
   b. The declaration of Ms. Aline El Khoury, Lebanese legal expert, dated 18 December 2020 (the "Khoury Declaration") and submitted in support of the Plaintiffs' opposition to the Bank's motion to dismiss in this case;
   c. The declaration of Mr. Naaman Naddour, Executive Director at Banque du Liban (the "Central Bank" or the "CBL"), dated 30 November 2020 (the "Naddour Declaration") and submitted in support of the Central Bank's motion to dismiss in this case; and
   d. The declaration of Mr. Fadi Moghaizel, Lebanese legal expert, dated 1 December 2020 (the "Moghaizel Declaration"), and submitted in support of the Central Bank's motion to dismiss in this case.

### A. Governing Law

6. Ms. El Khoury wrongly states in paragraph 22 of the Khoury Declaration that the Agreement entered into between CL Bank and the Plaintiffs *"does not include a clause specifying the governing law, although it refers to Lebanese laws in one of the clauses"*.

7. I do not agree with this statement. I pointed out in the First Declaration that clause 11 of the section titled "General Conditions Governing the Opening and Operation of a Savings Account" designates the Lebanese laws as the laws governing the Plaintiffs' Account, and states that the *"account is subject (...) to the Laws stipulated in the [Lebanese] Code of Money and Credit, the [Lebanese] Code of Obligations and Contracts, and the [Lebanese] Law governing the Joint Account, dated 19 December 1961."*

2

8. In my opinion, the above clause 11 clearly designates the Lebanese law as the governing law of the Account, and thus of the Agreement to which the said Account relates.

9. This being said, Ms. El Khoury's statement in paragraph 21 of the Khoury Declaration that "*provisions in agreements to select governing law are not considered binding upon the parties before their signature by all parties (...), but when the signature is affixed by the parties at different places and time, then the agreement shall be considered as final at the place and time of signature of the last party*" becomes irrelevant. Indeed, since (i) the Agreement has been signed by all parties thereto, i.e., CL Bank and the Plaintiffs, and (ii) such Agreement designates the Lebanese law as the governing law, the matters of the time and place of the last party's signature are moot issues.

10. Even if I were to consider, for the sole purpose of discussion, that the Agreement does not designate the Lebanese law as governing law, I do not agree with Ms. El Khoury's conclusions in paragraphs 25 and 26 of the Khoury Declaration that the U.S. law should govern the Agreement.

11. This is because in the absence of a contractual designation, the governing law of an agreement is the law that has the closest points of contacts with such agreement[1]. In our case, it is obviously the Lebanese law, since:

    (i)    the Agreement is signed by CL Bank and the Plaintiff Joseph Daou in Lebanon,

    (ii)    the Agreement refers to several Lebanese statutes such as the Code of Obligations and Contracts, the Code of Money and Credit, the banking secrecy law of 1956 and the joint account law of 1961,

    (iii)    CL Bank is a bank incorporated and having its principal operations in Lebanon, and is subject to the Lebanese law and to the Central Bank of Lebanon,

    (iv)    the Account and the funds subject matter thereof are located in Lebanon,

---

[1] See in this respect: S. Mansour, Private International Law, Dar Al Aloum Al Arabiyah, pages 525-526, paragraph 335; Court of Cassation, decision n. 16 dated 22 February 2011, Cassandre electronic reference "*The applicable law to international contracts can be chosen by the parties. When the parties fail to do so, the Court should determine the applicable law based on elements of the case*" (free translation).

3

(v) the principal rights and obligations of CL Bank and the Plaintiffs under the Agreement (maintaining the Account, paying interest thereon, offsetting with other accounts with CL Bank, etc.) are to be performed in Lebanon,

(vi) the Plaintiffs have elected domicile on the first page of the Agreement at a Lebanese address for the purpose of the Agreement (Dekwaneh – Mar Roukoz – Cap Sur Ville – Lebanon), and all statements and documents relating to the Account are to be provided at such address[2], thus clearly anchoring their relationship with CL Bank in Lebanon.

