# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH A. DAOU and KAREN M. DAOU,<br><br>Plaintiffs,<br><br>v.<br><br>BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., AL-MAWARID BANK, S.A.L., and BANQUE DU LIBAN,<br><br>Defendants. | Case No. 1:20-cv-4438-DLC |

**REPLY DECLARATION OF Professor Nasri Antoine DIAB**

I, Nasri Antoine DIAB, declare pursuant to 28 U.S.C. § 1746:

1. I submit this reply declaration ("Reply Declaration") in further support of BLC Bank S.A.L.'s (the "Bank") motion to dismiss in the lawsuit brought by plaintiffs Joseph and Karen Daou (the "Plaintiffs"). I had submitted a first declaration dated 9 October 2020 ("my First Declaration") in support of the Bank's motion to dismiss.

2. In their declarations dated respectively 17 and 18 December 2020 that were submitted on behalf of the Plaintiffs, my two esteemed colleagues Dr. Karim Torbey and Ms. Aline El Khoury addressed some of the issues that I developed under Lebanese law in my First Declaration. In this Reply Declaration, I will discuss very respectfully and briefly my two colleagues' main arguments. Anything in their declarations which is not expressly and directly addressed in this Reply Declaration is neither confirmed nor refuted. The words starting with capitalized letters are defined herein or in my First Declaration.

3. I am a native Arabic and French speaker and fluent in English, and for ease of the parties and the Court, I prepared this declaration in English.

4. For the purpose of this declaration, I have reviewed scanned photocopies of the two following documents:

a. The declaration of Dr. Karim Henri Torbey, dated 17 December 2020, and submitted in support of the Plaintiffs' opposition to the Bank's motion to dismiss.

b. The declaration of Ms. Aline Michel El Khoury, dated 18 December 2020, and submitted in support of the Plaintiffs' opposition to the Bank's motion to dismiss.

**A- The Declaration of Dr. Karim Torbey**

5. The declaration of my esteemed colleague Dr. Torbey is essentially centered around two subjects: Wire transfers abroad constitute a well-established practice under Article 4 of the Lebanese Commercial Law (Code of Commerce) (Para. 25 of his declaration); and the Lebanese courts "*have begun denying depositors relief on dubious grounds*" (Para. 48 of his declaration).

6. **To start with the "*well-established practice*"** to which Dr. Torbey refers in Para. 25 of his declaration, it should be noted that Article 4 of the Code of Commerce provides that the judge will apply the well established customs/practice ("*usages*") which do not contradict either a derogatory agreement of the parties or imperative statutory provisions. Since no imperative Lebanese statutory provision compels the banks to make international transfers, the Lebanese judge can look to the customs which are applied in the Lebanese banking sector. Irrespective of what the practice may have been before the outbreak of the current economic, financial and banking crisis in October/November 2019, it is apparent that presently the practice, as applied by the whole Lebanese banking sector, is that all the banks have reduced to the very strict minimum, if not altogether stopped, the international transfers, i.e. the banks have all refrained from offering this service to their clients except within very strict and limited boundaries of amounts

and of consideration (medical reasons; tuition; taxes; subsidized imports; etc.), including within mechanisms put in place by the Central Bank of Lebanon as detailed here-below. For more than one year, there has clearly been a unanimous consensus among Lebanese banks to put an end to offering international transfer services to their clients. Thus, Lebanese judges would not be in a position to recognize the existence today, under the current circumstances, of a custom (as per Article 4 of the Code of Commerce) of making international transfers.

7. **As for the judicial decisions referred to by Dr. Torbey**, as noted in my First Declaration and confirmed by Dr. Torbey in his declaration, "*there have been several cases filed in Lebanese courts in recent months involving disputes between banks and their clients. Several decisions, mainly rendered by fast-track Judges of Urgent Matters ("Juges des Référés"), who rule on prima facie basis and not on the merits (Articles 579 et seq. of the CCP), are the subject of appeals, which are still pending.*" (Para. 31 of my First Declaration). Instead of analyzing each one of the decisions mentioned by Dr. Torbey, I will only make the following comments:

8. The fast-track Judge of Urgent Matters is not qualified to rule or opine on the merits of the cases. Rather, this Judge can issue interim decisions or injunctions in case of *inter alia* need for urgent decisions (Article 570 of the Code of Civil Procedure – "CCP"). These decisions and injunctions can be appealed before the Court of Appeals (Article 586 of the CCP) and they can also be amended or cancelled by the same Judge in case new circumstances justify it (Article 584 of the CCP). In turn, recourse can be filed before the Supreme Judicial Court ("*Cour de Cassation*") against the Court of Appeals' decisions. So, ultimately, each case could be reviewed at three levels of judicial authority.

