# Exhibit 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH A. DAOU and KAREN M. DAOU,<br><br>        Plaintiffs,<br><br>v.<br><br>BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., AL-MAWARID BANK, S.A.L., and BANQUE DU LIBAN,<br><br>        Defendants. | Case No. 1:20-cv-4438-DLC |

**DECLARATION OF MAKRAM SADER**

I, Makram Sader, declare pursuant to 28 U.S.C. § 1746:

1. I submit this declaration in further support of defendants' BLC Bank, S.A.L. and Credit Libanais, S.A.L.'s motion to dismiss plaintiffs, Joseph A. Daou and Karen M. Daou (the "Plaintiffs"), amended complaint (the "Complaint").

2. I am a native Arabic and French speaker and fluent in English, and for ease of the parties and the Court, I prepared this declaration in English.

3. I am presently employed by and have served since 1991 as the Secretary General of the Association of Banks in Lebanon ("ABL").

    i. I am submitting this declaration in my personal capacity.

    ii. I hold a PhD in Economics from the University of Grenoble in France (1979).

    iii. I served as Professor of Economics at the State Lebanese University (1985-1991).

    iv. I am familiar with the banking laws, regulations, and practices of the banking sector in Lebanon.

1

     v.     I am presently closely involved, through various Parliamentary, governmental, and banking commissions, in working on various alternatives for the reorganization and restructuring of the Lebanese debt and the banking sector.

     vi.     Neither ABL nor I have any personal interest in the pending litigation and I do not hold any equity in either Credit Libanais S.A.L. or BLC Bank S.A.L.

     vii.     My more detailed resume is attached hereto as Exhibit A

4. I have been engaged to address claims the Plaintiffs have made in response to the motion filed by the Banks and render an opinion in rebuttal regarding the presently prevailing situation of the economy of Lebanon, the imposed restriction on the Lebanese banks to effect transfers abroad of funds in foreign currency, and the impact of any decision of a foreign court which would extend advantages to depositors who seek a remedy other than through the Lebanese court system.

5. For the purpose of this declaration, I have reviewed the complaint filed by the Plaintiffs, as well as the following documents:

     i.     Plaintiffs' memorandum of law in opposition to the Bank's motion to dismiss;

     ii.     The declaration of Aline Michel El Khoury, dated December 18, 2020;

     iii.     The declaration of Karim Henri Torbey, dated December 17, 2020; and

     iv.     The declaration of Naaman Naddour, dated November 30, 2020.

**Collapse of the Lebanese Economy and its Effect on the Banking System**

6. For over 70 years, Lebanon was recognized as one of the most prominent regional banking centers in the world. However, in recent years the wheels of fortune have experienced a sharp decline, thus changing the landscape of the economy in the country. This occurred as a result of and in correlation to various regional political conflicts and severe economic depression, thus triggering a sharp increase in poverty, leading to social unrest in one of the highest dollarized

economies in the world, as stated in the last report issued on Lebanon by the World Bank'. The result was a run of depositors on the banking system in late 2019, which carries a majority of its deposits in foreign currency, mainly US Dollars.

7. Subsequently and related to this crisis, in early 2020, the government defaulted on its foreign debt, including about $32 billion in Eurobonds denominated in US Dollars (the "Government Eurobonds"), which elevated the crisis and its adverse impact on the entire banking system. The Lebanese banks were holding approximately 40% of such Government Eurobonds. As a result of the Lebanese government defaulting on its foreign debt, a large portion of the foreign currency liquidity of the Central Bank of Lebanon (the "Central Bank") has been depleted, thus creating a huge short position and shortage of liquidity in foreign currency across the system. The market value of such bonds decreased to about 10-15 cents per US Dollar. This put further pressure on the banking sector.

8. The current situation is an unexpected and unprecedented situation that the authorities are dealing with through a plan of reorganization/restructuring, aiming to negotiate the country's debt with foreign creditors and reschedule or restructure same in an affordable manner that satisfies the requirements of the International Monetary Fund ("IMF") and other international lenders which have expressed readiness to help and assist the country, subject to Lebanon achieving a trusted and workable plan for reforms.

**Actions of the Banks**

---

[1] The Fall 2020 edition of the World Bank Lebanon Economic Monitor entitled "The Deliberate Depression" published December 1, 2020.

9. In order to safeguard the system and avoid the full collapse (bankruptcy) of the banking sector, the Central Bank declined to make funds available for banks for transfers abroad in late 2019, despite the large deposits that the banks held with the Central Bank. Banks are prevented from making transfers of funds abroad except for the limited purposes described herein. Consequently, Banks are failing to respond to their customers' requests for the transfer of funds overseas, except for customers providing resources originated from incoming fresh funds.

10. The banks operating in the country, have, as of October 2019, been forced to impose upon themselves such discipline for the use of funds in coordination with the Central Bank in order to avoid a full collapse and safeguard all parties' interests, including the depositors, until a restructuring plan is in place. ABL, a not-for-profit organization whose members include the banks operating in the country, adopted a resolution confirming said policy.

