### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

JOSEPH A. DAOU and KAREN M. DAOU,

Plaintiffs,

vs.

BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., AL-MAWARID BANK, S.A.L., and BANQUE DU LIBAN,

Defendants.

Civ. Action No. 1:20-cv-4438

### SECOND DECLARATION OF FADI MOGHAIZEL

I, Fadi Moghaizel, declare pursuant to 28 U.S.C. § 1746:

1.      I have submitted a declaration dated December 1st, 2020 (the 'First Declaration') in support of the *Banque du Liban*'s ('BDL') motion to dismiss plaintiffs' (the 'Plaintiffs') *First Amended Complaint*.

2.      I have been asked by BDL to further opine on specific matters addressed in (i) the Plaintiff's *Memorandum of Law in opposition of BDL's motion to dismiss the First Amended Complaint* (the 'Memorandum of Law'), (ii) the declaration of attorney Aline Michel El Khoury

dated December 18th, 2020 submitted in support of the Plaintiff's opposition to the Defendants'
motions to dismiss the First Amended Complaint (the 'El Khoury First Declaration'), (iii) the
second declaration of attorney Aline Michel El Khoury dated January 8th, 2021 submitted in
further support of the Plaintiff's opposition to BDL's motion to dismiss the First Amended
Complaint (the 'Second El Khoury Declaration') (together the 'El Khoury Declarations'); and
(iv) the declaration of Dr. Karim Torbey dated December 17th, 2020 submitted in opposition to
the Defendants' motions to dismiss the First Amended Complaint (the 'Torbey Declaration').

3.      For the purpose of this Second Declaration, I have reviewed copies of the Memorandum
of Law and of the Torbey and El Khoury Declarations, as well as copies of the checks[1] drawn by
each of *BLC Bank SAL, Credit Libanais SAL*, and *Al-Mawarid Bank SAL* (altogether the
'Banks').

## A.     BDL is not the Drawer of the Checks

4.      I am surprised that the plaintiffs maintain that (i) BDL is the drawer of the checks, (ii) the
Checks do not identify the Banks as the drawers, and (iii) the Checks were signed by the Banks'

---

[1] The following checks (the 'Checks'):
- Check no. 115982/F drawn by *BLC Bank SAL* on BDL on November 28, 2019 in an amount of US $ 7,525,000, marked 'Redacted';
- Check no. 036018/F drawn by *Crédit Libanais* SAL on BDL on November 21, 2019 in an amount of US $ 5,300,000, marked 'Redacted';
- Check no. 036022/F drawn by *BLC Bank SAL* on BDL on December 2, 2019 in an amount of US $ 40,180, marked 'Redacted'; and
- Check no. 443219/F drawn by *Al-Mawarid Bank SAL* on BDL on March 3, 2020 in an amount of US $ 5,811,500, marked 'Redacted'.

employees who acted as authorized signatories of BDL[2]. All such statements are wrong, as indisputably shown by the face of the Checks.

5.      At the bottom of each of the Checks, the name of the Banks as drawers is clearly printed in Arabic and, on the right next to each name, we see the names of the signatories who are alleged in the Complaint to be employees of each of the Banks. They are not alleged to be employed by BDL, and therefore would have no authority to sign on behalf of BDL, otherwise this would be equivalent to saying that officers of, let us say, *The Bank of Tampa* or *BNY Mellon*, have the authority to sign on behalf of the US *Federal Reserve Bank*.

6.      The facts are that, like other banks, BDL provides its account holders - in this case the Banks - with check leaves in the form of a check book that includes on each leaf the mandatory information prescribed by law, including the check's place of payment. It is exactly the same for individual and corporate clients who use check books provided by their commercial banks[3] with check leaves having the bank's name printed on them. This does not make the banks drawee and drawer of the check. Clearly, it is possible for a bank to draw a check on itself, *i.e.* to be at the same time the drawee and the drawer (cashier's cheque), but this is not the case in this case, because the drawers are the Banks, as shown on the face of the checks having the name of the drawer printed on each cheque on the right next to the signatures of the Banks' authorized signatories.

---

[2] Pages 4, 5, 28 (footnote 5), and 39 of the Memorandum of Law.
[3] Except that some large issuers/drawers of checks print their specifically designed own check forms with their names printed on them as drawers and the name of their bank as drawee.

7.      That is why I hereby reassert that the Checks were neither drawn, nor passed or issued by BDL. They were all drawn, issued, and passed by the Banks. The drawers and issuers were the Banks, and BDL was only the drawee.

**B.      The Place of Payment of the Checks**

8.      Nothing in the El Khoury Declarations shows that BDL had to settle the Checks by wiring funds to an account outside the Lebanese territory. In paragraph 45 of the First El Khoury Declaration, it is said that the payee of a check can deposit such check in any bank in Lebanon or abroad, and that such bank then 'requires' the drawee to pay through a correspondent bank to the payee's account. The First El Khoury Declaration states that this is what takes place 'usually' in line with 'international banking transactions', but it does not explain on which ground would such 'usual' practice and 'international banking transactions' (i) apply by law or by any other mandatory mechanism to checks drawn by Lebanese private banks on BDL, and (ii) create an obligation for BDL to pay funds offshore. There is no single supporting reference or citation in the First El Khoury Declaration in this regard, whether a statute, court decision, academic's opinion, or else, except attorney EL Khoury's personal opinion.

