UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH A. DAOU and KAREN M. DAOU,           :

                       Plaintiffs,           :    Case No. 1:20-cv-04438-DLC

            vs.           :    **THIRD DECLARATION OF**
                            :    **ALINE EL KHOURY**

BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L.,
AL-MAWARID BANK, S.A.L., and BANQUE DU           :
LIBAN,
                            :
                 Defendants.           x

      I, Aline Michel El Khoury, further to my previous Declarations dated December 18, 2020

and January 8, 2021, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

      1.      I have been engaged by the law firm of Meister Seelig & Fein LLP to provide

analysis of Lebanese law and court practice in connection with the above-captioned lawsuit filed

in this Court by Joseph A. Daou and Karen M. Daou ("Plaintiffs") against BLC Bank, S.A.L.

("BLC Bank"), Credit Libanais, S.A.L. ("CL Bank"), Al Mawared Bank, S.A.L. a/k/a A.M. Bank

S.A.L. ("AM Bank" and together with BLC Bank and CL Bank, the "Banks"), and Banque Du

Liban ("BDL").

      2.      In connection with my analysis, I have reviewed Plaintiffs' Complaint and

Plaintiffs' Amended Complaint.  I have also reviewed: (a) the opening and reply motion papers

filed by BLC Bank and CL Bank in support of their joint motion to dismiss; (b) the opening and

reply motion papers filed AM Bank in support of its motion to dismiss; and (c) the opening and

reply motion papers filed by BDL in support of its motion to dismiss.

      3.      On December 18, 2020, I submitted my first declaration in this action. (ECF 69).

On January 8, 2021, I submitted my second declaration in this action.  (ECF 82). I understand

those declarations were submitted in connection with Plaintiffs' oppositions to Defendants' motions to dismiss.

4.     I have reviewed the declarations that were submitted by my esteemed colleagues Mr. Waddah El Chaer (ECF 77), Mr. Patrick Soumrani (ECF 80-1), Professor Nasri Diab (ECF 80-2), and Mr. Fadi Moghaizel (ECF 85), and I address their main assertions below.

### I- On Jurisdictional Issues

### A- Declaration of Mr. Waddah El Chaer (ECF 77)

5.     Mr. Waddah El Chaer confirmed in paragraph 4 of his declaration that "*in lawsuits related to civil or commercial contracts, jurisdiction will lie in the court ....(2) where the contract was signed, on condition that one of the main obligations of the contract will be performed there,...*" but then concludes that Lebanese courts are competent, despite the fact that the contract is considered final upon the signature of the last party Ms. Karen Daou in USA and not in Lebanon and despite the fact that one of the main obligations, which is the right to transfer and receive payment of the deposited amount shall be performed in the USA.  My esteemed colleague Mr. Waddah El Chaer did not mention these facts.  ECF 77, ¶4. Thus, it is my opinion that the conditions required in matter of contracts to give exclusive jurisdiction to Lebanese courts are not satisfied; and because the territorial jurisdiction in this case is not compulsory, in the event another jurisdiction has sufficient grounds to retain its competence, the case may be submitted to the said other jurisdiction.

6.     Mr. El Chaer stated in paragraphs 8 through 11 of his declaration (ECF 77) that a contract is an adhesion contract "*when the bargaining power of the parties is extremely unequal in a manner that exploits the signer of the contract and is inconsistent with the signing party's reasonable expectations of their economic power stipulated in the contract's provision*" and he

considers that the Plaintiffs' claim not to litigate in Lebanon due to the crisis would in his opinion, *"be considered as irrelevant to a Lebanese court's determination of the jurisdiction of the Beirut courts."* ECF 77, ¶¶8-11.

7.　　I respectfully do not agree with my colleague's statement; the clause of jurisdiction inserted in the contract does not respect the principle of equality between the rights and obligations of the respective parties because it gives the bank the choice to prosecute the customer, here the Plaintiffs, either before the Beirut courts or the courts of their residence. This choice gives the bank a wider opportunity to get its potential rights, and does not give the same right to the customer. Giving the customer the same right of choice is fundamental to allow the Plaintiffs getting their rights, and any clause to the contrary is clearly inconsistent with the Plaintiffs' reasonable expectations of their economic power since it would deprive them from getting their rights in case they file their lawsuit in Lebanon. Therefore, in my professional opinion, I find that a discretionary condition that leads to deprive a party from an equivalent right to the other party would be most likely considered by the Lebanese courts as null and void.

