UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH A. DAOU and KAREN M. DAOU, :

                 Plaintiffs,    :   Case No. 1:20-cv-04438-DLC

      vs.    :

                              :   **SECOND DECLARATION OF**

BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L.,   **DR. KARIM HENRI TORBEY**
AL-MAWARID BANK, S.A.L., and BANQUE DU :
LIBAN,
                              x
                 Defendants.

I the undersigned, **DR. KARIM HENRI TORBEY,** declare the following:

1. I have been engaged by the law firm of Meister Seelig & Fein LLP to provide analysis of Lebanese law in connection with the above-captioned lawsuit filed in this Court by Joseph A. Daou and Karen M. Daou ("Plaintiffs") against BLC Bank, S.A.L. ("BLC Bank"), Credit Libanais, S.A.L. ("CL Bank"), Al Mawared Bank, S.A.L. n/k/a A.M. Bank S.A.L. ("AM Bank" and together with BLC Bank and CL Bank, the "Banks"), and Banque Du Liban ("BDL").

2. In connection with my analysis, I have reviewed Plaintiffs' Complaint and Plaintiffs' Amended Complaint. In addition, I have reviewed: (a) the opening and reply motion papers filed by BLC Bank and CL Bank in support of their joint motion to dismiss; (b) the opening and reply motion papers filed AM Bank in support of its motion to dismiss; and (c) the opening and reply motion papers filed by BDL in support of its motion to dismiss.

3. On December 17, 2020, I submitted my first declaration in this action. ECF 70.

4. This, my second declaration, which I understand is being submitted in connection with Plaintiffs' motion for an attachment against the Banks, addresses the following points below in response to the declarations of Dr. Nasri A. Diab, Dr. Patrick Soumrani, Mr. Waddah el Chaer,

1

and Mr. FadI Moghaizel:

        (a)    Wire transfers, including international wire transfers, are a legal custom which until the banking crisis were widely and regularly executed by Lebanese banks. There is no prohibition against wire transfers in any of the bank account opening documents submitted in connection with the Banks' motion papers. In addition, Defendants' declarations all ignore the fact that Plaintiffs allege in detail that the Banks all repeatedly represented to Plaintiffs that the Banks would, in fact, execute international wire transfers of Plaintiffs' United States Dollars ("USD") to the United States upon instruction from Plaintiffs. The violation of the right enshrined in this customary practice and based on the Banks' agreement to execute the international wire transfers upon instruction by Plaintiff violates Lebanese law.

        (b)    The circulars issued by BDL are not legally binding provisions that would give the Banks grounds to refuse Plaintiffs' instructions to execute wire transfers.

        (c)    The judicial practice occurring in Lebanon currently goes against the right of litigants to obtain a speedy judgment and genuine remedy on such urgent cases.

**A.**     **The Banks are Required to Return Plaintiffs' USD, including by Wire Transfer**

5.     In his declaration (ECF 71), Mr. Waddah el Chaer confirms that international transfers are one of the services offered by AM Bank to its customers. ECF 77, ¶18. While Mr. Waddah el Chaer claims AM Bank "kept the means of the repayment of Plaintiffs' funds within its discretion" (ECF 77, ¶18), he cites no provision of AM Bank's account opening document and provides no legal authority for his assertion. His assertion is wrong. For example, Article 28, subparagraph 2 of the translated account opening document submitted by AM Bank states as follows with regard to foreign currency deposits: "Withdrawals from the aforementioned foreign currencies shall be made either by bank transfer issued by the Bank or by wire transfers in those

foreign currencies issued upon a written request of the Second Party." ECF 41-4, p. 18.

6. There is no prohibition against international wire transfers of Plaintiffs' USD contained in the account opening document submitted by AM Bank. ECF 41-4. Therefore, Mr. Waddah el Chaer's citation to Article 254 of the Lebanese Code of Civil Procedure for the proposition "that contradicting a written proof may be performed only by providing evidence of another writing" (ECF 77, ¶21), is irrelevant. Mr. Waddah el Chaer fails to provide a copy of Article 254 for the Court. In this case, the account opening document submitted by AM Bank does not prohibit international wire transfers, and in fact states that wire transfers are one of the common methods for AM Bank to return Plaintiffs' USD. Therefore, the representations by AM Bank to Plaintiffs (who are U.S. citizens residing in the U.S.) that AM Bank would wire transfer their USD to the U.S. is consistent with, and not contradictory to, the account opening document submitted by AM Bank.

