```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
 JOSEPH A. DAOU and KAREN M. DAOU,     :
                                       :        20cv4438 (DLC)
                          Plaintiffs,  :
                                       :      OPINION AND ORDER
               -v-                     :
                                       :
 BLC BANK, S.A.L., CREDIT LIBANAIS     :
 S.A.L., AL-MAWARID BANK, S.A.L., and  :
 BANQUE DU LIBAN,                      :
                                       :
                          Defendants.  :
                                       :
-------------------------------------- X
```

APPEARANCES:

For plaintiffs Joseph A. Daou and Karen M. Daou:
Christopher J. Major
Eva Sullivan
Leah Henry
Amit Shertzer
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, NY 10017

For defendants BLC Bank, S.A.L. and Credit Libanais, S.A.L.:
Jeffrey D. Rotenberg
Caroline A. Fish
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020

For defendant Al-Mawarid Bank, S.A.L.:
Gassan A. Baloul
Mitchell R. Berger
Squire Patton Boggs (US) LLP
2550 M Street, N.W.
Washington, D.C. 20037

Joseph S. Alonzo
Squire Patton Boggs (US) LLP
1211 Avenue of the Americas, 26th Floor
New York, NY 10036

For defendant Banque du Liban:
Linda C. Goldstein
Christine Isaacs
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036

Ryan M. Moore
Dechert LLP
2929 Arch Street
Philadelphia, PA 19104


DENISE COTE, District Judge:

Joseph A. Daou and Karen M. Daou bring this action against three Lebanese commercial banks -- BLC Bank, S.A.L. ("BLC Bank"), Credit Libanais, S.A.L. ("CL Bank"), Al-Mawarid Bank, S.A.L. ("AM Bank") (collectively, the "Commercial Bank Defendants") -- and Lebanon's central bank, Banque du Liban ("BDL").  The plaintiffs essentially allege that the defendant banks conspired to deprive the plaintiffs of millions of U.S. dollars that they had deposited in their Lebanese accounts with the Commercial Bank Defendants.  All defendants have moved to dismiss.  For the following reasons, the motions to dismiss are granted.

## Background

The following facts are taken from the first amended complaint ("FAC") and documents properly considered on these motions to dismiss.  The alleged facts are assumed to be true.

Plaintiffs Joseph and Karen Daou are citizens of the United States, domiciled in Florida.  The plaintiffs are also citizens of Lebanon and maintain a residence there.  They own a real estate investment business and a pharmaceutical business in the United States and also invest in Lebanese real estate.

In 2016, Joseph Daou opened dollar-denominated accounts with CL Bank and BLC Bank.  CL Bank and BLC Bank are both privately held Lebanese banks that maintain correspondent accounts at banks in New York.  Joseph Daou opened the accounts while physically present in Lebanon.

When he commenced his relationship with BLC Bank, Joseph Daou executed a document entitled "General Operating Conditions Governing BLC Bank S.A.L.'s Accounts, Products, and Services." That document contained a forum selection clause, which stated that

> [t]he Beirut courts shall have exclusive jurisdiction to hear any disputes arising in connection with these General Conditions and/or relating to the relationship between the Bank and Client.  This exclusive jurisdiction is for the benefit of the Bank which shall be entitled to take action against the Client in any Lebanese or foreign court of its choice in order to defend its rights.

Between 2016 and 2018, the plaintiffs made several transfers, totaling in the millions of dollars, between their United States bank accounts and their BLC Bank and CL Bank

3

accounts.  These transactions were conducted via wire transfer
and completed via correspondent accounts in New York.

In 2019, Lebanon began to experience a political and
economic crisis.  Because of the effects of the crisis,
Lebanon's banks closed for several weeks during October and
November of 2019.  When Lebanese banks reopened, they imposed
restrictions that included weekly caps on withdrawals from
dollar-denominated accounts and limits on transfers from
Lebanese bank accounts to overseas accounts.