12. Furthermore, no argument can be drawn, like Ms. El Khoury suggests in paragraph 25 of the Khoury Declaration, from the fact that the Plaintiffs are U.S. nationals, because both of them are also Lebanese nationals and have disclosed both nationalities to CL Bank. In the same vein, no argument can be drawn from the fact that the Agreement refers to FATCA U.S. statute, as all bank agreements throughout the world now include the reference to such statute to avoid being in breach with the U.S. laws.

13. As to tort claims, Lebanese law also governs because it is the law of the place where the alleged tort was committed (see paragraph 9 of the First Declaration) and here, the entirety of the dispute and alleged tort arises out of Lebanon, from account opening to the alleged refusal to make a wire transfer and the issuance of the disputed Checks.

14. Despite the clear and numerous points of contact described in paragraph 11 of this Second Declaration, Ms. El Khoury ignores each of the above points, making her analysis critically flawed. In reality, not one aspect of the relationship or the dispute here arising connected to the U.S. for the purposes of determining the applicable law. At best, the US is incidental and the Lebanese law governs.

---

[2] See clause 1 of section 6 "General Provisions Governing All Accounts" of the Agreement.

B. <u>Jurisdiction</u>

15. Ms. El Khoury conducted a reasoning on *"elective"* jurisdiction under paragraphs 14 and 15 of the Khoury Declaration to conclude in paragraphs 20(a) and 20(b) that this case can be submitted to other jurisdictions than the Lebanese jurisdiction because:
   a. With respect to the contractual jurisdiction rule, one of the two conditions (i.e., the signing of the Agreement in Lebanon by Karen Daou) is not fulfilled.
   b. With respect to the tort jurisdiction rule, damages are caused in the US *"where the plaintiffs had to honor their obligations in the US territory"*.

16. I do not agree with Ms. El Khoury's reasoning and have described in paragraphs 10, 13 and 14 of the First Declaration why Lebanese courts have jurisdiction over this dispute.

17. Even if I were to assume for the mere sake of the discussion that the statements under (a) and (b) of paragraph 15 above are correct, the jurisdiction of the Lebanese courts would still be retained on the following alternative grounds, all of which are expressly provided for in articles 97, 100 and 102 of the Lebanese Code of Civil Proceedings ("CCP") and constitute independent grounds of jurisdiction:
   (i) all the Defendants have elected domicile under the Agreement in Lebanon (articles 97, 100 and 102 of the CCP),
   (ii) the obligations provided for in the Agreement are to be performed in Lebanon, where the Account is opened and maintained (article 100 of the CCP), and
   (iii) the alleged tortious acts have occurred in Lebanon (article 102 of the CCP).

18. Furthermore, and as I stated in paragraph 14 of the First Declaration, it is my opinion that the Lebanese courts are the most appropriate to interpret and apply the Lebanese law when the claim implicates the operation of the Lebanese financial system during the current acute financial crisis in Lebanon, which has created entirely new legal issues and entailed the passing of new laws and regulations imposed by the unprecedented and continuing sequence of events that took place since October 2019.

5

19. My opinion is confirmed by the contradictory positions adopted by the Judges of Urgent Matters and the Courts of Appeal, as shown in the description of the cases made by Dr. Torbey in the Torbey Declaration. These positions further demonstrate the difficulties that the judges are facing when dealing with the unforeseen circumstances.

20. Consequently, the answers to the legal issues that the crisis generated can best be tailored by the Lebanese courts, not just because of their mastery and deep knowledge of Lebanese laws, but also because of their concrete feeling and understanding of the situation on the ground, and of its implications on each particular case and on the Lebanese economy and the financial system as a whole.