9. As it transpires from Dr. Torbey's declaration, the Lebanese judicial system is working properly: decisions are rendered by different Judges of Urgent Matters; decisions are appealed;

Courts of Appeals and the Cour de Cassation are rendering decisions; etc. Whether these decisions are in favor of the depositors or of the banks can only be discussed under Lebanese law; divergent opinions can always be expressed, and I respect Dr. Torbey's opinion and do not intend to discuss it (I do not have the background of these decisions, save for one that I will detail below, being noted that none of them are published in law reviews). But I am of the opinion that it is not accurate to state that "*case law in this field reveals that in light of the Court of Cassation's ruling the courts of Lebanon have begun denying depositors relief on dubious ground*" (Para. 48 of Dr. Torbey's declaration) :

> i. As mentioned in my First Declaration (Para.26), the "case law" ("*jurisprudence*", in the meaning attributed thereto in Lebanese and French laws) results from several identical decisions rendered in similar cases by the high courts and expressed in general and abstract terms. Obviously, no "case law" has yet been created in Lebanon in this field, since the Cour de Cassation has not yet rendered one single case on the merits.
>
> ii. Lawsuits started being filed in the subject matter less than one year ago, and to say that the course of justice is slow and hence that justice is denied (Para. 44 of Dr. Torbey's declaration) does not do justice to the Lebanese courts.

10. The one case referred to by Dr. Torbey that I will discuss is the decision rendered by the Cour de Cassation on 24 August 2020, case No.47/2020 (Para. 33 et seq. of Dr. Torbey's declaration), because this decision is illustrative of the way the Lebanese judicial system properly functions in the subject matter, and it involves all three degrees/levels of tribunals (a Judge of Urgent Matters; a Court of Appeals; and the Cour de Cassation). From the (unpublished) text of the Cour de Cassation's decision, I can deduce and state the following:

4

i. The depositor prevailed in his case against the bank before a first degree fast-track Judge of Urgent Matters. The bank then appealed this order before a three-judge chamber of the Court of Appeals of Beirut, which affirmed the Judge of Urgent Matters' order. The bank then filed a recourse against the Court of Appeals' decision before the Cour de Cassation, which ordered the stay of the Court of Appeals' decision.

ii. The fact that the Cour de Cassation stayed the Court of Appeals' decision cannot be construed in any way to say that "*The courts' reluctance to enforce this right shows that the courts are not providing protection of the depositors, but rather are providing protection for the banks ...*" (Para. 34 of Dr. Torbey's declaration). I cannot agree with such a general statement. As far as I can understand it from the Cour de Cassation's decision, the judicial proceedings were as follows: a Judge of Urgent Matters, who rules on prima facie basis, ordered the bank to make the transfer abroad. The bank appealed this order before the Court of Appeals of Beirut and requested that the Court stays its order pending the Court's final ruling in the case. The Court of Appeals rejected this request, while the case was still pending before it awaiting its final ruling. The bank filed a recourse before the Cour de Cassation against the Court of Appeals' decision. The scope of this recourse was very limited, for the Cour de Cassation had only to decide whether or not to stay the Judge of Urgent Matters' order (by staying or not the Court of Appeals' decision), before the rendering of the final ruling of the Court of Appeals. The Cour de Cassation considered that the legal and factual arguments presented by the bank before the Court of Appeals in the still on-going appeals proceedings were serious and fundamental and, consequently, the Cour de Cassation ruled that the Judge of Urgent

5

Matters' order should be stayed until the Court of Appeals issues its final ruling in the matter.

iii. This case proves that the Lebanese judicial system is working and that the depositors can assert claims against the banks in Lebanon. Not only does this case show that the Lebanese judicial system works properly, but also that it expedites the cases in a swift manner: the decision of the Court of Appeals was rendered in May 2020; the recourse was presented by the bank before the Cour de Cassation in June 2020; and the decision of the Cour de Cassation was rendered in August 2020.

11. Some of the cases referred to by Dr. Torbey in his declaration relate to the transfer abroad of students tuitions and expenses. This issue, that is known in Lebanon as the "Student's Dollars", was addressed by the Lebanese Parliament on 16 October 2020. The Parliament enacted Law No.193, whereby it compelled the Lebanese banks to transfer abroad, only once, a maximum amount of 10,000 US dollars, to cover the tuitions and living expenses of Lebanese students who were registered at foreign universities before academic year 2020-2021. This incidentally shows *a contrario* that international transfers by Lebanese banks are no longer possible without parliamentary statutes expressly ordering them.