11. Under the law (the Lebanese Code of Money and Credit), the Central Bank has full authority to regulate banking operational policies and maintain the stability of the local financial markets, especially in times of acute crisis.

12. That being said, there are no restrictions on inter-bank transfers in foreign currency within Lebanon. The depositors still have full access to their funds, as long as they accept to use their US Dollars within Lebanon. As a result, the depositors continued having access to their deposits and the banks have not declined the payment of such funds in Lebanon through the formal local payment system of local clearance, including bankers' checks drawn on the Central Bank. Therefore, any transfer a depositor makes from an account at one bank to an account at another bank in Lebanon is fully available. As a matter of fact, many depositors of foreign currency have freely utilized their funds for various investment purposes locally, including investing in real estate assets, for the settlement of debts, and for buying third-party credit risk without any restriction on

the use of their funds at their discretion. As an exception, the transfers abroad have been allowed primarily for national interest purposes only, such as payments by the government in the form of subsidies for the import of basic necessities, including medical supplies, oil and gas, agricultural products, and the like to ensure that the country's population has access to basic day-to-day needs. Additionally, while acknowledging the restrictions applied by banks on international transfers, in 2020 Parliament enacted Law No. 193 imposing on banks the duty to transfer, in foreign currency, for one year, up to $10,000 for the payment of tuition for Lebanese students studying abroad who are already enrolled in universities and whose parents have accounts with a bank.

13. The present situation in Lebanon, as described above, is no different from the problems encountered by other developed countries in recent years, such as Greece, Cyprus, Argentina, Ecuador, and many others around the world. These countries have gone through similar situations and, in each case, bankers were on the frontline to face market pressure and public accusations.

14. For quite some time, the Lebanese banking sector has been the main driving force of the Lebanese economy and has survived a number of challenges over the last 50 years, including civil war and many other major problems. In the long run, the country will survive this unprecedented financial and economic turbulence and the banks will eventually regain their position if a successful bail out restructuring is approved by the country's leaders.

15. Over the years, the banking sector has enjoyed a quality reputation because of its sound banking, and it has always managed to operate in good standing, free of malpractice and corruption. To the best of my knowledge and contrary to what is being claimed, there were no transfers made outside Lebanon for over a year except under the very limited circumstances enumerated above.

16. It is normal that given the current circumstances triggered by systemic risk, depositors in Lebanese banks presently feel frustrated and concerned. This is made worse by rumors of fraud, illicit behavior of malpractice, and corruption within the banking sector that have been circulated. I believe these accusations are false, without any basis, and are fueled by certain media outlets. It is worth noting that the Lebanese banks have over $80 billion in deposits in foreign currency on the books of the Central Bank and they are trying to work out a fair solution for all depositors, without any discrimination based on nationality or residency.

17. The Lebanese banks have no choice but to treat their customers equally and equitably (needless to say, under Lebanese law it is illegal to discriminate in favor of a foreign creditor over a local creditor in an insolvency status or restructuring and rescheduling proceeding). All local or foreign depositors, either resident or non-resident, have taken the same inherent and/or calculated risk by investing or depositing their money in Lebanese banks, each for his or her own reasons and considerations, assuming their own "country risk." A likely incentive was the high yield that the Lebanese emerging market was paying and the depositors were on notice of such risk based on the financial statements and reports of international rating agencies, such as Fitch Ratings.

18. Depositors with large account balances, or high net-worth individuals investing in Lebanon, were and are usually fairly familiar with all of the conditions of the embedded risk profile associated with the Lebanese banking sector and the country's sovereign risk, which for years has carried a non-investment grade (B-) by major rating agencies. Residents of Lebanon, regular visitors to the country, and those having local connections, including Lebanese expats, who hold deposits with Lebanese banks should be deemed to have full knowledge of the financial and

economic circumstances the country has been in over at least the last 4-5 years, based on many articles and media coverage warning the public about the risk/reward attached to high yields on bank deposits. The banks and the bankers did not hide the facts pertaining to, in particular, their published B- credit rating held for years or the macro situation in Lebanon, which is all public information.

19. The banks operated with a high degree of transparency. The banks' audited financial statements and balance sheets available to the customers and the correspondent banks reflect fairly the state and classes of assets. If anything, the banks' shareholders are among the victims of the collapse of the economy, as the value of their equity stake in their respective institution is presently largely depleted. The banking sector has been the victim of the government's excess of borrowing and letting its public debt run out of control. Nevertheless, the bankers will remain keen on and have a vested interest in working through this crisis and rebuilding the economy of the country with the aim to restore confidence in the system. At the request of the Central Bank, shareholders are presently increasing their equity by 20% by injecting new additional capital.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Makram Sader**
Beirut (Lebanon), January 6, 2021.          signature: _____