9.      The First El Khoury Declaration goes on in saying in its paragraph 46 '*If the beneficiary deposits the check in London or <u>anywhere outside the territory of Lebanon</u>*[4], *the check will be paid through a correspondent bank of the drawee*'. This is correct in the sense that the Checks must be sent to a correspondent bank in Lebanon to be paid in the place of payment indicated on the check, *i.e.* Beirut, and this is where BDL pays checks drawn on it with the indication 'payable in Beirut' in line with the provisions of Article 409 of the Lebanese Code of Commerce that mandates that the place of payment be indicated on the check. Article 410 of the Lebanese Code of Commerce[5] specifies that, absent a specific indication, the place mentioned next to the drawee's name would be considered as the place of payment, and that if no such information is set out, the check must be payable at the drawee's principal place of business. This means that, in the matter at hand, the Checks are in all instances payable in Beirut.

10.     Paragraph 47 of the First El Khoury Declaration explains further that '… *the bank check issued by the bank on BDL and deposited abroad should be compensated through its standard way of compensation used by BDL*'. Such statement does not establish that BDL has an obligation to wire funds abroad. On the contrary, said statement indicates that settlement is made by payment through BDL's clearing house system, which entails payment of the Checks by BDL in Beirut into an account of a bank opened with BDL in Lebanon. The First El Khoury Declaration has nowhere shown that BDL had an obligation under Lebanese law to settle the Checks by wiring funds to a country outside Lebanon.  To the contrary, Annex 7 to the First El

---

[4] Emphasis from the quoted text.
[5] Exhibit no. 9 of my First Declaration.

---

Khoury Declaration states that all cheques in Lebanese pounds and in foreign currencies are cleared through a single system, which is BDL's clearing houses (which operate only in Lebanon). Clearing checks drawn on BDL through its clearing houses in Lebanon is mandatory pursuant to BDL Basic Decision no. 11081 of June 27, 2012 and BDL Basic Decision no. 11594 of November 6, 2013[6].

11.      I now turn to the assertions of Plaintiffs made in the Memorandum of Law[7] regarding the terms 'payable at Beirut' printed on the Checks. Such assertions call for the following comments: Irrespective of whether the Checks are deposited in Beirut or anywhere else in the world, BDL does not have a duty to pay such checks by wiring funds abroad. There is no such obligation under Lebanese law. To the contrary, under Articles 409 and 410 of the Lebanese Code of Commerce referred to in paragraph 5 above, the Checks are payable only in Beirut and, as a result, BDL validly discharges its obligation by clearing the Checks in Beirut and paying them into the account of a Lebanese bank in Beirut. The place of payment indicates where the check must be presented for payment and paid, irrespective whether it reaches the place of payment through various banks in Lebanon or abroad. The check is cleared in Beirut by BDL, and there is no duty for BDL to wire funds abroad.

---

[6] Page 17 of Annex 7 to the First El Khoury Declaration. The BDL Basic Decisions cited in Annex 7 have been replaced by BDL's Basic Decision no. 11081 of June 27, 2012 and BDL Basic Decision no. 11594 of November 6, 2013.
[7] Pages 9 and 10 of the Memorandum of Law.

12.     Even if, and assuming that, the Banks represented to the Plaintiffs that the Checks could be deposited in the United States and/or acknowledged that Plaintiffs would deposit them there as stated at page 11 of the Memorandum of Law, BDL would still have no legal obligation to wire funds to the United States.

## C.     The Lebanese Judicial System

13.     The allegations made in the Torbey Declaration and the Memorandum of Law[8] that Lebanon's judicial system lacks independence and is not providing justice to bank depositors are not correct. Quite the contrary, Lebanese judges have been seen by the banks as acting very strongly in favor of depositors. Clearly, there is a diversity of outcome in court decisions because the doctrine of precedents does not apply in Lebanon, however, despite such diversity of decisions, I can assert that, by far, a large majority of decisions have been taken by the court in favor of depositors, and in a swift fashion. Here are a few examples (eleven) of recent court decisions against commercial banks, of which there are many more:[9]

-       Decision of the Urgent Matters Judge in the El Metn District, rendered on January 10, 2020 against *Lebanese-Swiss Bank SAL* upon an application filed by the plaintiff on December 30, 2019, ordering the bank to perform an international transfer under penalty of a US $ 3,000 daily fine for each day of delay.

---

[8] Pages 20 to 26 of the Memorandum of Law.
[9] Subject to pending or decided appeals.

- Decision of the Urgent Matters Judge in the Zahle District, rendered on January 13, 2020 against *Credit Libanais SAL* upon an application filed by the plaintiff on December 16, 2019, ordering the bank to perform an international transfer under penalty of an LBP 10,000,000[10] daily fine for each day of delay.