8.　　Mr. El Chaer stated in paragraph 12 of his declaration that "there would be no need for the Plaintiffs to travel to Lebanon to litigate the case" and it would be enough to hire a Lebanese lawyer to represent them. It would be inaccurate to confirm there will be no need for the Plaintiffs to appear before Lebanese courts, since the court may at any time require the presence of the parties, Plaintiffs and/or Defendants, for interrogation or for confrontation, especially to discuss the oral allegations and respective mails addressed, which were the basis of the relation between the Plaintiffs and the Banks. ECF 77, ¶12.

**B- Declaration of Prof. Nasri Diab (ECF 80-2)**

9.      Professor Nasri Diab stated in paragraph 15 of his declaration that the text of Section X of Chapter 04 of the BLC Bank account opening documents agreement is very clear and gives jurisdiction to the Lebanese Courts, quoting only half of the mentioned Section, and considers that according to that part of the Section *"the choice of jurisdiction by the parties denies jurisdiction to any tribunal other than the one designated in their clause."* ECF 80-2, ¶15. This statement is not accurate, because the other part of the same section stipulates clearly that "[t]his exclusive jurisdiction is for the benefit of the Bank which shall be entitled to take action against the Client in any Lebanese or foreign court of its choice in order to defend its rights." ECF 68-1, p. 15. Thus, it is clear that the said section gave jurisdiction to the Lebanese Courts only for the benefit of the bank, which confirms my previous opinion in this respect.

**C- Declaration of Mr. Patrick Soumrani (ECF 80-1)**

10.     I have already discussed the legal point of view related to the jurisdiction issue in my previous declaration, but I would like to address the statement of Mr. Patrick Soumrani mentioned in paragraphs 18 through 20 of his declaration in which Mr. Soumrani considers that *"the answers to the legal issues that the crisis generated can best be tailored by the Lebanese courts, ... because of their concrete feeling and understanding of the situation on the ground and of its implications ... on the Lebanese economy and the financial system as a whole."* ECF 80-1, ¶20. He added that the contradictory positions adopted by the judges demonstrate the difficulties that the judges are facing when dealing with the unforeseen circumstances. ECF 80-1, ¶19. Such declaration confirms the following:

   a.  The fact that the Lebanese courts are away from applying the law and they consider that the economic crisis gives them the right to overpass the law and the well-

established customs related to checks and wire transfers in order to maintain the stability of the Lebanese economy and the financial system to the detriment of the depositors, including the Plaintiffs.

b.   The fact that the depositors are far from getting their rights from the Lebanese courts because of the difficulties facing the judges in issuing decisions regarding claims submitted against the Banks during the current crisis.

11.   In conclusion, because the territorial jurisdiction of Lebanon in this case is not compulsory, another jurisdiction may retain its competence in the event it has sufficient grounds to do so, it would be up to the courts to settle this discussion, based on the case's facts.

**II- Governing Law**

**A-  Declaration of Mr. Waddah El Chaer (ECF 77)**

12.   Mr. Waddah El Chaer stated in the paragraph 14 of his declaration that, according to article 1 of the General Agreement that refers to Lebanese laws, the governing law shall be the Lebanese Law.   This statement is not accurate. In fact, the translation of that article as presented by Mr. El Chaer in paragraph 14 of his declaration and in AM Bank's translated agreement does not reflect the exact meaning of the Arabic version.   According to the Arabic version of the agreement, Article 1 mentions clearly that:

"وذلك على سبيل التعداد دون التعداد إلى (أ) أية أنظمة أو تعليمات تطبق حالياً أو ستطبق مستقبلاً في البنك..."

This sentence is translated in the version of said agreement presented by the Plaintiffs, as *"shall be subject among others, to: (a) any regulations or instructions applied by the bank presently or in the future…"* and which means exactly and literally *"by way of enumeration and without any limitation."*   Consequently, said article should be read as follows, *"the funds deposited in the accounts the bank agreed to open ... shall be subject by way of enumeration and without any*

*limitation, to: (a) any regulations or instructions applied by the bank presently or in the future…"*
This means that the enumeration of some Lebanese laws and regulations to be applicable does not exclude the application of other laws. I have stated in paragraph 24 of my previous declaration also that AM Bank does not include a clause specifying the governing law, although it refers to Lebanese laws in some articles. Thus, in my opinion this article gives the courts the right to choose the convenient applicable law based on the case's facts.

### B- Declaration of Professor Nasri Diab (ECF 80-2)

13.     Professor Nasri Diab states in his declaration that the governing law clause shall be applicable by a Lebanese judge.  However, the application of such law would not be different from any international law, including U.S. law in matters of wire transfer and checks.  I address Professor Diab's assertions regarding regulation of wire transfers and checks below.