7. Mr. Waddah el Chaer's citation to Article 307 of the Lebanese Commercial Code is similarly irrelevant and does not undercut Plaintiffs' entitlement to a wire transfer. Mr. Waddah el Chaer claims "Article 307 of the Lebanese Commercial Code states that all evidence of of banking operations in connection with deposits and refunds of the deposited funds must be stated in writing." ECF 77, ¶22. Once again, Mr. Waddah el Chaer fails to provide a copy of Article 307 for the Court. Article 307 (translated to English) actually provides as follows:

> The bank which receives a sum of money as deposit acquires ownership thereof. It must refund it in one or several installments of equivalent value on the depositor's first request or within the terms of time-limit or prior notice laid down in the contract. All deposit or refund operations must-be stated in writing. In the absence of agreement to the contrary, interests, if any, are due as from the working day following each deposit and up to the eve of the day of each refund.

Mr. Waddah el Chaer ignores the facts that the account opening document submitted by AM Bank states that AM Bank will wire transfer the clients' funds and that Plaintiffs instructed AM Bank in

3

writing to execute the wire transfer. ECF 68, ¶¶158, 161. Article 307 is irrelevant to this case.

8. Therefore, if the contract provides that the bank will have to transfer funds, it means that it is contractually obliged to do so by virtue of the binding effect of the agreements (Article 221 of the Code of Obligations and Contracts). This Article provides that agreements must be executed in good faith in accordance with the law and practice, and these same practices, even in the absence of a particular contractual provision, oblige the bank to execute transfers. Contrary to Mr. Chaer's allegations, Article 307 of the Commercial Code is irrelevant and its interpretation supports the plaintiffs' claims. One may read in Fabia and Safa comment on this Article under number 48 the following: "However, banks generally accept to make payments on account of the deposit in locations other than the one where the deposit was made, in the form of transfers and against the payment of a fee." This directly implies that the transfer is a means of refunding the deposit.

9. Mr. Waddah el Chaer's assertions regarding wire transfers are also contradicted by AM Bank's Chairman, Mr. Marwan Kheireddine, who has stated that the Banks' refusal to execute wire transfers is illegal. ECF 68, ¶161; ECF 71-59.

10. Mr. Waddah el Chaer's assertions are fundamentally flawed because, as he does not deny, Plaintiffs were entitled to their funds in USD. *See, e.g.*, ECF 41-4, p. 18 (Article 28, subparagraph 2 of the translated account opening document submitted by AM Bank: "Withdrawals from the aforementioned foreign currencies shall be made either by bank transfer issued by the Bank or by wire transfers in those foreign currencies issued upon a written request of the Second Party"); Article 307 of the Code of Commerce ("The bank which receives a sum of money as deposit acquires ownership thereof. It must refund it in one or several installments of equivalent value on the depositor's first request or within the terms of time-limit or prior notice laid down in

the contract"). Giving Plaintiffs a check drawn on BDL that cannot be exchanged for USD but rather can only be deposited in a Lebanese bank does not satisfy this fundamental obligation owed by the Banks. The Banks do not deny that despite their attempts for more than one year, Plaintiffs have still not received any of their USD from the Banks.

11. In his declaration (ECF 80-1), Dr. Patrick Soumrani denies that international transfers are a customary practice alleging that they have not been recognized as such by the trial courts and that decisions rendered by the summary judges cannot consider them as a legal binding practice. ECF 80-1, ¶26. In addition, Dr. Patrick Soumrani asserts that wire transfers are not mentioned in the account opening documents submitted by CL Bank and therefore CL Bank is not obligated to make wire transfers.

12. Nothing in the account opening documents submitted by CL Bank states that CL Bank may refuse a wire transfer instruction. ECF 61-3. Rather, Article 5 of the account opening documents submitted by CL Bank clearly contemplates electronic transfers at the instruction of the client and requires CL Bank to promptly provide clients with a written accounting of such transactions. ECF 61-3, p. 5. Indeed, CL Bank previously executed wire transfer instructions by Plaintiffs and charged Plaintiffs a standard fee for the customary service. ECF 68-11, p. 5.

13. The bank is bound to make international transfers except in the presence of a contrary clause in the account opening agreement. This obligation results from Article 221 of the Code of Obligations and Contracts, which specified the following: "Agreements legally entered into operate as law for those who engaged in them. They must be understood, interpreted and executed in accordance with good faith and business practice." Therefore, even if the account opening agreement does not include any specific provisions on international transfers, the bank is bound to make the said transfers because they are a customary practice. The bank is all the more

bound to execute said transfers if in the past, in its relationship with Plaintiffs, it executed transfers.

14.     The transfer has always been recognized as a common banking transaction the "bank must execute as quickly as possible, not only because a delay may cause a cash flow difficulty to the beneficiary, but also because an event may occur, such as the death of the orderer, which makes the execution of the transfer impossible." (J. Ferronnière, opérations de Banque, num. 95). The transfer may not be replaced by a payment by check because the two transactions are different from one another and the bank must execute its client's instructions without being able to change the nature of the requested transaction.