During this period, the plaintiffs unsuccessfully sought to
transfer funds from their Lebanese bank accounts to accounts in
the United States.  Joseph Daou repeatedly requested that BLC
Bank and CL Bank convey the plaintiffs' funds to accounts in the
United States via wire transfer, but these requests were
rejected.  The plaintiffs were instead offered checks, which
they accepted.  The checks were drawn against BDL, Lebanon's
central bank, but were signed by representatives of CL Bank or
BLC Bank and included the words "BLC Bank" or "CL Bank" in
Arabic.  The plaintiffs then attempted to deposit the checks at
several banks in the United States, but each bank rejected the
deposits.

On December 2, 2019, Joseph Daou opened two dollar-
denominated bank accounts at AM Bank and deposited millions of

4

dollars in the accounts.  Like BLC Bank and CL Bank, AM Bank is
a Lebanese commercial bank that maintains a correspondent bank
account in New York.  Joseph Daou opened one of the accounts
while physically present at a branch of AM Bank in Lebanon and
opened the second while in the United States.  Upon opening each
account with AM Bank, he signed an agreement containing a forum
selection clause.  That forum selection clause, in relevant
part, stipulated that "[t]he Beirut courts shall have the
exclusive jurisdiction to hear any case or dispute brought up by
the Second Party against [AM] Bank."

     In January 2020, Joseph Daou instructed AM Bank to wire
funds from the plaintiffs' accounts to accounts in the United
States.  As was the case when a similar request was made to BLC
Bank and CL Bank, AM Bank failed to execute the requested wire
transfer and instead offered a check.  The plaintiffs eventually
accepted a check from AM Bank.  As with the BLC and CL checks,
the AM Bank check was drawn on BDL, but included the signature
of an AM Bank representative and the name of AM Bank written in
Arabic.  The plaintiffs attempted to deposit the AM Bank check
in the United States, but the check was rejected.

     The plaintiffs initiated this action on June 10, 2020.
Their complaint alleged common-law claims for issuance of
dishonored check, conspiracy, fraud, breach of contract,

conversion, unjust enrichment, and promissory estoppel, as well as claims under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 et seq., and a Florida statute governing payment of payment of negotiable instruments.

On October 9, the defendants moved to dismiss.  The plaintiffs filed an amended complaint on October 30.  The defendants again moved to dismiss, and the motions to dismiss became fully submitted on January 29, 2021.[1]

On March 12, the plaintiffs renewed a previously filed motion for attachment.[2]  An Order of March 15 stayed consideration of the motion pending resolution of the defendants' motions to dismiss.  On March 18, plaintiffs moved to strike certain declarations submitted in conjunction with the defendants' reply memoranda in support of their motions to dismiss.  In an Order of March 19, briefing in support of the

---

[1] On December 8, 2020, the Pro Se Intake Unit of the United States District Court for the Southern District of New York received a letter from a George Elghossain, requesting assistance in joining this case.  On December 9, this Court issued an Order characterizing Elghossain's letter as a request for intervention pursuant to Rule 24, Fed R. Civ. P, and setting a briefing schedule for any motion to intervene from Elghossain. Elghossain never moved to intervene.

[2] On October 28, the plaintiffs withdrew a motion for an order of attachment they had filed on July 30.

motion to strike was stayed.  The disputed documents were not considered in conjunction with this Opinion.

## Discussion

The defendants have moved to dismiss on several grounds. All defendants have moved to dismiss for lack of personal jurisdiction, requiring dismissal pursuant to Rule 12(b)(2), Fed. R. Civ. P., and for dismissal pursuant to the doctrine of forum non conveniens.  BLC Bank and AM Bank have also moved to dismiss on the grounds that a mandatory forum selection clause requires that this litigation proceed in Lebanon.  BDL argues that it is entitled to sovereign immunity as an agency or instrumentality of Lebanon under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604, requiring dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P.  Finally, all defendants have moved to dismiss for failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P.

When, as is true here, the defendants have presented several jurisdictional arguments, a court "has leeway to choose among threshold grounds for denying audience to a case on the merits," and "there is no mandatory sequencing of jurisdictional issues."  Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431 (2007) (citation omitted).  Instead, a court

may "dispose of an action" on a single appropriate jurisdictional ground, as "considerations of convenience, fairness, and judicial economy so warrant." Id. at 432.  As such, this Opinion will only address one threshold jurisdictional issue for each defendant that is sufficient to resolve the motion.