C. **Lebanese Law Relating To International Transfers**

21. I have stated in the First Declaration that (i) the Lebanese statutes and decrees in force do not impose on banks the providing of international transfer of funds services to their clients; and (ii) in the particular case of CL Bank, nothing in the Agreement imposes an obligation on CL Bank to provide such transfers to the Plaintiffs, or even mentions the said transfers.

22. In the absence of such a legal or contractual obligation, CL Bank may elect not to make an international transfer requested by the Plaintiffs and the latter cannot force it to do so. This is confirmed by Lebanese scholars who consider that the banks' clients do not have a vested right to international transfer services[3].

23. Although Ms. El Khoury has confirmed in paragraph 27 of the Khoury Declaration that *"there are no specific laws in Lebanon regulating wire transfers"*, she has erroneously

---

[3] F. Nammour, Droit bancaire, Beirut, 2nd Edition, 2012, n.666 – in French language. According to Mr. Nammour, the client does not have a "right to the transfer" (droit au virement). Such transfer is legally a mandate given by the client to its bank to debit an amount from the client's account and credit it to another bank account. As for any mandate, which is a contract by nature, the author concluded that the bank's consent is required. See also in this respect in French law: F. Grua, Les contrats de base de la pratique bancaire, Ed. Litec, 2000, n. 66 in which the author clearly mentions that the bank retains the right to determine which services it offers to its clients.

6

concluded in paragraph 38 of the Khoury Declaration that it is *"illegal to refuse the execution of the required wire transfer"*. In the absence of such a statute and of a contractual obligation on CL Bank in this respect, I disagree with Ms. El Khoury's conclusion.

24. Furthermore, the statement by Ms. El Khoury in paragraph 31 of the Khoury Declaration, citing a decision of the Court of Appeal in Beirut[4], that the wire transfer is *"simply considered as a payment similar to the payment in cash or by check"* actually proves against her point, as it means that CL Bank can rightfully discharge its obligation by substituting the payment by bankers check to the payment by wire transfer.

25. Dr. Torbey has also indirectly recognized in paragraph 25 of the Torbey Declaration that there are no statutes in Lebanon imposing international bank transfers, when he said that such transfers only constitute a *"well established practice"*. Dr. Torbey tried however to give the practice of such transfers the binding force of a law, by considering them a usage falling under article 4 of the Lebanese Code of Commerce ("CC").

26. I do not concur with this analysis for the following reasons:

a. The usage having force of law that is alleged by Dr. Torbey has not been recognized by Lebanese trial courts (*tribunaux du fond*) and scholars, especially in the current circumstances. On the contrary, and as stated under paragraph 22 above, scholars in Lebanon have denied the right for clients to compel a bank to perform a transfer[5]. As to the decisions taken by the Judges of Urgent Matters mentioned in the Torbey Declaration, they do not in my opinion constitute a solid counter-argument, because they are grounded on article 579 of the CCP that limits the said Courts' competence to the taking of urgent measures and the stopping of blatant infringement to rights on the mere basis of appearances, without addressing the merits of the case. Consequently, decisions taken by the Judges of

---

[4] Court of Appeal of Beirut, Decision n. 11 dated 6 March 1986, cited in paragraph 31 of the Khoury Declaration.
[5] See for exemple: F. Nammour, Droit bancaire, Beirut, 2nd Edition, 2012, n.666 – in French language.

Urgent Matters are not sufficient to elevate the past practice of bank transfers to a usage having force of law.

b. Furthermore, assuming for the sake of discussion that such a usage did exist, it has been progressively amended since October 2019 as a result of the financial crisis, and this amendment has been materialized in a recommendation of the Lebanese Banks Association ("ABL") issued on 17 November 2019 after consulting with the CBL in order to address the consequences of the crisis in Lebanon and mitigate the systemic risks that such crisis entails on the financial sector[6]. It is a well-known principle of interpretation of law that the usage is amended to adapt to new circumstances[7].

c. The restrictions on international transfers adopted by the banks resulting in the change in past practice and in the so-called usage have even been endorsed and expressly recognized by the Lebanese parliament in the explanatory statements of the law n. 193 enacted on 16 October 2020, aiming to compel Lebanese banks to transfer limited amounts to Lebanese students abroad. The need for such a law, coupled with the express recognition of the international transfers restrictions, clearly demonstrate, *first* the absence of a so-called usage having the force of law, and *second* the legitimacy of the restrictive measures implemented by the Lebanese banks in the wake of the crisis.