12. I finally note that, in Para. 37 of his declaration, Dr. Torbey states that the circulars of Central Bank of Lebanon "*are not binding law*". In fact, the Central Bank of Lebanon's decisions are among the sources of law in the Lebanese civil law system, together with formal statutes and codes enacted by the Parliament, decrees enacted by the Government and ministers, and various directives and decisions issued by other public authorities, etc. (Para. 24 of my First Declaration). The Central Bank of Lebanon's decisions (that are published by way of "circulars") are binding on all banks operating in Lebanon, since the Central Bank of Lebanon issues them by

delegation given by the Parliament in the scope of the Code of Money and Credit, and any violation of these decisions could lead to sanctions and penalties, up to the deregistration of the bank (Article 208 of the Code of Money and Credit).

**B- The Declaration of Ms. Aline El Khoury**

13. The declaration of my esteemed colleague Ms. Khoury contains various points that need to be addressed, further and above what was discussed in the above paragraphs pertaining to Dr. Torbey's declaration.

14. In Section A of her declaration (Para. 6 to 10), Ms. Khoury makes several statements relating to "**The Lebanese Legal System and the Structure of the Lebanese Court System**". I only note that in Para. 10, she states that the "*Minister of Justice maintains the power to appoint, promote, demote, and transfer judges throughout Lebanon*". That is not accurate. Pursuant to Articles 5.a. and 5.b. of Legislative Decree No.150 dated 16 September 1983 governing the judicial courts (Para. 25 of my First Declaration), the appointment/transfer of judges to/from their positions is first proposed by the High Judicial Council (which is entirely composed of judges), and then the Minister of Justice's approval is sought on this proposal of appointments/transfers; in case of disagreement between the High Judicial Council and the Minister of Justice on this proposal, and after an attempt to settle the disagreement amicably in a meeting to be held by them, the Council has the final say, and the Minister signs the decree which is then submitted to the Council of Ministers. This shows that the Minister of Justice has not the power to appoint/transfer the judges. As mentioned in Para. 27 of my First Declaration, the independence of the judicial power is consecrated in Article 20 of the Constitution as well as in Article 1 of the CCP which provides that the "*The judiciary is a power independent from the other powers in the investigation and resolution of lawsuits, and such independence cannot be restricted by any limit which is not provided for in the Constitution.*"

15. In Section B of her declaration (Para. 11 to Para. 20), Ms. Khoury makes several statements relating to "**Jurisdictional Issues**". I only note the following:

i. In Para. 17 of her declaration, Ms. Khoury states that the BLC Agreement "*does not include a clause giving jurisdiction to Lebanese courts in the event a bank customer files a lawsuit against the bank*". However, the text of Section X of Chapter 04 of the BLC Agreement is very clear: "*The Beirut Courts shall have exclusive jurisdiction to hear any dispute arising in connection with these General Conditions and/or relating to the relationship between the Bank and the Client*".

ii. As stated in Para. 5.v. of my First Declaration, this clause alone gives jurisdiction to the Lebanese courts. It should be noted that :

    a) the parties used the word "*shall*";

    b) the parties expressly agreed that this jurisdiction is "*exclusive*", i.e. that no other jurisdiction or forum are acceptable to them; and

    c) the wording of this clause seems to encompass the contractual as well as the tortuous aspects of the parties' relationship.

iii. The choice of jurisdiction by the parties denies jurisdiction to any tribunal other than the one designated in their clause (Y. Loussouarn, P. Bourel, P. de Vareilles-Sommières, *Droit international privé*, Dalloz, 2013, No.716 - in French language).

iv. The Lebanese Cour de Cassation regularly upholds Courts of Appeals' decisions which validate the clause of choice of jurisdiction inserted in bank contracts and which consequently consider as devoid of jurisdiction all tribunals and courts other than the one mentioned in said clause (e.g. see: Cour de Cassation, Decision No.66 dated 20 October 2009, *Sader Lex – Lebanon.saderlex.com*; and Decision No.75 dated 27 June 2013, *Sader*

*Lex – Lebanon.saderlex.com* - in Arabic language). These two Cour de Cassation's decisions, which were rendered in domestic disputes opposing banks to their clients, apply also in international law pursuant to Article 74 of the Code of Civil Procedure which provides that, in principle, the rules of domestic (territorial) jurisdiction apply to determine the international jurisdiction of the Lebanese courts (Para. 5 of my First Declaration), as routinely confirmed by the Cour de Cassation (Cour de Cassation, Decision No.91 dated 12 July 2018, *Sader Lex – Lebanon.saderlex.com* – in Arabic language).

v. I am of the opinion that, under Lebanese law, the courts of Beirut have exclusive jurisdiction over this case, for all the reasons developed above in this Reply Declaration as well as in my First Declaration.