- Decision of the Urgent Matters Judge in the Aley District, rendered on January 17, 2020 against *Credit Libanais SAL* upon an application filed by the plaintiff on December 5, 2019, ordering the bank to perform an international transfer under penalty of an LBP 1,000,000[11] daily fine for each day of delay.

- Decision of the Urgent Matters Judge in the El Metn District, rendered on March 11, 2020 against *BLOM Bank SAL* upon an application filed by the plaintiff on January 20, 2020, ordering the bank to perform an international transfer under penalty of a US $ 5,000 daily fine for each day of delay.

- Decision of the Urgent Matters Judge in the El Metn District, rendered on May 11, 2020 against *Byblos Bank SAL* ordering the bank to perform an international transfer under penalty of an LBP 9,000,000[12] daily fine for each day of delay. In the context of the Covid-19 restrictions, the plaintiff's application was submitted to the court by email on May 7, 2020, and decided in his favor three business days later.

- Decision of the Urgent Matters Judge in Beirut, rendered on June 30, 2020 against *BLOM Bank SAL* upon an application filed by the plaintiff on June 19, 2020,

---

[10] US $ 6,635 at the official rate of LBP 1,507 per one US $.
[11] US $ 663 at the official rate of LBP 1,507 per one US $.
[12] US $ 5,972 at the official rate of LBP 1,507 per one US $.

ordering the bank to perform an international transfer under penalty of an LBP 1,000,000[13] daily fine for each day of delay.

- Decision of the Urgent Matters Judge in the El Metn District, rendered on November 26, 2020 against *Byblos Bank SAL*, upon an application filed by the plaintiff on November 11, 2020, ordering the bank to perform an international transfer under penalty of an LBP 5,000,000[14] daily fine for each day of delay.

- Decision of the Urgent Matters Judge in Beirut, rendered on November 30, 2020 against *BankMed SAL* upon an application filed by the plaintiff on November 2, 2020, ordering the bank to pay the plaintiff the claimed amount in cash under penalty of an LBP 3,000,000[15] daily fine for each day of delay.

- Decision of the Urgent Matters Judge in the El Metn District, rendered on December 10, 2020 against *Bank Beirut SAL* dismissing an opposition to a previous decision ordering the bank to perform an international transfer, and confirming such decision to be implemented by the bank under penalty of an LBP 50,000,000[16] daily fine for each day of delay.

- Decision of the Urgent Matters Judge in Beirut, rendered on December 23, 2020 against *Fransabank SAL* upon an application filed by the plaintiff on November 10, 2020, ordering the bank to perform an international transfer under penalty of an LBP 20,000,000[17] daily fine for each day of delay.

---

[13] US $ 663 at the official rate of LBP 1,507 per one US $.
[14] US $ 3,317 at the official rate of LBP 1,507 per one US $.
[15] US $ 1,990 at the official rate of LBP 1,507 per one US $.
[16] US $ 33,178 at the official rate of LBP 1,507 per one US $.
[17] US $ 13,271 at the official rate of LBP 1,507 per one US $.

- Decision of the Urgent Matters Judge in Nabatieh, rendered on January 7, 2021 against *Fransabank SAL* upon an application filed by the plaintiff on December 29, 2020, ordering the bank to perform an international transfer under penalty of an LBP 30,000,000[18] daily fine for each day of delay.

**D.    Lebanese Law does not acknowledge the Conversion Tort**

14.    The Memorandum of Law states in its page 28 that '*While BDL's expert claims no conversion claim is available under Lebanese law, there is such a claim against banks, albeit not by the name "conversion"*'. In support of such statement, the Memorandum of Law refers to the Second El Khoury Declaration, specifically the paragraphs covering the deposit contract under Lebanese law.

15.    The Second El Khoury Declaration describes the deposit contract that is regulated by the Lebanese Code of Obligations and Contracts. It neither demonstrates, nor says, that a claim for conversion is available under Lebanese law. The repayment duty of the party who receives a deposit in the context of deposit contracts comes under the statutory provisions governing such contracts in the Code of Obligations and Contracts cited in the Second El Khoury Declaration. This is a contractual obligation, not a tort claim such as conversion. The contractual rights of

---

[18] US $ 19,907 at the official rate of LBP 1,507 per one US $.

---

depositors to be repaid are totally unrelated to the conversion tort as I understand it under New York law and Florida law[19].

16.     Saying that there are conversion claims under Lebanese law, albeit under another name, by relying on a contractual claim, is simply wrong from the legal viewpoint. Lebanese law does not recognize claims under tort for conversion, whether under such name or any other name.

**Final Considerations**

17.     The opinions expressed in this Second Declaration are limited to matters of the laws of Lebanon. I express no opinion with respect to the laws of any other jurisdiction, and it is assumed that no law of any other jurisdiction affects the conclusions in this Second Declaration.

18.     This Second Declaration is given in light of the laws of Lebanon presently in force, as implemented by Lebanese courts. The opinions in this Declaration may vary if these laws were to be amended, repealed or annulled, or differently applied by Lebanese courts.

---

[19] Paragraph 41 of my First Declaration refers to my understanding of the conversion tort under New York and Florida law.

12

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 28, 2021, in Beirut, Lebanon.

FADI MOGHAIZEL