### C- Declaration of Mr. Patrick Soumrani (ECF 80-1)

14.     Mr. Patrick Soumrani confirmed in his declaration in paragraph 11 that the CL Bank agreement does not include a governing law clause but refers to several Lebanese laws (ECF 68-10) as I mentioned in paragraph 24 of my Declaration dated December 18, 2020.  ECF 69, ¶22. Moreover, did not mention that the agreement was signed at last by Ms. Karen Daou in the USA and not in Lebanon, and Mr. Soumrani disregarded the consequence of such signature on the governing Law.  I do not agree with Mr. Soumrani that the obligations were to be performed in Lebanon, because as alleged in the Amended Complaint, the Banks represented they would make the transfers, and only after the Banks later reversed course and refused to execute wire transfers, and represented to Plaintiffs that the checks could be deposited in the U.S. and would clear, Plaintiffs agreed to accept payment by check.

15.      In conclusion, nothing forbids the U.S. courts to apply the Lebanese Law on the case, if it finds it appropriate, or else to apply the U.S. laws, knowing that the general principles related to the relevant points (i.e., wire transfer and check), are almost the same in the majority of the international applicable laws, and it would be up to the courts to settle this issue, based on the case's facts.

### III- Wire Transfer Regulations in Lebanon

### A- Declaration of Mr. Waddah El Chaer (ECF 77)

16.      Mr. El Chaer states in paragraphs 17 through 22 of his declaration that according to the introductory paragraph of the General Agreements, AM Bank did not agree to provide the service of making wire transfers to the Plaintiffs, and consequently AM Bank is not bound to transfer the Plaintiffs money internationally and is not obliged to provide Plaintiffs with international service of their funds and that the Bank is only required to provide Plaintiffs with their funds in the form of a check payable in Lebanon. Moreover, Mr. El Chaer states that contradicting a written proof may be performed only by providing evidence in writing.

17.      International Wire Transfers are well-established practices according to article 4 of the Code of Commerce which gives the commercial practices the force of law, in this respect the judge shall apply well established customs especially that the parties have not agreed to the contrary and that such custom is not contrary to imperative legal provisions.

18.      Contrary to the statement of my esteemed colleague Mr. El Chaer, Article 28 paragraph 2 of the AM Bank agreement includes a very clear, specific and written clause giving the right to the Plaintiffs to require a wire transfer only by a written request, as mentioned in paragraph 36 of my previous Declaration dated December 18, 2020, said article stipulates:

"The following additional special conditions are applicable with regards to deposits in foreign currency (ies):

7

1-  ...

2- Withdrawals from aforementioned foreign currencies shall be made either by bank transfer issued by the Bank or by wire transfer in those foreign currencies issued upon the written request of the Second Party..."  ECF 69, ¶36.

19.    The special condition stipulated in Article 28 shall prevail over the general conditions stipulated in the introductory paragraph of the General Agreement.

20.    Consequently, it is my opinion that under Lebanese law the refusal by AM Bank to execute the wire transfer required by the Plaintiffs is illegal, because there are no laws forbidding the execution of an international wire transfer, and such operation is one of the daily operations executed by the Banks, and it is a well-established custom having force of law. Moreover, there are no clauses in the AM Bank account opening document forbidding the payment by wire transfer, but on the contrary said agreement includes an Article 28 stipulating clearly, specifically and in writing that the Plaintiffs have the right to require a wire transfer.

### B- Declaration of Professor Nasri Diab (ECF 80-2)

21.    Professor Nasri Diab states in paragraph 17 of his declaration that since there are no laws related to wire transfers in Lebanon and since BLC agreement does not contain any provision commanding the Bank to make international transfers, then the Plaintiffs have no right to compel the Bank to make such transfer.  Professor Diab added in this respect in paragraph 18.v.c on page 14 of his declaration that Lebanese banks are opening for their clients "fresh accounts" to credit "fresh money" for newly transferred money from abroad and that only "fresh money" can be transferred abroad. Plaintiffs deposit are not considered as "fresh money."  ECF 80-2, ¶18.v.c. Moreover, he stated in paragraph 18.iv, page 12 of his Declaration that my reference in my Declaration to the Article he published in 1987 was on a totally unrelated subject.  ECF 80-2, ¶18.iv.