15.     In addition, payment by check does not provide the customer with funds abroad, and the judgments we mentioned in our first declaration confirm the foregoing. In a decision rendered on 10 November 1962 (Dalloz 1962, p. 199) the Paris Court of Appeal held the bank responsible for not having executed a transfer order on time: "the bank which did not execute the received order to transfer funds abroad with the required celerity, and which is not even able to say on which date it executed the transfer request must repair the damage incurred by the client, as the transfer was executed more than a week after the issuance of the order leading to a loss in the equivalent in the foreign currency."

16.     Unlike the opinion of Dr. Soumrani according to which the decisions of the summary judges are insufficient to raise this practice to the rank of a customary practice (ECF 80-1, ¶26), we consider that neither the summary judge nor the trial court is entitled to establish or create a custom. Their role is to apply the custom, even ex officio, or at the request of the parties, and the role of the summary judge is to put an end to the violation of a right arising from this custom, and that is indeed what the summary judges did when they ordered the banks under penalty to transfer amounts abroad.

17.     Dr. Patrick Soumrani's assertions are fundamentally flawed because, as he does not deny, Plaintiffs were entitled to their funds in USD. Giving Plaintiffs a check drawn on BDL that cannot be exchanged for USD but rather can only be deposited in a Lebanese bank does not satisfy this fundamental obligation owed by the Banks. The Banks do not deny that, despite Plaintiffs' attempts for more than one year, Plaintiffs have still not received any of their USD from the Banks.

18.     In his declaration (ECF 80-2), Professor Nasri Antoine Diab asserts that BLC Bank is not legally obligated to execute wire transfer instructions delivered by Plaintiffs. ECF 80-2, ¶6. Professor Diab is incorrect.

19.     Article 307 of the Lebanese Commercial Code confirms the fundamental obligation of the Banks to return Plaintiffs' USD. Delivering a check that cannot be cashed in Lebanon in equivalent USD and that will be dishonored if it is deposited outside Lebanon is obviously not a return of Plaintiffs' USD.

20.     Moreover, the account opening document submitted by BLC Bank clearly contemplates wire transfers on behalf of Plaintiffs. For example, Article XV.1.A defines "Services" as "the services allowing the carrying out of financial and banking transactions through electronic means." ECF 61-4, p. 11. Moreover, Article XV.1.B identifies the following service available to Plaintiffs: "transferring funds from any of his accounts to another person's account opened with the Bank or with another financial institution, or to another of his accounts opened with another financial institution, provided that the aggregate daily transfers amount shall not exceed the daily services ceiling or its equivalent amount as determined the Bank if the transfer was made in a foreign currency." ECF 61-4, p. 11. Indeed, the account opening document submitted by BLC Bank contains an entire section pertaining to electronic transfers, entitled

"Framework of Electronic Financial and Banking Services and Transactions." ECF 61-4, p. 13.

21.     Therefore, the account opening document submitted by BLC Bank recognizes the customary usage of wire transfers, and does not restrict such transfers to Lebanon. Consistent with the custom, Article 307 of the Lebanese Commercial Code, and the account opening document submitted by BLC Bank to the Court, BLC Bank represented to Plaintiffs that it would make the wire transfer for Plaintiffs. ECF 68, ¶¶15-17, 33. BLC Bank was obligated under Lebanese law to execute the wire transfer.

22.     Moreover, Professor Diab's analysis is flawed because, while he does not dispute that Plaintiffs are entitled to the return of their USD, he fails to acknowledge that Plaintiffs never received their USD. Indeed, as Professor Diab himself has previously written: "The bank which receives money from the depositor is bound to give back the same amount to the depositor (article 307 of the Code of Commerce). The depositor is entitled to get its deposit back from the trusted depository." ECF 71-49, p. 9, ¶8.

23.     As explained in more detail below, the established customary practice of wire transfers cannot be changed unilaterally by the Banks as Professor Diab asserts without citation to any legal authority. ECF 80-2, ¶6.

24.     Article 4 of the Commercial Law gives commercial practices the force of law: In his assessment of the effects of a commercial transaction, the judge shall apply well-established usages, unless it becomes apparent that the parties had agreed to derogate to said usages, and unless such usages are contrary to imperative legal provisions.