I.   BLC Bank and AM Bank:  Forum Selection Clause

BLC Bank and AM Bank contend that a forum selection clause in their contracts with the plaintiffs requires the plaintiffs to litigate in Lebanon.  For the following reasons, their motion to dismiss is granted on this ground.

The Supreme Court has instructed that "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of forum non conveniens." Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas, 571 U.S. 49, 60 (2013).  A valid forum selection clause will be given "controlling weight in all but the most exceptional cases." Id. at 63 (citation omitted).  After all, a forum selection clause "may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms." Id. at 66.  "In all but the most unusual cases, therefore, the interest of justice is served by holding parties to their bargain." Id. (citation omitted).

When confronted with a motion to dismiss for <u>forum non
conveniens</u> based on a forum selection clause, a court must first
assess whether the forum selection clause is valid and
applicable to the dispute.  <u>Id</u>. at 62 n.5.  In the Second
Circuit, a forum selection clause is valid and applicable if the
"clause was reasonably communicated to the party resisting
enforcement," the clause is mandatory, and the "claims and
parties in the suit are subject to the forum selection clause."
<u>Martinez v. Bloomberg LP</u>, 740 F.3d 211, 217 (2d Cir. 2014)
(citation omitted).

A forum selection clause will not be enforced, however,
where the resisting party "mak[es] a sufficiently strong showing
that enforcement would be unreasonable or unjust."  <u>Id</u>.
(citation omitted).  Enforcement may be unreasonable or unjust
if

> (1) [the] incorporation [of the forum selection clause
> into the contract] was the result of fraud or
> overreaching; (2) the law to be applied in the
> selected forum is fundamentally unfair; (3)
> enforcement contravenes a strong public policy of the
> forum in which suit is brought; or (4) trial in the
> selected forum will be so difficult and inconvenient
> that the plaintiff effectively will be deprived of his
> day in court.

<u>Id.</u> at 228 (citation omitted).

A party resisting enforcement of a forum selection clause
may also attempt to show that public interest factors weigh

against enforcement of the clause.  <u>Atlantic</u>, 571 U.S. at 64.

"Public-interest factors may include the administrative

difficulties flowing from court congestion; the local interest

in having localized controversies decided at home; [and] the

interest in having the trial of a diversity case in a forum that

is at home with the law."  <u>Id</u>. at 62 n.6 (citation omitted).

These public interest factors "will rarely defeat" a motion to

dismiss for <u>forum non conveniens</u>, however, and "the practical

result is that forum-selection clauses should control except in

unusual cases."  <u>Id</u>. at 64.

A.   The Validity and Applicability of the Forum Selection
     Clauses

BLC Bank and AM Bank each had forum selection clauses in

their contracts with the plaintiffs.[3]  The plaintiffs do not

appear to dispute that the forum selection clauses were

reasonably communicated to them, that the forum selection

clauses are mandatory, and that their claims in this litigation

are subject to these broadly worded clauses.[4]

---

[3] The BLC Bank forum selection clause states in relevant part
that "[t]he Beirut courts shall have exclusive jurisdiction to
hear any dispute . . . relating to the relationship between
[BLC] Bank and the Client."  The AM Bank forum selection clause
states in relevant part that "[t]he Beirut courts shall have the
exclusive jurisdiction to hear any case or dispute brought up by
the Second Party against [AM] Bank."

[4] Plaintiffs argue that the forum selection clause in their
contract with AM Bank is unenforceable under Lebanese contract

Instead, the plaintiffs argue that enforcement of these forum selection clauses would be unreasonable under the circumstances of this case.  Plaintiffs argue that, because of corruption in Lebanon, Lebanon's ongoing political crisis, and the documented mistreatment of U.S. litigants in Lebanon, proceeding with this litigation in Lebanon would be so difficult as to essentially deny them their day in court.  They point to the political power of the defendant banks in Lebanon and U.S. State Department warnings regarding the precarious state of Lebanon's financial system and government.  They also highlight a case in which a plaintiff who sued Lebanese government officials in a U.S. court was improperly detained and mistreated upon her return to Lebanon, suggesting that they face the same risk if this case proceeds in Lebanon and they choose to travel to Lebanon.