27. All Lebanese banks, including CL Bank, abided by the ABL recommendation, which aimed in fact at safeguarding the banking sector, and as a result the depositors, given the prevailing circumstances in Lebanon since October 2019.

---

[6] The ABL recommendation stated:
*"The ABL Board of Directors held a general assembly for its members in order to prepare a list of temporary banking directives that banks could implement to facilitate, standardize and regulate the daily work of employees in light of the country's present exceptional circumstances; given that the content of this list does not impose restrictions on the movement of money and is prepared with great care to safeguard the clients' and public interests, in order to overcome the existing circumstances. As for the general temporary directives agreed on in consultation with Banque Du Liban (the Central Bank of Lebanon), they are as follows:*
   *1-No restrictions on new funds transferred from abroad.*
   *2-Overseas transfers are only made to cover urgent personal expenses (...)".*
(https://www.abl.org.lb/english/abl-and-banking-sector-news/abl-news/press-release-17-11-2019).
[7] See: B. Starck, Droit civil, Introduction, Ed. Litec 1972, n. 117 – in French language: *"The usage amends itself, imperceptibly, to adapt to new circumstances (...)"* (free translation).

28. Consequently, and even if I were to assume for the sake of the discussion that there was a usage resulting from the previous providing by banks of international transfer services to their clients, such usage has been discontinued by the whole banking sector for valid reasons, e.g., preserving the banking sector from collapsing and maintaining the economic stability, and the Lebanese legislator has recognized such discontinuance, albeit providing for a limited exception in relation to international transfers to Lebanese students abroad.

29. It also bears noting that the Central Bank imposed a number of restrictions on international transfers as part of its regulatory role and in an attempt to stabilize the country due to the financial situation in Lebanon. The Executive Director of the Central Bank, Mr. Naddour, explained to this Court in his declaration that the Central Bank is a key regulator that was required to "*deploy[] multiple measures*" to stabilize the country's economy, to protect account-holders in Lebanon, and to maintain the country's foreign currency resources (see paragraphs 13 and 16 of the Naddour Declaration). These measures, including circulars, imposed restrictions on wire transfers that, if ignored, would potentially subject the Bank to severe consequences, including investigation and sanction. I refer this Court as well to the declaration of Mr. Moghaizel on this point of the Central Bank's regulations and the consequences for the Bank if it were to violate those regulations (see paragraphs 29 and 32 of the Moghaizel Declaration).

30. In light of the above, it is my opinion that CL Bank is not obliged to abide by the Plaintiffs' request to transfer abroad funds from the Account.

D. <u>Lebanese Law Relating To Checks</u>

31. I have stated in paragraphs 20-23 of the First Declaration that payments by checks, such as the Checks, are recognized under the Lebanese law as a valid payment method usable in Lebanon, as provided for in articles 409 and subs. of the CC.

32. Ms. El Khoury has confirmed this statement in paragraph 31 of the Khoury Declaration. Consequently, the remittance by CL Bank of the Checks to the Plaintiffs and their acceptance thereof constitute a valid payment by CL Bank.

33. Ms. El Khoury is however wrong regarding the meaning of the statement on the Checks that they are "*payable in Beirut*" (see paragraphs 45 to 47 of the El Khoury Declaration). Under Article 409 of the CC, this designation means the payment must be made in Lebanon. The Central Bank has reiterated in its declaration to this Court that this designation means these "*checks drawn on the Central Bank by a bank operating in Lebanon may be negotiated or deposited only in Lebanon.*" (see paragraph 11 of the Naddour Declaration).