16. In Section C of her declaration (Para. 21 to Para. 26), Ms. Khoury makes several statements relating to "**Governing Law**". I note the following :

i. In Para. 23 of her declaration, Ms. Khoury acknowledges that BLC Agreement contains a governing law clause. Indeed, Section X of Chapter 04 of the BLC Agreement provides that "*These General Conditions and the relationship between the Bank and the Client shall be governed by the laws of Lebanon*".

ii. But then Ms. Khoury goes to say that this governing law clause could be "*easily*" challenged and considered as "*null and void*" by Lebanese judges, on the ground that the whole BLC Agreement is a "contract of adhesion" (standard form of contracts) pursuant to Article 172 of the Code of Obligations and Contracts (by reference to Para. 18 of Ms. Khoury's declaration). I am of the opinion that this is not correct. Article 172 of the Code of Obligations and Contracts is one of a series of Articles which define different types of

9

contracts. Article 172 opposes the "*contrat d'adhesion*" to the "*contrat de gré à gré*" (where the conditions are discussed by the parties). Article 172 does not consider the contract of adhesion as "*null and void*" but, to the contrary, it consecrates it as one of the valid and legal contracts governed by the Code of Obligations and Contracts. I am not aware of any judicial decision, either under Lebanese law or under French law, which "annulled and avoided" a clause of choice of governing law on the mere and sole ground that it was inserted in a banking agreement (or in any other type of contracts of adhesion). Such clauses are routinely inserted in banking agreements and, more generally, in all types of contracts of adhesion, without being automatically annulled and avoided: insurance contracts, transportation contracts (sea, air and ground), lease contracts, etc. Furthermore, there is no reason why this clause would be considered abusive and hence avoidable under Lebanese law: the BLC Agreement is tightly linked to Lebanon by all its elements, and there is no doubt that its center of gravity is located in Lebanon (Para. 8.ii. of my First Declaration), making the choice of the Lebanese law as its governing law natural and fair. Nothing justifies the annulment of this governing law clause by a Lebanese judge.

iii. In Para. 25 and Para. 26 of her declaration, Ms. Khoury mentions the US "FACTA law" to conclude that, since *inter alia* the Bank applies this US law, then the whole BLC Agreement should be governed by US law. I am inclined to believe that Ms. Khoury meant the US <u>FATCA</u> (Foreign Account Tax Compliance Act) and not the US <u>FACTA</u> (Fair and Accurate Credit Transactions Act) (please see: Chapter 03 of the BLC Agreement: "Compliance with the U.S. Foreign Account Tax Compliance Act (FATCA)). In either case, that does not change the analysis. The Bank is subject to many

10

tax and banking regulations issued by various countries around the world, and the fact that it complies with foreign regulations does not displace the governing law to govern the parties' agreement. FATCA applies all over the world, and all banks abide thereby without having their agreements and general terms & conditions governed by US law.

17. In Section D of her declaration (Para. 27 to Para. 38), Ms. Khoury makes several statements relating to "**Wire Transfer Regulations in Lebanon**". She tacitly but undoubtedly acknowledges that, as detailed in Para. 14 and Para. 15 of my First Declaration, "*There are no specific laws in Lebanon relating to wire transfer*", and that the BLC Agreement does not contain any provision commanding the Bank to make international transfers. But then, my conclusion and Ms. Khoury's are entirely at odds. In my opinion, and in the absence of both a statutory (law) provision and a contractual provision commanding the Bank to make international transfers, the Plaintiffs have no right to compel the Bank to make such a transfer, and thus the latter can, at its discretion, refuse the Plaintiffs' instructions to transfer funds abroad from their account, without violating any (inexistent) statutory provision or breaching any (inexistent) contractual provision. Ms. Khoury concludes to the contrary. By all means, it would be up to the Beirut courts, having exclusive jurisdiction over this case, to settle this discussion, probably based on Article 4 of the Code of Commerce as discussed above.