8

22.     With all my respect to my esteemed colleague Professor Diab, it is very clear that the operation/service of international transfer is a well-established custom having force of law as I mentioned in paragraph 17 above. Moreover, the BLC Bank account opening documents include in Chapter 02 section I article 1 a clause stipulating clearly that the Plaintiffs have the right to access the sums deposited, in particular by way of wire transfer, as I clarified in paragraph 35 of my first declaration. ECF 69, ¶35.

23.     "Fresh money" and "Fresh Accounts" are new expressions created by banks in order to distinguish between the money deposited in the banks before the crisis and those transferred to the banks after the crisis, and confirming that wire transfer can only be executed on the "fresh money," proves that the wire transfer operation is still a well-established custom having force of law and compulsory for the banks, and that the old depositors, as the Plaintiffs, will never get their deposited money in U.S. Dollars, not in cash in Lebanon nor by wire transfer since they are not considered as "fresh money." Moreover, it is to be noted that there is no difference between the banknote U.S. Dollars transferred before the crisis and the one transferred after the crisis under the nomination of "fresh money" except that the Banks and the BDL have seized the money of the old depositors and created the "fresh money" theory in order to encourage the new banknote transfers to Lebanon. Thus, based on the above, it is clear that what I stated regarding the effectiveness and the legality of the wire transfer operation is correct and is compulsory for the banks, and that all the efforts to refute said opinion is for the sake of protection of the banks in the detriment of the depositors' rights.

24.     I respectfully disagree with Professor Diab's statement that the article he published in 1987 is not related to the present case. In fact, said article is related to the "Monetary depreciation and its effect on the contracts" due to the economic crisis that happened in Lebanon

in 1987, which is similar to the case in Lebanon now, and in said article he confirmed that the currency depreciation can make the execution of the obligation extremely costly, but it does not constitute an invincible obstacle which makes the execution absolutely impossible.   While in paragraphs 18 and 19 of his first declaration he stated the contrary where he said *"the above matters made it practically impossible for the Bank to effect international transfers, and such impossibility would extinguish any contractual obligation that the Bank would have had to the Plaintiffs to make such a transfer."*   The contradiction resides in the fact that, in his article in 1987, Professor Diab confirmed that the money depreciation does not constitute an invincible obstacle which makes the execution absolutely impossible, but now he is saying that such depreciation extinguishes any contractual obligation that the Bank would have. Accordingly, I confirm that in this case there is no "Force Majeure" under Lebanese Law, because the execution of a wire transfer is not impossible but simply costly for the Banks.

25.     Consequently, it is my opinion that the refusal of BLC Bank to execute the wire transfer required by the Plaintiffs is illegal, since there are no laws forbidding the execution of an international wire transfer, and such operation is one of the daily operations executed by the Banks, and it is a well-established custom having force of law. Moreover, there are no clauses in the BLC Bank agreement forbidding the payment by wire transfer, but on the contrary said agreement includes in Chapter 02 section I article 1 stipulating clearly and specifically that the Plaintiffs has the right to require, in particular, a wire transfer.

**C- Declaration of Mr. Patrick Soumrani (ECF 80-1)**

26.     Mr. Patrick Soumrani states in paragraphs 21 to 30 of his declaration the following:

a.   In the absence of a legal or contractual obligation the bank may elect not to make an international transfer and the Plaintiffs cannot force it to do so.

b.  Lebanese scholars, namely Fady Nammour, confirmed that the bank's clients do not have a vested right to international transfer services.

c.  The usage of wire transfer having force of law has not been recognized by Lebanese trial courts and scholars, <u>especially in the current circumstances</u>, and the decisions taken recently by the Judges of Urgent matters are not sufficient to elevate the past practice of bank transfers to a usage having force of law.

d.  If such usage did exist, it has been progressively amended since October 2019 as a result of the financial crisis, and this amendment has been materialized in a recommendation of the Association of Banks in Lebanon ("ABL") issued on November 17, 2019 after consulting with BDL in order to address the consequences of the crisis in Lebanon.

e.  It is a well-known principle of interpretation of law that the usage is amended to adapt to new circumstances.

f.  He concluded that in light of the above, CL Bank is not obliged to abide by the Plaintiffs request to transfer abroad funds from their account.

27.     I disagree with my esteemed colleague's arguments and conclusions for the following reasons, and for the purpose of clarity I will reply to the above-mentioned arguments adopting the same order.