**B.    Directives Issued by BDL Cannot Remove Plaintiffs' Rights**

25.     Directives of the BDL are not laws, either in the formal or the practical sense of the term. As a result of the decisions of the summary judges that we submitted in our first declaration,

ordering banks to transfer funds, BDL directives are devoid of any binding value. This qualification is legally founded for the following reasons:

    a.    The preamble of the Lebanese constitution states that the economic system is free and based on free trade. Therefore, any capital control law is questionable from the point of view of its conformity with the Constitution. And therefore, what about BDL circulars, which are administrative acts that have neither the authority to amend a law, let alone, the Constitution; and

    b.    The BDL circulars, which limits transfers abroad are contrary to Article 70 of the Monetary and Credit Act (as amended by Law 133 of October 26, 1999), defined the role of the BDL. Under this text, the purpose of the BDL is in particular to develop and regulate transfers abroad, including electronic transfers. The term "develop transfers" is a key term as it reveals the legislator's intent to develop the place of the Lebanese banking sector in the world. Therefore, BDL directives, which limit transfers abroad are contrary to this text.

### C. Judicial Practice in Lebanon is Against the Right of Depositors to Obtain a Speedy, Just, and Effective Judgment.

26. The fact that disputes between banks and depositors are brought before summary judges reveals two truths, one related to the facts and the other to the law. First, the fact is that there is an urgent need for depositors to transfer funds abroad. Second, the law is that the bank's refusal is a violation of the right to make transfers, and it reverts to the summary judge to put an end to this violation pursuant to Article 659 of the Code of Civil Procedure.

27. Usually, a summary trial must be definitively settled within a period of time that does not exceed a few weeks, especially since the Code of Civil Procedure has given the summary judge the right to sit on public holidays and to shorten response times to submissions. But in reality,

these texts are not applied, whether it is because of the delaying tactics of the banks or the poor functioning of the judicial system. My honorable colleague Dr. Nasri Diab, in his book "The Fundamental Right to Justice (Lebanese Civil Procedure Put to the Test of Fundamental Rights - Ed Delta - LGDG 2005") described this reality very well on page 213:

> The Time and the civil trial maintain a murky relationship: enough, but not too much, they seem to say to each other. Contradictory imperatives are at play, and the proper administration of justice depends on the reconciliation of said imperatives. The judge needs enough time to properly examine the case but not too much under penalty of emptying the case of its substance by causing the loss or the depreciation of the issue at stake. Slowness has positive aspects in that on the one hand, it protects the rights of the defense and, on the other hand, it gives the judge time to settle the dispute. But it also has negative aspects which must be eliminated as much as possible and which are reflected by the dilatory maneuvers of the parties, by the poor functioning of the judiciary public service due to the individual behavior of the judge or the dysfunctioning of the judiciary system as a whole.

Professor Diab clearly recognizes in his work the dysfunctioning and weaknesses of the judicial system in Lebanon. As Professor Diab wrote in 2020, depositors are left "without any real recourse" in Lebanon. ECF 71-49, p. 9, ¶9. While Professor Diab attempts to distinguish his article from the position he now espouses as BLC Bank's declarant by claiming that his article related to a haircut against the depositors while this lawsuit relates to international wire transfers (ECF 80-2, ¶19), his point clearly was that bank depositors suing Lebanese banks in Lebanon will not obtain a remedy while Eurobond holders suing Lebanese banks in New York would have the protection of New York courts. ECF 71-49, p. 9, ¶9. His point was not limited to a single cause of action, but rather applies to any claim against Lebanese banks in the Lebanese judicial system. Moreover, Plaintiffs were not simply denied a wire transfer. They have been denied refund of their USD in violation of Lebanese law.

28.   The Chairman of AM Bank recognized this fundamental flaw in the Lebanese legal system as well in a television interview: "The judiciary in Lebanon, which is supposed to act as a

compass ... a compass for the rights and without judiciary you cannot build a country. Today, if you have a right, you would take it after 10 years delay, I do not think that you will lose your right but it will come after 10 years which is somehow as if it is lost." ECF 71-58,

29. For this reason, I do not agree with my colleagues Professor Diab, Dr Patrick Soumrani, or Mr. Fadi Moghaizel when they cite to decisions rendered by the Court of Cassation and other Lebanese courts to declare that the judicial system works properly because these decisions did not examine the merits of the case but only ordered the stay of execution of judgments rendered by the first instance courts in favor of depositors. ECF 80-2, ¶10; ECF 80-1, ¶¶45-46; ECF 85, ¶13.

30. Notably, the declarants for the Banks do not state whether or not any depositors in the Lebanese cases they cite actually recovered USD. ECF 80-2, ¶10; ECF 80-1, ¶¶45-46; ECF 85, ¶13. They neglect to state the current status of the cases, and whether they have been stayed pending appeal.

31. As noted in my original declaration, even where depositors have had initial success in asserting claims against the banks, the banks appeal and no execution of a judgment occurs. ECF 70, ¶¶31-32.

I declare under penalty of perjury under the laws of the United States that the above is true and accurate.

Dated: March 12, 2021
       Beirut, Lebanon

                                                            Dr. Karim Torbey