These arguments do not overcome the strong presumption in favor of the enforcement of forum selection clauses.  The Second Circuit is "reluctant to find foreign courts 'corrupt' or

_____

law because it binds only the plaintiffs and not AM Bank.  While foreign law may govern certain questions regarding the interpretation of forum selection clauses, "[f]ederal law must govern the ultimate enforceability of a forum selection clause" in federal court.  Martinez, 740 F.3d at 218.  Under federal law, a forum selection clause is enforceable even if it binds only one party.  See Karl Koch Erecting Co., Inc. v. New York Convention Center Development Corp., 838 F.2d 656, 659-60 (2d Cir. 1988).

'biased.'"   In re Arb. between Monegasque De Reassurances S.A.M.
v. Nak Naftogaz of Ukraine, 311 F.3d 488, 499 (2d Cir. 2002).
Because of this general reluctance to call into question the
integrity of a foreign judiciary, a plaintiff must present
particularized evidence as to why the chosen foreign forum is
inadequate in their specific case.  "[B]are denunciations and
sweeping generalizations" regarding a foreign judiciary or
government are not sufficient.  Id. (citation omitted).  While
the plaintiffs' allegations regarding the instability of the
Lebanese government and the mistreatment of a U.S. plaintiff in
Lebanon are of course concerning, the plaintiffs have not
presented facts indicating that they, specifically, would be
victimized or unable to secure a fair hearing if required to
litigate their claims against Lebanese financial institutions in
Lebanon.[5]

---

[5] Other courts in this District have rejected similar arguments
against the enforceability of a forum selection clause requiring
litigation in Lebanon.  See, e.g., du Quenoy v. Am. Univ. of
Beirut, 2019 WL 4735371, at *7-8 (S.D.N.Y. Sept. 27, 2019),
aff'd, 828 F.Appx. 769 (2d Cir. 2020) (holding that an
"allegation that [the defendant] enjoys significant prominence
and political clout in Lebanon" and that Lebanon has experienced
dangerous political instability "is not sufficient to overturn
the forum selection clause"); Iskandar v. Am. Univ. of Beirut,
1999 WL 595651, at *3 (S.D.N.Y. Aug. 9, 1999).  See also Ismail
v. Am. Univ. of Beirut, 246 F.Supp.2d 330, 333 (S.D.N.Y. 2003)
(holding, for forum non conveniens purposes, that Lebanon was an
adequate alternative forum).

12

Moreover, plaintiffs voluntarily conducted business in Lebanon as late as December 2019, when they opened a new account with AM Bank despite their awareness of Lebanon's tenuous political and economic situation and of the difficulties they would likely experience if they attempted to transfer funds out of Lebanon.  In doing so they "must have anticipated the possibility of litigation in" Lebanon when they conducted business there, which included signing contracts that contained mandatory forum selection clauses requiring them to litigate disputes in Lebanon.  Naftogaz, 311 F.3d at 499.  Plaintiffs bear a "heavy burden" to "show unreasonableness" of the enforceability of a forum selection clause.  New Moon Shipping Co., Ltd. v. MAN B&W Diesel AG, 121 F.3d 24, 33 (2d Cir. 1997). They cannot meet it by expressing post hoc concern about the risks of litigation there after voluntarily doing business in Lebanon during a time when difficult economic and political conditions prevailed there.

B.   Public Interest Factors

The plaintiffs contend as well that matters of public interest weigh against enforcement of the forum selection cluases.  The public interest factors, however, also weigh in favor of enforcing the forum selection clauses.

13

New York has minimal interest in this litigation.  None of
the parties are domiciled here and almost none of the relevant
facts occurred here.  Although the plaintiffs point to New
York's interest in maintaining the integrity of its banking
system given its status as a commercial and financial hub, "New
York's interest in its banking system is not a trump to be
played whenever a party . . . seeks to use [New York's] courts
for a lawsuit with little or no apparent contact with New York."
Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co., 23 N.Y.3d
129, 137 (2014) (citation omitted).  By contrast, Lebanon has a
significant interest in a dispute between Lebanese citizen
plaintiffs and Lebanese bank defendants regarding financial
transactions that took place in Lebanon.