34. In fact, even if, as Ms. El Khoury indicates, the Checks are deposited for collection in a bank abroad, such bank not having an account with the CBL in Lebanon, will have no means to collect such Checks other than sending them for clearing to a correspondent bank in Lebanon that maintains such an account with the CBL, since the place of payment specified on the Checks is Beirut.

35. Furthermore, the Checks being crossed[8] bankers' checks drawn on the CBL they (i) must be cleared through a Lebanese bank that maintains an account with the CBL (as confirmed by Ms. El Khoury in paragraph 47 of the Khoury Declaration[9]); and (ii) cannot by law be paid in cash[10], but only by crediting their amount to a bank account.

36. As a result, the Plaintiffs' acceptance of the Checks drawn on the CBL inevitably entails their acceptance of the Check's clearing in an account in a bank in Lebanon. Thus, by delivering the Checks to the Plaintiffs', CL Bank would have discharged its obligations towards

---

[8] Crossed checks are provided for in articles 433 and subs. of the CC. It is common practice in the banking industry in Lebanon to issue "crossed" checks, which are similar to the "banker" checks, in order to secure proper payment in favor of the payee. They constitute valid means of payment.
[9] Ms. Khoury states in this respect: "*(...) while the bank check issued by the bank on BDL and deposited abroad should be compensated through its standard way of compensation used by BDL*".
[10] See in this respect article 434 of the CC; F. Nammour, Droit bancaire, Beirut, 2nd Edition, 2012, n.1184 – in French language.

the Plaintiffs as to the amounts set forth in the Checks, and it becomes incumbent upon the Plaintiffs to deposit the Checks for collection in an account in any bank in Lebanon.

### E. Plaintiffs Can Litigate Freely In Lebanon And The Lebanese Courts Are Fully Operational And Subject To The Rule Of Law

37. Plaintiffs allege litigants such as themselves risk harm, violence, or arrest by litigating in Lebanon against Lebanon banks.

38. I am unaware of any instances of this happening. Many cases have been brought by depositors against banks in the past months since the onset of the crisis in October 2019 and judgments have been rendered without incident (see paragraph 33 of the First Declaration). The Courts are functioning properly, with decisions being rendered and appeals being taken. Plaintiffs' expert Dr. Torbey himself illustrates this, stating that he is actively litigating cases against banks in Lebanon (see, e.g., paragraphs 12 and 38 of the Torbey Declaration).

39. Plaintiffs also falsely argue that the judiciary is corrupted by the influence of the banks and the banks would and could use violence to intimidate litigants. Plaintiffs' allegations lack any evidence. To the contrary, as described, the cases are being litigated against banks without incident.

40. The above being said, if Plaintiffs did not want to personally appear in Lebanon to litigate their claims, they could still easily litigate them by appointing a lawyer in Lebanon by virtue of a power of attorney signed in the U.S., to litigate in Lebanon on their behalf. Thus, they are not without recourse even if they do not wish to travel to Lebanon.

41. Although Dr. Torbey discusses a number of cases in Lebanon that he claims show that the courts are not functioning, all these cases show, in fact, is that cases are routinely being heard, decided, and appealed without incident in Lebanon (see paragraphs 31-33 and 36-40 of the Torbey Declaration). Plaintiffs' expert Ms. El Khoury also states that "*depositors are not obtaining any protection from the Lebanese courts*" without offering any proof of the allegation other than some decisions are not going as they would have hoped (see paragraph 19 of the El Khoury Declaration).

11

42. Dr. Torbey describes in paragraphs 28 to 45 of the Torbey Declaration several court cases in Lebanon in which (i) Judges of Urgent Matters have rendered decisions in favor of depositors forcing banks to make international transfers, (ii) these decisions have been appealed but stayed at the level of the Court of Appeal and the Court of Cassation. Dr. Torbey then concludes from this description that *"banks have been successful in blocking depositors from actually colleting their USD even if they obtain rulings in their favor in the lower courts"*[11], and that *"the courts are not providing protection of the depositors but rather are providing protection for the banks that are engaging in a blatant violation of the Lebanese law"*[12].