18. In Section E of her declaration (Para. 39 to Para. 50), Ms. Khoury makes several statements relating to "**Checks Regulations in Lebanon**". I note the following ;

    i. In Para. 19 of her Declaration, Ms. Khoury states that the banker checks drawn by Lebanese banks on the Central Bank of Lebanon "*are only a piece of paper*". This is not correct and this not the position of Lebanese judges :

11

      a) The Central Bank of Lebanon honors the banker checks drawn on it by banks operating in Lebanon. The amounts of these checks can be deposited at banks operating in Lebanon, can be used to purchase goods and assets in Lebanon, etc.

      b) The Judge of Urgent Matters of Baabda tackled this issue in his decision rendered on 14 September 2020, and affirmed the validity and value of the banker checks : "*The banker check is considered as a means of payment which discharges the debtor; and one cannot object that the payment by this means does not have a discharge effect in the current situation because it does not assure to the creditor the sufficient liquidity and does not lead to the payment of his debt abroad, since this* (objection) *would deny the check its value of means of payment which is prescribed by law.*" (Judge of Urgent Matters of Baabda, Case No. 200/2020, Decision No.122 dated 14 September 2020, not published in law reviews, pages 9 & 10 - in Arabic language).

ii. In Para. 39 (and indirectly in Para. 35) of her declaration, Ms. Khoury acknowledges that the check is considered as a payment in cash. This is my position, with some caveats (Para. 20 et seq. of my First Declaration).

iii. In Para 40. of her declaration, Ms. Khoury states, pursuant to Article 307 of the Code of Commerce, the banks can refund the deposit of sum of money in "*equivalent value*."

iv. In Para. 49 of her declaration, Ms. Khoury refers to a legal article that I published, 33 years ago, on a totally unrelated subject: the monetary depreciation and its effect on the contracts ("La dépréciation monétaire et ses effets sur les contrats en droit interne et dans la pratique internationale", *Law Review of the Bar of Beirut "Al Adl"*, 1987, page 127 – in French language). She considers that there is a "contradiction" between what I wrote in

1987 in this article and what I stated in 2020 in Para. 19 of my First Declaration. However, I fail to find any contradiction. In 1987, I wrote that force majeure requires the "***impossibility***" to perform the contractual obligation; and in 2020, I wrote that "*The above matters made it practically **impossible** for the Bank to effect international transfers, and such **impossibility** would extinguish any contractual obligation that the Bank would have had to the Plaintiffs to make such a transfer*" (Para. 19 of my First Declaration). My position did not vary. By all means, it would be up to the Lebanese courts, having exclusive jurisdiction over this case, to give or to deny to these circumstances the qualification of force majeure in the light of the criteria applicable under Lebanese statutory and case law.

v. A large number of Central Bank of Lebanon's decision show that the Lebanese banks cannot make transfer abroad outside the scope of strictly regulated mechanisms put in place by Central Bank of Lebanon :

> a) This applied first to the import of oil, wheat, and medicines, as early as 30 September 2019 (Intermediate Decisions No.13113 dated 30 September 2019, and No.13152 dated 26 November 2019); then, to the import of raw material needed by the local industries (Intermediate Decision No.13228 dated 27 May 2020); and then to the import of essential food products and materials (Intermediate Decisions No.13229 dated 27 May 2020, and No.13245 dated 8 July 2020); etc.
>
> b) At least since January 2020, the Central Bank of Lebanon has enacted several decisions restricting further the international transfers and the usage of foreign currency, *inter alia*: Intermediate Decision No.13187 dated 30 January 2020, mandates that the payment of the principal and interest of bonds and other

financial instruments issued by Lebanese banks and deposited with a Lebanese custodian be made only at banks operating in Lebanon; Basic Decision No.13217 dated 9 April 2020, limits the bank transfers abroad to the foreign currency amounts that were transferred from abroad as of that date, and to amounts received in cash by the banks; Intermediate Decision No.13220 dated 16 April 2020, requires non-banking institutions making electronic transfers of cash amounts to settle all incoming foreign currency transfers in Lebanese Pounds at the market exchange rate, and to sell to the Central Bank of Lebanon the foreign currency amounts resulting from such operations (this Intermediate Decision was replaced by Intermediate Decision No.13255 dated 6 August 2020, which requires the payment of all incoming foreign currency transfers in US dollars); Basic Decision No.13221 dated 21 April 2020, provides that if a client addresses to the bank a request to withdraw money from the client's foreign currency denominated account, the bank should, if the client agrees, pay the latter in Lebanese Pounds at the market exchange rate and within the limits set by the bank; and then the bank should sell to the Central Bank of Lebanon the foreign currency amounts resulting from this operation (this Basic Decision was amended by the Intermediate Decision No.13282 dated 9 October 2020).