28.     According to Lebanese laws, for matters that are not regulated as in the case of international wire transfer, the provisions of the basic laws in force in Lebanon shall apply, specifically Article 4 of the Civil Procedure Code which stipulates clearly that when there is no text, the judge shall rely on the general principles of law, the custom and fairness, and Article 4 of the Code of Commerce which also stipulates clearly that the judge shall, in his or her assessment

of the effects of a commercial operation, apply well-established usages. Moreover, it is well known that the wire transfer is a well-established custom, which made the BDL issue a regulation of Transfer Operations to and from BDL by circular no. 6367 dated November 9, 1996. Consequently, because it is well known that the wire transfer is one of the daily operations of the banks and is a well-established custom, in my opinion, any refusal by CL Bank to execute a wire transfer requested by the Plaintiffs is illegal under Lebanese law.

29.    I also do not agree with my esteemed colleague Mr. Soumrani that Lebanese scholars confirmed that the bank's clients do not have a vested right to international transfer services. In fact, scholars and courts agree that the banker must execute the transfer as soon as he receives the order from the client and shall be held responsible if he refuses to do so.  In this respect, Mr. Fady Nammour in his book titled "Droit Bancaire," "Banking Law", paragraph 1167, confirms the following:

> "(In french) Le banquier doit exécuter le virement dès qu'il en a reçu l'ordre et en rendre compte à son client (JU Beyrouth 5 Aout 1998, Al Adl 1998). A défaut, sa responsabilité pour inexécution de l'ordre de virement sera engagée (JU Beyrouth 12 Avril 2001, Al Adl 2001) en tant que mandataire. La banque a pour obligation d'exécuter avec célérité les ordre reçus."

Translated to English:

> "The banker must execute the transfer as soon as he receives the order and report this to his client (Unique Judge of Beirut 5 August 1998, Al Adl 1998). Otherwise, its liability for non-execution of the transfer order will be engaged (Unique Judge of Beirut 12 April 2001, Al Adl 2001) as a proxy. The bank has the obligation to execute the orders received expeditiously."

30.    Contrary to the statement of my esteemed colleague Mr. Soumrani, the courts and scholars have always recognized that the usage of wire transfer has force of law as confirmed in Paragraph 29 above, and they also held the banks refusing the execution of the wire transfer as responsible.

31.    Also, stating that such usage cannot have force of law *"especially in the current circumstances"* is irrelevant in the absence of laws forbidding such operation, knowing that circulars and recommendations issued by any authority does not have force of law and does not amend a well-established and recognized custom.

32.    Moreover, stating that the decisions taken recently by the Judges of Urgent matters are not sufficient to elevate the past practice of bank transfers to a usage having force of law, is not correct because when the judges are considering a case related to a wire transfer and in the event they are compelling the bank to execute a wire transfer, the judges are not elevating a past practice to a usage having force of law.   Rather, the judges are just applying the law in acknowledging the force of a well-established custom.

33.    The custom and practice of the wire transfer operation cannot be progressively amended since October 2019 as a result of the financial crisis, since refusing to execute a wire transfer without any legal ground is considered an exception, and the exception cannot prevail over the rule. Moreover, the recommendations of the ABL and/or the BDL are not laws, they are tailored to fit their interests to the detriment of the depositors' interests, and anyway cannot contradict with an international well-established custom in the banking sector, the wire transfer.

34.    If I were to agree that the custom is amended to adapt to new circumstances, a new tactic, like refusing wire transfer instructions, cannot have force of law unless having been adopted, applied and constant for a long period of time (Fabia & Safa Annotated Lebanese Code of Commerce- Article 4, and The Code of Civil Procedure- Lawyer Elias Abou Eid- Article 4). Thus, the refusal of executing a wire transfer for the reason of the current economic crisis cannot be elevated even to the rank of custom, since it is a very new procedure adopted illegally by the banks to avoid the transfer of the money, especially the US Dollar abroad.

35.     In conclusion, in my opinion it is illegal for the banks and CL Bank to refuse the execution of the Plaintiffs' wire transfer instructions and they should be held responsible for such conduct.

### IV- Check regulations in Lebanon

### A- Declaration of Mr. Patrick Soumrani (ECF 80-1)

36.     Mr. Patrick Soumrani states in paragraph 32 of his declaration that I confirmed the payment by check is a valid payment method, and concluded that the remittance by CL Bank of the checks to the Plaintiffs and their acceptance thereof constitute a valid payment by CL Bank. He added in paragraph 36 of his declaration that the Plaintiffs' acceptance of the checks drawn on CBL (BDL) inevitably entails their acceptance of the check's clearing in an account in a bank in Lebanon, and concluded that by delivering the checks to the Plaintiffs, CL Bank would have discharged its obligations towards the Plaintiffs as to the amounts set forth in the checks, and it becomes incumbent upon the Plaintiffs to deposit the checks for collection in an account in any bank in Lebanon.