Further, the parties dispute the appropriate choice of law
in this case, so resolution of the common-law claims in this
dispute may not involve the application of New York law.  To the
extent that the plaintiffs bring statutory claims, they are
premised on federal law and Florida law, not New York law.  It
would make little sense to burden a New York court and jury with
a case that has little or no factual or legal connection to New
York.  Since this case is covered by valid and applicable forum
selection clauses in the contracts plaintiffs entered with AM
Bank and BLC Bank and the public interest factors weigh in favor

of dismissal, this action is dismissed against AM Bank and BLC Bank on the grounds of <u>forum non conveniens</u>.

II.  BDL:  FSIA

BDL has moved to dismiss on the grounds that it is entitled to sovereign immunity pursuant to the FSIA.  For the following reasons, the motion to dismiss is granted.

"The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court," and "[u]nder the Act, a foreign state is presumptively immune from the jurisdiction of United States courts."  <u>Pablo Star Ltd. v. Welsh Gov't</u>, 961 F.3d 555, 559 (2d Cir. 2020) (citation omitted).  This presumption of sovereign immunity for foreign states extends to their "political subdivision[s]" and "agenc[ies] and instrumentalit[ies]."  28 U.S.C. § 1603(a).

The FSIA also creates certain exceptions to the general presumption of sovereign immunity.  As relevant here, the so-called "commercial activity exception" to the FSIA abrogates sovereign immunity where a claim is:

> based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or <u>upon an act outside the territory of the United States</u> in connection with a commercial activity of the foreign state elsewhere and <u>that</u> act <u>causes a direct effect in the United States</u>.

28 U.S.C. § 1605(a)(2)(emphasis supplied).

For the purpose of the commercial activity exception, "commercial activity" is defined as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  Id.  A "commercial activity carried on in the United States by a foreign state" is defined as "commercial activity carried on by such state and having substantial contact with the United States."  28 U.S.C. § 1603(e).

"A defendant seeking sovereign immunity bears the burden of establishing a prima facie case that it is a foreign sovereign." Pablo Star, 961 F.3d 559-60.  But once a prima facie case is established, "the burden shifts to the plaintiff to make an initial showing that an enumerated exception to sovereign immunity applies."  Id. at 560.  "Once the plaintiff has met its initial burden of production, the defendant bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply."  Id.

A motion to dismiss pursuant to the FSIA is a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P.  Pablo Star, 961 F.3d at 559.  "In

16

resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Fountain v. Karim, 838 F.3d 129, 134 (2d Cir. 2016) (citation omitted).  In resolving a motion to dismiss for lack of subject matter jurisdiction, however, a district court can also "refer to evidence outside the pleadings." Broidy Capital Management LLC v. Benomar, 944 F.3d 436, 441 (2d Cir. 2019) (citation omitted).

The plaintiffs do not dispute that BDL, as Lebanon's central bank, is an agency or instrumentality of Lebanon.  See EM Ltd. v. Republic of Argentina, 473 F.3d 463, 472 (2d Cir. 2007).  Accordingly, BDL is presumptively entitled to sovereign immunity absent a showing that an exception applies.

The plaintiffs argue that the FSIA's commercial activity exception applies because the Commercial Bank Defendants issued checks drawn on BDL to the plaintiffs, which BDL refused to pay. They contend that BDL engaged in the commercial act of issuing and refusing to pay a check, which had a direct effect in the United States when the plaintiffs unsuccessfully attempted to deposit the checks in the United States.

A.    Nexus with Claims in Complaint

In order to determine whether a claim is "based upon" commercial activity, courts look to "the basis or foundation for a claim", and the "gravamen of the complaint." OBB Personenverkehr AG v. Sachs, 577 U.S. 27, 33-34 (2015) (citation omitted).  The inquiry involves first "identify[ing] the particular conduct on which the plaintiff's action is based." Id. at 33.  Then, a court must consider the "degree of closeness . . . between the commercial activity and the gravamen of the plaintiff's complaint." Kensington Int'l Ltd. v. Itoua, 505 F.3d 147, 156 (2d Cir. 2007).  There must be "a significant nexus between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action." Id. at 155 (citation omitted).  This significant nexus requirement involves a "degree of closeness" between the alleged commercial activity and the conduct at the core of the plaintiff's complaint that is "considerably greater than common law causation requirements." Id. at 156 (citation omitted).