43. I do not agree with Dr. Torbey's repeated opinions that the positions taken by the banks are contrary to, or in violation with, the Lebanese laws, for the reasons explained under Section C of this Second Declaration.

44. Moreover, all the cases described by Dr. Torbey relate to requests filed before Judges of Urgent Matters who are not competent to look into the merits of the cases, but rather to take urgent measures and to stop blatant infringements to rights, as provided for in article 579 of the CCP. The contradictory positions adopted by the courts and recognized by Dr. Torbey in paragraph 45 of the Torbey Declaration clearly show the diverging opinions of the judges in assessing the plaintiffs' requests under the current circumstances, and demonstrate the normal functioning of a judicial system that must adapt to an unprecedented and evolving major crisis, and its repercussions both at the individual level of the banks' clients, and at the level of the financial system as a whole.

45. It is important to finally comment on Dr. Torbey's concluding statement in paragraph 48 of the Torbey Declaration, where he states that *"an examination of the Lebanese case law in this field reveals that in light of the Court of Cassation's ruling the courts of Lebanon have begun denying depositors relief on dubious grounds"*. I disagree with this statement and refer to several rulings issued in the preceding months and weeks, pursuant to which Lebanese trial courts have

---

[11] Paragraph 33 of the Torbey Declaration.
[12] Paragraph 34 of the Torbey Declaration.

adopted the same position as the Judges of Urgent Matters, and validated the repayment in Lebanese Pounds at the official exchange rate -which is currently LBP1507.7 for US$1.00, whereas the black market rate is in excess of LBP8,000 for US$1.00- of loans initially denominated in US$, notwithstanding provisions to the contrary in the agreements signed between the banks and the borrowers, hence obviously disadvantaging the banks[13].

46. Regardless of the outcomes of cases in Lebanon to date, what Mr. Torbey shows is that the courts of Lebanon are hearing and deciding cases and the various decisions are being appealed to the Courts of Appeal and the Court of Cassation, the highest court. This is a proper, functioning judiciary.

47. In view of the above, it is my opinion that the Plaintiffs are not without access to recourse in Lebanon. On the contrary, it is possible for them to litigate their case before the trial courts the competence of which extends to the merits of the case.

### F. Conclusion

As discussed above, I respectfully submit my opinion that the expert declarations of Ms. Aline El Khoury and Dr. Karim Torbey proffered by the Plaintiffs incorrectly state, apply, and/or interpret the relevant law and facts at issue. I respectfully refer this Court to my analysis above, to my First Declaration previously filed with the Court, as well as to the Naddour Declaration and Moghaizel Declaration also filed with this Court, with which I agree and find further support for what I believe is the correct statement, application, and interpretation of the relevant law and events in this case.

Based on the above, I conclude that:
a.   The law of Lebanon governs this dispute;

---

[13] See in this respect: Civil Judge in Beirut Maya Ofeiche, decision n. 279/2020 dated 3 December 2020; First Degree Civil Court in Beirut presided by Judge Zalfa El Hassan, decision n. 289/2020 dated 1 December 2020.

b.  The courts of Lebanon have jurisdiction over this dispute and are the appropriate courts to decide and determine questions of Lebanese law, including those related to the present Lebanese banking situation;

b.  It was not illegal for CL Bank not to abide by the Plaintiffs' request to transfer abroad funds from the Account.

c.  The Checks are valid payment instruments under Lebanese law, and CL Bank acted consistent with Lebanese law in issuing and delivering the Checks to the Plaintiffs, thus fulfilling its obligations towards them; and

d.  The courts of Lebanon are functioning and litigants may bring claims safely.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 6, 2021
Beirut

/s/ _Patrick_

Patrick Soumrani

14