c) The Lebanese banks are opening for their clients "Fresh Accounts" (this expression is used by the Central Bank of Lebanon, e.g. in its Intermediate Decision No.13288 dated 4 November 2020) to credit "Fresh Money" (this expression is used for instance by the Banking Control Commission, in its Circular No.13/2020 dated 18 August 2020) i.e. *inter alia* foreign currency

amounts which are newly transferred from abroad to these clients. The Fresh Money is segregated from the foreign currency amounts which already were in these clients' accounts (and which are subjected to the restrictions described above), and it is freely transferable abroad. In this context, only "Fresh Money" can be transferred abroad; Plaintiffs deposits are not considered as Fresh Money.

**C- Clarification of One Issue Raised in the Plaintiffs' Memorandum of Law in Opposition**

19. Before concluding, I need to clarify one issue that was brought to my attention. In their Memorandum of Law in Opposition filed on 18 December 2020 (which I did not read and on which I do not opine), the Plaintiffs stated that *"Before BLC paid him for an "expert" declaration, Diab wrote that depositors were "without any real recourse" in the Lebanese courts"*, and they based their statement on my article entitled *"Let Us (not) Talk About Haircut"* dated 11 April 2020 (which they attached to their Memorandum, as Exhibit 49). I respectfully state the following:

i. The subject that I covered in my "Haircut" article is entirely irrelevant to this lawsuit: this lawsuit relates to international bank transfers of funds in the scope of the relationship between banks and clients; whereas my "Haircut" article relates to the restructuring plans of the Lebanese banking and financial sectors (as recommended by Lazard Freres bank and adopted by the Lebanese Government), and more specifically to the contemplated haircut on bank deposits (by Parliament's and/or Government's decision).

ii. This lawsuit opposes two parties from the private sector: the Plaintiffs and the Bank; whereas the restructuring plans and the haircut (if put in place) would oppose parties from the private sector (whole classes of depositors) to public authorities (the Government, the Parliament, etc.). Obviously, the difference is fundamental, especially as far as the recourses are concerned; and it is in this very specific context that I talked

15

about the "recourse" (available to the depositors in case of haircut by Parliament's and/or Government's decision).

iii. What I wrote on page 3 of my "Haircut" article, as referred to by the Plaintiffs, relates to yet another very specific and subsidiary issue that is also totally irrelevant to this lawsuit: the (eventual) haircut on The Republic of Lebanon Eurobonds. These Eurobonds are governed by foreign law, contain a choice of foreign jurisdiction clause, involve very technical legal and financial mechanisms, give rise to public and private international law complex issues, are affected by state immunity, etc. I compared the recourse that the Euro-bondholders would have in case of haircut on their Eurobonds with the recourse that the depositors would have in case of haircut on their bank deposits. Obviously, both scenarios are entirely different from a dispute relating to bank wire transfers (subject matter of this lawsuit) and the recourses available to the parties.

iv. Thus, this reference to my "Haircut" article is totally out of context. But since this reference was made, I would point out that I have praised, on page 6 of my "Haircut" article, the Lebanese judicial system: "*6- The Constitutional Council: It is the only constitutional organ which can boast about its record*". This Council has a judicial nature (Article 1 of Law No.520 dated 14 July 1993 creating the Constitutional Council; and Article 1 of Law No.243 dated 7 August 2000 enacting the internal bylaws of the Constitutional Council).

## Conclusion

Based on the above, I reiterate the conclusion that I have reached, under Lebanese law, in my First Declaration:

a) The Lebanese courts have jurisdiction over any claims related to the relationship of the Bank and the Plaintiffs, whether in contract or in tort; and I will add that the Lebanese courts constitute a proper forum to hear this lawsuit.

b) Lebanese law governs such claims.

c) The Bank has no obligation to effect international transfers of funds, and it may have been impossible for the Bank to do so had it wanted to.

d) The Bank acted consistent with Lebanese law in issuing and delivering to the Plaintiffs the check drawn on the Central Bank of Lebanon, and it fulfilled its obligations towards them by doing so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Prof. Nasri Antoine DIAB**
Beirut (Lebanon), 7 January 2021.             signature :