37.     I disagree with my esteemed colleague Mr. Soumrani. Confirming that the payment by check is a valid payment method is true when it leads to receive the money in cash in the Plaintiffs' account anywhere they wish to deposit it, otherwise if the USD cannot be received by the depositors in the U.S. the check remains "a piece of paper." Thus, the remittance of checks that the Plaintiffs cannot receive in cash in their accounts wherever the checks are deposited is not considered a valid method of payment.

38.     Moreover, it is not true that the Plaintiffs accepted the checks delivered to them by CL Bank for collection in an account in a bank in Lebanon, since the Plaintiffs were clear about their intention to deposit the checks in the U.S. and the Banks represented the checks could be

deposited in the U.S. after they improperly refused to execute the required wire transfers they previously agreed to and represented they would execute.

39.     In conclusion, in my opinion the issuance of the banker check by CL Bank is not a valid payment of the deposited amounts of the Plaintiffs.

### B- **Declaration of Professor Nasri Diab (ECF 80-2)**

40.     Professor Diab states in paragraph 18 of his declaration, that what I mentioned in my declaration regarding the check being only "a piece of paper" is not correct and he states the Plaintiffs have the right to deposit the checks in Lebanon and use them to purchase goods and assets in Lebanon.

41.     I disagree with my esteemed colleague Professor Diab, and reiterate that considering the payment by check is a valid payment method, is true when it leads to receive the money in cash in the Plaintiffs' account anywhere they wish to deposit it; otherwise the check remains "a piece of paper." Knowing that currently the entire Lebanese population is dealing with cash, even assets are now being sold in cash or in fresh dollars.

42.     By Lebanese law, it is not up to either the Banks or the BDL or Professor Diab to tell the Plaintiffs what to do with their money, or where to deposit it or what to buy with it. The value of the amount mentioned in the checks should be equal to cash money valid to be deposited wherever the Plaintiffs want and they should be able to use them for whatever reason they decide in Lebanon or abroad. Moreover, such declaration from Professor Diab confirms again that the amount of the checks given to Plaintiffs will never be received in their account in the U.S.

43.     In conclusion, the issuance of the banker's check by BLC Bank is not a valid payment of the deposited amounts of the Plaintiffs.

44.      As for the BDL and the ABL decisions referred to by Professor Diab in paragraph 19.v, page 13 of his Declaration, those decisions are in contradiction with the laws in force in Lebanon and are issued by BDL and ABL to protect the interests of the Banks and to face the financial crisis they created in order to forbid the depositors from getting back their money either in cash in Lebanon or through wire transfer or check deposits outside Lebanon due to the shortage of banknotes they caused by their mismanagement of the depositors' money.

**V- The Lebanese legal system and the structure of the Lebanese court system**

45.      In reply to my statement regarding the appointment/transfer of the judges, my esteemed colleague Professor Nasri Diab (ECF 80-2) stated that according to Articles 5a. and 5b of the Legislative Decree No. 150 dated 16 September 1983 the appointment/transfer of the judges is made by the High Judicial Council and that the independence of the judicial power is consecrated in Article 20 of the Constitution as well as in Article 1 of the Code of Civil Procedure. This statement is not accurate.

46.      In fact, according to Article 2 of the Legislative Decree No. 150 dated 16 September 1983 the High Judicial Court is composed of (10) ten judges as follows:

> a.   Three (3) of them are members by law, the First President of the Supreme Court as the President of the High Judicial Court, the Procureur General at the Supreme Court as Vice President, the President of the Judicial Inspection Committee as member. The three of them are appointed by decree of the Council of Ministers according to the Minister of Justice's proposal. (Articles 26, 31 and 100 of the Legislative Decree no. 150 dated 16 September 1983)
>
> b.   Five (5) members of the 10, are appointed by decree of the Council of Ministers according to the Minister of Justice's proposal.

c.  The remaining (2) two members are elected among the Presidents of the Supreme

Court Chambers by the First President of the Supreme Court and the Chambers'

Presidents and Consultants.

Consequently, 8 out of 10 members are appointed by the political authority.

47.    Article 5.a of the same Legislative Decree stipulates that the said High Judicial

Court prepares a project of appointment/transfer of Judges and submits it to the Minister of Justice

for approval, and Article 5.b of the said legislative decree stipulates that the project of

appointment/transfer will be applicable/effective only after the Minister of Justice's approval. In

this respect, even if according to article 5.b, in case of disagreement, the High Judicial Council has

the final say, the appointment/transfer will not be adopted unless it is promulgated by decree of

the Council of Ministers further to the Minister of Justice's proposal according to same article.