Here, the plaintiffs have failed to show a significant nexus between the gravamen of their complaint and BDL's commercial activity.  Plaintiffs' claims arise out of their business relationships with the Commercial Bank Defendants: the gravamen of their complaint is that those banks took their

deposits but refused to return or transfer their funds upon request.  The plaintiffs have no contractual or other direct relationship with BDL.  The checks that gave rise to the plaintiffs' claims were drawn and issued by the Commercial Bank Defendants.  These checks were drawn on the dollar-denominated accounts of the Commercial Bank Defendants at BDL and were not approved or authorized by BDL.  The gravamen of plaintiffs' complaint, then, involves the conduct of the Commercial Bank Defendants in accepting the plaintiffs' deposits, refusing to authorize wire transfers, and issuing the checks.  Under the circumstances, the requisite "degree of closeness" between BDL's alleged commercial activities and the core allegations in the complaint is absent.

B.   Direct Effect in the United States

Moreover, the plaintiffs have not shown that BDL's conduct had a direct effect in the United States.  The Second Circuit has held that, in the context of the commercial activity exception, "an effect is 'direct' if it follows as an immediate consequence of the defendant's activity."  Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 74 (2d Cir. 2010) (quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 618 (1992)).  But "the requisite immediacy is lacking where the alleged effect depends crucially on variables independent of the

conduct" of the foreign state or instrumentality.  Id. at 75
(citation omitted).

Here, any effect in the United States was independent of
BDL's conduct.  The plaintiffs point to their unsuccessful
attempts to deposit in the United States checks issued by the
Commercial Bank Defendants and drawn on the Commercial Bank
Defendants' accounts at BDL.  This effect depended on
independent factors outside of the control of BDL.  Any effect
felt in the United States was contingent on, inter alia, the
Commercial Bank Defendants' decisions to address their disputes
with the plaintiffs by issuing the checks and the plaintiffs'
decision to attempt to deposit those checks in the United
States.

III. CL Bank:  Personal Jurisdiction

CL Bank has moved to dismiss on the ground that this Court
lacks personal jurisdiction over it.  Because there is no
personal jurisdiction over CL Bank, its motion to dismiss is
granted.

"In order to survive a motion to dismiss for lack of
personal jurisdiction, a plaintiff must make a prima facie
showing that jurisdiction exists.  A plaintiff must include an
averment of facts that, if credited by the ultimate trier of
fact, would suffice to establish jurisdiction over the

defendant." <u>SPV Osus Ltd. v. UBS AG</u>, 882 F.3d 333, 342 (2d Cir. 2018) (citation omitted).

The personal jurisdiction determination at issue here involves two steps.[6]  First, a court must look to whether the long-arm statute of the state in which it is located -- here, New York -- authorizes an exercise of personal jurisdiction in the case.  <u>Friedman v. Bloomberg L.P.</u>, 884 F.3d 83, 90 (2d Cir. 2017).  "If the exercise of jurisdiction is appropriate under that statute, the court must decide whether such exercise comports with the requisites of due process."  <u>Id</u>. (citation omitted).  Because, as described below, the plaintiffs have not demonstrated that the New York long-arm statute authorizes an exercise of personal jurisdiction over CL Bank in this case, it is unnecessary to address whether due process permits an exercise of personal jurisdiction in this action.

The plaintiffs claim jurisdiction over CL Bank under the provision of New York's long-arm statute that addresses the transaction of business in New York.  <u>See</u> N.Y. C.P.L.R. §

---

[6] This two-step analysis is more accurately described as the proper analysis for assessing whether a defendant is subject to specific personal jurisdiction.  A different analysis is required when a plaintiff alleges that a defendant is subject to general personal jurisdiction.  <u>See generally</u> <u>Daimler AG v. Bauman</u>, 571 U.S. 117 (2014).  Here, the plaintiffs do not argue that CL Bank is subject to general personal jurisdiction in New York, so all references to "personal jurisdiction" in this Opinion describe specific personal jurisdiction.