Applying the law as mentioned would be highly requested, but unfortunately the real practice is

totally different and the example showing that said law is not applied as it is stipulated shall be

found in every appointment/transfer of Judges and among them the last one; indeed, the High

Judicial Court has submitted his last proposition of appointment/transfer on March 5, 2020 which

is still pending up to date, and the reason as usual is the final say of the Minister of Justice

according to a final settlement to be decided by the politicians. (Attached a press release dated

April 21, 2020 titled "The judicial appointment/transfer in Lebanon awaiting a settlement on the

basis of 'not a winner nor a vanquished'- Annex 1).

48.    Moreover, if I were to consider that the judicial system is independent according to

the Constitution, which is also highly requested, then why is the Lebanese Judges Association

requesting for independence? And here I refer to the call released by the said Association in 2019

just after the revolution of October 17, 2019. (Attached a press release dated December 20, 2019

titled 'The Judges Association: a revolutionary step to liberate the judiciary system from the clutches of the ruling authority'- Annex 1) (Posts published on the Facebook page of the Judges Association- Annex 1).

49.     Mr. El Chaer in paragraph 23 of his declaration (ECF 77) states that as of March 5, 2020 the "Enforcement Division in Beirut ordered the attachment of assets of the BDL's governor, assets of twenty Lebanese banks and assets of their general managers."  However, Mr. El Chaer withheld from his declaration that the attachment ordered by Lebanon's financial prosecutor was immediately quashed by the general state prosecutor in less than twenty-four hours. *See* Annex 2 (Bloomberg Article entitled "Freeze Order Order Against Banks Lifted in Less Than 24 Hours).

50.     In conclusion, it is my opinion that the Minister of Justice holds the powers to approve the judicial appointment/transfer after a settlement to be agreed upon between the politicians and that the judiciary system is not independent as stipulated in the related legal texts.

### VI- Declaration of Mr. Fadi Moghaizel

51.     I respectfully disagree with the statement of Mr. Fadi Moghaizel regarding the following points:

a-     Mr. Moghaizel stated that the BDL has no legal obligation to wire funds to the U.S., I disagree, because wiring funds outside the Lebanese territory is an international banking transaction applied in the banking sector, BDL is a Bank, it has always performed wire transfers abroad, and the obligation of executing a wire transfer request is based on the fact that it is a well-established custom and practice in the banking sector.

b-     Mr. Fadi Moghaizel stated that the Lebanese Judges have been seen by the banks as acting very strongly in favor of depositors and gave in this respect eleven recent court decisions, which requires the following comments:

i-  All the mentioned decisions are issued by the Judges of Urgent Matters which means from the courts of First Instance.

ii- Ten out of the eleven decisions referred to, are related to ordering the banks to perform an international transfer, which demonstrates that performing an international transfer is a legal obligation to the banks, and that the refusal of the banks to perform such transfer is illegal.

iii- Mr. Moghaizel mentioned only the decisions issued by the courts of First Instance without any mention related to the outcome of such decisions. In fact, none of the said eleven decisions was executed because they were stopped either by the Court of Appeal or by the Supreme Court and two of them were not found in the Court's registers. I will present here below an update of the current state of said decisions, and for the purpose of clarity I will adopt the same order:

1-  Decision of the Urgent Matters Judge in El Metn, rendered on January 10, 2020 against Lebanese- Swiss Bank s.a.l.: The Bank submitted an appeal requesting to stop the execution of said decision, the Court of Appeal decided on February 6, 2020 to stop the execution of the decision. The Plaintiff submitted on February 17, 2020, a petition before the Supreme Court, requesting the annulment of the Appeal Court's decision and the execution of the Urgent Matters Judge's decision, the file is still pending for more than a year without any decision rendered.

2-  Decision of the Urgent Matters Judge in Zahle, rendered on January 13, 2020 against Credit Libanais s.a.l.: The Bank submitted an appeal requesting to stop the execution of said decision, the Court of Appeal decided on January 23, 2020 to reject the Bank's request. The Bank submitted on January 24, 2020, a petition

before the Supreme Court, requesting the annulment of the Appeal Court's decision and to stop the execution of the Urgent Matters Judge's decision, the Supreme Court decided on February 17, 2020 to stop the execution of latter's decision.

3- Decision of the Urgent Matters Judge in Aley, rendered on January 17, 2020 against Credit Libanais s.a.l.: The Bank submitted an appeal requesting to stop the execution of said decision, the Court of Appeal decided on February 13, 2020 to stop the execution of the decision.