302(a)(1).  That provision confers personal jurisdiction when "(1) [t]he defendant [has] transacted business within the state; and (2) the claim asserted [arises] from that business activity."  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d Cir. 2013) (Licci II).  In order to show that the claim arose from the defendant's business activity, there must be an "articulable nexus" or "substantial relationship" between the "business transaction and the claim asserted."  Licci v. Lebanese Canadian Bank, 20 N.Y.3d 327, 339 (2012) (Licci I).

The plaintiffs contend that CL Bank transacted business in the state when it conducted business with them via its correspondent bank accounts in New York.  "[S]tanding by itself, a correspondent bank relationship . . . may not form the basis for long-arm jurisdiction under" § 302(a)(1).  Amigo Foods Corp. v. Marine Midland Bank-New York, 39 N.Y.2d 391, 396 (1976).  But where a "foreign bank[] repeated[ly] [makes] use of a correspondent account in New York on behalf of a [plaintiff]," it may be concluded that the foreign bank defendant transacted business with that plaintiff in New York.  Licci I, 20 N.Y.3d 339.  In order to determine whether a foreign bank's conduct satisfies this standard, "close[] examin[ation]" of the "particular facts in each case" is required.  Id. at 338.

22

"[T]he frequency and deliberate nature of [the] use of [the] correspondent account" may be "determinative" of whether personal jurisdiction is proper.  Licci II, 732 F.3d at 168.

A.    Frequency of Transactions

The plaintiffs have not established that CL Bank transacted business with them in New York.  Plaintiffs point to only four instances in which CL Bank used its New York correspondent account in connection with the plaintiffs.  This is too infrequent to establish that the defendant transacted business with the plaintiffs in New York.  See, e.g., Vasquez v. Hong Kong and Shanghai Banking Corporation, Ltd., 477 F.Supp.3d 241, 258 (S.D.N.Y. 2020) (three transactions insufficient); Community Finance Group v. Stanbic Bank Ltd., No. 14cv5216 (DLC), 2015 WL 4164763, at *4 (S.D.N.Y. 2015) (one transaction insufficient).

Plaintiffs point to Licci I as a case where the New York Court of Appeals affirmed the use of a correspondent account as a basis for personal jurisdiction under § 302(a)(1), but Licci I involved "dozens" of wire transfers that passed through a New York correspondent account.  Licci I, 20 N.Y.2d at 334. Similarly, the district court cases cited by plaintiffs, in which a court found that the defendant bank transacted business in New York, all involved a number of transactions well in excess of the number here.  See Bartlett v. Societe Generale de

23

Banque Au Liban SAL, 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020) ("dozens" of transactions); Averbach v. Cairo Amman Bank, 2020 WL 486860, at *5 (S.D.N.Y. Jan. 21, 2020) (twenty-three transactions).

B.   Nexus with Plaintiffs' Claims

Additionally, plaintiffs have not shown the requisite "articulable nexus" or "substantial relationship" between the claims asserted and CL Bank's use of the correspondent accounts. The gravamen of the plaintiffs' complaint is CL Bank's breach of its contract with the plaintiffs when it failed to return the plaintiffs' funds upon their request in 2019.  But CL Bank's use of the New York correspondent accounts in conjunction with the plaintiffs occurred between 2016 and 2018, in advance of the events that prompt the plaintiffs' complaint.  Moreover, the events at the core of the complaint all took place in Lebanon. See Khalife v. Audi Saradar Private Bank SAL, 129 A.D.3d 468 (1st Dep't. 2015) (plaintiff failed to satisfy the "articulable nexus" or "substantial relationship" requirement in case against Lebanese bank where "all four claims [were] based solely upon actions taken by defendant bank in Lebanon").

## Conclusion

Defendants' motions to dismiss are granted.  The Clerk of Court is instructed to enter judgment for the defendants and

close this case.  All other pending motions, including

plaintiffs' March 12, 2021 motion for attachment and plaintiffs'

March 18, 2021 motion to strike, are denied as moot.


Dated:    New York, New York
          April 9, 2021



                              _____
                                     DENISE COTE
                              United States District Judge

25