4- Decision of the Urgent Matters Judge in El Metn, rendered on March 11, 2020 against BLOM Bank s.a.l.: The Bank submitted an appeal requesting to stop the execution of said decision, the Court of Appeal decided to reject the Bank's request. The Bank submitted a petition before the Supreme Court, requesting the annulment of the Appeal Court's decision and to stop the execution of the Urgent Matters Judge's decision, the Supreme Court decided on August 24, 2020 to stop the execution of latter's decision.

5- Decision of the Urgent Matters Judge in El Metn, rendered on May 11, 2020 against Byblos Bank s.a.l.: the file is pending before the Supreme Court, we couldn't get an update since the file is with the Judge.

6- Decision of the Urgent Matters Judge in Beirut, rendered on June 30, 2020 against BLOM Bank s.a.l. upon an application filed by the plaintiff on June 19, 2020: According to the Court registers, there is no lawsuit submitted against BLOM Bank s.a.l. on June 19, 2020, and no decision rendered against BLOM Bank s.a.l. on June 30, 2020.

7- Decision of the Urgent Matters Judge in El Metn, rendered on November 26, 2020 against Byblos Bank s.a.l.: the file is pending before the Supreme Court, we couldn't get an update since the file is with the Judge.

8- Decision of the Urgent Matters Judge in Beirut, rendered on November 30, 2020 against BankMed s.a.l.: the file is pending before the Appeal Court, no decision has been taken regarding the execution or stopping the execution up to date.

9- Decision of the Urgent Matters Judge in El Metn, rendered on December 10, 2020 against Bank Beirut s.a.l.: the file is pending before the Appeal Court, we couldn't get an update about the court decision since the file is with the Judge.

10- Decision of the Urgent Matters Judge in Beirut, rendered on December 23, 2020 against Fransabank s.a.l. upon an application filed by the plaintiff on November 10, 2020: According to the Court registers, there is no lawsuit submitted against Fransabank s.a.l. on November 10, 2020, and no decision rendered against Fransabank s.a.l. on December 23, 2020.

11- Decision of the Urgent Matters Judge in Nabatieh, rendered on January 7, 2021 against Fransabank s.a.l.: The Bank did not submit an appeal and the Plaintiff did not start an execution procedure up to date.

iv- If anything can be deduced from the above, the first instance decisions related to international transfers are either stopped by the Court of Appeal or by the Supreme Court or kept dormant without a decision, leaving the depositors' rights suspended without any timeline.

v- Moreover, I have searched, manually (Lebanon does not have electronic filing), within the Enforcement Division registries and found no request for the execution of any

similar judgments. The only explanation for the non-execution of those decisions is that they were stopped either by the Court of Appeal or by the Supreme Court, as it is the case of the above-mentioned decisions, and we know from experience that this is the common occurrence.

vi- These recent decisions prove also that the banks, before the crisis, did not refuse to perform an international wire transfer, which is a usual daily banking operation; indeed, such refusal is recent and without any legal ground.

vii- One of the said decisions is about ordering the bank to pay the plaintiff the claimed amount in cash; if this proves anything, it proves that the banks are currently refusing to pay the depositors' deposits in cash, and that all banking transactions similar to cash like wire transfer and checks to be collected abroad are not executed willingly by the banks and by the BDL without any legal ground.

**VII- Conclusion**

52.     Based on the above, I confirm my opinion as stated in my First Declaration and my Second Declaration and reiterate that I am of the opinion that:

1- Because the territorial jurisdiction of Lebanon in this case is not compulsory, and other jurisdiction may retain its competence in the event it has sufficient grounds, it would be up to the courts to settle this discussion, based on the case's facts.

2- Because nothing forbids the U.S. courts to apply the Lebanese Law, on the case, if it finds it appropriate, or else to apply the U.S. laws, knowing that the general principles related to the relevant points, ie., wire transfer and check, are almost the same in the majority of the international applicable laws, and it would be up to the courts to settle this discussion, based on the case's facts.

3-  The refusal by the Banks to execute a wire transfer requested by the Plaintiffs is illegal, because there are no laws forbidding the execution of an international wire transfer, such operation is one of the daily operations executed by the Banks, and it is a well-established custom having force of law.

4-   The payment by banker's check cannot be considered as a valid payment of the deposited amounts of the Plaintiffs, unless it is valid to be collected wherever the Plaintiffs want, especially in the USA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  March 12, 2021
       Beirut, Lebanon                                   Aline El Khoury